# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSE LOPEZ, by his wife and next best friend, SANDRA CARDIEL,

Plaintiff,

v.

STEVAN VIDLJINOVIC, Star No. 4051, JOHN D. GUETTLER, Star No. 5174, JOSE VALDOVINOS, Star No. 11820, ANTONIO J. VALENZUELA, Star No. 14123, MANUEL GONZALEZ, JR., Star No. 11733, ADRIAN VALADEZ, Star No. 15777, ARMANDO ALAMILLO, Star No. 106912, JOSEPH DE MONICA, Employee No. 27496, DANIEL LOPEZ, Star No. 3477, LUIS C. LUQUE-ROSALES, Star No. 15369, Supervising Sergeant MARK E. KEARNS, Star No. 1811, and Watch Commander ROBERT H. DUBIEL, Star No. 194, individually and in their official capacities as police officers for the CITY OF CHICAGO, ILLINOIS, a municipal corporation and a body politic,

Defendants.

No. 12-C-5751

Judge Harry D. Leinenweber

Magistrate Judge Geraldine Soat Brown

Jury Demand

THE DISCOVERY DEPOSITION OF
OFFICER STEVAN VIDLJINOVIC
September 4th, 2013
10:30 A.M.

Called as a witness by the Plaintiff herein, pursuant to the provisions of the Federal Rules of Civil Procedure pertaining to the taking of

depositions for the purpose of discovery, before GLORIA APOSTOLOS SIOLIDIS, C.S.R., License #084-001205, qualified and commissioned for the State of Illinois.

PRESENT:

JOHN P. DE ROSE & ASSOCIATES, by
MR. JOHN P. DE ROSE and
MS. KAITLIN DE ROSE
15 Spinning Wheel Road
Suite 428
Hinsdale, IL 60521 and
CARONE LAW OFFICES, by
MR. FRANCO N. CARONE
2227 North Mannheim Road
Melrose Park, IL 60164

appeared on behalf of the Plaintiffs.

CITY OF CHICAGO - DEPARTMENT OF LAW, by
MR. JOSEPH M. POLICK and
MR. KEVIN R. GALLARDO
30 North LaSalle Street
Suite 900
Chicago, IL 60602

appeared on behalf of the Defendant Police Officers and Paramedics.

CITY OF CHICAGO - DEPARTMENT OF LAW, by
MR. GEORGE J. YAMIN, JR.
30 North LaSalle Street
Suite 900
Chicago, IL 60602

appeared on behalf of the City of Chicago.

I N D E X

WITNESS: OFFICER STEVAN VIDLJINOVIC

| | | Page No. |
|---|---|---|
| EXAMINATION BY: | Mr. DeRose | 4, 299, 305 |
| | Mr. Polick | 290,304 |

E X H I B I T S

(Listed in order in which referenced in deposition.)

| | Page No. |
|---|---|
| Exhibit No. 2B | 34 |
| Exhibit No. 2G | 43 |
| Exhibit No. 2C | 45 |
| Exhibit No. 14B | 73 |
| Exhibit No. 14A | 87 |
| Exhibit No. 14C | 98 |
| Exhibit No. 10 | 145 |
| Exhibit No. 11 | 149 |
| Exhibit No. 12 | 158 |
| Exhibit No. 20 | 174 |
| Exhibit No. 21 | 176 |
| Exhibit No. 6 | 224 |
| Exhibit No. 7 | 240 |
| Exhibit No. 51 | 268 |

MR. DE ROSE: Miss Reporter, would you please swear in the deponent?

THE COURT REPORTER: Raise your right hand please.

(The oath was thereupon duly administered to the witness by the Notary.)

STEVAN VIDLJINOVIC,

Called as a witness by the Plaintiff herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

By: Mr. DeRose

Q Sir, would you please state your name for the record?

**A Stevan V-i-d-l-j-i-n-o-v-i-c.**

Q Mr. Vidljinovic, I am going to try very hard to always pronounce your name correctly. But if I fail to do that in the deposition, you can either correct me, but I hope you don't hold against me that I --

**A I won't take offense.**

Q That I'm having a little problem with it.

**A That's fine.**

Q Officer, have you ever given a deposition before in your experience?

**A No, I have not.**

Q I'm going to give you a little preamble of what you can expect, because the law requires us to do so. And if it covers matters that you and your lawyers have already discussed together, just kind of bear with me, because it's part of the record that we make in this case.

We are going to take this deposition according to all the Rules of the United States District Court for the Northern District of Illinois, the appropriate Rules of the Seventh Circuit Court of Appeals and of the United States Supreme Court that apply to the taking of depositions. We don't expect you to know all those rules. That's why your lawyers are here, to make sure that those rules are followed. And sometimes to discuss those rules, they will interject while you and I are talking together with a word like objection. That does not mean you've done anything wrong; that just means that they need to talk with me about whatever question is on the table for

your consideration.

But no matter how they do it, if you hear any one of your three lawyers here today start to talk, you should immediately stop talking and give them an opportunity to discuss with me whatever the problem is.

After that you should take your direction from your lawyers as to whether you are to answer the question. They are not here to be potted plants. They want to help you. So you want to make sure to do that.

I have seen witnesses from time to time in a deposition go that's all right, counsel, I'll answer that question. It really kind of defeats what your lawyers are here to help you with. So just follow their lead on those matters.

With her machine there, the court reporter has the ability to take down verbatim everything you might have to say.

By the way, have you ever given a deposition before?

**A No, I have not.**

Q All right. Well, with that machine, it's like in a courtroom when you're called to testify. The

reporter can take down verbatim everything that anybody says in this room. She has some important limitations though. First of all, she can only take down people she can hear. So you've got to keep your voice up loudly and clearly so she can hear you at all times.

Secondly, she can only take us down one speaking at a time. And if I'm trying to ask one of my brilliant questions and you're trying to answer the question at the same time, she ends up picking and choosing which one of us to take down. And that is neither fair to me trying to sound like I can ask full, complete, intelligent questions, nor is it fair to you trying to sound like you can answer full, complete and intelligent answers.

I'm going to try to practice what I preach and not interrupt you when you're answering a question. But there are occasions when I raise my hand and say stop, stop, stop. I've heard enough in answer to my question. Now, if I do that to you, you have the right to say but I was not finished with my answer. I will allow you to say that.

Your attorneys are making notes while we

talk here and they will be allowed to follow up with any question I ask at a later time. But sometimes for their own purposes and reasons, they decide they don't want to follow up with any questions. And so if that occurred and they didn't follow up on that question you weren't finished on, at least the record will show that you had some more to say about the particular question if this transcript is ever written up for use in other proceedings.

In the course of this deposition, Officer, we do not want you to guess, because you are the first of many people to be deposed in this case, and if you give us a guess to an answer and we ask another deponent a same or similar question and they come up with a very different answer, lawyers have very suspicious minds, and we'll assume somebody was lying. But the truth of the matter is nobody lied, it's just somebody guessed and didn't tell us they were guessing. So that serves us no purpose. You want to guard against that.

If you don't know an answer to a question, there's no harm in saying I don't know. If you think

Stevan Vidljinovic
September 4, 2013

9

it was something you did know and have since forgotten, you can tell us I don't remember or I've forgotten. And that is all fine.

We do not mean this to be a trial by ordeal. We will take periodic brakes to rest the fingers of this court reporter. She's the only one really working here today. But if we have not taken a break soon enough to accommodate your own personal needs, such as a need to make a telephone call or just to refresh yourself, let us know and we'll interrupt the proceedings and give you an opportunity to accomplish whatever you need during that recess.

You have a right at all times to consult with your lawyers. And we jealously guard that right to do so. All I ask is if there's a question on the table, that you try to answer that question before we break for that private consultation that you will have with your lawyers. And if you say I can't answer the question and I still want to talk to my lawyers, very well. We're going to interrupt.

Is all of that clear?

**A Yes.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

10

Q Because of the jointed way in which I talk to you, I might not have covered everything, but -- oh, I know another thing. When you mean an affirmative answer, we want you to use a word like yes or correct. When you mean a negative answer, we want you to use a word like no or wrong. We don't want you to use sounds like uh-huh, uh-uh. I don't know what the reporter just took down regarding those sounds, but we have a lot of things to argue about in this case. The lawyers don't want to argue about that. No matter how hard you shrug your shoulders or shake your head, we don't get enough sound out of that to take down a record. So you can be demonstrative and also nod in any direction or make body gestures, as long as you be sure to accompany that with actual verbal answers.

Is all that clear?

**A Yes.**

Q All right. Thank you.

Sir, by whom are you employed?

**A The City of Chicago.**

Q And what is your occupation?

**A I'm a police officer.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

11

Q And how long have you been a police officer for the City of Chicago?

**A Just over five years.**

Q I take it your rank is still patrolman at this point?

**A Yes.**

Q And that is the only rank you've had so far, correct?

**A Yes.**

Q Where did you receive your training to be a Chicago Police Officer?

**A At the Chicago Police Academy.**

Q And that was before you actually started your tours of duty as a Chicago Police officers?

**A Yes.**

Q Then you went through a probationary period with the Department?

**A Correct.**

Q And how long was that probationary period?

**A Including the academy?**

Q Yes.

**A 18 months.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

12

Q So for the last three and-a-half years you have been a fully-qualified Chicago Police Officer; is that correct?

**A Just over three and-a-half years, yes.**

Q And how many different districts have you been assigned to?

**A I've only been assigned to one.**

Q And is that the 10th Police District?

**A Yes.**

Q And I would take it you have never been subjected to any kind of discipline as a police officer for the City of Chicago?

MR. POLICK: Objection to the relevance, but you can answer over the objection.

THE WITNESS: I have.

BY MR. DE ROSE:

Q You have been? What was the nature of the discipline, the kinds of things that you have been disciplined for?

MR. POLICK: Again, I'm going to object on the grounds of relevance. And to expedite matters, I'll make a continuing objection on the grounds of relevance

County Court Reporters, Inc.
630.653.1622

to any questioning regarding discipline of this officer. You can answer over the objection.

MR. YAMIN: And I object as to form.

THE WITNESS: I was disciplined when I was notified for court and I did not have the proper uniform, proper attire, and I was disciplined by a Supervisor when I worked in the 10th District by mistakenly discharging a Taser.

BY MR. DE ROSE:

Q And who was the Supervisor who disciplined you for that second event?

**A It was Lieutenant Serb (sic) is the one that created the CR Report.**

Q And can you tell us approximately when that was?

**A I don't recall approximately when it was.**

Q When you discharged your Taser, did you actually strike a person?

**A No, I did not.**

Q All right. So you discharged it accidentally under what kind of circumstances?

**A The protocol is before you take a Taser out,**

**you test it and you point it to the ground so that nobody else will be harmed in the event that there was an accidental discharge. So I pointed it to the ground and it discharged into the ground.**

Q And no one was injured in any way because of that?

**A No, they were not.**

Q And approximately how long ago was that?

**A Approximately almost two years ago, approximately. I'm not sure about the time.**

Q Did you receive any kind of a suspension or discipline as a result of this?

**A I believe it's still pending.**

Q Now, when did you receive your training for the use of the Taser?

**A Approximately, I would say two and-a-half years, three years ago.**

Q It was after you completed your initial assignment in the Police Academy to become an officer?

**A It was completed after my initial probationary period, so it was after 18 months.**

Q So did you go back to the Police Academy or

somewhere else?

**A I went to another location for in-service training.**

Q And where was that?

**A Near north.**

Q And is that a branch of the Chicago Police Department, or a private institution?

**A No, it's a branch of the Chicago Police Department; the tactical unit, the tactical and training unit, that is their location.**

Q And how long was your training on the use of the Taser at that time?

**A I believe it was only one day.**

Q A full day?

**A Eight hours.**

Q And were there other Chicago police officers in attendance at that eight-hour training session?

**A Yes.**

Q Were there officers from other departments who were not with Chicago also in attendance?

**A I can't recall that.**

Q All right. Were you in uniform when you were

receiving that training at the near north -- do they call it the Near North Academy or anything?

**A Training location.**

Q All right. At the Near North training location --

MR. DE ROSE: I forgot what I asked. Would you read it back, please?

(The question was so read by the court reporter.)

THE WITNESS: I don't remember.

BY MR. DE ROSE:

Q Do you remember the name of your training instructor?

**A I do not.**

Q Was it a male or female?

**A It was a male.**

Q Was it only one person who trained you, or were there several different instructors?

**A There were at least two.**

Q And they were both males?

**A Yes.**

Q Did you know the rank or did you refer to

Stevan Vidljinovic
September 4, 2013

17

them as lieutenant or sergeant, the people who were training you?

**A I don't recall.**

Q Have you ever seen the people who trained you again after that one-day training?

**A I don't recall who it was, so I can't answer that.**

Q Did you receive any kind of testing during that one-day training by your instructors to see how you were grasping what they were teaching?

**A Yes.**

Q Was it written testing or verbal testing only?

**A It was a written test, as well as a scenario.**

Q All right. The written test, was it a rather lengthy or rather short written test?

**A I don't recall.**

Q Were you given a grade at the end of that testing?

**A I don't recall if it was a grade or just pass/fail. I'm not sure.**

Q Were there other attendees at the training

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

18

session who you came to know did not pass the training program?

**A I don't recall.**

Q All you know is you passed?

**A Correct.**

Q And after you passed that training, were you given some kind of a certificate?

**A I believe so.**

Q And it was given to you personally to keep, and a copy you believe went into your personnel file?

**A Correct.**

Q And subsequent to that --

By the way, prior to that training, you had not ever been allowed to carry a Taser with you as part of your uniform on your utility belt?

**A Correct.**

Q Subsequent to being advised that you successfully completed that training, did you add a Taser to your utility belt?

**A When a Taser was available, yes.**

Q All right. So there were days when you would go about your assignments for the City of Chicago

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

19

without being armed with a Taser?

**A Every district was allotted a certain amount of Tasers, so when I would start my tour, sometimes none were available for me to take.**

Q So there would be other officers on your tour who would be armed with Tasers on those occasions?

**A On my tour or the tour preceding mine.**

Q But on your tour there was always some officer or officers who were armed with Tasers?

**A Yes.**

Q Do you remember how many Tasers were available in the 10th District over the approximately three years that you have been one of the officers using it?

MR. POLICK: Object to the relevance, but you can answer.

THE WITNESS: In the ballpark of a dozen.

BY MR. DE ROSE:

Q And do you have to sign out the Taser that you're going to use at the beginning of your tour of duty?

**A Yes.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

20

Q And there's a number on the Taser gun that you record somewhere?

**A Yes, there's a model number.**

Q And where do you keep the record of what model number you have on a particular date? What kind of a record is that?

**A There's a clipboard in the room where the Tasers are stored and you fill those out, and I believe the Watch Secretary, after that page is finished, will give it to whichever Supervisor is there at the time.**

Q All right. Are you told at the beginning of the shift by your Shift Supervisor or your Watch Commander whether you're going to be one of the officers who is going to be equipped with a Taser on that particular shift?

**A No. Nobody is designated a Taser for any particular shift. You go there; if there's one available and you want to take it you out, you take it out.**

Q So after your roll call you go in and check and see if there are any Tasers available?

**A Correct.**

County Court Reporters, Inc.
630.653.1622

Q And I take it by your earlier answers, there have been occasions when you went in before your tour of duty started to see if there were any Tasers available, and there just weren't any?

**A Correct.**

Q Do you notify your Watch Commander when you are not able to arm yourself with a Taser?

**A No. It's up to you; if the next shift comes and finishes their tour of duty, they place their Taser back, you can then come into the station and sign out the Taser.**

Q All right. I'm going to come back to some of your training later.

**A Okay.**

Q But I want to start with the date of this event. And I want to start you out with July 22nd, 2011. Do you have some recollection of your work that day?

**A Yes.**

Q All right. What shift were you working?

**A I was working the Midnight shift.**

Q And what are the hours of operation of the

Midnight shift?

**A Anywhere -- I don't know whether our schedule changed at that time or if it was something after, but I knew we'd start between 9:00 and 10:30 to 6:00, 7:30 in the morning.**

Q And you are assigned to a particular squad car?

**A I was. Yes, I was personally signed to a particular squad car.**

Q And was it a two-man squad car?

**A Yes, it was.**

Q And who was your partner?

**A Officer Guettler, G-u-e-t-t-l-e-r.**

Q Had you ever worked with Officer Guettler before the 22nd of July, 2011?

**A Yes.**

Q Was he your regularly-assigned partner?

**A Yes.**

Q Approximately for how long prior to that time?

**A I believe it was only for a matter of months.**

Q And did he continue to be your partner after

the 22nd of July for additional months?

**A Yes.**

Q So all total, is he still your partner?

**A No.**

Q All right. How long were you and Officer Guettler partners?

**A Approximately two years, maybe.**

Q Did the two of you rotate and exchange the obligation of driving the squad car, or did one of you always drive it and the other one always sit in the shotgun seat?

**A No, we always rotated.**

Q Approximately each day, or parts of the particular shift?

**A Normally every other day I would drive.**

Q Do you remember if you were the driver or the one in the shotgun position on the 22nd of July, 2011?

MR. POLICK: Objection to the form. You can answer.

THE WITNESS: I do not recall.

BY MR. DE ROSE:

Q And when one is not the driver, when you have

the non-driving responsibility, are you the one who will answer any calls from dispatch?

**A That varies.**

Q So even the driver may occasionally do that?

**A Correct.**

Q On the 22nd of July, what was the squad car you were driving? Was it a regularly-assigned car, or any car that's in the lot?

**A Regularly-assigned car.**

Q And what is its number?

**A I don't recall.**

Q And so it had been a car that you were familiar with for a period of time before that?

**A We have used it before, yes.**

Q All right. Do you fill out some kind of a form at the beginning of your shift that identifies the particular squad car you are driving?

**A Yes.**

Q Now, I noticed that you were beat, I believe it is 1011R; is that correct?

**A That is correct.**

Q And that will identify a particular vehicle

in the 10th District that you were driving that night or riding in that night?

**A I know that we were driving a Crown Vic vehicle.**

**I misunderstood you when you asked me earlier. When you said regular, I thought you meant regular as in a blue and white, or another one as in an unmarked. I'm sorry. Yes, we were in a marked vehicle.**

Q But I can try to focus in on your particular vehicle. Is there a record that will tell us what that particular vehicle is?

**A Yes. There's an A & A that shows what vehicle you take out on any given date.**

Q So when we see a beat number assigned to your records in this case of 1011R, that will not necessarily identify that vehicle?

**A It will just give you a number; it will not specify what kind of vehicle.**

Q In the 10th District there are squad cars that are assigned with video/audio equipment on them when you make stops, are there not?

**A Yes.**

Q And if I understand it, the way the video/audio equipment works is when you activate your emergency or MARS light equipment, the video/audio automatically goes into operation, correct?

**A Correct.**

Q Have you ever been assigned to a squad car in the 10th District that had video/audio equipment?

**A Yes.**

Q Can you tell us how many squads in the 10th District have that kind of equipment?

**A I cannot.**

Q Are there several?

**A I don't know any more. At the time that we're speaking of there were a few.**

Q And at the time we're speaking of, had you and your partner, Officer Guettler, occasionally driven such a car?

**A Yes.**

Q Do you know if on the 22nd of July, 2011 the Crown Victoria that you were driving was equipped with that equipment?

**A I don't recall.**

Q As I understand it, every shift was to have the maximum number of video/audio equipped squad cars in operation on the shift. Is that your understanding?

MR. YAMIN: Object to form.

MR. POLICK: Join. You can answer.

THE WITNESS: Whatever vehicle that was available for us at the beginning of our shift is a vehicle that we can take out. That doesn't necessarily mean that they were equipped with audio equipment in there.

BY MR. DE ROSE:

Q Would you say as many as half of the 10th District squad cars were at the time of July, 2011 equipped with audio/video equipment?

MR. YAMIN: Objection to foundation.

MR. POLICK: Join. You can answer over the objection.

THE WITNESS: Again, I can't give you a specific. I know that there were a few. I don't know approximately how many.

BY MR. DE ROSE:

Q But less than half of the vehicles, you

believe?

MR. YAMIN: Same objection.

MR. POLICK: Join in the foundation. Objection. You can answer.

THE WITNESS: I do not know. I don't know if it was more than half or less. There were a few.

BY MR. DE ROSE:

Q Would you make a record when you start your shift if you had a squad car that was equipped with audio/video equipment?

**A Yes.**

Q So there would be some kind of a record of whether your vehicle had such equipment, correct?

**A Correct.**

Q And when you start your shift, are you supposed to test that equipment to make sure it's operational before you take your vehicle out?

**A Yes.**

Q How do you test it?

**A You turn on the monitor that is inside, make sure that the lens, the actual monitor is not cracked. You check the recording device that you can put on your**

**vest or leave on the inside to make sure that they are working properly just by turning them on and off. And then if there's any footage prior to the shift before you start, you download that footage so that you have additional footage that if it needs to be recorded while you are on your tour of duty.**

Q And if you find the particular audio/video equipment on the unit you're working with to be malfunctioning, you must immediately report that to your Supervisor or Watch Commander, is that right?

**A You would report it to your immediate Supervisor.**

Q Do you remember who your immediate Supervisor was on 22nd July, 2011?

**A It was Sergeant Kearns.**

Q Had you worked with Sergeant Kearns before?

**A No. He was an acting sergeant from another district that night.**

Q Do you know from what district he was working?

**A The Eleventh District, just north of the 10th District.**

Stevan Vidljinovic
September 4, 2013

Q Had you ever worked with Sergeant Kearns before that night?

**A He was never my immediate Supervisor, no.**

Q Do you know why he was, for lack of a better word, on loan from the Eleventh District to be the Supervisor of your shift that night?

MR. POLICK: Objection to the foundation. You can answer over the objection.

THE WITNESS: Any number of reasons. Our sergeants might have been on furlough and then we would borrow one from another district. That's probably the more general reason.

BY MR. DE ROSE:

Q All right. Did Sergeant Kearns conduct your roll call that evening before you went out on your tour of duty?

**A Usually it's the Watch Commander that would conduct the roll call. I do believe Sergeant Kearns was present though.**

Q And the Watch Commander on the 22nd of July, 2011 was who?

**A Lieutenant Dubiel.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

Q And spell his name.

**A D-u-b-i-e-l.**

Q Did you yourself speak up at all during the roll call or the preparation for your tour of duty about any topic?

MR. YAMIN: Objection to form.

MR. POLICK: Join. You may answer.

THE WITNESS: I don't recall.

BY MR. DE ROSE:

Q Do you remember whether Lieutenant Dubiel gave you any special instructions in that roll call meeting before you went out on your tour?

**A I don't recall.**

Q Was the beat assignment that you got that night, was it confined to a particular geographic area?

**A Yes.**

Q What was the geographic area?

**A The geographic area to our beat, which is 1011, is Roosevelt to 15th Street are the north and south borders. The west border stretches as far as Kenneth. And the eastern border stretches to Central Park.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

Q Give me one second.

Had you ever been assigned to that particular geographical area before that night?

**A Yes.**

Q Was that your regularly-assigned geographical area?

**A Yes.**

Q And I take it already by that night Officer Guettler had been your partner for a few months, so he had also familiarity with that particular geographic area?

**A Officer Gutrey, yes.**

Q I'm sorry. What did I call him?

**A Gutrey.**

Q And I'm not doing that to confuse you. You correct me when I mispronounce.

**A That's fine.**

Q All right. And you started your tour of duty actually on the street in that geographical area about what time?

**A After roll call, roughly around 9:30.**

Q So you're out on the street by 9:30?

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

33

**A Around that time, 9:30.**

Q And your plan will be to keep your tour of duty until about 6:00 A.M.?

**A Correct.**

Q And that means you'll be on the street from 9:30 to 6:30 A.M., unless any kind of an emergency occurs?

**A Well, we were assigned --**

MR. YAMIN: Objection to the form.

MR. POLICK: Join. You may answer.

THE WITNESS: We were assigned nine-hour days. So we had a half-hour lunch and the tour of duty usually ended around 6:00.

BY MR. DE ROSE:

Q All right. Now, your broadcast equipment is tuned in at all times to the Chicago Emergency Dispatch Network?

**A Yes.**

Q While you're riding in your car?

**A Yes, all the time.**

Q And you can hear all the dispatches that are being made by the Chicago Dispatch Center?

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

34

**A Only the Chicago Police side.**

Q So if a 911 dispatcher is communicating to the Chicago Fire Department, those kind of messages are not overheard on your equipment?

**A No, they are not.**

Q All right.

MR. DE ROSE: Now guys, the numbers that I am going to assign to these exhibits will be the same in every depositions. And for my purposes, the particular numbers will be used throughout any proceedings, even in trial. So we don't have to kill too many trees. If you can bring them back, I'd appreciate it. Otherwise, we'll make sure we have a copy for you at every deposition.

MR. POLICK: Okay.

MR. YAMIN: Thank you.

BY MR. DE ROSE:

Q All right. I want you first to look at Exhibit 2B, and that is a Chicago Police Department Event Query. Have you ever seen this document before, Officer?

**A Yes.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

35

Q And it looks like the address of occurrence that this Query concerned is 2451 South Albany Avenue. Do you see that?

**A Yes.**

Q And that is an area in the geographical area that you and your partner were assigned to that night?

**A No.**

Q All right. How far over is your geographical beat assignment from this address?

**A That's closer to Cermak and Albany, and we're by, the closest point is Central Park and 15th. So not very close.**

Q All right. And it looks like the 911 dispatcher received this call on the 22nd of July at 03:21 hours, 3:21 in the morning. Do you see that?

MR. POLICK: I'll object to the foundation, because you have not established he created this document. But you can go ahead and answer the question.

THE WITNESS: From reading this particular document, it shows that the call did come in at 03:21 hours in the morning.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

36

BY MR. DE ROSE:

Q All right. And you did not prepare this document, did you?

**A No, I did not.**

Q All right. But you will from time to time in your practice as a police officer, you do see these kind of Event Queries, don't you?

**A Yes.**

Q All right. Now, then it indicates that the dispatcher entered this information into its system at 3:27 in the morning. Do you see that?

MR. POLICK: Again, I'll object to the foundation, but you can answer over the objection.

THE WITNESS: I don't know the protocol on how they enter information. All I see is that at 3:27 the activity shows entry.

BY MR. DE ROSE:

Q You don't know if that means that communication came over the Chicago Police Department radios at that time, talking about this event?

**A I do not know.**

Q All right. And then at the same time they've

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

37

got an abbreviation there of further activity of ADVD. Do you know what that means?

MR. POLICK: Again, object to the foundation. You may answer.

THE WITNESS: I do not.

BY MR. DE ROSE:

Q All right. And then again at the same hour it looks like they make some remarks that there was a wireless call, Spanish 9359, of a 40-year old male having chest pains. And NFI, I suppose means no further information.

When you read this document, did you know how to interpret these particular entries?

MR. POLICK: Again, I'm going to object to the foundation, first as to when he first saw the document, and then again because he did not prepare this document, there's no foundation for the answer. So you may answer over those objections though.

THE WITNESS: I know some of the terminology that's used because it's used the same for when we get a job dispatched to us in particular. Like NFI does mean no further information.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

38

Other than the wireless call and Spanish on the document, I don't know how it's prepared.

BY MR. DE ROSE:

Q All right. Do you know what the numbers 9359 after the word Spanish mean?

MR. POLICK: Again, I object to the foundation. You may answer.

THE WITNESS: I do not.

BY MR. DE ROSE:

Q All right. But in any event, at some time that morning, do you remember hearing over the air before you had any involvement in the case a communication that there was a 40-year old male having chest pains at 2451 South Albany Avenue?

MR. POLICK: Object to the foundation. You may answer.

THE WITNESS: I don't recall.

BY MR. DE ROSE:

Q Do you monitor all calls or kind of have your ear attuned to hear a call concerning your beat car that you obviously do listen very carefully to?

MR. YAMIN: Objection, form.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

39

MR. POLICK: Join in the objection. You may answer.

THE WITNESS: All calls are classified with priority. If it's directed towards my beat, we respond to that call. If it's somewhere within the parameters of our beat; for example, if a police officer needs assistance, we'll respond to that call. Geographic limitation doesn't come into play then.

BY MR. DE ROSE:

Q But I know that the dispatchers are kind of talking on the air just about your entire shift, aren't they?

MR. POLICK: Object to the form. You may answer.

MR. YAMIN: Same.

THE WITNESS: Depending on how busy that night is is how frequent the dispatchers talk over the radio.

BY MR. DE ROSE:

Q And when they are talking almost incessantly and it is not about matters that concern your beat or close proximity to your geographic area, is it fair to say you gentlemen are trained to kind of tune it out until you hear something that's close to your area?

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

40

MR. YAMIN: Objection to form.

MR. POLICK: Same objection. You may answer.

THE WITNESS: That's incorrect.

We listen to the radio. And like I said, every job is classified with a level of priority. And if that level of priority garners us to go and assist another police officer, or if it's surrounding our beat and we can help out, especially if it's busy, we will go.

BY MR. DE ROSE:

Q All right. In looking at Exhibit 2B, that does not tell you how this initial call was being classified; is that correct?

MR. POLICK: Again, object to the foundation. But you may answer.

THE WITNESS: Well, on the document it shows a priority 1A.

BY MR. DE ROSE:

Q I'm sorry, I don't know. Where are you looking?

**A Between the date and DG, which I believe is district given, it says PRI which stands for priority,**

County Court Reporters, Inc.
630.653.1622

**and 1A which is the highest priority.**

Q So it was a high priority event, right?

**A Correct.**

Q So if this communication went over the air at 3:21 in the morning, this being of the highest priority and it looks like it's an area in the geographic location immediately next to your area, were you paying particular attention to the information that will go on concerning this?

MR. POLICK: Object to the form. It's a hypothetical. And to foundation. You may answer.

MR. YAMIN: Join in those objections.

THE WITNESS: Regarding this particular exhibit in front of me, this particular call, it looks like it was dispatched to a fire, a Chicago fire. For station I would say an ambulance or an engine. I don't recall at this particular call. And it was not in my immediate area.

BY MR. DE ROSE:

Q All right. So although it says Chicago Police Department, from what you're reading here, this would have been, because we see a CFD 112030210, that

this was a call that probably didn't even go over your communications network at the time; is that correct?

MR. POLICK: Again, object to the foundation, but you may answer.

THE WITNESS: Again, I don't know how they dispatched the calls and the terminology that's used. What I can see on this particular Exhibit 2B is that the only person I see receiving the call is CFD. I see no mention of CPD.

BY MR. DE ROSE:

Q All right. Well, we see a service beat right over from the priority and that's 1033. That's a squad car in the 10th District, isn't it?

MR. POLICK: Again, object to the foundation. You can answer.

THE WITNESS: I don't know if they just mean if that's just a particular beat that the occurrence is happening. I don't know whether that's a dispatch to that particular squad car.

BY MR. DE ROSE:

Q All right. And who was manning squad car 1033, I believe it was 1033R that night?

**A 1033 Robert was manned by Officer Alamillo. I might mispronounce his name. It's A-l-a-m-i-l-l-o. And also Officer Valdovinos, V-a-l-d-o-v-i-n-o-s.**

Q Had you ever worked on the same beat with those two officers prior to July 22nd?

**A Normally only two people are assigned to beats. So to my recollection, I have never worked with them on a beat.**

Q I guess I mean had you ever worked with them on the same shift prior to that event?

**A Yes.**

Q Were they regularly following the same kind of a shift pattern as you were as of July 22nd, 2011?

**A I can't speak for them. I don't recall.**

MR. YAMIN: Objection, foundation.

MR. POLICK: The answer can stand. Same objection.

MR. DE ROSE: Kaitlin, would you give them Exhibit 2G?

MR. POLICK: John, before you get to that exhibit, can we take a short bathroom break?

MR. DE ROSE: Of course.

MR. POLICK: Thank you.

(There was a break taken, after which the deposition was resumed as follows:)

BY MR. DE ROSE:

Q Officer, looking at 2B and that priority of 1A, it looks like it's a call about a 40-year old male having chest pains. Do you know why they gave that a high priority?

MR. POLICK: Again, object to the foundation. He did not prepare this document. You can answer over the objection.

THE WITNESS: Again, I don't know why they particularly gave this particular document a 1A. I don't prepare it. And there's a call-taker that decides who should be dispatched to call.

BY MR. DE ROSE:

Q All right. Now I want you to look at this 2G. Now this is again a Chicago Police Department Event Query, and now they've got that same 1A priority on this document. Do you see it?

**A I do.**

Q All right. So it appears that the Chicago Police Department actually put that in their system as a high priority?

MR. POLICK: Again, object to the foundation. You may answer.

THE WITNESS: Again, I don't know how they prepare it. Both documents look the same.

BY MR. DE ROSE:

Q But if you look down under the service beat, it says occurrence beat 1033 and service beat 1033. So this is a priority for the police department also, if you know?

MR. POLICK: Again, object to the foundation. You may answer.

THE WITNESS: I do not know.

BY MR. DE ROSE:

Q All right. Let's go back to Exhibit 2C.

And when we're done, Officer, you'll give all your exhibits, you just make a stack of them, to the court reporter. The lawyers are going to keep theirs. They've got their copy. And I will talk to you about it.

**A Understood.**

Q Now, did you review this particular Event Query at any time in your life before today?

**A Yes.**

Q Now, this is clearly an Event Query that is going over the police dispatch ban that you're receiving in your squad car?

MR. POLICK: Again, object to the foundation, but you can answer.

THE WITNESS: Again, I don't know how they prepare it, but from looking at this exhibit, it looks like it's directed towards police.

BY MR. DE ROSE:

Q All right. And you'll see at the top, again, it's priority 1A, right?

**A Correct.**

Q And DG must be district. What's the G for?

MR. POLICK: Again, object to the foundation. You may answer.

THE WITNESS: Again, I don't know. I can only speculate that it stands for district given which is the 10th.

BY MR. DE ROSE:

Q And that is your district, right?

**A That is the district I was working that night, yes.**

Q And it says service beat 1033, and then disposition or DISP. What does that stand for?

MR. POLICK: Again, object to the foundation. You may answer.

THE WITNESS: From my experience, every dispatcher gives a disposition for every call that they dispatch out to the police officers.

BY MR. DE ROSE:

Q All right. Can you tell from this document who is the dispatcher who is making these entries?

**A No, I can't. From this document it looks like it's at least two different dispatchers.**

Q And where are you picking up the identification of the two dispatchers?

**A Well, if you look at the event chronology, you have a column labeled date. Next to it is activity. Next to it is work station. Work station is where you find the dispatcher work station. Police**

**Department 41 and Police Department 40 are our dispatchers for our zone.**

**And then there's actually a third one that I recognize just by knowing the terminology that Fire Department 87 is the initial work station.**

Q So let's go down to Police Department 41 and 40. The first time we see it, it looks like the dispatcher put out a call at 3:39. Do you see that?

MR. POLICK: Again, object to the foundation. You can answer.

BY MR. DE ROSE:

Q To the 10th District?

**A Again, I don't know how they prepare it and when they receive the calls and when they dispatch them, if the times are correct. But from just looking at Exhibit 2C at 3:39, it looks like the call was dispatched by PD41.**

Q And if that's so, the Fire Department had been dispatched, by the documents we looked at earlier, at least 10 or 15 minutes earlier, weren't they?

MR. POLICK: Again, object to the foundation. You may answer.

Stevan Vidljinovic
September 4, 2013

49

MR. YAMIN: Same objection.

THE WITNESS: I don't recall when the fire was dispatched and how they were dispatched, just because I don't know the workings of being an OEMC dispatcher. All I can tell you is that from reading this document, that at 3:39 a police dispatcher 41 did dispatch the call to a police officer.

BY MR. DE ROSE:

Q And that officer was on beat 1033R, and those were the two officers you identified earlier as -- who were they again?

**A Officer Alamillo and Officer Valdovinos.**

Q All right. When they get dispatched at that point, can you hear that they are being dispatched?

**A Yes. Normally you can hear when a police officer is dispatched to a job.**

Q Do you remember what kind of a response they made when they got dispatched?

MR. POLICK: Again, object to the foundation. You may answer.

THE WITNESS: I can't speak for Officer Alamillo or Valdovinos.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

50

BY MR. DE ROSE:

Q All right. But it looks like they acknowledged the call just seven seconds later, do you see that, at 3:39 and .18 seconds?

MR. POLICK: Object to the foundation. You may answer.

THE WITNESS: Again, I don't know how this document is prepared, but just by reading it, an activity of acknowledgment is shown at 3:39 by beat 1033 Robert.

BY MR. DE ROSE:

Q Do you remember hearing that acknowledgment that night?

**A I don't recall hearing the acknowledgment.**

Q All right. Now let's look just a little bit further. About two minutes later, it looks like beat 1033R made a request over the police radio. Do you see that?

**A Yes, I do.**

Q All right. Now, had you heard anything going over the radio during those intervening two minutes from 3:39 to 3:41 that you remember at all?

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

51

**A I don't recall.**

Q All right. And he put in, that beat 1033 put in a request for a Taser, didn't they?

MR. POLICK: Again, objection to the foundation, but you may answer.

THE WITNESS: From reading the document, it looks like beat 1033R requested a Taser at 3:41 in the morning.

BY MR. DE ROSE:

Q Do you remember hearing that request?

**A I recall hearing a request for a Taser.**

Q And did you recognize the name of the officer or the voice of the officer who was communicating that request?

**A I don't specifically remember if I recognized the voice of the officer requesting the Taser.**

Q When you heard the request for a Taser, you had a Taser on you that night, didn't you?

**A Yes, I was equipped with a Taser that night.**

Q Do you know if there were other officers in the 10th District in the geographical area where the officer was making the request who were also armed with

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

52

Tasers?

**A I can't speak for other officers. I know I was specifically equipped with a Taser that night.**

Q All right. And when you hear the request for a Taser, do you automatically go to any location in the 10th District, or you've got to wait for an assignment to go to the location?

**A Normally, when an officer requests a Taser, that generally means that they need assistance, and then geographic limitations don't apply.**

Q All right. So having heard that, if nobody specifically had requested you, you would go to that location if you were not otherwise engaged, right?

**A Not knowing if anybody else was equipped with a Taser that night, and knowing that I was, if an officer was requesting a Taser, I would go.**

Q All right. Do you remember what you were doing when you heard the request for a Taser?

**A Specifically, no, I don't recall.**

Q But you do remember that you dropped whatever you were doing and went to the location, correct?

MR. POLICK: Objection to the form. You may

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

53

answer.

THE WITNESS: Yes.

BY MR. DE ROSE:

Q All right. And I don't know if we established this yet, but who was driving your squad car that night, you or your partner?

MR. POLICK: Asked and answered. You may answer again.

THE WITNESS: I don't recall who was driving.

BY MR. DE ROSE:

Q So we look at the next entry and it concerns your vehicle and we see now this is just four seconds after he makes the request, there is a note of an assist by 1011R; that's your squad car, right?

**A Yes. On that given night that was our squad car, yes.**

Q So do you remember receiving an actual assignment over the air just four seconds later saying you go to that one, 1011R?

**A I don't remember receiving the specific assignment to go there.**

Q And you do not remember if you or your

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

54

partner communicated with the dispatcher about going to that location, do you?

**A I do not remember.**

Q And there is an acknowledgment at 3:42 in the morning, 3:42 and 11/10ths seconds. The acknowledgment is by your squad car. Do you see that? So that's about a minute later.

**A Yes.**

Q All right. So seeing that, you would not dispute that either you or your partner got on the air and said we acknowledge the call, we're on our way?

**A Again, I don't know whether he went over the air or he went through the PDT to say that we were responding to the call. I don't know the nature of how we responded, but it shows that we did acknowledge it at 3:42.**

Q And when you said the PDT, what's that?

**A That's a computer terminal that's equipped in every, mostly in every squad car. Some squad cars do not have it.**

Q So I take it on the morning of July 22nd, you and your partner were on your way at that point for

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

55

2451 South Albany Avenue; is that correct?

**A We were on our way to that location when a Taser was requested.**

Q And how long does it take you from your geographical responsible area to get over to that area?

MR. YAMIN: In general?

MR. DE ROSE: Yes.

MR. YAMIN: Then objection to the form.

BY MR. DE ROSE:

Q Well, let's say that night?

**A That depends on the time of day. At 3:41 when a Taser was requested, at 3:41 in the morning, traffic is relatively light, so it would not take long at all.**

Q And when you got a call like that, and you already indicated it seems to indicate to you an officer needs assistance, I would take it you would activate your emergency equipment to get from whatever you were doing over to that address on Albany?

**A Correct.**

Q So if you had video equipment in the car, once you activated your emergency equipment, your

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

56

video/audio recording equipment was automatically activated, wasn't it?

MR. POLICK: Again, object to the foundation. It assumes facts not in evidence. But you may answer over the objection.

MR. YAMIN: Also object to form.

THE WITNESS: I don't recall if we did have equipment equipped in our vehicle. But normally, yes, if you do activate your emergency equipment, if you do have equipment, that equipment will be activated.

BY MR. DE ROSE:

Q And you are trained that you're not supposed to turn off the video/audio equipment until after the assignment is completely done, are you not?

MR. POLICK: Objection to the form. You may answer it.

THE WITNESS: Yes, you're supposed to keep it recording.

BY MR. DE ROSE:

Q And are you told that if you turn it off before you complete the particular call or assignment, you have to fill out certain paperwork and explain why

County Court Reporters, Inc.
630.653.1622

you turned it off?

**A I don't recall if you have to fill out certain paperwork if you turn it off prematurely. I know that if I do have it equipped in my car, I never turn it off prematurely, so I've never had to deal with that.**

Q All right. The Supervisor working that night, the Sergeant, the Sergeants' cars, they have video equipment and audio recording equipment also, don't they?

MR. POLICK: Objection to the foundation. You may answer.

THE WITNESS: Some do, some don't.

BY MR. DE ROSE:

Q Do you know if Sergeant -- I forgot his last name.

**A Kearns.**

Q Did Sergeant Kearns' vehicle have video/audio equipment on it that night?

**A I can't answer for Sergeant Kearns. I don't know whether his vehicle had video/audio equipment equipped.**

Q And as you went to that location, you saw and heard other squad cars arriving at the location, didn't you?

**A I don't recall if I heard other squad cars arriving at that location.**

Q But you saw other squad cars arriving?

**A When I arrived at the location, I saw 1033 Robert. I don't recall seeing anybody else.**

Q So you believe you got there before Sergeant Kearns?

**A I don't recall seeing Sergeant Kearns. I can't answer whether I got there before or after. All I know is initially when I arrived on scene at 2451 South Albany, I don't recall seeing Sergeant Kearns.**

Q Is it fair to say by that answer, you don't recall seeing Sergeant Kearns on the scene at all that night?

MR. POLICK: Objection. Misstates the witness's testimony. You may answer over the objection.

THE WITNESS: The question was asked whether I saw other squad cars. I answered initially when I arrived on scene, I don't recall seeing Sergeant Kearns.

BY MR. DE ROSE:

Q All right. But sometime after you arrived on the scene and closely in time to your arrival on the scene, you saw other squad cars arrive, did you not?

MR. YAMIN: Objection to the form.

MR. POLICK: Join. You may answer.

THE WITNESS: I don't know specifically what squad cars, but I do know that there were a couple other squad cars there.

BY MR. DE ROSE:

Q And where did you situate your squad car when you got to the scene?

**A I don't know. I don't recall.**

Q Do you remember seeing Sergeant Kearns there when you got to the scene?

MR. POLICK: Objection. Asked and answered. You may answer over the objection.

THE WITNESS: Throughout the duration of the actual event, from when we arrived to the moment that we left, I recall seeing Sergeant Kearns.

BY MR. DE ROSE:

Q And on the scene while you were there, do you

recall seeing Officer Valenzuela?

**A Yes.**

Q Do you recall seeing Officer Gonzalez?

**A Yes.**

Q Do you recall seeing Officer Valdovinos?

**A Yes.**

Q Do you recall seeing Officer Alamillo?

**A Yes.**

Q Do you recall seeing Officer DeMonica?

**A I do not recall.**

Q Do you recall seeing Officer Lopez?

**A I do not recall.**

Q And you do recall seeing Sergeant Kearns?

**A Yes.**

Q And how about Watch Commander Lieutenant Robert Dubiel?

**A I do not recall.**

Q All right. So can you estimate how long it took you from the time you got the call until the time you actually stepped out of your squad car at the location?

**A By the time that we received the call for the**

**request for a Taser to the time that we actually exited our vehicle, a matter of minutes, a couple minutes.**

Q A couple of minutes?

**A Roughly.**

Q All right. Now, when you arrived on the scene, there was a fire truck there, wasn't there?

**A I don't recall seeing a fire truck.**

Q Did you actually go to the address 4551 South Albany? Is that the address you were going to?

MR. YAMIN: I think you misstated the address, just so the record is clear.

THE WITNESS: Yes.

MR. DE ROSE: Excuse me. Counselor, you're absolutely right.

MR. YAMIN: Just so it's clear.

MR. DE ROSE: I withdraw the question or strike the question.

BY MR. DE ROSE:

Q You went to the location 2451 South Albany Avenue?

**A That's where we went, to 2451 South Albany.**

Q And what kind of a building is located there?

**A It's mainly residential apartment buildings.**

Q Was it an apartment building or just a single-family residence?

**A Speaking of 2451 South Albany in particular?**

Q Yes.

**A I don't recall. I know that when we responded, we responded to the area of 25th and Albany, the intersection.**

Q So you were only going to the general area of that block?

**A Well, the location shows that it is closer to 25th Street, so our route to get there to assist beat 1033 Robert was to take 25th Street from Kedzie.**

Q Is it fair to say you cannot picture in your mind now what the building located at the address 2451 South Albany looks like?

**A Yes. I don't recall what 2451 South Albany looks like in particular.**

Q All right. So when you got there to that scene, do you remember seeing a Fire Department ambulance?

**A I don't recall whether I -- I don't recall**

**when I saw the ambulance. I know that throughout the duration while I was on scene, I did see an ambulance. I just don't know when.**

Q All right. And you say you don't recall seeing a big red fire truck there, though, with men, firemen?

MR. YAMIN: Objection. Misstates his testimony.

MR. POLICK: Same objection. You may answer over the objection.

THE WITNESS: I don't recall seeing a fire truck.

BY MR. DE ROSE:

Q Do you recall seeing firefighters, five or six firefighters in firefighter equipment, on the scene?

**A I don't recall seeing firefighters on the scene with equipment.**

Q All right. Do you recall seeing any paramedics on the scene?

**A Throughout the duration while I was on the scene, I did see paramedics; I just can't pinpoint what time.**

Q And how many paramedics did you see on the

scene?

**A I believe there were two paramedics at the scene.**

Q Were they in uniform?

**A They were in Chicago Fire Department Polo's and slacks, regular attire for paramedics for the Chicago Fire Department.**

Q So that's like the uniform for paramedics?

**A Correct.**

Q Do you remember, were they both female, both male?

**A I don't recall the gender.**

Q All right. When you first arrived on the scene, did you talk to any of the paramedics?

**A I don't recall speaking with any paramedics when I first arrived on scene.**

Q All right. Sometime during the night did you have any conversation with any of the paramedics?

**A I don't recall having a conversation with the paramedics.**

Q Any of them that night?

**A I don't recall.**

Q Did you learn the identity of the paramedics, the names of who they were?
MR. POLICK: Objection to the form.
John, you mean does he know now, or did he know back then?
MR. DE ROSE: Yes.
BY MR. DE ROSE:
Q Have you learned their names or their identity?
**A I don't know the names of the paramedics.**
Q So is it fair to say you never learned the paramedics' names that night and don't remember asking for any identification or identifiers of them at all that night?
**A That night, correct, I do not recall.**
Q And you don't know if you've ever met those paramedics again after that?
**A If I can't recall them on scene, I don't know whether I would have met them later.**
Q All right. So when you first got on the scene, where did you go?
**A I believe I approached Officer Alamillo, who**

**was one of the two people that were on 1033 Robert that requested the Taser.**
Q And you recognized him right away, right?
MR. POLICK: Object to the form. You may answer.
THE WITNESS: Correct.
BY MR. DE ROSE:
Q And you know he was one of the two officers in squad car 1033?
**A Yes, he was one of the two in 1033R squad car.**
Q And when you approached him, where were you physically located, the two of you?
**A I don't recall.**
Q Did your partner go with you as you approached Alamillo?
**A I don't recall.**
Q All right. So had you and your partner developed any kind of a plan of action as you were driving over to the scene?
MR. YAMIN: Objection.
MR. POLICK: Join. You may answer.
THE WITNESS: All we know is that while responding

to the scene, en route, we knew that they needed a Taser. We would talk to the officer that requested a Taser, and then we would take it from there.
BY MR. DE ROSE:
Q All right. Was your partner also armed with a Taser that night?
**A Normally only one car was allowed one Taser. So he was not.**
Q So if you had it, he did not have it; we can be pretty sure of that?
**A Yes.**
Q By the way, does he have occasion when he wears the Taser and you don't?
**A At that time, no.**
Q He wasn't authorized to carry a Taser at that time?
**A I do not believe he took the class.**
Q Has he since taken the class and now authorized to do that?
**A I can't speak for him. I don't know.**
Q All right. When you walked up to Officer Alamillo, was he standing there alone, wherever there

was?
**A I don't recall who Officer Alamillo was standing with, if he was standing with anybody or alone.**
Q All right. What did you say to him and what did he say to you?
**A A generalization of the conversation? Because I don't know verbatim what we spoke about. I know that through past experiences, if somebody were to request police assistance and if it asked for a Taser specifically, I would go over there, ask him what do you need a Taser for; he would give me a general synopsis of the events that occurred.**
Q So you think you asked him that night what do you need a Taser for?
**A It's safe to say I probably did ask him that night.**
Q And was he in contact with any person at that moment, grappling with anyone?
**A I do not recall. I do not believe so.**
Q You think you would remember if he was grappling with someone as you walked up to him, don't

you?

MR. YAMIN: Object to form.

MR. POLICK: Join in the objection. You can answer.

THE WITNESS: I don't recall if he was in contact with anybody.

BY MR. DE ROSE:

Q So when you asked him what do you need a Taser for, what did he tell you?

**A Not verbatim, but the initial call was assist a CFD for apparent drug overdose. And he directed me toward the subject in question that was having the apparent drug overdose.**

Q And when he directed you towards this person, was he suggesting to you that you were to use your Taser on this person?

**A No. It was just a tool that he would like to have in case we did need it, but our whole objective was to get him medical assistance, which was to peacefully escort him to the ambulance which would transport him to a hospital.**

Q Well, did Officer Alamillo, did he tell you

that the person had already verbalized that he did not want any help from the Chicago Fire Department or its paramedics?

**A I can't speak for Officer Alamillo, specifically. All I know is that during my interaction with Mr. Lopez, he was incoherent, incomprehensible, and I could not make out anything that he was saying.**

Q All right. So you yourself, before you took any action, did you talk to anybody on the scene to determine, other than Officer Alamillo, if this individual was refusing medical attention?

MR. YAMIN: Objection as to if he took any action.

MR. POLICK: Join.

BY MR. DE ROSE:

Q Did you try and talk to anyone to say what's going on?

MR. POLICK: Object to the form. You can go ahead and answer.

THE WITNESS: I believe I only spoke to Officer Alamillo. I don't believe I spoke to anybody else on scene. I don't recall speaking to anybody else on scene.

BY MR. DE ROSE:

Q I take it that he did not tell you this man had verbalized already that he was refusing any medical attention?

MR. POLICK: Objection. Assumes facts not in evidence. You may answer over the objection.

THE WITNESS: Again, I can't speak for Officer Alamillo. I do not know the conversation that he had with Mr. Lopez.

BY MR. DE ROSE:

Q Did you ask Officer Alamillo, has the man refused medical attention?

**A Generally when I come on scene, if it's an officer that needs assist, I will go to the officer that requested the assist and ask him what he needs an assist for. He said this individual, Mr. Lopez, was apparently, apparently he was having a drug overdose.**

**The CFD needed to place him in the ambulance to transport him to a hospital. He was incoherent. And our whole objective was to try to peacefully try to place him in the ambulance and transport him to a hospital so he could receive medical**

**attention. That was our objective.**

Q Did you ask Officer Alamillo how he made the determination that this man was suffering from a drug overdose?

**A Officer Alamillo didn't make that determination; it was the call that was dispatched to Officer Alamillo initially.**

Q So someone on the dispatch told him that this was an overdose victim?

**A Looking at Exhibit 2C, fire dispatcher 87 from the work station said that they need CPD for drug overdose. That's when they dispatched the call to 1033R, which is Officer Alamillo and Officer Valdovinos.**

Q At any time that night did you determine how someone determined that this was for a drug overdose?

**A Again, I don't know the workings of OEMC and dispatchers and how they present documents. All I know is that an officer requested a Taser and assistance, and I responded.**

Q All right. Well, let me show you one other exhibit for a moment. And you can keep that one there,

because we'll need it.

**A Okay.**

Q 14B. Officer, I put before you Plaintiff's Exhibit 14B and it looks like a Special Order of the Chicago Police Department Regarding Alcohol and Drug Dependent Persons. Have you ever seen this Special Order before?

**A Yes.**

Q When Special Orders come out, do you have your own book of all the Special Orders of the police department?

**A They are accessible on-line.**

Q And from time to time you have course study in these different Special Orders and how they affect your operations and work as a police officer?

**A From time to time, yes.**

Q Now, this Order is a rather old one. It goes all the way back to July of 1992. Do you see that?

**A Yes. That's the effective date.**

Q And I want you to look with me at Paragraph 2B. And I want to read into the record, and I'm going to -- yes, let me read it into the record and then

we'll have some questions for you.

It says, "Persons who, in the professional judgment of the police officer, are identified as being intoxicated in a public place and who may present a danger to themselves or others and who have apparently not violated a criminal law or committed an Ordinance violation may, if they consent, be assisted to their home if it is located in the district of occurrence.

"They may also be assisted to a public treatment facility, a private treatment facility or other health facility, if they consent, and such a facility is located in the district of occurrence or immediately adjacent districts. If the person refuses the assistance offered, no further police action will be taken."

Do you see where I just read?

**A Yes.**

MR. POLICK: Object under the Rule of Completeness.

BY MR. DE ROSE:

Q Did I read that accurately into the record as you followed along?

MR. POLICK: Same objection under the Rule of

Completeness. You may answer.

THE WITNESS: Yes.

BY MR. DE ROSE:

Q All right. Had you knowledge of this particular Special Order before you went out in your performance of duties on the 22nd of July, 2011?

**A Yes.**

Q All right. I notice that some of the words in the paragraph I read the words "if they consent" are in full caps, and the word "refuses" is in caps. Do you see that?

**A Yes, sir.**

Q Do you know why the words "if they consent" and the word "refuses" are in caps there?

**A To make your argument.**

Q Pardon?

**A To make your argument.**

Q To make my argument about what?

**A That you're saying that your client, Mr. Lopez, did not consent to medical services or assistance, and that he actually refused is what you said. I said that I spoke or attempted to speak to**

**Mr. Lopez and he was incomprehensible and I could not understand what he was saying.**

Q Well, let me ask you a few questions.

Also calling your attention to paragraph E, and then I've got questions about all of this. E reads, for the record, "Sworn members who transport an individual to a facility for treatment will make every reasonable effort to protect the person's health and safety."

Did I read that correctly?

MR. POLICK: Again, object under the Rule of Completeness. You may answer.

THE WITNESS: Yes.

BY MR. DE ROSE:

Q As you went on that assignment that night, did you understand that you had any duty to protect the health and safety of a citizen who was not violating any law and who you were going in assistance of?

MR. POLICK: Objection to the form, but you may answer.

THE WITNESS: As I responded to the call as requested for Taser by 1033R, when I arrived on scene

Stevan Vidljinovic
September 4, 2013

77

he directed me to the individual that CFD initially asked assistance for, and our whole objective was to peacefully attempt to get him on the ambulance to transport him to a hospital without using any force, because he seemed to be incoherent, and we could not understand what he was trying to convey to us.

BY MR. DE ROSE:

Q Did you ask anybody when you arrived on the scene, did any of you understand what he was saying?

**A I only recall speaking to Officer Alamillo and when I spoke -- I can't speak for anybody else. I don't recall speaking to anybody else. But when I spoke to him, I know that Mr. Lopez did not make sense, for lack of a better phrase.**

Q By the way, do you speak Spanish?

**A I speak a little Spanish.**

Q When you first approached Mr. Lopez -- by the way, the man you approached you later learned to be Jose Lopez; is that not true?

**A Yes.**

Q Describe him for us.

**A He was a male Hispanic who to me appeared to**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

78

**be middle-aged. That's all I recall.**

Q How tall was he?

**A I don't recall how tall he was.**

Q How tall are you, Officer?

**A I'm 6'2".**

Q Is it fair to say that he was considerably shorter than you?

MR. YAMIN: Objection to the form.

MR. POLICK: Join. You may answer.

THE WITNESS: It's not fair. I don't recall how tall he was, so I don't know if he was considerably shorter than me.

BY MR. DE ROSE:

Q Well, if he was 5'7', would you consider that considerably shorter than you?

MR. YAMIN: Objection.

MR. POLICK: Objection to form. You may answer.

THE WITNESS: I don't know if I would say considerably. If he was 5'7", he was shorter than me.

BY MR. DE ROSE:

Q And how much did you weigh at that time?

**A I don't recall. 225.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

79

Q To your knowledge, had you ever met this man before that night, or that early morning hour, in your life?

**A To my knowledge, no.**

Q Did you see any women out there on the scene where you were engaged with the officer and then later with Mr. Lopez?

**A Well, throughout the duration while I was on scene, I eventually saw one Hispanic female.**

Q Describe her.

**A Again, a female that appeared to be of Hispanic descent, maybe mid-30's. I don't recall anything else specific.**

Q Can you give us the color of her hair?

**A I don't recall the color of her hair.**

Q Or the length of it; anything like that?

**A No, I cannot. I don't recall.**

Q Do you remember her body build in anyway? Was she slender or plump or anything like that?

**A I don't recall.**

Q Do you remember how she was dressed?

**A No, I do not.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

80

Q You never talked to her at all that night?

**A I don't recall ever speaking to her that night.**

Q All right. Well, the gentleman you came to learn was Jose Lopez, how was he dressed?

**A I don't recall how he was dressed.**

Q It was summertime. Was that a particularly warm night, or anything about the temperature you remember?

**A I don't remember what the temperature was like on that given night.**

Q Jose Lopez wasn't in shorts or anything, that you remember?

**A Again, I don't recall what he was wearing.**

Q All right. And when you first had your attention directed to him, was his back to you, or was he looking in your direction?

**A I don't recall which way he was facing.**

Q All right. And do you recall where you saw him located when you first started to take him in your view?

**A I believe it was somewhere on the street. I**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

81

**don't know an approximate address.**

Q Was there anybody standing around him at that time?

**A I don't recall anybody standing around him.**

Q And where was the partner of Officer Alamillo as you had your attention directed to Mr. Lopez?

**A I don't recall.**

Q Did it then become your assignment after Alamillo had called for the assistance of a Taser, was it now your job to take the action in the case?

**A No. It was a call for a request for a Taser; police officer needed assistance. It was still the assignment of the originally dispatched beat, which was 1033R.**

Q So that would be Alamillo and who else?

**A Alamillo and Valdovinos.**

Q So it's still their call, so I take it you would follow behind them and let them take the immediate action?

MR. YAMIN: Objection to the form.

MR. POLICK: Join in that objection. You may answer.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

82

THE WITNESS: Every situation dictates a different course of action. I don't recall who took the lead or who did not take the lead. I know that it varies.

BY MR. DE ROSE:

Q All right. So we're clear on the record, this fire department needs police assistance for a drug overdose, you were able to equate that with a 40 year-old male, from the earlier call, who was having difficulty breathing?

MR. YAMIN: Objection to the form.

MR. POLICK: Yes. Are we talking about Mr. Lopez?

MR. DE ROSE: Yes.

THE WITNESS: I do not recall anything about a 40 year-old male. All I recall by reading Exhibit 2C, is that 1033 Robert requested a Taser.

BY MR. DE ROSE:

Q All right. The Chicago Police Department Event Query we looked at earlier talks about a 40 year-old man having difficulty breathing, remember?

**A I recall reading Exhibit 2B regarding a 40 year-old man having chest pains with no further information.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

83

Q And so you didn't draw the connection of these two being for the same man?

**A Again, I don't recall a call of a 40 year-old man having chest pains, so how could I make the connection to the request for Taser and the job that 1033R was handling at that time?**

Q All right. But my question is a little bit different.

You yourself, as you were out there hearing about officer needs assistance with a Taser, you did not remember or you did not have in your memory at all that the man they needed to have help with had been complaining of difficulty breathing?

**A I don't recall the initial call of a man having chest pains, so I cannot make the connection that Mr. Lopez was that individual.**

Q So before you took any action, did you yourself, officer, ask the officer who you were talking to, has the man consented to be put in the ambulance?

**A A general conversation that I would have had with Officer Alamillo when I arrived on the scene would be why are you requesting a Taser. And I can't speak**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

84

**verbatim what he told me, but it would have been something along the lines of we're trying to get this guy in the ambulance and he seems to be having a drug overdose and we want to try to get him to the hospital to get him treatment.**

Q All right. But I'm asking, did he either tell you that the man was refusing to get in the ambulance, or did you ask him has the man consented to getting into the ambulance?

**A I don't recall him telling me.**

Q And you didn't inquire yourself?

**A I don't recall myself inquiring. I'm not sure.**

Q All right. Well, in the exhibit I just read in there the last sentence of B, it says "If the person Refuses, the assistance offered, no further police action will be taken."

Is it fair to say that you did not inquire or were not advised by anyone whether the man was refusing the assistance at that time?

MR. POLICK: As to 14B, the Special Order, I'll object under the Rule of Completeness.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

85

MR. YAMIN: Also objection to form, compound.

MR. POLICK: You may answer.

THE WITNESS: No, it's not fair to say, because me and my partner, Officer Guettler, approached Mr. Lopez and asked him personally and attempted to escort him peacefully into the ambulance. So at that time we found out whether he refused medical attention or not.

BY MR. DE ROSE:

Q All right. So as you and your partner approached him, where were the two officers who had the assignment?

**A I believe that me, my partner, Officer Guettler, and Officer Alamillo approached Mr. Lopez. I don't recall where officer Valdovinos was on scene.**

Q As you approached the man, did you approach him from behind?

**A I don't recall what direction he was facing or which route we approached him from.**

Q But he was walking away from you, wasn't he?

MR. YAMIN: Objection to form.

MR. POLICK: Join. You may answer.

THE WITNESS: I don't recall whether he was

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

86

walking away from me or standing there.

BY MR. DE ROSE:

Q But he was about a block and-a-half from that location that was in the dispatch, wasn't he? He was on 25th Street?

MR. YAMIN: Object to form and foundation.

MR. POLICK: Join in those objections. You may answer.

THE WITNESS: I don't recall the approximate distance where he was at the given location that it occurred.

BY MR. DE ROSE:

Q All right. You didn't have to run to catch up with him, did you?

**A I don't recall running.**

Q Do you think you would remember if you had to run to catch up with him?

**A I don't run a lot, so yes, I probably would remember.**

Q And if he was walking away from the house at the address of the call, you believe that you just had to walk at a little faster pace to catch up with him?

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

87

MR. YAMIN: Objection to the form.

MR. POLICK: Join in the objection. It calls for speculation. You can answer over the objection.

THE WITNESS: Again, I don't recall the approximate address that Mr. Lopez was standing at, so I cannot answer whether he was walking away from a particular location or walking away from me.

BY MR. DE ROSE:

Q All right. Let me ask you about a couple of more exhibits.

Did you believe that that day, you were doing this assignment in assistance of the paramedics?

**A I believe that I was asked by 1033R, who requested a Taser, that I was assisting them. I don't recall their initial dispatch job.**

Q All right. Exhibit 14A. Now, this is also a Special Order of the Chicago Police Department, a little later than the last one we looked at. It's dated 27 September, 1995, and it's Special Order SO3-08. Have you ever seen this Special Order before?

**A Yes, I have probably come across this Special Order in the past.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

88

Q And did you know of this Order as of the 22nd of July, 2011 when you were out on the street talking to the officer before approaching Mr. Lopez?

**A I had prior knowledge of the guidelines of the Order in question.**

Q All right. And it's called Assisting Chicago Fire Department Paramedics. Do you see that at the top?

**A Yes.**

Q And it looks like its purpose, No. 1, is, "This directive establishes Department policy regarding requests for assistance by the Chicago Fire Department paramedics." Do you see that?

**A Yes.**

Q All right. And under its policy the Chicago Police Department writes, "It is the policy of the department to assist Chicago Fire Department paramedics in transporting a patient to a hospital whenever a Chicago Fire Department paramedic declares that the situation constitutes a medical emergency and requires police assistance." And then in bold it says, "Department members will not assist in the transporting

County Court Reporters, Inc.
630.653.1622

of a patient who objects to transportation or medical treatment on religious grounds." Do you see that?

**A Yes.**

Q First of all, am I clear that you did not talk yourself to any fire department paramedic before you approached Jose Lopez that night?

MR. POLICK: Objection. Misstates the witness's testimony. You may answer over the objection.

THE WITNESS: I don't recall speaking to any paramedics on the scene.

BY MR. DE ROSE:

Q At any time that night?

**A I don't recall.**

Q All right. So it's fair to say that no fire department paramedic declared in your presence that there was a medical emergency that required your assistance?

MR. POLICK: Again, objection to the form. You can answer.

THE WITNESS: I don't recall.

BY MR. DE ROSE:

Q All right. And now we're down to procedures.

And under A it says -- by the way, up above that the reference is to peace officer assistance during emergencies and Emergency Medical Services Systems Act. Are you familiar with either of those learned treatises?

MR. POLICK: Objection to the form of the question. Where are you referring to in the --

MR. DE ROSE: Under 4, the references.

MR. POLICK: Paragraph 4, okay.

MR. DE ROSE: Yes.

MR. POLICK: Those are a Municipal Code and Illinois Compiled Statutes.

MR. DE ROSE: Right.

MR. POLICK: Not learned treatises. So object on those grounds, but you can answer over the objection.

MR. DE ROSE: And counsel, I called them learned treatises because they are normally drafted by members of our esteemed professional lawyers, but he may not agree they are learned.

MR. POLICK: I call them Municipal Codes and Illinois Compiled Statutes.

MR. DE ROSE: You are definitely right.

BY MR. DE ROSE:

Q Sir, are you familiar with those references?

**A I'm familiar with a generalization of many Municipal Codes and Compiled Statutes.**

Q Let's look under procedures. It says, "A member will assist Chicago Fire Department paramedics in transporting a patient whenever a Chicago Fire Department paramedic declares a medical emergency and, 1, requests assistance in restraining an adult patient who has not objected to transportation or medical treatment on religious grounds." Do you see that?

**A Yes.**

Q Did you have this particular Special Order in mind when you went to work on this call that evening?

MR. YAMIN: Objection.

MR. POLICK: I'm going to object under the Rule of Completeness.

MR. YAMIN: And to form.

MR. POLICK: You may answer over those objections.

THE WITNESS: Generally, I don't recall what I had in mind en route to the request for Taser. All I know is that a police officer asked for assistance, asked

for a Taser, so I tried my best to speedily arrive in the area.

BY MR. DE ROSE:

Q So you thought you were assisting a police officer and not necessarily a Chicago Fire Department paramedic?

MR. POLICK: Objection to form. You may answer.

THE WITNESS: 1033R requested a Taser. 1033R is a Chicago Police beat number. And I somehow, either over the air or through the computer, acknowledged the assist, so I assumed that I was assisting a police officer.

BY MR. DE ROSE:

Q All right. Now look at B, because I want to read that into the record also. It says, "In most life threatening situations, the patient is not actively resisting. However, members are authorized to employ the minimum amount of force necessary to overcome the amount of force exerted by the patient resisting medical assistance or transportation." Do you see that?

MR. POLICK: Again, object under the Rule of

Stevan Vidljinovic
September 4, 2013

93

Completeness. You can answer.

THE WITNESS: Yes, I see it.

BY MR. DE ROSE:

Q Can you estimate at all how many policemen were on the scene that night before you used your Taser?

**A I don't recall how many were on the scene, specifically, before I used my Taser. I know I was there. I know my partner, Officer Guettler was there, Officer Alamillo and Officer Valdovinos. I know that I saw Officer Valenzuela and Officer Gonzalez during the duration, as well as Sergeant Kearns.**

Q And at least two paramedics, right?

**A As well as two paramedics, at least, that were on scene during the duration of the event.**

Q And if there were also six firemen on the scene, you have no recollection of that?

**A I don't recall seeing any firemen.**

Q All right. So as you remember it, there were at least seven or eight men on the scene to deal with Jose Lopez?

MR. YAMIN: Objection.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

94

THE WITNESS: That's not what I said.

Throughout the duration of the event there were possibly seven police officers and two paramedics, but I do not know when they arrived on scene. It could have been before or after.

BY MR. DE ROSE:

Q All right. So but before you unholstered your Taser gun, I take it you know for a fact the four of you were there?

**A Yes.**

Q All right. And you are, I think you said, 6'2"?

**A Correct.**

Q What's the height of your partner?

**A Roughly 6 feet.**

Q And about approximately how much did he weigh?

**A At the time in question, I don't recall how much he weighed. Approximately 170 pounds.**

Q And the two other officers, approximately how tall were they?

**A Officer Alamillo is approximately close to 6**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

95

**feet. Officer Valdovinos is 5'7", if I have to take a rough guess.**

Q All right. But is it fair to say, you're in pretty good physical condition. Would you say the other three officers were all in pretty good physical condition also?

MR. YAMIN: Objection to the form.

MR. POLICK: Join in the objection. You may answer.

THE WITNESS: I can't speak for the physical condition of other officers.

BY MR. DE ROSE:

Q I mean they didn't look unusually portly from having had a donut tour duty, right? They looked like they were not overweight?

MR. YAMIN: Objection to the form.

MR. POLICK: Join in that objection. You may answer.

THE WITNESS: They weren't busting at the seams.

BY MR. DE ROSE:

Q There was more than a sufficient amount of manpower among the four of you to physically overpower

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

96

Jose Lopez that night if you felt like you had to do so, wasn't there?

MR. YAMIN: Objection to form. Calls for speculation.

MR. POLICK: Join in those objections. You may answer.

THE WITNESS: Our objective was never to overpower Mr. Lopez. And when we approached him initially, after me and my partner, Officer Guettler, arrived on the scene, it was only myself, Officer Guettler and Officer Alamillo. I don't recall where officer Valdovinos was, so it was just the three of us.

BY MR. DE ROSE:

Q But the three of you, you were satisfied, although you had no plan to do so, the three of you were physically capable of restraining Jose Lopez physically if you had to?

**A Again, every situation dictates a different course of action.**

**The behavior that your client, Mr. Lopez, was displaying when I approached him was behavior that was similar to other individuals that were under the**

County Court Reporters, Inc.
630.653.1622

**influence of substances such as PCP or cocaine where they are given strength that it takes -- it has, in my personal recollection, taken five or six officers to restrain just one individual.**

Q And you don't remember if there were that many and many more officers on the scene that night?

**A All I can recall is initially approaching Mr. Lopez, there was three of us.**

Q All right. So did you make a plan of attack with Officer Alamillo that when we go over there, we'll be able to tase him and then we can put him in the ambulance?

**A No such plan was ever made. We never made a plan of attack. All I did when I spoke to Officer Alamillo was to ask him why he requested a Taser. And this is not verbatim, but he told me that, "We're trying to escort Mr. Lopez peacefully into the ambulance and transport him to a medical facility to seek treatment."**

**There was no plan of attack comprised by the three of us.**

Q As far as you know it, does the Municipal

Code of the Chicago Police Department allow you to take people into physical custody for medical treatment whether they consent or not?

**A Again, every situation dictates a different course of action. It solely depends on the behavior and actions of that individual.**

Q I want you to look at Exhibit 14C. Now, this is an excerpt from the Municipal Code of the City of Chicago entitled Peace Officer Assistance During Emergencies. Have you ever seen this?

**A Specifically, I don't recall seeing this.**

Q I want to read in the record; then I'm going to ask you a few questions about it. It says, "A peace officer may assist an emergency medical technician, as defined in the Illinois Emergency Medical Services Systems Act 210 ILCS 50/1, et seq, in transporting a person to a hospital licensed to provide comprehensive emergency treatment services when the officer is informed by an emergency medical technician that the situation constitutes an emergency as defined in the Emergency Medical Services Systems Act and that person is in need of immediate hospitalization to protect such

person or others from physical harm. The provisions of this section shall not apply when the person sought to be transported objects to transportation or medical treatment on religious grounds." Do you see that?

**A Yes.**

Q Were you ever taught that a citizen of the community has a right to refuse medical treatment or attention of any kind by police officers or fire department personnel if they just don't want the treatment?

MR. YAMIN: Objection to form.

MR. POLICK: Join in the objection. You may answer.

THE WITNESS: Yes, we were taught that individuals had the right to deny any medical treatment or assistance.

BY MR. DE ROSE:

Q All right. And you had been taught that even before you went out on this particular assignment that night?

**A Yes. It's something that they teach you in the Academy initially.**

Q All right. But you made no inquiry as you went up to Jose Lopez whether he had already, because he had been on the scene for several minutes, been refusing medical treatment and attention?

MR. POLICK: Objection to form. He may answer.

THE WITNESS: I don't recall how long Mr. Lopez was on the scene prior to my arrival. All I know is that when I arrived, I spoke to Officer Alamillo, and then the three of us along with Officer Guettler approached Mr. Lopez to inquire whether he needed medical assistance, at which time he was incoherent and I could not understand him.

BY MR. DE ROSE:

Q So my question still stands. No one told you before you approached him he has been refusing attention for the last 10 or 15 minutes?

MR. POLICK: Objection. Assumes facts not in evidence. You may answer over the objection.

THE WITNESS: I don't recall anybody telling me.

MR. POLICK: John, if I can just interject for a minute. It's just about 1:00. I don't know how much further you've got to go, but --

MR. DE ROSE: Oh, I've got enough. Off the record.

(There was a break taken, after which the deposition was resumed as follows:)

MR. DE ROSE: Would you read back the last question and answer, please?

(The record was so read by the court reporter.)

BY MR. DE ROSE:

Q All right. So as you started towards Jose Lopez, were you in the front of the group of three of you, as you remember it? Were you walking abreast? How did that turn out?

**A I don't recall the formation that we were walking when we approached Mr. Lopez.**

Q And you had not made up any decision as to who was going to address him first or talk to him?

**A No. In my training, it doesn't matter whether you're dispatched to the job or you're assisting on-the-job; everybody has the power to assess the situation. So me and my partner, along with**

**Officer Alamillo, went along with the small synopsis that we were given from Officer Alamillo to assess the situation by trying to engage in a conversation with Mr. Lopez.**

Q Now, as you remember it, all three of you being in uniform, you had a full complement of the accouterments on your utility or service belt?

**A I can't speak for the other two officers. And I don't specifically recall what I had equipped on my belt. I know that I had my service weapon, handcuffs, two Magazines and a Taser.**

Q All right. And you don't believe any of the other two men who were with you had a Taser at the time?

**A I don't recall any of them, either one of them having a Taser.**

Q As you walked up to my client, did you understand that the other officers were expecting you to draw out your Taser before you went up to him?

MR. POLICK: Objection to the form of the question what somebody else believed he was going to do. You can answer over the objection.

THE WITNESS: I can't speak for the other officers. I know that when I respond to an assist requiring a Taser, when I exit my vehicle, I take out the Taser and have it readily accessible in the event that we might need it.

BY MR. DE ROSE:

Q So it's in your hand, but probably pointed down?

**A Correct.**

Q So as you walked up to him, you had the Taser at your side?

**A I don't recall where I had it. I knew that it was in my hand.**

Q All right. But out of its holster?

**A Yes.**

Q Did you notice if either of the other officers had any weapon in their hand such as an ASP, or their service revolver?

**A I can't speak for the other officers. I don't recall them having anything in their hands.**

Q So were you believe the only one who had a weapon at the ready if needed?

**A Yes.**

Q And you did not have your handcuffs at the ready; they were still in your utility belt?

**A Yes, they were still in my belt.**

Q And your partner normally carries handcuffs, doesn't he?

**A Yes.**

Q And you didn't see either of the other two officers with handcuffs in their hands?

**A I don't recall seeing anything in anybody's hands. I can't speak for the other two officers.**

Q All right. So as you went up to my client, you said you don't remember ever having to run. Did you have to walk? Was he walking and you had to walk at a faster pace to catch up with him?

**A I don't recall how quickly I had to, or not so quickly I had to move to get to your client. I don't recall if it was just a walk or a brisk walk. I'm not sure.**

Q Are you walking on the sidewalk, or are you walking on the street or on the parkway? What are you walking on?

**A We were on the street. Your client was also on the street. So we were approaching him, all of us, on the street.**

Q This would be on Albany, or on 25th Street?

**A I don't recall specifically which street. All I know is that we were on a street.**

Q All right. Well, was traffic on the particular street you were on blocked by squad cars and fire vehicles, fire department vehicles?

**A I don't recall if they were blocked. The only vehicles I do recall when I arrived on scene were my vehicle, 1033 Roberts', an ambulance, throughout the duration, not initially, so I don't recall.**

Q Well, is it fair to say you don't remember any traffic, civilian traffic of any kind, such as cars or trucks, going down the street as you were walking in the street?

**A I don't remember any civilian traffic.**

Q At any time?

**A During the time of the event.**

Q All right. Can you estimate for us how long it took you to get in the immediate vicinity of my

client?

**A As opposed to when I exited my vehicle, or after I spoke to Officer Alamillo?**

Q Yeah, after you spoke to the officer. You're right. From the time you left your vehicle, how long do you think it took you to get right up next to my client?

**A Half a minute maybe, maybe a minute max. Half a minute or so.**

Q And is it fair to say during that half a minute my client was walking?

**A I don't recall what your client was doing. I was speaking to Officer Alamillo. He directed me towards your client. All I know is that your client was standing in the street. I don't even know what direction.**

Q All right. Standing in the street. You don't know if he was walking or just standing stationary?

**A I don't know his movements.**

Q As you walked up to my client, did you notice what he was doing with his arms and hands, if anything?

**A I observed him with his fists clenched.**

Q Were his hands at his side with his fists clenched, or did he have them up in a perpendicular, or I guess at a 90-degree angle at his waist?

**A All I recall is that your client had his fists clenched. I don't recall how his arms were positioned.**

Q Did he have a hat on that day?

**A I don't recall his clothing.**

Q Can you tell us, do you remember, did he have any facial hair?

**A I do not recall any facial hair.**

Q All right. Can you picture his face in your mind as you're recounting this today?

**A He just looked like a middle-aged Hispanic man.**

Q But can you actually picture that in your mind now as you tell us that description? Because that is a description.

**A Nothing specific. The only thing that I can recall is that he was a middle-aged Hispanic male, nothing specific.**

Q And you neither knew of and no one had told you that he was wanted by the police for anything?

**A Please repeat the question.**

Q You neither knew that Jose Lopez, or no other policeman or anybody else told you that he was wanted by the police?

**A I spoke to Officer Alamillo on scene and all he said to me was that he seems to be under the influence of a substance, and we tried to escort him to the ambulance so that he can be transported to a medical facility. Nothing more was said to me.**

Q All right. So then the answer to my question would be that you didn't know of anybody claiming he was wanted by the police, there was a warrant out for him, or anything like that?

**A I didn't inquire for such information.**

Q All right. As far as you know, he was not fleeing from police custody as you saw him out there at the street; am I correct?

**A He was standing in the street. That's all I can recall.**

Q So he wasn't fleeing at that point?

Stevan Vidljinovic
September 4, 2013

109

**A He was standing by himself in the street. So yes, it would be a safe assumption to say that he was not fleeing.**

Q All right. So you remember the three of you walking up to him. Did he turn and face you, or did you have to go around to get in front of him?

**A I don't recall what direction we went around to, we went about to speak to Mr. Lopez. All I know is that when we did approach him, the three of us, Officer Guettler was the one that initiated the conversation to see whether he needed medical assistance.**

Q Did you three officers strategically position yourself in a different position around Jose Lopez's body so that you would be off to one side, your partner in another, and Officer Guettler in a third position?

MR. YAMIN: Objection to the form.

MR. POLICK: Join. You can answer.

THE WITNESS: Given the behavior and the manner that Mr. Lopez was standing in with his fists clenched, in my prior experiences, I described it as somewhat of an agressive manner. So I was, through my training, bladed and ready to react, depending on how Mr. Lopez

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

110

was going to react, while my partner was speaking to him.

BY MR. DE ROSE:

Q All right. You say bladed. That's a word I'm not used to. What does the word bladed mean?

**A You're just angled with your weapon away from the individual.**

Q All right. So the way you were bladed, where was your hand that you had your Taser weapon in? Was that blocking his view of the weapon?

MR. POLICK: Objection to the form of the question and to the foundation as to what Mr. Lopez could see. You can answer over the objection.

THE WITNESS: My Taser was in my right hand and it was further away from Mr. Lopez.

BY MR. DE ROSE:

Q So it would be obstructing some of his view of the weapon as you were in your position?

MR. YAMIN: Objection.

MR. POLICK: Objection. Same objection as to the foundation what Mr. Lopez could see. You can answer over the objection.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

111

THE WITNESS: The reason why we stand in a bladed position is we can't predict an individual's actions, so we try to make it as safe for us and everybody else around him, so we try to keep our weapons as far away from the individual that we're interacting with as possible.

BY MR. DE ROSE:

Q As you walked up to him did you say that you had a Taser in your hand so that you could at least let him know that you had the Taser?

**A When we walked up to him, the only conversation that we had with Mr. Lopez was asking him whether he needed medical treatment.**

Q And by the way, when you asked that, before you asked that he seemed to be standing up under his own power and steam?

**A He was upright on his own, yeah, his own power and steam.**

Q And he wasn't teetering or falling over as you noticed him?

**A All I recall is him standing upright in the street with his fists clenched.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

112

Q All right. But he wasn't waddling from side-to-side or anything like that?

**A I don't recall him swaying.**

Q All right. He appeared to you from your vantage point to be a formidable, powerful man that you wanted to be careful with. Is that a fair statement?

**A In my vantage point, he appeared to be under the influence of a substance. With my experience in situations, I've known that people that are influenced with certain substances, for example, cocaine or PCP, can, regardless of stature or size, can prove to be formidable for anybody that's a larger individual. So yes, I was in a bladed position in the event that that was the conclusion.**

Q So what is your answer to my question? Did he appear to be physically formidable as he stood there, without waddling and teetering and falling over?

**A His behavior, I drew the conclusion that he had the potential, if he wanted to, to be formidable.**

Q All right. Now, so we're very clear on this, no one told you and you did not know as you stood there in front of him that he was under the influence of

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

113

anything. Is that fair to say?

MR. POLICK: Objection. Misstates the witness's testimony. He can answer over the objection.

THE WITNESS: Again, earlier I stated that in our job, in our training --

BY MR. DE ROSE:

Q No, no.

**A I know. Let me finish though.**

**In our job, in our training, we come to a scene, and it doesn't whether you're the preliminary investigator, the first person on a scene or assisting, you can assess the situation. And by me assessing Mr. Lopez, it looked like he was under the influence of a substance that I have come to know as PCP or cocaine, because I have dealt with individuals that have been under that same substance.**

Q All right. Now, are you finished with that?

**A Yes, I am.**

MR. DE ROSE: Move to strike it as not responsive to my question. Would you read back my question? And I just want to see if you can answer it.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

114

(The record was so read by the court reporter.)

THE WITNESS: Through my experience, I believed that your client was under the influence of something.

BY MR. DE ROSE:

Q All right. I'm going to ask the question one more time. I know what you're saying, and you have your own conclusions; I'm not going to argue with you about that.

My question is, had anybody told you, or did he tell you himself that my client was under the influence of alcohol or any drug?

MR. POLICK: Objection. Asked and answered. You can answer over the objection.

THE WITNESS: Nobody told me. He was incoherent, so he could not tell me. And I assumed with reasonable belief that he was.

MR. DE ROSE: All right. Move to strike the last part.

BY MR. DE ROSE:

Q Just listen to the question. Counsel are writing notes. They will follow up.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

115

**A Okay, understood.**

Q Because I know you have your own conclusions, and you're entitled to them.

All right. So as you were positioned off in the bladed position, what did your partner say to Jose Lopez?

**A Not verbatim, but my partner approached him and asked him if he was okay, if he needed any medical treatment.**

Q Is that all of it, or you think he mentioned something more?

**A I can't specifically speak for what my partner said to him. I know I was standing next to my partner. All I know with respect to Mr. Lopez is he tried to see if he needed medical treatment and if he was all right.**

Q And did Jose Lopez respond to him?

**A No. Jose Lopez was incoherent. We could not make out what he was saying, at which time my partner approached Jose Lopez and tried to peacefully escort him to the ambulance.**

Q All right. We'll get to that.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

116

**A Okay.**

Q But when you say he was incoherent and you could not make out what he was saying, was he talking in Spanish?

**A No, he was not.**

Q What language was he talking in?

**A He was just making sounds and words. He was saying nothing that was comprehensible to --**

Q Can you remember any of the words he was using?

**A I don't recall. He was just mumbling and saying sounds and different words that didn't make sense to anybody on scene.**

Q Well, if you heard a word like no or I don't want help, would you be able to recognize those words?

MR. POLICK: Objection to the incomplete hypothetical. It assumes facts not in evidence. You may answer with those objections.

THE WITNESS: Of course I would recognize those words.

BY MR. DE ROSE:

Q All right. But as you sit here now, you

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

117

don't remember what specific words he said?

MR. POLICK: Objection. Asked and answered.

BY MR. DE ROSE:

Q Is that correct?

**A I don't know --**

MR. YAMIN: Also, excuse me, mischaracterizes his testimony.

MR. POLICK: Join in that objection as well. Go ahead and answer.

THE WITNESS: I don't recall the words and sounds he was making when he was trying to make conversation.

BY MR. DE ROSE:

Q Can you mimic the sounds for us now?

**A It would be any one of us making a sound or making words, not making sense and not conveying a message, I guess. Like he would be incomprehensible to another human being.**

Q Well, did you tell the man that you could not understand him?

**A I didn't speak to Mr. Lopez. My partner was speaking to Mr. Lopez.**

Q Did you hear your partner saying, "I cannot

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

118

understand your words and sounds?"

**A I don't recall. I can't speak for my partner. I don't recall specifically what he said. I just know the general conversation that they had.**

Q All right. Did you move closer to see if you could understand what Jose Lopez was saying?

**A We were approximately five feet from each other, so he was speaking, saying words and making sounds very loudly. So I didn't need to move closer.**

Q He had a higher voice than normal conversational speech, a louder voice?

**A He was just making, like noises were just coming out of his mouth, just words and sounds. And I was standing five feet away from him. There was no reason for me to step closer.**

Q Did you think he was hollering those words and sounds, or did you think he was using a conversational tone?

**A His tone was a little bit more aggressive than a conversational tone.**

Q Was your partner raising his voice when he talked to Mr. Lopez?

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

119

**A No. I've worked with my partner long enough. He deals with people in a very mild manner and calmly.**

Q All right. So after you heard these sounds and words, what is the next thing that happened?

**A My partner approached Mr. Lopez even closer and attempted to escort him peacefully to the ambulance.**

Q All right. When you say he approached closer, he went right up to Jose Lopez, right next to him?

**A He was fairly close to him, yes.**

Q And did he put his hands on Jose Lopez?

**A I don't recall. All I know is that he pointed to the ambulance and not verbatim said, "Hey, Buddy, let's go see if we can get you checked out. Let's get you some help."**

Q All right. Now, as he moved closer to Jose Lopez and said that, did you also maintain your bladed position, but move closer?

**A I don't recall myself moving closer. I was pretty much approximately five feet from Mr. Lopez the whole time.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

120

Q So you stayed about that distance. And what was the other officer, Alamillo, doing at this time?

**A I don't recall. I know that he came with us to attempt to speak to Mr. Lopez, but I don't recall what happened the minute that my partner started to speak to him.**

Q All right. Did Alamillo now move closer as your partner moved closer to Mr. Lopez while you stayed five feet away?

**A Again, I don't recall the actions of Officer Alamillo. I know that he came with us to approach Mr. Lopez to see if he was okay and try to attempt to escort him to an ambulance; but from the minute that my partner began to speak to Mr. Lopez, I don't recall the actions of Mr. Alamillo, nor where he was standing.**

Q All right. And so when your partner goes up closer and says, "Come on, Buddy, let's see if we can get you some -- I think you said, "get you some help in the ambulance?"

**A He directed his hand, pointed to the ambulance. That's like a gesture to say let's see if we can help you out, so general conversation.**

County Court Reporters, Inc.
630.653.1622

Q All right. So as your partner gestured with his one hand towards the ambulance, did he put his second hand on my client's elbow, arm or back in any way?

**A I can't speak for Officer Guettler. I don't know what he did with his other hand. I know that he gestured towards the ambulance. I believe I saw him gesture towards the ambulance with his other hand.**

Q All right. But at that point you don't know if Officer Guettler was in physical contact with Jose Lopez?

**A I do not know.**

Q All right. And so what was the next thing that happened?

**A Mr. Lopez, with his fists still clenched, began to flail his arms and swing in the direction of Officer Guettler. I wasn't too far away, so swinging in our general direction.**

Q All right. So let's get this.

His hands in the clenched fists, as you walked up, they were outstretched, or were they down at his side?

**A Again, I don't know the position of his arms.**

Q All right. So when he started to flail them, did he raise them up over his head?

**A I mean he just began to flail, no particular direction. He just began to move his arms about.**

Q You didn't see him trying to pull away from a guiding gesture that your partner had put on his shoulder or arm?

**A I can't recall.**

Q And he was considerably shorter than your partner, wasn't he?

MR. YAMIN: Objection. Asked and answered.

MR. POLICK: Join in the objection.

MR. YAMIN: And objection as to form.

THE WITNESS: Again, I can't say how you measure considerably, but yes, he was shorter than my partner.

BY MR. DE ROSE:

Q When he started you say flailing his arms, did he flail both arms, left and right, or only one arm?

**A He flailed both.**

Q And by flailing, you mean he went off to the

side from his arm, or up and down from his shoulder?

**A When someone says flailing, in my belief it's not a particular motion. He's just moving his arms about in every which direction.**

Q And that's about how you would describe it, his arms were going everywhere?

**A Yes. Initially he was flailing his arms before he proceeded to try to take a swing at my partner.**

Q Now, you say initially before he tried to take a swing at your partner. How long was he flailing his arms while you and your partner and Officer Alamillo were out there? A couple of minutes, minute and-a-half?

**A Seconds.**

Q Seconds?

**A From the moment that he began to flail, he only flailed for a matter of seconds and then became to direct those clenched fists at my partner.**

Q All right. When he started to flail, did your partner -- every which way when he was flailing his hands, did your partner and you move back and

retreat at all?

**A My partner was, Officer Guettler was closer to Mr. Lopez because he was talking to him and trying to see what the situation was and attempting to get him in the ambulance. So I know that my partner tried to avoid getting struck.**

Q So how far back did he move?

**A I don't know how far back he moved. He tried to move far back enough so as not to be struck.**

Q When you were five feet away still, did your partner go a distance greater than that five feet so that he now is either abreast or behind you?

**A No. My partner was still in front of me.**

Q All right. And at this point there had been no physical contact between Jose Lopez and anyone else that you saw, correct?

**A That I personally observed, no.**

Q All right. And the very next thing you remember after your partner stepped back, did Jose Lopez swing more than one of his clenched fists?

**A I don't recall, but I believe that he swung multiple times in the direction of my partner and**

Stevan Vidljinovic
September 4, 2013

125

**myself, because we were in the general area.**

Q All right. You're five feet away from him. Did your distance from him ever get closer than five feet?

**A I never approached Mr. Lopez. Mr. Lopez flailed his arms and was moving about. So he moved towards my partner's direction. My partner backed off, which made him closer to me. So yes, Mr. Lopez was nearing my --**

Q How close were you to Mr. Lopez at the closest interval that you were before you used your Taser that night?

**A Approximately three to five feet.**

Q All right. And is it fair to say, being three to five feet away from him, from that vantage point he was unable to reach you with his fists?

**A Again, dealing with individuals who displayed similar behavior to Mr. Lopez, they were able to do things physically that I did not think initially they were able to do. So that's why the Taser was requested; that's why I had it readily accessible, because --**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

126

MR. DE ROSE: All right, stop. I am going to move to strike that as non-responsive.

BY MR. DE ROSE:

Q Maybe you didn't understand my question.

From your vantage point three to five feet away, are you satisfied that he did not have a reach long enough that he could touch you if he continued to flail from three to five feet away from you?

MR. POLICK: Objection. Asked and answered. He can answer over the objection.

THE WITNESS: I felt that my partner and my life was in danger, so I felt that he was capable of doing many things because he was under the influence of some kind of substance.

MR. DE ROSE: Move to strike that.

BY MR. DE ROSE:

Q Listen to the question.

**A Okay.**

Q You don't get to answer what's in your mind at the time.

**A Okay.**

Q From your vantage point three to five feet

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

127

away from him, is it fair to say that you were satisfied that the man was beyond the reach of you?

**A I do not know Mr. Lopez's reach, so I can't say to that.**

Q Did you see my client, Mr. Lopez, come into physical contact with your partner that night?

**A Your client attempted, but --**

Q The answer is no, you did not?

**A Attempted to make physical contact with my partner. My partner was quick enough to react and attempt to get out of the way.**

Q All right. Did you see either your partner or Officer Alamillo try to reach forward and grab and control my client when they saw him flailing his arms?

**A I don't recall seeing anybody trying to control your client as he was flailing his arms.**

Q As a matter of fact, you told them to clear away from him, didn't you?

**A No. I believed that my partner, as well as myself, were in fear of receiving a battery, so I gave the command Taser Taser Taser and deployed my Taser in the center mass area of Mr. Lopez.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

128

MR. DE ROSE: All right. Well, move to strike that. We'll get to all of that. Would you read that question back and see if he can answer just this question?

BY MR. DE ROSE:

Q We'll get to what you did or why you did it, okay?

**A Okay.**

**(The record was so read by the court reporter.)**

THE WITNESS: I don't recall saying anything to anybody.

BY MR. DE ROSE:

Q All right. But you just indicated for us a moment ago you said Taser Taser Taser, correct?

**A My mistake. I don't recall saying those words, "get away from him," to anybody.**

Q All right. But you do recall using the words Taser Taser Taser?

**A Yes.**

Q All right. Had you heard anything else said before you said Taser Taser Taser?

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

129

**A From the moment that he started flailing his arms?**

Q Yes.

**A No, I don't recall hearing anything else up until the moment that I said Taser Taser Taser.**

Q All right. And when you said Taser Taser Taser, that was a signal that you used to tell your brother officers to get out of the way; I'm about to use the Taser weapon, right?

**A Through the training, when I got certified by the Taser, that is protocol in the Chicago Police Department to give that command prior to using it.**

Q All right. And they tell you to use those three words because, as you're trained, that is a warning to other officers to get out of the way?

**A You want people surrounding you to be aware that you are using a Taser.**

Q They are not to take any kind of a position, are they?

MR. YAMIN: Objection to form.

THE WITNESS: I don't believe that it dictates for them to take a particular position. It's just to make

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

130

them aware that a Taser is about to be deployed.

BY MR. DE ROSE:

Q Let's talk about that training that you got.

When you went to the North Side Police Training Center there were several of you officers receiving your training, weren't there?

**A Yes.**

Q And you were advised that during the day each of you were going to have the very unpleasant experience of being tased, weren't you?

**A That's incorrect.**

Q Oh, when you went there they didn't tell you that was going to happen?

**A They said being tased is a voluntary act. You can choose to be tased or choose not to be tased.**

Q And if none of you would volunteer, then they weren't going to use the Taser on anybody that day, as far as you knew?

**A I don't know what they would have done, because people did volunteer. So I don't know what their backup plan would have been if nobody volunteered.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

131

Q Did they get a lot of volunteers?

**A I don't recall. A handful.**

Q Were you one of the volunteers?

**A No, I was not.**

Q Why not?

**A Because I just chose not to be tased. It was a decision that they gave us that I made.**

Q All right. Did they tell you what would be the effect if you were tased?

**A Something to the extent of two probes entering the body and sending an electromagnetic wave between point A and point B.**

Q And did they tell you how that feels when that happens before they asked for volunteers?

**A They didn't go into any specifics. They just said that you become incapacitated; you have no control over your body.**

Q All right. Now, these are the two different instructors, they were both there when they asked for volunteers?

**A At least two different instructors, yes.**

Q And did you guys give a round of applause to

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

132

the volunteers when they said they would let it happen to them?

**A I don't recall.**

MR. YAMIN: Object to form.

BY MR. DE ROSE:

Q You did not want to volunteer because you suspected this was a pretty uncomfortable experience, right?

MR. YAMIN: Objection. Asked and answered, and calls for speculation.

MR. POLICK: Join in the objections.

THE WITNESS: I just chose not to volunteer.

BY MR. DE ROSE:

Q No particular reason?

**A No particular reason.**

Q All right. And in the room where the volunteers were going to be energized by the Taser weapon, there were mats on the floor, weren't there?

**A I don't recall if there were mats on the floor.**

Q Well, did the rest of you officers stand around while these volunteers got tased?

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

133

MR. YAMIN: Objection to form.

THE WITNESS: No. The officer that was about to get tased was being held upright by two other officers that were in the class.

BY MR. DE ROSE:

Q All right. But I mean your vantage point while the different five volunteers had it done to them, you were standing around the area where the volunteers were tased, right, so you could all watch what happened?

**A Again, I don't know how many volunteers specifically, but it was in an auditorium, so we were sitting on carpeted seats of the auditorium.**

Q Oh, you were seated. Were they like up on the stage?

**A They were still on the ground level in front of the stage, so not too far from the stage.**

Q So from where you were seated it was only about five or six, maybe ten feet, at most, from where the tasing event took place?

**A That's a good ballpark estimation, about 10 feet, 15 feet.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

134

Q And the instructors told all of you in the training session that these volunteers are going to have a spotter on either side of them?

**A Yes. That's the way that they did that.**

Q And they explained what the purpose of the spotters was, didn't they?

**A Yes.**

Q What do you remember your instructors told you was the purpose of a spotter?

**A One was to brace the individual that was being tased.**

Q To catch them when they were tased?

**A To bring them down lightly when they were tased.**

Q Were they told, the spotters, to be in physical contact with the person who was about to be tased?

**A Each spotter on each side had one arm underneath the individual that was about to be tased under each of their arms.**

Q And that was already even before Taser darts were expelled?

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

135

**A Correct.**

Q And by the way, did you get to be one of the spotters that day?

**A I don't recall whether I was a spotter or not.**

Q Did they get volunteer spotters?

**A People just willingly would go up.**

Q And they instructed what they expected the spotter to do?

**A Yes.**

Q And did the instructors say when the Taser darts are expelled into the individual, be prepared because the individual can fall any way imaginable; front, back, or to the side?

**A They just said that it incapacitates your body, so you have no control; so just be prepared to hold them up and bring them down lightly. They didn't specify which direction they would fall.**

Q And did the instructors say to bring them down lightly so they are not injured?

**A They were told to bring them down lightly. I mean, an assumption can be made that to avoid injury,**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

136

**yes.**

Q And each one of these volunteers that was tased that day in your training instruction, each one of them always had a spotter on either side of them when each one of them was tased; is that correct?

**A Yes.**

Q There was nobody who was a volunteer who was tased without the assistance of spotters on either side of them?

**A Not to my knowledge.**

Q Did the instructors tell you where in the body you were to tase someone?

**A Center mass.**

Q Center mass, front side or back side?

**A Front side.**

Q And center mass means what, below the chest, at the chest level?

**A The torso area.**

Q All right. So anywhere in the front torso, from the top of the shoulders all the way down to the waistband?

**A You want to avoid the head. So anywhere**

County Court Reporters, Inc.
630.653.1622

**underneath the neck line to the waistband would be considered center mass.**

Q Did they tell you that it was less dangerous if you could tase a suspect on his back side?

**A I don't recall them saying that.**

Q Did they tell you you could tase a suspect on his back side?

**A No, I don't recall.**

Q So by your training, you always wanted to be facing the suspect and trying to tase them in center mass front, right?

**A In ideal situations, yes.**

Q And you know what a dry stun is, don't you?

**A Yes.**

Q And that's without the use of the deployment of the darts, right?

**A That's correct.**

Q Have you been trained how to do the dry tase?

**A We were told about it by the instructors as another option while carrying the Taser, but I don't recall us being shown in particular a dry stun example.**

Q Did they tell you which was the preferable

use of the Taser gun?

**A Every situation dictates itself. In order to dry stun somebody, you would have to dislodge the cartridge that's already in the Taser and try to come up to close proximity of the person to try to dry stun them.**

Q And when you dry stun them, you actually put the muzzle of the Taser gun right up against the person and pull the trigger just like you would when you expel the darts?

**A Yes.**

Q In your experience or your training, once you pull the trigger and you're either dry stunning, or the two darts reach the person's body, there is an electrical current that is produced in the person's body, correct?

**A After making contact?**

Q Yes.

**A Yes.**

Q And for how long is that electrical current going on inside of someone's body?

**A For as long as you have the Taser on.**

Q And how long -- if you hold the Taser trigger down, you can hold it down continuously?

**A Our instructors when I took the Taser program said that by Department regulations, we're only allowed to tase somebody for five seconds, no more.**

Q So do you watch with your watch how long that is?

**A No.**

Q Are you counting 1,001, 1,002 or something like that?

**A I don't recall if I was counting at that time.**

Q A single pull of the trigger on the Taser gun it expels a single charge for five seconds, doesn't it?

**A I know that if you pull the trigger and hold onto it, you can only hold onto it for five seconds. That's my understanding of the use of the Taser through the training that I had.**

Q And you know that you can then pull the Taser trigger an additional time or multiple additional times and put another charge into the individual?

**A The trigger is used to deploy the prongs.**

**There's an actual toggle switch that turns the Taser on and off.**

Q All right. So if you had to put additional charges into an individual, there is a method that you can do that with the gun after the darts have already been expelled; is that not correct?

**A I don't recall if we were taught to perform additional charges with the Taser after the prongs have already been in the subject. I don't recall that.**

Q But do you know how to do it?

**A It would be fairly easy to figure it out. You would just turn the toggle back on and hold down the trigger.**

Q All right. So you just learned that yourself, or somebody taught you that, just turning the toggle back on and off?

**A It's taught that the toggle cuts the bumper, cuts the electricity.**

Q Were you taught how many volts of electricity passed through one's body after one Taser, or during one Taser event?

**A I'm sure they told us, but I don't recall the**

**exact number.**

Q If I suggested 12,000 volts, do you remember hearing that?

**A Again, I don't recall a specific number. I can't even begin to speculate.**

Q Were you instructed that tasing of a person will normally make that person go to the ground?

**A We were instructed that tasing somebody would incapacitate them and have them lose control of their muscles and eventually collapse.**

Q All right. Those volunteers that went through the tasing event there in your training session, did they appear, before the event took place, to be nervous and worried about what they were about to experience?

**A I don't recall the behavior of the volunteers.**

Q Every one of the volunteers who you watched that day, they lost physical control so that they, if they didn't have spotters, would have gone to the ground, correct?

**A There was one individual in my mind I**

**remember that was still was upright.**

Q Some guys or gals can really take a --

**A It all depends on the individual.**

Q And the person that you remember still standing -- by the way, I saw Seagal do that in a police movie years ago, so I picture Seagal doing it.

This person that you saw doing this, was he as big as Seagal, or a huge man like that?

**A I don't recall the stature of the person that still was upright during the tasing.**

Q But you don't know how much holding was going on by the two spotters, right?

**A I do not. I can't speak for the spotters. I do not. I was not holding it.**

Q Well, if I tell you Seagal had no spotters and he stood up during it, you didn't see that movie, did you?

**A No, I did not.**

Q When you said Taser Taser Taser, did you tell your partner and Officer Alamillo, "You guys have got to get over on the sides of him as a spotter?"

**A No, no. It's a command given to make**

**everybody aware that a Taser is about to be deployed. Nothing else is said.**

Q Well, did you wait to deploy the Taser until you had a spotter on either side of him?

**A No, I did not. I was in fear of receiving a battery from the behavior that Mr. Lopez displayed. He went from being an active resister to an assailant, so I used a less lethal device that I had readily accessible to gain compliance.**

MR. DE ROSE: All right. Move to strike everything that you said after the words, "No, I did not," as non-responsive to my question.

THE WITNESS: Okay.

BY MR. DE ROSE:

Q You're going to get a chance today to say all that, but not necessarily in my questioning.

**A Understood.**

Q All right. So when you pointed your Taser, you said Taser Taser Taser and then you pointed it at Jose Lopez, correct?

**A The command is to say the word three times. So I said Taser Taser Taser and then deployed the Taser**

**in the direction of Mr. Lopez.**

Q You pointed it at him first, right?

**A Yes.**

Q And then you knew that the darts were poised and ready to be fired when you pulled the trigger?

**A Correct.**

Q And Mr. Lopez is standing out in the street at this point; he's not running away from you?

**A No. He's aggressively approaching me, swinging, in the area that I was standing.**

Q All right. But he's in the street?

**A Yes.**

Q And the street was a typical City of Chicago street made of asphalt on the top, as you remember it? It wasn't a cement street?

**A I assume that it was an asphalt street, yes.**

Q And when you deployed the Taser, into which part of Jose Lopez's body did you see the darts go?

**A I did not see personally where they went. I directed the Taser to the center mass area of Jose Lopez's body.**

Q If there were two Taser darts in his stomach

Stevan Vidljinovic
September 4, 2013

145

later when he was at the hospital, would that be the general area of target that you were using?

**A Yes.**

Q And were you taught how fast these darts travel through the air when you deploy them from the Taser weapon?

**A I'm sure the course covered it. I don't recall exactly.**

Q Did you ever have any refresher courses in use the Taser?

**A That I do not recall.**

Q All right. Give me one second. I want to just ask if you were -- I'm going to go with Exhibit No. 10, 11 and 12.

Have you ever seen this document, Plaintiff's Exhibit 10 before, sir?

**A Yes.**

Q All right. You see it's talking about a Taser and they give information on it, and it indicates that it's downloaded by Robert Dubiel. That was your Lieutenant Watch Commander that night, right?

**A Correct.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

146

Q And it talks about a serial number of this particular Taser. This is the Taser that you actually used that night?

**A I don't recall the specific serial number of the Taser that I used.**

Q But you made a record of it sometime later, didn't you, when you had to make certain reports about the firing of the Taser gun?

**A Yes.**

Q And we'll get to your reports in a minute. This is a Model X26. Do you see that?

**A Yes.**

Q Now, Taser International has available by 2011 video and audio reproduction capabilities once the Taser becomes unholstered and before deployment right through deployment. Are you aware that Taser International makes such an issue?

MR. POLICK: Objection to the foundation. He can answer over the foundation.

THE WITNESS: I was aware, but none of them were accessible to Chicago police officers that were working in any of the districts at that time.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

147

BY MR. DE ROSE:

Q All right. And as you were aware, the purpose of that audio/video recording capabilities is to record what exactly the officer is confronting when he discharges the weapon, correct?

MR. POLICK: Objection to the form of the question and to foundation. You can answer it over the objection.

THE WITNESS: Again, I don't work for Taser International. I don't know the reasoning behind it. It is a safe assumption to say that that probably would be correct.

BY MR. DE ROSE:

Q Well, how did you learn that they had that available?

**A I believe word-of-mouth. I believe another officer told me.**

Q All right. And it looks like this exhibit was generated on July 22nd, 2011, the same day you went out there, at 4:38 in the morning. Do you see that?

**A Yes.**

Q And that would be about an hour after you

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

148

discharged the Taser, correct?

**A Yes, roughly an hour after.**

Q All right. Because if you look at the bottom entry there, on that same day you discharged your Taser at 3:46 A.M., right?

**A According to the entry, yes.**

Q Is that about the time that you remember discharging?

MR. POLICK: Objection to the foundation. You can answer it.

THE WITNESS: I don't know how Lieutenant Dubiel prepares the reports, and I don't know the workings of OEMC. But roughly around that time would be a good assumption that that's around the time that I discharged my Taser.

BY MR. DE ROSE:

Q All right. And we see handwriting underneath that. It says Lieutenant S-a-h-n-a-s.

**A Sahnas.**

Q Do you know him?

**A He was at that time the Supervisor for the day shift.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

149

Q All right. So in the 10th District, right?

**A Correct.**

Q And he was not on duty when you discharged the Taser that night?

**A I don't recall Lieutenant Sahnas's schedule. I don't know whether he was on duty. I can't speak for him.**

Q All right. Let's go to the next document. It's Exhibit No. 11.

MR. POLICK: I'm going to object to this document on the grounds that it has not been produced to the defendants in this case. I don't know if it's been produced to Mr. Yamin, but I don't recall it being produced to the attorneys for the defendant officers and paramedics in this case.

MR. YAMIN: I haven't seen it.

MR. DE ROSE: I would suggest that I did produce them. But in the event that I did not, I will be using these throughout the depositions, and so I want to make sure you take a copy of this with you.

MR. POLICK: I'll take a copy of it. I'm objecting to it because it's not been produced. I have

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

150

no idea where this document comes from, who wrote it, who the author is; if it's a corporation, if it's the International Association of Chiefs of Police, if it's Taser International. There's no indication from this document as to who its author is. This might have been pulled off the Internet, for all I know.

MR. DE ROSE: It was probably pulled off the Internet.

MR. POLICK: Well, I object on those grounds as well.

MR. DE ROSE: I'll have to check and see if I gave it to you. I thought I did.

MR. POLICK: You're free to ask my client questions about it, but you're going to get a standing objection to this document because, number one, it's never been produced to my knowledge. I have never seen it before, and I have no idea where this document comes from. So if you're going to ask my client any questions concerning Plaintiff's Exhibit No. 11, which is entitled Protocol For Deployment of Tasers, I'm going to have a standing objection to that for the reasons I previously stated. There's no foundation.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

151

And I don't even think this has been produced to us.

MR. DE ROSE: All right. And I will respect that standing objection. So you will not have waived it. If you don't repeat that one throughout the questioning, it will probably get us along further.

MR. POLICK: Right. I'll have a standing objection to any questions you ask my client about it.

MR. DE ROSE: All right.

BY MR. DE ROSE:

Q Now, sir, this Exhibit No. 11, counsel for the City has already indicated what its title is, and it says it's by Scott Roberts, eHOW Contributor, updated on April 15th, 2010. Do you know who Scott Roberts is?

**A I do not.**

Q All right. And it looks like it bears a date before the date of your involvement with Jose Lopez, correct?

**A It does.**

Q All right. Now, look at the first paragraph. It says, "Those state and local law enforcement agencies develop their own protocols for the deployment

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

152

of Tasers, they generally follow guidelines put forth by the Police Executive Research Forum (PERF) and the International Association of Chiefs of Police (IACP).

"Taser International, the largest manufacturer of Tasers, also recommends protocols for safe and effective deployment of the weapons, which incapacitate people through electric probes that either cause uncontrollable muscle spasms (neuromuscular incapacitation, also known as NMI), or painful electric shocks, ("drive stun").

"NMI is usually more effective and is more commonly used."

Do you see where I just read?

**A Yes.**

Q When you were trained by the Chicago Police Department, they only told you about dry stun and they were teaching you the neuromuscular incapacitation with the darts?

**A Yes.**

Q And now it talks about probe areas under there. And it says, "In 2009, Taser International issued a training bulletin to law enforcement agencies

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

153

urging them to avoid shooting probes into people's chests, as doing so may increase the risks of cardiac problems."

Do you see where I just read?

**A Yes.**

MR. POLICK: If you're not going to read any further, I'll object under the Rule of Completeness.

MR. DE ROSE: All right. I won't go any -- well, I'm going to read one more part.

BY MR. DE ROSE:

Q Well, just look at the next line. "Officers should -- and this is only a half a sentence; and counsel would be correct, I'm not completing it. "Officers should ideally shoot probes into the back." Do you see that?

MR. POLICK: Again, object to the Rule of Completeness. Taken out of context. It doesn't complete the paragraph. And there are indications that what you're reading there is not an absolute, based on the completeness of the document.

BY MR. DE ROSE:

Q All right. Do you see where I just read?

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

154

**A Yes.**

MR. POLICK: Same objection.

BY MR. DE ROSE:

Q In your training at the Chicago Police Department, were you told about Taser International's recommendation that you try to tase people in the back?

**A I don't know how credible the originator and the information given to me is, nor the updated date of April 15th, 2010. All I recall is while going through the completion course of having a Taser, all I recall is that the instructors I don't believe said anything based on center mass.**

Q And everybody who volunteered in your training were shot with the Taser darts in front of their body?

**A No, they were shot in separate areas of the body.**

Q And were they ever shot in the back?

**A Yes.**

Q Did the instructor ever tell you that it was preferable, when possible, to deploy the darts to the back area of the person?

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

155

**A I do not recall if an instructor specified that.**

Q An on those occasions when you saw the volunteers tasered in the front area, did they always fall forward, or did they fall backwards?

**A I don't recall how any of the volunteers that were tased fell.**

Q All right. I want you to look under Field Use, No. 2 part of this. And I'm going to read you one sentence here. After the 2 it says, "Whenever possible, officers should avoid deploying Tasers." Then after a few kinds of people it says, "People located in an area where a fall could result in serious injury or death." Do you see where I just read?

MR. POLICK: Again, object under the Rule of Completeness, but you can answer over the objection.

THE WITNESS: Yes, I see where you just read.

BY MR. DE ROSE:

Q When you deployed the Taser on Jose Lopez out there in the street, were you aware that there was a potential that he would fall to the street and strike a portion of his body violently in the fall?

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

156

**A I, through my training, have observed people lose control of their muscles, and their body would collapse. I've also observed somebody stand upright while being tased. So prior to tasing Jose Lopez, I couldn't predict how he would react to the Taser.**

Q But you were aware through your use of spotters in your training that there was potential he could fall very fast to the street there where you were confronting, correct?

**A Anybody losing control of their muscles could collapse to the ground beneath them, yes.**

Q So is your answer that you were aware of the potential that Jose Lopez, when you deployed the Taser to him, would fall to the street and he could strike a portion of his body?

**A I believe that after deploying my Taser to Jose Lopez, he could collapse to the street, yes.**

Q All right, thank you.

And then I want you to go to the next page under No. 3. And I'm going to start with the second sentence on the top of the page. It says, "The manufacturer warns that the involuntary muscle spasms

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

157

Tasers cause could be injurious to people with pre-existing health problems like osteoporosis, hernias, spinal injuries, or soft tissue damage, to name a few. Also, the spasms could cause severe exhaustion in people under the influence of drugs or suffering from any number of respiratory or mental health problems."

Do you see where I just read?

MR. POLICK: Objection under the Rule of Completeness. Taken out of context. You may answer over the objection.

THE WITNESS: Yes, I see where you just read.

BY MR. DE ROSE:

Q Were you trained that using a Taser on a person who is under the influence of drugs can be exacerbating of any injuries the recipient of your Taser darts is going to suffer?

MR. POLICK: Objection to the form of the question.

MR. YAMIN: Also objection; misstates what was just read to him.

MR. POLICK: Join in that objection.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

158

BY MR. DE ROSE:

Q You may answer?

MR. POLICK: You can answer over the objections.

THE WITNESS: I was trained to use a Taser when an individual displayed a behavior that could be described as an assailant. And if somebody was in fear of receiving a battery, as well as myself or fellow officers, that's when I was trained to use a Taser. I don't recall anything else.

BY MR. DE ROSE:

Q All right. So then in answer to my question, you say you don't recall ever being advised that using a Taser against a person who you believe is under the influence of drugs will exacerbate the effects on that person?

**A I cannot recall.**

MR. DE ROSE: All right. Let me look at No. 12, please.

MR. POLICK: Again, as to Plaintiff's Exhibit 12, I'll represent for the record that this has never been produced to counsel for the defendant officers during the course of this litigation, which is months since

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

159

the discovery at this point. I can't speak for counsel for the City, but I know this has not been produced to us.

This appears to be some type of Chicago Tribune article regarding the use of Tasers. So I'll object to it as hearsay, and rank hearsay as that.

And if you ask my client any questions about this document, I will have a standing objection to it on those grounds, that it's never been produced to us and it's hearsay. And I have a standing objection for those reasons with regard to anything in this particular article.

MR. YAMIN: It also has not been produced to the City, and the City joins in those objections.

BY MR. DE ROSE:

Q All right. As counsel just observed, this is a document taken off the Internet by Chicago Tribune reporters Dan Hinkel, H-i-n-k-e-l, and Alex Richards on July 20th, 2012. Did you read this article in the Tribune when it came out?

MR. POLICK: Objection to the relevance, in addition to my standing objection to this Internet

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

160

hearsay article.

THE WITNESS: I don't recall ever reading this article.

BY MR. DE ROSE:

Q All right. And it says at the top, "Jolt of reality: Shootings persist as Chicago police Taser use skyrockets. Use of devices marketed as means to limit gunfire rose more than 300 percent in two years data show."

Did you ever hear reports like that as a police Officer that the use of the Taser gun had risen 300 percent from 2010 to 2012?

MR. POLICK: Again, object to the relevance and to the foundation for those figures. This is a hearsay document, and I think contained in it is hearsay, since the author is not here to tell us where in fact he got or made up these figures.

So with those objections, in addition to my standing objection to this exhibit, you may answer.

THE WITNESS: I don't know how credible the information is, or the source, but I don't recall hearing those figures.

County Court Reporters, Inc.
630.653.1622

BY MR. DE ROSE:

Q Are you aware that the Chicago Police Department is keeping data records of the frequency of the deployment of a Taser by its members?

**A I do not know if they are keeping it individually by members.**

Q And you have never been provided as part of your training any documentation from the Chicago Police Department about any increases or decreases in the use of Tasers?

**A I don't recall receiving any such documentation.**

Q And I want to go four paragraphs up from the bottom of the first page of Plaintiff's Exhibit 12. It reads for the record, "The numbers raise questions about how often police use the weapons to diffuse confrontations that might otherwise escalate to use of deadly force.

"Civil lawyers and department critics have alleged that, rather than deploying Tasers to subdue dangerous criminals, officers have sometimes drawn them on mildly obstinate suspects."

Do you see where I just read?

MR. POLICK: Object under the grounds of the Rule of Completeness. It's being taken out of context in this three-page Internet article. It's hearsay. It's irrelevant. And in addition to my standing objections to this document, you may answer over the objections.

BY MR. DE ROSE:

Q Do you see where I just read?

**A I do see were you just read.**

Q All right. First of all, you had no information that Jose Lopez that night was a dangerous criminal, did you?

**A At which time are we speaking of?**

Q When you went out to the scene, you had the Taser gun in your hand, and at the moment you deployed it?

**A Yes. He became from an active resister to an assailant. An assailant is described as someone who is dangerous that can cause death or great bodily harm to people that surround him.**

Q So in your opinion, he was a dangerous criminal when you deployed your Taser?

MR. YAMIN: Objection. That misstates his testimony.

MR. POLICK: Join in the objection.

MR. YAMIN: The word criminal was not stated by the deponent.

MR. POLICK: Join in that objection. Argumentative.

BY MR. DE ROSE:

Q All right. I'm going to ask this question. When you pulled the trigger on the Taser gun, is it fair to say that you had no information that Jose Lopez was a dangerous criminal that should be apprehended, because you knew of no criminal activity he had been engaged in a moment prior to that, or any other time in his life?

MR. POLICK: All right. I'm going to object to that question as to the form, because it's a compound question. There's about three questions involved in that question. And again, the question I think is ambiguous. You can answer it if you understand it.

MR. DE ROSE: Let me withdraw it.

MR. YAMIN: I will also object it's been asked and

answered and mischaracterizes the previous testimony of the deponent.

BY MR. DE ROSE:

Q All right. As you walked up to Jose Lopez and before he made whatever gesture you determined, before that, is it fair to say you had no information that Jose Lopez was a dangerous criminal wanted by the police?

MR. POLICK: Objection. Again, that's a compound question, dangerous criminal and wanted by the police.

MR. DE ROSE: All right.

MR. POLICK: So again, I'm going to object to the form of the question. And again, I think it's been asked and answered.

MR. DE ROSE: All right. Let me strike the question.

BY MR. DE ROSE:

Q Before you walked up to him and deployed your Taser weapon, is it fair to say you had no information that Jose Lopez was wanted by the police?

**A Our objective when we were walking up to Mr. Lopez was to seek medical assistance. He was not a**

Stevan Vidljinovic
September 4, 2013

165

**criminal, but he did display aggressive manners that he could be dangerous --**

MR. DE ROSE: All right, stop.

MR. POLICK: Let him finish his answer. You asked a compound question, and I think he's allowed to finish his answer.

BY MR. DE ROSE:

Q Finish your answer.

MR. POLICK: You can do what you want afterwards, but please don't interrupt him while he's answering your question. He has a right to answer your question to the best of his ability. You may not like it, but he has a right to do it. You can do what you want afterward, but please don't cut him off. Nobody's cutting you off.

THE WITNESS: He expressed behavior that I have observed in the past that could make him a dangerous individual.

MR. DE ROSE: Move to strike the answer as not responsive to my question. Miss Reporter, will you read my question?

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

166

BY MR. DE ROSE:

Q And sir, can you confine your answer to just answer the question posed?

**A Yes.**

**(The question was so read by the court reporter.)**

MR. POLICK: Asked and answered. You may answer over the objection. Go ahead.

THE WITNESS: I do not have any recollection of anybody telling me anything of Jose Lopez's criminal history, or whether he was wanted by the police.

BY MR. DE ROSE:

Q All right. And Jose Lopez stood his ground as you and the other officers walked up to him; is that correct?

MR. POLICK: Objection to the form of the question.

MR. YAMIN: Object to form.

MR. POLICK: You can answer over the objection.

THE WITNESS: He was standing in the street by himself, with his fists clenched to his side.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

167

BY MR. DE ROSE:

Q He was not attempting to escape or run away from you?

**A I don't recall him attempting to escape or run away.**

Q All right. Thank you.

In your police training in the last few years, you were trained about the use of force model that the police department wants to use?

MR. POLICK: Objection to the form. You can answer it.

THE WITNESS: Yes.

BY MR. DE ROSE:

Q And how long was your training in the use of force model?

**A It's continuous. We started in the Academy. They introduce the use of force model to us. They threw out scenarios, because every scenario dictates a different action by a police officer, given the behavior and the actions of the individual in the scenario. And then through the Internet, in-service training, etc.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

168

Q All right. And you learned there are gradations of force that you're allowed to use, depending on the behavior of the person that you are confronting in the course of your police duties?

**A Yes.**

Q And your first level of force to be used is verbal, word-of-mouth, isn't it?

**A Yes, that's a way that we try to gain compliance initially, depending on the behavior of the individual.**

Q And you try to use persuasion or commands, correct?

**A Again, every situation is different. Depending on the individual, those are tactics that we do use.**

Q It sounds like your partner, when he walked up to Jose Lopez, was using the very basic and first step of the use of force continuum, right? He was trying to use persuasion?

**A My partner was attempting to get him into the ambulance, so that is away that you could see it, yes; he was trying to use persuasion.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

169

Q And your partner, you told us, gestured toward the ambulance and he said, "Come on, Buddy. Let's see if we can get you some help." That's a persuasive effort, right?

**A Yes.**

Q And after your partner said that, did your partner ever escalate his verbal communication with Jose Lopez to an order or a command that he should get into the ambulance?

MR. YAMIN: Objection to the form, scope.

MR. POLICK: Join. You can answer.

THE WITNESS: Again, depending on the behavior of the individual that we're speaking of, my partner didn't have time to verbally command him with anything else.

BY MR. DE ROSE:

Q So you heard no verbal commands; you only heard persuasion?

**A I heard my partner having a conversation with him to try to get him into the ambulance, yes.**

Q And that is the lowest level on the force on the continuum of force hierarchy, right?

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

170

**A Speaking to an individual would be considered the lowest form, yes.**

Q And then as you talk to the person, there are uses of various kinds of weapons that are at your disposal that you can deploy against a person to make them follow your wishes or commands, correct?

**A Depending on the situation, we have several tools that we can use to get compliance from an individual.**

Q And the first one you use, and the least violent of those tools, are the handcuffs, right?

MR. YAMIN: Objection to the form.

MR. POLICK: Join. You may answer over the objection.

THE WITNESS: Mr. Lopez was never to be placed in custody. Our main objective was to get him medical treatment. So I did not have the handcuffs readily accessible.

BY MR. DE ROSE:

Q All right. But in the continuum, as you're taught, the first weapon available to you officers are the handcuffs, correct?

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

171

**A Again, depending on the situation and the individual.**

Q And then the second level of weapons available to you, and normally on one or the other of your utility belts, is the ASP, correct, the collapsible baton?

**A The collapsible baton is also a tool that we can use that we've been trained in.**

Q And it's much lower on the continuum than any firearms you have on your person, isn't it, according to your training?

**A Again, it depends on the situation. We also have OC spray that we can use.**

Q We're going to get to that. That's right.

Your collapsible baton is lower on the continuum of weapons to be used than is OC spray, isn't it?

**A I don't know -- I don't recall the model for certain which one comes before the other, because again, it all dictates on what the individual is being classified as, and then you react to that individual and you have certain options that you can use.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

172

Q Did you have on your utility belt, pepper spray or OC spray?

**A I normally do carry it out, so there was probably a good chance that I did have it.**

Q Does your partner carry either OC spray or pepper spray?

MR. YAMIN: On that occasion?

MR. DE ROSE: Yes, that's right, of course.

BY MR. DE ROSE:

Q On that day?

**A I can't speak for my partner. I don't know what he had on his utility belt.**

Q Do you know if he has a habit of normally carrying one or the other?

**A He normally makes it a point to carry a retractable baton and OC spray, yes.**

Q All of those items we just talked about, handcuffs, collapsible baton and the OC and pepper spray, those are all lower down on the continuum of force that you were taught to use, right? You were to consider the use of those first?

**A As opposed to lethal?**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

173

Q Yes.

**A Yes, they are lower than using lethal force.**

Q All right. And then after all those, the next item of use is the Taser, correct?

MR. YAMIN: Object to the question, in that it misstates the use of force continuum.

MR. DE ROSE: Well, let's find it.

MR. POLICK: I will join in that objection.

MR. DE ROSE: Give me a minute.

BY MR. DE ROSE:

Q So you don't have to guess, I know training was a while ago, and things might have changed. Let's see what I can find here.

Sir, do you ever remember seeing this General Order of the Chicago Police Department before your experience and training?

**A Yes.**

Q And it is General Order Number 02-08-01A. It's the Use of Force Model. Were you trained in this when you were in the Academy?

**A Yes.**

Q And because its effective date was in August

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

174

of 2003, right, that would be before you did your training?

MR. POLICK: I'm going to object to the form of the question. It implies that there was no such Order prior to that time. This may be an update to the Order that was in existence, but to imply that there was no such Order prior to the time this officer attended the academy is incorrect. I object on those grounds.

MR. DE ROSE: Well, I surely did not mean that implication by the question.

BY MR. DE ROSE:

Q What I'm suggesting is this particular Order in front of you has an effective date prior to your joining the police department and going through the Academy, right?

**A Yes. On Exhibit 20 the effective day is 15 August, 2003, which was prior to me entering the Academy.**

Q All right. Now, I want you to look down on that first page under Department policy and look at letter B. And it says, "Whenever reasonable, members will exercise persuasion, advice, and warning prior to

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

175

the use of physical force." Do you see where I just read?

**A Yes, I see where you just read.**

Q And the word physical is like in bold. Do you notice that?

MR. POLICK: Where is this you're talking about?

MR. DE ROSE: On the first page under 2B.

MR. POLICK: Okay.

BY MR. DE ROSE:

Q Is the word physical in bold there on your copy?

**A It's slightly bolder.**

Q All right. Now, go to Page 2. They have that illustration No. 1. It looks like step things. Were you taught about what the meaning of this illustration No. 1 was when you were in the Academy?

**A Yes.**

Q So they distinguish between cooperative subjects, resisters and I can't read that other word.

**A Assailants.**

Q Assailants, right?

**A Correct.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

176

Q And they taught you to distinguish the differences, correct?

**A Yes.**

Q Let's go to Exhibit 21. This is General Order 02-08-02. Have you received this General Order from the Police Department over the period of your training with the department?

**A I believe throughout the training, that I have received this Order.**

Q All right. Let's go down it. First of all, under Policy, under A it says, "Members will maintain a courteous and professional demeanor when dealing with the public." Were you trained that that was the way you were supposed to do it?

**A Yes.**

Q And 2B, "Before taking any police action, sworn members will identify themselves as police officers unless identification would jeopardize the safety of the member or others or compromise the integrity of an investigation." You were trained in that, also?

**A Yes.**

County Court Reporters, Inc.
630.653.1622

Q All right. You tell us as you walked up to this man, you thought he was incoherent; is that correct?

**A We believed that he was incoherent after trying to have a conversation with him.**

Q Did any of you officers identify yourself as a Chicago Police Officer?

**A I can't speak for Officer Guettler or Officer Alamillo, because I don't recall. I know what Officer Guettler spoke about to Mr. Lopez. I was in my Chicago Police Department-issued vest with my star and my name tag and my uniform, not in plain clothes. So I did not verbally say that I was a police officer, although what I was wearing is, how would you say, department-mandated uniform for anybody working a beat.**

Q Did you hear any police officer in your presence at any time that night identify themselves as a police officer?

**A I can't speak for anybody else. I don't recall myself saying that to Mr. Lopez.**

Q And you thought Mr. Lopez was incoherent. Did you believe that Mr. Lopez could understand what

you were saying to him?

MR. POLICK: Objection as to what Mr. Lopez understood. You can answer over the objection.

THE WITNESS: I can't speak for Mr. Lopez and what he comprehended what was going on. All I could speak for is that I could not understand Mr. Lopez.

BY MR. DE ROSE:

Q Did you believe, because you could not understand him and he was incoherent, that he couldn't understand anything you guys were saying?

MR. POLICK: Objection. Calls for speculation. He's not competent to answer what Mr. Lopez thought. You can answer under the objection.

BY MR. DE ROSE:

Q I'm talking about your belief, not what you thought.

MR. POLICK: That's a different question.

MR. DE ROSE: That's what I'm asking. Stop. Would you re-read my question, please? And this is the only one I want you to answer.

(The question was so read by the court reporter.)

MR. POLICK: Why don't you restate it?

MR. DE ROSE: All right. Let me restate it.

BY MR. DE ROSE:

Q And just please try to answer this question.

Sir, because you perceived that Mr. Lopez was incoherent, did you believe that he could not understand what officers were saying to him at that time?

MR. POLICK: Same objection. Calls for speculation. You can answer.

THE WITNESS: Again, I can't speculate what Mr. Lopez was thinking.

BY MR. DE ROSE:

Q Nobody is asking you that. I'm asking you what you believe.

MR. POLICK: And he's answering you, so please let him answer your question.

THE WITNESS: He appeared to be under the influence of a substance. I have never been under the influence of that substance, so I do not know whether somebody can comprehend another individual when they are speaking to him; therefore, I can't speculate how

Mr. Lopez comprehended or didn't comprehend us. All I know is that he was incoherent to me.

MR. DE ROSE: Move to strike that answer as not responsive.

BY MR. DE ROSE:

Q Is it fair to say then, you have no belief as to whether he could understand you or not?

**A It's fair to say that I don't know whether Mr. Lopez could understand me or not.**

Q Thank you.

All right. Now let's go down to Level of Force Response Options Guidelines. "A. A cooperative subject is a person who is compliant without the need for physical force. And the following response options are appropriate when dealing with a cooperative subject:" You can use social control, police presence.

"Social control/police presence is established through identification of authority and proximity to the subject. Police presence may result in conforming behavior."

**A Yes, I was taught that.**

Q I'm on to Page 2 now. "Social control/police

Stevan Vidljinovic
September 4, 2013

181

presence, used alone, is the only force option which is appropriate for use with subjects who are cooperative without the need for direction from law enforcement personnel." Were you taught that?

**A With subjects who were cooperative, yes, I was taught that.**

Q Then they have verbal control. "Verbal control consists of persuasion, advice and warning. It includes instruction or direction from a member in the form of verbal statements or commands. Verbal control may result in conforming behavior.

"Whenever practical, members will attempt to de-escalate confrontations by utilizing verbal control techniques prior to, during, and after the use of physical force." Do you see that?

**A Yes, I do.**

Q And you were trained in that; is that correct?

**A Yes, I was.**

Q If the man had been able to be understood by you and said, "No, I do not want to go to the ambulance," would you have just turned and walked away?

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

182

MR. POLICK: Objection. It's an incomplete hypothetical and a hypothetical unsupported by any facts heretofore in evidence, and therefore, it calls for speculation. You may answer.

THE WITNESS: If an individual who didn't appear to be a harm to himself and people around him could convey that he did not need medical assistance, then it is his right to deny it.

BY MR. DE ROSE:

Q We saw that earlier Illinois Code, a statement that said if a person on the street refuses your aide and assistance, you just walk away and your activity is terminated, correct?

MR. POLICK: I'm going to object to the form of the question, since I don't know what Illinois Code or Statute you are referring to.

MR. DE ROSE: We looked at it earlier, but let me turn back to the number.

MR. POLICK: Okay. If you could direct us to what you're looking at, that would be helpful.

MR. DE ROSE: Okay.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

183

BY MR. DE ROSE:

Q 14B. Turn again to 14B just for a moment. You remember when we went through that earlier?

MR. POLICK: 14B?

MR. DE ROSE: I believe so. Let me turn to it in mine.

MR. POLICK: I show 14B to be a Chicago Police Department Special Order entitled Alcohol and Drug Dependent Persons.

MR. DE ROSE: All right. That's not what I wanted. Hold on.

BY MR. DE ROSE:

Q Yes, 14B. That's what I wanted to talk to you about. That is a Chicago Police Department Special Order of how you are to deal with alcohol and drug dependent persons when you come upon them in the public way, right?

**A Yes, that's what the Special Order specifies.**

Q Look under B, the very last sentence, and there is a word in the middle that is all in caps. The word is REFUSES. And the sentence reads, "If the person REFUSES the assistance offered, no further

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

184

police action will be taken." Do you see that?

MR. POLICK: Again, object under the Rule of Completeness. It's taken out of context. It's also irrelevant, because this refers to a person being intoxicated. You may answer over the objection.

THE WITNESS: Yes, I see that what you just read.

BY MR. DE ROSE:

Q All right. You think this Special Order only applies to people who are intoxicated?

**A 2B states in bold print, "intoxicated in a public place."**

Q Well, let's look at the top of that. Under purpose, "This directive facilitates Department compliance with the Alcoholism and Other Drug Abuse and Dependency Act, (20 ILCS 301.)" Do you see that?

**A Yes.**

Q So you believe that this policy only concerns alcohol dependence?

MR. POLICK: Objection. Misstates the witness's testimony.

THE WITNESS: The way that I read it, I believe that when the word intoxicated is involved, it means

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

185

alcohol.

BY MR. DE ROSE:

Q Have you ever heard of the principle that when one is under drug use, they are intoxicated by drugs?

**A Through my training and knowledge, usually when somebody is under drug use, it is described as under the influence of drugs.**

Q All right. That's just like you've been trained when one is under the influence of alcohol, it's under the influence of alcohol, right; the very same kind of thing?

**A Correct. But intoxicated has never been used for somebody who was under the influence of drugs, which is what Mr. Lopez displayed.**

Q All right. Let me go back to where we were.

So you did not think it was at all required for you officers there to see if he was refusing your help in any way that night?

**A As a police officer responding to the scene, initially, that's the conversation, that was the objective that we were trying to gain from talking to**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

186

**Mr. Lopez.**

Q But you, yourself, never tried to determine if he was refusing any help or attendance of any kind?

**A Of course I was. If my partner was asking the questions, that doesn't mean that I wasn't listening to the answer. And I made the assessment that he was incoherent, under the influence of what I believed to be PCP and cocaine; therefore, he could not answer for himself whether he wanted to go or not. He was not making any sense.**

Q So in any event, there were several options available to you to restrain him, for whatever reason you might have, and limit his freedom of motion to put him in the ambulance before you go to the level of using a Taser, wasn't there?

MR. POLICK: Objection. It's irrelevant. You can answer over the objection.

THE WITNESS: Again, my partner displayed some of those techniques and attempted to persuade Mr. Lopez to go to the ambulance.

BY MR. DE ROSE:

Q And neither you nor your partner or any of

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

187

the other men on the street that night tried to just grab my client, overpower him and restrain his movement and put him in the ambulance, did you?

MR. POLICK: Objection to the compound nature of the question. It also misstates the witness's testimony. You may answer over those objections.

THE WITNESS: Again, my partner, Officer Guettler, approached to try to persuade Mr. Lopez, and as he neared Mr. Lopez, Mr. Lopez flailed his arms and began to direct --

BY MR. DE ROSE:

Q Sir, I'm going to interrupt.

MR. POLICK: No, you asked him a question, and he's allowed to answer it.

MR. DE ROSE: This is not my question.

MR. POLICK: You asked him a compound question that had about three or four parts to it. So if you want to ask him a succinct question, do it, but you cannot ask a compound question of that nature. I've made my objection. I cannot tell the witness not to answer that question, but you cannot cut him off of his answer. If you want to ask a succinct question, go

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

188

ahead.

MR. DE ROSE: All right. I will withdraw the question.

MR. YAMIN: I also want to make an objection on different grounds, John.

I've been here for several hours, and you've asked many questions. No one has interrupted you. We have three defense counsel and a deponent, and everyone has been polite and allowed you to ask your questions in their entirety.

Now, I understand that you have issues with some of the answers that the officer has given, but he's entitled, as we all are, to make a record. And if you want ultimately to move to strike an answer, I understand that procedurally that's okay, but I think as a matter of courtesy, that the deponent should be allowed to speak his -- to give what he believes is a complete answer. Then we have a record that if this ever goes before a Judge, where the Judge can see what the officer has said in its entirety, and the Judge can assess whether your motion to strike or whatever your objection is is based on.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

189

What I've seen repeatedly is the witness being cut off and not allowed to complete his answer. You're anticipating, in my opinion, that he's going to give an answer that's unacceptable to you, and I don't think that's right. I think he should get the opportunity to complete his answer, and then you should take it from there.

MR. DE ROSE: All right.

MR. YAMIN: I would appreciate that.

MR. DE ROSE: And I don't mean any disrespect to either the deponent or his able counsel here, and I know you're all very experienced.

BY MR. DE ROSE:

Q Sir, I'm going to withdraw that last question and I'm going to ask a very little question.

I know that you've said now on the record, and I don't think I've cut you off very many times. We've heard many times what was in your head when you took the action you took and what you thought and what you observed. I'm going to ask very little questions, and I want you to see if you can answer just my question.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

190

When I'm done, counsel can go back and ask you why you answered any one of these questions a certain way. But my questions will be very small. And they are not asking for your philosophy or why you did what you did, but what you did and what you observed, that's all. Okay?

Sir, is it fair to say that neither you, nor the other officers who you remember being right in the vicinity at the time tried to grab and overpower Jose Lopez before you deployed your Taser gun?

**A It's fair to say that nobody tried to overpower Jose Lopez. We tried to persuade him to go into the ambulance.**

Q All right, thank you.

And none of you used any of the lesser weapons available to you before you used your Taser that night; is that correct?

MR. POLICK: Objection to the relevance.

MR. YAMIN: This is where I was coming from that led to, I think led to making as exhibits the CPD Use of Force Models or, as you said, Directives.

I think that's an inaccurate

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

191

characterization of what the models show; also what the directives show. There is no hierarchy, lesser to greater, in terms of these other modes of compliance.

Under Exhibit 21, Roman Numeral III B and 2, so that's Pages 3 and 4 as they are numbered at the bottom corner I think. Four techniques are listed under little letters, small letters a, b, c and d. And I want to go to number Roman Numeral III, capital letter B, Arabic numeral 2, small letters a through d; those are options that are listed as all of which are equally available alternatives. They are not listed as in terms of a hierarchy of use.

So it's not as if you use, according to this directive, you can only use b if you've tried a, you can only use c if you've tried b and a; you can only use d if you use a, b and c. And that's from the plain language of the directive.

So based on the exhibit itself on its face, I object to the question.

MR. DE ROSE: All right. Counsel, I was getting to that. I have not gotten there yet. I appreciate your interpretation of it.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

192

And for the record, we all know that the Taser was added to this section much later than it was originally. Don't we realize that the Taser was added later?

MR. YAMIN: Well, I'm not sure what you mean by later, but --

MR. DE ROSE: It wasn't in the original Special Order when it was put out, was it?

MR. POLICK: He's just referring to the Addendum on Page 6 and 7, George.

MR. YAMIN: Okay. I will read it. Yes.

MR. DE ROSE: All right. Well, we're off on a tangent.

BY MR. DE ROSE:

Q Let me ask you, so you agree that although you had handcuffs and you had OC spray, and your partner had at least handcuffs and probably OC spray, neither one of you suggested the use of it? Is that fair to say?

**A It's fair to say that my partner verbally tried to gain compliance from your client.**

MR. DE ROSE: Wait a minute, sir. Move to strike.

County Court Reporters, Inc.
630.653.1622

Will you read back my question back?

(The question was so read by the court reporter.)

THE WITNESS: At that time we didn't deal because we wanted to assess the situation. The only way we could do that was by talking to him. So no, we didn't assume to use handcuffs or OC spray.

BY MR. DE ROSE:

Q And even lower on the use of force model there are certain pain holds that you can use against or striking stunning moves that you are trained that you can use against an uncooperative subject or an active resister, are you not?

**A Yes.**

Q And neither one of you, as far as you remember it, tried to use any kind of a stunning blow against him or a pressure hold or any kind of a grapple with him?

**A Given your client's actions, he didn't give us the time to do that.**

Q Sir --

**A So we didn't have that as an option.**

Q So by your answer, I guess you're saying no, we didn't try to use a stunning action against your client, correct?

MR. POLICK: Again, misstating the witness's testimony. You can answer over the objection.

THE WITNESS: Again, your client did not give us the option because of his actions.

MR. DE ROSE: Move to strike.

BY MR. DE ROSE:

Q Can you answer the question?

**A I did.**

Q Try yes or no.

**A Every situation dictates a cause and a reaction to how somebody acts.**

**If your client did not start to flail his arms, did not start to throw clenched fists in the direction of my partner and myself, when I already had a Taser readily accessible because that was the nature of the call, to assist requesting a Taser, I could have used control tactics, I could have used grappling. But since he went from an active resister to an assailant, I was justified to use a Taser, especially when it was**

**readily accessible.**

MR. DE ROSE: Move to strike that.

BY MR. DE ROSE:

Q My question to you is you never tried to use a stunning technique that you were taught in the Department; is that correct?

MR. POLICK: Objection. Asked and answered, and it's irrelevant.

BY MR. DE ROSE:

Q Can you answer that yes or no?

**A My answer is that your client didn't give me that option.**

MR. DE ROSE: All right. Move to strike.

BY MR. DE ROSE:

Q Is your answer also that you did not do that?

MR. POLICK: Did not do what?

BY MR. DE ROSE:

Q Try to use a stunning technique that you were taught to use?

**A Of course I did not do that. I didn't have the opportunity to because of what your client acted.**

MR. DE ROSE: All right. Move to strike

everything from beyond --

MR. POLICK: I'm going to object to the relevance of other means of course.

MR. DE ROSE: All right. Let's go on.

BY MR. DE ROSE:

Q So when you said Taser Taser Taser, you were expecting the officers to step back and leave my client standing alone when you expelled your weapon, correct?

**A I can't speculate what the other officers were going to do. I said --**

Q What did they do?

MR. POLICK: Objection. Let him answer your question before you interrupt his answer with another question. That's not fair. Let him answer your first question, then you can ask him another question.

MR. DE ROSE: All right, counsel.

MR. POLICK: He's not interrupting you when you ask your questions. He's patiently listening to your questions and trying his best to answer them. You can't cut him off by asking him another question in the middle of his answer. That, sir, is inappropriate, and I object to it, and I'm not going to tolerate it. And

you know what? We're going to take a break right now.

MR. DE ROSE: But before we do, we're going to make my observation on the record.

I suggest that this gentleman is not listening to the question; he's giving whatever answer he wants. My questions are very simple, and he can say yes or no to them. I'm not asking him for his reasons why.

Go ahead. Take your break.

MR. POLICK: I object to your characterization of my client's answers.

(There was a break taken, after which the deposition was resumed as follows:)

BY MR. DE ROSE:

Q All right, Officer. I want to take you back to Exhibit 21 that's there in front of you which is the General Order 02-08-02, okay?

**A Got it.**

Q And as counsel as I were noticing before, I want you to go to Page 3. And under 2, it talks about an active resister, and they describe, "A person whose

actions attempt to create distance between that person and the member's reach. This type of resistance includes gestures ranging from evasive movement of the arms, through flailing arms, to full flight by running." Do you see that?

**A Yes, I do.**

Q And you believe he was an active resister because he was flailing his arms and made the fist that you thought was going in the direction of your partner?

**A That's incorrect. The fist that was going in the direction of my partner made him an assailant.**

Q An assailant, even higher?

**A Correct.**

Q All right. Well, let's look where they talk about stunning. It's right underneath what I just read. It says, "Stunning is diffused-pressure striking or slapping and is an attempt to increase control by disorienting the subject and interfering with the subject's ability to resist." Do you see that?

**A Yes.**

Q By the way, at the moment you were confronting my client, did you have the power to place

him under arrest?

**A It was never our objective to place your client under arrest.**

Q Did you have any reason to place him under arrest as you were talking to him and before the flailing of arms?

**A No. Our whole objective was to transport him to a medical facility and seek treatment.**

Q And of course, if he refused that, you did not have authority seize him, correct?

MR. POLICK: Objection to the hypothetical, not supported by the evidence. You may answer over the objection.

THE WITNESS: Your client was incoherent, so we could not tell whether he refused it or accepted it.

BY MR. DE ROSE:

Q Did you ask your partner if he understood my client?

**A I was standing next to my partner when he was talking to your client. I did not understand what your client was saying. And a conversation between me and my partner never took place.**

Q So the answer is you never asked your partner, did you understand the words and the sounds he just used?

**A No, that conversation never took place.**

Q All right. So let's go on.

Now, when you pulled the trigger on the Taser, were you directly in front of my client?

**A Yes.**

Q And your partner was off to which side of you?

**A I believe it was to my right side.**

Q And where was the other officer?

**A Again, I don't recall where Officer Alamillo was positioned at the time that your client began to flail his arms.**

Q All right. Do you believe he was out of your view; the only one in front of you was my client?

**A It's safe to say that since I can't recall where he was standing, then he was out of my view. I could see Mr. Lopez and my partner attempting to engage in a conversation with your client.**

Q All right. But on the basis of the questions

Stevan Vidljinovic
September 4, 2013

201

or answers you gave me earlier, you believe you were on the same street as where the ambulance was, because your partner gestured to the ambulance, correct?

MR. POLICK: Objection. Misstates the witness's testimony. You may answer over the objection.

THE WITNESS: I never said where the ambulance was. My partner just gestured to where the ambulance was. The approximate location where the ambulance was located, I don't recall.

BY MR. DE ROSE:

Q The ambulance wasn't even in your view when you confronted my client, was it?

**A I don't recall.**

Q Well, when you say your partner gestured to the ambulance, did you see him pointing or gesturing to wherever the ambulance was situated?

**A If my partner gestured to the ambulance, I would assume that my partner was gesturing to the direction where, the general vicinity where the ambulance was located.**

Q And you don't know if it was completely around the corner from where you were and a block away

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

202

from where you were, do you?

**A That given situation, my whole focus was centered on Mr. Lopez.**

Q All right. Now, can you answer my question?

Where you were situated when your partner gestured, you don't know if you were around the corner and a block, a total of one full block away from where the ambulance was situated?

MR. POLICK: Objection. Asked and answered. He can answer over the objection.

THE WITNESS: Again, since I was centered on Mr. Lopez, and I don't recall the ambulance being there, then I don't know where the ambulance was located precisely.

BY MR. DE ROSE:

Q All right. Very good.

So in any event, when you discharged the Taser, the two prongs struck my client on the front of his body, somewhere in center mass, correct?

**A That's correct.**

Q And what happened to my client when that happened?

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

203

**A Your client collapsed to the floor.**

Q All right. The floor, or the street?

**A The ground beneath him, the street.**

Q All right. And did he fall forward onto his face area, or how did he fall?

**A I don't specifically recall how your client's body fell to the street.**

Q Were you still looking at him at the time?

**A My eyes were always on your client. I just don't recall, because of the amount of time that has passed since the actual occurrence, of how your client fell to the street.**

Q All right. When he fell, did you see his head strike the pavement of the street?

**A When he collapsed, I saw his body collapse to the street. I can't recall if I saw a particular body part strike anything.**

Q All right. By a collapse, do you mean he just like slithered down, or he actually went forward, backward or to his side, straight down?

**A My idea of collapse is his body went from standing in an upright position, collapsing down to the**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

204

**street. I don't recall which movement and which direction each body part was taking. All I know is that after I tasered Mr. Lopez, he fell, he collapsed to the street.**

Q You heard a loud thud when his head hit the street pavement, didn't you?

MR. POLICK: Objection. Argumentative. Assumes facts not in evidence. You may answer over the objection.

THE WITNESS: I do not recall hearing a thud.

BY MR. DE ROSE:

Q And you don't know what part of his body hit the pavement first?

MR. POLICK: Objection. Asked and answered. You may answer over the objection.

THE WITNESS: I do not recall which part of his body made contact with the ground first after he collapsed.

BY MR. DE ROSE:

Q Did you notice him breaking his fall with his hands in any way?

**A I did not notice that action.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

205

Q Did it appear to you that he did not break the fall when he hit the street?

**A Again, after I deployed the Taser in the direction of Mr. Lopez, all I saw was his body collapse, not in any specific manner, to the street.**

Q All right. And then did you go up to him and take the Taser darts out of his body?

**A No, I did not.**

Q What did you do?

**A The probes are not to be taken from the subject that's been tased by a Department member. The probes are to be taken out by somebody with a medical background, either a paramedic, nurse or doctor.**

Q You weren't trained in your Taser training of how to take the barbs out?

**A The actual probes you're speaking of?**

Q Yes.

**A We were trained to cut it, inventory it, along with the Taser cartridge. We were never trained to pull probes out of subjects that have just recently been tased.**

Q All right. So you've never yourself tried to

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

206

extract the actual dart from the body?

MR. POLICK: Objection. Asked and answered. You can answer over the objection.

THE WITNESS: No, I haven't.

BY MR. DE ROSE:

Q All right. So did you walk up to him and cut off the lines from the darts?

**A No. I believe initially, we handcuffed Mr. Lopez.**

Q Well, when he fell, was he face-down, or was he on his side or his back?

**A I don't recall the position that he was on the street. All I know is that we handcuffed him, to my knowledge.**

Q Whose handcuffs were used?

**A I don't recall whose handcuffs were used.**

Q But only one person's handcuffs?

**A Only one pair of handcuffs. I don't know whose.**

Q Well, did you have to the three of you rush him and get on top of him?

**A Nobody rushed Mr. Lopez. After his body**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

207

**collapsed to the ground, someone handcuffed him to gain physical control of him because of his behavior prior to being tased.**

Q All right. I don't want to jump through this.

When you went up to him, did you have to turn him over and put his hands behind his back in order to handcuff him?

**A Again, I don't recall the position that he was in when I approached him after tasing him.**

Q Was he handcuffed with his hands in front of him or behind him?

**A I don't recall. All I know is that I believe we handcuffed him. I do not know what position he was handcuffed in.**

Q Protocol with the Chicago Police Department is to handcuff someone behind their back, right, if possible?

**A Yes, the operative phrase being if possible. Every situation dictates a different method.**

Q And you didn't make any notes, mental notes or part of your police report, of whether he was

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

208

handcuffed in front of his back or behind his back?

**A I don't recall knowing whether he was handcuffed in front or behind, so I don't recall whether I made reports specifying that.**

Q All right. The three of you that you remember being there, were all three of you in contact with Jose Lopez's body when he was being positioned to be handcuffed?

**A I don't recall.**

MR. YAMIN: Object to the form.

BY MR. DE ROSE:

Q Do you recall just standing there while someone else did the handcuffing?

**A Again, I don't recall.**

Q Jose Lopez let out a very loud sound right after you tasered him, and he hit the ground, didn't he?

MR. POLICK: Objection. Argumentative, assumes facts not in evidence. You may answer over the objection.

THE WITNESS: Again, I don't recall any sound following me tasering your client and him collapsing to

County Court Reporters, Inc.
630.653.1622

the ground.

BY MR. DE ROSE:

Q Was he still making incoherent words and sounds as he was being handcuffed?

**A I do not recall.**

Q Were his eyes open after you handcuffed him?

**A I don't recall.**

Q Then did you stand him up and walk him back to the ambulance?

**A I believe the paramedics brought a gurney over to the area where Jose Lopez's body collapsed to the street and they placed him on the gurney, restrained him, and then that's when we, I believe we took the handcuffs off.**

Q All right. Where did the paramedics come from with the gurney that they brought over to where you were?

**A I don't recall any paramedics during the occurrence of me tasing Jose Lopez, so it's a safe assumption that they came from behind me.**

Q But somewhere behind you; you don't know if it was around the block or anything?

**A I don't know the exact location.**

Q All right. When they came up, was one of them a female paramedic and one of them a male paramedic?

**A Again, I don't recall the gender of the paramedics.**

Q Did any firemen come up to you at the time?

**A Again, I don't recall any firemen being on the scene.**

Q Is it fair to say that you yourself never came into physical contact, nor did my client come into physical contact with you that night before you deployed your Taser?

**A Yes, it's fair to say.**

Q Is it fair to say that my client never came into physical contact with your partner or any other police officer there that you saw prior to your deploying your Taser?

**A Your client's actions made us feel in fear of our well-being, as well as the well-being around others. So he never physically came into contact with us, but that's also not to say that he wasn't**

**attempting to come into contact with us; hence, that's why I deployed the Taser.**

MR. DE ROSE: Move to strike the answer, because I'm going to see if I can get a clean answer to the question. I move to strike it as non-responsive.

Would you read my question back and see if he can just answer that question?

(The question was so read by the court reporter.)

THE WITNESS: There's no way that I can answer that without articulating why he did not come into contact with us, because of the behavior of your client.

BY MR. DE ROSE:

Q So you're not able to answer the question, is that what you're saying?

**A No, I'm able to answer the question, just it can't be answered as a simple yes or no.**

Q All right, Officer. We'll see if someone else agrees with you later on that point.

But anyway, was my client kicking and flailing any more after he hit the pavement on that

street?

**A Again, I don't recall the position that your client fell and collapsed to the street, nor do I recall any movement of your client.**

Q You don't recall any movement. Could it have been that there was absolutely no movement by him?

**A I can't speculate, because if I don't recall, then there could have been and there couldn't have been. So I just don't recall of him moving after being tased.**

Q Well, when the paramedics came up, did you just go away, or did you stay there to see what they were doing?

**A I cut the wires to the Taser and observed the paramedics lift Jose Lopez into a gurney.**

Q They were, just the two of them picked his body up and put him on the gurney?

**A My best recollection, yes.**

Q And was he still handcuffed when they put him onto the gurney?

**A I don't recall whether he was uncuffed prior or after being restrained in the gurney.**

Stevan Vidljinovic
September 4, 2013

213

Q Who uncuffed him?
**A I don't recall.**
Q Would you expect it would be the officer whose handcuffs they were?
**A Not necessarily.**
Q All right. Do you know if you used your handcuffs that day?
**A I don't recall using my handcuffs.**
Q I mean on this event?
**A Correct. I don't recall using my handcuffs on that given event.**
Q And you don't know whose handcuffs were used?
**A That's correct.**
Q Do you remember ever touching my client's body that day at any time yourself with your hands in any way, or any other part of your body?
**A Immediately preceding the Taser?**
Q Either immediately preceding the Taser, or after?
**A I remember assisting nurses at Mt. Sinai Hospital to restrain him in a hospital bed.**
Q All right. We'll get into that part.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

214

Out there on the street, is it fair to say you don't remember as you sit here now, ever coming into physical contact with my client's person?
**A I don't recall placing hands on your client.**
Q Now, who picked up the gurney?
**A I don't recall.**
Q Were any police officers involved in picking up the gurney, if you know?
**A I do not know.**
Q All right. And somebody walked from where you had tased him back to where the ambulance was, carrying the gurney with him on it?
**A Please repeat the question.**
Q Well, was this gurney on wheels, or is it one that you pick up and walk with?
**A I believe it was on wheels.**
Q All right. So he was wheeled back to the ambulance, correct?
**A Correct.**
Q Did you accompany the wheeling of him in the gurney back to the ambulance?
**A I was in the general area, yeah.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

215

Q And you kind of walked with them as somebody pushed the gurney along?
**A I wouldn't say I necessarily walked with them. They pushed the gurney towards the ambulance, and I was in the area. I don't recall how far the ambulance was and how long I walked along them, if I walked along them at all.**
Q Well, were you there when they put the gurney into the ambulance?
**A Again, I was in the general area.**
Q Did you see any other people on the street in that general area where the gurney was going into the ambulance?
**A Only the officers that I've mentioned and the two paramedics.**
Q Two paramedics and your partner and one other officer?
**A No. My partner, Officer Guettler, Officer Valdovinos, Officer Alamillo, Officer Gonzales, Officer Valenzuela and Sergeant Kearns.**
Q Where were they all situated when you remember seeing them on the scene?

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

216

**A They were in the general area of the scene. I don't know specifically where they were, approximately.**
Q Did Sergeant Kearns arrive on the scene before you walked up to my client?
**A I don't recall seeing Sergeant Kearns prior to engaging in a conversation or attempting to engage in a conversation with Mr. Lopez.**
Q But you did engage in conversations with Sergeant Kearns at some time on the scene, didn't you?
**A I don't recall speaking to Sergeant Kearns on the scene. All I know is that he was there.**
Q Being your Superior Officer on the street that night on your shift, if he had told you, "Do not use your Taser on this man," would you have followed that order?
**A My getting a direct order from an immediate Supervisor? No, because I think I was justified to use it.**
Q So you would have just ignored his order?
**A We don't need permission from a Sergeant to deploy a Taser, especially if the subject that's being**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

217

**tased has the capacity to cause great bodily harm or death to my part, myself, or other people around him.**

Q So I know you don't need authority from your Supervisor to use the Taser. But if your Sergeant tells you, "When you approach that man, do not use the Taser," are you obliged to follow that order?

MR. YAMIN: Objection. Incomplete hypothetical.

MR. POLICK: Join in the objection. You can answer.

THE WITNESS: It completely depends on when he tells me prior to me reaching him. Does he tell me when I'm 30 feet away from your client and I don't know that he seems to be under the influence of what I, in my experience, believe to be PCP and I've had run-ins with people with PCP? Or is he telling me right when he flails his arms? There are different scenarios that can happen which would dictate how I would react to that type of demand.

BY MR. DE ROSE:

Q As you walked up with your Taser, did you hide the fact that you had the Taser out and at the ready from the two officers whom you remember walking

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

218

up with you to Jose Lopez?

MR. YAMIN: Objection to form.

MR. POLICK: Join. You may answer.

THE WITNESS: No, I didn't hide it, because Officer Alamillo who accompanied us to talk to Mr. Lopez is the one that requested the Taser.

BY MR. DE ROSE:

Q And you understood he wanted the Taser, and you there to use the Taser in order to get Jose Lopez in that ambulance, correct?

**A That is incorrect. He did not want to use the Taser. He requested the Taser --**

Q How do you know that?

**A Because we talked when he gave me a synopsis of the events that were going on, and our objective was to get him medical treatment, so we tried to persuade him into the ambulance.**

Q All right. Did the officer who you were talking to before you went up to my client say, "We don't want to use the Taser if we don't have to?"

**A He didn't specify.**

Q All right. As you walked up with the Taser

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

219

visible to those officers, the two that you remember on the scene, neither one of you told you, "Do not use the Taser, did they?"

**A I don't recall having a conversation like that with the other two officers.**

Q All right. And when you said Taser Taser Taser, did the Sergeant or any of the other police officers who you know were on the scene say, "Do not tase him?"

**A Again, I did not know the Sergeant was on the scene prior to me tasing him. I saw him after the Taser incident occurred. And I did not hear anybody say anything. All I remember was me giving the command Taser Taser Taser.**

Q All right. And so no other officer was on the scene trying to intervene and stop you from tasing my client, as understand it; is that correct?

MR. POLICK: Objection to the incomplete hypothetical. Assumes facts not in evidence. You may answer over the objection.

THE WITNESS: The only officer that I can speak for is my partner, Officer Guettler, and he was

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

220

avoiding getting struck from your client, so he did not say anything.

BY MR. DE ROSE:

Q All right. Nor did the other officer next to you say, "Don't use the Taser," correct?

**A I don't recall if there was even an officer next to me. All I recall is me, Officer Guettler and Mr. Lopez.**

Q All right. But the other Officer Alamillo, you never heard him saying, "Don't use the Taser?"

**A I never heard anybody.**

Q Of any of those officers on the scene?

**A I didn't hear anybody utter those words.**

Q All right, thank you.

As my client laid on that gurney, was he moving?

**A I don't recall.**

Q You don't recall if his arms were flailing or his legs were flailing or anything like that?

**A Well, it would be hard for his arms or legs to flail, because he was restrained, but I don't recall any movement.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

221

Q Well, who restrained him?

MR. POLICK: Objection. Asked and answered.

THE WITNESS: The paramedics.

BY MR. DE ROSE:

Q And how did they restrain him on the gurney?

**A The way that I've seen paramedics restrain other individuals on the gurney, it's a strap that goes across the body at certain portions of your body.**

Q And you're just giving that answer from your usual recollection, or do you remember the various belts and restraints actually being applied to my client that night?

**A I don't recall particularly. I'm giving you an assumption of what I have experienced in other situations, so I don't recall with Mr. Lopez particularly.**

Q All right. When Mr. Lopez was loaded into the ambulance, do you remember anybody protesting about the fact that you folks had tasered him out there on the street?

MR. YAMIN: Objection to form; "you folks" particularly.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

222

MR. POLICK: Join in the objection. You can answer.

BY MR. DE ROSE:

Q By that I meant you police officers.

MR. YAMIN: I still object.

MR. POLICK: Join in the objection. You may answer.

THE WITNESS: Did any police officers protest?

MR. DE ROSE: No, no. It's a bad question, and I think counsel's right.

BY MR. DE ROSE:

Q Did you see any civilians, people who you could tell were not police officers, protesting the fact that Jose Lopez had been tasered and put on the gurney?

MR. YAMIN: Objection, form.

MR. POLICK: Join. You may answer.

THE WITNESS: The only civilian that I recall on the scene throughout the duration of the occurrence was an Hispanic female, but I don't recall her saying anything to that extent.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

223

BY MR. DE ROSE:

Q Did she say anything that you heard?

**A Again, I don't recall her saying anything to me in particular. I can't speak for any other officers.**

Q Did you ever talk to her yourself?

**A No, I did not.**

Q You don't know her name?

**A At the time of the occurrence? No, I did not.**

Q Do you know it now?

**A I would have to refer to my notes. I don't know it off the top of my head.**

Q Do you have your notes with you?

MR. POLICK: You mean the reports?

THE WITNESS: Yes, the reports.

BY MR. DE ROSE:

Q Your report, or other people's reports?

**A Other people's reports, the people that were at the scene, the reports that were generated.**

Q You've looked at your reports before coming here, haven't you?

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

224

**A Yes.**

Q Can we turn, I think it's Exhibit 6.

MR. YAMIN: Can we go off the record for just a second?

(There was a discussion held off the record, after which the deposition resumed as follows:)

BY MR. DE ROSE:

Q Now, Exhibit 6 we have placed in front of you is an Officer's Battery Report. Is this a report -- it looks like it was generated on the computer. Are you the one who generated this report?

**A Yes.**

Q All right. And you've got your name first on Officer Information, right?

**A Correct.**

Q All right. And if you go over to the Incident Information, you have the box checked outdoors; and address of occurrence, 3038 West 25th Street. Do you see that?

**A I do.**

Q Does that refresh your memory as to the

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

225

location in the geographical area of the 10th District where you had this event with Jose Lopez?

**A Obviously, since this report was made not long after the incident, this address would probably be more accurate than what I recall. I still don't recall -- I know that he was on the street. I still don't recall whether he was on 25th Street or Albany.**

Q Well, but if you put that address in there, why would you put that 25th Street address if you weren't actually at that location?

MR. POLICK: Objection. Misstates the witness's testimony. You can answer over the objection.

THE WITNESS: Earlier I stated that I don't recall where I was at. But since this report was generated only moments after the incident, it would be more fresh in my mind, so that is a more accurate address.

BY MR. DE ROSE:

Q All right. And if one is standing in the street at that address, one cannot see the address on Albany that was initially communicated in the dispatch, can they?

MR. POLICK: Objection as to what someone else can

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

226

see. You may answer over the objection.

BY MR. DE ROSE:

Q You. I'm talking about you, you couldn't see?

**A I would have to physically be standing at 3038 West 25th Street to see if I could see the address on Albany. I can't answer that.**

Q And right now you don't know; is that correct?

**A I'm saying I can't answer it.**

Q All right. And the date of occurrence you've got as 22 July, 2011 at 3:54 P.M. Because this was more fresh in your memory at the time, are you satisfied that that was the time you deployed the Taser?

**A Again, I can't answer. If I generated the report and it said 3:54 A.M., that means that I generated the Officer's Battery Report at 3:54 A.M. I don't know.**

Q So is this the time you generated the report?

**A That's the time that I initially thought, after it occurred, is what the time I felt it happened,**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

227

**is what I'm trying to say.**

Q And you were trying to be as accurate as you could, weren't you?

**A Yes.**

Q And then your next line, it says day of week and you've got Friday. You're satisfied that at that time you would be careful to put the right day of the week that this occurred at 3:54 A.M., right?

**A I would have to look at a calendar, but if it was Friday, it was Friday. If it was another day, then it was an oversight on my part. But I'm satisfied that it was Friday.**

Q All right. And then on number of officers battered, you put the number 1. Do you see that?

**A Yes.**

Q Who was the officer who was battered?

**A My understanding of the actual field that says number of officers battered was the fact of officers completing an Officer's Battery Report, so I placed 1, because nobody else was completing an Officer's Battery Report.**

Q You saw no officers that night battered, did

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

228

you?

**A Are you asking me if your client struck any of my fellow officers or myself? Is that what you're asking?**

Q I can't answer questions.

Do you know the definition of the word battery?

**A Yes.**

Q What do you understand it is?

**A It's to inflict harm upon somebody through physical contact.**

Q All right. And I thought you told us earlier that you saw no officer battered or have physical contact from my client. Am I correct?

**A Yes.**

Q All right. So why did you put the number 1 in there of number of officers battered?

**A Because when I was finishing the report, my understanding of what they were asking for were people that weren't battered, but they were filling out an Officer Battery Report, so I put 1 because I was the only one filling out an Officer Battery Report.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

229

Q All right.

**A It was a mistake on my part.**

Q I see. So where it says number of officers battered, you only put down the number of officers you knew were filling out a Battery Report?

**A Under my understanding, yes. That was my understanding at the time.**

Q All right. And that night you filled out this report that evening before you went off duty, right?

**A That's not correct.**

Q When did you --

**A Before I went off duty?**

Q Yes.

**A Oh, I thought you asked before I went on duty. Yes, before I checked off and went off duty, I filled out the report, that's correct.**

Q You were required to do that by Special Orders of the Chicago Police Department, weren't you?

**A Yes, it's protocol.**

Q And did your Supervisor, the Sergeant, tell you you have to fill out an Officer's Battery Report

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

230

before you go home?

**A No. It's just something that I knew I had to do.**

Q All right. And then it says were there assisting units on the scene, and you fill out the box that says yes. Do you see that?

**A Yes.**

Q And then the next question is if yes, how many assisting officers were present at the time of the battery, excluding you or your partner, and you put a number 7. Where did you get that number from?

**A I might have misread it and did not see excluding you and your partners, because there were seven of us there. There was a lot happening at the time, and I had to inventory Taser complete a TR, as well as an Officer Battery Report. So I probably assumed there were seven of us, which is the seven that I recall being at the scene.**

Q There weren't as many as nine of you at the scene?

**A Sitting here right now today, I don't recall any more than seven police officer.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

231

Q By the way, this report that you did that night, your Sergeant, Supervising Sergeant, he had to approve it that night before you left work, didn't he?

**A I believe that an Officer's Battery Report is approved by the Watch Commander, which is Lieutenant Dubiel.**

Q So you didn't show this to Sergeant Kearns?

**A I don't recall if I did or not.**

Q All right. And then it says manner of attack, and they've got several boxes; shot, shot at, stabbed, cut, struck with a blunt force, and then finally they have other, including verbal threats. Do you see that?

**A Correct.**

Q And that's the one that you put down here, including verbal threats, correct?

**A Correct.**

Q What verbal threats did you hear Jose Lopez utter out of his mouth?

**A In the report it says other. It doesn't specify including verbal threats. They are just using that as an example. So it doesn't necessarily mean**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

232

**that I was verbally threatened by your client.**

Q My question is, did you hear my client utter a single verbal threat to anyone that night?

**A I heard your client utter words and sounds that I could not make out, so no.**

Q All right, thank you.

Now, look down at type of activity on the other side, and you have checked one box called disturbance - mental patient. Why did you fill out that box?

**A I'm sorry, where?**

Q Under type of activity.

**A Okay.**

Q And you checked the box disturbance - mental patient. Why did you pick that box?

**A I checked that box because that was the only option that I felt described what the actual incident was pulled for. It was pulled for a mental health transport; so I tried to make it coincide with the initial report, so I put disturbance - mental patient.**

Q Well, did you think you were going over there to that scene to treat a mental patient?

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

233

**A I don't recall knowing what I was going -- I knew I was going over there per a request for a Taser. That's why there are so many options. And the reports are done after the occurrence.**

Q All right. But did anybody that night tell you that Jose Lopez was a mental patient?

**A No. The report that was generated by Officer Alamillo was a mental health transport, so I assumed that that was the closest description of my type of activity, was disturbance - mental patient. That's why I checked that box.**

Q So it's fair to say, although that box is checked, no one ever that night told you that Jose Lopez was a mental patient to be transported to a mental facility?

**A The box that was checked was the most accurate type of activity that I was given in that field.**

Q Well, you've got disturbance - other.

My question still stands, and it is, is it fair to say that no one that night described Jose Lopez to you as a mental patient?

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

234

**A The only person I spoke to on the scene was Officer Alamillo, and I don't recall him saying that he was a mental patient.**

Q All right. So you picked that particular box describing a mental patient because you thought it was the most ethical, applicable box in that particular portion, correct?

**A Due to the actions that we took afterwards by generating a report regarding a mental health transport, yes, I did.**

Q Did you believe this was a mental health transport?

**A Yes. Our objective was to seek medical treatment for Mr. Lopez. And our objective was still, even after a Taser was deployed on your client, was to seek him medical treatment.**

Q In your training, is a mental health transport the same thing as a medical transport?

**A I don't understand what you're trying to ask me.**

Q I'm asking you, when you transport people who have not exhibited any mental problems, do you still

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

235

call them mental patients because you're transporting them to the hospital?

**A In my experience, I believe that the closest title that can be used for transporting somebody to the hospital, and the most justifiable one, is the mental health transport, because that is the report that is generated for him.**

**I do not believe, I could be wrong, that there is a medical health transport.**

Q All right. And then they ask for type of injury to officer. When you see these kinds of questions, did it dawn on you that they wanted you to describe a battery on a police officer, not just an officer filling out a Battery Report?

**A When I see these questions, I looked at the options and I chose the most apparent option, which at the time was none apparent/none.**

Q So by now as you're working through this report, did you realize this was to be a report by an officer who had suffered a battery or observed a brother officer suffer a battery?

**A No, because they would not give me the option**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

236

**of none apparent or none at all for type of injury to officer.**

Q All right. So that didn't click anything off for you, right?

**A No, it did not.**

Q All right. And then on the offender information, you write male, white Hispanic, and the date of birth of Redacted 1962. Where did you get that information from?

**A I believe that I would have had to have talked to the person that generated the original report, which is Officer Alamillo.**

Q So Officer Alamillo had some kind of a document from the man that told you his date of birth was Redacted 1962?

**A I don't recall how Officer Alamillo obtained that information.**

Q All right. On your report I don't see where you've named the man. Is there a place where you name him?

**A I don't see a specific field where you have to name the individual. He's named in the Tactical**

County Court Reporters, Inc.
630.653.1622

**Report that we make that's attached to this.**

Q All right. There's another report that goes with it, correct?

**A Correct, a TR.**

Q And there's a field here for a CB number, and that would be a central booking number if you were generating a report to arrest somebody, correct?

**A If somebody was in custody, yes, we would have generated a CB number.**

Q And you didn't generate a CB number for this case because this man was not under arrest; is that not true?

**A That's correct, he was not under arrest.**

Q All right. And there's also a field for an IR number, and that's an Individual Registered number for anybody who had any kind of a history with the police. You didn't fill a number in there either, did you?

**A It doesn't appear that I did.**

Q Did you try to get -- you didn't try to get a CB number because you weren't arresting him, right?

**A Yes. Our objective was never to arrest Mr.**

**Lopez.**

Q Did you try to get his IR number, if he had one, when you filled out this report?

**A I can't recall. I would assume that I would try to fill out the report as complete as possible, and a number of things could have been an issue. Maybe a computer wasn't working, maybe it was running too slow, maybe I just couldn't find it; hence why the field is empty.**

Q Look at the next question that you were asked for an answer to. Was the offender's activity drug related, and you checked unknown. Why did you pick that?

**A Because I have no medical experience.**

**If they were to ask me was the offender's activity the activity of somebody who might be under the influence of drugs through your past experiences, then yes, I would have checked yes. But since I don't have medical experience, nor do I have a background in medicine, I checked unknown because I felt that that was the most efficient out of the three options that I had.**

Q You understood that each of you police officers are expected to fill this out, and the vast majority of you don't have medical experience, right?

**A Yes.**

Q And they are asking you, was the offender's activity drug related, and you said unknown. Did you believe his activity was drug related?

**A Reading the report, I put unknown because I don't have that professional opinion. I don't have the background in that to be definite and say. I can only assume and have reasonable suspicion that he might be under the influence, which is what I assumed.**

Q All right. Besides filling out that Officer's Battery Report, you are required by Police Special Orders to fill out a Tactical Response Report when you discharge a fire weapon, right, a firearm?

**A You have to fill out a Tactical Response Report for many reasons, yes.**

Q All right. Exhibit No. 7. Now, this, Officer, is another report you filled out before you got off duty that day, right?

**A That's correct.**

Q And down on the bottom, although these are, because they are computer-generated, you don't sign them any more, but you filled it out on the 22nd of July, 2011 at 4:52 and 36 seconds on that day, right, 36/100ths of a second?

**A That's when I submitted it, yes.**

Q All right. And it looks like just six minutes later, Sergeant Kearns signed, having reviewed your report and approving it, correct?

**A By reading the report, yes, that's what it looks like.**

Q All right. So let's look at the information you put in this. At the very top, again you say the date of the incident was 22 July, 2011 at 3:54 A.M. in the morning, right?

**A Yes, that's what it says.**

Q And again, you put down the address 3038 West 25th Street, Chicago, Illinois, 60623. Did you get that address from Sergeant Kearns, or someone else, to put in there?

**A I don't recall where I had gotten the address. Personally in my past experiences I would**

Stevan Vidljinovic
September 4, 2013

241

**have written the address down in an approximate, like a specific location when an incident occurred, so I probably wrote that down individually.**

Q So did you like have a notebook out there on the street with you that you were making notes so you could --

**A I have pieces of paper that we call contact cards when we come into contact with somebody, and I usually just jot down something on those contact cards. I don't have a note pad, per se.**

Q So you make hand pen-written and printed entries on these contact cards?

**A I'm saying that in my past experiences, that's what I've done. I don't recall if that's what I did here in particular, but that's something that I would have done in an incident like this.**

Q Where is the contact card that you would have done in this case?

**A I discarded it, because I already used the information that I wrote down on it and applied it to the report that I needed.**

Q When you say discarded, you threw it away?

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

242

**A Yes, I discarded it. I had no further use for it.**

Q Sergeant Kearns didn't tell you to keep every note that you make about this event?

**A Seeing that the only note that I made was the address of occurrence, if that's what I did, I don't recall. All I'm saying is that in past experiences that's what I would have done in an incident such as this. So if I did do that, I discarded it.**

**Sergeant Kearns being a visiting Sergeant, I don't recall him having any conversation like that with me.**

Q All right. Now let's look at the third line.

Well, first of all, on the second line you indicate on that night you were 6'2" and 225 pounds. Was that an accurate description of you that night?

**A Yes, that's fairly accurate.**

Q All right. And if you go to the next line, it indicates that your unit and beat of assignment was the 10th District and car 1011R, correct?

**A Correct.**

Q And that was all accurate, right?

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

243

**A Yes.**

Q And then if you look over a couple, first it says you were on duty. That's accurate, right?

**A Yes.**

Q And then the question is member injured, and you struck the section that says no, right?

**A Yes, under member injured I checked no.**

Q Because to your knowledge, no police officer was injured that night, right?

**A Well, the report specifies just me, not any other police officers, so it was the member that's generating the report injured and I put no, because I was not injured.**

Q Is there any place on your report to say if the man who you used the Taser on is injured?

**A Yes. It's under subject information.**

Q All right. We'll get to that. Here we go.

First of all, you've got the name of Jose **A. Lopez. Where did you get that name and that middle initial?**

**A I would assume Officer Alamillo, who was generating the original report.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

244

Q Did you write that down on the contact card so you would have it when you went to write your report?

**A I believe we were both in 10th District doing the reports at the same time, so I might have just asked him.**

Q I see. So were you both like in one room at the same desk filling out your separate reports?

**A I don't recall what computers we were using at the time, but I believe that we were both in the 10th District.**

Q And as you're filling out the report, do you ask him do you have anything that gives us this fellow's name?

**A I would ask him, when I come to the subject information, what the subject's last name, first name and middle initial was, if he had that information obtained.**

Q And you remember actually looking at identification that he had taken from Jose Lopez?

**A I don't recall where he obtained the information, or where he was looking. He told me that**

County Court Reporters, Inc.
630.653.1622

**the last name was Lopez, the first name was Jose, who had a middle initial A as in Adam.**

Q All right. I take it that it was Officer Alamillo that told you his date of birth was Redacted 1962, right?

**A In my past experiences, if I were to fill out a TR or an Officer Battery Report, information that I need, I would go directly to the person generating the original report, which was Officer Alamillo.**

Q So he gave you that information, right?

**A I can't recall specifically, but there's a good chance that it was him that gave it to me.**

Q And had you measured Jose Lopez, or where you put the height and weight of the man on the report, is that in some kind of an identification document that you and Alamillo were sharing together?

**A Again, that information that I asked Officer Alamillo, I don't know where he obtained the information, but he gave me a height of 5'6" and a weight of 180.**

Q And if you were 6'2" and he was 5'6", that would make him what, six inches shorter than you, or

eight inches?

**A Approximately eight inches shorter than me.**

Q And approximately 45 pounds lighter than you?

**A My weight of 225 and his weight of 180, yes, I'm 45 pounds heavier than Mr. Lopez.**

Q All right. You put on here the address 2451 South Albany Avenue, Chicago, Illinois, 60623 for Mr. Lopez, correct?

**A That's what it says on the report, yes.**

Q So if we look at the address of the occurrence you have at the top of 3038 West 25th Street and compare it to the address of 2451 South Albany Avenue, can you tell us approximately how far apart those two addresses are?

**A Again, I wouldn't be able to give you an approximate distance of how far the address of the occurrence was from the actual address of Mr. Lopez.**

Q All right. And how did you settle on that address of 2451 South Albany as the man's residence address?

**A Again, it would be information that I obtained from whoever was creating the original report.**

Q If, as a matter of fact, Jose Lopez lived with his wife and children in Summit, Illinois, not at that Chicago address, that's something you did not know; is that fair to say?

**A It's fair to say that the residence address Jose Lopez was 2451 South Albany, which I obtained from another officer.**

Q All right. And you leave the telephone number blank. Is that because you couldn't find a phone number for him anywhere?

**A I would assume that if I left the field blank, it's because I didn't have that information to write in there.**

Q All right. In the next box, box 30, you were asked was the subject armed, and you choose the box no, correct?

**A Correct.**

Q After you tased him, did you search him?

**A I do not recall searching him.**

Q Well, it would be good police work not to put a man in a gurney that's to be put in an ambulance if he has a gun or any kind of a weapon on him, on his

person; isn't that right?

**A Usually by protocol, what we would do if the man is not under arrest is do a protective pat-down for weapons. And after tasing Mr. Lopez, I believe someone did a protective pat-down for weapons, or he would not have entered and been allowed into the ambulance.**

Q All right. But did you watch the patting down of him?

**A I can't answer for any other police officers. I know that I did not perform the protective pat-down for weapons.**

Q So the answer is you don't remember watching the pat-down?

**A I don't recall a protective pat-down by the officers that were on the scene.**

Q All right. And then your next box, the question asked, subject injured, and you answer no. Why did you put that on there?

**A Because I saw no visible sign of injury on Mr. Lopez.**

Q Well, were his eyes open? Was he still talking?

**A Immediately after tasing him, I don't recall if his eyes were open. That information was more geared towards when I went to the hospital after Mr. Lopez was dropped off by Chicago Fire Department paramedics.**

Q While you were in the hospital, how long did you stay there that night?

**A I don't recall.**

Q As much as an hour or two?

**A No, not that long. I was there strictly to help restrain Mr. Lopez into a hospital bed and assist the nurses. So a matter of minutes.**

Q Did you stay when the doctors came in to examine him?

**A No, I never spoke to a doctor.**

Q Did you follow up within the next day or two to find out that Jose Lopez had a fractured skull and was bleeding internally in his brain?

**A I was not privy to that information after the incident.**

Q Did you ever learn that?

MR. POLICK: Objection to anything he may have

discussed with his attorney that's protected by attorney/client privilege. And I would direct the witness not to answer anything that infringes upon that privilege.

If you want to rephrase your question to put it outside that realm, Mr. DeRose, then I will allow him to answer.

MR. DE ROSE: All right. That's fair enough.

BY MR. DE ROSE:

Q Did any of the officers who were out there on that scene that night ever tell you that they learned that Jose Lopez got a fractured skull that night and had several brain surgeries as a result of internal bleeding, starting with the very next day?

MR. POLICK: Again, I'm going to object on the grounds of attorney/client privilege, since I represent all the officers in this case. So if you want to qualify your question and ask him in such a way that is just, for example, have you heard from anyone other than your attorney, I'll allow him to answer the question.

MR. DE ROSE: All right.

MR. POLICK: But if you're going to not qualify it, then I'm going to direct him not to answer on the grounds of privilege.

BY MR. DE ROSE:

Q And sir, if I'm not making myself clear by any question I ask you at any time in this deposition, I never want to know what you and your august attorneys are discussing with you. I only ever want to know statements you are learning from members of the Chicago Police Department or civilians who might talk to you about Jose Lopez, and that's all. I want you to have that clearly in your head. I am not ever trying to gather from you what you and your lawyers talk about.

**A Understood.**

Q All right.

Did any officer or civilian tell you that Jose Lopez had a fractured skull when they brought him to the hospital?

**A I do not recall anybody saying anything regarding Jose Lopez and any injury the minute that he was tased to the minute that I left the hospital, or the minute that I finished the report.**

Q It says where was medical treatment obtained, and you've got Mt. Sinai Hospital. You went there, right?

**A Correct.**

Q And obviously, your partner went with you?

**A He did not -- I do not believe that he came into the hospital with me.**

Q So he just drove with you there and waited in the car?

**A Correct, because I was not going to take a long time. We had to come back to the station to finish our reports.**

Q And then it says by whom, and you have the name Dr. Orellana, O-r-e-l-l-a-n-a. Where did you get that name?

**A Again, it's probably information that I received from the original officer who generated the original Case Report.**

Q And that officer is Officer --

**A Alamillo.**

Q Did Officer Alamillo tell you that he talked to Dr. Orellana that night?

**A I didn't ask him. The field asked by whom was medical treatment obtained, and he said Mt. Sinai Hospital and Dr. Orellana.**

Q All right. But did he tell you that Dr. Orellana said the man has a skull fractured and is bleeding internally?

**A I don't recall Officer Alamillo ever telling me any conversation that he would have had with Dr. Orellana, if he had one.**

Q And you did not ask the doctor any questions?

**A I did not have a conversation with Dr. Orellana.**

Q All right. And then you've got condition, hospitalized, and under influence. Do you see that?

**A Yes.**

Q Why did you check the box under influence?

**A Because I thought that it was a field that was appropriate what I felt was happening at the time.**

Q Under influence of what?

**A It doesn't specify. He had behavior and demeanor that could have been similar to someone under the influence or under the influence of drugs, under**

**the influence of any other type of narcotic; PCP, cocaine. That's what I assumed.**

Q How about alcohol?

**A I can't answer for Mr. Lopez, because I don't know how he acts when he's under the influence of alcohol. Through my training and my experience, when I deal with somebody that displayed the same behavior as Mr. Lopez, usually that meant that they were under the influence of a narcotic, which would be mainly PCP or cocaine.**

Q But no doctor that night told you that Jose Lopez was under the influence of a narcotic or PCP, did he?

**A Again, I don't recall having a conversation with any doctor.**

Q No nurse or no paramedic or anybody else ever said to you that night, as you were making out this report, the man was under the influence of a narcotic or a drug or alcohol or anything, did they?

**A Well, the initial request for police from CFD was CPD for drug overdose. So after coming back to the station and filling out my reports, what I generally do**

**is I print this out. So that was originally the nature of the call.**

Q All right.

**A But nobody specifically -- I didn't have a specific conversation with anybody that said that.**

Q All right. And then they want to see what the subject's actions were, and you struck two boxes; did not follow verbal directions. Do you see that?

**A Yes.**

Q And the verbal directions you're talking about are the persuasive suggestions by your partner, "Why don't we go over to the ambulance and get you some help," right?

**A Yes, that could be one of the verbal directions that we used, yes.**

Q Well, were there other verbal directions that he refused to follow?

**A I can't speak for anybody else. All I know is my conversation that my partner had with him generally was revolved around, "Hey, let's try to get you some help, let's go to the ambulance," which he did not follow.**

Q All right. So that was the only verbal direction you had in mind when you wrote this report?

**A That is the only verbal direction that I saw him not follow personally.**

Q Then you strike another box under subject's actions, you marked the box he stiffened and was dead weight. Why did you put that in there?

**A Well, in my previous experiences, when somebody stiffens their body, they are clenching their fists, they are making their body tighter, and it's more of an agressive manner when they stiffen. They don't allow anybody to get compliance through any type of escort hold or anything like that, anything of that nature.**

**So I observed him stiffening, meaning that his fists were clenched. I don't know what kind of position his arms were in. All I remember is that his fists were clenched, and when my partner approached him to try to persuade him to go in the ambulance, that's when he upgraded from passive resister to an assailant.**

Q You never saw the man as dead weight until after you tasered him though; is that fair to say?

**A Dead weight is more of an example. I mean it's not a definition of stiffened.**

Q You didn't mean to say that you thought he was trying to be dead weight so you couldn't take him into custody?

**A I'm sorry. Repeat that question, please.**

Q You are not saying that the man made himself dead weight to resist your taking him into your physical control, did you?

**A Again, I don't know if he was dead weight. Dead weight is just an example used to describe stiff and not to define it.**

Q All right. And now here in this report if we go down further we say that you give the Taser dart numbers. Do you see that, X00-565370?

**A I do.**

Q Now, is that the number of the gun, or the actual darts?

**A That's the model number of the Taser itself.**

Q The Taser gun?

**A Yes.**

Q So although it says Taser dart, the

individual darts don't get actual numbers, do they?

**A That I do not know.**

Q All right. And then it says weapon serial number. This is the number that's on the Taser weapon?

**A Yes.**

Q And where is that Taser dart number that you got?

**A The dart number?**

Q Yes, X00-565370?

**A It's usually underneath -- I can't recall whether it's a serial number or the model number that's underneath the handle, and then there's one along the frame or the slide underneath that, but I can't recall which one is which.**

Q All right. And just a little lower it says who fired first shot, member or offender, and you indicate member. Do you see that?

**A Yes.**

Q And as a matter of fact, no one else fired a shot that night but you; isn't that correct?

**A It asks who fired the first shot, and I checked member, which was me. That's correct, nobody**

**else.**

Q All right. And down in case information it says notifications, OC or Taser incident. That would be OC spray, right?

**A Yes.**

Q And notifications are the place that you have to notify that you discharged your Taser?

**A That's correct.**

Q What's OEMC, the first box you checked off?

**A That's our dispatch unit. We go over the air. We give them a beat number of who deployed the Taser.**

Q All right. The very next entry -- first of all, OEMC, what do those initials stand for?

**A It's operations command. I mean I don't know exactly what the initials for OEMC stand for. I know that it's our dispatch unit.**

Q All right. And then the very next box, you've checked that, and it says Desk Sergeant and Watch Commander, District of Occurrence, and you've checked that off?

**A Yes.**

Q That they were also notified?

**A Yes. If I checked it off that means they would have been notified.**

Q But that particular X in that box, was that hand-made? Because it doesn't look to be quite as clear as the other boxes you're filling out. Did you fill that out after the fact?

**A I can't recall. All I know is that I checked the box saying that I notified the Desk Sergeant Watch Commander, District of Occurrence.**

Q Are you knowledgeable of what happens with these Tactical Response Reports and the Officer's Battery Reports after you fill them out?

**A I know that copies are sent to different places. I don't know what is done with them afterwards.**

Q Do you know if a Criminal Register number, a CR number, was taken out on this case concerning your activities that night?

MR. POLICK: Again, if you're going to qualify that with regard to information other than, have you heard from anyone other than your attorney, I'll allow

him to answer.

MR. DE ROSE: All right.

MR. POLICK: If you're going to keep it unqualified, then I'm going to direct him not to answer.

MR. DE ROSE: All right. Then I want to qualify so that I don't ever draw that kind of an inference from you.

BY MR. DE ROSE:

Q Every question I ask you only concerns information you get from sources other than your attorneys. Do we have that understanding together? And I'll try to remember to qualify it, so let me do it. Now I'll qualify it.

Other than any conversation you may have had with your attorneys, did you ever learn that there was a Criminal Register number taken out on the activities that police officers had with Jose Lopez on that evening?

**A I don't recall the CR number.**

MR. POLICK: I think you misspoke, John. I think you said Criminal Register number. It's Complaint

Register number. There's no criminal charge here.

MR. DE ROSE: I apologize.

MR. POLICK: That's all right.

MR. DE ROSE: I've probably done that a few million times in my life, Joe.

BY MR. DE ROSE:

Q Did Sergeant Kearns ever talk to you that night about what happened out there?

MR. POLICK: Again, other than in the presence of your attorney.

BY MR. DE ROSE:

Q Other than in the presence of your lawyers?

**A While I was in the 10th District generating the TRR and OBR reports, I had a conversation with Sergeant Kearns where I gave him a synopsis of what happened and what occurred.**

Q Did he say he saw what happened when it happened?

**A I don't recall Sergeant Kearns saying anything of that nature. All I remember in general is telling him what occurred on my end.**

Q Did he tell you he was out on the scene

before you deployed your Taser?

**A I don't recall Sergeant Kearns saying anything to that extent. All I know is since he had to approve the TRR report, he asked me what happened, I gave him a quick synopsis, and that was that.**

Q Did you tell him that the man never touched anyone on the street?

**A I told him that my partner, Officer Guettler, and myself were in fear of receiving a battery or great bodily harm, and that's why I tased him because he went from being a -- he went to become an assailant.**

MR. DE ROSE: All right. Move to strike.

BY MR. DE ROSE:

Q That's not my question.

**A But that's what I told him.**

Q Thank you.

**A You're welcome.**

Q My question is, did you tell the Sergeant that the man never touched anyone on the street in your presence?

**A My Sergeant asked me what happened. I told him what happened and why I deployed the Taser. My**

**Sergeant never asked me if anybody touched me or not.**

Q All right. So I take it you never volunteered the fact that you and the other officers were never touched in any way?

**A I gave the information that my Sergeant asked for.**

Q So the answer is no, I never told him that we were not touched in any way?

**A I don't recall my Sergeant ever asking me that, so I don't recall ever saying it.**

Q All right. Did your Sergeant that night, he went to the hospital too, didn't he?

**A I don't recall whether he was at the hospital or not.**

Q But there were other officers at the hospital besides you, weren't there, who had been out at the street?

**A The only officer I recall at the hospital was Officer Alamillo, because it's protocol; if you are generating the original report, you have to get such information as the doctor's name and the condition of the subject.**

Q What condition did he tell you he got of Jose Lopez when he was at the hospital from the doctor?

**A I asked him was he injured because that was relevant to my report, and I don't believe, I did not see any visible sign of injury. And I asked him for what the doctor's name was, and his condition was that he was hospitalized and under the influence.**

Q All right. You kind of answered a little different.

Did you ask him what condition the doctor said the man was in when he examined him?

**A When an officer generates an original report, those are questions that they would ask him. I don't recall whether I asked him that specific question.**

Q Have you ever seen a police report generated in this case that the man had a skull fracture and was hemorrhaging from his brain?

**A I don't recall any visible sign of injury, so I don't recall any reports stating such a degree.**

Q He looked fine to you, didn't he?

**A Hence why I said no visible sign of injury.**

Q And you never went back to visit him in the

hospital and see that half of his skull was missing, did you?

MR. POLICK: Objection to the form of the question. It's compound.

THE WITNESS: I never visited Mr. Lopez again.

BY MR. DE ROSE:

Q And did you ever inquire, without anything to your lawyers, did you ever inquire of anybody what happened to that man I tased and they took to Mt. Sinai?

**A Seeing that he had no visible sign of injury at the time of the occurrence, I don't recall I ever inquired how he was doing thereafter.**

Q All right. Before you got a lawyer in this case, you were served with a copy of the Complaint, were you not?

**A I believe I was.**

Q Did you read it?

**A I believe I did.**

Q And did you notice that the day following your tasering of him, that his skull was cut open and a flap of his skull was placed in his stomach and a

quarter of his brain was cut away?

**A I don't recall that specific description. I know that I obtained such a document, I know that I read it over, but I can't recall specifically what was in the document.**

Q Well, did you see references of what they did, before they started to talk about the Counts on the facts of the case, what the doctors at Mt. Sinai Hospital did to him over the next several months?

**A I don't recall what was done to Mr. Lopez after the incident.**

Q Did you notice in the Complaint the assertion that Mr. Lopez has been in a coma for several years?

MR. POLICK: I would object to the form of the question. You call it an assertion that's in the Complaint. It's an allegation to which this officer has responded to in his Answer.

MR. DE ROSE: All right.

BY MR. DE ROSE:

Q By the way, you read your Answer before you signed it, right?

MR. POLICK: Objection. The defendant is not

required to sign the Answer to the Complaint.

MR. DE ROSE: All right. And that's true.

BY MR. DE ROSE:

Q Did you read the Answer that was filed in your behalf in this Complaint, in this case?

**A I believe I did, but I don't recall specifics.**

Q All right. And this is Exhibit 51.

Exhibit No. 51, it says on the first page are Defendant Stevan Vidljinovic's Answers to Plaintiff's First Set of Interrogatories. Did you review this before even considering signing it?

MR. POLICK: All right. Let me make my objections here.

First of all, his name is Vidljinovic. Secondly, you were asking him questions about his answer to the Complaint in this case and various allegations in the Complaint. We now have before the defendant what's been marked as Plaintiff's Exhibit 51, which is Defendant Vidljinovic's Answers to Plaintiff's First Set of Interrogatories. So this is a document that is different than what you were previously asking

Stevan Vidljinovic
September 4, 2013

269

him about.

MR. DE ROSE: That is correct.

MR. POLICK: Take your time and look at it.

MR. DE ROSE: Yes. Take a moment. And I'm not trying to tell you this is a copy of the Complaint. That's Exhibit No. 1, but I'm not going to show you that today, or we'll never get done.

BY MR. DE ROSE:

Q Sir, did you sign this document, Page 12?

**A Yes.**

Q And you negate that you were first duly sworn on oath, and state that you've read the foregoing document and the answers made herein are true, correct and complete, to the best of your knowledge and belief, correct?

MR. POLICK: Did you say that he negate, or he stated?

MR. DE ROSE: I'm sorry. He stated. If I said negate I apologize.

MR. POLICK: It sounded like it. I might be wrong. It's been a long day.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

270

BY MR. DE ROSE:

Q Do you remember signing that on the 31st of January, 2013?

**A It shows that I did sign it 31 January, 2013, yes.**

Q Before a Notary Public, right?

**A Yes.**

Q And your eminent lawyer, was he with you to sign right after you, Mr. Gallardo?

**A I don't recall whether he was with me or not, but it seems that he has signed it.**

Q All right. I want you to go back. I want to just look at one question and answer with you. Go to Page 3. And the Interrogatory that you're being asked to answer is Interrogatory No. 5. And it says, "For the individually-named defendants, please describe in detail your interactions with Jose Lopez, including any physical contact you had with him."

And your answer is, "Officer Vidljinovic objects to this Interrogatory as vague as to the term 'interactions,' and requesting detailed information that is more properly the subject of a deposition.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

271

Subject to and without waiving these objections, Officer Vidljinovic states that when he was on the scene he observed the plaintiff pacing and mumbling, and that plaintiff appeared to be under the influence of some substance.

"Officer Vidljinovic observed his partner, Officer Guettler, try to speak with the plaintiff, but plaintiff did not respond and at some point walked away.

"When Officer Guettler tried to escort plaintiff by the arm, plaintiff became combative, clenched his fists and started swinging. Officer Vidljinovic tased plaintiff to protect his partner and other officers."

Just that far, is that the way you remember this happening, or the way you've been telling us today?

MR. POLICK: Objection to the form of the question, but you can answer over the objection.

THE WITNESS: As opposed to the specifics that I didn't recall whether he was pacing, the subject was mumbling. We could not comprehend him.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

272

My partner, Officer Guettler, tried to speak with the plaintiff and persuade him into an ambulance, which he did not respond.

Here it states that at some point he walked away. Again, I don't recall whether he was pacing, or whether he was walking away. The elements that I do recall are that my partner attempted to have a conversation with him, he began to become combative and swing his arms.

BY MR. DE ROSE:

Q All right. So let me ask on each of those, I'm going to break it down a little bit.

Where you signed this document attesting to its accuracy, it says in this answer when you were on the scene, you observed the plaintiff pacing and mumbling. You didn't tell us anything about pacing today, did you?

**A I said I did not recall whether he was pacing. I recalled him standing on the street.**

Q All right. Why did you sign this, the truthfulness of this document, if you did not observe Jose Lopez pacing?

County Court Reporters, Inc.
630.653.1622

**A Reading --**

MR. POLICK: Objection to the form of the question. It misstates the witness's testimony. You may answer over the objection.

THE WITNESS: Reading the Interrogatory and signing it in January, early this year, the events were more fresh in my mind. Asking me the questions today, I sufficiently supplied you with all the elements that I did observe. And if I did not observe something or I couldn't recall, I simply stated that I couldn't recall. That doesn't mean that he wasn't facing, and that doesn't mean that he didn't pull away. This given date and time, I just don't recall.

Q All right. Today you don't recall. But if this was taken many months ago and you attested to its accuracy, would you believe that this description is more accurate than the one you gave today during your deposition so far, that you actually observed him pacing and mumbling?

**A Reading it today, yes, I believe that there is a fair assumption that this might be more accurate. The elements that I did pose to you --**

Q And I don't want to know about --

**A I just want to finish really quick. Can I finish?**

Q No, because you've answered my question.

**A Well, I have to articulate myself in order to answer.**

Q Well, you've answered enough.

MR. POLICK: No, you can't cut him off, John. You can move to strike, but you can't cut him off.

MR. DE ROSE: All right. I'll move to strike.

MR. POLICK: But you can't move to strike when he hasn't answered.

MR. DE ROSE: Okay. I move to withdraw the question.

MR. POLICK: Okay. You can move to withdraw the question.

MR. DE ROSE: Thank you.

MR. POLICK: You're welcome.

BY MR. DE ROSE:

Q Now. Very simply, is your memory now refreshed, as you look at this document, that you observed my client pacing when you first walked up to

him?

**A Reading this now, seeing that I have signed it, I would say that it is accurate that I probably observed the plaintiff pacing and mumbling.**

Q Is your memory now refreshed as to how he was pacing?

**A It's still not refreshed. I don't recall how he was pacing and if he was pacing at all. All I know is that if I answered the Interrogatory No. 5 as he was pacing, then he was.**

MR. DE ROSE: Thank you. Move to strike the rest of the plaintiff's answer after he indicated he doesn't recall how my client was pacing.

MR. POLICK: My client is not the plaintiff in this case. He is the defendant, named defendant in this case. So you can't strike something that he isn't. He's not the plaintiff.

MR. DE ROSE: If I made an observation of him as a plaintiff, I apologize to you. I mean to strike all of the deponent's answer after he indicated that he did not recall how my client was pacing, because that really was all I was asking.

BY MR. DE ROSE:

Q All right. Let's go down a little further.

You wrote in this document and attested to it that Officer Guettler tried to escort plaintiff by the arm. Do you see that?

**A Yes.**

Q Earlier on in this deposition I specifically asked you if you observed your partner take hold or grab Jose Lopez's arm or elbow and gently try to escort him over to the ambulance. Do you remember that?

**A I remember you asking that question, yes.**

Q And you indicated that he did not, did you not, in the deposition?

MR. POLICK: Objection to the form of the question. Double negative, compound.

MR. DE ROSE: All right. Let me withdraw it.

BY MR. DE ROSE:

Q You want to change your earlier answers in this deposition, seeing this answer that you have attested to, indicating now that your partner tried to escort my plaintiff by the arm?

MR. POLICK: Objection to the form of the

question.

If you're trying to impeach him, it's an improper impeachment, and it misstates the witness's testimony. He's not trying to change his answers here; I think he's trying to explain them to you. So again, I'll object to the form of the question. It's improper impeachment.

MR. DE ROSE: All right. I'll withdraw the question.

BY MR. DE ROSE:

Q Is your memory now refreshed that your partner tried to escort Jose Lopez by the arm?

**A Reading this document today, there is a chance that Officer Guettler tried to escort Mr. Lopez by the arm.**

Q And do you believe that the observation you're making in this Answers to Interrogatories is more properly accurate than the testimony you gave earlier today, because you signed this document months ago?

**A I believe that the testimony that I gave today was truthful about the elements that you asked,**

**and I tried to answer the questions as best as I could. Since this documentation was taken and I signed off on it months ago, there is a chance that this might be more accurate.**

Q All right. What arm did your partner take hold of on Jose Lopez that night?

**A Reading this, I don't recall what arm. And earlier today I didn't even recall that he grabbed him by the arm. All I recalled was that he gestured to him and tried to persuade him to go into an ambulance.**

Q When you say now grabbed my client by the arm, did you see my client raise his arm to try to break the grip on his arm that your partner had?

MR. POLICK: I'm going to object to the form of the question because it assumes facts not in evidence and it's improper impeachment.

What the Interrogatory says is, "Officer Guettler tried to escort plaintiff by the arm." It does not say that Officer Guettler grabbed plaintiff by the arm. So I'm going to object to this on the grounds that it is improper impeachment. And he can answer over that objection.

MR. DE ROSE: But excuse me. I'm going to make this clear.

BY MR. DE ROSE:

Q Aren't you the one that said grabbed by the arm? I never used those words, did I, before you gave that answer, your last answer?

**A I don't know. And if I did, I was mistaken. I did not mean to use that phrase.**

MR. DE ROSE: All right. Miss Reporter, will you read his last answer before this one, just his answer, or my question and his answer?

(The record was so read by the court reporter.)

BY MR. DE ROSE:

Q All right. So the first use of the words "grabbed by the arm" were used by you. Do you remember him grabbing my client by the arm at any time?

**A From what I just heard, the first use was used by you.**

**I don't recall him grabbing. All I recall him doing was persuading him to try to get into an ambulance. The method that he used to try to persuade**

**him I did not recall, except that he gestured to the ambulance. Today I did not recall.**

Q Why did you use the word -- first of all, I'm not going to even go back to that question, because it's not worth it for where we're at.

But look at -- you signed the document that said that your partner tried to escort plaintiff by the arm. Why did you pick those particular words to put in this document?

**A When I said that Officer Guettler tried to escort your plaintiff by the arm, I was describing an action that at the time of signing the document, I might have believed that he did.**

**The operative word in the document and in the answer is tried. I don't know if he ever came into contact with his arm. I don't know if he ever grabbed his arm. All it says, that he attempted, tried to escort the plaintiff by the arm.**

Q And why did you pick the arm? Why not some other part of the man's anatomy, like his back or his shoulder?

**A Because normally, the way we're trained, an**

Stevan Vidljinovic
September 4, 2013

281

**escort hold is by the arm. And if he was attempting to escort him to the ambulance, it would be by the arm, which I don't even know if he made the contact with, because I did emphasize tried.**

Q All right. And right after that you indicate plaintiff became combative. Is that when you saw my client raise his arm and start flailing both of them?

**A When your client's fists were clenched and he started swinging them, that happened at the same time that he was becoming combative. That was just a description of him being combative.**

Q And all of that was after you believe your partner tried to escort the plaintiff, my client, by his arm. Is that why you wrote this that way?

**A I answered to you earlier today that my partner tried to gesture him to the ambulance, at which time your client flailed his arms and began swinging clenched fists towards my partner's direction. And I was in the general vicinity; so, to protect my partner and other police officers, that is why I tased Mr. Lopez. He became combative and became an assailant.**

Q So this is very clear, by this answer you

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

282

don't mean to say that any police officer was in physical contact with my client when erased and flailed his arm?

**A I do not recall anybody having physical contact with your client as regards to Officer Guettler at the moment that he flailed his arms, because that was the only person I could see.**

Q Which side, or where was Officer Guettler in relation to the arm or arms that my client flailed when Officer Guettler tried to escort him by an arm? Which arm was the officer at?

MR. POLICK: Asked and answered. He may answer over the objection.

THE WITNESS: If the defendant was facing me, Officer Guettler was to my right, so he would be closest to Mr. Lopez's left arm if he attempted to escort him by his arm.

MR. DE ROSE: All right, good.

BY MR. DE ROSE:

Q I just want to ask you a few questions about the last sentence of this Interrogatory. It writes, "He recalls," and I guess he means you, "plaintiff

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

283

being combative at the hospital and assisted hospital personnel in getting plaintiff under control." Do you see that?

**A Yes.**

Q So how long did you stay at the hospital before you left?

MR. POLICK: Objection. Asked and answered. You can answer over the objection.

THE WITNESS: Not long. I don't know an approximate time.

BY MR. DE ROSE:

Q As many as ten minutes?

**A Again, I don't know an approximate time.**

Q Were you the one that helped take the restraining straps off of my client's body?

**A I don't recall me ever saying or doing that.**

Q All right. And you say you assisted the hospital personnel in getting Jose Lopez under control. How did you do that?

**A I believe that when I was assisting hospital personnel, I was holding down an arm of Jose Lopez while they were trying to restrain him.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

284

Q They were trying to put the straps on him again after they took them off?

**A I believe they were trying to restrain him to -- if it was to put the straps on, I can't answer that. I don't recall what they were attempting to do. All I know is that they needed assistance, and I attempted to hold Jose Lopez by the arm to try to gain compliance.**

Q And was there another officer there holding down his other arm?

**A I don't recall if there was another officer or not inside the hospital.**

Q And how long did you hold down -- you only held down one arm, I take it?

**A Correct.**

Q Left or right?

**A I don't recall.**

Q And did you hold it down until a different kind of restraining mechanism was put on that arm?

**A I held Jose Lopez by the arm until they gained compliance from him, until they properly restrained him.**

County Court Reporters, Inc.
630.653.1622

Q Did you look at his face while you were holding his arm?

**A Yes.**

Q His eyes were closed, weren't they?

**A If he was combative, I don't believe that his eyes were closed.**

Q You thought he was wide-eyed and open and looking at you folks?

**A He was still incoherent at the hospital, but he was being combative. All I know is that I went there to assist the nurses and the other employees of the hospital to gain compliance by him.**

Q When you say he was being combative, was he trying to hit you or one of them people?

**A He was displaying the behavior that he displayed on the street prior to me tasing him. He had his fists clenched and he was flailing them around, so we tried to restrain him to get him medical treatment.**

Q He did not utter a single word you could understand once he got in the hospital; is that true?

**A He didn't utter a single word that I could understand, period, the whole time I was in contact**

**with him.**

Q Well, you told us out on the street he was uttering words; you just couldn't understand them?

**A Right. He didn't utter words that I could understand.**

Q All right. Now in the hospital, was he still uttering words, or just sounds?

**A He was acting the same as he was when he was on the street uttering words and sounds that I could not comprehend.**

Q All right. Did it appear to you that he was in any kind of pain?

**A I saw no physical sign of injury. I did not believe that he was in any kind of pain. All I know is that he was being combative, and I attempted to assist the hospital personnel to gain his compliance.**

Q All right. And just one more, because I'm going to quit on here.

Interrogatory No. 8, it's on Page 4, and I'm just going to read you your answer. "Officer Vidljinovic objects to this Interrogatory to the extent that it requests information protected by the

attorney/client privilege and the attorney work-product doctrine. Subject to and without waiving these objections, Officer Vidljinovic states that he had contact with Sergeant Mark Kearns and Lieutenant Robert Dubiel regarding the Tactical Response Report, and refers plaintiff to the documents previously produced. He also had contact with hospital staff at Mt. Sinai Hospital."

Who were the hospital staff that you had contact with?

**A Specifically, I don't recall. I know that there were nurses in the room.**

Q Female or mail?

**A Mt. Sinai at that time has both genders, so I can't be gender specific.**

Q So you have no picture in your mind as you're answering this question of who or what the hospital staff personnel looked like who you were talking to?

**A All I know is that there was hospital personnel inside the room while I was trying to gain Mr. Lopez's compliance. I could not specifically tell you who they were.**

Q Did they tell you they had to rush him to the Emergency Room?

MR. POLICK: Objection to the form of the question, because it assumes facts not in evidence. You may answer over the objection.

THE WITNESS: I did not have a conversation with the hospital staff. All I did was try to gain control of Mr. Lopez while they were attempting to gain compliance.

BY MR. DE ROSE:

Q And you never inquired of any hospital staff at Mt. Sinai within the next few days, or of your command staff in the 10th District, how is this man doing; how did it turn out for him?

MR. POLICK: Objection. That's been asked and answered. And it's also a compound question. You may answer over the objections.

THE WITNESS: The only hospital staff personnel that I inquired about was Dr. Orellana for my report purposes. And after that, no, I never inquired.

BY MR. DE ROSE:

Q And your only inquiry of him was what's your

name?

**A I asked Officer Alamillo, who originally generated the original Case Report, because it was a field that I needed for my Technical Response Officer Battery Report.**

Q And just one more for you.

Did you have any concern for the physical well-being of the man you had just tasered and went down to the street that night, after that night?

MR. POLICK: Again, I'm going to object to the form of the question. But you may answer.

THE WITNESS: Seeing that he had no visible sign of injury, and seeing that he was very uncooperative and very aggressive and very combative, I did my job by gaining his compliance, by helping hospital staff restrain him. And then I filled out the proper paperwork. After that, I did not inquire about Mr. Lopez after that.

MR. DE ROSE: All right. I just want that answer stricken as not responsive. This will be my last question. Will you read it back?

(The question was so read by the court reporter.)

MR. POLICK: Again, my objections to the question will stand. You may answer over the objections.

THE WITNESS: Yes, if I tasered somebody, I might, depending on the situation and if I observed injury, inquire whether that man was okay.

After the incident was done, I assumed from everything that I observed, that Mr. Lopez was okay, so I did not inquire thereafter.

MR. DE ROSE: All right. Move to strike those portions of the answer that do not respond to the question. But otherwise, I have no objection to those responsive portions.

I have no further questions, counsel. You may inquire.

MR. POLICK: I have a few follow-up.

EXAMINATION

By: Mr. Polick

Q Officer, you indicated at the beginning of the deposition that you have only been assigned to the 10th District; is that correct?

**A That's correct.**

Q Have you been detailed to any units other than the 10th District?

**A Yes, I have.**

Q And where have you been detailed?

**A I've been detailed to Unit 211, the area Central PSN Dentyne.**

Q Okay. And by detailed, does that mean that you are on loan to that unit; that you were still technically assigned, for Department purposes, to the 10th District?

**A Technically, yes.**

Q And how long have you been detailed to Unit 211? When did you start that detail?

**A Initially the detail was to Unit 214, which ended up becoming unit 211. So I have been detailed to unit 214/211, it will be two years in November.**

Q You told us earlier that you were in a marked Chicago Police Department squad car on the evening of this occurrence, July 22nd of 2011, correct?

**A Correct.**

Q And you were in a full Chicago Police

Department issued uniform?

**A That's correct.**

Q Was Officer Guettler, your partner, also in a Chicago Police Department uniform?

**A Yes, he was.**

Q And how about Officer Alamillo, was he also in a CPD uniform?

**A Yes, he was.**

Q And the other officers that you told us you recall being on the scene of the occurrence, were they also in Chicago Police Department uniform?

**A My best recollection, yes.**

Q You said that the shift you were working started at either 9:30 or 10:30, and if you started at 9:30, you usually ended your tour of duty around 6:00; and if you started at 10:30, your tour of duty would end at around 7:30 A.M. Strike that. Let me restate that.

You indicated that the Midnight shift you were working on either started at 9:00 P.M. and ran to 6:00 A.M., or started at 10:30 P.M. and ran to 7:30 A.M., correct?

**A Correct.**

Q On the date of this occurrence, July 22nd of 2011, do you recall if you started at 9:00 P.M., or at 10:30 P.M.?

**A 9:00 P.M.**

Q And that's the best of your recollection?

**A Yes.**

Q And I believe you testified that you think you went on patrol after roll call at approximately 9:30 P.M. that evening, correct?

**A Correct.**

Q You also told us that when you are listening to radio traffic or communications in your squad car, you're doing that over what is called Zone 10, correct?

**A Correct.**

Q And that is a police dispatcher that you are receiving those communications from?

**A Correct.**

Q You are aware that the City of Chicago has a 911 emergency call system?

**A Yes.**

Q And that citizens who need emergency

assistance can call 911, and either the police or the fire department will be dispatched?

**A Correct.**

Q When a citizen makes a 911 call to the 911 center, are you able to hear those calls over your radio in the squad car, Zone 10?

**A Not the ones that are dispatched to the fire side of OEMC.**

Q How about the actual telephone call of the citizen to the 911 center, are you able to hear those calls over your radio?

**A No.**

Q Okay. You get your information from the police dispatcher who is receiving the call from a citizen, correct?

**A Correct.**

Q On a day-to-day basis you engage in what would be described as normal conversation with friends and co-workers, correct?

**A Correct.**

Q Were you able to have any type of normal conversation with Mr. Jose Lopez on July 22nd of 2011?

**A No.**

Q Was Mr. Lopez able to communicate to you in anything that could be described as normal conversation on July 22nd of 2011?

**A No.**

Q Going to the Taser that you deployed at the scene, you indicated that the trigger of that Taser is what jettisons the probes, and that there is then a toggle switch that controls the electric current, correct?

**A Correct.**

Q How many times did you press the trigger of the Taser that you deployed?

**A Once.**

Q And did you manipulate in any way the toggle switch on that Taser after you pulled the trigger of the Taser?

**A I did it to turn off the electromagnetic waves.**

Q And after you turned it off to cut off the electromagnetic waves, did you ever re-engage the toggle switch to send more electric waves into Mr.

Lopez?

**A No.**

Q Did you ever dry stun Mr. Lopez with the Taser?

**A No.**

Q Approximately how far away from Mr. Lopez were you when you deployed your Taser?

**A Approximately three to five feet.**

MR. DE ROSE: While he's looking, just an observation. That's the way you should answer questions. When he's giving you a direct question, just go to it.

All right. Go ahead.

BY MR. POLICK:

Q You indicated that you observed no signs of physical injury to Mr. Lopez, correct?

**A Correct.**

Q Did you notice if he was bleeding in any way from any of your observations, first at the scene of the occurrence?

**A No.**

Q Did you notice any signs of bleeding to Mr.

Lopez when you were at Mt. Sinai Hospital?

**A No.**

Q You were asked questions about the Event Queries that were marked as Exhibits 2C, 2G and 2B.

Have you ever personally prepared an Event Query of the type that were marked as those exhibits?

**A No.**

Q With regard to Exhibit 2C, you indicated from your reading of that document, that it appeared that the initial police dispatch was a need for CPD for drug overdose, correct?

**A Correct.**

Q Do you recall actually hearing the police dispatcher make that call over your Zone 10 radio?

**A I do not recall.**

Q Would you consider a person who is having a drug overdose to be an emergency situation?

**A Yes.**

Q I want to direct your attention to the Special Order from the Chicago Police Department that was marked as Plaintiff's Exhibit 14B that's entitled Alcohol and Drug Dependent Persons. You were asked

some questions about that Special Order, correct?

**A Correct.**

Q I want to direct your attention to Section 2A of that Special Order which I'm going to read into the record.

"Persons who, in the professional judgment of the police officer, are identified as being incapacitated in a public place will be taken into protective custody and immediately transported to a detoxification facility. If no detoxification facility in the district of occurrence or immediately adjacent districts, the person will be taken to the nearest hospital approved by the Chicago Department of Health to participate an Emergency Room Service. A list of those hospitals is contained in the Department directive entitled 'Squadrol Operating Procedures.'"

You indicated that Mr. Lopez, in your opinion, was under the influence of some type of narcotic which you believed to be either PCP or cocaine, correct?

**A Correct.**

Q And that based on your observation of Mr.

Lopez's actions, he was incoherent and incomprehensible, correct?

**A Correct.**

Q Did you believe him to be a danger to himself?

**A Yes.**

Q Did you believe him to be a danger to others?

**A Yes.**

Q Did you believe he was incapacitated in a public place because of that condition?

**A Yes.**

Q And was it your judgment that he should be taken into protective custody for his safety?

**A Yes.**

Q After seeing Mr. Lopez at Mt. Sinai Hospital on July 22nd of 2011, did you ever see him again?

**A No.**

MR. POLICK: I don't have any further questions. Mr. DeRose might have a follow-up.

MR. DE ROSE: Just a couple on what counsel did.

RE-EXAMINATION

By: Mr. DeRose

Q You told counsel that Jose Lopez had no normal conversation with you that night, in the few moments you were in his presence, before you used your Taser; is that correct?

**A Nothing that I would have described as normal conversation.**

Q All right. You were aware that other members of the Chicago Fire Department had been in his presence for at least 15 minutes before you arrived?

MR. POLICK: Objection to the form of the question. You can answer.

THE WITNESS: I was not aware.

BY MR. DE ROSE:

Q You didn't know if anybody else had been with him during that 15-minute period?

**A I know that beat 1033R, Officer Alamillo and Valdovinos, and the two paramedics -- I don't know them specifically, from the Chicago Fire -- were on scene. I don't know how much contact they had with Mr. Lopez or how long they were on scene.**

Stevan Vidljinovic
September 4, 2013

301

Q And the ambulance, you don't know, or do you know, the ambulance didn't even arrive on the scene until ten minutes after the fire truck, did it?

MR. POLICK: Objection. Calls for speculation. You can answer over the objection.

THE WITNESS: I don't recall a fire truck being there, and I don't recall initially when the ambulance arrived on scene.

BY MR. DE ROSE:

Q If, even before you got there, Jose Lopez had said to personnel of the Chicago Fire Department over a 10- to 15-minute period that he did not want medical assistance or attention, is that something you would have wanted to know?

MR. POLICK: Objection to the form of the hypothetical. It's incomplete and assumes facts not in evidence. You may answer over the objection.

THE WITNESS: When you come to a scene, you'd like to know as much information that's given.

BY MR. DE ROSE:

Q But you, yourself, never talked to any of the paramedics or anyone else who was on the scene, other

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

302

than that one officer?

**A Again, I recall the paramedics there; I just do not know when they arrived on scene, if they were already on scene.**

**Initially when I arrived on scene, I recall going straight to Officer Alamillo, asking him for a quick synopsis of what was going on.**

Q All right. Now, the Event Queries that counsel asked you about, you said I never drafted those, but you can tell from those Event Queries we've shown you that two dispatchers who worked the 10th District are making entries on those Queries, right?

**A You can assume that there are two work stations at work, usually manned by one dispatcher each. I can't speculate whether it was one or two.**

Q Did you recognize the voice of either one of those dispatchers that night?

**A I don't recall which dispatchers were working that night.**

Q All right. Sometimes you recognize the voice of the particular dispatcher, and you'll even call them by their first name, hello Gladys, or something like

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

303

that; is that not true?

**A That is true.**

Q All right. So it's fair to say, as you try to think back on that night, you cannot recall the names of the dispatchers involved?

**A Yes, it's fair to say that the dispatchers that I'm familiar with on Zone 10, I cannot recall whether they were working that night or not.**

Q And you didn't recognize the voice of the persons who were talking to you?

**A I don't recall recognizing the voice of the dispatchers on that given night.**

Q As you understand it, the section that counsel just read to you about a person that you believe is under the influence of a narcotic drug, you have the right to take them for their own protection to a detoxification facility, right?

**A It's right that somebody that's incapacitated in a public place will be taken into protective custody and immediately transported into a detoxification facility. If there isn't one in the district of occurrence or adjacent districts, they will be taken to**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

304

**a hospital, nearest hospital.**

Q I know what that says. My question to you now is, was it your intention to take Mr. Lopez to a detoxification facility that night?

**A Our objective, which was our objective the whole time all the way up to Mr. Lopez's actions that caused us to tase him, was to seek medical treatment for him.**

Q All right. Now, with that being your intention, do you know that a citizen of the community has a right to refuse medical attention or treatment of any kind?

MR. POLICK: Objection. That's been asked and answered several times. You can answer over the objection.

THE WITNESS: I do know that.

Having a conversation with Mr. Lopez, I could not understand anything that he was saying, so I could not make that assumption.

MR. DE ROSE: All right. Move to strike the rest of the answer that was beyond the words "I do know that."

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

305

I have no further, counsel.

MR. POLICK: Just a few follow-up on that.

RE-EXAMINATION

By: Mr. Polick

Q Did Mr. Jose Lopez ever say to you specifically, "I do not want to go to the hospital?"

**A I did not have a normal conversation with Mr. Jose Lopez. He never said anything that I could understand or make sense of specifically.**

Q And who took Mr. Jose Lopez to Mt. Sinai Hospital? Was it a police officer, or was it the Chicago Fire Department paramedics?

**A Chicago Fire Department paramedics.**

Q So Mr. Lopez was placed in the Chicago Fire Department ambulance and transported by Chicago Fire Department paramedics to Mt. Sinai Hospital?

**A Correct.**

MR. POLICK: I have nothing further.

RE-EXAMINATION

By: Mr. DeRose

Q Just on that. Did one of the police officers ride in the ambulance with the paramedics and Mr. Lopez

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

306

over to Mt. Sinai?

**A Normal protocol, sometimes a police officer does ride, especially if a paramedic requests them to ride, if the subject is combative.**

**That given date, I do not recall specifically if somebody rode with Mr. Lopez in the ambulance.**

Q Did you and your partner follow the ambulance to the Mt. Sinai Hospital?

**A Yes, we did.**

Q Did you help take the gurney out of the ambulance with any other officer's help?

**A I don't recall taking the gurney out of the ambulance or assisting the paramedics.**

Q And I take it that when the ambulance arrived there, you didn't see an officer step out of the ambulance with, before, or after the gurney?

**A Again, if I did, I would have recalled somebody riding with him. I don't recall.**

MR. DE ROSE: All right. I have no further questions. Counsel?

MR. POLICK: None from me.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

307

MR. DE ROSE: All right.

MR. POLICK: Signature is reserved.

MR. DE ROSE: All right. With that, you're free to go.

THE WITNESS: Thank you.

AND FURTHER DEPONENT SAITH NOT

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

308

STATE OF ILLINOIS )
) SS.
COUNTY OF DU PAGE )

I, GLORIA APOSTOLOS SIOLIDIS, C.S.R., in and for the State of Illinois do hereby certify that OFFICER STEVAN VIDLJINOVIC was first duly sworn by me to testify the truth; that the above deposition was recorded in shorthand and reduced to typewriting by me; that the deposition is a true, correct and complete transcript of the entire testimony given by the said witness at the time and place hereinabove set forth, and that signature is hereby reserved by said witness.

I further certify that I am not counsel for, nor in any way related to any of the parties to this suit, nor am I in any way interested in the outcome thereof.

In witness hereof, I have hereunto set my hand and affixed my Notarial Seal this 7th day of September, A.D., 2013.

_______________________________

GLORIA APOSTOLOS SIOLIDIS
CSR License #084-0001205

County Court Reporters, Inc.
630.653.1622

STATE OF ILLINOIS )
) SS.
COUNTY OF DU PAGE )

I HEREBY CERTIFY that I have read the foregoing transcript of my deposition given at the time and place aforesaid, consisting of pages 1 through 307 inclusive, and I do again subscribe and make oath that the same is a true, correct, and complete transcript of my deposition so given as aforesaid as it now appears or inclusive of any corrections or additions attached hereto.

_______________________________
OFFICER STEVAN VIDLJINOVIC

SUBSCRIBED AND SWORN TO
before me this _____ day of
_______________ A.D., 2013.

_________________________
Notary Public

A

**A-l-a-...** 43:2
**A.D** 308:17 309:17
**A.M** 1:18 33:3,6 148:5 226:17 226:18 227:8 240:14 292:17 292:21 292:22
**abbrev...** 37:1
**ability** 6:16 165:12 198:19
**able** 21:7 82:7 97:11 116:15 125:18 125:20 181:20 189:11 211:15 211:17 246:15 294:5,10 294:21 295:2
**abreast** 101:13 124:12
**absolute** 153:19
**absolu...** 61:14 212:6
**Abuse** 184:14
**academy** 11:12,20 14:19,22 16:2 99:22 167:16 173:20 174:8,15 174:18 175:16
**accepted** 199:15
**access...** 73:12 103:4 125:21 143:9 146:21 170:18 194:18 195:1
**accide...** 14:3
**accide...** 13:20
**accomm...** 9:8
**accomp...** 218:5
**accompany** 10:14 214:20
**accomp...** 9:12
**accout...** 102:7
**accuracy** 272:14 273:16
**accurate** 225:5,16 227:2 233:17 242:16 242:17 242:22 243:3 273:17 273:21 275:3 277:18 278:4
**accura...** 74:20
**acknow...** 54:11,15
**acknow...** 50:3 92:10
**acknow...** 50:9,12 50:14 54:4,5
**act** 90:3 98:16,21 130:14 184:15
**acted** 195:21
**acting** 29:17 286:8
**action** 66:18 70:9,12 74:14 81:10,19 82:2 83:17 84:17 96:19 98:5 167:19 176:16 184:1 189:19 194:2 204:22 280:12
**actions** 98:6 111:2 120:10 120:15 167:20 193:19 194:7 198:1 210:19 234:8 255:7 256:6 299:1 304:6
**activate** 26:3 55:18 56:9
**activated** 55:22 56:2,10
**active** 143:7 162:17 193:13 194:21 197:22 198:7
**actively** 92:16
**activi...** 260:19 261:18
**activity** 36:16 37:1 47:21 50:9 163:13 182:13 232:7,12 233:10 233:17 238:11 238:16 238:16 239:6,7
**acts** 194:14 254:5
**actual** 10:15 28:21 53:17 59:19 140:1 203:11 205:16 206:1 227:17 232:17 246:17 257:18 258:1 294:9
**Adam** 245:2
**add** 18:18
**added** 192:2,3
**Addendum** 192:9
**addition** 159:22 160:18 162:5
**additi...** 23:1 29:5 139:20 139:20 140:3,8
**additions** 309:10
**address** 35:1,9 55:19 61:8,9 61:10 62:15 81:1 86:21 87:5 101:18 224:19 225:4,8 225:9,16 225:19 225:19 226:6 240:17 240:19 240:22 241:1 242:6 246:6,10 246:12 246:16 246:17 246:19 246:20 247:3,5
**addresses** 246:14
**adjacent** 74:13 298:11 303:22
**admini...** 4:5
**ADRIAN** 1:8
**adult** 91:9
**ADVD** 37:1
**advice** 174:22 181:8
**advised** 18:17 84:19 130:8 158:12
**affect** 73:14
**affirm...** 10:3
**affixed** 308:16
**aforesaid** 309:6,9
**afterward** 165:14

**agencies** 151:22 152:22
**aggres...** 118:19 165:1 289:14
**aggres...** 144:9
**ago** 14:8,9 14:17 128:15 142:6 173:12 273:15 277:20 278:3
**agree** 90:19 192:15
**agrees** 211:20
**agressive** 109:21 256:11
**ahead** 35:18 70:17 117:9 166:8 188:1 197:9 296:13
**aide** 182:12
**air** 38:11 39:11 41:4 53:18 54:10,13 92:10 145:5 259:11
**Alamillo** 1:9 43:1 49:12,21 60:7 65:22 66:15 67:22 68:2 69:22 70:4,10 70:20 71:8,11 72:2,5,7 72:13 77:10 81:5,9 81:15,16 83:21 85:13 93:10 94:22 96:11 97:10,15 100:8 102:1,2 106:3,13 108:7 120:2,7 120:11 120:15 123:13 127:13 142:20 177:9 200:13 215:19 218:5 220:9 233:8 234:2 236:12 236:13 236:16 243:21 245:4,9 245:16 245:18 252:20 252:21 253:7 264:19 289:2 292:6 300:18 302:6
**Albany** 35:2,10 38:14 55:1,19 58:14 61:9,19 61:21 62:4,7 62:16,17 105:4 225:7,20 226:7 246:7,12 246:19 247:6
**alcohol** 73:5 114:12 183:8,15 184:18 185:1,10 185:11 254:3,6 254:19 297:22
**Alcoho...** 184:14
**Alex** 159:18
**allega...** 267:16
**allega...** 268:18
**alleged** 161:20
**allotted** 19:2
**allow** 7:21 98:1 250:7,20 256:12 260:22
**allowed** 8:1 18:14 67:7 139:4 165:5 168:2 187:14 188:9,17 189:2 248:6
**altern...** 191:11
**ambiguous** 163:20
**ambulance** 41:16 62:21 63:1,2 69:20 71:19,21 77:3 83:19 84:3,8,9 85:6 97:12,18 105:12 108:10 115:21 119:7,14 120:13 120:19 120:21 121:2,7 121:8 124:5 168:21 169:2,9 169:20 181:22 186:14 186:20 187:3 190:13 201:2,3 201:6,7 201:8,11 201:15 201:16 201:17 201:20 202:8,12 202:13 209:9 214:11 214:18 214:21 215:4,6 215:9,13 218:10 218:17 221:18 247:21 248:6 255:12 255:21 256:19 272:3 276:10 278:10 279:22 280:2 281:2,16 301:1,2 301:7 305:15 305:22 306:7,8 306:12 306:14 306:15 306:17
**amount** 19:2 92:18,19 95:21 203:10
**anatomy** 280:20
**and-a-...** 12:1,4 14:16 86:3 123:14
**angle** 107:4
**angled** 110:6
**answer** 6:7 6:11 7:8 7:13,18 7:20 8:13,15 8:21 9:16,18 10:4,5 12:14 13:2 17:6 19:16 23:19 24:2 27:6,16 28:4 30:8 31:7 33:10 35:18 36:13 37:4,17 37:18 38:7,16 39:2,13 40:2,15 41:11 42:4,15 43:16 44:11 45:5,14 46:9,19 47:8 48:10,22 49:20 50:6 51:5 53:1,7

56:4,16 57:12,20 58:12,15 58:19 59:6,17 63:8 66:4,21 69:4 70:18 71:6 75:1 76:12,20 78:9,17 81:22 85:2,21 86:8 87:3,6 89:8,19 90:15 91:19 92:7 93:1 95:9,18 96:6 99:13 100:5,18 101:7 102:22 108:12 109:17 110:13 110:21 112:15 113:3,21 114:14 116:18 117:9 126:10 126:19 127:8 128:3 146:19 147:7 148:10 155:16 156:12 157:10 158:2,3 158:11 160:19 162:6 163:20 165:4,6 165:8,11 165:19 166:2,3 166:7,19 167:11 169:11 170:13 178:3,12 178:13 178:20 179:4,10 179:17 180:3 182:4 184:5 186:6,9 186:17 187:6,14 187:21 187:22 188:14 188:18 189:2,4 189:6,21 194:1,5 194:10 195:10 195:11 195:15 196:12 196:13 196:14 196:19 196:21 197:5 199:12 200:1 201:5 202:4,10 204:8,15 206:3 208:19 211:3,4 211:7,10 211:15 211:17 217:9 218:3 219:20 221:9 222:2,7 222:17 225:12 226:1,7 226:10 226:16 228:5 238:11 248:9,12 248:17 250:3,7 250:20 251:2 254:4 261:1,5 264:7 267:17 267:20 268:1,4 268:17 270:13 270:15 270:19 271:19 272:14 273:4 274:6 275:12 275:20 276:19 278:1,21 279:6,6 279:10 279:10 279:11 280:15 281:22 282:12 283:8 284:4 286:20 288:5,17 289:11 289:19 290:4,12 296:10 300:13 301:5,17 304:14 304:21
**answered** 53:7 58:21 59:16 114:13 117:2 122:12 126:9 132:9 164:1,14 166:7 190:2 195:7 202:9 204:14 206:2 211:18 221:2 265:8 274:4,7 274:12 275:9 281:15 282:12 283:7 288:16 304:14
**answering** 7:16 165:10 179:16 287:17
**answers** 7:14 10:15 21:1 188:12 197:11 201:1 268:10 268:20 269:13 276:18 277:4,17
**antici...** 189:3
**ANTONIO** 1:7
**anybody** 7:1 52:14 58:8 68:3 69:6 70:9,20 70:21 77:8,11 77:12 81:2,4 100:19 108:5,13 112:12 114:10 116:13 127:15 128:12 128:17 130:17 156:10 166:10 177:15 177:19 219:12 220:11 220:13 221:18 233:5 237:16 251:19 254:16 255:5,18 256:12 264:1 266:8 282:4 300:16
**anybody's** 104:10
**anyway** 79:18 211:21
**apart** 246:13
**apartment** 62:1,2
**apologize** 262:2 269:19 275:19
**APOSTOLOS** 2:2 308:3,19
**apparent** 69:11,13 235:16 236:1
**appare...** 235:17
**appare...** 71:17,17 74:5
**Appeals** 5:14
**appear** 112:16 141:13 182:5 205:1 237:19 286:11
**appeared** 2:11,16 2:21

77:22
79:11
112:4,7
179:18
271:4
297:9
**appears**
45:1
159:4
309:9
**applause**
131:22
**applic...**
234:6
**applied**
221:11
241:20
**applies**
184:9
**apply** 5:15
52:10
99:2
**apprec...**
34:12
189:9
191:21
**appreh...**
163:12
**approach**
85:15
109:9
120:11
217:5
**approa...**
65:22
66:11,15
77:17,18
85:4,10
85:13,15
85:18
89:6
96:8,21
100:10
100:15
101:16
115:7,20
119:5,8
125:5
187:8
207:10
256:18
**approa...**
88:3
97:7
105:2
144:9
**approp...**
5:13
180:15
181:2
253:18
**approve**
231:3
263:4
**approved**
231:5
298:13
**approving**
240:9
**approx...**
81:1
86:9
87:5
201:8
241:1
246:16
283:10
283:13
**approx...**
13:14,16
14:8,9
14:10,16
19:12
22:19
23:7,13
27:20
94:16,19
94:20,22
118:7
119:21
125:13
216:3
246:2,3
246:13
293:9
296:6,8
**April**
151:13
154:9
**Arabic**
191:9
**area** 31:15
31:17,18
32:3,6
32:11,19
35:5,5
39:20,22
41:6,7
41:18
51:21
55:5,5
62:7,9
92:2
125:1
127:22
133:8
136:18
144:10
144:20
145:2
154:22
155:4,13
203:5
209:11
214:22
215:5,10
215:12
216:1
225:1
291:6
**areas**
152:20
154:16
**argue** 10:9
10:10
114:8
**argument**
75:15,17
75:18
**Argume...**
163:7
204:7
208:18
**arm** 21:7
121:3
122:8,20
123:1
134:18
271:11
276:5,9
276:21
277:12
277:15
278:5,7
278:9,12
278:12
278:13
278:18
278:20
279:5,16
279:17
280:8,11
280:16
280:17
280:18
280:19
281:1,2
281:7,14
282:3,9
282:10
282:11
282:16
282:17
283:21
284:7,10
284:14
284:19
284:20
285:2
**ARMANDO**
1:9
**armed** 19:1
19:6,9
51:22
67:5
247:15
**arms**
106:22
107:6
121:16
122:1,5
122:18
122:19
123:3,6
123:7,12
125:6
127:14
127:16
129:2
134:20
187:9
194:16
198:4,4
198:8
199:6
200:15
217:16
220:18
220:20
256:17
272:9
281:17
282:6,9
**arrest**
199:1,3
199:5
237:7,11
237:13
237:22
248:3
**arresting**
237:21
**arrival**
59:3
100:7
**arrive**
59:4
92:1
216:4
301:2
**arrived**
58:7,13
58:21
59:2,19
61:5
64:13,16
76:22
77:8
83:21
94:4
96:9
100:8
105:11
300:11
301:8
302:3,5
306:15
**arriving**
58:2,5,6
**article**
159:5,12
159:19
160:1,3
162:4
**articu...**
274:5
**articu...**
211:11
**asked** 16:6
25:5
53:7
58:20
59:16
68:10,14
69:8
77:2
85:5
87:13
91:22,22
111:14
111:15
114:13
115:8
117:2
122:12
126:9

131:14
131:19
132:9
163:22
164:14
165:4
166:7
187:13
187:16
188:7
195:7
200:1
202:9
204:14
206:2
221:2
229:15
238:10
244:6
245:17
247:15
248:17
253:1
263:4,21
264:1,5
265:3,5
265:14
270:14
276:8
277:22
282:12
283:7
288:15
289:2
297:3,22
302:9
304:13
**asking**
65:12
84:6
111:12
178:18
179:14
179:14
186:4
190:4
196:20
197:7
228:2,4
228:19
234:21
239:5
264:9
268:16
268:22
273:7
275:22
276:11
302:6
**asks**
258:21
**ASP** 103:17
171:5
**asphalt**
144:14
144:16
**assailant**
143:7
158:6
162:18
162:18
194:21
198:11
198:12
256:20
263:11
281:21
**Assail...**
175:20
175:21
**assertion**
267:12
267:15
**assess**
101:21
102:2
113:12
188:21
193:5
**assessing**
113:12
**assess...**
186:6
**assign**
34:8
**assigned**
12:6,7
22:6
25:15,21
26:7
32:2
33:8,11
35:6
43:6
290:21
291:10
**assign...**
14:19
31:14
35:9
52:6
53:18,21
56:14,21
76:15
81:8,13
85:11
87:12
99:19
242:19
**assign...**
18:22
**assist**
40:6
53:14
62:12
69:10
71:14,15
71:16
88:17,22
91:6
92:11
98:14
103:2
194:19
249:11
285:11
286:15
**assist...**
39:7
52:9
55:17
68:10
69:19
72:19
74:14
75:21
76:18
77:2
81:9,12
82:6
83:10
84:16,20
87:12
88:12,21
89:17
90:2
91:9,22
92:20
98:9
99:16
100:11
109:11
136:8
164:22
182:7,12
183:22
284:6
294:1
301:13
**assisted**
74:7,9
283:1,17
**assisting**
87:14
88:6
92:4,11
101:21
113:11
213:20
230:5,9
283:20
306:14
**ASSOCI...**
2:6
**Associ...**
150:3
152:3
**assume**
8:16
144:16
193:7
201:18
238:4
239:11
243:21
247:11
302:13
**assumed**
92:11
114:16
230:17
233:8
239:12
254:2
290:8
**assumes**
56:4
71:5
100:17
116:17
204:7
208:18
219:19
278:15
288:4
301:16
**assump...**
109:2
135:22
147:11
148:14
209:20
221:14
273:21
304:19
**attached**
237:1
309:10
**attack**
97:9,14
97:20
231:10
**attempt**
77:3
120:4,12
127:11
181:12
198:1,17
**attempted**
75:22
85:5
119:6
127:7,9
186:19
272:7
280:17
282:16
284:7
286:15
**attemp...**
124:4
167:2,4
168:20
200:20
211:1
216:7
281:1
284:5
288:8
**attend...**
15:17,20
186:3
**attended**
174:7
**attendees**
17:22
**attention**
41:8
70:11
71:4,12
72:1
76:4
80:16
81:6
85:7
99:8

100:4,16
297:19
298:3
301:13
304:11
**attested**
273:15
276:3,20
**attesting**
272:13
**attire**
13:6
64:6
**attorney**
250:1,20
260:22
262:10
287:1
**attorn...**
250:2,16
287:1
**attorneys**
7:22
149:14
251:7
261:12
261:16
**attuned**
38:20
**audio** 26:3
27:10
57:9
146:14
**audio/...**
27:14
28:10
29:7
147:3
**audito...**
133:12
133:13
**august**
173:22
174:17
251:7
**author**
150:2,5
160:16
**authority**
180:18
199:10
217:3
**author...**
67:15,19
92:17
**automa...**
26:5
52:5
56:1
**available**
18:20
19:4,12
20:18,21
21:4
27:7
146:13
147:15
170:21
171:4
186:12
190:16
191:11
**Avenue**
35:2
38:14
55:1
61:20
246:7,13
**avoid**
124:6
135:22
136:22
153:1
155:11
**avoiding**
220:1
**aware**
129:16
130:1
143:1
146:16
146:20
147:2
155:20
156:6,12
161:2
293:19
300:9,14

**B**

**b** 3:6
84:15
92:14
131:12
174:21
183:19
191:4,7
191:9,14
191:15
191:16
**back** 14:22
16:7
21:10,12
34:12
45:17
65:5
73:18
80:16
101:6
113:20
121:3
123:22
124:7,8
124:9,19
128:3
135:14
136:14
137:4,7
140:12
140:16
153:14
154:6,18
154:22
182:18
185:16
190:1
193:1,1
196:7
197:16
206:11
207:7,17
208:1,1
209:8
211:6
214:11
214:17
214:21
252:11
254:21
265:22
270:12
280:4,20
289:21
303:4
**backed**
125:7
**backgr...**
205:13
238:19
239:10
**backup**
130:21
**backward**
203:20
**backwards**
155:5
**bad** 222:9
**ballpark**
19:17
133:21
**ban** 46:6
**barbs**
205:15
**based**
153:19
154:12
188:22
191:18
298:22
**basic**
168:17
**basis**
200:22
294:17
**bathroom**
43:21
**baton**
171:6,7
171:15
172:16
172:18
**battered**
227:14
227:16
227:18
227:22
228:13
228:17
228:20
229:4
**battery**
127:20
143:6
158:7
224:10
226:18
227:19
227:21
228:7,21
228:22
229:5,22
230:10
230:16
231:4
235:13
235:14
235:20
235:21
239:14
245:7
260:13
263:9
289:5
**bear** 5:7
**bears**
151:16
**beat** 24:19
25:15
31:14,18
35:9
38:20
39:4,6
39:19
40:7
42:11,17
43:4,8
45:9,10
45:10
47:5
49:9
50:9,16
51:2,7
62:12
81:13
92:9
177:15
242:19
259:11
300:18
**beats** 43:7
**becoming**
281:10
291:16
**bed** 213:21
249:11
**began**
120:14
121:16
122:4,5
123:17
187:9
200:14
272:8
281:17
**beginning**
19:20
20:11
24:16
27:8
290:20
**behalf**
2:11,16
2:21
268:5
**behavior**
96:20,21

98:5
109:18
112:18
125:18
141:16
143:6
158:5
165:16
167:20
168:3,9
169:12
180:20
181:11
207:2
211:12
253:20
254:7
285:15
**belief**
114:17
123:2
178:15
180:6
269:14
**believe**
14:13
15:13
18:8,10
20:8
22:21
24:19
28:1
30:18
40:21
42:22
58:9
64:2
65:22
67:17
68:20
70:19,20
80:22
85:12
86:21
87:11,13
102:12
103:21
121:7
124:21
129:21
147:16
147:16
154:11
156:16
158:13
176:8
177:22
178:8
179:6,15
183:5
184:17
184:21
198:7
200:11
200:16
201:1
206:8
207:13
209:10
209:13
214:16
217:14
231:4
234:11
235:3,8
236:10
239:7
244:4,10
248:4
252:6
265:4
266:17
266:19
268:6
273:16
273:20
277:16
277:21
281:12
283:20
284:3
285:5
286:14
293:8
299:4,7
299:9
303:15
**believed**
102:21
114:3
127:19
177:4
186:8
280:13
298:19
**believes**
188:17
**belt** 18:15
18:19
102:7,10
104:3,4
172:1,12
**belts**
171:5
221:11
**beneath**
156:11
203:3
**best** 1:3
92:1
165:12
196:19
212:18
269:14
278:1
292:12
293:6
**better**
30:4
77:14
**beyond**
127:2
196:1
304:21
**big** 63:5
142:8
**birth**
236:8,14
245:4
**bit** 50:15
83:7
118:19
272:12
**bladed**
109:22
110:4,5
110:8
111:1
112:13
115:5
119:18
**blank**
247:9,12
**bleeding**
249:18
250:14
253:6
296:18
296:22
**block**
62:10
86:3
201:22
202:7,7
209:22
**blocked**
105:8,10
**blocking**
110:10
**blow**
193:16
**blue** 25:7
**blunt**
231:11
**bodily**
162:19
217:1
263:10
**body** 1:14
10:14
79:18
109:14
131:11
131:17
135:16
136:12
138:14
138:16
138:21
140:20
144:18
144:21
154:15
154:17
155:22
156:2,15
202:19
203:7,15
203:16
203:21
204:2,12
204:17
205:4,7
206:1,22
208:7
209:11
212:17
213:15
213:16
221:8,8
256:9,10
283:15
**bold** 88:21
175:4,10
184:10
**bolder**
175:12
**book** 73:10
**booking**
237:6
**border**
31:20,21
**borders**
31:20
**borrow**
30:11
**bottom**
148:3
161:14
191:6
240:1
**box** 224:18
230:5
232:8,10
232:14
232:15
232:16
233:11
233:12
233:16
234:4,6
247:14
247:14
247:15
248:16
253:16
256:5,6
259:9,18
260:4,9
**boxes**
231:10
255:7
260:6
**brace**
134:10
**brain**
249:18
250:13
265:17
267:1
**brakes** 9:5
**branch**
15:6,8
**break** 9:8
9:17
43:21
44:2
101:3
197:1,9
197:12
205:1
272:12
278:13
**breaking**
204:20
**breathing**

82:9,19
83:13
brilliant
7:8
bring
34:12
134:13
135:17
135:19
135:21
brisk
104:18
broadcast
33:15
brother
129:8
235:21
brought
209:10
209:16
251:17
Brown 1:9
Buddy
119:15
120:17
169:2
build
79:18
building
61:22
62:2,15
buildings
62:1
bulletin
152:22
bumper
140:17
busting
95:19
busy 39:15
40:8
C
c 1:10
191:7,15
191:16
C.S.R 2:2
308:3
calendar
227:9
call 9:9
16:2
20:20
30:15,18
31:4,11
32:13,21
35:14,21
37:9
38:1,20
39:5,7
40:12
41:14,17
42:1,8
44:7,16
47:10
48:8,16
49:7
50:3
54:11,14
55:15
56:21
60:19,22
69:10
72:6,12
76:21
81:11,17
82:8
83:3,14
86:21
90:20
91:14
194:19
235:1
241:7
255:2
267:15
293:9,20
294:1,4
294:9,14
297:14
302:21
call-t...
44:15
called
1:20 4:8
6:22
81:9
88:6
90:16
232:8
293:14
calling
76:4
calls 24:2
38:19
39:3
42:6
48:14
87:2
96:3
132:10
178:11
179:9
182:3
294:5,11
301:4
calmly
119:2
capabi...
146:14
147:3
capable
96:16
126:12
capaci...
1:13
capacity
217:1
capital
191:8
caps 75:10
75:10,14
183:20
car 22:7,9
22:10
23:9
24:6,7,8
24:9,12
24:17
26:7,18
28:9
33:19
38:20
42:13,19
42:21
46:7
53:6,14
53:16
54:6,19
55:21
57:4
59:11
60:20
66:8,10
67:7
242:20
252:9
291:19
293:13
294:6
card
241:17
244:1
cardiac
153:2
CARDIEL
1:3
cards
241:8,9
241:12
careful
112:6
227:7
carefully
38:21
CARONE 2:9
2:9
carpeted
133:13
carries
104:5
carry
18:14
67:15
172:3,5
172:15
carrying
137:20
172:14
214:12
cars 25:20
27:3,13
54:19
57:8
58:2,4,6
58:21
59:4,8,9
105:8,15
cartridge
138:4
205:19
case 5:9
8:12
10:9
25:16
38:12
69:18
81:10
149:12
149:15
237:11
241:18
250:17
252:18
259:2
260:18
265:16
266:15
267:8
268:5,17
275:15
275:16
289:3
catch
86:13,17
86:22
104:15
134:12
cause
152:8
157:1,4
162:19
194:13
217:1
caused
304:7
CB 237:5,9
237:10
237:21
cement
144:15
center
33:22
127:22
130:5
136:13
136:14
136:16
137:2,10
144:20
154:12
202:19
294:5,10
centered
202:3,11
central
31:21
35:11
237:6
291:7
Cermak
35:10
certain
19:2
56:22
57:3
112:10
146:7
171:19
171:22
190:3
193:10
221:8
certif...
18:7
certified

certify
308:4,12
309:4
CFD 41:22
42:8
69:11
71:18
77:1
254:20
chance
143:15
172:4
245:12
277:14
278:3
change
276:18
277:4
changed
22:3
173:12
charac...
191:1
197:10
charge
139:14
139:21
262:1
charges
140:4,8
check
20:20
28:22
150:11
253:16
checked
119:15
224:18
229:16
232:8,14
232:16
233:11
233:13
233:16
238:12
238:18
238:20
243:7
258:22
259:9,19
259:21
260:2,8
chest
37:10
38:14
44:8
82:21
83:4,15
136:16
136:17
chests
153:2
Chicago
1:14
2:13,15
2:18,20
2:22
10:20
11:2,11
11:12,14
12:2,12
15:6,8
15:16,20
18:22
33:16,22
34:1,3
34:19
36:19
41:15,20
44:19
45:1
64:5,7
70:2
73:5
82:17
87:17
88:6,12
88:15,17
88:19
91:6,7
92:5,9
98:1,9
129:11
144:13
146:21
152:15
154:4
159:4,17
160:6
161:2,8
173:15
177:7,10
183:7,14
207:16
229:19
240:18
246:7
247:3
249:4
251:9
291:19
291:22
292:4,11
293:19
297:20
298:13
300:10
300:20
301:11
305:12
305:13
305:14
305:15
Chiefs
150:3
152:3
children
247:2
choose
130:15
130:15
247:15
choosing
7:10
chose
131:6
132:12
235:16
chrono...
47:19
Circuit
5:13
circum...
13:21
citizen
76:17
99:6
294:4,10
294:15
304:10
citizens
293:22
City 1:13
2:13,18
2:21
10:20
11:2
12:12
18:22
98:8
144:13
151:11
159:2,14
159:14
293:19
Civil 1:22
161:19
civilian
105:15
105:18
222:18
251:16
civilians
222:12
251:10
claiming
108:13
class
67:17,18
133:4
classi...
39:3
40:5,13
171:21
clean
211:4
clear 9:21
10:16
61:11,15
82:5
89:4
112:20
127:17
251:5
260:6
279:2
281:22
clearly
7:5 46:5
251:12
clenched
107:1,3
107:6
109:19
111:22
121:15
121:20
123:19
124:20
166:21
194:16
256:16
256:18
271:12
281:8,18
285:17
clenching
256:9
click
236:3
client
75:19
96:20
102:17
104:12
104:17
105:1
106:1,7
106:11
106:12
106:14
106:14
106:21
107:5
114:4,11
127:5,7
127:14
127:16
150:13
150:18
151:7
159:7
187:2
192:21
194:3,6
194:15
195:11
195:21
196:7
198:22
199:3,14
199:18
199:20
199:21
200:7,14
200:17
200:21
201:12
202:18
202:21
203:1,9
203:11
208:22
210:11
210:15
211:13
211:21
212:3,4
214:4
216:5
217:12
218:19
219:17
220:1,15
221:12
228:2,14

232:1,2
232:4
234:15
274:22
275:13
275:14
275:21
278:11
278:12
279:17
281:7,13
281:17
282:2,5
282:9
client's
121:3
193:19
197:11
203:6
210:19
213:14
214:3
281:8
283:15
clipboard
20:7
close
35:12
39:20,22
94:22
119:11
125:10
138:5
closed
285:4,6
closely
59:3
closer
35:10
62:11
118:5,9
118:15
119:5,9
119:17
119:19
119:20
120:7,8
120:17
124:2
125:3,8
closest
35:11
125:11
233:9
235:3
282:16
clothes
177:12
clothing
107:9
co-wor...
294:19
cocaine
97:1
112:10
113:14
186:8
254:2,10
298:20
Code 90:11
98:1,8
182:10
182:15
Codes
90:20
91:4
coincide
232:19
collapse
141:10
156:3,11
156:17
203:15
203:18
203:21
205:5
collapsed
203:1,15
204:3,18
207:1
209:11
212:3
collap...
171:6,7
171:15
172:18
collap...
203:22
208:22
color
79:14,15
column
47:20
coma
267:13
combative
271:11
272:8
281:6,10
281:11
281:21
283:1
285:5,10
285:13
286:15
289:14
306:4
come 8:14
21:10,12
35:21
39:8
71:13
73:9
87:21
113:9,14
120:17
127:5
138:4
169:2
183:16
209:15
210:7,11
211:1,11
241:8
244:15
252:11
301:18
comes 21:8
150:1,17
171:19
coming
118:13
190:19
214:2
223:21
254:21
command
127:21
129:12
142:22
143:21
169:8,14
219:13
259:15
288:13
Commander
1:12
20:13
21:6
29:10
30:17,20
60:15
145:21
231:5
259:20
260:10
commands
168:11
169:17
170:6
181:10
commis...
2:3
committed
74:6
commonly
152:12
commun...
295:2
commun...
54:1
225:20
commun...
34:2
51:13
commun...
36:19
38:13
41:4
169:7
commun...
42:2
293:13
293:17
community
99:7
304:10
compare
246:12
competent
178:12
Compiled
90:12,21
91:4
compla...
83:13
Complaint
261:22
266:15
267:12
267:16
268:1,5
268:17
268:18
269:5
comple...
102:6
complete
7:12,13
56:21
153:18
188:18
189:2,6
230:15
238:5
269:14
308:8
309:8
completed
14:18,20
18:18
comple...
56:14
201:21
217:10
comple...
74:18
75:1
76:12
84:22
91:17
93:1
153:7,17
153:20
155:16
157:10
162:3
184:3
comple...
153:13
227:19
227:20
comple...
154:10
compli...
143:9
168:9
170:8
184:14
191:3
192:21
256:12
284:8,21
285:12
286:16
287:21
288:9
289:15
compliant
180:13
compound
85:1
163:17
164:9
165:5
187:4,16

187:19
266:4
276:15
288:16
compre...
179:21
180:1
271:22
286:10
compre...
178:5
180:1
compre...
116:8
compre...
98:17
comprised
97:20
compro...
176:19
computer
54:18
92:10
224:11
238:7
comput...
240:2
computers
244:9
concern
39:19
289:7
concerned
35:2
concer...
38:20
41:9
150:19
260:18
concerns
53:11
184:17
261:10
conclu...
112:14
112:18
conclu...
114:8
115:2
condition
95:4,6
95:11
253:13
264:21
265:1,6
265:10
299:10
conduct
30:14,18
confine
166:2
confined
31:15
confor...
180:20
181:11
confro...
161:17
181:13
confro...
201:12
confro...
147:4
156:9
168:4
198:22
confuse
32:15
connec...
83:1,5
83:15
consent
74:7,11
75:9,13
75:20
98:3
consented
83:19
84:8
consider
78:14
172:21
297:16
consid...
78:6,11
78:15,19
122:10
122:16
consid...
6:1
consid...
137:2
170:1
consid...
268:12
consis...
309:6
consists
181:8
consti...
88:20
98:20
consult
9:13
consul...
9:17
contact
68:18
69:5
121:10
124:15
127:6,9
134:16
138:17
204:17
208:6
210:11
210:12
210:16
210:21
211:1,12
214:3
228:11
228:14
241:7,8
241:9,12
241:17
244:1
270:18
280:16
281:3
282:2,5
285:22
287:4,7
287:10
300:21
contained
160:15
298:15
context
153:17
157:10
162:3
184:3
continue
22:22
continued
126:7
contin...
12:22
contin...
167:16
contin...
139:2
continuum
168:18
169:22
170:20
171:9,16
172:19
173:6
Contri...
151:12
control
127:14
127:16
131:16
135:16
141:9,19
156:2,10
180:16
181:7,8
181:10
181:14
194:20
198:17
207:2
257:9
283:2,18
288:7
contro...
180:17
180:22
controls
295:9
conver...
64:18,19
68:7
71:8
83:20
102:3
109:10
111:12
117:11
118:4
120:22
169:19
177:5
185:21
199:21
200:4,21
216:7,8
219:4
242:11
253:8,11
254:14
255:5,19
261:15
262:14
272:8
288:6
294:18
294:22
295:3
300:4,8
304:17
305:7
conver...
118:11
118:18
118:20
conver...
216:9
convey
77:6
182:7
conveying
117:15
cooper...
175:18
180:12
180:15
181:2,5
copies
260:14
copy 18:10
34:13
45:21
149:20
149:21
175:11
266:15
269:5
corner
191:6
201:22
202:6
corpor...
1:14
150:2
correct
4:18
10:4
11:8,18
12:3
18:5,11
18:16
20:22
21:5
24:5,20
24:21
26:5,6
28:13,14
32:16
33:4
40:13

Stevan Vidljinovic
September 4, 2013
321

41:3
42:2
46:16
48:15
52:21
55:1,20
64:9
65:15
66:5
94:13
103:9
108:19
117:4
124:16
128:15
135:1
136:5
137:17
138:16
140:6
141:21
143:20
144:6
145:22
147:5,12
148:1
149:2
151:18
153:13
156:9
166:15
168:12
170:6,22
171:5
173:4
175:22
176:2
177:3
181:18
182:13
185:13
190:17
194:3
195:6
196:8
198:13
199:10
201:3
202:19
202:20
213:10
213:13
214:18
214:19
218:10
219:17
220:5
224:16
226:9
228:14
229:11
229:17
231:14
231:16
231:17
234:7
237:3,4
237:7,13
239:22
240:9
242:20
242:21
246:8
247:16
247:17
252:4,10
258:20
258:22
259:8
269:2,13
269:15
284:15
290:22
291:1,20
291:21
292:2,22
293:1,10
293:11
293:14
293:15
293:18
294:3,15
294:16
294:19
294:20
295:10
295:11
296:16
296:17
297:11
297:12
298:1,2
298:20
298:21
299:2,3
300:6
305:17
308:8
309:8
**correc...** 309:10
**correctly** 4:17 76:10
**counsel** 6:11 90:16 114:21 151:10 153:13 158:21 159:1,16 188:8 189:11 190:1 191:20 196:16 197:20 290:15 299:20 300:3 302:9 303:14 305:1 306:21 308:12
**counsel's** 222:10
**Counselor** 61:13
**counting** 139:9,11
**Counts** 267:7
**COUNTY** 308:2 309:2
**couple** 59:8 61:2,3 87:9 123:13 243:2 299:20
**course** 8:10 43:22 73:13 82:2 96:19 98:5 116:19 145:7 154:10 158:22 168:4 172:8 186:4 195:20 196:3 199:9
**courses** 145:9
**court** 1:1 4:3 5:12 5:13,14 6:15 9:6 13:5 16:9 45:20 101:9 114:2 128:10 166:6 178:22 193:3 211:9 279:13 290:2
**courteous** 176:12
**courtesy** 188:16
**courtroom** 6:22
**covered** 10:2 145:7
**covers** 5:6
**CPD** 42:9 72:11 190:20 254:21 292:7 297:10
**CR** 13:13 260:18 261:20
**cracked** 28:21
**create** 198:1
**created** 13:13 35:17
**creating** 246:22
**credible** 154:7 160:20
**criminal** 74:6 162:12 162:22 163:4,12 163:13 164:7,10 165:1 166:10 260:17 261:17 261:22 262:1
**criminals** 161:21
**critics** 161:19
**Crown** 25:3 26:21
**CSR** 308:20
**current** 138:15 138:20 295:9
**custody** 98:2 108:18 170:16 237:8 257:5 298:9 299:13 303:19
**cut** 165:14 187:21 189:2,17 196:20 205:18 206:6 212:14 231:11 266:21 267:1 274:8,9 295:20
**cuts** 140:17 140:18
**cutting** 165:15

D

**d** 1:6,6 3:1 191:7,9 191:16

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013
322

**D-u-b-...** 31:2
**damage** 157:3
**Dan** 159:18
**danger** 74:5 126:12 299:4,7
**dangerous** 137:3 161:21 162:11 162:19 162:21 163:12 164:7,10 165:2,17
**DANIEL** 1:10
**dart** 206:1 257:14 257:22 258:6,8
**darts** 134:21 135:12 137:16 138:10 138:14 140:5 144:4,18 144:22 145:4 152:18 154:14 154:21 157:17 205:7 206:7 257:18 258:1
**data** 160:8 161:3
**date** 20:5 21:15 25:14 40:21 47:20 73:19 151:16 151:17 154:8 173:22 174:13 226:11 236:8,14 240:14 245:4 273:13 293:2 306:5
**dated** 87:19
**dawn** 235:12
**day** 15:13 15:14 21:18 23:13,15 55:11 87:11 107:8 130:8,17 135:3 136:3 141:19 147:19 148:4,22 172:10 174:16 213:7,15 227:5,7 227:10 239:21 240:4 249:16 250:14 266:20 269:21 308:16 309:17
**day-to...** 294:17
**days** 18:21 33:11 288:12
**DE** 1:9 2:6 2:6,7 4:1 12:16 13:9 16:6,11 19:18 23:21 27:11,21 28:7 30:13 31:9 33:14 34:7,17 36:1,17 37:6 38:3,9 38:18 39:9,17 40:10,18 41:19 42:10,20 43:18,22 44:5,17 45:8,16 46:13 47:1,12 48:11 49:8 50:1,11 51:9 53:3,10 55:7,9 56:11,19 57:14 59:1,10 59:21 61:13,16 61:18 63:11 65:6,7 66:6 67:4 69:7 70:14 71:1,10 74:19 75:3 76:14 77:7 78:13,20 82:4,12 82:16 85:8 86:2,12 87:8 89:11,21 90:8,10 90:13,16 90:22 91:1 92:3,13 93:3 94:6 95:12,20 96:13 99:17 100:13 101:1,6 101:10 103:6 110:3,16 111:7 113:6,19 114:5,18 114:20 116:21 117:3,12 122:17 126:1,3 126:15 126:16 128:1,5 128:13 130:2 132:5,13 133:5 143:10 143:14 147:1,13 148:16 149:17 150:7,11 151:2,8 151:9 153:8,10 153:21 154:3 155:18 157:13 158:1,10 158:17 159:15 160:4 161:1 162:7 163:8,21 164:3,11 164:15 164:17 165:3,7 165:19 166:1,12 167:1,13 169:16 170:19 172:8,9 173:7,9 173:10 174:9,11 175:7,9 178:7,14 178:18 179:2,3 179:13 180:3,5 182:9,17 182:21 183:1,5 183:10 183:12 184:7 185:2 186:21 187:11 187:15 188:2 189:8,10 189:13 191:20 192:7,12 192:14 192:22 193:8 194:8,9 195:2,3 195:9,13 195:14 195:17 195:22 196:4,5 196:16 197:2,15 199:16 201:10 202:15 204:11 204:19 206:5 208:11 209:2 211:3,14 217:19 218:7 220:3 221:4 222:3,9 222:11 223:1,17 224:8 225:17 226:2 250:8,9 250:22 251:4 261:2,6 261:9 262:2,4 262:6,11

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013
323

263:12
263:13
266:6
267:18
267:19
268:2,3
269:2,4
269:8,18
270:1
272:10
274:10
274:13
274:17
274:19
275:11
275:18
276:1,16
276:17
277:8,10
279:1,3
279:9,14
282:18
282:19
283:11
288:10
288:21
289:19
290:11
296:9
299:20
300:15
301:9,20
304:20
306:20
307:1,3
**de-esc...** 181:13
**dead** 256:6 256:21 257:1,4 257:8,10 257:11
**deadly** 161:18
**deal** 57:5 93:20 183:15 193:4 254:7
**dealing** 125:17 176:12 180:15
**deals** 119:2
**dealt** 113:15
**death** 155:14 162:19 217:2
**decide** 8:3
**decides** 44:16
**decision** 101:17 131:7
**declared** 89:15
**declares** 88:19 91:8
**decreases** 161:9
**defeats** 6:12
**defendant** 2:16 149:14 158:21 267:22 268:10 268:19 268:20 275:15 275:15 282:14
**defend...** 1:15 149:12 270:16
**defense** 188:8
**define** 257:12
**defined** 98:15,20
**definite** 239:10
**defini...** 90:22
**defini...** 228:6 257:2
**degree** 265:19
**demand** 1:12 217:18
**demeanor** 176:12 253:21
**DeMonica** 60:9
**demons...** 10:13
**Dentyne** 291:7
**deny** 99:15 182:8
**depart...** 2:13,18 11:17 15:7,9 34:3,19 36:19 41:21 44:19 45:2,11 48:1,1,5 48:6,18 62:20 64:5,7 70:2 73:5,11 82:6,17 87:17 88:7,11 88:12,16 88:17,17 88:19,22 89:5,15 91:6,8 92:5 98:1 99:9 105:9 129:12 139:4 152:16 154:5 161:3,9 161:19 167:9 173:15 174:14 174:20 176:6,7 177:14 183:8,14 184:13 195:6 205:11 207:16 229:19 249:4 251:10 291:10 291:19 292:1,4 292:11 294:2 297:20 298:13 298:15 300:10 301:11 305:12 305:13 305:15 305:16
**Depart...** 177:11
**depart...** 15:19
**depend...** 184:18
**Depend...** 184:15
**dependent** 73:6 183:9,16 297:22
**depending** 39:15 109:22 168:3,9 168:14 169:12 170:7 171:1 290:6
**depends** 55:11 98:5 142:3 171:12 217:10
**deploy** 139:22 143:3 145:5 154:21 170:5 216:22
**deployed** 127:21 130:1 143:1,22 144:17 155:19 156:13 162:15 162:22 164:18 190:10 205:3 210:13 211:2 226:14 234:15 259:11 263:1,22 295:6,13 296:7
**deploying** 155:11 156:16 161:20 210:18
**deploy...** 137:15 146:15 146:16 150:20 151:22 152:6 161:4
**deponent** 4:2 8:14 163:5 164:2 188:8,16 189:11 307:8
**depone...** 275:20
**deposed** 8:12
**deposi...** 1:17 3:7 4:18 5:1 5:10 6:11,19 8:10 34:14 44:3 101:4 197:13 224:7 251:6 270:22 273:18 276:7,13 276:19 290:21

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013
324

308:6,8
309:5,9
**deposi...** 2:1 5:15 34:9 149:19
**DeRose** 3:4 4:12 250:6 299:19 300:2 305:20
**descent** 79:12
**describe** 77:21 79:10 123:5 197:22 235:13 257:11 270:16
**described** 109:20 158:5 162:18 185:7 232:17 233:21 294:18 295:3 300:7
**descri...** 234:5 280:11
**descri...** 107:18 107:19 233:9 242:16 267:2 273:16 281:11
**design...** 20:16
**desk** 244:8 259:19 260:9
**detail** 270:17 291:14 291:15
**detailed** 270:21 291:2,5 291:6,8 291:13 291:16
**determ...** 72:3,6
**determine** 70:10 72:15 186:2
**determ...** 72:16 164:5
**detoxi...** 298:10 298:10 303:17 303:20 304:4
**develop** 151:22
**developed** 66:18
**device** 28:22 143:8
**devices** 160:7
**DG** 40:21 46:17
**dictate** 217:17
**dictates** 82:1 96:18 98:4 129:21 138:2 167:18 171:20 194:13 207:20
**differ...** 176:2
**different** 8:15 12:5 16:18 47:16 73:14 82:1 83:8 96:18 98:4 109:13 116:12 131:18 131:21 133:7 167:19 168:13 178:17 188:5 207:20 217:16 260:14 265:9 268:22 284:18
**diffic...** 82:9,19 83:13
**diffuse** 161:16
**diffus...** 198:16
**direct** 123:19 182:19 187:10 216:17 250:2 251:2 261:4 296:11 297:19 298:3
**directed** 39:4 46:12 69:11,14 77:1 80:16 81:6 106:13 120:20 144:20
**direction** 6:6 10:13 80:17 85:17 106:16 109:7 121:16 121:18 122:5 123:4 124:22 125:7 135:18 144:1 181:3,9 194:17 198:9,11 201:19 204:2 205:4 256:2,3 281:18
**direct...** 255:8,10 255:15 255:16
**directive** 88:11 184:13 191:14 191:17 298:16
**direct...** 190:21 191:2
**directly** 200:7 245:8
**discarded** 241:19 241:22 242:1,9
**discharge** 14:3 239:16
**discha...** 13:17,20 14:4 148:1,4 148:15 149:3 202:17 259:7
**discha...** 147:5
**discha...** 13:8 148:8
**discip...** 12:11,18 13:1 14:12
**discip...** 12:19 13:4,6 13:10
**discovery** 1:17 2:1 159:1
**discuss** 5:18 6:5
**discussed** 5:7 250:1
**discus...** 251:8
**discus...** 224:5
**dislodge** 138:3
**disori...** 198:18
**DISP** 47:6
**dispatch** 24:2 33:16,22 42:18 46:6 47:10 48:14 49:6 72:8 86:4 87:15 225:20 259:10 259:17 297:10
**dispat...** 37:21 41:15 42:6 44:16 48:17,19 49:3,3 49:13,14 49:16,18 72:6,12 81:13 101:20 294:2,7
**dispat...** 34:2 35:14 36:10 47:9,14 47:22 48:8 49:4,6 54:1 72:10 293:16 294:14 297:14

County Court Reporters, Inc.
630.653.1622

302:14
302:21
**dispat...**
39:10,16
47:16,18
48:2
72:18
302:11
302:17
302:18
303:5,6
303:12
**dispat...**
33:21
**display**
165:1
**displayed**
125:17
143:6
158:5
185:15
186:18
254:7
285:16
**displa...**
96:21
285:15
**disposal**
170:5
**dispos...**
47:6,10
**dispute**
54:10
**disres...**
189:10
**distance**
86:10
120:1
124:11
125:3
198:1
246:16
**distin...**
175:18
176:1
**district**
1:1,1
5:12,12
12:8
13:7
19:2,12
25:1,20
26:8,11
27:13
29:18,19
29:21,22
30:5,11
40:22
42:13
46:17,21
47:2,3
48:12
51:21
52:6
74:8,12
149:1
225:1
242:20
244:4,11
259:20
260:10
262:13
288:13
290:22
291:3,11
298:11
302:12
303:21
**districts**
12:5
74:13
146:22
298:12
303:22
**distur...**
232:9,14
232:20
233:10
233:19
**DIVISION**
1:2
**doctor**
205:13
249:15
253:10
254:11
254:15
265:2,10
**doctor's**
264:21
265:6
**doctors**
249:13
267:8
**doctrine**
287:2
**document**
34:20
35:18,21
36:3
37:12,15
37:17
38:2
40:16
44:11,14
44:21
47:13,15
49:5
50:8
51:6
145:15
149:8,10
150:1,5
150:15
150:17
153:20
159:8,17
160:15
162:6
236:14
245:15
267:3,5
268:21
269:9,13
272:13
272:21
274:21
276:3
277:13
277:19
280:6,9
280:12
280:14
297:9
**docume...**
161:8,12
278:2
**documents**
45:7
48:19
72:18
287:6
**doing**
32:15
52:18,21
55:19
87:12
106:12
106:22
120:2
126:12
142:6,7
153:2
212:13
244:4
266:13
279:21
283:16
288:14
293:14
**donut**
95:14
**Double**
276:15
**download**
29:4
**downlo...**
145:20
**dozen**
19:17
**Dr** 252:14
252:22
253:3,4
253:8,11
288:19
**drafted**
90:17
302:9
**draw** 83:1
102:19
261:7
**drawn**
161:21
**dressed**
79:21
80:5,6
**drew**
112:18
**drive**
23:10,15
152:10
**driven**
26:17
**driver**
23:16,22
24:4
**driving**
23:9
24:7,17
25:1,3
26:21
53:5,9
66:19
**dropped**
52:20
249:4
**drove**
252:8
**drug** 69:11
69:13
71:17
72:3,11
72:16
73:5
82:6
84:3
114:12
183:8,15
184:14
185:4,7
238:11
239:6,7
254:19
254:21
297:10
297:17
297:22
303:15
**drugs**
157:5,15
158:14
185:5,8
185:14
238:17
253:22
**dry** 137:13
137:18
137:21
138:3,5
138:7,13
152:16
296:3
**DU** 308:2
309:2
**Dubiel**
1:12
30:22
31:10
60:16
145:20
148:11
231:6
287:5
**Due** 234:8
**duly** 4:4,9
269:11
308:5
**duration**
59:18
63:2,19
79:8
93:12,15
94:2
105:13
222:19
**duties**

75:6
168:4
**duty** 11:14
19:21
21:3,9
29:6
30:16
31:4
32:18
33:3,12
76:16
95:14
149:3,6
229:9,13
229:16
229:16
239:21
243:3
292:15
292:16
**E**
**E** 1:11 3:1
3:6 76:5
76:6
**ear** 38:20
**earlier**
21:1
25:6
48:19,20
49:10
82:8,18
113:4
182:10
182:17
183:3
201:1
225:13
228:12
276:7,18
277:19
278:8
281:15
291:18
**early** 79:2
273:6
**eastern**
1:2
31:21
**easy**
140:11
**effect**
131:9
**effective**
73:19
152:6,11
173:22
174:13
174:16
**effects**
158:14
**efficient**
238:21
**effort**
76:8
169:4
**eHOW**
151:12
**eight**
15:15
93:20
246:1,2
**eight-...**
15:17
**either**
4:18
54:10
84:6
90:4
92:9
102:15
103:16
104:8
124:12
127:12
134:3
136:4,8
138:13
143:4
152:7
172:5
189:11
205:13
213:18
237:17
292:14
292:20
294:1
298:19
302:16
**elbow**
121:3
276:9
**electric**
152:7,9
295:9,22
**electr...**
138:15
138:20
**electr...**
140:18
140:19
**electr...**
131:11
295:18
295:21
**elements**
272:6
273:8,22
277:22
**Eleventh**
29:21
30:5
**emerge...**
90:3
98:10
**emergency**
26:4
33:6,16
55:18,22
56:9
88:20
89:16
90:3
91:8
98:14,15
98:18,19
98:20,21
288:2
293:20
293:22
297:17
298:14
**eminent**
270:8
**emphasize**
281:4
**employ**
92:17
**employed**
10:19
**Employee**
1:9
**employees**
285:11
**empty**
238:9
**en** 67:1
91:21
**ended**
33:13
291:16
292:15
**ends** 7:9
**energized**
132:17
**enforc...**
151:21
152:22
181:3
**engage**
102:3
200:20
216:7,9
294:17
**engaged**
52:13
79:6
163:14
**engaging**
216:7
**engine**
41:16
**enter**
36:15
**entered**
36:10
248:6
**entering**
131:11
174:17
**entire**
39:11
308:9
**entirety**
188:10
188:20
**entitled**
98:9
115:3
150:20
183:8
188:13
297:21
298:16
**entries**
37:13
47:14
241:12
302:12
**entry**
36:16
53:11
148:4,6
259:13
**equally**
191:11
**equate**
82:7
**equipment**
25:21
26:3,4,8
26:11,22
27:10,14
28:10,13
28:16
29:8
33:15
34:4
55:18,21
55:22
56:1,8,9
56:10,10
56:13
57:9,9
57:19,21
63:13,16
**equipped**
20:14
26:21
27:3,10
27:14
28:9
51:19
52:3,14
54:18
56:8
57:4,22
102:9
**erased**
282:2
**escalate**
161:17
169:7
**escape**
167:2,4
**escort**
69:20
85:5
97:17
108:9
115:20
119:6
120:13
256:13
271:10
276:4,9
276:21
277:12
277:14
278:18
280:7,11
280:18
281:1,2
281:13
282:10

282:17
**especi...**
40:8
194:22
216:22
306:3
**establ...**
35:17
53:5
180:18
**establ...**
88:11
**esteemed**
90:18
**estimate**
60:18
93:4
105:21
**estima...**
133:21
**et** 98:16
**ethical**
234:6
**evasive**
198:3
**evening**
30:15
91:14
229:9
261:19
291:19
293:10
**event**
13:11
14:2
21:16
34:20
36:7,20
38:10
41:2
43:10
44:20
46:2,5
47:19
59:19
82:18
93:15
94:2
103:4
105:20
112:13
133:20
140:21
141:12
141:13
149:18
186:11
202:17
213:9,11
225:2
242:4
297:3,5
302:8,10
**events**
68:13
218:15
273:6
**eventu...**
79:9
141:10
**everybody**
101:21
111:3
143:1
154:13
**evidence**
56:4
71:6
100:18
116:17
182:3
199:12
204:8
208:19
219:19
278:15
288:4
301:17
**exacer...**
158:14
**exacer...**
157:16
**exact**
141:1
210:1
**exactly**
145:8
147:4
259:16
**EXAMIN...**
3:4 4:11
290:18
**examine**
249:14
**examined**
4:9
265:11
**example**
39:6
112:10
137:21
231:22
250:19
257:1,11
**excerpt**
98:8
**exchange**
23:8
**excluding**
230:10
230:13
**excuse**
61:13
117:6
279:1
**Executive**
152:2
**exercise**
174:22
**exerted**
92:19
**exhaus...**
157:5
**exhibit**
3:9,10
3:11,12
3:13,14
3:15,16
3:17,18
3:19,20
3:21,22
34:19
40:11
41:13
42:7
43:18,20
45:17
46:11
48:16
72:10,22
73:4
82:14,20
84:14
87:16
98:7
145:13
145:16
147:18
149:9
150:19
151:10
158:19
160:19
161:14
174:16
176:4
191:4,18
197:17
224:2,9
239:19
268:8,9
268:19
269:6
297:8,21
**exhibited**
234:22
**exhibits**
34:8
45:19
87:10
190:20
297:4,6
**existence**
174:6
**exit** 103:3
**exited**
61:1
106:2
**expect** 5:5
5:15
213:3
**expected**
135:8
239:2
**expecting**
102:18
196:7
**expedite**
12:21
**expel**
138:9
**expelled**
134:22
135:12
140:6
196:8
**expels**
139:14
**experi...**
5:2 47:9
112:8
114:3
130:10
132:7
138:12
141:15
173:16
217:14
235:3
238:14
238:19
239:3
254:6
**experi...**
189:12
221:14
**experi...**
68:9
109:20
238:17
240:22
241:13
242:7
245:6
256:8
**explain**
56:22
277:5
**explained**
134:5
**expressed**
165:16
**extent**
131:10
222:21
263:3
286:21
**extract**
206:1
**eyes** 203:9
209:6
248:21
249:2
285:4,6
**F**
**face**
107:13
109:5
191:19
203:5
285:1
**face-down**
206:10
**facial**
107:11
107:12
**facili...**
184:13
**facility**
74:10,10
74:11,12
76:7
97:18
108:11
199:8

233:15
298:10
298:10
303:17
303:21
304:4
**facing**
80:18
85:17
137:10
273:11
282:14
**fact** 94:8
127:17
160:16
217:21
221:19
222:14
227:18
247:1
258:19
260:7
264:3
**facts** 56:4
71:5
100:17
116:17
182:3
204:8
208:19
219:19
267:8
278:15
288:4
301:16
**fail** 4:17
**fair** 7:11
7:12
39:20
58:15
62:14
65:11
78:6,10
84:18
85:3
89:14
95:3
105:14
106:10
112:6
113:1
125:14
127:1
163:11
164:6,19
180:6,8
190:7,11
192:19
192:20
196:14
210:10
210:14
210:15
214:1
233:12
233:21
247:4,5
250:8
256:22
273:21
303:3,6
**fairly**
119:11
140:11
242:17
**fall**
135:13
135:18
155:5,5
155:13
155:21
155:22
156:8,14
203:4,5
204:20
205:2
**falling**
111:19
112:17
**familiar**
24:13
90:4
91:2,3
303:7
**famili...**
32:10
**far** 11:7
31:20
35:8
97:22
108:17
111:4
121:17
124:7,8
124:9
130:18
133:17
193:15
215:5
246:13
246:16
271:15
273:18
296:6
**fast** 145:4
156:8
**faster**
86:22
104:15
**fear**
127:20
143:5
158:6
210:19
263:9
**Federal**
1:21
**feel**
210:19
**feels**
131:13
**feet** 94:15
95:1
118:7,14
119:21
120:9
124:10
124:11
125:2,4
125:13
125:15
126:5,8
126:22
133:19
133:22
133:22
217:12
296:8
**fell** 155:7
203:7,12
203:13
204:3
206:10
212:3
**fellow**
158:7
228:3
**fellow's**
244:14
**felt** 96:1
126:11
126:12
226:22
232:17
238:20
253:18
**female**
16:15
64:10
79:9,11
210:3
222:20
287:13
**field**
155:8
227:17
233:18
236:21
237:5,14
238:8
247:11
253:1,17
289:4
**figure**
140:11
**figures**
160:14
160:17
160:22
**file** 18:10
**filed**
268:4
**fill** 20:8
24:15
56:22
57:2
229:22
230:5
232:9
237:17
238:5
239:2,15
239:17
245:6
260:7,13
**filled**
229:8,17
238:3
239:20
240:3
289:16
**filling**
228:20
228:22
229:5
235:14
239:13
244:8,12
254:22
260:6
**finally**
231:12
**find** 29:7
47:22
173:7,13
238:8
247:9
249:17
**fine** 4:22
9:3
32:17
265:20
**fingers**
9:6
**finish**
113:8
165:4,5
165:8
252:12
274:2,3
**finished**
7:20 8:6
20:9
113:17
251:22
**finishes**
21:9
**finishing**
228:18
**fire** 34:3
41:15,15
48:4,18
49:2
61:6,7
62:20
63:5,10
64:5,7
70:2
72:10
82:6
88:7,12
88:17,19
89:5,14
91:6,7
92:5
99:8
105:9,9
239:16
249:4
294:2,7
300:10
300:20
301:3,6
301:11
305:12
305:13

Stevan Vidljinovic
September 4, 2013

329

305:14
305:15
**firearm** 239:16
**firearms** 171:10
**fired** 144:5 258:16 258:19 258:21
**firefi...** 63:13
**firefi...** 63:12,13 63:15
**firemen** 63:6 93:16,18 210:7,8
**firing** 146:8
**first** 4:9 7:3 8:11 34:18 37:15,15 48:7 64:13,16 65:20 77:17 80:15,20 89:4 101:18 113:11 144:2 151:20 161:14 162:10 168:6,17 170:10 170:21 172:21 174:20 175:7 176:10 196:14 204:13 204:17 224:14 242:14 243:2,18 244:16 245:1 258:16 258:21 259:9,13 268:9,11 268:15 268:21 269:11 274:22 279:15 279:18 280:3 296:19 302:22 308:5
**fist** 198:8 198:10
**fists** 107:1,2 107:6 109:19 111:22 121:15 121:20 123:19 124:20 125:16 166:21 194:16 256:10 256:16 256:18 271:12 281:8,18 285:17
**five** 11:3 63:12 97:3 118:7,14 119:21 120:9 124:10 124:11 125:2,3 125:13 125:15 126:5,8 126:22 133:7,19 139:5,14 139:16 296:8
**flail** 121:16 122:2,4 122:19 123:17 123:20 126:8 194:15 200:15 220:21
**flailed** 122:21 123:18 125:6 187:9 281:17 282:2,6 282:9
**flailing** 122:18 122:22 123:2,7 123:11 123:21 127:14 127:16 129:1 198:4,8 199:6 211:22 220:18 220:19 281:7 285:17
**flails** 217:16
**flap** 266:22
**fleeing** 108:18 108:22 109:3
**flight** 198:4
**floor** 132:18 132:20 203:1,2
**focus** 25:10 202:2
**folks** 221:19 221:21 285:8
**follow** 6:13 8:1 8:4,5 81:18 114:22 152:1 170:6 217:6 249:16 255:8,17 255:22 256:4 306:8
**follow-up** 290:17 299:19 305:2
**followed** 5:17 74:21 216:15
**following** 43:12 180:14 208:22 266:20
**follows** 4:10 44:4 101:5 197:14 224:7
**footage** 29:3,4,5
**force** 77:4 92:18,19 161:18 167:8,15 167:17 168:2,6 168:18 169:21 169:22 172:20 173:2,6 173:19 175:1 180:12 180:14 181:1,15 190:21 193:9 231:11
**foregoing** 269:12 309:5
**forgot** 16:6 57:15
**forgotten** 9:1,2
**form** 13:3 23:18 24:16 27:5 31:6 33:9 38:22 39:13 40:1 41:10 52:22 55:8 56:6,15 59:5 65:3 66:4 69:2 70:17 76:19 78:8,17 81:20 82:10 85:1,20 86:6 87:1 89:18 90:6 91:18 92:7 95:7,16 96:3 99:11 100:5 102:20 109:16 110:11 122:14 129:20 132:4 133:1 147:6 157:18 163:17 164:13 166:16 166:18 167:10 169:10 170:2,12 174:3 181:10 182:14 208:10 218:2 221:21 222:16

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

330

266:3 267:14 271:18 273:2 276:14 276:22 277:6 278:14 288:3 289:11 300:12 301:15
**formation** 101:15
**formid...** 112:5,12 112:16 112:19
**forth** 152:1 308:10
**Forum** 152:2
**forward** 127:13 155:5 203:4,19
**found** 85:7
**founda...** 27:15 28:3 30:7 35:16 36:12 37:3,15 37:17 38:6,15 40:14 41:11 42:3,14 43:15 44:10 45:4,13 46:8,18 47:7 48:9,21 49:19 50:5 51:4 56:3 57:11 86:6 110:12 110:21 146:18 146:19 147:7 148:9 150:22 160:14
**four** 53:12 53:18 94:8 95:22 161:13 187:17 191:6
**fracture** 265:16
**fractured** 249:17 250:12 251:17 253:5
**frame** 258:13
**FRANCO** 2:9
**free** 150:13 307:3
**freedom** 186:13
**frequency** 161:3
**frequent** 39:16
**fresh** 225:15 226:13 273:7
**Friday** 227:6,10 227:10 227:12
**friend** 1:3
**friends** 294:18
**front** 41:14 101:12 109:6 112:22 124:13 133:16 135:14 136:14 136:15 136:19 137:11 154:14 155:4 174:13 197:17 200:7,17 202:18 207:11 208:1,3 224:9
**full** 7:11 7:13 15:14 75:10 102:6 198:4 202:7 291:22
**fully-...** 12:2
**furlough** 30:10
**further** 37:1,11 37:22 50:16 74:14 82:21 84:16 100:22 110:15 151:5 153:7 183:22 242:1 257:14 276:2 290:15 299:18 305:1,18 306:20 307:8 308:12

**G**

**G** 46:17
**G-u-e-...** 22:13
**gain** 143:9 168:8 185:22 192:21 207:1 284:7 285:12 286:16 287:20 288:7,8
**gained** 284:21
**gaining** 289:15
**Gallardo** 2:14 270:9
**gals** 142:2
**garners** 40:6
**gather** 251:13
**geared** 249:3
**gender** 64:12 210:5 287:15
**genders** 287:14
**general** 30:12 55:6 62:9 68:12 83:20 118:4 120:22 121:18 125:1 145:2 173:15 173:18 176:4,5 197:18 201:19 214:22 215:10 215:12 216:1 262:20 281:19
**genera...** 68:7 91:3
**generally** 52:9 71:13 91:20 152:1 254:22 255:20
**generate** 237:10
**generated** 147:19 223:20 224:11 224:12 225:14 226:16 226:18 226:20 233:7 235:7 236:11 237:9 252:17 265:15 289:3
**generates** 265:12
**genera...** 234:9 237:7 243:12 243:22 245:8 262:13 264:20
**gentleman** 80:4 197:4
**gentlemen** 39:21
**gently** 276:9
**geogra...** 31:15,17 31:18 32:10 39:7,20 41:6 52:10
**geogra...** 32:3,5 32:19 35:5,8 51:21 55:5 225:1
**George** 2:19 192:10
**Geraldine** 1:8
**gesture** 120:21 121:8 122:7

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

331

164:5 281:16
**gestured** 121:1,7 169:1 201:3,7 201:14 201:17 202:6 278:9 280:1
**gestures** 10:14 198:3
**gesturing** 201:15 201:18
**getting** 84:9 124:6 191:20 216:17 220:1 283:2,18
**give** 5:4 6:4 8:13 9:11 20:10 25:18 27:18 32:1 43:18 45:18 68:12 79:14 129:12 131:22 145:12 145:19 173:9 188:17 189:4 193:19 194:6 195:11 235:22 246:15 257:14 259:11
**given** 5:1 6:18 17:18 18:7,9 25:14 40:22 46:21 53:15 80:11 86:10 97:2 102:2 109:18 142:22 154:8 167:19 188:12 193:19 202:2 213:11 233:17 273:12 301:19 303:12 306:5 308:9 309:5,9
**gives** 47:10 244:13
**giving** 197:5 219:13 221:9,13 296:11
**Gladys** 302:22
**GLORIA** 2:1 308:3,19
**go** 6:11 14:22 18:22 20:17,20 35:18 40:6,9 41:8 42:1 45:17 48:6 52:5,7 52:12,16 53:19,21 61:8 65:21 66:14 68:11 70:17 71:14 97:10 100:22 109:6 117:8 119:15 124:11 131:15 135:7 141:7 144:18 145:13 149:8 153:8 156:19 161:13 166:8 175:13 176:4,10 180:11 181:21 185:16 186:9,14 186:20 187:22 190:1,12 191:8 196:4 197:9,21 200:5 205:6 212:12 224:3,17 230:1 242:18 243:17 245:8 255:12 255:21 256:19 257:14 259:10 270:12 270:13 276:2 278:10 280:4 296:12 296:13 305:6 307:4
**goes** 26:5 73:17 120:16 188:19 221:7 237:2
**going** 4:16 5:4,10 7:15 9:20 12:20 19:20 20:13,14 21:12 34:8 37:14 45:20 46:6 50:20 54:1 61:9 62:9 70:16 73:21 76:18 91:16 98:12 101:18 102:21 105:16 110:1 114:6,8 123:6 126:1 130:9,13 130:17 132:17 134:2 138:21 142:11 143:15 145:13 149:10 150:14 150:18 150:21 153:6,9 154:9 155:9 156:20 157:17 163:9,16 164:12 171:14 174:3,14 178:5 182:14 187:12 189:3,14 189:15 189:20 196:2,10 196:22 197:1,2 198:9,10 211:4 215:12 218:15 232:21 233:1,2 250:15 251:1,2 252:10 260:20 261:3,4 269:6 272:12 278:14 278:20 279:1 280:4 286:18 286:20 289:10 295:6 298:4 302:6,7
**Gonzales** 215:19
**Gonzalez** 1:8 60:3 93:11
**good** 95:4 95:5 133:21 148:13 172:4 202:16 245:12 247:20 282:18
**gotten** 191:21 240:21
**grab** 127:13 187:2 190:9 276:9
**grabbed** 278:8,11 278:19 279:4,16 280:16
**grabbing** 279:17 279:20
**gradat...** 168:2

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

332

**grade** 17:18,20
**grapple** 193:17
**grappling** 68:19,22 194:20
**grasping** 17:10
**great** 162:19 217:1 263:9
**greater** 124:11 191:3
**grip** 278:13
**ground** 14:1,3,4 133:16 141:7,21 156:11 166:13 203:3 204:17 207:1 208:16 209:1
**grounds** 12:21,22 89:2 90:15 91:11 99:4 149:11 150:9 159:9 162:2 174:8 188:5 250:16 251:3 278:20
**group** 101:12
**guard** 8:19 9:14
**guess** 8:11 8:13 43:9 95:2 107:4 117:16 173:11 194:1 282:22
**guessed** 8:18
**guessing** 8:18
**Guettler** 1:6 22:13,14 23:6 26:17 32:9 85:4,13 93:9 96:9,10 100:9 109:10 109:15 121:5,10 121:17 124:2 177:8,10 187:7 215:18 219:22 220:7 263:8 271:7,10 272:1 276:4 277:14 278:18 278:19 280:10 282:5,8 282:10 282:15 292:3
**guidel...** 88:4 152:1 180:12
**guiding** 122:7
**gun** 20:1 94:8 138:1,8 139:13 140:5 146:8 160:11 162:15 163:10 190:10 247:22 257:17 257:20
**gunfire** 160:8
**gurney** 209:10 209:12 209:16 212:15 212:17 212:20 212:22 214:5,8 214:12 214:14 214:21 215:2,4 215:8,12 220:15 221:5,7 222:15 247:21 306:11 306:13 306:17
**Gutrey** 32:12,14
**guy** 84:3
**guys** 34:7 131:22 142:2,20 178:10

**H**

**H** 1:12 3:6
**H-i-n-...** 159:18
**habit** 172:13
**hair** 79:14 79:15 107:11 107:12
**half** 27:12 27:22 28:6 106:8,9 106:10 153:12 266:1
**half-hour** 33:12
**hand** 4:3 7:17 103:7,13 103:17 110:9,14 111:9 120:20 121:2,3 121:6,8 162:15 241:11 308:15
**hand-made** 260:5
**handcuff** 207:8,17
**handcu...** 206:8,13 207:1,11 207:14 207:15 208:1,3 208:8 209:4,6 212:19
**handcu...** 208:13
**handcuffs** 102:11 104:2,5 104:9 170:11 170:17 170:22 172:18 192:16 192:17 193:7 206:15 206:16 206:17 206:18 209:14 213:4,7 213:8,10 213:12
**handful** 131:2
**handle** 258:12
**handling** 83:6
**hands** 103:20 104:9,11 106:22 107:2 119:12 121:20 123:22 204:21 207:7,11 213:15 214:4
**handwr...** 148:17
**happen** 130:13 132:1 217:17
**happened** 119:4 120:5 121:14 133:10 202:21 202:22 226:22 262:8,16 262:17 262:18 263:4,21 263:22 266:9 281:9
**happening** 42:18 230:14 253:18 271:16
**happens** 131:14 260:11
**hard** 4:16 10:10 220:20
**harm** 8:22 99:1 162:19 182:6 217:1 228:10 263:10
**harmed** 14:2
**Harry** 1:6
**hat** 107:8
**head** 10:11 122:3 136:22 189:18 203:14 204:5 223:13

County Court Reporters, Inc.
630.653.1622

251:12
**health**
74:11
76:8,17
157:2,7
232:18
233:8
234:9,11
234:17
235:6,9
298:13
**hear** 6:2
7:4,5
33:21
38:20
39:22
49:14,15
52:4
117:22
160:10
177:16
219:12
220:13
231:18
232:2
294:5,10
**heard** 7:18
50:20
51:17
52:11,18
58:2,4
116:14
119:3
128:21
169:17
169:18
169:19
185:3
189:18
204:5
220:10
220:11
223:2
232:4
250:19
260:22
279:18
**hearing**
38:11
50:12,14
51:10,11
83:10
129:4
141:3
160:22
204:10
297:13
**hearsay**
159:6,6
159:10
160:1,14
160:15
162:4
**heavier**
246:5
**height**
94:14
245:14
245:19
**held** 133:3
224:5
284:14
284:20
**hello**
302:22
**help** 6:9
6:13
40:8
70:2
83:12
116:15
119:16
120:18
120:22
169:3
185:19
186:3
249:11
255:13
255:21
306:11
306:12
**helped**
283:14
**helpful**
182:20
**helping**
289:15
**hemorr...**
265:17
**herein...**
308:10
**hereof**
308:15
**hereto**
309:11
**hereto...**
182:3
**hereunto**
308:15
**hernias**
157:3
**Hey** 119:14
255:20
**hide**
217:21
218:4
**hierarchy**
169:22
191:2,12
**high** 41:2
44:9
45:3
**higher**
118:10
198:12
**highest**
41:1,5
**Hinkel**
159:18
**Hinsdale**
2:8
**Hispanic**
77:22
79:9,12
107:15
107:21
222:20
236:7
**history**
166:11
237:16
**hit** 204:5
204:12
205:2
208:16
211:22
285:14
**hold** 4:19
135:17
139:1,2
139:15
139:16
140:12
183:11
193:17
256:13
276:8
278:6
281:1
284:7,13
284:18
**holding**
142:11
142:14
283:21
284:9
285:2
**holds**
193:10
**hollering**
118:16
**holster**
103:14
**home** 74:8
230:1
**hope** 4:19
**hospital**
69:21
71:19,22
77:4
84:4
88:18
98:17
145:1
213:21
213:21
235:2,5
249:3,6
249:11
251:18
251:21
252:2,7
253:3
264:12
264:13
264:15
264:18
265:2
266:1
267:9
283:1,1
283:5,18
283:20
284:12
285:9,12
285:20
286:6,16
287:7,8
287:9,17
287:19
288:7,11
288:18
289:15
297:1
298:13
299:15
304:1,1
305:6,11
305:16
306:9
**hospit...**
98:22
**hospit...**
253:14
265:7
**hospitals**
298:15
**hour** 37:7
79:2
147:22
148:2
249:9
**hours**
15:15
21:22
35:15,22
188:6
**house**
86:20
**huge** 142:8
**human**
117:17
**hypoth...**
41:11
116:17
182:2,2
199:11
217:7
219:19
301:16

**I**

**IACP** 152:3
**idea** 150:1
150:17
203:21
**ideal**
137:12
**ideally**
153:14
**identi...**
47:17
**identi...**
65:13
176:18
180:18
244:20
245:15
**identi...**
49:10
74:3
298:7
**identi...**
65:13
**identi...**

24:16
**identify**
24:22
25:17
176:17
177:6,17
**identity**
65:1,9
**ignored**
216:20
**III** 191:4
191:8
**IL** 2:8,10
2:15,20
**ILCS** 98:16
184:15
**Illinois**
1:1,14
2:3 5:12
90:12,21
98:15
182:10
182:15
240:18
246:7
247:2
308:1,4
309:1
**illust...**
175:14
175:16
**imagin...**
135:13
**immediate**
29:11,13
30:3
41:17
81:19
98:22
105:22
216:17
**immedi...**
6:4 29:9
41:7
74:13
213:17
213:18
249:1
298:9,11
303:20
**impeach**
277:2
**impeac...**
277:3,7
278:16
278:21
**implic...**
174:10
**implies**
174:4
**imply**
174:6
**important**
7:2
**improper**
277:3,6
278:16
278:21
**in-ser...**
15:2
167:21
**inaccu...**
190:22
**inappr...**
196:21
**incapa...**
141:9
152:7
**incapa...**
131:16
298:8
299:9
303:18
**incapa...**
135:15
**incapa...**
152:9,17
**incess...**
39:18
**inches**
245:22
246:1,2
**incident**
219:12
224:18
225:4,15
232:17
240:14
241:2,16
242:8
249:20
259:3
267:11
290:8
**includes**
181:9
198:3
**including**
11:20
231:12
231:16
231:21
270:17
**inclusive**
309:7,10
**incohe...**
70:6
71:20
77:5
100:11
114:15
115:18
116:2
177:2,4
177:21
178:9
179:6
180:2
186:7
199:14
209:3
285:9
299:1
**incomp...**
116:16
182:1
217:7
219:18
301:16
**incomp...**
70:6
76:1
117:16
299:1
**incorrect**
40:3
130:11
174:8
198:10
218:11
**increase**
153:2
198:17
**increases**
161:9
**indicate**
55:16
242:15
258:17
281:5
**indicated**
55:16
128:14
151:11
275:12
275:20
276:12
290:20
292:19
295:7
296:15
297:8
298:17
**indicates**
36:9
145:19
242:19
**indica...**
276:20
**indica...**
150:4
**indica...**
153:18
**indivi...**
70:11
71:16
76:7
77:1
83:16
97:4
98:6
110:7
111:5
112:12
134:10
134:19
135:12
135:13
139:21
140:4
141:22
142:3
158:5
165:18
167:20
168:10
168:14
169:13
170:1,9
171:2,20
171:21
179:21
182:5
236:22
237:15
258:1
**indivi...**
111:2
**indivi...**
1:12
161:6
241:3
**indivi...**
270:16
**indivi...**
96:22
99:14
113:15
125:17
221:7
**inference**
261:7
**inflict**
228:10
**influence**
97:1
108:9
112:8,22
113:13
114:4,12
126:13
157:5,15
158:14
179:19
179:20
185:8,10
185:11
185:14
186:7
217:13
238:17
239:12
253:14
253:16
253:19
253:22
253:22
254:1,5
254:9,12
254:18
265:7
271:4
298:18
303:15
**influe...**
112:9
**inform...**
36:10,15
37:11,22
41:8
82:22
108:16
145:19
154:8
160:21
162:11

164:6,19
224:15
224:18
236:7,9
236:17
240:12
241:20
243:16
244:16
244:17
244:22
245:7,10
245:17
245:19
246:21
247:12
249:2,19
252:16
259:2
260:21
261:11
264:5,21
270:21
286:22
294:13
301:19
**informed**
98:19
**infringes**
250:3
**initial**
14:18,20
40:12
48:5
69:10
83:14
87:15
232:20
243:20
244:17
245:2
254:20
297:10
**initially**
58:13,21
72:7
77:1
96:8
97:7
99:22
105:13
123:7,10
125:19
168:9
185:21
206:8
225:20
226:21
291:15
301:7
302:5
**initials**
259:14
259:16
**initiated**
109:10
**injured**
14:5
135:20
243:5,7
243:9,12
243:13
243:15
248:17
265:3
**injuries**
157:3,16
**injurious**
157:1
**injury**
135:22
155:14
235:11
236:1
248:19
251:20
265:5,18
265:21
266:11
286:13
289:13
290:6
296:16
**inquire**
84:11,18
100:10
108:16
266:7,8
289:17
290:7,10
290:16
**inquired**
266:13
288:11
288:19
288:20
**inquiring**
84:12
**inquiry**
100:1
288:22
**inside**
28:20
29:1
138:21
284:12
287:20
**instit...**
15:7
**instru...**
135:8
141:6,8
**instru...**
136:3
181:9
**instru...**
31:11
**instru...**
16:13
154:20
155:1
**instru...**
16:18
17:9
131:19
131:21
134:1,8
135:11
135:19
136:11
137:19
139:3
154:11
**integrity**
176:20
**intell...**
7:12,14
**intention**
304:3,10
**intera...**
111:5
**intera...**
70:5
**intera...**
270:17
270:21
**intere...**
308:14
**interf...**
198:18
**interject**
5:19
100:20
**internal**
250:13
**intern...**
249:18
253:6
**Intern...**
146:13
146:17
147:10
150:3,4
152:3,4
152:21
**Intern...**
154:5
**Internet**
150:6,8
159:17
159:22
162:4
167:21
**interpret**
37:13
**interp...**
191:22
**Interr...**
268:11
268:21
277:17
**Interr...**
270:14
270:15
270:20
273:5
275:9
278:17
282:21
286:19
286:21
**interrupt**
7:16
9:10,20
165:10
187:12
196:13
**interr...**
188:7
**interr...**
196:17
**inters...**
62:8
**interval**
125:11
**intervene**
219:16
**interv...**
50:21
**intoxi...**
74:4
184:5,9
184:10
184:22
185:4,13
**introduce**
167:17
**inventory**
205:18
230:15
**invest...**
176:20
**invest...**
113:11
**involu...**
156:22
**involved**
163:18
184:22
214:7
303:5
**involv...**
38:12
151:17
**IR** 237:15
238:2
**irrele...**
162:5
184:4
186:16
195:8
**issue**
146:17
238:6
**issued**
152:22
292:1
**issues**
188:11
**item** 173:4
**items**
172:17

**J**

**J** 1:7 2:19
**January**
270:3,4
273:6
**jealously**
9:14
**jeopar...**
176:18
**jettisons**
295:8
**job** 37:21
40:5

49:16
81:10
83:5
87:15
101:20
113:5,9
289:14
**Joe** 262:5
**John** 1:6
2:6,6
43:20
65:4
100:20
188:5
261:21
274:8
**join** 27:6
27:16
28:3
31:7
33:10
39:1
41:12
59:6
66:21
69:3
70:13
78:9
81:21
85:21
86:7
87:2
95:8,17
96:5
99:12
109:17
117:8
122:13
132:11
157:22
163:3,6
169:11
170:13
173:8
217:8
218:3
222:1,6
222:17
**joining**
174:14
**joins**
159:14
**jointed**
10:1
**Jolt** 160:5
**Jose** 1:3,7
77:19
80:5,12
89:6
93:21
96:1,16
100:2
101:11
108:4
109:13
115:6,17
115:18
115:20
118:6
119:9,12
119:17
121:10
124:15
124:19
143:20
144:18
144:20
151:17
155:19
156:4,13
156:17
162:11
163:11
164:4,7
164:20
166:10
166:13
168:17
169:8
190:10
190:12
208:7,15
209:11
209:19
212:15
218:1,9
222:14
225:2
231:18
233:6,13
233:21
243:18
244:20
245:1,13
247:1,6
249:17
250:12
251:11
251:17
251:20
254:11
261:18
265:1
270:17
272:22
276:9
277:12
278:6
283:18
283:21
284:7,20
294:22
300:3
301:10
305:5,8
305:10
**JOSEPH** 1:9
2:13
**jot** 241:9
**JR** 1:8
2:19
**Judge** 1:6
1:8
188:19
188:19
188:20
**judgment**
74:3
298:6
299:12
**July** 21:16
22:15
23:1,17
24:6
26:20
27:13
29:14
30:20
35:14
43:5,13
54:21
73:18
75:6
88:2
147:19
159:19
226:12
240:4,14
291:20
293:2
294:22
295:4
299:16
**jump** 207:4
**Jury** 1:12
**justif...**
235:5
**justified**
194:22
216:18

**K**

**Kaitlin**
2:7
43:18
**Kearns**
1:11
29:15,16
30:1,14
30:18
57:17,18
57:20
58:10,11
58:14,16
58:22
59:14,20
60:13
93:12
215:20
216:4,6
216:10
216:11
231:7
240:8,19
242:3,10
262:7,15
262:19
263:2
287:4
**Kedzie**
62:13
**keep** 7:4
18:9
20:4
33:2
45:20
56:17
72:22
111:4
242:3
261:3
**keeping**
161:3,5
**Kenneth**
31:21
**KEVIN** 2:14
**kicking**
211:21
**kill** 34:11
**kind** 5:7
6:12
12:11
13:21
14:11
17:8
18:7
20:5
24:15
25:19
26:11
28:12
33:6
34:3
36:7
38:19
39:10,21
43:12
49:17
61:22
66:18
99:8
105:15
126:14
129:18
185:12
186:3
193:16
193:17
215:1
236:13
237:16
245:15
247:22
256:16
261:7
265:8
284:19
286:12
286:14
304:12
**kinds**
12:18
155:12
170:4
235:11
**knew** 22:4
67:1
103:12
108:1,4
130:18
144:4
163:13
229:5
230:2
233:2
**know** 5:16

8:21,22
9:1,10
10:3,7
16:22
18:1,4
22:2
25:3
26:14,20
27:19,19
28:5,5
29:19
30:4
36:14,18
36:21
37:2,12
37:19
38:2,4
39:10
40:19
42:5,16
42:18
44:8,13
45:6,12
45:15
46:10,20
48:13
49:4
50:7
51:20
52:2
53:4
54:12,14
57:4,15
57:21
58:13
59:7,8
59:13
62:6
63:1,3
65:4,5
65:10,16
65:18
66:7,22
67:20
68:8,9
70:5
71:8
72:17,18
75:13
77:13
78:11,18
81:1
82:3
88:1
91:21
93:8,9
93:10
94:4,8
97:22
100:7,21
102:10
103:2
105:6
106:14
106:15
106:18
106:20
108:13
108:17
109:8
111:10
112:21
113:8,14
114:7
115:2,13
115:14
117:5
118:4
119:13
120:3,11
121:6,6
121:9,12
122:1
124:5,8
127:3
130:19
130:20
133:11
137:13
139:15
139:19
140:10
142:11
147:10
148:11
148:12
148:20
149:6,12
150:6
151:13
154:7
159:2
160:20
161:5
171:18
172:11
172:13
173:11
177:9
179:20
180:2,8
182:15
189:12
189:16
192:1
197:1
201:21
202:6,13
204:2,12
206:13
206:18
207:13
207:14
209:21
210:1
213:6,12
214:8,9
216:2,12
217:3,12
218:13
219:8,10
223:8,11
223:13
225:6
226:8,19
228:6
245:18
247:4
248:10
251:7,8
254:5
255:18
256:16
257:10
258:2
259:15
259:16
260:8,14
260:15
260:17
263:3
267:3,3
274:1
275:8
279:7
280:15
280:16
281:3
283:9,13
284:6
285:10
286:14
287:11
287:19
300:16
300:18
300:19
300:21
301:1,2
301:14
301:19
302:3
304:2,10
304:16
304:21
**knowing**
48:4
52:14,15
208:2
233:1
**knowledge**
75:4
79:1,4
88:4
136:10
150:16
185:6
206:14
243:8
269:14
**knowle...**
260:11
**known**
112:9
152:9

**L**

**labeled**
47:20
**lack** 30:4
77:14
**laid**
220:15
**language**
116:6
191:17
**larger**
112:12
**largest**
152:4
**LaSalle**
2:14,19
**law** 2:9,13
2:18 5:5
74:6
76:18
151:21
152:22
181:3
**lawyer**
266:14
270:8
**lawyers**
5:6,16
6:3,7,13
8:15
9:14,18
9:19
10:9
45:20
90:18
161:19
251:13
262:12
266:8
**lead** 6:14
82:2,3
**learn** 65:1
80:5
147:14
249:21
261:16
**learned**
65:8,11
77:18
90:4,14
90:16,19
140:14
168:1
250:11
**learning**
251:9
**leave** 29:1
196:7
247:8
**led** 190:20
190:20
**left** 59:20
106:5
122:19
231:3
247:11
251:21
282:16
283:6
284:16
**legs**
220:19
220:20
**Leinen...**
1:6
**length**
79:16
**lengthy**
17:16
**lens** 28:21

**lesser**
190:15
191:2
**let's**
45:17
48:6
50:15
55:10
91:5
119:15
119:16
120:17
120:21
121:19
130:3
149:8
169:3
173:7,12
176:4,10
180:11
184:12
196:4
198:14
200:5
240:12
242:13
255:20
255:21
276:2
**lethal**
143:8
172:22
173:2
**letter**
174:21
191:9
**letters**
191:7,7
191:9
**level** 40:5
40:6
133:16
136:17
168:6
169:21
171:3
180:11
186:14
**License**
2:2
308:20
**licensed**
98:17
**lied** 8:17
**lieute...**
13:12
17:1
30:22
31:10
60:15
145:21
148:11
148:18
149:5
231:5
287:4
**life** 46:3
79:3
92:15
126:11
163:15
262:5
**lift**
212:15
**light** 26:4
55:13
**lighter**
246:3
**lightly**
134:13
135:17
135:20
135:21
**limit**
160:7
186:13
**limita...**
39:8
**limita...**
7:2
52:10
**line** 137:1
153:11
227:5
242:13
242:14
242:18
**lines** 84:2
206:7
**list**
298:14
**listed** 3:7
191:6,10
191:11
**listen**
38:21
40:4
114:21
126:17
**listening**
186:6
196:18
197:5
293:12
**litiga...**
158:22
**little**
4:21 5:4
50:15
77:16
83:7
86:22
87:18
118:19
189:15
189:20
191:7
258:15
265:8
272:12
276:2
**lived**
247:1
**loaded**
221:17
**loan** 30:5
291:9
**local**
151:21
**located**
61:22
62:15
66:12
74:8,12
80:20
155:13
201:9,20
202:13
**location**
15:2,10
16:3,5
41:7
52:5,7
52:13,21
54:2
55:2
58:1,2,5
58:7
60:21
61:19
62:11
86:4,10
87:7
201:8
210:1
225:1,10
241:2
**long** 10:14
11:1,19
14:8
15:11
22:19
23:5
55:4,13
60:18
100:6
105:21
106:5
119:1
123:11
126:7
138:20
138:22
139:1,6
167:14
215:6
225:4
249:6,10
252:11
269:21
283:5,9
284:13
291:13
300:22
**look** 34:18
44:18
45:7,9
47:19
50:15
53:11
73:20
91:5
92:14
95:13
98:7
148:3
151:20
153:11
155:8
158:17
174:19
174:20
183:19
184:12
198:14
227:9
232:7
238:10
240:12
242:13
243:2
246:10
260:5
269:3
270:13
274:21
280:6
285:1
**looked**
48:19
82:18
87:18
95:14
107:15
113:13
182:17
223:21
235:15
265:20
287:18
**looking**
40:11,20
44:6
46:11
48:15
72:10
80:17
182:20
203:8
244:19
244:22
285:8
296:9
**looks** 35:1
35:13
37:8
41:6,14
44:7
46:11
47:15
48:7,16
50:2,16
51:6
62:16,18
73:4
88:10
147:18
151:16
175:14
224:11
240:7,11
**Lopez** 1:3
1:10
60:11
70:6
71:9,16

75:20
76:1
77:13,17
77:19
79:7
80:5,12
81:6
82:11
83:16
85:4,13
87:5
88:3
89:6
93:21
96:1,8
96:16,20
97:8,17
100:2,6
100:10
101:12
101:16
102:4
108:4
109:8,19
109:22
110:12
110:15
110:21
111:12
113:13
115:6,14
115:17
115:18
115:20
117:20
117:21
118:6,22
119:5,9
119:12
119:18
119:21
120:4,8
120:12
120:14
121:11
121:15
124:3,15
124:20
125:5,5
125:8,10
125:18
127:5,22
143:6,20
144:1,7
151:17
155:19
156:4,13
156:17
162:11
163:11
164:4,7
164:20
164:22
166:13
168:17
169:8
170:15
177:10
177:20
177:21
177:22
178:2,4
178:6,12
179:5,12
180:1,9
185:15
186:1,19
187:8,9
187:9
190:10
190:12
200:20
202:3,12
204:3
205:4
206:9,22
208:15
209:19
212:15
216:8
218:1,6
218:9
220:8
221:15
221:17
222:14
225:2
231:18
233:6,14
233:21
234:14
238:1
243:19
244:20
245:1,13
246:5,8
246:17
247:1,6
248:4,20
249:4,11
249:17
250:12
251:11
251:17
251:20
254:4,8
254:12
261:18
265:2
266:5
267:10
267:13
270:17
272:22
277:12
277:14
278:6
281:21
283:18
283:21
284:7,20
288:8
289:18
290:9
294:22
295:2
296:1,3
296:6,16
297:1
298:17
299:15
300:3,21
301:10
304:3,17
305:5,8
305:10
305:14
305:22
306:6
**Lopez's**
109:13
127:3
144:18
144:21
166:10
208:7
209:11
276:9
282:16
287:21
299:1
304:6
**lose** 141:9
156:2
**losing**
156:10
**lost**
141:19
**lot** 10:9
24:8
86:18
131:1
230:14
**loud** 204:5
208:15
**louder**
118:11
**loudly** 7:5
118:9
**lower**
171:9,15
172:19
173:2
193:9
258:15
**lowest**
169:21
170:2
**LUIS** 1:10
**lunch**
33:12
**LUQUE-...**
1:10
**lying** 8:16

**M**

**M** 2:13
**machine**
6:15,21
**Magazines**
102:11
**Magist...**
1:8
**mail**
287:13
**main**
170:16
**maintain**
119:18
176:11
**majority**
239:3
**making**
7:22
47:14
51:22
116:7
117:11
117:14
117:15
117:15
118:8,12
138:17
186:10
190:20
209:3
241:5
251:5
254:17
256:10
277:17
302:12
**male** 16:15
16:16
37:9
38:13
44:7
64:11
77:22
82:8,14
107:21
210:3
236:7
**males**
16:20
**malfun...**
29:9
**man** 71:2
71:11
72:3
77:18
79:1
82:19,21
83:2,4
83:12,14
83:19
84:7,8
84:19
85:15
107:16
112:5
117:18
127:2
142:8
177:2
181:20
216:15
217:5
236:14
236:19
237:11
243:15
245:14
247:21
248:3
253:5

254:18
256:21
257:7
263:6,19
265:11
265:16
266:9
288:13
289:8
290:7
**man's**
246:19
280:20
**mandated**
177:15
**manipu...**
295:15
**manned**
43:1
302:14
**manner**
109:18
109:21
119:2
205:5
231:9
256:11
**manners**
165:1
**Mannheim**
2:10
**manning**
42:21
**manpower**
95:22
**MANUEL** 1:8
**manufa...**
152:5
156:22
**Mark** 1:11
287:4
**marked**
25:8
256:6
268:19
291:18
297:4,6
297:21
**marketed**
160:7
**MARS** 26:4
**mass**
127:22
136:13
136:14
136:16
137:2,11
144:20
154:12
202:19
**mats**
132:18
132:19
**matter** 6:2
8:17
10:10
22:21
61:2
101:19
123:18
127:17
188:16
247:1
249:12
258:19
**matters**
5:6 6:14
12:21
39:19
**max** 106:8
**maximum**
27:3
**mean** 5:20
9:4 10:3
10:5
27:9
37:22
38:5
42:16
43:9
65:4
95:13
110:5
122:4,22
133:6
135:22
174:9
186:5
189:10
192:5
203:18
213:9
223:15
231:22
257:1,3
259:15
273:11
273:12
275:19
279:8
282:1
291:8
**meaning**
175:15
256:15
**means** 5:21
33:5
36:18
37:2,10
52:9
136:16
160:7
184:22
196:3
226:17
260:2
282:22
**meant** 25:6
222:4
254:8
**measure**
122:15
**measured**
245:13
**mechanism**
284:19
**medical**
69:19
70:11
71:3,12
71:22
75:20
85:7
88:20
89:1,16
90:3
91:8,10
92:20
97:18
98:2,14
98:15,19
98:21
99:3,7
99:15
100:4,11
108:11
109:11
111:13
115:8,15
164:22
170:16
182:7
199:8
205:12
218:16
234:13
234:16
234:18
235:9
238:14
238:19
239:3
252:1
253:2
285:18
301:12
304:7,11
**medicine**
238:20
**meeting**
31:12
**Melrose**
2:10
**member**
91:6
176:19
181:9
205:11
243:5,7
243:11
258:16
258:17
258:22
**member's**
198:2
**members**
76:6
88:22
90:17
92:17
161:4,6
174:21
176:11
176:17
181:12
251:9
300:9
**memory**
83:11
224:22
226:13
274:20
275:5
277:11
**men** 63:5
93:20
102:13
187:1
**mental**
157:6
207:21
232:9,14
232:18
232:20
232:22
233:6,8
233:10
233:14
233:15
233:22
234:3,5
234:9,11
234:17
234:22
235:1,5
**mention**
42:9
**mentioned**
115:10
215:14
**message**
117:16
**messages**
34:3
**met** 65:16
65:19
79:1
**method**
140:4
207:20
279:22
**mid-30's**
79:12
**middle**
183:20
196:21
243:19
244:17
245:2
**middle...**
78:1
107:15
107:21
**Midnight**
21:21
22:1
292:19
**mild** 119:2
**mildly**
161:22
**million**
262:5
**mimic**
117:13
**mind** 62:15
91:14,21

Stevan Vidljinovic
September 4, 2013

341

107:14
107:18
126:19
141:22
225:16
256:2
273:7
287:16
**minds** 8:16
**mine** 19:7
183:6
**minimum**
92:18
**minute**
54:7
100:21
106:8,8
106:9,11
120:5,13
123:13
146:10
173:9
192:22
251:20
251:21
251:22
**minutes**
48:20
50:16,21
61:2,2,3
100:3,16
123:13
240:8
249:12
283:12
300:11
301:3
**mischa...**
117:6
164:1
**mispro...**
32:16
43:2
**misread**
230:12
**missing**
266:1
**misspoke**
261:21
**misstated**
61:10
**misstates**
58:18
63:7
89:7
113:2
157:20
163:1
173:6
184:19
187:5
201:4
225:11
273:3
277:3
**missta...**
194:4
**mistake**
128:16
229:2
**mistaken**
279:7
**mistak...**
13:8
**misund...**
25:5
**model** 20:3
20:5
146:11
167:8,15
167:17
171:18
173:19
193:9
257:19
258:11
**models**
190:21
191:1
**modes**
191:3
**moment**
59:19
68:19
72:22
123:17
128:15
129:1,5
162:15
163:14
183:2
198:21
269:4
282:6
**moments**
225:15
300:5
**MONICA** 1:9
**monitor**
28:20,21
38:19
**months**
11:22
14:21
22:21
23:1
32:9
158:22
267:9
273:15
277:19
278:3
**morning**
22:5
35:15,22
36:11
38:11
41:5
51:8
54:5,21
55:12
79:2
147:20
240:15
**motion**
123:3
186:13
188:21
**mouth**
118:13
231:19
**move**
104:17
113:19
114:18
118:5,9
119:19
120:7
122:5
123:22
124:7,9
126:1,15
128:1
143:10
165:19
180:3
188:14
192:22
194:8
195:2,13
195:22
211:3,5
263:12
274:9,10
274:11
274:13
274:15
275:11
290:11
304:20
**moved**
119:17
120:8
124:8
125:6
**movement**
187:2
198:3
204:1
212:4,5
212:6
220:22
**movements**
106:20
**moves**
193:11
**movie**
142:6,16
**moving**
119:20
123:3
125:6
212:9
220:16
**Mt** 213:20
252:2
253:2
266:9
267:8
287:7,14
288:12
297:1
299:15
305:10
305:16
306:1,9
**multiple**
124:22
139:20
**mumbling**
116:11
271:3,22
272:16
273:19
275:4
**municipal**
1:14
90:11,20
91:4
97:22
98:8
**muscle**
152:8
156:22
**muscles**
141:10
156:2,10
**muzzle**
138:8

**N**
**N** 2:9 3:1
**name** 4:13
4:17
16:12
31:1
43:2
51:12
57:16
157:4
177:11
223:8
224:14
236:19
236:22
243:18
243:19
244:14
244:16
244:16
245:1,1
252:14
252:15
264:21
265:6
268:15
289:1
302:22
**named**
236:19
236:22
275:15
**names** 65:2
65:8,10
65:12
303:5
**narcotic**
254:1,9
254:12
254:18
298:19
303:15
**nature**
12:17
54:14

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

342

187:4,19
194:18
255:1
256:14
262:20
**near** 15:5
16:1,2,4
**neared**
187:9
**nearest**
298:12
304:1
**nearing**
125:9
**necess...**
25:17
27:9
92:5
143:16
213:5
215:3
231:22
**necessary**
92:18
**neck** 137:1
**need** 5:21
9:9,12
52:9
68:12,15
69:8,18
72:11
73:1
98:22
103:5
118:9
180:13
181:3
182:7
216:21
217:3
245:8
293:22
297:10
**needed**
67:1
71:18
81:12
83:12
100:10
103:22
109:11
111:13
115:8,15
241:21
284:6
289:4
**needs** 9:9
29:5
39:6
55:17
71:14,15
82:6
83:10
**negate**
269:11
269:16
269:19
**negative**
10:5
276:15
**neither**
7:11
108:1,4
186:22
190:7
192:18
193:15
219:2
**nervous**
141:14
**network**
33:17
42:2
**neurom...**
152:8,17
**never**
12:10
30:3
43:7
57:4,5
65:11
80:1
96:7
97:13
125:5
150:16
150:16
158:20
159:9
161:7
170:15
179:19
185:13
186:2
195:4
199:2,22
200:1,4
201:6
205:19
205:22
210:10
210:15
210:21
220:10
220:11
237:22
249:15
251:7
256:21
263:6,19
264:1,2
264:4,7
265:22
266:5
269:7
279:5
288:11
288:20
301:21
302:9
305:8
**NFI** 37:10
37:21
**night** 25:1
25:2
29:18
30:2,6
31:15
32:3,8
35:6
39:15
42:22
47:4
50:13
51:18,19
52:3,15
53:6,15
55:10
57:8,19
58:17
64:17,21
65:12,14
65:15
67:6
68:14,17
72:15
76:15
79:2
80:1,3,8
80:11
89:6,12
93:5
96:1
97:6
99:20
125:12
127:6
145:21
146:3
149:4
162:11
177:17
185:19
187:1
190:17
210:12
216:14
221:12
227:22
229:8
231:2,3
232:3
233:5,13
233:21
242:15
242:16
243:9
249:7
250:11
250:12
252:22
254:11
254:17
258:20
260:19
262:8
264:11
278:6
289:9,9
300:4
302:17
302:19
303:4,8
303:12
304:4
**nine**
230:19
**nine-hour**
33:11
**NMI** 152:9
152:11
**Nobody's**
165:14
**nod** 10:13
**noises**
118:12
**non-dr...**
24:1
**non-re...**
126:2
143:12
211:5
**normal**
118:10
294:18
294:21
295:3
300:4,7
305:7
306:2
**normally**
23:15
43:6
49:15
52:8
56:8
67:7
90:17
104:5
141:7
171:4
172:3,13
172:15
280:22
**north** 2:10
2:14,19
15:5
16:1,2,4
29:21
31:19
130:4
**Northern**
1:1 5:12
**Notarial**
308:16
**Notary** 4:6
270:6
309:20
**note** 53:13
241:10
242:4,5
**notebook**
241:4
**notes** 7:22
114:22
207:21
207:21
223:12
223:14
241:5
**notice**
75:8
103:16
106:21
175:5
204:20

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

343

204:22
266:20
267:12
296:18
296:22
**noticed**
24:19
111:20
**noticing**
197:20
**notifi...**
259:3,6
**notified**
13:5
260:1,3
260:9
**notify**
21:6
259:7
**November**
291:17
**number**
20:1,3,5
24:10
25:15,18
27:3
30:9
92:9
141:1,4
146:1,4
150:15
157:6
173:18
182:18
191:8
227:13
227:14
227:18
228:16
228:17
229:3,4
230:11
230:11
237:5,6
237:9,10
237:15
237:15
237:17
237:21
238:2,6
247:9,10
257:17
257:19
258:4,4
258:6,8
258:11
258:11
259:11
260:17
260:18
261:17
261:20
261:22
262:1
**numbered**
191:5
**numbers**
34:7,10
38:4
161:15
257:15
258:1
**numeral**
191:4,8
191:9
**nurse**
205:13
254:16
**nurses**
213:20
249:12
285:11
287:12

**O**
**O-r-e-...**
252:14
**oath** 4:4
269:12
309:7
**object**
12:20
13:3
19:15
27:5
35:16
36:12
37:3,14
38:6,15
39:13
40:14
41:10
42:3,14
44:10
45:4,13
46:8,18
47:7
48:9,21
49:19
50:5
56:3,6
66:4
69:2
70:17
74:18
76:11
84:22
86:6
90:14
91:16
92:22
132:4
149:10
150:9
153:7,16
155:15
159:6
160:13
162:2
163:16
163:22
164:12
166:18
173:5
174:3,8
182:14
184:2
191:19
196:2,22
197:10
208:10
222:5
250:15
267:14
277:6
278:14
278:20
289:10
**objected**
91:10
**objecting**
149:22
**objection**
5:20
12:13,14
12:22
13:2
23:18
27:15,17
28:2,3
30:7,8
31:6
33:9
36:13
38:22
39:1
40:1,2
43:15,17
44:12
49:1
51:4
52:22
55:8
56:5,15
57:11
58:18,19
59:5,16
59:17
63:7,8,9
65:3
66:20
69:3
70:12
71:5,6
74:22
76:19
78:8,16
78:17
81:20,21
82:10
85:1,20
87:1,2,3
89:7,8
89:18
90:6,15
91:15
92:7
93:22
95:7,8
95:16,17
96:3
99:11,12
100:5,17
100:18
102:20
102:22
109:16
110:11
110:13
110:19
110:20
110:20
110:22
113:2,3
114:13
114:14
116:16
117:2,8
122:12
122:13
122:14
126:9,10
129:20
132:9
133:1
146:18
147:6,8
148:9
150:15
150:21
151:3,7
154:2
155:16
157:9,11
157:18
157:20
157:22
159:8,11
159:21
159:22
160:19
163:1,3
163:6
164:9
166:8,16
166:19
167:10
169:10
170:12
170:14
173:8
178:2,3
178:11
178:13
179:9
182:1
184:5,19
186:16
186:17
187:4,20
188:4,22
190:18
194:5
195:7
196:12
199:11
199:13
201:4,5
202:9,10
204:7,9
204:14
204:15
206:2,3
208:18
208:20
217:7,8

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

344

218:2
219:18
219:20
221:2,21
222:1,6
222:16
225:11
225:12
225:22
226:1
249:22
266:3
267:22
271:18
271:19
273:2,4
276:14
276:22
278:22
282:13
283:7,8
288:3,5
288:15
290:13
300:12
301:4,5
301:15
301:17
304:13
304:15
**object...**
37:18
41:12
86:7
91:19
96:5
116:18
132:11
158:3
159:14
160:18
162:5,6
187:6
268:13
271:1
287:3
288:17
290:3,4
**objective**
69:18
71:20
72:1
77:2
96:7
164:21
170:16
185:22
199:2,7
218:15
234:13
234:14
237:22
304:5,5
**objects**
89:1
99:3
270:20
286:21
**obliga...**
23:9
**obliged**
217:6
**OBR** 262:14
**observ...**
197:3
275:18
277:16
296:10
298:22
**observ...**
296:19
**observe**
272:21
273:9,9
**observed**
107:1
124:17
156:1,3
159:16
165:17
189:20
190:5
212:14
235:20
256:15
271:3,6
272:15
273:18
274:22
275:4
276:8
290:6,9
296:15
**obstinate**
161:22
**obstru...**
110:17
**obtained**
236:16
244:18
244:21
245:18
246:22
247:6
252:1
253:2
267:3
**obviously**
38:21
225:3
252:5
**OC** 171:13
171:16
172:2,5
172:16
172:18
192:16
192:17
193:7
259:3,4
**occasion**
67:12
172:7
**occasi...**
24:4
26:17
**occasions**
7:17
19:6
21:2
155:3
**occupa...**
10:21
**occurred**
8:5
68:13
86:11
219:12
226:22
227:8
241:2
262:16
262:21
**occurr...**
35:1
42:17
45:10
74:8,12
203:11
209:19
222:19
223:9
224:19
226:11
233:4
242:6
246:11
246:17
259:20
260:10
266:12
291:20
292:10
293:2
296:20
298:11
303:22
**occurs**
33:7
**OEMC** 49:4
72:17
148:13
259:9,14
259:16
294:8
**offender**
236:6
258:16
**offend...**
238:11
238:15
239:5
**offense**
4:20
**offered**
74:14
84:16
183:22
**officer**
1:17 3:2
5:1 8:10
10:22
11:1,11
12:2,11
13:2
14:19
19:9
22:13,14
23:5
26:17
32:8,12
34:21
36:6
39:6
40:7
43:1,3
44:6
45:18
49:7,9
49:12,12
49:16,21
51:12,13
51:16,22
52:8,16
55:17
60:1,3,5
60:7,9
60:11
65:22
67:2,21
68:2
69:22
70:4,10
70:19
71:7,11
71:14,14
72:2,5,7
72:13,13
72:19
73:3,15
74:3
77:10
78:4
79:6
81:5,12
83:10,18
83:18,21
85:4,12
85:13,14
88:3
90:2
91:22
92:5,12
93:9,10
93:10,11
93:11
94:22
95:1
96:9,10
96:10,11
97:10,14
98:9,14
98:18
100:8,9
102:1,2
106:3,4
106:13
108:7
109:9,15
120:2,10
121:5,10
121:17
123:12
124:2
127:13
133:2

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

345

142:20 147:4,17 160:11 167:19 174:7 177:7,8 177:8,9 177:13 177:16 177:18 185:20 187:7 188:12 188:20 197:16 200:12 200:13 210:17 211:19 213:3 215:17 215:18 215:18 215:19 215:19 215:19 216:13 218:5,18 219:15 219:21 219:22 220:4,6 220:7,9 224:15 227:16 228:13 228:21 228:22 230:16 230:22 233:7 234:2 235:11 235:13 235:14 235:20 235:21 236:2,12 236:13 236:16 239:20 243:8,21 245:3,7 245:9,17 247:7 251:16 252:17 252:19 252:19 252:21 253:7 263:8 264:18 264:19 265:12 267:16 270:19 271:2,6 271:7,10 271:12 272:1 276:4 277:14 278:17 278:19 280:10 282:1,5 282:8,10 282:11 282:15 284:9,11 286:20 287:3 289:2,4 290:20 292:3,6 298:7 300:18 302:1,6 305:11 306:2,16 308:4 309:14
**officer's** 224:10 226:18 227:19 227:21 229:22 231:4 239:14 260:12 306:12
**officers** 1:13 2:17 11:14 15:16,19 19:5,9 19:13 20:14 43:5 47:11 49:10 51:20 52:2 66:7 85:10 94:3,20 95:5,11 97:3,6 99:8 102:8,18 103:2,17 103:19 104:9,11 109:12 129:8,15 130:5 132:21 133:3 146:21 149:14 153:11 153:14 155:11 158:8,21 161:21 166:14 170:21 176:18 177:6 179:7 185:18 190:8 196:7,9 214:7 215:14 217:22 219:1,5 219:8 220:12 222:4,8 222:13 223:5 227:13 227:18 227:19 227:22 228:3,17 229:3,4 230:9 239:2 243:11 248:9,15 250:10 250:17 261:18 264:3,15 271:14 281:20 292:9 305:21
**OFFICES** 2:9
**official** 1:13
**oh** 10:2 101:1 130:12 133:14 229:15
**okay** 21:14 34:15 73:2 90:9 115:1,8 116:1 120:12 126:18 126:21 128:7,8 143:13 175:8 182:19 182:21 188:15 190:6 192:11 197:18 232:13 274:13 274:15 290:7,10 291:8 294:13
**old** 37:9 38:13 44:7 73:17
**on-line** 73:12
**on-the...** 101:21
**once** 55:22 138:12 146:14 285:20 295:14
**one's** 140:20
**one-day** 17:5,9
**ones** 294:7
**open** 209:6 248:21 249:2 266:21 285:7
**Operating** 298:16
**operation** 21:22 26:5 27:4
**operat...** 28:17
**operat...** 73:15 259:15
**operative** 207:19 280:14
**opinion** 162:21 189:3 239:9 298:18
**opport...** 6:5 9:11 189:6 195:21
**opposed** 106:2 172:22 271:20
**option** 137:20 181:1 193:22 194:7 195:12 232:17 235:16 235:22
**options** 171:22 180:12 180:14 186:11 191:10 233:3 235:16 238:21
**ordeal** 9:5
**order** 3:7

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

346

73:4,7 73:17 75:5 84:21 87:17,19 87:20,22 88:1,5 91:13 138:2 169:8 173:15 173:18 174:4,5 174:7,12 176:5,5 176:9 183:8,15 183:18 184:8 192:8 197:18 207:8 216:16 216:17 216:20 217:6 218:9 274:5 297:20 298:1,4
**Orders** 73:9,10 73:14 229:19 239:15
**Ordinance** 74:6
**Orellana** 252:14 252:22 253:3,5 253:9,12 288:19
**original** 192:7 236:11 243:22 245:9 246:22 252:17 252:18 264:20 265:12 289:3
**origin...** 81:13 192:3 255:1 289:2
**origin...** 154:7
**osteop...** 157:2
**outcome** 308:14
**outdoors** 224:19
**outside** 250:6
**outstr...** 121:21
**overcome** 92:18
**overdose** 69:11,13 71:17 72:4,9 72:12,16 82:7 84:4 254:21 297:11 297:17
**overheard** 34:4
**overpower** 95:22 96:7 187:2 190:9,12
**oversight** 227:11
**overwe...** 95:15

**P**

**P** 2:6,6
**P.M** 226:12 292:20 292:21 293:3,4 293:5,10
**pace** 86:22 104:15
**pacing** 271:3,21 272:6,15 272:16 272:19 272:22 273:19 274:22 275:4,6 275:8,8 275:10 275:13 275:21
**pad** 241:10
**page** 3:3,8 20:9 156:19 156:21 161:14 174:20 175:7,13 180:22 192:10 197:21 268:9 269:9 270:14 286:19 308:2 309:2
**pages** 191:5 309:6
**pain** 193:10 286:12 286:14
**painful** 152:9
**pains** 37:10 38:14 44:8 82:21 83:4,15
**pair** 206:18
**paper** 241:7
**paperwork** 56:22 57:3 289:17
**paragraph** 73:20 75:9 76:4 90:9 151:20 153:18
**paragr...** 161:13
**paramedic** 88:19 89:5,15 91:8 92:6 205:13 210:3,4 254:16 306:3
**parame...** 2:17 63:18,20 63:22 64:2,6,8 64:14,15 64:18,20 65:1,10 65:12,17 70:3 87:12 88:7,13 88:17 89:10 91:6 93:13,14 94:3 149:15 209:10 209:15 209:18 210:6 212:11 212:15 215:15 215:16 221:3,6 249:5 300:19 301:22 302:2 305:12 305:13 305:16 305:22 306:14
**parame...** 39:5
**Pardon** 75:16
**Park** 2:10 31:22 35:11
**parkway** 104:21
**part** 5:8 18:15 114:19 144:18 153:9 155:9 161:7 203:17 204:2,12 204:16 207:22 213:16 213:22 217:2 227:11 229:2 280:20
**partic...** 298:14
**partic...** 8:7 20:5 20:15,17 22:6,9 23:14 24:17,22 25:10,12 29:7 31:15 32:3,10 34:9 35:20 37:13,21 41:8,13 41:14,17 42:7,17 42:19 44:14 46:2 56:21 62:4,18 75:5 87:7 91:13 99:19 105:8 122:4 123:3 129:22 132:14 132:15 137:21 146:2 159:12 174:12 203:16 223:4

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

347

234:4,6 241:15 260:4 280:8 302:21
**partic...** 44:14 80:7 221:13 221:16 221:22
**parties** 308:13
**partner** 22:12,17 22:22 23:3 26:17 32:9 35:6 53:6 54:1,10 54:22 66:14,17 67:5 81:5 85:4,9 85:12 93:9 94:14 96:9 101:22 104:5 109:14 110:1 115:5,7 115:13 115:14 115:19 117:20 117:22 118:3,21 119:1,5 120:5,8 120:14 120:16 121:1 122:7,11 122:16 123:9,11 123:12 123:19 123:21 123:22 124:2,5 124:11 124:13 124:19 124:22 125:7 126:11 127:6,10 127:10 127:12 127:19 142:20 168:16 168:20 169:1,6 169:7,13 169:19 172:5,11 186:4,18 186:22 187:7 192:17 192:20 194:17 198:9,11 199:17 199:19 199:22 200:2,9 200:20 201:3,7 201:14 201:17 201:18 202:5 210:16 215:16 215:18 219:22 230:10 252:5 255:11 255:19 256:18 263:8 271:6,13 272:1,7 276:8,20 277:12 278:5,13 280:7 281:13 281:16 281:19 292:3 306:8
**partner's** 125:7 281:18
**partners** 23:6 230:13
**parts** 23:13 187:17
**pass** 18:1
**pass/fail** 17:21
**passed** 18:4,6 140:20 203:11
**passive** 256:20
**pat-down** 248:3,5 248:10 248:13 248:14
**patient** 88:18 89:1 91:7,9 92:16,19 232:9,15 232:20 232:22 233:6,10 233:14 233:22 234:3,5
**patiently** 196:18
**patients** 235:1
**patrol** 293:9
**patrolman** 11:4
**pattern** 43:13
**patting** 248:7
**pavement** 203:14 204:6,13 211:22
**paying** 41:7
**PCP** 97:1 112:10 113:14 186:8 217:14 217:15 254:1,9 254:12 298:19
**PD41** 48:17
**PDT** 54:13 54:17
**peace** 90:2 98:9,13
**peacef...** 69:20 71:21 77:3 85:6 97:17 115:20 119:6
**pen-wr...** 241:11
**pending** 14:13
**people** 7:3 8:12 17:1,4 43:6 66:1 98:2 112:9 119:2 129:16 130:20 135:7 152:7 154:6 155:12 155:12 156:1 157:1,5 162:20 182:6 184:9 215:11 217:2,15 222:12 223:19 228:19 234:21 285:14
**people's** 153:1 223:18 223:19
**pepper** 172:1,6 172:18
**perceived** 179:5
**percent** 160:8,12
**PERF** 152:2
**perform** 140:7 248:10
**perfor...** 75:6
**period** 11:16,19 14:21 24:13 176:6 285:22 300:17 301:12
**periodic** 9:5
**permis...** 216:21
**perpen...** 107:3
**persist** 160:6
**person** 13:18 16:17 42:8 68:18 69:14,16 70:1 74:13 84:15 98:17,21 99:1,2 113:11 134:16 138:5,8 141:6,7 142:4,7 142:9 154:22 157:15 158:13 158:15 168:3 170:3,5 171:10 180:13 182:11 183:22

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

348

184:4 197:22 198:1 214:3 234:1 236:11 245:8 248:1 282:7 297:16 298:12 303:14
**person's** 76:8 138:14 138:15 206:17
**personal** 9:8 97:3
**person...** 18:9 22:8 85:5 124:17 144:19 240:22 256:4 297:5
**personnel** 18:10 99:9 181:4 283:2,18 283:21 286:16 287:18 287:20 288:18 301:11
**persons** 73:6 74:2 183:9,16 297:22 298:6 303:10
**persuade** 186:19 187:8 190:12 218:16 256:19 272:2 278:10 279:22
**persua...** 279:21
**persua...** 168:11 168:19 168:22 169:18 174:22 181:8
**persua...** 169:4 255:11
**pertai...** 1:22
**philos...** 190:4
**phone** 247:10
**phrase** 77:14 207:19 279:8
**physical** 95:4,5 95:10 98:2 99:1 121:10 124:15 127:6,9 134:16 141:19 175:1,4 175:10 180:14 181:15 207:2 210:11 210:12 210:16 214:3 228:11 228:13 257:9 270:18 282:2,4 286:13 289:7 296:16
**physic...** 66:12 95:22 96:16,17 112:16 125:19 210:21 226:5
**pick** 214:15 232:15 238:12 280:8,19
**picked** 212:16 214:5 234:4
**picking** 7:9 47:17 214:7
**picture** 62:14 107:13 107:17 142:6 287:16
**pieces** 241:7
**pinpoint** 63:20
**place** 21:9 71:18,21 74:4 133:20 141:13 184:11 198:22 199:2,4 199:22 200:4 236:19 243:14 259:6 298:8 299:10 303:19 308:10 309:6
**placed** 170:15 209:12 224:9 227:20 266:22 305:14
**places** 260:15
**placing** 214:4
**plain** 177:12 191:17
**plaintiff** 1:4,20 4:8 271:3,4 271:7,8 271:11 271:11 271:13 272:2,15 275:4,14 275:17 275:19 276:4,21 278:18 278:19 280:7,11 280:18 281:6,13 282:22 283:2 287:6
**plaint...** 73:3 145:16 150:19 158:19 161:14 268:11 268:19 268:20 275:12 297:21
**Plaint...** 2:11
**plan** 33:2 66:18 96:15 97:9,13 97:14,20 130:21
**plants** 6:8
**play** 39:8
**please** 4:1 4:3,13 16:7 101:7 108:3 158:18 165:10 165:14 178:19 179:4,16 214:13 257:6 270:16
**plump** 79:19
**point** 11:5 14:1 35:11 49:14 54:22 108:22 112:5,7 121:9 124:14 125:16 126:5,22 131:12 131:12 133:6 144:8 159:1 172:15 211:20 271:8 272:4
**pointed** 14:3 103:7 119:14 120:20 143:18 143:19 144:2
**pointing** 201:15
**poised** 144:4
**police** 1:13 2:17 10:22 11:1,11 11:12,14 12:2,8 12:11 14:19,22 15:6,8 15:16 34:1,19 36:6,19 39:6 40:7 41:21 44:19 45:2,11 46:6,12 47:11,22

County Court Reporters, Inc.
630.653.1622

48:1,6
49:6,7
49:15
50:17
68:10
73:5,10
73:15
74:3,14
81:12
82:6,17
84:16
87:17
88:16,21
91:22
92:4,9
92:11
94:3
98:1
99:8
108:2,6
108:14
108:18
129:11
130:4
142:6
146:21
150:3
152:2,3
152:15
154:4
160:6,11
161:2,8
161:16
164:8,10
164:20
166:11
167:7,9
167:19
168:4
173:15
174:14
176:6,16
176:17
177:7,11
177:13
177:16
177:18
180:16
180:19
183:7,14
184:1
185:20
207:16
207:22
210:17
214:7
219:7
222:4,8
222:13
229:19
230:22
235:13
237:17
239:1,14
243:8,11
247:20
248:9
251:10
254:20
261:18
265:15
281:20
282:1
291:19
291:22
292:4,11
293:16
294:1,14
297:10
297:13
297:20
298:7
305:11
305:21
306:2
**policeman**
108:5
**policemen**
93:4
**Polick**
2:13 3:5
12:13,20
19:15
23:18
27:6,16
28:3
30:7
31:7
33:10
34:15
35:16
36:12
37:3,14
38:6,15
39:1,13
40:2,14
41:10
42:3,14
43:16,20
44:1,10
45:4,13
46:8,18
47:7
48:9,21
49:19
50:5
51:4
52:22
53:7
56:3,15
57:11
58:18
59:6,16
63:8
65:3
66:4,21
69:3
70:13,17
71:5
74:18,22
76:11,19
78:9,17
81:21
82:11
84:21
85:2,21
86:7
87:2
89:7,18
90:6,9
90:11,14
90:20
91:16,19
92:7,22
95:8,17
96:5
99:12
100:5,17
100:20
102:20
109:17
110:11
110:20
113:2
114:13
116:16
117:2,8
122:13
126:9
132:11
146:18
147:6
148:9
149:10
149:21
150:9,13
151:6
153:6,16
154:2
155:15
157:9,18
157:22
158:3,19
159:21
160:13
162:2
163:3,6
163:16
164:9,12
165:4,9
166:7,16
166:19
167:10
169:11
170:13
173:8
174:3
175:6,8
178:2,11
178:17
179:1,9
179:16
182:1,14
182:19
183:4,7
184:2,19
186:16
187:4,13
187:16
190:18
192:9
194:4
195:7,16
196:2,12
196:17
197:10
199:11
201:4
202:9
204:7,14
206:2
208:18
217:8
218:3
219:18
221:2
222:1,6
222:17
223:15
225:11
225:22
249:22
250:15
251:1
260:20
261:3,21
262:3,9
266:3
267:14
267:22
268:13
269:3,16
269:20
271:18
273:2
274:8,11
274:15
274:18
275:14
276:14
276:22
278:14
282:12
283:7
288:3,15
289:10
290:3,17
290:19
296:14
299:18
300:12
301:4,15
304:13
305:2,4
305:18
306:22
307:2
**policy**
88:11,15
88:16
174:20
176:11
184:17
**polite**
188:9
**politic**
1:14
**Polo's**
64:5
**portion**
155:22
156:15
234:7
**portions**
221:8
290:12

290:14
**portly**
95:13
**pose**
273:22
**posed**
166:3
**position**
23:17
109:12
109:13
109:15
110:18
111:2
112:13
115:5
119:19
122:1
129:18
129:22
203:22
206:12
207:9,14
212:2
256:17
**positi...**
107:7
115:4
200:14
208:7
**possible**
111:6
154:21
155:11
207:18
207:19
238:5
**possibly**
94:3
**potential**
112:19
155:21
156:7,13
**potted** 6:8
**pounds**
94:19
242:15
246:3,5
**power**
101:21
111:16
111:18
198:22
**powerful**
112:5
**practical**
181:12
**practice**
7:15
36:6
**pre-ex...**
157:2
**preach**
7:15
**preamble**
5:4
**preceding**
19:7
213:17
213:18
**precisely**
202:14
**predict**
111:2
156:5
**prefer...**
137:22
154:21
**prelim...**
113:10
**premat...**
57:3,5
**prepar...**
31:4
**prepare**
36:2
37:16
44:11,15
45:6
46:10
48:13
**prepared**
38:2
50:8
135:12
135:16
297:5
**prepares**
148:12
**presence**
89:15
177:17
180:16
180:17
180:19
181:1
262:9,12
263:20
300:5,10
**present**
2:5
30:19
72:18
74:4
230:9
**press**
295:12
**pressure**
193:17
**pretty**
67:10
95:4,5
119:21
132:7
**previous**
164:1
256:8
**previo...**
150:22
268:22
287:6
**PRI** 40:22
**principle**
185:3
**print**
184:10
255:1
**printed**
241:11
**prior**
18:13
22:19
29:3
43:5,10
88:4
100:7
109:20
129:12
156:4
163:14
174:5,7
174:13
174:17
174:22
181:14
207:2
210:17
212:21
216:6
217:11
219:11
285:16
**priority**
39:4
40:5,6
40:17,22
41:1,2,5
42:12
44:6,9
44:20
45:3,11
46:15
**private**
9:17
15:7
74:10
**privilege**
250:2,4
250:16
251:3
287:1
**privy**
249:19
**probably**
30:11
42:1
68:16
86:18
87:21
103:7
147:11
150:7
151:5
172:4
192:17
225:4
230:16
241:3
252:16
262:4
275:3
**probat...**
11:16,19
14:21
**probe**
152:20
**probes**
131:10
152:7
153:1,14
205:10
205:12
205:16
205:20
295:8
**problem**
4:21 6:5
**problems**
153:3
157:2,7
234:22
**proced...**
188:15
**Procedure**
1:22
**proced...**
89:22
91:5
298:16
**proceeded**
123:8
**procee...**
8:9 9:11
34:10
**produce**
149:17
**produced**
138:15
149:11
149:13
149:14
149:22
150:16
151:1
158:21
159:2,9
159:13
287:6
**profes...**
74:2
90:18
176:12
239:9
298:6
**program**
18:2
139:3
**prongs**
139:22
140:8
202:18
**pronounce**
4:17
**proper**
13:5,6
289:16
**properly**
29:2
270:22
277:18
284:21
**protect**
76:8,16
98:22
271:13
281:19

**protected**
250:1
286:22
**protec...**
303:16
**protec...**
248:3,5
248:10
248:14
298:9
299:13
303:19
**protest**
222:8
**protes...**
221:18
222:13
**protocol**
13:22
36:14
129:11
150:20
207:16
229:20
248:2
264:19
306:2
**protocols**
151:22
152:5
**prove**
112:11
**provide**
98:17
**provided**
161:7
**provis...**
1:21
99:1
**proximity**
39:20
138:5
180:19
**PSN** 291:7
**public**
74:4,9
176:13
183:16
184:11
270:6
298:8
299:10
303:19
309:20
**pull** 122:6
138:9,13
139:13
139:15
139:19
205:20
273:12
**pulled**
144:5
150:6,7
163:10
200:6
232:18
232:18
295:16
**purpose**
2:1 8:19
88:10
134:5,9
147:3
184:13
**purposes**
8:3 34:9
288:20
291:10
**pursuant**
1:21
**pushed**
215:2,4
**put** 28:22
45:2
48:8
51:2,2
73:3
83:19
97:11
119:12
121:2
122:7
138:7
139:21
140:3
152:1
186:13
187:3
192:8
207:7
212:17
212:19
215:8
222:14
225:8,9
227:7,14
228:16
228:21
229:4
230:10
231:15
232:20
239:8
240:13
240:17
240:20
243:12
245:14
246:6
247:20
247:21
248:18
250:6
256:7
280:9
284:1,4
284:19

**Q**

**qualified**
2:3
**qualify**
250:18
251:1
260:20
261:6,13
261:14
**quarter**
267:1
**Queries**
36:7
297:4
302:8,10
302:12
**Query**
34:20
35:2
44:20
46:3,5
82:18
297:6
**question**
5:22 6:8
6:12 7:9
7:16,19
8:2,5,7
8:14,21
9:15,16
9:19
16:8
35:19
58:20
61:16,17
69:12
83:7
88:5
90:7
94:18
100:14
101:7
102:20
108:3,12
110:11
112:15
113:20
113:20
114:6,10
114:21
126:4,17
128:3,4
143:12
147:6
157:19
158:11
163:9,17
163:18
163:19
163:19
164:10
164:13
164:16
165:5,11
165:11
165:20
165:21
166:3,5
166:17
173:5
174:4,10
178:17
178:19
178:21
179:4,17
182:15
187:5,13
187:15
187:16
187:18
187:19
187:21
187:22
188:3
189:14
189:15
189:22
191:19
193:1,2
194:10
195:4
196:13
196:14
196:15
196:15
196:20
197:5
202:4
211:5,6
211:7,8
211:15
211:17
214:13
222:9
230:8
232:2
233:20
238:10
243:5
248:17
250:5,18
250:21
251:6
257:6
261:10
263:14
263:18
265:14
266:4
267:15
270:13
271:19
273:3
274:4,14
274:16
276:11
276:15
277:1,6
277:9
278:15
279:11
280:4
287:17
288:4,16
289:11
289:21
290:1,3
290:13
296:11
300:13
304:2
**questi...**
13:1
143:16
151:5
**questions**
7:8,12

8:4 74:1
76:3,5
98:13
150:14
150:19
151:7
159:7
161:15
163:18
186:5
188:7,10
189:20
190:2,3
196:18
196:19
197:6
200:22
228:5
235:12
235:15
253:10
265:13
268:16
273:7
278:1
282:20
290:15
296:11
297:3
298:1
299:18
306:21
**quick**
127:10
263:5
274:2
302:7
**quickly**
104:16
104:17
**quit**
286:18
**quite**
260:5

**R**

**R** 2:14
**radio**
39:16
40:4
50:17,21
293:13
294:6,11
297:14
**radios**
36:20
**raise** 4:3
7:17
122:3
161:15
278:12
281:7
**raising**
118:21
**ran** 292:20
292:21
**ranging**
198:3
**rank** 11:4
11:7
16:22
159:6
**re-engage**
295:21
**RE-EXA...**
300:1
305:3,19
**re-read**
178:19
**reach**
125:16
126:6
127:2,3
127:13
138:14
198:2
**reaching**
217:11
**react**
109:22
110:1
127:10
156:5
171:21
217:17
**reaction**
194:14
**read** 16:7
16:8
37:12
73:21,22
74:16,20
75:9
76:10
84:14
92:15
98:12
101:6,8
113:20
114:1
128:2,9
152:13
153:4,6
153:9,22
155:9,14
155:17
157:8,12
157:21
159:19
162:1,8
162:9
165:21
166:5
175:2,3
175:19
178:21
184:6,21
192:11
193:1,2
198:16
211:6,8
266:18
267:4,20
268:4
269:12
279:10
279:12
286:20
289:21
290:1
298:4
303:14
309:4
**readily**
103:4
125:21
143:8
170:17
194:18
195:1
**reading**
35:20
41:21
49:5
50:8
51:6
82:14,20
153:19
160:2
239:8
240:10
273:1,5
273:20
275:2
277:13
278:7
297:9
**reads** 76:6
161:15
183:21
**ready**
103:22
104:3
109:22
144:5
217:22
**reality**
160:6
**realize**
192:3
235:19
**really**
6:12 9:7
142:2
274:2
275:22
**realm**
250:6
**reason**
30:12
111:1
118:15
132:14
132:15
186:12
199:4
**reason...**
76:8
114:16
174:21
239:11
**reasoning**
147:10
**reasons**
8:3 30:9
150:22
159:11
197:7
239:18
**recall**
13:16
15:21
17:3,6
17:17,20
18:3
23:20
24:11
27:1
31:8,13
38:17
41:16
43:14
49:2
50:14
51:1,11
52:19
53:9
56:7
57:2
58:4,8
58:11,14
58:16,22
59:13,20
60:1,3,5
60:7,9
60:10,11
60:12,13
60:17
61:7
62:6,17
62:22,22
63:4,10
63:12,15
63:17
64:12,15
64:19,22
65:15,18
66:13,16
68:2,20
69:5
70:21
77:10,12
78:1,3
78:10,22
79:12,15
79:17,20
80:2,6
80:14,18
80:19
81:4,7
82:2,13
82:14,20
83:3,14
84:10,12
85:14,17
85:22
86:9,15
87:4,15
89:9,13
89:20
91:20
93:7,18
94:18
96:11
97:7
98:11

Stevan Vidljinovic
September 4, 2013

353

100:6,19 101:15 102:9,15 103:12 103:20 104:10 104:16 104:18 105:5,10 105:11 105:13 106:12 107:5,6 107:9,12 107:21 108:21 109:7 111:21 112:3 116:11 117:10 118:2,3 119:13 119:20 120:3,4 120:10 120:14 122:9 124:21 127:15 128:11 128:16 128:18 129:4 131:2 132:3,19 135:4 137:5,8 137:21 139:11 140:7,9 140:22 141:4,16 142:9 145:8,11 146:4

149:5,13 154:9,10 155:1,6 158:9,12 158:16 160:2,21 161:11 167:4 171:18 177:9,20 200:13 200:18 201:9,13 202:12 203:6,10 203:16 204:1,10 204:16 206:12 206:16 207:9,13 208:2,3 208:9,12 208:14 208:21 209:5,7 209:18 210:5,8 212:2,4 212:5,7 212:9,21 213:2,8 213:10 214:4,6 215:5 216:6,11 219:4 220:6,7 220:17 220:18 220:21 221:13 221:15 222:18 222:20 223:3

225:5,6 225:7,13 230:18 230:21 231:8 233:1 234:2 236:16 238:4 240:21 241:14 242:7,11 244:9,21 245:11 247:19 248:14 249:1,8 251:19 253:7 254:14 258:10 258:13 260:8 261:20 262:19 263:2 264:9,10 264:13 264:18 265:14 265:18 265:19 266:12 267:2,4 267:10 268:6 270:10 271:21 272:5,7 272:18 273:10 273:11 273:13 273:14 275:7,13 275:21

278:7,8 279:20 279:20 280:1,2 282:4 283:16 284:5,11 284:17 287:11 292:10 293:3 297:13 297:15 301:6,7 302:2,6 302:18 303:4,7 303:11 306:5,13 306:19
**recalled** 272:19 278:9 306:18
**recalls** 282:22
**receive** 11:10 14:11,14 17:8 48:14 71:22
**received** 35:14 60:22 176:5,9 252:17
**receiving** 16:1 42:8 46:7 53:17,20 127:20 130:6 143:5 158:7 161:11 263:9 293:17 294:14
**recess** 9:12
**recipient** 157:16
**recognize** 48:4 51:12 116:15 116:19 302:16 302:20 303:9
**recogn...** 51:15 66:3
**recogn...** 303:11
**recoll...** 21:17 43:7 93:17 97:3 166:9 212:18 221:10 292:12 293:6
**recomm...** 154:6
**recomm...** 152:5
**record** 4:14 5:8 8:6 10:12 20:2,4,6 25:11 28:8,12 61:11 73:21,22 74:20 76:6 82:5 92:15 98:12 101:2,8 114:1 128:9 146:6 147:4 158:20 161:15 188:13 188:18 189:16 192:1 197:3 224:3,6 279:12 298:5
**recorded** 29:5 308:7
**recording** 28:22 56:1,18 57:9 147:3
**records** 25:16 161:3
**recoun...** 107:14
**red** 63:5
**reduced** 308:7
**refer** 16:22 223:12
**reference** 90:2
**refere...** 3:7
**refere...** 90:8 91:2 267:6
**referring**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

354

90:7 182:16 192:9
**refers** 184:4 287:6
**refresh** 9:10 224:22
**refreshed** 274:21 275:5,7 277:11
**refresher** 145:9
**refuse** 99:7 304:11
**refused** 71:12 75:21 85:7 199:9,15 255:17
**refuses** 74:13 75:10,14 84:16 182:11 183:21 183:22
**refusing** 70:11 71:3 84:7,20 100:4,15 185:19 186:3
**regard** 159:11 260:21 297:8
**regarding** 10:8 13:1 41:13 73:5 82:20 88:11 159:5 234:9 251:20 287:5
**regard...** 112:11
**regards** 282:5
**Register** 260:17 261:17 261:22 262:1
**Regist...** 237:15
**regular** 25:6,7 64:6
**regularly** 43:12
**regula...** 22:17 24:7,9 32:5
**regula...** 139:4
**related** 238:12 239:6,7 308:13
**relation** 282:9
**relati...** 55:13
**relevance** 12:13,21 12:22 19:15 159:21 160:13 190:18 196:2
**relevant** 265:4
**religious** 89:2 91:11 99:4
**remarks** 37:8
**remember** 9:2 16:10,12 19:11 23:16 29:13 31:10 38:11 49:17 50:12,22 51:10,15 52:17,20 53:17,20 53:22 54:3 59:14 62:20 64:10 65:12 68:21 79:18,21 80:9,10 80:13 82:19 83:11 86:16,19 93:19 97:5 101:13 102:5 104:13 105:14 105:18 107:10 109:4 116:9 117:1 124:19 134:8 141:2 142:1,4 144:14 148:7 173:14 183:3 190:8 193:16 208:6 213:14 213:20 214:2 215:22 217:22 219:1,13 221:10 221:18 244:19 248:12 256:17 261:13 262:20 270:2 271:16 276:10 276:11 279:16
**repeat** 108:3 151:4 214:13 257:6
**repeat...** 189:1
**rephrase** 250:5
**report** 13:13 29:9,11 207:22 223:18 224:10 224:10 224:12 225:3,14 226:17 226:18 226:20 227:19 227:21 228:18 228:21 228:22 229:5,9 229:17 229:22 230:16 231:1,4 231:20 232:20 233:7 234:9 235:6,14 235:19 235:19 236:12 236:18 237:1,2 237:7 238:3,5 239:8,14 239:15 239:18 239:20 240:9,10 241:21 243:10 243:12 243:14 243:22 244:3,12 245:7,9 245:14 246:9,22 251:22 252:18 254:18 256:2 257:13 263:4 264:20 265:4,12 265:15 287:5 288:19 289:3,5
**reporter** 4:1,3 6:15 7:1 9:6 10:7 16:9 45:20 101:9 114:2 128:10 165:20 166:6 178:22 193:3 211:9 279:9,13 290:2
**reporters** 159:18
**reports** 146:7,10 148:12 160:10 208:4 223:15 223:16 223:18 223:19 223:20 223:21 233:3 244:5,8 252:12 254:22 260:12 260:13 262:14 265:19
**represent** 158:20 250:16
**reprod...** 146:14

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

355

50:17 51:3,10 51:11,14 51:17,22 52:4,18 53:13 61:1 68:10 81:11 83:5 91:21 233:2 254:20
**requested** 51:7 52:12 55:3,12 66:2 67:2 71:15 72:19 76:22 82:15 87:14 92:8 97:15 125:21 218:6,12
**reques...** 51:16 52:16 83:22 194:19 270:21
**requests** 52:8 88:12 91:9 286:22 306:3
**required** 89:16 185:18 229:18 239:14 268:1
**requires** 5:5 88:20
**requiring** 103:3
**Research** 152:2
**reserved** 307:2 308:11
**residence** 62:3 246:19 247:5
**reside...** 62:1
**resist** 198:19 257:8
**resist...** 198:2
**resister** 143:7 162:17 193:13 194:21 197:22 198:7 256:20
**resisters** 175:19
**resisting** 92:17,19
**respect** 115:14 151:2
**respir...** 157:6
**respond** 39:4,7 103:2 115:17 271:8 272:3 290:12
**responded** 54:15 62:7,7 72:20 76:21 267:17
**respon...** 54:14 66:22 185:20
**response** 49:17 180:12 180:14 239:15 239:17 260:12 287:5 289:4
**respon...** 24:1
**respon...** 55:5
**respon...** 113:19 165:20 180:4 289:20 290:14
**rest** 9:5 132:21 275:11 304:20
**restate** 179:1,2 292:17
**restrain** 97:4 186:12 187:2 213:21 221:5,6 249:11 283:22 284:3 285:18 289:16
**restra...** 209:13 212:22 220:21 221:1 284:22
**restra...** 91:9 96:16 283:15 284:19
**restra...** 221:11
**result** 14:12 155:13 180:19 181:11 250:13
**resumed** 44:3 101:4 197:13 224:7
**retrac...** 172:16
**retreat** 124:1
**review** 46:2 268:12
**reviewed** 240:8
**revolved** 255:20
**revolver** 103:18
**Richards** 159:18
**ride** 305:22 306:3,4
**riding** 25:2 33:19 306:19
**right** 4:3 6:11,21 7:19 9:13,14 10:18 13:20 15:22 16:4 17:15 18:21 20:11 21:12,20 23:5 24:15 29:10 30:14 32:18 33:15 34:6,18 35:8,13 36:2,5,9 36:22 37:7 38:4,10 40:11 41:2,20 42:11,11 42:21 44:18 45:1,17 46:14,15 47:2,13 49:13 50:2,15 50:20 51:2 52:4,11 52:13,17 53:4,14 54:9 57:7 59:2 60:18 61:5,14 62:19 63:4,17 64:13,17 65:20 66:3,3 66:17 67:5,21 68:5 70:8 72:21 75:4,8 80:4,15 80:19 82:5,17 83:7 84:6,14 85:9 86:13 87:9,16 88:6,15 89:14,22 90:13,22 92:14 93:13,19 94:7,11 95:3,14 97:9 99:7,15 99:18 100:1 101:11 102:12 103:14 104:12 105:7,21 106:5,6 106:17 107:13 108:12 108:17 109:4 110:4,8 110:14 112:1,4 112:20 113:17 114:6,18 115:4,16

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

356

116:22 118:5 119:3,8 119:9,9 119:17 120:7,16 121:1,9 121:13 121:19 122:2,19 123:20 124:14 124:18 125:2,14 126:1 127:12 128:1,14 128:18 128:21 129:6,9 129:13 131:8,18 132:8,16 133:6,9 136:19 137:11 137:16 138:8 140:3,14 141:11 142:12 143:10 143:18 144:2,11 145:12 145:18 145:21 146:15 147:2,18 148:3,5 148:17 149:1,1 149:8 151:2,6 151:8,16 151:20

153:8,22 155:8 156:18 158:11 158:17 159:16 160:5 162:10 163:9,16 164:4,11 164:15 165:3,11 165:13 166:13 167:6 168:1,18 169:4,22 170:11 170:20 171:14 172:8,20 173:3 174:1,15 174:19 175:13 175:21 176:10 177:1 179:2 180:11 182:8 183:10 183:17 184:8 185:9,11 185:16 188:2 189:5,8 190:8,14 191:20 192:12 195:13 195:22 196:4,16 197:1,16 198:14

198:15 200:5,11 200:16 200:22 202:4,16 203:2,4 203:13 203:18 205:6,22 206:6 207:4,17 208:5,15 209:15 210:2 211:19 213:6,22 214:10 214:17 217:15 218:18 218:22 219:6,15 220:4,9 220:14 221:17 222:10 224:14 224:15 224:17 225:18 226:8,11 227:7,8 227:13 228:12 228:16 229:1,8 229:10 230:4,21 231:9 232:6 233:5 234:4 235:10 236:3,4 236:6,18 237:2,14

237:21 239:3,13 239:16 239:19 239:21 240:4,7 240:12 240:15 242:13 242:18 242:22 243:3,6 243:9,17 245:3,5 245:10 246:6,18 247:8,14 248:1,7 248:16 250:8,22 251:15 252:3 253:4,13 255:3,6 255:13 256:1 257:13 258:3,15 259:2,4 259:13 259:18 261:2,6 262:3 263:12 264:2,11 265:8 266:14 267:18 267:21 268:2,8 268:13 270:6,9 270:12 272:11 272:20 273:14

274:10 276:2,16 277:8 278:5 279:9,15 281:5,5 282:15 282:18 283:17 284:16 286:4,6 286:11 286:17 289:19 290:11 296:13 300:9 302:8,12 302:20 303:3,16 303:17 303:18 304:9,11 304:20 306:20 307:1,3
**risen** 160:11
**risks** 153:2
**Road** 2:7 2:10
**Robert** 1:12 43:1 50:10 58:8 60:16 62:13 66:1 82:15 145:20 287:4
**Roberts** 105:12 151:12 151:14
**rode** 306:6
**roll** 20:20 30:15,18 31:4,11 32:21 293:9
**Roman** 191:4,8
**room** 7:2 20:7 132:16 244:7 287:12 287:20 288:2 298:14
**Roosevelt** 31:19
**rose** 2:6,6 2:7 4:1 12:16 13:9 16:6,11 19:18 23:21 27:11,21 28:7 30:13 31:9 33:14 34:7,17 36:1,17 37:6 38:3,9 38:18 39:9,17 40:10,18 41:19 42:10,20 43:18,22 44:5,17 45:8,16 46:13 47:1,12 48:11

County Court Reporters, Inc.
630.653.1622

49:8 50:1,11 51:9 53:3,10 55:7,9 56:11,19 57:14 59:1,10 59:21 61:13,16 61:18 63:11 65:6,7 66:6 67:4 69:7 70:14 71:1,10 74:19 75:3 76:14 77:7 78:13,20 82:4,12 82:16 85:8 86:2,12 87:8 89:11,21 90:8,10 90:13,16 90:22 91:1 92:3,13 93:3 94:6 95:12,20 96:13 99:17 100:13 101:1,6 101:10 103:6 110:3,16 111:7 113:6,19 114:5,18 114:20 116:21 117:3,12 122:17 126:1,3 126:15 126:16 128:1,5 128:13 130:2 132:5,13 133:5 143:10 143:14 147:1,13 148:16 149:17 150:7,11 151:2,8 151:9 153:8,10 153:21 154:3 155:18 157:13 158:1,10 158:17 159:15 160:4,8 161:1 162:7 163:8,21 164:3,11 164:15 164:17 165:3,7 165:19 166:1,12 167:1,13 169:16 170:19 172:8,9 173:7,9 173:10 174:9,11 175:7,9 178:7,14 178:18 179:2,3 179:13 180:3,5 182:9,17 182:21 183:1,5 183:10 183:12 184:7 185:2 186:21 187:11 187:15 188:2 189:8,10 189:13 191:20 192:7,12 192:14 192:22 193:8 194:8,9 195:2,3 195:9,13 195:14 195:17 195:22 196:4,5 196:16 197:2,15 199:16 201:10 202:15 204:11 204:19 206:5 208:11 209:2 211:3,14 217:19 218:7 220:3 221:4 222:3,9 222:11 223:1,17 224:8 225:17 226:2 250:8,9 250:22 251:4 261:2,6 261:9 262:2,4 262:6,11 263:12 263:13 266:6 267:18 267:19 268:2,3 269:2,4 269:8,18 270:1 272:10 274:10 274:13 274:17 274:19 275:11 275:18 276:1,16 276:17 277:8,10 279:1,3 279:9,14 282:18 282:19 283:11 288:10 288:21 289:19 290:11 296:9 299:20 300:15 301:9,20 304:20 306:20 307:1,3
**rotate** 23:8
**rotated** 23:12
**rough** 95:2
**roughly** 32:21 61:4 94:15 148:2,13
**round** 131:22
**route** 62:12 67:1 85:18 91:21
**Rule** 74:18 74:22 76:11 84:22 91:16 92:22 153:7,16 155:15 157:9 162:2 184:2
**rules** 1:21 5:11,13 5:16,17 5:18
**run** 86:13 86:17,18 104:13 167:2,5
**run-ins** 217:14
**running** 86:15 144:8 198:5 238:7
**rush** 206:20 288:1
**rushed** 206:22

**S**

**S** 3:6
**S-a-h-...** 148:18
**safe** 68:16 109:2 111:3 147:11 152:6 200:18 209:19
**safety** 76:9,17 176:19 299:13
**Sahnas** 148:19
**Sahnas's** 149:5
**SAITH** 307:8
**SANDRA** 1:3
**satisfied** 96:14 126:6 127:2 226:14 227:6,11
**saw** 37:15 58:1,6,7 58:20 59:4 63:1 79:9 80:19 93:11 108:18 121:7 124:16 127:14 142:5,7

155:3 182:10 203:15 203:16 205:4 210:17 219:11 227:22 228:13 248:19 256:3,21 262:17 281:6 286:13
**saying** 8:22 53:18 70:7 75:19 76:2 77:9 114:7 115:19 116:3,8 116:12 117:22 118:6,8 128:11 128:16 137:5 177:20 178:1,10 179:7 194:1 199:21 211:16 220:10 222:20 223:3 226:10 234:2 241:13 242:7 251:19 257:7 260:9 262:19 263:2 264:10 283:16 304:18
**says** 7:2 40:22 41:20 45:10 47:5 74:2 84:15 88:21 90:1 91:5 92:15 98:13 120:17 123:2 148:18 151:12 151:21 152:21 155:10 155:12 156:21 160:5 174:21 176:11 198:16 227:5,18 229:3 230:4,6 231:9,20 240:16 243:3,6 246:9 252:1,13 257:22 258:3,15 259:3,19 268:9 270:15 272:14 278:17 280:17 304:2
**scenario** 17:14 167:18 167:21
**scenarios** 167:18 217:16
**scene** 58:13,16 58:22 59:3,4 59:12,15 59:22 61:6 62:20 63:2,14 63:16,18 63:20 64:1,3 64:14,16 65:18,21 66:19 67:1 70:9,21 70:22 71:13 76:22 77:9 79:5,9 83:21 85:14 89:10 93:5,7 93:15,17 93:20 94:4 96:10 97:6 100:3,7 105:11 108:7 113:10 113:11 116:13 162:14 185:20 210:9 215:22 216:1,4 216:10 216:12 219:2,8 219:11 219:16 220:12 222:19 223:20 230:5,18 230:20 232:22 234:1 248:15 250:11 262:22 271:3 272:15 292:10 295:7 296:19 300:20 300:22 301:2,8 301:18 301:22 302:3,4 302:5
**schedule** 22:2 149:5
**scope** 169:10
**Scott** 151:12 151:13
**se** 241:10
**Seagal** 142:5,6 142:8,15
**Seal** 308:16
**seams** 95:19
**search** 247:18
**searching** 247:19
**seat** 23:11
**seated** 133:14 133:18
**seats** 133:13
**second** 13:11 32:1 121:3 145:12 156:20 171:3 224:4 240:5 242:14
**Secondly** 7:6 268:16
**seconds** 50:3,4 53:12,18 54:5 123:15 123:16 123:18 139:5,14 139:16 240:4
**Secretary** 20:9
**section** 99:2 192:2 243:6 298:3 303:13
**see** 17:9 20:21 21:3 25:15 35:3,15 36:6,11 36:15 41:22 42:7,8,8 42:11 44:21 46:14 48:7,8 50:4,17 53:12 54:6 63:2,20 63:22 73:18 74:16 75:11 79:5 88:7,13 89:2 91:11 92:20 93:2 99:4 104:8 109:11 110:12 110:21 113:21 115:15 118:5 119:15 120:12 120:17 120:21 122:6 124:4 127:5,12 128:3 142:16 144:18 144:19 145:18 146:11 147:20 148:17

150:11 152:13 153:4,15 153:22 155:14 155:17 157:8,12 162:1,8 162:9 168:21 169:3 173:13 175:1,3 181:15 184:1,6 184:15 185:18 188:19 189:21 198:5,19 200:20 201:15 203:13 211:4,6 211:19 212:12 215:11 222:12 224:20 225:19 226:1,4 226:6,6 227:14 229:3 230:6,12 231:13 235:11 235:15 236:18 236:21 244:7 253:14 255:6,8 257:15 258:17 265:5 266:1 267:6 276:5 278:12 282:7 283:3 299:16 306:16
**seeing** 54:9 58:8,11 58:14,16 58:22 59:14,20 60:1,3,5 60:7,9 60:11,13 61:7 62:20 63:5,10 63:12,15 63:17 93:18 98:11 104:10 127:15 173:14 215:22 216:6 242:5 266:11 275:2 276:19 289:12 289:13 299:15
**seek** 97:19 164:22 199:8 234:13 234:16 304:7
**seen** 6:10 17:4 34:20 73:6 87:20 98:10 145:15 149:16 150:16 189:1 221:6 265:15
**seize** 199:10
**send** 295:22
**sending** 131:11
**sense** 77:13 116:13 117:15 186:10 305:9
**sent** 260:14
**sentence** 84:15 153:12 155:10 156:21 183:19 183:21 282:21
**separate** 154:16 244:8
**September** 1:18 87:19 308:16
**seq** 98:16
**Serb** 13:12
**sergeant** 1:11 17:1 29:15,16 29:17 30:1,14 30:18 57:8,15 57:18,20 58:9,11 58:14,16 58:22 59:14,20 60:13 93:12 215:20 216:4,6 216:10 216:11 216:21 217:4 219:7,10 229:21 231:2,2 231:7 240:8,19 242:3,10 242:10 259:19 260:9 262:7,15 262:19 263:2,18 263:21 264:1,5 264:9,11 287:4
**sergeants** 30:10 57:8
**serial** 146:1,4 258:3,11
**serious** 155:13
**served** 266:15
**serves** 8:19
**service** 42:11 45:9,10 47:5 102:7,10 103:18 298:14
**services** 75:20 90:3 98:15,18 98:21
**session** 15:17 18:1 134:2 141:13
**set** 268:11 268:21 308:10 308:15
**settle** 246:18
**seven** 50:3 93:20 94:3 230:14 230:17 230:17 230:22
**Seventh** 5:13
**severe** 157:4
**shake** 10:11
**sharing** 245:16
**shift** 20:12,12 20:15,17 21:8,20 21:21 22:1 23:14 24:16 27:2,4,8 28:9,15 29:3 30:6 39:11 43:10,13 148:22 216:14 292:13 292:19
**shocks** 152:10
**shoot** 153:14
**shooting** 153:1
**Shootings** 160:6
**short** 17:16 43:21
**shorter** 78:7,12 78:15,19 122:10 122:16 245:22 246:2
**shorthand** 308:7
**shorts** 80:12
**shot** 154:14 154:16 154:18 231:10 231:10 258:16 258:20 258:21
**shotgun** 23:11,17
**shoulder** 122:8 123:1 280:21
**shoulders** 10:11 136:20

**show** 8:6 72:21 160:9 183:7 191:1,2 231:7 269:6
**shown** 50:9 137:21 302:11
**shows** 25:13 35:21 36:16 40:16 54:15 62:11 270:4
**shrug** 10:11
**sic** 13:12
**side** 34:1 103:11 107:2 109:14 121:22 123:1 130:4 134:3,18 135:14 136:4,8 136:14 136:14 136:15 137:4,7 143:4 166:21 200:9,11 203:20 206:11 232:8 282:8 294:8
**side-t...** 112:2
**sides** 142:21
**sidewalk** 104:20
**sign** 19:19 21:10 240:2 248:19 265:5,18 265:21 266:11 268:1 269:9 270:4,9 272:20 286:13 289:12
**signal** 129:7
**signature** 307:2 308:11
**signed** 22:8 240:8 267:21 270:11 272:13 275:2 277:19 278:2 280:6
**signing** 268:12 270:2 273:6 280:12
**signs** 296:15 296:22
**similar** 8:14 96:22 125:18 253:21
**simple** 197:6 211:18
**simply** 273:10 274:20
**Sinai** 213:20 252:2 253:2 266:10 267:8 287:7,14 288:12 297:1 299:15 305:10 305:16 306:1,9
**single** 139:13 139:14 232:3 285:19 285:21
**single...** 62:3
**SIOLIDIS** 2:2 308:3,19
**sir** 4:13 10:19 75:12 91:2 145:16 151:10 166:2 173:14 179:5 187:12 189:14 190:7 192:22 193:21 196:21 251:5 269:9
**sit** 23:10 116:22 214:2
**sitting** 133:13 230:21
**situate** 59:11
**situated** 201:16 202:5,8 215:21
**situation** 82:1 88:20 96:18 98:4,20 101:22 102:3 113:12 124:4 138:2 168:13 170:7 171:1,12 193:5 194:13 202:2 207:20 290:6 297:17
**situat...** 92:16 112:9 137:12 221:15
**six** 63:13 93:16 97:3 133:19 240:7 245:22
**size** 112:11
**skull** 249:17 250:12 251:17 253:5 265:16 266:1,21 266:22
**skyroc...** 160:7
**slacks** 64:6
**slapping** 198:17
**slender** 79:19
**slide** 258:13
**slightly** 175:12
**slithered** 203:19
**slow** 238:7
**small** 102:1 190:3 191:7,9
**SO3-08** 87:20
**Soat** 1:8
**social** 180:16 180:17 180:22
**soft** 157:3
**solely** 98:5
**somebody** 8:16,18 68:9 102:21 138:3 139:5 140:15 141:8 156:3 158:6 179:21 185:7,14 194:14 205:12 214:10 215:1 228:10 235:4 237:7,8 238:16 241:8 254:7 256:9 290:5 303:18 306:6,19
**someone's** 138:21
**somewhat** 109:20
**soon** 9:8
**sorry** 25:8 32:13 40:19 232:11 257:6 269:18
**sought** 99:2
**sound** 7:11 7:13 10:12 117:14 208:15 208:21
**sounded** 269:20
**sounds** 10:6,8 116:7,12 117:10 117:13 118:1,9 118:13 118:17 119:3 168:16 200:2

Stevan Vidljinovic
September 4, 2013

361

209:4 232:4 286:7,9
**source** 160:21
**sources** 261:11
**south** 31:20 35:2 38:14 55:1 58:14 61:8,19 61:21 62:4,16 62:17 246:7,12 246:19 247:6
**Spanish** 37:9 38:1,5 77:15,16 116:4
**spasms** 152:8 156:22 157:4
**speak** 31:3 43:14 49:21 52:2 67:20 70:4 71:7 75:22 77:11,15 77:16 83:22 95:10 102:8 103:1,19 104:11 109:8 115:12 117:20 118:2 120:4,6 120:14 121:5 142:13 149:6 159:1 172:11 177:8,19 178:4,5 188:17 219:21 223:4 255:18 271:7 272:2
**speaking** 7:7 26:15,16 62:4 64:15 70:21 77:10,12 80:2 89:9 106:13 110:1 117:21 118:8 162:13 169:13 170:1 179:22 205:16 216:11
**special** 31:11 73:4,6,9 73:10,14 75:5 84:21 87:17,19 87:20,21 91:13 183:8,14 183:18 184:8 192:7 229:18 239:15 297:20 298:1,4
**specific** 27:18 53:20 79:13 107:20 107:22 117:1 141:4 146:4 205:5 236:21 241:2 255:5 265:14 267:2 287:15
**specif...** 51:15 52:3,12 52:19 59:7 68:11 70:5 93:8 98:11 102:9 105:5 115:12 118:3 133:12 203:6 216:2 245:11 255:4 267:4 276:7 287:11 287:21 300:20 305:6,9 306:6
**specifics** 131:15 268:7 271:20
**specified** 155:1
**specifies** 183:18 243:10
**specify** 25:19 135:18 218:21 231:21 253:20
**specif...** 208:4
**speculate** 46:21 141:5 179:11 179:22 196:9 212:7 302:15
**specul...** 87:3 96:4 132:10 178:11 179:10 182:4 301:4
**speech** 118:11
**speedily** 92:1
**spell** 31:1
**spinal** 157:3
**Spinning** 2:7
**spoke** 68:8 70:19,20 75:22 77:11,13 97:14 100:8 106:3,4 108:7 177:10 234:1 249:15
**spotter** 134:3,9 134:18 135:4,9 136:4 142:21 143:4
**spotters** 134:6,15 135:3,6 136:8 141:20 142:12 142:13 142:15 156:7
**spray** 171:13 171:16 172:2,2 172:5,6 172:16 172:19 192:16 192:17 193:7 259:4
**squad** 22:6 22:9,10 23:9 24:6,17 25:20 26:7 27:3,13 28:9 42:12,19 42:21 46:7 53:5,14 53:15 54:6,19 54:19 58:2,4,6 58:21 59:4,7,9 59:11 60:20 66:8,9 105:8 291:19 293:13 294:6
**Squadrol** 298:16
**squads** 26:10
**SS** 308:1 309:1
**stabbed** 231:11
**stack** 45:19
**staff** 287:7,9 287:18 288:7,11 288:13 288:18 289:15
**stage** 133:15 133:17 133:17
**stand** 43:16 47:6 111:1 132:21 156:3 209:8 259:14 259:16 290:4

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

362

**standing** 67:22 68:3,3 81:2,4 86:1 87:5 106:15 106:17 106:18 108:20 109:1,19 111:15 111:21 115:13 118:14 120:15 133:8 142:5 144:7,10 150:14 150:21 151:3,6 159:8,10 159:22 160:19 162:5 166:20 196:8 199:19 200:19 203:22 208:12 225:18 226:5 272:19
**stands** 40:22 46:21 100:14 233:20
**star** 1:6,6 1:7,7,8 1:8,9,10 1:10,11 1:12 177:11
**start** 6:3 19:3 21:15,16 22:4 28:8,15 29:4 156:20 194:15 194:16 281:7 291:14
**started** 11:13 21:3 32:18 80:20 101:11 120:5 122:2,18 123:20 129:1 167:16 267:7 271:12 281:9 292:14 292:14 292:16 292:20 292:21 293:3
**starting** 250:14
**state** 2:3 4:13 151:21 269:12 308:1,4 309:1
**stated** 113:4 150:22 163:4 225:13 269:17 269:18 273:10
**statement** 112:6 182:11
**statem...** 181:10 251:9
**states** 1:1 5:11,14 184:10 271:2 272:4 287:3
**stating** 265:19
**station** 21:10 41:15 47:21,21 47:22 48:5 72:11 252:11 254:22
**statio...** 106:19
**stations** 302:14
**stature** 112:11 142:9
**Statute** 182:16
**Statutes** 90:12,21 91:4
**stay** 212:12 249:7,13 283:5
**stayed** 120:1,8
**steam** 111:16 111:18
**step** 118:15 168:18 175:14 196:7 306:16
**stepped** 60:20 124:19
**Stevan** 1:6 1:17 3:2 4:7,15 268:10 308:5 309:14
**stiff** 257:11
**stiffen** 256:11
**stiffened** 256:6 257:2
**stiffe...** 256:15
**stiffens** 256:9
**stomach** 144:22 266:22
**stood** 112:16 112:21 142:16 166:13
**stop** 6:4 7:18,18 7:18 126:1 165:3 178:18 219:16
**stops** 25:22
**stored** 20:8
**straight** 203:20 302:6
**strap** 221:7
**straps** 283:15 284:1,4
**strate...** 109:12
**street** 2:14,19 31:19 32:19,22 33:5 62:12,13 80:22 86:5 88:2 104:21 105:1,2 105:3,4 105:5,6 105:8,16 105:17 106:15 106:17 108:19 108:20 109:1 111:22 144:7,11 144:13 144:14 144:15 144:16 155:20 155:21 156:8,14 156:17 166:20 182:11 187:1 201:2 203:2,3 203:7,12 203:14 203:16 204:1,4 204:6 205:2,5 206:13 209:12 212:1,3 214:1 215:11 216:13 221:20 224:20 225:6,7 225:9,19 226:6 240:18 241:5 246:11 263:7,19 264:17 272:19 285:16 286:2,9 289:9
**strength** 97:2
**stretches** 31:20,21
**stricken** 289:20
**strictly** 249:10
**strike** 13:18 61:16 113:19 114:18 126:2,15 128:1 143:10 155:21 156:14 164:15 165:19 180:3 188:14 188:21

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

363

192:22 194:8 195:2,13 195:22 203:14 203:17 211:3,5 256:5 263:12 274:9,10 274:11 275:11 275:16 275:19 290:11 292:17 304:20
**striking** 193:11 198:16
**struck** 124:6,9 202:18 220:1 228:2 231:11 243:6 255:7
**study** 73:13
**stun** 137:13 137:21 138:3,5 138:7 152:10 152:16 296:3
**stunning** 138:13 193:11 193:16 194:2 195:5,18 198:15 198:16
**subdue** 161:20
**subject** 69:12 140:9 180:13 180:16 180:19 193:12 198:18 205:11 216:22 243:16 244:15 247:15 248:17 264:22 270:22 271:1,21 287:2 306:4
**subject's** 198:19 244:16 255:7 256:5
**subjected** 12:11
**subjects** 175:19 181:2,5 205:20
**submitted** 240:6
**subscribe** 309:7
**SUBSCR...** 309:16
**subseq...** 18:12,17
**substance** 108:9 112:8 113:14 113:16 126:14 179:19 179:20 271:5
**substa...** 97:1 112:10
**succes...** 18:18
**succinct** 187:18 187:22
**suffer** 157:17 235:21
**suffered** 235:20
**suffering** 72:3 157:6
**suffic...** 95:21
**suffic...** 273:8
**suggest** 149:17 197:4
**suggested** 141:2 192:18
**sugges...** 69:15 174:12
**sugges...** 255:11
**suit** 308:13
**Suite** 2:8 2:15,20
**summer...** 80:7
**Summit** 247:2
**Superior** 216:13
**Superv...** 1:11 231:2
**Superv...** 13:7,10 20:10,12 29:10,12 29:13 30:3,6 57:7 148:21 216:18 217:4 229:21
**supplied** 273:8
**supported** 199:12
**suppose** 37:10
**supposed** 28:16 56:12,17 176:14
**Supreme** 5:14
**sure** 5:17 6:9 10:14 14:10 17:21 28:16,21 29:1 34:13 67:10 84:13 104:19 140:22 145:7 149:20 192:5
**surely** 174:9
**surgeries** 250:13
**surround** 162:20
**surrou...** 40:7 129:16
**suspect** 137:4,6 137:10
**suspected** 132:7
**suspects** 161:22
**suspen...** 14:11
**suspicion** 239:11
**suspic...** 8:16
**swaying** 112:3
**swear** 4:2
**swing** 121:16 123:8,11 124:20 272:9
**swinging** 121:17 144:10 271:12 281:9,17
**switch** 140:1 295:9,16 295:22
**sworn** 4:9 76:6 176:17 269:11 308:5 309:16
**swung** 124:21
**synopsis** 68:13 102:1 218:14 262:15 263:5 302:7
**system** 36:10 45:2 293:20
**Systems** 90:3 98:16,21

**T**

**T** 3:6
**table** 5:22 9:16
**tactical** 15:9,9 236:22 239:15 239:17 260:12 287:5
**tactics** 168:14 194:20
**tag** 177:12
**take** 4:20 5:10 6:6 6:16 7:1 7:3,6,10 9:5 10:12 11:4 12:10 13:22 19:4 20:18,18 21:1 25:14 27:9 28:17 32:8 43:21 54:21 55:4,13 55:17 62:13 67:3

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

364

71:2 80:20 81:10,17 81:18 82:3 94:8 95:1 98:1 103:3 123:8,11 129:18 129:22 142:2 149:20 149:21 189:7 197:1,9 197:16 205:7,15 245:3 252:10 257:4 264:2 269:3,4 276:8 278:5 283:14 284:14 303:16 304:3 306:11 306:15
**taken** 9:7 44:2 67:18 74:15 84:17 97:3 101:3 153:17 157:10 159:17 162:3 184:1,3 197:12 205:10 205:12 244:20 260:18 261:17 273:15 278:2 298:8,12 299:13 303:19 303:22
**takes** 97:2
**talk** 5:21 6:3 8:1 9:19 10:1 39:16 45:21 64:14 67:2 70:9,15 89:5 101:18 130:3 170:3 183:13 198:14 218:5 223:6 251:10 251:13 262:7 267:7
**talked** 80:1 118:22 172:17 218:14 236:11 252:21 301:21
**talking** 5:19 6:4 36:20 39:11,18 82:11 83:18 88:3 116:3,6 124:3 145:18 175:6 178:15 185:22 193:6 199:5,20 218:19 226:3 248:22 255:10 287:18 303:10
**talks** 82:18 146:1 152:20 197:21
**tall** 78:2 78:3,4 78:11 94:21
**tangent** 192:13
**target** 145:2
**tase** 97:11 136:12 137:4,6 137:10 137:18 139:5 154:6 219:9 304:7
**tased** 130:10 130:14 130:15 130:15 131:6,9 132:22 133:3,9 134:11 134:12 134:14 134:17 134:19 136:3,5 136:8 155:7 156:4 205:11 205:21 207:3 212:10 214:11 217:1 247:18 251:21 263:10 266:9 271:13 281:20
**Taser** 13:8 13:17,22 14:15 15:12 18:14,19 18:20 19:1,19 20:1,14 20:16 21:7,9 21:11 51:3,7 51:11,16 51:17,18 51:19 52:3,5,8 52:15,16 52:18 55:3,12 61:1 66:2 67:2,3,6 67:7,13 67:15 68:10,12 68:15 69:9,16 72:19 76:22 81:9,11 82:15 83:5,10 83:22 87:14 91:21 92:1,8 93:6,8 94:8 97:15 102:11 102:13 102:16 102:19 103:3,4 103:10 110:9,14 111:9,10 125:12 125:20 127:21 127:21 127:21 128:15 128:15 128:15 128:19 128:19 128:19 128:22 128:22 128:22 129:5,5 129:5,6 129:6,7 129:9,11 129:17 130:1,17 132:17 134:21 135:11 137:20 138:1,4 138:8,22 139:1,3 139:13 139:17 139:19 140:1,8 140:20 140:21 142:19 142:19 142:19 143:1,3 143:18 143:19 143:19 143:19 143:22 143:22 143:22 143:22 144:17 144:20 144:22 145:6,10 145:19 146:2,2 146:5,8 146:13 146:15 146:16 147:9 148:1,4 148:15 149:4 150:4 152:4,21 154:5,10 154:14 155:19 156:5,13 156:16 157:14 157:17 158:4,8 158:13

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

365

160:6,11
161:4
162:15
162:22
163:10
164:19
173:4
186:15
190:10
190:16
192:2,3
194:18
194:19
194:22
196:6,6
196:6
200:7
202:18
205:3,7
205:14
205:19
210:13
210:18
211:2
212:14
213:17
213:18
216:15
216:22
217:4,6
217:20
217:21
218:6,8
218:9,12
218:12
218:20
218:22
219:3,6
219:6,7
219:12
219:14
219:14
219:14
220:5,10
226:15
230:15
233:2
234:15
243:15
257:14
257:19
257:20
257:22
258:4,6
259:3,7
259:12
263:1,22
295:6,7
295:13
295:16
295:17
296:4,7
300:6
**tasered**
155:4
204:3
208:16
221:19
222:14
256:22
289:8
290:5
**tasering**
208:22
266:21
**Tasers**
19:3,6,9
19:11
20:8,21
21:3
52:1
150:20
152:1,5
155:11
157:1
159:5
161:10
161:20
**tasing**
133:20
141:6,8
141:12
142:10
156:4
207:10
209:19
219:11
219:16
248:4
249:1
285:16
**taught**
99:6,14
99:18
140:7,15
140:17
140:19
145:4
170:21
172:20
175:15
176:1
180:21
181:4,6
195:5,19
**teach**
99:21
**teaching**
17:10
152:17
**Technical**
289:4
**techni...**
291:10
291:12
**techni...**
98:14,19
**technique**
195:5,18
**techni...**
181:14
186:19
191:6
**teetering**
111:19
112:17
**telephone**
9:9
247:8
294:9
**tell** 8:18
9:2
13:14
25:11
26:10
40:12
47:13
49:5
69:9,22
71:2
84:7
107:10
107:18
114:11
114:16
117:18
129:7,13
130:12
131:8,13
136:11
137:3,6
137:22
142:15
142:19
154:20
160:16
177:1
187:20
199:15
217:11
222:13
229:21
233:5
242:3
246:13
250:11
251:16
252:21
253:4
262:22
263:6,18
265:1
269:5
272:16
287:21
288:1
302:10
**telling**
84:10
100:19
166:10
217:15
253:7
262:21
271:16
**tells**
217:5,11
**temper...**
80:8,10
**ten** 133:19
283:12
301:3
**term**
270:20
**terminal**
54:18
**termin...**
182:13
**termin...**
37:19
42:6
48:4
**terms**
191:3,12
**test** 14:1
17:14,15
17:16
28:16,19
**testified**
4:9
293:8
**testify**
6:22
308:6
**testimony**
58:19
63:7
89:8
113:3
117:7
163:2
164:1
184:20
187:6
194:5
201:5
225:12
273:3
277:4,18
277:21
308:9
**testing**
17:8,12
17:12,19
**thank**
10:18
34:16
44:1
156:18
167:6
180:10
190:14
220:14
232:6
263:16
274:17
275:11
307:5
**theirs**
45:21
**thereof**
308:14
**thing** 10:3
107:20
119:4
121:13
124:18
185:12
234:18
**things**
10:9
12:18
125:19
126:13
173:12
175:14

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

366

238:6
**think** 8:22
61:10
68:14,21
86:16
94:11
106:6
115:10
118:16
118:17
120:18
125:19
151:1
160:15
163:19
164:13
165:5
184:8
185:17
188:15
189:5,5
189:17
190:20
190:22
191:6
216:18
222:10
224:2
232:21
261:21
261:21
277:5
293:8
303:4
**thinking**
179:12
**third** 48:3
109:15
242:13
**thought**
25:6
92:4
150:12
177:2,21
178:12
178:16
189:19
198:9
226:21
228:12
229:15
234:5
253:17
257:3
285:7
**threat**
232:3
**threat...**
232:1
**threat...**
92:16
**threats**
231:12
231:16
231:18
231:21
**three** 6:3
12:1,4
14:17
19:13
95:5
96:12,14
96:15
97:8,21
100:9
101:12
102:5
109:4,9
109:12
125:13
125:15
126:5,8
126:22
129:14
143:21
163:18
187:17
188:8
206:20
208:5,6
238:21
296:8
**three-...**
162:4
**threw**
167:18
241:22
**throw**
194:16
**thud** 204:5
204:10
**tighter**
256:10
**time** 6:10
6:10 7:7
7:9 8:2
14:10
15:12
20:10
22:3,20
24:13
26:14,16
27:13
32:20
33:1,20
36:5,5
36:20,22
38:10
42:2
46:3
48:7
55:11
59:3
60:19,19
60:22
61:1
63:21
67:14,16
72:15
73:13,13
73:16,16
78:21
81:3
83:6
84:20
85:6
89:12
94:18
100:11
102:14
105:19
105:20
106:5
114:7
115:19
119:22
120:2
126:20
139:12
139:20
146:22
148:7,13
148:14
148:21
162:13
163:14
169:14
174:5,7
177:17
179:8
190:9
193:4,20
200:14
203:8,10
210:7
213:15
216:10
223:9
226:13
226:14
226:20
226:21
226:22
227:7
229:7
230:9,15
235:17
244:5,10
251:6
252:11
253:18
266:12
269:3
273:13
279:17
280:12
281:9,17
283:10
283:13
285:22
287:14
304:6
308:10
309:5
**times** 7:5
9:13
33:16
48:15
124:22
139:20
143:21
189:17
189:18
262:5
295:12
304:14
**tion** 47:18
**tissue**
157:3
**title**
151:11
235:4
**today** 6:3
9:7 46:3
107:14
143:15
230:21
269:7
271:17
272:17
273:7,14
273:17
273:20
277:13
277:19
277:22
278:8
280:2
281:15
**toggle**
140:1,12
140:16
140:17
295:9,15
295:22
**told** 20:11
56:20
72:8
84:1
97:16
100:14
108:1,5
112:21
114:10
114:15
127:17
134:1,8
134:15
135:21
137:19
140:22
147:17
152:16
154:5
169:1
216:14
219:2
228:12
233:13
236:14
244:22
245:4
254:11
263:8,15
263:21
264:7
286:2
291:18
292:9
293:12
300:3
**tolerate**
196:22
**tone**
118:18
118:19

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

367

118:20
**tool** 69:17
171:7
**tools**
170:8,11
**top** 46:14
88:8
136:20
144:14
156:21
160:5
184:12
206:21
223:13
240:13
246:11
**topic** 31:5
**torso**
136:18
136:19
**total** 23:3
202:7
**touch**
126:7
**touched**
263:6,19
264:1,4
264:8
**touching**
213:14
**tour** 19:3
19:5,7,7
19:8,20
21:2,9
29:6
30:15
31:4,12
32:18
33:2,12
95:14
292:15
292:16
**tours**
11:14
**TR** 230:15
237:4
245:7
**traffic**
55:13
105:7,15
105:15
105:18
293:13
**trained**
16:17
17:4
39:21
56:12
129:14
137:18
152:15
157:14
158:4,8
167:8
171:8
173:19
176:13
176:20
181:17
185:10
193:11
205:14
205:18
205:19
280:22
**training**
11:10
14:14
15:3,10
15:11,17
16:1,3,4
16:12
17:2,5,9
17:22
18:1,6
18:13,18
21:13
101:19
109:21
113:5,9
129:10
130:3,5
130:6
134:2
136:3
137:9
138:12
139:18
141:12
152:22
154:4,14
156:1,7
161:8
167:7,14
167:22
171:11
173:11
173:16
174:2
176:7,8
185:6
205:14
234:17
254:6
**transc...**
8:8
308:9
309:5,8
**transport**
69:21
71:19,22
76:6
77:4
97:18
199:7
232:19
233:8
234:10
234:12
234:18
234:18
234:21
235:6,9
**transp...**
89:1
91:10
92:20
99:3
**transp...**
99:3
108:10
233:14
298:9
303:20
305:15
**transp...**
88:18,22
91:7
98:16
235:1,4
**travel**
145:5
**treat**
232:22
**treatises**
90:5,14
90:17
**treatment**
74:10,10
76:7
84:5
89:2
91:11
97:19
98:2,18
99:4,7
99:10,15
100:4
111:13
115:9,15
170:17
199:8
218:16
234:14
234:16
252:1
253:2
285:18
304:7,11
**trees**
34:11
**trial** 9:4
34:11
**Tribune**
159:5,17
159:20
**tried** 92:1
108:9
115:15
115:20
123:10
124:5,8
186:2
187:1
190:9,11
190:12
191:14
191:15
192:21
193:16
195:4
205:22
218:16
232:19
271:10
272:1
276:4,20
277:12
277:14
278:1,10
278:18
280:7,10
280:15
280:17
281:4,13
281:16
282:10
285:18
**trigger**
138:9,13
139:1,13
139:15
139:20
139:22
140:13
144:5
163:10
200:6
295:7,12
295:16
**TRR** 262:14
263:4
**truck** 61:6
61:7
63:5,10
301:3,6
**trucks**
105:16
**true** 77:19
237:12
268:2
269:13
285:20
303:1,2
308:8
309:8
**truth** 8:17
308:6
**truthful**
277:22
**truthf...**
272:21
**try** 4:16
7:15
9:16
25:10
70:15
71:20,21
84:4
111:3,4
120:12
123:8
127:13
138:4,5
154:6
168:8,11
169:20
179:4
187:8
194:2,12
195:18
237:20
237:20
238:2,5
255:20
256:19

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

368

261:13
271:7
276:9
278:12
279:21
279:22
284:7
288:7
303:3
**trying** 7:7
7:8,11
7:13
77:6
84:2
97:17
102:3
117:11
122:6
124:3
127:15
137:10
168:19
168:22
177:5
185:22
196:19
219:16
227:1,2
234:19
251:12
257:4
269:5
277:2,4
277:5
283:22
284:1,3
285:14
287:20
**tune** 39:21
**tuned**
33:16
**turn** 28:20
56:13,20
57:3,5
101:14
109:5
140:12
182:18
183:2,5
207:7
224:2
288:14
295:18
**turned**
57:1
181:22
295:20
**turning**
29:2
140:15
**turns**
140:1
**two** 14:9
14:16
16:19
23:7,8
43:5,6
47:16,18
49:10
50:16,21
64:2
66:1,7,9
66:12
83:2
85:10
93:13,14
94:3,20
102:8,11
102:13
104:8,11
131:10
131:18
131:21
133:3
138:14
142:12
144:22
160:8
202:18
212:16
215:15
215:16
217:22
219:1,5
246:14
249:9,16
255:7
291:17
300:19
302:11
302:13
302:15
**two-man**
22:10
**type** 159:4
198:2
217:18
232:7,12
233:9,17
235:10
236:1
254:1
256:12
294:21
297:6
298:18
**typewr...**
308:7
**typical**
144:13

**U**

**uh-huh**
10:7
**uh-uh** 10:7
**ultima...**
188:14
**unable**
125:16
**unacce...**
189:4
**uncomf...**
132:7
**uncont...**
152:8
**uncoop...**
193:12
289:13
**uncuffed**
212:21
213:1
**undern...**
134:19
137:1
148:17
198:15
258:10
258:12
258:13
**unders...**
26:2
27:2
76:2,16
77:6,9
100:12
102:18
117:19
118:1,6
126:4
163:20
177:22
178:6,9
178:10
179:7
180:7,9
188:11
188:15
199:20
200:2
219:17
228:9
234:19
285:20
285:22
286:3,5
303:13
304:18
305:9
**unders...**
27:4
139:17
227:17
228:19
229:6,7
261:12
**unders...**
46:1
115:1
143:17
178:3
181:20
199:17
218:8
239:1
251:14
**unhols...**
94:7
146:15
**uniform**
13:6
15:22
18:15
64:4,8
102:6
177:12
177:15
292:1,4
292:7,11
**unit** 15:9
15:10
29:8
242:19
259:10
259:17
291:6,9
291:13
291:15
291:16
291:17
**United** 1:1
5:11,14
**units**
230:5
291:2
**unknown**
238:12
238:20
239:6,8
**unmarked**
25:8
**unplea...**
130:9
**unqual...**
261:4
**unsupp...**
182:2
**unusually**
95:13
**update**
174:5
**updated**
151:13
154:8
**upgraded**
256:20
**upright**
111:17
111:21
133:3
142:1,10
156:3
203:22
**urging**
153:1
**use** 8:8
10:4,5,6
14:15
15:11
19:20
69:15
129:9,13
130:17
137:15
138:1
139:17
145:10
155:9
156:6
158:4,8
159:5
160:6,7
160:11
161:9,16
161:17
167:8,9
167:14

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

369

167:17 168:2,11 168:15 168:18 168:19 168:22 170:8,10 171:8,13 171:22 172:20 172:21 173:4,6 173:19 175:1 180:16 181:2,14 185:4,7 190:20 191:12 191:13 191:14 191:15 191:16 191:16 192:18 193:7,9 193:10 193:12 193:16 194:2,22 195:4,18 195:19 216:15 216:18 217:4,5 218:9,11 218:20 219:2 220:5,10 242:1 279:8,15 279:18 280:3
**uses** 170:4
**usual** 221:10
**usually** 30:17 33:12 152:11 185:6 241:9 248:2 254:8 258:10 292:15 302:14
**utility** 18:15,19 102:7 104:3 171:5 172:1,12
**utilizing** 181:13
**utter** 220:13 231:19 232:2,4 285:19 285:21 286:4
**uttering** 286:3,7 286:9

**V**

**v** 1:5
**V-a-l-...** 43:3
**V-i-d-...** 4:15
**vague** 270:20
**VALADEZ** 1:8
**Valdov...** 1:7 43:3 49:12,22 60:5 72:14 81:16 85:14 93:10 95:1 96:11 215:19 300:19
**Valenz...** 1:7 60:1 93:11 215:20
**vantage** 112:5,7 125:15 126:5,22 133:6
**varies** 24:3 82:3
**various** 170:4 221:10 268:17
**vast** 239:2
**vehicle** 24:22 25:4,9 25:11,12 25:14,17 25:19 27:7,8 28:13,17 53:12 56:8 57:18,21 61:2 103:3 105:12 106:2,5
**vehicles** 27:22 105:9,9 105:11
**verbal** 10:15 17:12 168:7 169:7,17 181:7,7 181:10 181:10 181:13 231:12 231:16 231:18 231:21 232:3 255:8,10 255:14 255:16 256:1,3
**verbal...** 70:1 71:3
**verbally** 169:14 177:13 192:20 232:1
**verbatim** 6:16 7:1 68:8 69:10 84:1 97:16 115:7 119:14
**vest** 29:1 177:11
**Vic** 25:3
**vicinity** 105:22 190:9 201:19 281:19
**victim** 72:9
**Victoria** 26:21
**video** 26:2 55:21 57:9 146:14
**video/...** 25:21 26:4,8 27:3 56:1,13 57:18,21
**Vidlji...** 1:6,17 3:2 4:7 4:16 268:15 270:19 271:2,6 271:13 286:21 287:3 308:5 309:14
**Vidlji...** 268:10 268:20
**view** 80:21 110:10 110:17 200:17 200:19 201:11
**violated** 74:6
**violating** 76:17
**violation** 74:7
**violent** 170:11
**violently** 155:22
**visible** 219:1 248:19 265:5,18 265:21 266:11 289:12
**visit** 265:22
**visited** 266:5
**visiting** 242:10
**voice** 7:4 51:13,16 118:10 118:11 118:21 302:16 302:20 303:9,11
**volts** 140:19 141:2
**voluntary** 130:14
**volunteer** 130:16 130:20 132:6,12 135:6 136:7
**volunt...** 130:22 154:13 264:3
**volunt...** 131:1,3 131:14 131:20 132:1,17 132:22 133:7,9 133:11 134:2 136:2 141:11 141:17 141:18 155:4,6

**W**

**waddling** 112:1,17
**waist**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

370

107:4
**waistband** 136:21 137:1
**wait** 52:6 143:3 192:22
**waited** 252:8
**waived** 151:3
**waiving** 271:1 287:2
**walk** 86:22 104:14 104:14 104:18 104:18 182:12 206:6 209:8 214:15
**walked** 67:21 68:22 102:17 103:10 106:21 111:8,11 121:21 164:4,18 166:14 168:16 177:1 181:22 214:10 215:1,3 215:6,7 216:5 217:20 218:22 271:8 272:5 274:22
**walking** 85:19 86:1,20 87:6,7 101:13 101:16 104:14 104:20 104:21 104:22 105:16 106:11 106:18 109:5 164:21 217:22 272:6
**want** 6:9,9 8:4,11 8:19 9:19 10:4,5,6 10:10 20:18 21:15,16 34:18 44:18 70:2 73:20,21 84:4 92:14 98:7,12 99:9 113:21 116:15 129:16 132:6 136:22 145:12 149:19 155:8 156:19 161:13 165:9,13 174:19 178:20 181:21 187:18 187:22 188:4,14 189:21 191:8 197:16 197:21 207:4 218:11 218:20 250:5,17 251:7,8 251:11 255:6 261:6 270:12 270:12 274:1,2 276:18 282:20 289:19 297:19 298:3 301:12 305:6
**wanted** 108:2,5 108:14 112:6,19 137:9 164:7,10 164:20 166:11 183:11 183:13 186:9 193:5 218:8 235:12 301:14
**wants** 167:9 197:6
**warm** 80:8
**warning** 129:15 174:22 181:8
**warns** 156:22
**warrant** 108:14
**wasn't** 56:2 61:6 67:15 80:12 85:19 86:4 96:2 108:22 111:19 112:1 121:17 122:11 144:15 186:5,15 192:7 201:11 210:22 238:7 273:11
**watch** 1:12 20:9,12 21:6 29:10 30:17,20 60:15 133:9 139:6,6 145:21 231:5 248:7 259:20 260:9
**watched** 141:18
**watching** 248:12
**wave** 131:11
**waves** 295:19 295:21 295:22
**way** 6:18 10:1 14:5 18:13 26:2 54:11,22 55:2 67:12 73:18 77:15,18 80:18 90:1 110:8 111:14 121:4 123:21 127:11 129:8,15 134:4 135:2,13 136:20 142:5 168:8 176:13 183:17 184:21 185:19 190:3 193:5 198:21 204:21 211:10 213:16 221:6 231:1 250:18 264:4,8 267:20 271:15 271:16 280:22 281:14 295:15 296:10 296:18 304:6 308:13 308:14
**we'll** 8:16 9:10 34:13 39:7 73:1 74:1 97:10 115:22 128:2,6 146:10 211:19 213:22 243:17 269:7
**we're** 9:20 26:15,16 35:10 45:18 54:11 82:5 84:2 89:22 97:16 111:5 112:20 139:4 169:13 171:14 192:12 197:1,2 280:5,22
**we've** 171:8 189:18 302:10
**weapon** 102:10 103:17 103:22 110:6,9 110:10

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

371

129:9 132:18 145:6 147:5 164:19 170:21 196:8 239:16 247:22 258:3,4
**weapons** 111:4 152:6 161:16 170:4 171:3,16 190:16 248:4,5 248:11
**wearing** 80:14 177:14
**wears** 67:13
**week** 227:5 227:8
**weigh** 78:21 94:17
**weighed** 94:19
**weight** 245:14 245:20 246:4,4 256:7,21 257:1,4 257:8,10 257:11
**welcome** 263:17 274:18
**well-b...** 210:20 210:20 289:8
**went** 11:16 15:2 18:10 21:2 30:15 31:12 41:4 52:21 54:12,13 58:1 61:19,21 75:5 76:15 91:14 99:19 100:2 102:1,19 104:12 109:7,8 119:9 122:22 130:4,12 141:11 143:7 144:19 147:19 162:14 183:3 194:21 203:19 203:21 207:6 218:19 229:9,13 229:15 229:16 244:2 249:3 252:2,5 263:10 263:11 264:12 265:22 285:10 289:8 293:9
**weren't** 8:6 21:4 48:20 95:19 130:6,10 130:17 132:18 205:14 225:10 227:3 228:20 229:19 230:19 237:21 264:16 285:4
**west** 31:20 224:19 226:6 240:17 246:11
**Wheel** 2:7
**wheeled** 214:17
**wheeling** 214:20
**wheels** 214:14 214:16
**whichever** 20:10
**white** 25:7 236:7
**wide-eyed** 285:7
**wife** 1:3 247:2
**willingly** 135:7
**wireless** 37:9 38:1
**wires** 212:14
**wishes** 170:6
**withdraw** 61:16 163:21 188:2 189:14 274:13 274:15 276:16 277:8
**witness** 1:20 3:2 4:5,8 12:15 13:4 16:10 19:17 23:20 27:7,18 28:5 30:9 31:8 33:11 35:20 36:14 37:5,19 38:8,17 39:3,15 40:3,16 41:13 42:5,16 44:13 45:6,15 46:10,20 47:9 49:2,21 50:7 51:6 53:2,9 56:7,17 57:13 58:20 59:7,18 61:12 63:10 66:5,22 69:5 70:19 71:7 75:2 76:13,21 78:10,18 82:1,13 85:3,22 86:9 87:4 89:9,20 91:20 92:8 93:2 94:1 95:10,19 96:7 99:14 100:6,19 103:1 109:18 110:14 111:1 113:4 114:3,15 116:19 117:10 122:15 126:11 128:11 129:21 132:12 133:2 143:13 146:20 147:9 148:11 155:17 157:12 158:4 160:2,20 165:16 166:9,20 167:12 169:12 170:15 178:4 179:11 179:18 182:5 184:6,21 186:18 187:7,20 189:1 193:4 194:6 199:14 201:6 202:11 204:10 204:16 206:4 208:21 211:10 217:10 218:4 219:21 221:3 222:8,18 223:16 225:13 250:3 266:5 271:20 273:5 282:14 283:9 288:6,18 289:12 290:5 300:14 301:6,18 304:16 307:5 308:10 308:11 308:15
**witness's** 58:18 89:7 113:2 184:19 187:5

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

372

194:4 201:4 225:11 273:3 277:3
**witnesses** 6:10
**women** 79:5
**word** 5:20 10:4,6 30:5 38:5 75:10,14 110:4,5 116:14 143:21 163:4 175:4,10 175:19 183:20 183:21 184:22 228:6 280:3,14 285:19 285:21
**word-o...** 147:16 168:7
**words** 75:8 75:9,13 116:7,9 116:12 116:15 116:20 117:1,10 117:15 118:1,8 118:13 118:16 119:4 128:17 128:18 129:14 143:11 200:2 209:3 220:13 232:4 279:5,15 280:8 286:3,4 286:7,9 304:21
**work** 21:17 47:21,21 47:22 48:5 72:11 73:15 91:14 147:9 231:3 247:20 302:13 302:14
**work-p...** 287:1
**worked** 13:7 22:14 29:16 30:1 43:4,7,9 119:1 302:11
**working** 9:7 21:20,21 29:2,8 29:20 47:3 57:7 146:21 177:15 235:18 238:7 292:13 292:20 302:18 303:8
**workings** 49:4 72:17 148:12
**works** 26:3
**worried** 141:14
**worth** 280:5
**wouldn't** 215:3 246:15
**write** 236:7 244:1,2 247:13
**writes** 88:16 282:21
**writing** 114:22
**written** 8:8 17:12,14 17:15,16 241:1
**wrong** 5:21 10:6 235:8 269:21
**wrote** 150:1 241:3,20 256:2 276:3 281:14

**X**

**X** 3:1,6 260:4
**X00-56...** 257:15 258:9
**X26** 146:11

**Y**

**Yamin** 2:19 13:3 27:5,15 28:2 31:6 33:9 34:16 38:22 39:14 40:1 41:12 43:15 49:1 55:6,8 56:6 59:5 61:10,15 63:7 66:20 69:2 70:12 78:8,16 81:20 82:10 85:1,20 86:6 87:1 91:15,18 93:22 95:7,16 96:3 99:11 109:16 110:19 117:6 122:12 122:14 129:20 132:4,9 133:1 149:13 149:16 157:20 159:13 163:1,4 163:22 166:18 169:10 170:12 172:7 173:5 188:4 189:9 190:19 192:5,11 208:10 217:7 218:2 221:21 222:5,16 224:3
**yeah** 106:4 111:17 214:22
**year** 273:6
**year-old** 82:8,14 82:19,21 83:3
**years** 11:3 12:1,4 14:9,17 14:17 19:13 23:7 142:6 160:8 167:8 267:13 291:17

**Z**

**zone** 48:2 293:14 294:6 297:14 303:7

**0**

**02-08-01A** 173:18
**02-08-02** 176:5 197:18
**03:21** 35:15,22
**084-00...** 308:20
**084-00...** 2:2

**1**

**1** 88:10 91:9 175:14 175:16 227:14 227:20 228:16 228:21 269:6 309:6
**1,001** 139:9
**1,002** 139:9
**1:00** 100:21
**10** 3:15 48:20 100:16 133:22 145:14 145:16 293:14 294:6 297:14 301:12 303:7
**10:30** 1:18 22:4 292:14 292:16 292:21 293:4
**1011** 31:19
**1011R** 24:20 25:16

County Court Reporters, Inc.
630.653.1622

53:14,19
242:20
**1033** 42:12
42:22
43:1
45:10,10
47:5
50:10
51:2
58:8
62:13
66:1,8
82:15
105:12
**1033R**
42:22
49:9
50:17
51:7
66:9
72:13
76:22
81:14
83:6
87:13
92:8,8
300:18
**106912** 1:9
**10th** 12:8
13:7
19:12
25:1,20
26:8,10
27:12
29:21
42:13
46:22
48:12
51:21
52:6
149:1
225:1
242:20
244:4,11
262:13
288:13
290:22
291:3,11
302:11
**11** 3:16
145:14
149:9
150:19
151:10
**11/10ths**
54:5
**112030210**
41:22
**11733** 1:8
**11820** 1:7
**12** 3:17
145:14
158:17
158:19
161:14
269:9
**12-C-5751**
1:5
**12,000**
141:2
**14123** 1:8
**145** 3:15
**149** 3:16
**14A** 3:13
87:16
**14B** 3:12
73:3,4
84:21
183:2,2
183:4,7
183:13
297:21
**14C** 3:14
98:7
**15** 2:7
48:20
100:16
133:22
174:16
300:11
**15-minute**
300:17
301:12
**15369** 1:11
**15777** 1:9
**158** 3:17
**15th** 31:19
35:11
151:13
154:9
**170** 94:19
**174** 3:18
**176** 3:19
**18** 11:22
14:21
50:4
**180** 245:20
246:4
**1811** 1:11
**194** 1:12
**1962** 236:8
236:15
245:5
**1992** 73:18
**1995** 87:19
**1A** 40:17
41:1
44:7,14
44:20
46:15

**2**

**2** 155:9,10
175:13
180:22
191:5,9
197:21
**20** 3:18
174:16
184:15
**2003** 174:1
174:17
**2009**
152:21
**2010**
151:13
154:9
160:12
**2011** 21:17
22:15
23:17
26:20
27:13
29:14
30:21
43:13
75:6
88:2
146:14
147:19
226:12
240:4,14
291:20
293:3
294:22
295:4
299:16
**2012**
159:19
160:12
**2013** 1:18
270:3,4
308:17
309:17
**20th**
159:19
**21** 3:19
176:4
191:4
197:17
**210** 98:16
**211** 291:6
291:14
291:16
**214** 291:15
**214/211**
291:17
**22** 226:12
240:14
**2227** 2:10
**224** 3:20
**225** 78:22
242:15
246:4
**22nd** 21:16
22:15
23:1,17
24:6
26:20
29:14
30:20
35:14
43:5,13
54:21
75:6
88:2
147:19
240:3
291:20
293:2
294:22
295:4
299:16
**240** 3:21
**2451** 35:2
38:14
55:1
58:13
61:19,21
62:4,15
62:17
246:6,12
246:19
247:6
**25th** 62:7
62:12,13
86:5
105:4
224:19
225:7,9
226:6
240:18
246:11
**268** 3:22
**27** 87:19
**27496** 1:10
**290,304**
3:5
**299** 3:4
**2A** 298:3
**2B** 3:9
34:19
40:11
42:7
44:6
73:21
82:20
175:7
176:16
184:10
297:4
**2C** 3:11
45:17
48:16
72:10
82:14
297:4,8
**2G** 3:10
43:19
44:19
297:4

**3**

**3** 156:20
191:5
197:21
270:14
**3:21** 35:15
41:5
**3:27** 36:11
36:15
**3:39** 48:8
48:16
49:6
50:4,9
50:22
**3:41** 50:22
51:7
55:11,12
**3:42** 54:4
54:5,16
**3:46** 148:5
**3:54**
226:12
226:17
226:18

Stevan Vidljinovic
September 4, 2013

227:8
240:14
**30** 2:14,19
217:12
247:14
**300** 160:8
160:12
**301** 184:15
**3038**
224:19
226:6
240:17
246:11
**305** 3:4
**307** 309:6
**31** 270:4
**31st** 270:2
**34** 3:9
**3477** 1:10
**36** 240:4
**36/100ths**
240:5

**4**

**4** 3:4 90:8
90:9
191:5
286:19
**4:38**
147:20
**4:52** 240:4
**40** 48:1,7
82:7,13
82:18,20
83:3
**40-year**
37:9
38:13
44:7
**4051** 1:6
**41** 48:1,6
49:6
**428** 2:8
**43** 3:10
**45** 3:11
246:3,5
**4551** 61:8
**4th** 1:18

**5**

**5** 270:15
275:9
**5'6** 245:19
245:21
**5'7** 78:14
78:19
95:1
**50/1** 98:16
**51** 3:22
268:8,9
268:19
**5174** 1:6

**6**

**6** 3:20
94:15,22
192:10
224:2,9
**6'2** 78:5
94:12
242:15
245:21
**6:00** 22:4
33:3,13
292:15
292:21
**6:30** 33:6
**60164** 2:10
**60521** 2:8
**60602** 2:15
2:20
**60623**
240:18
246:7

**7**

**7** 3:21
192:10
230:11
239:19
**7:30** 22:5
292:17
292:21
**73** 3:12
**7th** 308:16

**8**

**8** 236:8,15
245:4
286:19
**87** 3:13
48:5
72:10

**9**

**9:00** 22:4
292:20
293:3,5
**9:30** 32:21
32:22
33:1,6
292:14
292:15
293:10
**90-degree**
107:4
**900** 2:15
2:20
**911** 34:2
35:13
293:20
294:1,4
294:4,10
**9359** 37:9
38:4
**98** 3:14

County Court Reporters, Inc.
630.653.1622