**EXHIBIT N**

**Report of Darrell L. Ross, Ph.D.**

*Lopez v. City of Chicago, et, al.*, No. 12 C 5751

March 6, 2015

1. Since August 2010, I have been employed as a Professor, the Department Head and the Director of the Center of Applied Social Sciences at Valdosta State University, Valdosta, GA. From 2006 to 2010, I served as a Professor and the Director of The School of Law Enforcement and Justice Administration at Western Illinois University, Macomb, IL. I was a Professor and former Chair of the Department of Criminal Justice at East Carolina University, Greenville, NC from 1992 to 2006. Attached hereto is a current copy of my CV, a list of cases in which I have rendered an opinion within the last four years, and my fee schedule.

2. I received my Ph.D. in 1992 from Michigan State University. I have published over 80 articles, four books, and six book chapters/monographs, and have made numerous national and international conference presentations (see my attached CV).

3. From 1985 to 1992 I served as the Technical Assistance Coordinator for the Criminal Justice Institute at Ferris State University, Big Rapids, MI. My duties included research and training for police, corrections, security, and military personnel, locally and nationally. I taught academic courses at Ferris. I was also a certified instructor by the Michigan Commission on Law Enforcement Standards and instructed the state training curriculum in the police academy at Ferris, including the mechanics of arrest, search, and subject control techniques, responding to persons in crisis and responding to the mentally ill, and physical fitness and physical wellness.

4. I worked for the Michigan Department of Corrections from 1973 to 1985 as an instructor teaching all levels of Department positions and jail officers throughout the state. I was also a probation officer, prison cell block supervisor, and correction officer. I was the Unit Manager of a psychiatric/protective custody cell block housing 500 mentally ill prisoners at the State Prison of Southern Michigan, Jackson, MI.

5. I have developed and provided numerous line level and administrative training programs for police, correctional officers, military, and security personnel throughout the United States and internationally. I am a certified law enforcement instructor by the GA POST.

I have served as a consultant and/or trainer for: National Institute of Justice, Michigan Commission on Law Enforcement Standards, Michigan Sheriff's Association, Illinois Law Enforcement Training and Standards Board, Illinois State Police, North Carolina Justice Academy, Federal Law Enforcement Training Center, Alaska Peace Officers Training Commission, Pennsylvania Law Enforcement Training and Education Commission, State of Florida Police Training Commission, State of Wyoming Police Training Commission, American Corrections Association, National Institute of Corrections, Michigan Department of Corrections, Michigan Department of Corrections Jail Division, North Carolina Department of Corrections,

Corrections Corporation of America, States Attorney's General Office in six states, U.S. Attorney's General Office in Florida, Federal Bureau of Prisons, the Australia Government, Hong Kong Correctional Services, other agencies across the United States, and various branches of the Military.

6.    I am familiar with recognized police use of force standards, practices, policies, procedures, and police responses to subject resistance, subject control techniques, the use of Conducted Energy Weapons, and police use of force training. My opinions are based on my knowledge, research, training, and experience regarding these practices; my training of various criminal justice, military, and private security personnel; and reviewing the following case documents:

> Plaintiff's Fourth Amended Complaint
> Defendant City's Answer to Plaintiff's Fourth Amended Complaint
> Defendant Officers' Answers to Plaintiff's Fourth Amended Complaint
> Defendant Paramedics' Answer to Plaintiff's Fourth Amended
> Deposition Transcripts:

- Guadalupe Guzman
- Daniel Kairis, Chicago Fire Department
- Julio Mendoza, Chicago Fire Department, ambulance
- Sandra Cheatam, Chicago Fire Department, ambulance
- Officer Armando Alamillo
- Officer Jose Valdovinos
- Officer Stevan Vidljinovic
- Officer John Guettler
- Officer Antonio Valenzuela
- Officer Manuel Gonzalez
- Sergeant Mark Kearns
- Sergeant Larry Snelling
- Officer George Cancel
- Lt. Robert Dubiel
- Ursula Scislicka, RN (and Triage Assessment and nurses' notes)
- Fernando Orellana, MD (and Exhibits 1-10)

Chicago Police Department General Orders, Special Orders, Rules and Regulations:

- Chicago Police Department Rules and Regulations
- General Order 02-08: Use of Force Guidelines with addenda, including Use of Force Model
- General Order 02-09-02: Other Weapon Discharge Incidents
- Special Order 02-01-04: Alcohol and Drug Dependent Persons
- Special Order 03-08: Assisting Chicago Fire Department Paramedics

Training Records of:

- Officer Armando Alamillo

· Officer Jose Valdovinos
· Officer Stevan Vidljinovic
· Officer John Guettler
· Officer Antonio Valezulea
· Officer Manuel Gonzalez
· Sergeant Mark Kearns
· Lt. Robert Dubiel

Other Documents

· Chicago Fire Department Paramedic report
· Chicago Police Department Original Case Incident report
· Chicago Police Department Tactical Response Report
· Chicago Police Department Officers' Battery Report
· Office of Emergency Communications, Police Department and Fire Department, event queries
· Chicago Fire Department incident report
· TASER download
· City of Chicago Municipal Code authorizing police to assist paramedics
· Paramedic Sandra Cheatam's statement to Independent Police Review Authority
· Paramedic Julio Mendoza statement to Independent Police Review Authority
· Independent Police Review Authority investigation file (CD)
· Chicago Police Department TASER training materials (7 DVDs, 2007-2012)
· Chicago Police Department TASER training review guide (11/09)
· Plaintiff's TASER articles from internet
· TASER/CEW research bibliography re: CEWs Reduce Use of Deadly Force and Injuries
· 20 ILCS 301/25-15 Emergency Treatment (Alcoholism and Other Drug Abuse and Dependency Act)

7.     Synopsis of the incident

On July 22, 2011, the Chicago Fire Department was dispatched to a call of person experiencing chest pains at about 3:25 a.m. A friend of Jose Lopez, Guadalupe Guzman, called 9-1-1 and requested that medical assistance be dispatched to 2451 South Albany Avenue. A Chicago Fire Department truck with a crew of firefighters and one firefighter/paramedic responded at about 3:27 a.m. Ms. Guzman spoke to the firefighters and identified Mr. Lopez as the person who needed assistance. Firefighter/paramedic Daniel Kairis approached Mr. Lopez and attempted to speak with him to determine what was wrong. According to Kairis, Mr. Lopez became agitated, threw his hands in the air, moved his hands in a jerking motion, and moved away from him. Mr. Lopez began climbing over a parked car, walking over the hood, the roof, trunk, and jumped back to the street. Mr. Lopez moved back closer to the firefighters, and began pacing and walking around. Kairis heard Mr. Lopez grunting and observed him acting erratically and in a threatening

3

manner. Kairis attempted to assess Mr. Lopez's medical condition to provide care but could not communicate with him due to Mr. Lopez's behavior and altered mental state. Kairis concluded that Mr. Lopez was under the influence of ETOH (alcohol), was on something, and could not make competent decisions. Kairis also concluded that it was not safe to approach Mr. Lopez to provide medical care. Kairis informed his lieutenant of his observations and it was determined the police should be contacted.

At about 3:38 a.m the ambulance crew responded and Kairis informed paramedics Cheatam and Mendoza that Mr. Lopez was acting erratically, believed that he was under the influence of an unknown substance (ETOH), that he was incompetent to make decisions, and that the police had been summoned. When the paramedics arrived they observed Mr. Lopez walking on the street, throwing his arms in the air, making fast gestures with his hands, making moaning sounds, that his speech was slurred and not making any sense, and that he was combative. They concluded that Mr. Lopez was under the influence of PCP based on his behavior and determined the scene was not safe.

