IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOSE LOPEZ, by his wife and next best friend, Sandra Cardiel, | ) ) ) | Case No. 12 cv 5751 |
| Plaintiff, | ) ) | Hon. John Robert Blakey, |
| v. | ) ) | Judge Presiding. |
| STEVAN VIDLJINOVIC, Star No. 4051, et al., | ) ) ) | Hon. Geraldine Soat Brown, Magistrate Judge. |
| Defendants. | ) | JURY DEMANDED |

**PLAINTIFFS LOCAL RULE 56.1(b)(3)(C) STATEMENT OF FACTS
REQUIRING DENIAL OF SUMMARY JUDGMENT
FOR THE CITY OF CHICAGO**

NOW COMES plaintiff JOSE LOPEZ, by his wife and next best friend, Sandra Cardiel, by and through one of their attorneys, John P. DeRose John P. DeRose & Associates, and pursuant to Local Rule 56.1(b)(3)(C), respectfully submits the following Statement of Facts Requiring the Denial of Summary Judgment in the above-captioned cause:

1. On July 22, 2011 at approximately 3:00 AM, unbeknownst to José Lopez, Guadelupe Guzman called 911, requesting an ambulance because plaintiff was having chest pains and trouble breathing. . (Tab 1, Event Queries of the Chicago Fire Department; Tab 25, Deposition of Guadalupe Guzman, pp. 106:13 to 107:6)

2. Upon the arrival of Chicago Fire Department personnel and paramedics, Lopez told them in English, "No. No. No. I'm okay. Don't worry. I don't need attention.", and "No, just go. I don't need help.", and "I don't want help, just go." (Tab 25, Deposition of Guadalupe Guzman, pp. 115:13 to 116:7, 124:3-7, 134:3-14).

1

3. For the next 13 to 16 minutes Lopez continually refused any medical attention whatsoever and was "definitely telling [the paramedics] to stay away". (Tab 1, Event Queries of the Chicago Fire Department; Tab 2, Event Queries of the Chicago Police Department; Tab 27, Deposition of Paramedic Mendoza, pp. 68:9-22; Tab 34, Deposition of Commander Dubiel, p. 48:19-22).

4. The Emergency Medical Responder Orders of the Chicago Fire Department and the training of its paramedics acknowledge the right of a citizen to refuse medical attention, but the citizen must first sign a Refusal of Treatment or Transport. (Tab 3, Region 11, Chicago EMS System Policies and Procedures, Consent/Refusal of Service Policy, pp. B.10-B.11; Tab 27, Deposition of Paramedic Mendoza, pp. 117:24 to 118:7; Tab 26, Deposition of Firefighter/Paramedic Kairis, p. 145:18-24).

5. By their training, Chicago Fire Department paramedics must take a citizen to a hospital to be evaluated if the citizen of the community has ingested some alcohol or drugs, and the patient has no right to refuse. (Tab 27, Deposition of Paramedic Mendoza, pp. 113:15 to 114:9; Tab 26, Deposition of Firefighter/Paramedic Kairis, p. 148:19 to 149:11).

6. The Policies and Procedures used by Chicago Fire Department Paramedics and EMS Personnel require them to seek police assistance if a Citizen will not cooperate with them by allowing either examination or transportation to a medical facility. (Tab 3, Region 11, Chicago EMS System Policies and Procedures, Consent/Refusal of Service Policy, pp. B.10-B.11; Tab 27, Deposition of Paramedic Mendoza, p.57:14-21).

7. The Municipal Code of the City of Chicago provides that Chicago police officers may assist an emergency medical technician in transporting the person to a hospital when the officer

is informed by an emergency medical technician that the situation constitutes an emergency and that person is in need of immediate hospitalization. (Tab 5, Municipal Code of the City of Chicago, Sec. 4-68-110 Peace officer assistance during emergencies).

8. Before ever having said one word to Lopez, or having examined him and without declaring any medical emergency, Chicago Fire Department personnel called for Chicago Police Department assistance "for drug overdose". (Tab 1, Event Queries of the Chicago Fire Department; Tab 27, Deposition of Paramedic Mendoza, pp. 69:1-11, 75:20-76:3, 85:13-16; 86:6-11, 118:8-13; Tab 26, Deposition of Firefighter/Paramedic Kairis, pp. 82:6-7, 92:23-24, 93:16-23).