Chicago Police Officers Alamillo and Valdovinos (Beat 1033 R) responded to a dispatch from the Chicago Fire Department requesting police assistance regarding a drug overdose and arrived on scene at about 3:39 a.m. Officer Alamillo spoke with the fire department personnel and learned that Mr. Lopez refused to cooperate with them, and that they could not make contact with him. Officer Alamillo also spoke to Ms. Guzman while Officer Valdovinos approached Mr. Lopez to make contact with him. Officer Valdovinos observed Mr. Lopez acting erratically, pacing back and forth, mumbling, and seemed to be high on something. Officer Valdovinos attempted to speak with him in English and Spanish and could not communicate with him. Officer Valdovinos determined that Mr. Lopez was under the influence of PCP based on his behavior and informed Officer Alamillo of his impressions. Officer Alamillo observed Mr. Lopez in the street and noted that he was irate, mumbling, pacing back and forth, looked like he was on something, would run, then stop and start again, would pace back and forth, was having a conservation with himself, and was breathing heavily. Based on the behavior of Mr. Lopez, Officer Alamillo requested more officers including an officer with a TASER at about 3:41 am. Officer Valdovinos attempted to make contact with Mr. Lopez a second time but Mr. Lopez continued his erratic behavior and Officer Valdovinos was unable to communicate with him.

Officers Gonzalez and Valenzuela (Beat 1032 R) responded to the officer assist call of a patient being combative and the call for a TASER. On location, they observed Officers Alamillo and Valdovinos near Mr. Lopez attempting to talk to him as he was standing in the street. Officer Gonzalez approached Mr. Lopez with Officers Alamillo and Valdovinos and observed him waving his hands, acting out of control, talking nonsense, walking away, and not in his right state of mind. Officer Gonzalez spoke with Mr. Lopez in Spanish in an attempt to calm him down but Mr. Lopez continued to walk down the street and away from the officers. Officer Gonzalez determined that Mr. Lopez was under the influence of PCP and that he was a danger to himself and others. During the contact with Mr. Lopez, Officer Gonzalez observed Mr. Lopez become more enraged, started grunting, clenched his fists, and looked at the officers in an aggressive

4

manner. Because of this behavior, the officers kept their distance from Mr. Lopez. Sergeant Kearns responded to the location and observed Mr. Lopez walking in the street.

At about 3:43 am, Officers Vidljinovic and Guettler (Beat 1011 R) responded to the location. Officer Vidljinovic was carrying a TASER. Officers Vidljinovic and Guettler observed Mr. Lopez on the street, and they were informed by other officers that Mr. Lopez was a combative patient and they were trying to get him into the ambulance. Officers Guettler, Alamillo, Valdovinos, and Vidljinovic approached Mr. Lopez, who had walked away down the block to an intersection at 25th and Whipple Streets. Officer Guettler spoke to Mr. Lopez initially from about 10 to 15 feet away, attempted to persuade him to cooperate, and to accompany him to the ambulance. Mr. Lopez responded with undecipherable speech and mumbling. Officer Vidljinovic stood behind Officer Guettler as Guettler approached Mr. Lopez, spoke with him, and placed his hand on Mr. Lopez's elbow to guide him toward the ambulance. Mr. Lopez clenched his fists and began swinging wildly at Officer Guettler. Officer Guettler moved to his right to avoid being struck. Officer Vidljinovic yelled "TASER" 3 times and deployed it for one, 4 second cycle at about 3:46 a.m.

Mr. Lopez collapsed in the street and the officers moved in, controlled his hands, and secured them in handcuffs. Paramedics Mendoza and Cheatam immediately brought the stretcher and the gurney to Mr. Lopez's location and they, firefighter Kairis, and the officers placed Mr. Lopez on it. After Mr. Lopez was secured on the gurney, he was placed in the ambulance where paramedics assessed him and checked his vital signs. Mr. Lopez was combative on the gurney. Neither the ambulance crew nor the officers observed any signs of trauma on Mr. Lopez's body. Mr. Lopez was transported to Mt. Sinai Hospital and admitted at about 4:00 a.m.

The admitting nurse performed a triage assessment of Mr. Lopez and marked "no" on the assessment form for sustaining trauma. Mr. Lopez became combative and began fighting in the emergency room. Dr. Orellana authorized Mr. Lopez to be four-pointed restrained. Officer Vidljinovic assisted medical personnel with restraining Mr. Lopez. Mr. Lopez's combativeness and altered state of mind made it difficult for medical personnel to perform an initial assessment. The probes from the TASER were noted to be attached in Mr. Lopez's abdomen. A urine test of Mr. Lopez was performed and it tested positive for PCP at about 4:41 a.m. Later testing of Mr. Lopez revealed that he had sustained a brain injury.

8.     Opinion #1:     *That Chicago Police Department (CPD) administrators have not abdicated their responsibility in developing and implementing operational policies for their police officers, especially regarding the use of force.*

An important function for police administrators is to provide their officers with relevant policies and procedures. Policies are a means by which an organization provides guidance and the bases for reasonable decision making for its employees. Policies cannot cover every conceivable situation that an employee will confront. They must allow for the totality of the circumstances

5

and the use of discretion by employees. As they relate to the claims made in this incident, I have reviewed the following General Orders and Special Orders from the CPD:

Rules and Regulations, Rules of Procedures, Table of contents;
G.O. 02-08: Use of Force Guidelines (October 1, 2002);
G.O. 02-08-02: Force Options (October 1, 2002);
G.O. 02-08-01A: The Use of Force Model (August 15, 2003);
G.O. 02-08-03: Deadly Force (October 1, 2002);
G.O. 02-08-04: Canine as a Force Option (October 1, 2002);
G. O. 02-08-05: Incidents Requiring the Completion of a Tactical Response Report (October 1, 2002);
G. O. 02-09-02: Other Weapon Discharge Incidents (October, 2002);
Special Order 02-01-04: Alcohol and Drug Dependent Persons (July 4, 1992); and
Special Order 03-08: Assisting Chicago Fire Department Paramedics (July 27,1995)

In my opinion, CPD administrators have taken a proactive approach by establishing written directives which set forth rules of conduct and policies which guide officer decisions and actions, and provide penalties for failing to follow them. Specifically, CPD administrators have addressed the reasonable use of force by Chicago police officers in their written directives. The use of force General Orders operationalize 720 ILCS 5/7-5 and the United States Supreme Court decision on the use of force in *Graham v. Connor*, 490 U.S. 386 (1989), and are consistent with nationally accepted police procedures for the use of force.

The CPD General Orders guide officers in the reasonable use of force through the use of force guidelines (GO 02-08), use of force options (GO 02-08-02), use of deadly force (GO 02-08-03); and other weapon discharge incidents (GO 02-09-02). Collectively, these GOs provide a systematic process for guiding officers in the appropriate and reasonable response to various types of citizen resistance that they may encounter. Officers are provided with numerous force options to consider based on varying types of citizen resistance. Furthermore, not all situations can be handled with one or two force options. Officers sometimes need a range of reasonable force options to select from when confronting a resisting citizen. In many confrontations a suspect may interact with an officer in a compliant mode and within a split-second, elevate his resistance to a physical attack or even a deadly force attack against the officer without warning. Therefore, I teach police administrators to develop their use of force policies to encompass the totality of the confrontation circumstances, subject variables, response time issues, and to provide officers with various force options with which to respond to a suspect's type of resistance. Consistent with these principles, CPD has integrated multiple force options available for officers in its use of force policy.

Specifically, CPD has developed a Use of Force Model which corresponds to the force policy options authorized for officers. This use of force model is a graphic illustration which operationalizes the CPD's use of force policy by depicting on a continuum subject resistance

6

typologies based on real-life encounters between citizens and police officers and appropriate officer force responses to them. Through visual representation, the model guides an officer in decision making as to the use of force when confronted with varying kinds of subject resistance and accounts for environmental and subject variables related to the confrontation that make up for the totality of the circumstances.

I am familiar with varying use of force models. I have served as a consultant to the Michigan Commission on Law Enforcement Standards when they developed their use of force matrix. I have instructed it to academy recruits and veteran police officers, and I have explained the mechanics of the matrix during civil trial proceedings. I have assisted in the development of the Pressure Point Control Tactics, Inc. (PPCT) force continuum and have instructed it to academy recruits, veteran police officers, and to subject control instructors. I have provided consultation to numerous police and correction agencies on their use of force continua as well. About 80 percent of the law enforcement agencies in the United States use some form of a use of force model/matrix and link it to their use of force policy (Terrill and Paoline, 2012). CPD does the same.