9. According to his training and Chicago EMS System Policies and Procedures, if Paramedic Mendoza receives a 911 call and arrives on the scene to find a person who is intoxicated or under the influence, the person has to go to the hospital to get evaluated and the person has no right to refuse transportation. (Tab 27, Deposition of Paramedic Mendoza, pp. 113:15 to 114:9, 121:8 to 122:9; Tab 3, Region 11, Chicago EMS System Policies and Procedures, Consent/Refusal of Service Policy, pp. B.10-B.11).

10. According to his training and through the Project Medical Director of the Chicago EMS System, Paramedic Kairis believes that he can force help and assistance on a citizen believed to be under the influence of something and in an altered mental state even if the citizen does not want his help and assistance. (Tab 26, Deposition of Firefighter/Paramedic Kairis, pp. 104:18-24; 153:20 to 154:22).

11. The Chicago Police Department Special Orders require Chicago police officers to assist paramedics in the transportation of a citizen for medical attention unless citizen refuses

transportation on religious grounds. (Tab 6, Special Order S03-08 Assisting Chicago Fire Department Paramedics).

12. Paramedic Mendoza was never trained that citizens of the community have a right to refuse transportation or any treatment of them on religious grounds. (Tab 27, Deposition of Paramedic Mendoza, p.116:2-6).

13. The Chicago Police Department Special Orders provide that citizens believed to be under the influence of drugs or alcohol may be assisted to a public treatment facility, a private treatment facility or other health facility, if they CONSENT. If the person REFUSES the assistance offered, no further police action will be taken. (Tab 7, Special Order S02-01-04 Alcohol and Drug Dependent Persons; Tab 29, Deposition of Officer Vidljinovic, p. 183:13 to 185:15).

14. The instructors at the Chicago Police Academy do not teach the officers to take any kind of special precautions when they are going into a situation where they will be dealing with a person who is believed to be mentally compromised in some way and in need of a mental health transport or when dealing with persons of "diminished capacity". (Tab 32, Deposition of Officer Cancel, pp. 169:2-18).

15. "In 2010, the city armed hundreds more officers with the weapon, fueling a 329 percent jump in Taser use, from 195 incidents in 2009 to 836 in 2011. Yet shootings by police didn't drop significantly during that period, according to figures from the city's Independent Police Review Authority." (Tab 15, *Chicago Tribune*: *Jolt of reality: Shooting persists as Chicago Police Taser use skyrockets. Use of devices marketed as means to limit gunfire rose more than 300 percent in 2 years, data show.* By Dan Hinkel and Alex Richards, July 20, 2012).

4

16. During 2010-2011, IPRA commenced 1,281 investigations of excessive force. During the 4th quarter of 2010 and the first three quarters of 2011, IPRA closed 867 investigations as unfounded and/or exonerated and an additional 846 investigations because no affidavit was provided of police officer misconduct. In the 4th quarter of 2011, IPRA closed 162 investigations as unfounded or not sustained, and closed another 186 investigations because there was no affidavit alleging police misconduct. (Tab 16, Annual Report of IPRA 2010-12, Statistical Tables, pp. 30-31).

17. "During the third quarter of 2013, IPRA initiated 508 investigations. This includes the 110 investigations resulting from notifications of a Taser discharge. IPRA responded to 13 officer-involved shootings during the third quarter of 2013. … Pursuant to the IPRA Ordinance, certain events trigger an IPRA investigation even in the absence of an allegation of misconduct. The term 'notification' refers to those events that IPRA investigates where there is no alleged misconduct." (Tab 17, Quarterly Report of IPRA July 1, 2013 - September 30, 2013, p. 2 and p. 3, fn 1).

18. "As of January 1, 2008, IPRA implemented procedures to issue Log Numbers for all uses of taser and shootings, regardless of the method of notification. In addition CPD issued a reminder to CPD personnel to provide notification to IPRA." (Tab 17, Quarterly Report of IPRA July 1, 2013 - September 30, 2013, p. 5, fn 7).

19. IPRA starts to gather reports when there is a tasing event as soon as it learns of the tasing incident, even if there is no allegation of police misconduct. (Tab 33, Deposition of IPRA

Investigator White, pp. 24:16 to 25:4 and 30:21 to 31:2; Tab 17, Quarterly Report of IPRA July 1, 2013 - September 30, 2013, pp. 3, fn1).