The CPD force model incorporates the force principles of escalation and de-escalation. The model identifies three types of general subject resistance, including: a Cooperative Subject, a Resister, and an Assailant. The model also provides for reasonable force responses to each of these types of resistance which include the presence of law enforcement representative, verbal control, control modes without weapons (empty-hand), control modes with weapons (impact weapons, impact munitions, OC spray/chemical weapons, LARD acoustic transmission, TASER, and Canine, and firearms and other lethal force. CPD's use of force model follows the objectives of other law enforcement agency's force continua and the Illinois Law Enforcement Training Standards Board guidelines for use of force training.

With regard to TASER use, the force model provides guidance to officers in activating the TASER in GO 02-08-02A Force Options. This directive specifies that an officer may use the TASER only after he/she has completed training in its use. The force model further provides that the appropriate use of the TASER is in response to an active resister and an assailant. The force model also guides the officer in writing a use of force report, and the policy for doing so is addressed in GO 02-08-05, Incidents Requiring the Completion of a Tactical Response Report. This GO clearly directs officers when to complete the Tactical Response Report (TRR) and the procedures for submitting the report. Deploying the TASER requires an officer to submit a TRR.

Regarding other areas of police operations, CPD administrators have developed and provided their officers with Special Order, SO2-01-04 (Alcohol and Drug Dependent Persons) and Special Order, SO3-08 (Assisting Chicago Fire Department Paramedics). The former SO provides a procedure and an appropriate response for officers when they determine in their professional judgment that a person is intoxicated or incapacitated in a public place. The SO operationalizes the Emergency Treatment section of the Alcoholism and Other Drug Abuse and Dependency Act (20 ILCS 301/25-15), which authorizes police to take into protective custody and bring to an

7

emergency medical service a person who appears to be in need of emergency medical services while in a public place and who shows symptoms of impairment brought on by alcoholism or other drug abuse or dependency. The latter SO provides officers with appropriate procedures when they are requested to assist fire department paramedics. This SO is integrated with peace officer assistance during emergencies, the Emergency Medical Services Systems Act (210 ILCS 50/1), and the use of force guidelines.

In my opinion these General and Special Orders comport with contemporary law enforcement policies consistent with the model use of force policies of the International Association Chiefs of Police (IACP; 2006 & 2010), the Police Executive Research Forum (PERF; 2011) Electronic Control Weapons guidelines, and the Illinois Law Enforcement Training and Standards Board force training guidelines. In particular, CPD's directives authorizing the use of force in general and the use of the TASER in particular follow generally accepted law enforcement policies and procedures, and are consistent with law enforcement best practices including:

> Maintaining written use of force general orders, force guidelines, a use of force model, and force options,
> Guiding officers to use objectively reasonable force based on legal standards, on the officer's perception, in response to a subject's resistance, and within the totality of the confrontation circumstances,
> Differentiating between varying types of force (less-lethal and lethal force),
> Identifying definitions of force options, types of authorized force measures, techniques, and equipment, and identifying types of subject actions/resistance with definitions,
> Guiding officers to use force under appropriate circumstances and identifying circumstances for prohibiting the use of force,
> Guiding officers to position and monitor an arrestee and to seek medical attention for an arrestee who sustained an injury,
> Developing and providing the direction on using the TASER for their officers (integrated with the use of force guidelines),
> Authorizing the use of a department-issued TASER,
> Designating the TASER as an impact weapon (integrated with the force model and force options),
> Certifying and maintaining in-house instructors to provide officer training,
> Training and certifying officers prior to being allowed to carry it in the field,
> Providing re-certification on a regular basis,
> Restricting the use of the TASER for two types of subject resistance (integrated with the force model),
> Requiring officers to check out the TASER for use during their respective shift,
> Requiring notification of OEMC or a supervisor after deploying the TASER,
> Requiring officers to submit a TRR after a TASER application and other uses of force,
> Reviewing the TASER Data Port printout,
> Requiring the Watch Commander to review the TASER application,

Directing officers in their response to assisting firefighters and paramedics,
Directing officers in responding to persons under the influence of alcohol and drug dependency, and
Requiring an investigation by a commander in circumstances of serious uses of force.

In my opinion the CPD has taken proactive steps to provide their officers with the written general orders and special orders which guide their performance in the field. These orders were operational prior to the incident date. They are accessible to officers through the policy manual and through the departments automated directive system. The directive system is available to all of the officers at the district station house.

9.

Opinion #2:     *Administrators of CPD have provided their officers with training commensurate to their law enforcement duties.*

Consistent with the United States Supreme Court's decision in *City of Canton v. Harris*, 489 U.S. 378 (1989), CPD officers have received ongoing training commensurate with their duties. Administrators of the department have made a conscious and proactive choice and as a matter of practice to provide officers with basic academy training and regular in-service training in order to perform their assigned duties. A review of the officers' depositions and their training records illustrate that prior to the incident date they had completed academy training, training on department general orders, use of force training, training on the use of the TASER, and training on various other topics through regular in-service training programs.

CPD administrators have exhibited their commitment to providing all officers with job related training by developing the Education and Training Division which is devoted to providing basic academy training and in-service training for their officers. This commitment is manifested on many levels. First, CPD is authorized by the Illinois Training and Standards Board to operate a basic training academy for their recruits. The State of Illinois requires all peace officers to complete 480 hours of basic training prior to being certified. CPD exceeds this requirement and requires their recruits to complete over 800 hours of basic training over six months. Second, various modes of training and education are incorporated into the training, including scenario-based training. Sergeant Snelling testified that scenario-based training is provided to officers and represents the department's training philosophy (Dep. pg. 171). Third, recruits are provided with classroom instruction and practical skills training depending on the subject matter. Fourth, recruits must pass various examinations and show proficiencies in knowledge, skills, and abilities relevant to the subject matters taught. Fifth, upon completion of the academy training, all officers must complete a probationary period with a field training officer (FTO) for 12 months. Hence, all officers of the CPD are probationary for 18 months until they complete the mandatory training and evaluation period.

Sergeant Snelling testified that he is assigned as an instructor at the CPD academy and that among other topics recruits receive training on the use of force, the force model, physical skills, report writing, interacting with people with disabilities, and department general orders. He

9

testified that all officers are taught the force options at the academy (Dep. pg. 136). He further testified that in-service training is provided on general orders at the district level and that legal instructors provide training to officers on legal issues and general orders (Dep. pgs. 12-13, 17-21, 23, 54-55, 57-58, 68-69, 74-75. 91-93, 98-113, 127-128, 131, 135-136, 177). Sergeant Snelling testified to his knowledge of the following department GOs and testified that they are taught at the academy: Use of Force Options, pgs. 55-56; Assisting Fire Department and Paramedics, pgs. 64, 70, 183-186; Alcohol and Drug Dependent Persons, pgs. 70-72; Tactical Response Report, pgs. 91-93; the Force Model, pgs. 97-113; 117; and Force Options, pgs. 136, 175-176.

Sergeant Snelling testified that CPD has adopted a continuing education program for department officers through e-learning. This training is available on-line through the department's computer system, and involves training on department GOs. Subject matter training is presented through a modular teaching format, streaming videos, and also includes examinations (Dep. pgs. 57, 132-135).

Moreover, Sergeant Snelling testified that officers are provided with training on the use of the TASER by certified department instructors of the Tactical Training Unit (TTU; Dep.pg. 25). Sergeant Snelling testified that he does not provide instruction on the TASER but that three department instructors of the TTU are certified to provide instruction (Dep. pg. 27). Sergeant Snelling testified in his deposition on how the TASER instruction is provided to officers and how the training connects to the Force Model GO and other general orders (Dep. pgs. 36-38, 47, 49, 50, 52-55, 82-87, 118, 120-121, 123-124, 129, 145, 147, 156, 158-160, 168, 171, 179-180). Sergeant Sealing testified in his deposition that the TASER training emphasizes the use of the Probe mode and distance when deploying the TASER, that an officer must check out the TASER at the beginning of the shift and return it at the end of his shift (pgs. 49, 52). In regard to the TASER he testified:

> That the TASER can be used on active resisters (pgs. 117, 120-121),
> That officers are trained that it is unreasonable to use the TASER on a cooperative person (pg. 128),
> That officers are trained to use appropriate force based on subject actions and force based on officer's assessment on scene (pgs. 84, 87),
> That officers are trained to stay within policy parameters and the law when using force (pg. 128),
> That officers are trained when a TASER is used, the data printout is downloaded and reviewed by a watch commander,
> That the TASER maybe used when multiple officers are on scene (pg. 179),
> That after the TASER is used, the officer is trained to control and handcuff the subject (pg. 156), and
> That officers are trained that when faced with an assailant, an officer may use whatever tool he sees fit to immobilize the subject (pg. 176).