20. According to the Case Log, IPRA Investigator White was not assigned to the José Lopez case on July 26, 2012, one year and 4 days after the tasing incident because there had been no allegations of police misconduct. (Tab 33, Deposition of IPRA Investigator White, pp. 35:24 to 36:5 and 39:8-14).

21. Although as part of her investigation for IPRA, Investigator White is supposed to find out if there are any in-squad videos of the event, she did not check because the case was over a year old. (Tab 33, Deposition of IPRA Investigator White, p. 128:2-14).

22. Investigator White did not talk to any of the police officers who were on the scene when the officer activated the Taser at José Lopez because she did not have a Sworn Affidavit.[1] (Tab 33, Deposition of IPRA Investigator White, pp. 91:4-10 and 92:14-18).

23. Based on her training, IPRA Investigator White testified, "My understanding when a citizen can be Tasered is if they're resisting arrest, in some cases where they're refusing medical treatment and they're not in their right mental state of mind and they cannot reasonably make decisions as to go into the hospital and they put they self (sic) in harm's way." (Tab 33, Deposition of IPRA Investigator White, p. 147:1-6).

24. Based on her training, experience, investigation, and research, IPRA Investigator White is unaware of the Taser international questions officers not to use tasers on persons

---

[1] According to the Annual Report of IPRA 2010 – 2012: "The No Affidavit finding is used when no one who observed the alleged misconduct provides an interview and affidavit to IPRA, and there is no other evidence sufficient to substitute for such a statement and no other exception applies."

6

suspected to be under the influence of drugs. (Tab 33, Deposition of IPRA Investigator White, pp. 181:14-21 and 182:2-12).

25. Although Investigator White testified, "I do know that a deposition can act as a sworn affidavit", after receiving the deposition transcripts of Maria Guzman and the Chicago police officers at the scene of the José Lopez tasing, IPRA left closed without making any determination and did not reopen its investigation of excessive force in the Lopez case because it did not have a signed affidavit in the matter. (Tab 33, Deposition of IPRA Investigator White, pp. 105:12-18, 109:1-2, and 160:13-18; Tab 35, Email to IPRA Investigator White, including deposition transcripts).

26. "It is a system seemingly designed to fail. Chicago police officers enforce a code of silence to protect one another when they shoot a citizen, giving some a sense they can do so with impunity. The Independent Police Review Authority, the civilian agency meant to pierce that protection and investigate shootings of citizens by officers, is slow, overworked and, according to its many critics, biased in favor of the police." (Tab 21, *Chicago's flawed system for investigating police shootings*, By Todd Lighty, Stacy St. Clair and Steve Mills, *Chicago Tribune*, December 4, 2015).

27. On December 1, 2015, after accepting the resignation of both the Chief Administrator of IPRA and the Superintendent of the Chicago Police Department, Mayor Rahm Emanuel announced the creation of a Task Force on Police Accountability in an op-ed in the *Chicago Tribune*:

> At the end of the day, I am the mayor and I own it. I take responsibility for what happened and I will fix it. Nothing less than complete and total reform of the system and the culture will meet the standards we have to set for ourselves.

7

> I know the history of police-community relations in Chicago. I am the mayor who agreed to provide reparations and bring important closure to the victims of Jon Burge and police torture in Chicago. I am the mayor who has committed to restoring community policing, because the only way to fight crime effectively is to build trust between officers and the residents they serve. I am the mayor who instituted body cameras for police, to reduce incidents of police misconduct as well as unfounded complaints.

(Tab 22, *"I own the problem of police brutality, and I'll fix it"*, Mayor Rahm Emanuel op-ed, *Chicago Tribune*, December 1, 2015).

28. In a press release on that same December 1, 2015, Mayor Rahm Emanuel announced that the newly created Task Force on Police Accountability "is charged with… improving independent oversight of police misconduct…. The task force will review what the CPD or IPRA can and should do to identify officers with problematic conduct, including racial bias, and what can be done to effectively intervene to change that conduct." (Tab 18, Press Release: Mayor Emanuel Announces Task Force on Police Accountability, December 1, 2015).

29. In answer to a direct question from moderator, Paris Schultz during an interview on *Chicago Tonight* on WTTW-TV on December 8, 2015, Mayor Rahm Emanuel acknowledged that a Code of Silence has existed in the Chicago Police Department. (Tab 23, Mayor Rahm Emanuel Interview[2] on *Chicago Tonight* WTTW-TV re: Police Reform, Accountability, and the Culture and Code of Silence in CPD).