10

Officer Cancel is assigned to the TTU at the training academy, and as a Master TASER Instructor and he provides instruction in the use of the TASER for department officers (Dep. pgs. 8, 10, 13-15, 19, 26-27, 31). Officer Cancel testified that GO 02-08-02 was amended in August 2003, and directs officers to use the TASER on an active resister or greater (Dep. pgs. 188-189).

Throughout his deposition, Officer Cancel testified as to how department officers are trained on using the TASER, which include the following components:

Provides 8 hours of training including classroom instruction and practical application (pgs. 23, 58),

Incorporates a power point presentation into his teaching methods and that he is required to check Taser International's website for updated information prior to teaching a course (pgs. 80, 161-162),

Provides training on the use of force policy (pgs. 54, 60-63, 114, 117, 189),

Training includes an examination (pgs. 51-52, 55-57),

Officers must be certified to carry the TASER (pg. 51),

Train officers to do a spark test (pg. 48),

Train officers that they must check-out the TASER prior to their shift (pg. 50),

Train officers on the TASER nomenclature and on the types of subject resistance an officer may activate the TASER (pgs. 24, 61-62, 78, 104, 116-117),

Specifically trains to use the TASER on active resistor and above (pg. 62),

Trains officers not to use the TASER on a cooperative subject (pg. 61),

Train officers that the TASER is less-lethal force and when to use it in varying situations and safety issues (pgs. 95-99),

Train officers on activating the TASER for 1, 5 second cycle, to release the trigger, to evaluate the situation, and to place the subject under control (pgs. 83-84,125-129),

Trains officers about the application of using a TASER on a person under the influence of narcotics (pgs. 165-166),

Train officers about the principle of contact and cover when using the TASER (pgs. 105-106),

11

Trains officers to state TASER three times prior deploying it, if they have the opportunity (pgs. 106-109, 187),

Trains officers to submit a TRR after deploying the TASER (pgs.144-145),

Trains officers on what procedures are to be followed after activating the TASER (pgs. 141-151), and

Trains officers that if the TASER is not effective, to go to something else and to make judgment calls when using the TASER (pgs. 172-173).

Moreover, each officer testified in their deposition about receiving basic training at the academy, receiving training on general and special orders, completing in-service training, and receiving training on using the TASER prior to the incident date. Officer Vidljinovic, the officer who deployed the TASER during the encounter with Mr. Lopez testified that he:

Completed academy training and probation (pg. 11),
Completed 8 hours of TASER training after the academy provided by the TTU, that he completed a written and scenario-based exam, and passed the course (pgs. 14-18),
Was trained in the academy that a person may refuse treatment or assistance (pg. 99),
Was trained to assess each situation (pgs. 112-113),
Trained and by CPD protocol to give a command three times before using the TASER (pgs. 129, 143),
Trained that the TASER would incapacitate the person (pg. 131),
Trained to target center mass and to deploy the TASER for 5 seconds, hold for 5 seconds, no more (pgs. 136, 139, 154),
Trained on how to drive stun and neuromuscular incapacitation (pgs. 138, 149),
Was aware that using the TASER would cause loss of muscle control and a person could collapse to the ground (pg. 156),
Trained to use the TASER for assailant resistance (pg. 158),
Trained in the Force Model, Force Response Options, and taught to make distinctions of varying types of resistance (pgs. 167-168, 171-176, 180-185),
Trained regarding persons behaving under the influence of drugs (pg. 185),
Trained that a medical expert would remove probes from the TASER (pg. 205),
Based on his training and experience that behaviors exhibited by Mr. Lopez usually meant they are under the influence of narcotics, PCP, or cocaine (pg. 254), and
Knew to notify a supervisor after he discharged the TASER (pg. 259).

Further, assessment of the officers' training records reveals that each officer has been provided and completed in-service training beyond their graduation from the academy. The records reveal that each officer completed numerous training courses commensurate with their law enforcement

12

duties on a regular basis. Topics for which training has been completed by the officers relevant to this civil action and prior to the incident date include: TASER certification, the reasonableness standard, controlling resisters and assailants, medical services, crisis intervention team, binge drinking, sudden and in-custody deaths, disorderly conduct, suspicious behavior assessment, emergency response, hands only CPR, and tactical communications.

I have also reviewed several discs which contain department training materials presented in the 8-hour TASER course by the TTU from 2007 to 2012. Consistently each year of training provided updated information and included: power point slides for lectures, curriculum materials, instructional materials specific to safely operating the TASER, general orders, training videos, and videos of field applications of the TASER. While these instructional materials set the framework for instructing the use of TASER and follow the manufacturer's specifications, they are also designed within CPD's total use of force system. For example, the Education and Training Division developed a 4-page "ready reference" Training Review handout (11/2009) which integrated two general orders (Use of Force Guidelines and Dept. Approved Weapons and Ammunition [Taser Devices]) and the Use of Force Model with directives and guidance for deploying the TASER. The handout specifies five steps for deploying the TASER and directions for Post-Taser Responsibilities for officers and supervisors.

In summary, based on my review of the aforementioned documents it is evident that CPD administrators have made a conscious choice to provide officers with basic law enforcement training which exceeds the state standard. By practice CPD administrators provide ongoing annual training to officers in order for them to keep abreast of their law enforcement duties. A review of the named officers training records shows that they have completed various training courses annually, supporting CPD's practice and commitment to providing officers with ongoing training. Concomitantly, CPD administrators have provided training and ongoing accessibility to department general and special orders which forms the foundation for the training. General orders may be accessed at the district station house through the department's directive system.

CPD has established a comprehensive and robust training and accountability system for managing and training officers, and for field application of the TASER. Components of such a system comport with guidelines outlined by the IACP, PERF, the Illinois Law Enforcement Training and Standards Board and by researchers on the subject (Alpert and Dunham, 2010; Smith, et al., 2010), which include: implementing and training in force policies, 8 hours of training, use of scenario-based training, training to activate 1, 5 second cycle and to assess the situation and the use of multiple applications, training on the risks of using the TASER, training which specifies the types of subject resistance in which the TASER will be used, targeting locations on the subject, restricting medical personnel to remove the probes, reporting the use of the TASER, supervisors reviewing incidents/reports in which an officer deployed the TASER, and providing training in accordance with the manufacturer's specifications.

My review of the department documents, the deposition testimony of the officers, depositions of the department training instructors, and department instructional materials demonstrates that the

CPD meets and exceeds the suggested guidelines for managing, training, and applying the TASER. The items identified on pages 8-9 and 10-12 of this report, combined with the officers' testimony illustrate that CPD administrators have more than adequately prepared their officers with operational policies and training with which to use force measures, including using the TASER in the field. Officers also testified to their knowledge of assisting fire department personnel and paramedics in various circumstances. The deposition testimony of the officers underscores the fact that CPD's use of force policies and the training provided on using force measures including the TASER, is actually guiding officer decision and field application, and further comports with professional, evidence-based, best practices. These components manifestly show that evidence of a training and policy deficiency at CPD is non-existent. CPD officers are provided with relevant and current training on a regular basis commensurate with their job responsibilities.

10.     Opinion #3     *That CPD officers used appropriate procedures to assist Chicago Fire Department personnel*

The officers responded to a call to assist CFD personnel regarding a drug overdose. Collectively these officers had over 60 years of police experience in which they had responded to numerous types of calls, including responding to calls involving persons acting under the influence of a substance. Beyond their experience the officers were trained and guided in their response by Special Order S03-08, Assisting Chicago Fire Department Paramedics (9/27/95) and Special Order, S02-01-04, Alcohol and Drug Dependent Persons (7/4/92). Further guidance was provided to officers through the Section 4-68-110 of the Municipal Code of Chicago (Peace officer assistance during emergencies) (7/30/97), and the Emergency Treatment Section of the Alcoholism and Other Drug Abuse Dependency Act, 20 ILCS 301/ 25-15 (7/13/1993). In their collective totality, these documents authorize police officers to assist paramedics on scene. Specifically, these documents authorize police to assist paramedics with a patient who requires emergency medical assistance; who is incapacitated in a public place; who presents a danger to himself or to others; to take the person into protective custody in order to obtain medical assistance; and permit an officer to use minimum force and to take reasonable steps to protect himself from harm.