30. On December 9, 2015 in an address[3] before the Chicago City Council, Mayor Rahm Emanuel acknowledged that the Code of Silence is also referred to as "The Thin Blue Line" and is used to "cover up" bad actions by police officers:

---

[2] A recording of the interview of Mayor Rahm Emanuel on December 8, 2015 can be found at: http://chicagotonight.wttw.com/2015/12/08/mayor-emanuel-police-reform-accountability.

[3] A recording of the address to the City Council by Mayor Rahm Emanuel on December 8, 2015 can be found at: http://chicagotonight.wttw.com/2015/12/09/mayor-emanuels-address-city-council-stresses-trust-respect

> CULTURE
>
> As we move forward, I am looking for a new leader of the Chicago Police Department to address the problems at the very heart of the policing profession.
>
> This problem is sometimes referred to as the Thin Blue Line. Other times it is referred to as the code of silence. It is the tendency to ignore, deny or in some cases cover-up the bad actions of a colleague or colleagues.
>
> No officer should be allowed to behave as if they are above the law just because they are responsible for upholding the law.
>
> …
>
> But we cannot have effective policing if we turn a blind eye to the extreme misconduct ….
>
> We cannot ask citizens in crime-ravaged neighborhoods to break the code of silence if we continue to allow a code of silence to exist within our own police department.

(Tab 24, Remarks of Mayor Rahm Emanuel, Wednesday, December 9, 2015, as Prepared for Delivery, p. 6).

31. Statistics kept by the Chicago Police Department over many years and recently revealed show that 2% of excessive force complaints ever result in a sustained finding against individual police officers. Statistics recently released by the Citizens Police Data Project Reveal:

### 56,384 ALLEGATIONS
**95.93%** of "Allegations" complaints were found" Unsustained"

| | |
|---|---|
| 56,384 | Allegations |
| 54,089 | Unsustained |
| 2,295 | Sustained |

(Tab 39, Citizens Police Database (CPDB), spanning approximately 2001 to 2008 and 2011 to 2015; Tab 40, *Small group of Chicago police costs city millions in settlements*, By Angela Caputo and Jeremy Gorner, *Chicago Tribune*, January 30, 2016).

9

32. At the Chicago Police Training Academy, Vidljinovic was instructed that he was to aim "center mass" on the front side of the person being tased and he was never instructed that that it was preferable that the Taser be shot into someone's back. (Tab 29, Deposition of Officer Vidljinovic, pp. 136:11-15 and 154:21 to 155:2).

33. Although Taser International warns "whenever possible, officer should avoid deploying tasers on people located in an area where a fall would result in serious injury or death", Vidljinovic couldn't predict how José Lopez would react to the deployment of the Taser, and there was potential he could collapse to the street. (Tab 29, Deposition of Officer Vidljinovic, p. 155:19 to156:17).

34. Although Taser International warns that "the involuntary muscle spasms that Tasers cause would be injurious to people with pre-existing health problems like osteoporosis, hernias, spinal injuries, or soft tissue damage, to name a few. Also, the spasms could cause severe exhaustion in people under the influence of drugs or suffering from any number of respiratory or mental health problems", Vidljinovic does not recall ever being trained or advised that using a Taser against a person is under the influence of drugs will exacerbate the effects on that person. (Tab 14, Protocol for a Taser Deployment; Tab 29, Deposition of Officer Vidljinovic, p. 156:21 to 157:7 and 158:12-16).

35. Prominent political leaders have encouraged the United States Department of Justice to undertaken an investigation of "systemic violations of the Constitution or federal law." by Chicago police officers coming into contact with citizens of the community. (Tab 19, Letter from Attorney General Madigan Requesting DOJ Investigation of systemic violations of the Constitution or federal law by CPD, December 1, 2015; Tab 20, Letter from Senator Durbin asking U.S. Attorney General for Probe of Chicago Police Department, December 3, 2015).

WHEREFORE, plaintiff moves this Honorable Court for an Order denying the motion for summary judgment filed by the City of Chicago in the above-captioned cause.

                                                Respectfully submitted,

                                                /s/John P. DeRose
                                                John P. DeRose

John P. DeRose & Associates
15 Spinning Wheel Road
Suite 428
Hinsdale, IL 60521
(630) 920-1111 office
(630) 920-1170 fax
john@johnderoselaw.com