Law enforcement officers respond to varying types of calls for service which include crimes in progress, investigating crimes, and calls requesting their assistance to place a person into protective custody. These types of calls are different from investigating a crime and arresting a subject and involve a community care taking function which may address taking a person into protective custody for the safety and protection of the person and for the safety of the public. Pursuant to the Special Orders S03-08 and S02-01-04, as well as the Chicago Municipal Code, 4-68-110, CPD officers are authorized to assist paramedics when requested, and in accordance with Illinois law, 20 ILCS 301/ 25-15, may take a person into protective custody for emergency medical service.

14

The officers testified in their depositions that they had been trained and had previous experience assisting firefighters and paramedics. Officer Alamillo testified that he determined that Mr. Lopez needed to be taken into protective custody, it was not an arrest, it was for his safety, that he posed a risk to himself and to public, and that he needed help (pgs. 91-92, 130, 132). Officer Valdovinos testified in his deposition that he believed the call was a medical emergency, that he believed that Mr. Lopez was under the influence of PCP, which he could not give consent, that we can't leave him on the street, he was on the public way, that Mr. Lopez needed medical attention, that the job of the police was to help CFD get him medical attention, that they were providing an effort to protect Mr. Lopez's health and safety, and that was the primary reason for being there (pgs. 90, 105-106, 132, 145).

Officer Gonzalez testified that he observed Mr. Lopez display behaviors characteristic of being under the influence of PCP and that he needed to be taken to the hospital for emergency medical treatment (pg. 71). Officer Guettler testified that Mr. Lopez would have been a danger to himself or others in the community if he had not received assistance and that he required assistance (pgs. 120, 122-123). Officer Vidljinovic testified that the objective was to seek medical assistance for him, that it was never our objective to arrest him but to take him to a medical facility and seek treatment, that based on Mr. Lopez's actions believed that his words were incoherent and indecipherable, that he was a danger to himself and to others, that he believed that he was incapacitated in a public place, and due to his condition he believed that Mr. Lopez needed to be taken into protective custody (Dep. pgs. 164, 199, 299).

The officers and the paramedics believed that Mr. Lopez's behaviors were consistent with being under the influence of PCP requiring immediate medical assistance. Such a belief was confirmed about an hour later at the hospital when a urine screen revealed that PCP was in his system. The paramedics call for police assistance, coupled with the demonstrated behaviors the officers confronted from Mr. Lopez, created a specific and articulable basis for the officers and paramedics to reasonably believe that Mr. Lopez posed a threat to himself, to others, and to the responding paramedics and officers. The situation clearly required police intervention, not to arrest Mr. Lopez, but to control him and to take him into protective custody in order for the paramedics to provide him with the medical attention that he required.

Further, the incident fit squarely within the previously identified Special Orders, municipal code and state law as the paramedics needed assistance in restraining Mr. Lopez before they could provide him with medical assistance. The officers responded on scene not to investigate a crime but to assist the paramedics on a call of drug overdose and for the purpose of providing protection to the paramedics and assist in providing Mr. Lopez with emergency care. Under these circumstances the officers were justified in responding to the call, taking control of scene safety, and attempting to persuade Mr. Lopez into cooperating with them so that he may obtain medical care.

I train officers when confronting such a person and in an unpredictable situation, when tactically feasible, to have multiple officers on scene, to acquire information about the situation as possible,

to remain calm, to maintain a safe reactionary distance but close enough to speak to the person, not to make quick aggressive motions, and to attempt to talk a person into compliance. I teach officers to cue into statements made by the person. I also emphasize to officers to be aware of the confrontation environment, to observe and to scan the behaviors and gestures of the person, to watch their hands and bodily motions, and to be prepared to use control techniques and weapons as warranted. An officer will not successfully "talk" an agitated person who is under the influence of a chemical substance or who displays behaviors of a mentally disorder into compliance in every situation.

In my opinion the officers used proper techniques in attempting to make verbal contact with Mr. Lopez. Each officer observed Mr. Lopez and noted that his behaviors and incoherent speech were characteristic of someone being under the influence of PCP and made numerous attempts to speak with him and persuade him to cooperate so that he could receive medical assistance. Once Officer Alamillo determined that Mr. Lopez was not responding to verbal attempts of control and that his condition could potentially turn violent, he radioed for additional officers and for an officer to respond with a TASER. The initial responding officers properly assessed the situation, maintained their distance, calmly spoke with Mr. Lopez, spoke with him in English and Spanish, did not crowd him, attempted to determine the problem, attempted to provide him assistance, and did not rush him creating a physical struggle with him. Rather, they showed restraint and radioed for additional officers which was prudent. Further, while waiting for back-up officer Valdovinos attempted a second time to verbally persuade Mr. Lopez into cooperating with them but was unsuccessful.

In my opinion, the officers followed Special Orders, the municipal code, and state law, and used appropriate protocols for responding to such a confrontation. First, their on scene management was performed properly as they approached with two officers and followed their training. Second, Officer Alamillo spoke with the paramedics on scene to obtain information about the call and the scene. Third, he and Valdovinos quickly observed Mr. Lopez's behaviors and attempted to speak with him but that he would not enter into a dialogue with them, would not comply with their instructions but did attempt to communicate with him. Fourth, they maintained a safe distance and cued into his behaviors. Officer Alamillo purposed to intervene with Mr. Lopez through communication and desired for him to comply without further incident. Based on the circumstances, the officers used appropriate police protocols in their approach to Mr. Lopez's behaviors in order to take him into protective custody for emergency medical treatment.

11.     Opinion #4:     *Officer Vidljinovic's decision to use the TASER was consistent with generally accepted police practices and procedures*

Law enforcement officers are trained to use objective reasonable force in light of the totality of the circumstances and based on their perception of the behaviors and resistance exhibited by the person they are attempting to control and/or arrest. In this case, Officer Vidljinovic's use of force must not be viewed in isolation but assessed in light of Mr. Lopez's actions and resistance in their totality. The incident was a dynamic and fluid confrontation.

An evaluation of a claim of excessive force is to be performed in accordance with the criteria established by the United States Supreme Court in their decision in *Graham v. Connor* (1989) including: balancing the nature and the quality of intrusion with the need for governmental action; the severity of the crime at issue; whether the suspect is actively resisting arrest or attempting to evade arrest by flight; or whether the suspect poses an immediate threat to the safety of officers or others. An officer does not have the luxury to select the location or the environment to confront a person, nor does the officer have the luxury to script a force response in a given confrontation. The officer's use of force must be judged at the moment the officer decided to use it, recognizing that there is no mechanical test applied to the incident circumstances, and knowing that an officer frequently must make a split-second decision under circumstances which are tense, uncertain, and rapidly evolving. Further, it is the subject's actions, combined with the totality of the circumstances which dictate an officer's force response.

In my opinion it was reasonable for Officer Vidljinovic to deploy the TASER in response to Mr. Lopez's assailant behaviors and to protect Officer Guettler and himself, as he advanced toward him, and while he attempted to strike him. It is relevant that Officer Vidljinovic only used the TASER after other officers had attempted to first verbally persuade Mr. Lopez to cooperate and allow the paramedics to attend to him. Officer Vidljinovic completed the TASER training and was certified to carry the TASER on the date of the incident.

In this stage of the incident Officers Vidljinovic and Guettler followed appropriate protocols which demonstrated application of their training and law enforcement experience when confronting a combative individual. First, officers Vidljinovic and Guettler spoke with Officer Alamillo and learned that Mr. Lopez was apparently experiencing a drug overdose, that the paramedics needed assistance in placing him in the ambulance, and the objective was to obtain medical assistance for him. Second, Officers Vidljinovic and Guettler assessed the situation and observed Mr. Lopez in the street with his fists clenched and formed the perception that Mr. Lopez was under the influence of a substance, probably PCP, based on his behaviors. Third, Officers Vidljinovic and Guettler approached Mr. Lopez and used a tactical contact and cover approach. When approaching a combative and unpredictable person/situation, officer safety is critical. The systematic approach enhances officer safety as one officer will initially make verbal contact with the person from a safe distance while the second officer provides cover as backup. Depending on the circumstances and generally, the cover officer will be the officer that may potentially use a level of force if warranted. The approach provides for the contact officer to speak with the person providing instructions so that the person does not receive contradictory or confusing instructions. Both officers stood in a bladed stance which positioned their firearm further away from Mr. Lopez.

Fourth, Officer Guettler began speaking to Mr. Lopez calmly from about 10 feet while Officer Vidljinovic stood behind officer Guettler with the TASER drawn. The initial distance provided an adequate safe reactionary gap which would allow officers time to respond should Mr. Lopez make sudden furtive movements. Officer Guettler attempted to persuade Mr. Lopez to cooperate with them and directed him toward the ambulance. Fifth, as officer Vidljinovic provided cover,

17

Officer Guettler moved slowly and next to Mr. Lopez while he spoke to him and attempted to guide him toward the ambulance. Officer Guettler placed his hand on Mr. Lopez's elbow to guide him to the ambulance but within a split-second, Mr. Lopez raised his clenched fists and began swinging his fists at him as he advanced toward Officer Guettler presenting an immediate threat. Officer Guettler formed the perception that he was going to be struck and moved away from the punches.

Sixth, Officer Vidljinovic observed Mr. Lopez advance towards he and Guettler, attempt to strike at Officer Guettler with his clenched fists, and formed the perception that Guettler would be struck. Officer Vidljinovic announced TASER three times and deployed the TASER for one trigger pull lasting 4 seconds. Officer Vidljinovic feared that Guettler and he may be struck, that Mr. Lopez suddenly transitioned from an active resister to an assailant, that he targeted the center mass of Mr. Lopez, and activated the TASER to protect Officer Guettler and himself from being battered. The TASER probes struck Mr. Lopez in the abdomen and he collapsed to the ground (see ER nurses notes).

In my opinion Officers Guettler and Vidljinovic followed accepted police practice in response to the confrontation and circumstances created by Mr. Lopez. Only after other officers attempted to verbally control and persuade Mr. Lopez over several minutes, and only after Mr. Lopez advanced on and attempted to strike the officers, did Officer Vidljinovic use force by deploying the TASER. The officers took appropriate steps to resolve the situation peacefully before Officer Vidljinovic resorted to using the TASER.

The TASER is a safe less-than-lethal device designed to incapacitate a resisting person without causing death or permanent injury. It uses an electrical discharge to disrupt the body's ability to communicate messages from the brain to muscles causing motor skill dysfunction. It provides a safe force option for officers to use on combative persons and stops conflicts, avoids the need to use higher forms of force, and has a lower injury rate for suspects and officers alike. A data port system records the time and date when an officer deploys the Taser.

The TASER is designed to be used in two different modes. In the probe mode, an officer can deploy the TASER from a safe distance through an Air Cartridge mechanism which projects two probes connected to wire leads. The probes attach to the person and carry electrical impulses which cause neuromuscular incapacitation (NMI) causing involuntary stimulation of the sensory nerves and motor nerves. The probe mode of application is not dependent upon pain and is effective on persons who may have a high tolerance of pain. Immediate submission by momentarily disrupting the nervous and muscular system occurs. By design the TASER applies a five second electrical discharge cycle. Officers are instructed to deploy the TASER and assess the situation prior to applying additional discharges.

Alternatively, the TASER may be used in a "Drive-Stun" mode by pushing the front of the weapon into the skin to function as a higher charge stun gun. The Dive Stun mode is applicable for application in close quarter circumstances and generally used as a pain compliance device

18

when confronting combative persons. With the fixed electrodes only 4 cm (centimeters) or 1.6 inches apart — and the lack of skin penetration — the current flow is primarily through the dermis between the electrodes and there is no significant penetration beyond the fat layer. Since there is insufficient depth of current flow to capture muscles, the drive-stun mode serves only as a compliance technique. To make an analogy to medicine, drive-stun is like rubbing an antibiotic on the skin compared to the probe mode which is like an injection. They have significantly different effects. Expected impact of the TASER exposure can result in local skin irritation or minor contact burns.

In the probe mode, the TASER uses compressed nitrogen to fire 2 small probes at typical distances of up to 7.7 m (meters) or 25 feet. When the TASER trigger is pulled, the high voltage first serves to open the nitrogen cartridges to release the nitrogen to propel the probes towards the target. These probes are designed to pierce or become lodged in most light clothing (which is usually overcome by the 50,000 V (volt, arcing capability). The sharp portion of the probe is typically 9 mm (millimeters) long and will usually penetrate the epidermis and dermis to a depth of 4-5 mm for a good electrical connection.

The TASER delivers only a fraction of the 50,000 V to the body and the mean delivered pulse voltage is 580V. The actual delivered electrical current of the TASER X26 is only about 1.9 milliamperes (mA) or 0.0019 amperes (A) and the peak current is only about 3 A. The stored energy in the TASER X26 is about 0.36 joules (J) per pulse (J/pulse) and the delivered energy is about 0.1 J/pulse. By comparison an automatic external cardiac defibrillator (AED) used numerous times per day by paramedics uses 360 J, over 3,000 times greater than the X26 TASER. The TASER is only powered by a battery of two 3 V cells, commonly used in some small digital cameras (such as the Nikon F6). It is the TASER's rapid cycling that can cause the person's muscles to contract at about 19 times a second that can offer the effective incapacitation of the subject in the probe mode, or pain compliance in the drive-stun mode, while still offering a significant safety margin from electrical injury. The result leads to a loss of regional muscle control and a fall to the ground to end a violent confrontation.

Over 12,000 law enforcement agencies in the United States use the TASER and over 2 million deployments have been applied in training and in the field. The TASER has an impressive record of safety. Research studies in the field have repeatedly shown than the use of TASER's are safe, are significantly instrumental in reducing the need to resort to lethal force, reduces the injury and death potential of subjects, and reduces officer injuries. Further, reliable human subject studies performed on the medical aspects of the TASER also demonstrate that there is no conclusive medical evidence indicating that the TASER poses a significant risk of serious injury or death from the direct effects of its use (Bozeman et al. 2009; Hall, et al 2012; Ho et al. 2006; Jenkinson, et al. 2006; Kroll, 2009; Laub, 2011; MacDonald, et al. 2009; Mesloch, et al. 2008; Ross, 2014; Smith, et al 2007; Stroke, et al. 2010; Taylor et al. 2010; Vilke, et al. 2011; Vilke, et al. 2009; White et al. 2012; White et al. 2009). These studies reveal that:

a.   The deployment and use of TASER has been shown to reduce injuries to officers and suspects over other force options, including physical force,

b.   The deployment and use of TASER has been shown to reduce officers' workers' compensation claims for use-of-force and arrest-related injuries,

c.   The deployment and use of the TASER has been shown to reduce use-officer-citizen complaints and law enforcement internal affairs complaints against law enforcement officers,

d.   The deployment and use of the TASER has resulted in the reduced need to use deadly lethal force,

e.   Rates of injury from the TASER are comparable to, or less than, some collegiate contact and exertion sports,

f.   Rates of injury from the TASER are less than several other common law enforcement force options, including, but not limited to: physical force, batons, impact tools, canines, rubber bullets, and bean bags,

g.   The TASER is a safer alternative than other comparable law enforcement force options tools or techniques,

h.   The TASER is shown to reduce suspect injuries when compared to physical force options,

i.   The TASER has greater accountability features than any other force option,

j.   The TASER is the most studied force option available to U.S. law enforcement,

k.   The TASER is the most effective force option in accomplishing intended effects for U.S. law enforcement, and

l.   According to peer-reviewed literature, the TASER causes less-severe physiologic and metabolic effects than other force options and the TASER is the safest force option available to law enforcement.

Collectively, these studies show that the use of the TASER reduces suspect injuries by about 2/3. To put it another way, the use of alternative control techniques triples (3x) the risk of injury to subjects. Indeed the current literature as a whole suggest that the deployment of the TASER has a margin of safety as great as or greater than most alternatives and recommends using the TASER over physical control techniques when it is justified.

An officer's use of reasonable force is justified based on the person's resistance, and consideration of the officer's safety is paramount. An officer does not have to sequentially progress through a series of force options before using the TASER, or any other force technique.

Prior to the advent of the TASER it was not uncommon for officers to have to use more force to gain control of a combative person and take the person to the ground. Typically in these incidents, several officers were involved in taking the person down frequently resulting in a prolonged struggle on the ground where officers used more force to control the resisting person resulting in an increased risk of injury to the person and the officers. During these ground fighting situations the resisting person was in close proximity to the officer's firearm increasing the risk of the officer being disarmed.

A further risk of injury or sudden death of the resisting person increases when the person is under the influence of an illicit drug or is experiencing a psychotic episode. The prolonged struggle on the ground and the strength of the person, who presents a high threshold to pain, combined with the condition of the resisting person can create a catecholamine surge flooding the heart whereby causing a sudden in custody death.

The observed behaviors of Mr. Lopez are consistent with a condition known as Excited Delirium Syndrome (ExDS). For example Mr. Lopez was repeatedly observed to be: agitated, combative, sweating, erratic behaviors (hyperactive, changing of his speed of movement), mumbling and grunting, incoherent/slurred speech, disoriented, threw his arms up, moving them in jerky motions, acting with an altered state of mind, facial grimaces, breathing heavily, clinching his fists, and was not responding to numerous verbal attempts to calm down and to cooperate with the officers. Prior to the officers responding on scene, Mr. Lopez was observed climbing and walking on a parked vehicle by firefighter Kairis. Mr. Lopez's behaviors were consistent with studies performed in the field when officers encountered suspects exhibiting features of ExDS. (Hall, et. al., 2012; Hall, et. al. 2015; Ross, 1998, 2014; Ross and Chan, 2006).

ExDS is commonly caused by use of stimulant drugs like cocaine, methamphetamine or PCP and presents typically with aggressiveness and sometimes paranoid behavior, but can also be caused by uncontrolled and untreated psychiatric illness. ExDS is a physiological condition manifesting itself with a psychological presentation often resulting in a sudden death. Classical general features include: agitation, hyperactivity, elevated body temperature, high degree of sweating, frequently breathing fast, are often destructive, have a high threshold of pain, and often exhibit extraordinary strength (DiMaio and DiMaio, 2006). A majority of cases occurs in subjects using illicit drugs and is a significant cause of sudden cardiac arrest, but psychiatric patients who have been off of their medications also present in and ultimately die from ExDS as well. ExDS is considered a medical emergency. I have worked as a consultant with the NIJ on the subject, researched and published on the subject, trained officers and investigators on the subject, and have provided expert opinions on the subject.

The TASER, reduces the need to engage in a physical struggle with a combative subject, provides a safe option to minimize the risk of injury to the subject and the officer from a safe distance while simultaneously maximizing the ability to control a combative person more quickly whereby shorting the confrontation time span. As described earlier, the TASER has actually been documented to reduce suspect injuries, reducing sudden in-custody deaths, and reducing officer

21

injuries as well. The TASER is the preferred use of force measure when faced with active resistance.

Officers Gonzalez, Guettler, and Vidljinovic all testified as being aware the risks of grappling, wrestling, and attempting to physically control a combative person under the influence of PCP. For example, Officer Gonzalez testified that he would not have used physical force as those on PCP have extreme strength, would be wrestling with him, it would not work, and believed that Mr. Lopez was under the influence of PCP (Dep. pg. 74). Officer Vidljinovic testified that that Mr. Lopez looked formidable, that he displayed behaviors consistent with individuals under the influence of a substance, such as PCP or cocaine, that those under the influence can be strong, that it would take five to six officers to restrain one individual, and that he believed that Mr. Lopez was capable of doing many more things as he was under the influence of some kind of substance (Dep. pgs. 69, 96-97, 112). Officer Guettler testified that he believed that Mr. Lopez was under the influence of PCP, that he has seen multiple others on PCP, and in his experience they have a higher threshold to pain, and that jumping on him would cause a lot more injury to himself and the officers than using the TASER (Dep. pgs. 89, 109-110, 113-114, 136-137, 153).

As described earlier, all of the research literature regarding the safety margin of the TASER recommends that the TASER is the preferred method of force to use over other forms of force when faced with active suspect resistance. The use of the TASER provides a safe and reasonable force option for an officer to maintain a reasonable safe distance from an uncontrolled suspect, whereby enhancing the officer's safety in order to deploy it and still achieve the objective of controlling the person. The use of the TASER allows an officer to control an uncooperative person from a safe distance, without undue risk to either party. The use of the TASER significantly lowers the risk of injury than using physical force.

The testimony of the officers and their response on scene not to physically engage with Mr. Lopez reflect their knowledge gained through training, experience, and proper tactical thinking of how to respond to a combative person under the influence of an illicit substance. Hence, Officer Vidljinovic's decision to deploy the TASER in response to Mr. Lopez's physical attack which presented an immediate threat was consistent with accepted police practices. An officer is not required to first physically engage with a violent person as he is advancing and throwing punches at the officer and then transition to another level of force. The officer does not have to risk his personal safety by being struck nor is an officer required to be struck first before using a degree of force, including the TASER.

Further, Officer Vidljinovic was not required to holster the TASER, unholster a canister of OC, and use it prior to using other force measures including the TASER. This is an important point as Mr. Lopez would have closed the reactionary gap between himself and Officer Vidljinovic before he could unholster the OC, acquire target acquisition, and spray Mr. Lopez. In this scenario, Officer Vidljinovic could have been attacked and injured. Had Officer Vidljinovic been able to spray Mr. Lopez with OC and had he fought through it and continued to advance and fight,

22

Officer Vidljinovic would not have been able to use the TASER as Mr. Lopez would have been covered in a potentially flammable liquid which can pose a risk of injury.

In my opinion and under the circumstances Officer Vidljinovic used the TASER appropriately under accepted police practices and pursuant to his training. This is evidenced on several levels. First, the officers including Officer Vidljinovic testified that they were trained about the potential risks of activating a TASER. While using any level of force may create a potential risk of injury to the resisting person and or the officer, the review of using such force is assessed on the objective reasonableness of using the force in light of the resistance encountered within the totality of the circumstances of the confrontation.

When officer Vidljinovic deployed the TASER, Mr. Lopez was in the street as he advanced and attempted to strike at Officer Guettler. Mr. Lopez was not standing on an elevated position, nor was he running away from the officers, nor was he operating a motor vehicle or bicycle, nor was he standing near combustible vapors or liquids (like OC), nor were sensitive bodily areas targeted. Officer Vidljinovic knew to target center mass and the TASER probes made contact Mr. Lopez's abdomen.

Second, Officer Vidljinovic used the TASER appropriately, consistent with the use of force model authorizing the application of the TASER for assailant type of resistance which was demonstrated by Mr. Lopez's behaviors. Third, Officer Vidljinovic's decision to deploy the TASER was made for the expressed purpose of protecting Officer Guettler and himself from being physically attacked and for the purpose of controlling Mr. Lopez. An officer may take reasonable measures to protect himself from harm. Officers are trained to provide a verbal announcement prior to activating the TASER. Fourth, Officer Vidljinovic announced TASER three times prior to activating it. Fifth, Officer Vidljinovic deployed the TASER one time for 4 seconds, assessed the situation, and did not activate it a second time. Hence, Officer Vidljinovic's use of the TASER was measured, and demonstrated comprehension of the force principle of de-escalation. The data print out confirmed the fact that Officer Vidljinovic deployed the TASER one time for 4 seconds.

Under the circumstances presented, Officer Vidljinovic's deployment of the TASER for one, 4 second application, rather than other force measures, was appropriate based on accepted police practices given Mr. Lopez's sudden behaviors of assailant resistance. The TASER was appropriately used as it was designed and for the purpose of bringing Mr. Lopez under control quickly without increasing the risk of using additional force measures whereby eliminating the risk that officers would have to engage in a prolonged physical altercation with Mr. Lopez.

In my opinion Officer Vidljinovic appropriately deployed the TASER in response to the assailant resistance demonstrated by Mr. Lopez and announced TASER three times prior to activating it. Fellow officers, paramedics, and Ms. Guzman heard the announcement and/or heard the TASER being deployed. No one testified that they heard repeated activations of the TASER.

23

Of those on scene, four testified that they recalled observing Mr. Lopez fall to the ground after the TASER being used. Officers Gonzalez and Valenzuela testified that Mr. Lopez fell backward onto the pavement. Ms. Guzman testified that Mr. Lopez fell forward, that the TASER probes made contact in his back, and that he was yelling in pain on the street. Paramedic Kairis reported that Mr. Lopez fell to his knees and then landed on his side. Paramedic Cheatam testified that she saw Mr. Lopez sitting in the street and was combative on the stretcher. Paramedic Mendoza testified that Mr. Lopez was flailing his arms on the ground, was combative on the stretcher and in the ambulance, and only allowing him to perform a partial medical assessment of him. No one on scene testified that they observed any signs of injuries or trauma on Mr. Lopez.

It is acknowledged that a person may fall to the ground after an activation of the TASER. CPD Officers are trained in this regard and Officer Vidljinovic testified that he was trained and aware of this. Responses to the use of the TASER vary from person to person, however, and depend on the confrontation circumstances and the condition of the person. Officers are instructed that some persons may fall to the ground (not necessarily in one specific manner), that some individuals may withstand the probe contact, that some persons may remove the probes and continue to fight or flee from the officer, and in some incidents the probes may not make full contact due to the type of or layers of clothing worn by the person. When it is tactically feasible a second officer on scene may be able to assist a person to the ground after the deployment of the TASER, but the totality of the circumstances may prevent that from occurring. Officers are trained that the person may not just simply fall to the ground and surrender and to assess the situation after one, 5 second cycle application, and to be prepared to apply a second TASER application or move to another form of force. When it is tactically safe the officer will advance to the person, control, restrain, him and assess for injuries. As warranted, medical attention will be summoned by an officer.

In this circumstance, Mr. Lopez suddenly attempted to strike Officer Guettler, creating a rapid and dynamic scenario. To protect himself and to avoid being struck, Officer Guettler moved several feet away from Mr. Lopez. Officer Vidljinovic was about 5 to 7 feet away and he had to make an on the scene, split-second decision to protect Officer Guettler, and to protect himself. The dynamic nature of the attack and the distance that he stood from Mr. Lopez, prevented Officer Vidljinovic or Officer Guettler from assisting Mr. Lopez to the ground after the TASER was deployed. Again, and for officer safety, an officer is trained to assess the situation after the deployment of the TASER and only to approach the person when he believes that it is tactically safe.

In my opinion, the use of the TASER provided a reasonable mechanism for the officers to bring Mr. Lopez under control so that paramedics could render medical treatment and convey him to the hospital so that he may obtain further treatment. After the TASER was used, the paramedics who were standing by immediately responded to Mr. Lopez, and placed him on the stretcher. Mr. Lopez was then placed in the ambulance for further assessment and transported to the hospital without further delay.

24

I reserve the privilege to amen my opinions should additional documents, materials or testimony become available and I have the opportunity to review it.

I acknowledge that there are differing accounts of the incident as described by Ms. Guzman on the one hand, and the officers and paramedics on the other. I do not attempt to resolve those differences. My opinions are based on generally accepted police practices and procedures, and from the perspective of a how a reasonably trained police officer would respond when confronted by the same fact patterns that the officers confronted in this incident.

Respectfully submitted by,

Darrell L. Ross, Ph.D.          March 6, 2015

25

## References

Alpert GP, Dunham RG (2010). Policy and training recommendations related to police use of CEDs: Overview of findings from a comprehensive national study. *Police Quarterly*, 13 (3): 235- 239.

Bozeman WP, Hauda WE Jr., Heck JJ, Graham DD, Martin BP, Winslow JE (2009, April). Safety and injury profile of conducted electrical weapons used by law enforcement officers against criminal suspects. *Ann Emerg Med* (4):480-89.

Di Maio TG, Di Maio JM (2006). *Excited delirium syndrome: Causes of death and prevention.* Taylor and Francis, CRC Press, Boca Raton, FL.

Hall CA, Votova K, Heyd C, Walker M, MacDonald, S, Eramian D, Vilke GM (2015). Restraint in police use of force events: Examining sudden death for prone and not-prone position. *Journal of Forensic and Legal Medicine*, 1-20.

Hall CA, Kader AS, McHale AM, Stewart A, Fick GH, Vilke GM (2012). Frequency of signs of excited delirium syndrome in subjects undergoing police use of force; Descriptive evaluation of a prospective consecutive cohort. *Journal of Forensic and Legal Medicine*, 1-6.

Ho JD, Miner JR, Lakireddy, D, Bultman LL, Heegaard L, Heegaard WG (2006). Cardiovascular and physiologic effects of conducted electrical weapons discharge in resting adult. *Academic Emergency Medicine*, 6:239-243.

Illinois Law Enforcement Training and Standards Board (2007). Policy development guidelines for deployment of electro-muscular disruption devices; Evaluation of guidelines for use of force training. Springfield, IL.

International Association of Chiefs of Police (2010). Electronic control weapons: Model policy. Alexandra, VA.

International Association of Chiefs of Police (2006). Use of force: Model policy. Alexandra, VA.

Jenkinson E, Neeson C, Bleetman A (2006). The relative risk of police use of force options: Evaluating the potential for deployment of electronic weaponry. *Journal of Clinical Forensic Medicine,* 13: 229-241.

Kroll M. (2009). Physiology and pathology of TASER electronic control devices. *J Forensic and Legal Medicine.*

Laub JH (2011, May). *Study of deaths following electro muscular disruption.* US Dept. of Justice, National Institute of Justice, Washington, D.C.: 1-60.

MacDonald JM, Kaminski RJ, Smith MR (2009, Dec.). The effect of less-lethal weapons on injuries in police use-of-force events. *Am J Public Health,* 99 (12):2268-2274.

Mesloh C, Henych M, Wolf R. (2008, Sept.). Less Lethal Weapon Effectiveness, Use of force, and suspect & officer injuries: A five-year analysis. *Report to the National Institute of Justice*, Washington, DC.

Police Executive Research Forum (2011). *Electronic weapon guidelines*. Washington, DC.

Smith M, Kaminski R, Alpert G, Fridell L, MacDonald J, Kubu B (2010, July). *A multi-method evaluation of police use of force outcomes: Final report to the national institute of justice*, US Department of Justice, Washington, DC.

Smith M, Kaminski R, Rojek J, Alpert G, Mathis J (2007). The impact of conducted energy devices and other types of force and resistance on officer and suspect injuries. *Policing: An International Journal of Police Strategies & Management.* 30(3):423-446.

Strote J, Verzemnieks E, Walsh M, Hutson HR. (2010, Nov.). Use of force by law enforcement: An evaluation of safety and injury. *J Trauma,* 69 (5):1288-1293.

Ross DL (2014). The outcomes of a prospective analysis of the outcomes of violent prone restraint incidents in policing. A technical research report.

Ross DL and Chan TC (2006). *Sudden in-custody deaths*. Humana Press, Totowa, NJ.

Ross DL (1998). Factors associated with excited delirium deaths in police custody. *Modern Pathology*, 11:1127-1137.

Taylor B, Woods D (2010, September). Injuries to officers and suspects in police use of force cases: A quasi-experimental evaluation. *Police Quarterly*, 13(3):260-289.

Terrill W and Paoline EA (2012). Examining less-lethal force policy and the force continuum: Results from a national use-of-force study. *Police Quarterly*, 16 (1): 38-65.

Vilke GM, Bozeman WP, Chan, TC (2011). Emergency department evaluation after conducted energy weapon use: Review of the literature for the clinician. *Journal Emerg Med*, 40 (5): 598-604.

Vilke GM, Sloan CM, Suffecool A, Kolkhurst FW, Neuman T, Castillo EM, Chan TC (2009). Physiologic effects of the TASER after exercise. *Academic Emergency Medicine*, 16 (8): 794-710.

White MD, Ready, J, Rigg C, Dawes, DM, Hinz A, Ho JD (2012). An incident-level profile of TASER device deployments in arrest-related deaths. *Police Quarterly,* 20 (10):1-28.

White MD, Ready J (2009). Examining fatal and nonfatal incidents involving the TASER, *Criminology and Public Policy*, 8: 865-891.