**Lopez v. Vidljinovic**

**Deposition of Stevan Vidljinovic**

**September 4, 2013**

**COUNTY COURT REPORTERS, INC.**
**600 S. COUNTY FARM ROAD**
**SUITE 200-B**
**WHEATON, IL 60187**
**Phone: 630.653.1622**
**Fax: 630.653.4119**

Stevan Vidljinovic
September 4, 2013

---

**1**

```
 1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION
 3  JOSE LOPEZ, by his wife and next   )
    best friend, SANDRA CARDIEL,       )
 4                                     )
              Plaintiff,               )
 5      v.                             )No. 12-C-5751
                                       )
 6  STEVAN VIDLJINOVIC, Star No. 4051, )Judge Harry D.
    JOHN D. GUETTLER, Star No. 5174,   )Leinenweber
 7  JOSE VALDOVINOS, Star No. 11820,   )
    ANTONIO J. VALENZUELA, Star No.    )
 8  14123, MANUEL GONZALEZ, JR., Star  )Magistrate Judge
    No. 11733, ADRIAN VALADEZ, Star No.)Geraldine Soat
 9  15777, ARMANDO ALAMILLO, Star No.  )Brown
    106912, JOSEPH DE MONICA, Employee )
10  No. 27496, DANIEL LOPEZ, Star No.  )
    3477, LUIS C. LUQUE-ROSALES, Star  )
11  No. 15369, Supervising Sergeant    )
    MARK E. KEARNS, Star No. 1811, and )
12  Watch Commander ROBERT H. DUBIEL,  )
    Star No. 194, individually and in  )Jury Demand
13  their official capacities as       )
    police officers for the CITY OF    )
14  CHICAGO, ILLINOIS, a municipal     )
    corporation and a body politic,    )
15                                     )
              Defendants.              )
16
17          THE DISCOVERY DEPOSITION OF
            OFFICER STEVAN VIDLJINOVIC
18              September 4th, 2013
                   10:30 A.M.
19
20          Called as a witness by the Plaintiff
21  herein, pursuant to the provisions of the Federal Rules
22  of Civil Procedure pertaining to the taking of
```

---

**2**

```
 1  depositions for the purpose of discovery, before GLORIA
 2  APOSTOLOS SIOLIDIS, C.S.R., License #084-001205,
 3  qualified and commissioned for the State of Illinois.
 4
 5  PRESENT:
 6              JOHN P. DE ROSE & ASSOCIATES, by
                MR. JOHN P. DE ROSE and
 7              MS. KAITLIN DE ROSE
                15 Spinning Wheel Road
 8              Suite 428
                Hinsdale, IL   60521   and
 9              CARONE LAW OFFICES, by
                MR. FRANCO N. CARONE
10              2227 North Mannheim Road
                Melrose Park, IL   60164
11
                    appeared on behalf of the Plaintiffs.
12
13              CITY OF CHICAGO - DEPARTMENT OF LAW, by
                MR. JOSEPH M. POLICK  and
14              MR. KEVIN R. GALLARDO
                30 North LaSalle Street
15              Suite 900
                Chicago, IL   60602
16
                    appeared on behalf of the Defendant
17              Police Officers and Paramedics.
18
                CITY OF CHICAGO - DEPARTMENT OF LAW, by
19              MR. GEORGE J. YAMIN, JR.
                30 North LaSalle Street
20              Suite 900
                Chicago, IL   60602
21
                    appeared on behalf of the City of
22              Chicago.
```

---

**3**

```
 1                   I N D E X
 2
    WITNESS:  OFFICER STEVAN VIDLJINOVIC
 3                                          Page No.
 4  EXAMINATION BY:  Mr. DeRose        4, 299, 305
 5                   Mr. Polick        290,304
 6          E X H I B I T S
 7  (Listed in order in which referenced in deposition.)
 8                                          Page No.
 9  Exhibit No. 2B                          34
10  Exhibit No. 2G                          43
11  Exhibit No. 2C                          45
12  Exhibit No. 14B                         73
13  Exhibit No. 14A                         87
14  Exhibit No. 14C                         98
15  Exhibit No. 10                          145
16  Exhibit No. 11                          149
17  Exhibit No. 12                          158
18  Exhibit No. 20                          174
19  Exhibit No. 21                          176
20  Exhibit No. 6                           224
21  Exhibit No. 7                           240
22  Exhibit No. 51                          268
```

---

**4**

```
 1      MR. DE ROSE:  Miss Reporter, would you please
 2  swear in the deponent?
 3      THE COURT REPORTER:  Raise your right hand please.
 4           (The oath was thereupon duly
 5            administered to the witness
 6            by the Notary.)
 7           STEVAN    VIDLJINOVIC,
 8  Called as a witness by the Plaintiff herein, having
 9  been first duly sworn, was examined and testified as
10  follows:
11      EXAMINATION
12      By: Mr. DeRose
13  Q  Sir, would you please state your name for the
14  record?
15  A  Stevan V-i-d-l-j-i-n-o-v-i-c.
16  Q  Mr. Vidljinovic, I am going to try very hard
17  to always pronounce your name correctly.  But if I fail
18  to do that in the deposition, you can either correct
19  me, but I hope you don't hold against me that I --
20  A  I won't take offense.
21  Q  That I'm having a little problem with it.
22  A  That's fine.
```

Pages 1 to 4

Stevan Vidljinovic
September 4, 2013

5

1    Q   Officer, have you ever given a deposition
2  before in your experience?
3    **A  No, I have not.**
4    Q   I'm going to give you a little preamble of
5  what you can expect, because the law requires us to do
6  so.  And if it covers matters that you and your lawyers
7  have already discussed together, just kind of bear with
8  me, because it's part of the record that we make in
9  this case.
10       We are going to take this deposition
11  according to all the Rules of the United States
12  District Court for the Northern District of Illinois,
13  the appropriate Rules of the Seventh Circuit Court of
14  Appeals and of the United States Supreme Court that
15  apply to the taking of depositions.  We don't expect
16  you to know all those rules.  That's why your lawyers
17  are here, to make sure that those rules are followed.
18  And sometimes to discuss those rules, they will
19  interject while you and I are talking together with a
20  word like objection.  That does not mean you've done
21  anything wrong; that just means that they need to talk
22  with me about whatever question is on the table for

6

1  your consideration.
2       But no matter how they do it, if you hear
3  any one of your three lawyers here today start to talk,
4  you should immediately stop talking and give them an
5  opportunity to discuss with me whatever the problem is.
6       After that you should take your direction
7  from your lawyers as to whether you are to answer the
8  question.  They are not here to be potted plants.  They
9  want to help you.  So you want to make sure to do that.
10       I have seen witnesses from time to time in
11  a deposition go that's all right, counsel, I'll answer
12  that question.  It really kind of defeats what your
13  lawyers are here to help you with.  So just follow
14  their lead on those matters.
15       With her machine there, the court reporter
16  has the ability to take down verbatim everything you
17  might have to say.
18       By the way, have you ever given a
19  deposition before?
20    **A  No, I have not.**
21    Q   All right.  Well, with that machine, it's
22  like in a courtroom when you're called to testify.  The

7

1  reporter can take down verbatim everything that anybody
2  says in this room.  She has some important limitations
3  though.  First of all, she can only take down people
4  she can hear.  So you've got to keep your voice up
5  loudly and clearly so she can hear you at all times.
6       Secondly, she can only take us down one
7  speaking at a time.  And if I'm trying to ask one of my
8  brilliant questions and you're trying to answer the
9  question at the same time, she ends up picking and
10  choosing which one of us to take down.  And that is
11  neither fair to me trying to sound like I can ask full,
12  complete, intelligent questions, nor is it fair to you
13  trying to sound like you can answer full, complete and
14  intelligent answers.
15       I'm going to try to practice what I preach
16  and not interrupt you when you're answering a question.
17  But there are occasions when I raise my hand and say
18  stop, stop, stop.  I've heard enough in answer to my
19  question.  Now, if I do that to you, you have the right
20  to say but I was not finished with my answer.  I will
21  allow you to say that.
22       Your attorneys are making notes while we

8

1  talk here and they will be allowed to follow up with
2  any question I ask at a later time.  But sometimes for
3  their own purposes and reasons, they decide they don't
4  want to follow up with any questions.  And so if that
5  occurred and they didn't follow up on that question you
6  weren't finished on, at least the record will show that
7  you had some more to say about the particular question
8  if this transcript is ever written up for use in other
9  proceedings.
10       In the course of this deposition, Officer,
11  we do not want you to guess, because you are the first
12  of many people to be deposed in this case, and if you
13  give us a guess to an answer and we ask another
14  deponent a same or similar question and they come up
15  with a very different answer, lawyers have very
16  suspicious minds, and we'll assume somebody was lying.
17  But the truth of the matter is nobody lied, it's just
18  somebody guessed and didn't tell us they were guessing.
19  So that serves us no purpose.  You want to guard
20  against that.
21       If you don't know an answer to a question,
22  there's no harm in saying I don't know.  If you think

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

9

1   it was something you did know and have since forgotten,
2   you can tell us I don't remember or I've forgotten.
3   And that is all fine.
4           We do not mean this to be a trial by
5   ordeal.  We will take periodic brakes to rest the
6   fingers of this court reporter.  She's the only one
7   really working here today.  But if we have not taken a
8   break soon enough to accommodate your own personal
9   needs, such as a need to make a telephone call or just
10  to refresh yourself, let us know and we'll interrupt
11  the proceedings and give you an opportunity to
12  accomplish whatever you need during that recess.
13          You have a right at all times to consult
14  with your lawyers.  And we jealously guard that right
15  to do so.  All I ask is if there's a question on the
16  table, that you try to answer that question before we
17  break for that private consultation that you will have
18  with your lawyers.  And if you say I can't answer the
19  question and I still want to talk to my lawyers, very
20  well.  We're going to interrupt.
21          Is all of that clear?
22      **A   Yes.**

10

1       Q    Because of the jointed way in which I talk to
2   you, I might not have covered everything, but -- oh, I
3   know another thing.  When you mean an affirmative
4   answer, we want you to use a word like yes or correct.
5   When you mean a negative answer, we want you to use a
6   word like no or wrong.  We don't want you to use sounds
7   like uh-huh, uh-uh.  I don't know what the reporter
8   just took down regarding those sounds, but we have a
9   lot of things to argue about in this case.  The lawyers
10  don't want to argue about that.  No matter how hard you
11  shrug your shoulders or shake your head, we don't get
12  enough sound out of that to take down a record.  So you
13  can be demonstrative and also nod in any direction or
14  make body gestures, as long as you be sure to accompany
15  that with actual verbal answers.
16          Is all that clear?
17      **A   Yes.**
18      Q    All right.  Thank you.
19          Sir, by whom are you employed?
20      **A   The City of Chicago.**
21      Q    And what is your occupation?
22      **A   I'm a police officer.**

11

1       Q    And how long have you been a police officer
2   for the City of Chicago?
3       **A   Just over five years.**
4       Q    I take it your rank is still patrolman at
5   this point?
6       **A   Yes.**
7       Q    And that is the only rank you've had so far,
8   correct?
9       **A   Yes.**
10      Q    Where did you receive your training to be a
11  Chicago Police Officer?
12      **A   At the Chicago Police Academy.**
13      Q    And that was before you actually started your
14  tours of duty as a Chicago Police officers?
15      **A   Yes.**
16      Q    Then you went through a probationary period
17  with the Department?
18      **A   Correct.**
19      Q    And how long was that probationary period?
20      **A   Including the academy?**
21      Q    Yes.
22      **A   18 months.**

12

1       Q    So for the last three and-a-half years you
2   have been a fully-qualified Chicago Police Officer; is
3   that correct?
4       **A   Just over three and-a-half years, yes.**
5       Q    And how many different districts have you
6   been assigned to?
7       **A   I've only been assigned to one.**
8       Q    And is that the 10th Police District?
9       **A   Yes.**
10      Q    And I would take it you have never been
11  subjected to any kind of discipline as a police officer
12  for the City of Chicago?
13          MR. POLICK:  Objection to the relevance, but you
14  can answer over the objection.
15          THE WITNESS:  I have.
16  BY MR. DE ROSE:
17      Q    You have been?  What was the nature of the
18  discipline, the kinds of things that you have been
19  disciplined for?
20          MR. POLICK:  Again, I'm going to object on the
21  grounds of relevance.  And to expedite matters, I'll
22  make a continuing objection on the grounds of relevance

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

13

1   to any questioning regarding discipline of this
2   officer.  You can answer over the objection.
3      MR. YAMIN:  And I object as to form.
4      THE WITNESS:  I was disciplined when I was
5   notified for court and I did not have the proper
6   uniform, proper attire, and I was disciplined by a
7   Supervisor when I worked in the 10th District by
8   mistakenly discharging a Taser.
9   BY MR. DE ROSE:
10     Q   And who was the Supervisor who disciplined
11   you for that second event?
12     **A   It was Lieutenant Serb (sic) is the one that**
13   **created the CR Report.**
14     Q   And can you tell us approximately when that
15   was?
16     **A   I don't recall approximately when it was.**
17     Q   When you discharged your Taser, did you
18   actually strike a person?
19     **A   No, I did not.**
20     Q   All right.  So you discharged it accidentally
21   under what kind of circumstances?
22     **A   The protocol is before you take a Taser out,**

14

1   **you test it and you point it to the ground so that**
2   **nobody else will be harmed in the event that there was**
3   **an accidental discharge.  So I pointed it to the ground**
4   **and it discharged into the ground.**
5     Q   And no one was injured in any way because of
6   that?
7     **A   No, they were not.**
8     Q   And approximately how long ago was that?
9     **A   Approximately almost two years ago,**
10   **approximately.  I'm not sure about the time.**
11     Q   Did you receive any kind of a suspension or
12   discipline as a result of this?
13     **A   I believe it's still pending.**
14     Q   Now, when did you receive your training for
15   the use of the Taser?
16     **A   Approximately, I would say two and-a-half**
17   **years, three years ago.**
18     Q   It was after you completed your initial
19   assignment in the Police Academy to become an officer?
20     **A   It was completed after my initial**
21   **probationary period, so it was after 18 months.**
22     Q   So did you go back to the Police Academy or

15

1   somewhere else?
2     **A   I went to another location for in-service**
3   **training.**
4     Q   And where was that?
5     **A   Near north.**
6     Q   And is that a branch of the Chicago Police
7   Department, or a private institution?
8     **A   No, it's a branch of the Chicago Police**
9   **Department; the tactical unit, the tactical and**
10   **training unit, that is their location.**
11     Q   And how long was your training on the use of
12   the Taser at that time?
13     **A   I believe it was only one day.**
14     Q   A full day?
15     **A   Eight hours.**
16     Q   And were there other Chicago police officers
17   in attendance at that eight-hour training session?
18     **A   Yes.**
19     Q   Were there officers from other departments
20   who were not with Chicago also in attendance?
21     **A   I can't recall that.**
22     Q   All right.  Were you in uniform when you were

16

1   receiving that training at the near north -- do they
2   call it the Near North Academy or anything?
3     **A   Training location.**
4     Q   All right.  At the Near North training
5   location --
6      MR. DE ROSE:  I forgot what I asked.  Would you
7   read it back, please?
8        (The question was so read
9        by the court reporter.)
10      THE WITNESS:  I don't remember.
11   BY MR. DE ROSE:
12     Q   Do you remember the name of your training
13   instructor?
14     **A   I do not.**
15     Q   Was it a male or female?
16     **A   It was a male.**
17     Q   Was it only one person who trained you, or
18   were there several different instructors?
19     **A   There were at least two.**
20     Q   And they were both males?
21     **A   Yes.**
22     Q   Did you know the rank or did you refer to

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

17

1  them as lieutenant or sergeant, the people who were
2  training you?
3      A   I don't recall.
4      Q   Have you ever seen the people who trained you
5  again after that one-day training?
6      A   I don't recall who it was, so I can't answer
7  that.
8      Q   Did you receive any kind of testing during
9  that one-day training by your instructors to see how
10 you were grasping what they were teaching?
11     A   Yes.
12     Q   Was it written testing or verbal testing
13 only?
14     A   It was a written test, as well as a scenario.
15     Q   All right.  The written test, was it a rather
16 lengthy or rather short written test?
17     A   I don't recall.
18     Q   Were you given a grade at the end of that
19 testing?
20     A   I don't recall if it was a grade or just
21 pass/fail.  I'm not sure.
22     Q   Were there other attendees at the training

18

1  session who you came to know did not pass the training
2  program?
3      A   I don't recall.
4      Q   All you know is you passed?
5      A   Correct.
6      Q   And after you passed that training, were you
7  given some kind of a certificate?
8      A   I believe so.
9      Q   And it was given to you personally to keep,
10 and a copy you believe went into your personnel file?
11     A   Correct.
12     Q   And subsequent to that --
13         By the way, prior to that training, you
14 had not ever been allowed to carry a Taser with you as
15 part of your uniform on your utility belt?
16     A   Correct.
17     Q   Subsequent to being advised that you
18 successfully completed that training, did you add a
19 Taser to your utility belt?
20     A   When a Taser was available, yes.
21     Q   All right.  So there were days when you would
22 go about your assignments for the City of Chicago

19

1  without being armed with a Taser?
2      A   Every district was allotted a certain amount
3  of Tasers, so when I would start my tour, sometimes
4  none were available for me to take.
5      Q   So there would be other officers on your tour
6  who would be armed with Tasers on those occasions?
7      A   On my tour or the tour preceding mine.
8      Q   But on your tour there was always some
9  officer or officers who were armed with Tasers?
10     A   Yes.
11     Q   Do you remember how many Tasers were
12 available in the 10th District over the approximately
13 three years that you have been one of the officers
14 using it?
15         MR. POLICK:  Object to the relevance, but you can
16 answer.
17         THE WITNESS:  In the ballpark of a dozen.
18 BY MR. DE ROSE:
19     Q   And do you have to sign out the Taser that
20 you're going to use at the beginning of your tour of
21 duty?
22     A   Yes.

20

1      Q   And there's a number on the Taser gun that
2  you record somewhere?
3      A   Yes, there's a model number.
4      Q   And where do you keep the record of what
5  model number you have on a particular date?  What kind
6  of a record is that?
7      A   There's a clipboard in the room where the
8  Tasers are stored and you fill those out, and I believe
9  the Watch Secretary, after that page is finished, will
10 give it to whichever Supervisor is there at the time.
11     Q   All right.  Are you told at the beginning of
12 the shift by your Shift Supervisor or your Watch
13 Commander whether you're going to be one of the
14 officers who is going to be equipped with a Taser on
15 that particular shift?
16     A   No.  Nobody is designated a Taser for any
17 particular shift.  You go there; if there's one
18 available and you want to take it you take it, you take it
19 out.
20     Q   So after your roll call you go in and check
21 and see if there are any Tasers available?
22     A   Correct.

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

21

1       Q    And I take it by your earlier answers, there
2    have been occasions when you went in before your tour
3    of duty started to see if there were any Tasers
4    available, and there just weren't any?
5       **A    Correct.**
6       Q    Do you notify your Watch Commander when you
7    are not able to arm yourself with a Taser?
8       **A    No.  It's up to you; if the next shift comes**
9    **and finishes their tour of duty, they place their Taser**
10   **back, you can then come into the station and sign out**
11   **the Taser.**
12      Q    All right.  I'm going to come back to some of
13   your training later.
14      **A    Okay.**
15      Q    But I want to start with the date of this
16   event.  And I want to start you out with July 22nd,
17   2011.  Do you have some recollection of your work that
18   day?
19      **A    Yes.**
20      Q    All right.  What shift were you working?
21      **A    I was working the Midnight shift.**
22      Q    And what are the hours of operation of the

22

1    Midnight shift?
2       **A    Anywhere -- I don't know whether our schedule**
3    **changed at that time or if it was something after, but**
4    **I knew we'd start between 9:00 and 10:30 to 6:00,**
5    **7:30 in the morning.**
6       Q    And you are assigned to a particular squad
7    car?
8       **A    I was.  Yes, I was personally signed to a**
9    **particular squad car.**
10      Q    And was it a two-man squad car?
11      **A    Yes, it was.**
12      Q    And who was your partner?
13      **A    Officer Guettler, G-u-e-t-t-l-e-r.**
14      Q    Had you ever worked with Officer Guettler
15   before the 22nd of July, 2011?
16      **A    Yes.**
17      Q    Was he your regularly-assigned partner?
18      **A    Yes.**
19      Q    Approximately for how long prior to that
20   time?
21      **A    I believe it was only for a matter of months.**
22      Q    And did he continue to be your partner after

23

1    the 22nd of July for additional months?
2       **A    Yes.**
3       Q    So all total, is he still your partner?
4       **A    No.**
5       Q    All right.  How long were you and Officer
6    Guettler partners?
7       **A    Approximately two years, maybe.**
8       Q    Did the two of you rotate and exchange the
9    obligation of driving the squad car, or did one of you
10   always drive it and the other one always sit in the
11   shotgun seat?
12      **A    No, we always rotated.**
13      Q    Approximately each day, or parts of the
14   particular shift?
15      **A    Normally every other day I would drive.**
16      Q    Do you remember if you were the driver or the
17   one in the shotgun position on the 22nd of July, 2011?
18      MR. POLICK:  Objection to the form.  You can
19   answer.
20      THE WITNESS:  I do not recall.
21   BY MR. DE ROSE:
22      Q    And when one is not the driver, when you have

24

1    the non-driving responsibility, are you the one who
2    will answer any calls from dispatch?
3       **A    That varies.**
4       Q    So even the driver may occasionally do that?
5       **A    Correct.**
6       Q    On the 22nd of July, what was the squad car
7    you were driving?  Was it a regularly-assigned car, or
8    any car that's in the lot?
9       **A    Regularly-assigned car.**
10      Q    And what is its number?
11      **A    I don't recall.**
12      Q    And so it had been a car that you were
13   familiar with for a period of time before that?
14      **A    We have used it before, yes.**
15      Q    All right.  Do you fill out some kind of a
16   form at the beginning of your shift that identifies the
17   particular squad car you are driving?
18      **A    Yes.**
19      Q    Now, I noticed that you were beat, I believe
20   it is 1011R; is that correct?
21      **A    That is correct.**
22      Q    And that will identify a particular vehicle

Pages 21 to 24

Stevan Vidljinovic
September 4, 2013

25

1  in the 10th District that you were driving that night
2  or riding in that night?
3      A   I know that we were driving a Crown Vic
4  vehicle.
5          I misunderstood you when you asked me
6  earlier.  When you said regular, I thought you meant
7  regular as in a blue and white, or another one as in an
8  unmarked.  I'm sorry.  Yes, we were in a marked
9  vehicle.
10     Q   But I can try to focus in on your particular
11  vehicle.  Is there a record that will tell us what that
12  particular vehicle is?
13     A   Yes.  There's an A & A that shows what
14  vehicle you take out on any given date.
15     Q   So when we see a beat number assigned to your
16  records in this case of 1011R, that will not
17  necessarily identify that vehicle?
18     A   It will just give you a number; it will not
19  specify what kind of vehicle.
20     Q   In the 10th District there are squad cars
21  that are assigned with video/audio equipment on them
22  when you make stops, are there not?

26

1      A   Yes.
2      Q   And if I understand it, the way the video/
3  audio equipment works is when you activate your
4  emergency or MARS light equipment, the video/audio
5  automatically goes into operation, correct?
6      A   Correct.
7      Q   Have you ever been assigned to a squad car in
8  the 10th District that had video/audio equipment?
9      A   Yes.
10     Q   Can you tell us how many squads in the 10th
11  District have that kind of equipment?
12     A   I cannot.
13     Q   Are there several?
14     A   I don't know any more.  At the time that
15  we're speaking of there were a few.
16     Q   And at the time we're speaking of, had you
17  and your partner, Officer Guettler, occasionally driven
18  such a car?
19     A   Yes.
20     Q   Do you know if on the 22nd of July, 2011 the
21  Crown Victoria that you were driving was equipped with
22  that equipment?

27

1      A   I don't recall.
2      Q   As I understand it, every shift was to have
3  the maximum number of video/audio equipped squad cars
4  in operation on the shift.  Is that your understanding?
5          MR. YAMIN:  Object to form.
6          MR. POLICK:  Join.  You can answer.
7          THE WITNESS:  Whatever vehicle that was available
8  for us at the beginning of our shift is a vehicle that
9  we can take out.  That doesn't necessarily mean that
10  they were equipped with audio equipment in there.
11  BY MR. DE ROSE:
12     Q   Would you say as many as half of the 10th
13  District squad cars were at the time of July, 2011
14  equipped with audio/video equipment?
15         MR. YAMIN:  Objection to foundation.
16         MR. POLICK:  Join.  You can answer over the
17  objection.
18         THE WITNESS:  Again, I can't give you a specific.
19  I know that there were a few.  I don't know
20  approximately how many.
21  BY MR. DE ROSE:
22     Q   But less than half of the vehicles, you

28

1  believe?
2          MR. YAMIN:  Same objection.
3          MR. POLICK:  Join in the foundation.  Objection.
4  You can answer.
5          THE WITNESS:  I do not know.  I don't know if it
6  was more than half or less.  There were a few.
7  BY MR. DE ROSE:
8      Q   Would you make a record when you start your
9  shift if you had a squad car that was equipped with
10  audio/video equipment?
11     A   Yes.
12     Q   So there would be some kind of a record of
13  whether your vehicle had such equipment, correct?
14     A   Correct.
15     Q   And when you start your shift, are you
16  supposed to test that equipment to make sure it's
17  operational before you take your vehicle out?
18     A   Yes.
19     Q   How do you test it?
20     A   You turn on the monitor that is inside, make
21  sure that the lens, the actual monitor is not cracked.
22  You check the recording device that you can put on your

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

29

1  vest or leave on the inside to make sure that they are
2  working properly just by turning them on and off. And
3  then if there's any footage prior to the shift before
4  you start, you download that footage so that you have
5  additional footage that if it needs to be recorded
6  while you are on your tour of duty.
7      Q   And if you find the particular audio/video
8  equipment on the unit you're working with to be
9  malfunctioning, you must immediately report that to
10 your Supervisor or Watch Commander, is that right?
11     A   You would report it to your immediate
12 Supervisor.
13     Q   Do you remember who your immediate Supervisor
14 was on 22nd July, 2011?
15     A   It was Sergeant Kearns.
16     Q   Had you worked with Sergeant Kearns before?
17     A   No. He was an acting sergeant from another
18 district that night.
19     Q   Do you know from what district he was
20 working?
21     A   The Eleventh District, just north of the 10th
22 District.

31

1      Q   And spell his name.
2      A   D-u-b-i-e-l.
3      Q   Did you yourself speak up at all during the
4  roll call or the preparation for your tour of duty
5  about any topic?
6      MR. YAMIN: Objection to form.
7      MR. POLICK: Join. You may answer.
8      THE WITNESS: I don't recall.
9  BY MR. DE ROSE:
10     Q   Do you remember whether Lieutenant Dubiel
11 gave you any special instructions in that roll call
12 meeting before you went out on your tour?
13     A   I don't recall.
14     Q   Was the beat assignment that you got that
15 night, was it confined to a particular geographic area?
16     A   Yes.
17     Q   What was the geographic area?
18     A   The geographic area to our beat, which is
19 1011, is Roosevelt to 15th Street are the north and
20 south borders. The west border stretches as far as
21 Kenneth. And the eastern border stretches to Central
22 Park.

30

1      Q   Had you ever worked with Sergeant Kearns
2  before that night?
3      A   He was never my immediate Supervisor, no.
4      Q   Do you know why he was, for lack of a better
5  word, on loan from the Eleventh District to be the
6  Supervisor of your shift that night?
7      MR. POLICK: Objection to the foundation. You can
8  answer over the objection.
9      THE WITNESS: Any number of reasons. Our
10 sergeants might have been on furlough and then we would
11 borrow one from another district. That's probably the
12 more general reason.
13 BY MR. DE ROSE:
14     Q   All right. Did Sergeant Kearns conduct your
15 roll call that evening before you went out on your tour
16 of duty?
17     A   Usually it's the Watch Commander that would
18 conduct the roll call. I do believe Sergeant Kearns
19 was present though.
20     Q   And the Watch Commander on the 22nd of July,
21 2011 was who?
22     A   Lieutenant Dubiel.

32

1      Q   Give me one second.
2          Had you ever been assigned to that
3  particular geographical area before that night?
4      A   Yes.
5      Q   Was that your regularly-assigned geographical
6  area?
7      A   Yes.
8      Q   And I take it already by that night Officer
9  Guettler had been your partner for a few months, so he
10 had also familiarity with that particular geographic
11 area?
12     A   Officer Gutrey, yes.
13     Q   I'm sorry. What did I call him?
14     A   Gutrey.
15     Q   And I'm not doing that to confuse you. You
16 correct me when I mispronounce.
17     A   That's fine.
18     Q   All right. And you started your tour of duty
19 actually on the street in that geographical area about
20 what time?
21     A   After roll call, roughly around 9:30.
22     Q   So you're out on the street by 9:30?

Pages 29 to 32

Stevan Vidljinovic
September 4, 2013

33

1    **A  Around that time, 9:30.**
2    Q  And your plan will be to keep your tour of
3  duty until about 6:00 A.M.?
4    **A  Correct.**
5    Q  And that means you'll be on the street from
6  9:30 to 6:30 A.M., unless any kind of an emergency
7  occurs?
8    **A  Well, we were assigned --**
9    MR. YAMIN:  Objection to the form.
10   MR. POLICK:  Join.  You may answer.
11   THE WITNESS:  We were assigned nine-hour days.  So
12  we had a half-hour lunch and the tour of duty usually
13  ended around 6:00.
14  BY MR. DE ROSE:
15    Q  All right.  Now, your broadcast equipment is
16  tuned in at all times to the Chicago Emergency Dispatch
17  Network?
18    **A  Yes.**
19    Q  While you're riding in your car?
20    **A  Yes, all the time.**
21    Q  And you can hear all the dispatches that are
22  being made by the Chicago Dispatch Center?

34

1    **A  Only the Chicago Police side.**
2    Q  So if a 911 dispatcher is communicating to
3  the Chicago Fire Department, those kind of messages are
4  not overheard on your equipment?
5    **A  No, they are not.**
6    Q  All right.
7    MR. DE ROSE:  Now guys, the numbers that I am
8  going to assign to these exhibits will be the same in
9  every depositions.  And for my purposes, the particular
10  numbers will be used throughout any proceedings, even
11  in trial.  So we don't have to kill too many trees.  If
12  you can bring them back, I'd appreciate it.  Otherwise,
13  we'll make sure we have a copy for you at every
14  deposition.
15   MR. POLICK:  Okay.
16   MR. YAMIN:  Thank you.
17  BY MR. DE ROSE:
18    Q  All right.  I want you first to look at
19  Exhibit 2B, and that is a Chicago Police Department
20  Event Query.  Have you ever seen this document before,
21  Officer?
22    **A  Yes.**

35

1    Q  And it looks like the address of occurrence
2  that this Query concerned is 2451 South Albany Avenue.
3  Do you see that?
4    **A  Yes.**
5    Q  And that is an area in the geographical area
6  that you and your partner were assigned to that night?
7    **A  No.**
8    Q  All right.  How far over is your geographical
9  beat assignment from this address?
10   **A  That's closer to Cermak and Albany, and we're**
11  **by, the closest point is Central Park and 15th.  So not**
12  **very close.**
13    Q  All right.  And it looks like the 911
14  dispatcher received this call on the 22nd of July at
15  03:21 hours, 3:21 in the morning.  Do you see that?
16   MR. POLICK:  I'll object to the foundation,
17  because you have not established he created this
18  document.  But you can go ahead and answer the
19  question.
20   THE WITNESS:  From reading this particular
21  document, it shows that the call did come in at
22  03:21 hours in the morning.

36

1  BY MR. DE ROSE:
2    Q  All right.  And you did not prepare this
3  document, did you?
4    **A  No, I did not.**
5    Q  All right.  But you will from time to time in
6  your practice as a police officer, you do see these
7  kind of Event Queries, don't you?
8    **A  Yes.**
9    Q  All right.  Now, then it indicates that the
10  dispatcher entered this information into its system at
11  3:27 in the morning.  Do you see that?
12   MR. POLICK:  Again, I'll object to the foundation,
13  but you can answer over the objection.
14   THE WITNESS:  I don't know the protocol on how
15  they enter information.  All I see is that at 3:27 the
16  activity shows entry.
17  BY MR. DE ROSE:
18    Q  You don't know if that means that
19  communication came over the Chicago Police Department
20  radios at that time, talking about this event?
21    **A  I do not know.**
22    Q  All right.  And then at the same time they've

Pages 33 to 36

Stevan Vidljinovic
September 4, 2013

37

1    got an abbreviation there of further activity of ADVD.
2    Do you know what that means?
3        MR. POLICK: Again, object to the foundation. You
4    may answer.
5        THE WITNESS: I do not.
6    BY MR. DE ROSE:
7        Q    All right. And then again at the same hour
8    it looks like they make some remarks that there was a
9    wireless call, Spanish 9359, of a 40-year old male
10   having chest pains. And NFI, I suppose means no
11   further information.
12           When you read this document, did you know
13   how to interpret these particular entries?
14       MR. POLICK: Again, I'm going to object to the
15   foundation, first as to when he first saw the document,
16   and then again because he did not prepare this
17   document, there's no foundation for the answer. So you
18   may answer over those objections though.
19       THE WITNESS: I know some of the terminology
20   that's used because it's used the same for when we get
21   a job dispatched to us in particular. Like NFI does
22   mean no further information.

38

1           Other than the wireless call and Spanish
2    on the document, I don't know how it's prepared.
3    BY MR. DE ROSE:
4        Q    All right. Do you know what the numbers 9359
5    after the word Spanish mean?
6        MR. POLICK: Again, I object to the foundation.
7    You may answer.
8        THE WITNESS: I do not.
9    BY MR. DE ROSE:
10       Q    All right. But in any event, at some time
11   that morning, do you remember hearing over the air
12   before you had any involvement in the case a
13   communication that there was a 40-year old male having
14   chest pains at 2451 South Albany Avenue?
15       MR. POLICK: Object to the foundation. You may
16   answer.
17       THE WITNESS: I don't recall.
18   BY MR. DE ROSE:
19       Q    Do you monitor all calls or kind of have your
20   ear attuned to hear a call concerning your beat car
21   that you obviously do listen very carefully to?
22       MR. YAMIN: Objection, form.

39

1        MR. POLICK: Join in the objection. You may
2    answer.
3        THE WITNESS: All calls are classified with
4    priority. If it's directed towards my beat, we respond
5    to that call. If it's somewhere within the parameters
6    of our beat; for example, if a police officer needs
7    assistance, we'll respond to that call. Geographic
8    limitation doesn't come into play then.
9    BY MR. DE ROSE:
10       Q    But I know that the dispatchers are kind of
11   talking on the air just about your entire shift, aren't
12   they?
13       MR. POLICK: Object to the form. You may answer.
14       MR. YAMIN: Same.
15       THE WITNESS: Depending on how busy that night is
16   is how frequent the dispatchers talk over the radio.
17   BY MR. DE ROSE:
18       Q    And when they are talking almost incessantly
19   and it is not about matters that concern your beat or
20   close proximity to your geographic area, is it fair to
21   say you gentlemen are trained to kind of tune it out
22   until you hear something that's close to your area?

40

1        MR. YAMIN: Objection to form.
2        MR. POLICK: Same objection. You may answer.
3        THE WITNESS: That's incorrect.
4           We listen to the radio. And like I said,
5    every job is classified with a level of priority. And
6    if that level of priority garners us to go and assist
7    another police officer, or if it's surrounding our beat
8    and we can help out, especially if it's busy, we will
9    go.
10   BY MR. DE ROSE:
11       Q    All right. In looking at Exhibit 2B, that
12   does not tell you how this initial call was being
13   classified; is that correct?
14       MR. POLICK: Again, object to the foundation. But
15   you may answer.
16       THE WITNESS: Well, on the document it shows a
17   priority 1A.
18   BY MR. DE ROSE:
19       Q    I'm sorry, I don't know. Where are you
20   looking?
21       A    Between the date and DG, which I believe is
22   district given, it says PRI which stands for priority,

Pages 37 to 40

Stevan Vidljinovic
September 4, 2013

41

1    **and 1A which is the highest priority.**
2    Q   So it was a high priority event, right?
3    **A   Correct.**
4    Q   So if this communication went over the air at
5    3:21 in the morning, this being of the highest priority
6    and it looks like it's an area in the geographic
7    location immediately next to your area, were you paying
8    particular attention to the information that will go on
9    concerning this?
10   MR. POLICK:  Object to the form.  It's a
11   hypothetical.  And to foundation.  You may answer.
12   MR. YAMIN:  Join in those objections.
13   THE WITNESS:  Regarding this particular exhibit in
14   front of me, this particular call, it looks like it was
15   dispatched to a fire, a Chicago fire.  For station I
16   would say an ambulance or an engine.  I don't recall at
17   this particular call.  And it was not in my immediate
18   area.
19   BY MR. DE ROSE:
20   Q   All right.  So although it says Chicago
21   Police Department, from what you're reading here, this
22   would have been, because we see a CFD 112030210, that

42

1    this was a call that probably didn't even go over your
2    communications network at the time; is that correct?
3    MR. POLICK:  Again, object to the foundation, but
4    you may answer.
5    THE WITNESS:  Again, I don't know how they
6    dispatched the calls and the terminology that's used.
7    What I can see on this particular Exhibit 2B is that
8    the only person I see receiving the call is CFD.  I see
9    no mention of CPD.
10   BY MR. DE ROSE:
11   Q   All right.  Well, we see a service beat right
12   over from the priority and that's 1033.  That's a squad
13   car in the 10th District, isn't it?
14   MR. POLICK:  Again, object to the foundation.  You
15   can answer.
16   THE WITNESS:  I don't know if they just mean if
17   that's just a particular beat that the occurrence is
18   happening.  I don't know whether that's a dispatch to
19   that particular squad car.
20   BY MR. DE ROSE:
21   Q   All right.  And who was manning squad car
22   1033, I believe it was 1033R that night?

43

1    **A   1033 Robert was manned by Officer Alamillo.**
2    **I might mispronounce his name.  It's A-l-a-m-i-l-l-o.**
3    **And also Officer Valdovinos, V-a-l-d-o-v-i-n-o-s.**
4    Q   Had you ever worked on the same beat with
5    those two officers prior to July 22nd?
6    **A   Normally only two people are assigned to**
7    **beats.  So to my recollection, I have never worked with**
8    **them on a beat.**
9    Q   I guess I mean had you ever worked with them
10   on the same shift prior to that event?
11   **A   Yes.**
12   Q   Were they regularly following the same kind
13   of a shift pattern as you were as of July 22nd, 2011?
14   **A   I can't speak for them.  I don't recall.**
15   MR. YAMIN:  Objection, foundation.
16   MR. POLICK:  The answer can stand.  Same
17   objection.
18   MR. DE ROSE:  Kaitlin, would you give them Exhibit
19   2G?
20   MR. POLICK:  John, before you get to that exhibit,
21   can we take a short bathroom break?
22   MR. DE ROSE:  Of course.

44

1    MR. POLICK:  Thank you.
2    (There was a break taken, after
3    which the deposition was resumed
4    as follows:)
5    BY MR. DE ROSE:
6    Q   Officer, looking at 2B and that priority of
7    1A, it looks like it's a call about a 40-year old male
8    having chest pains.  Do you know why they gave that a
9    high priority?
10   MR. POLICK:  Again, object to the foundation.  He
11   did not prepare this document.  You can answer over the
12   objection.
13   THE WITNESS:  Again, I don't know why they
14   particularly gave this particular document a 1A.  I
15   don't prepare it.  And there's a call-taker that
16   decides who should be dispatched to call.
17   BY MR. DE ROSE:
18   Q   All right.  Now I want you to look at this
19   2G.  Now this is again a Chicago Police Department
20   Event Query, and now they've got that same 1A priority
21   on this document.  Do you see it?
22   **A   I do.**

Pages 41 to 44

Stevan Vidljinovic
September 4, 2013

45

1      Q   All right.  So it appears that the Chicago
2  Police Department actually put that in their system as
3  a high priority?
4      MR. POLICK:  Again, object to the foundation.  You
5  may answer.
6      THE WITNESS:  Again, I don't know how they prepare
7  it.  Both documents look the same.
8  BY MR. DE ROSE:
9      Q   But if you look down under the service beat,
10  it says occurrence beat 1033 and service beat 1033.  So
11  this is a priority for the police department also, if
12  you know?
13      MR. POLICK:  Again, object to the foundation.  You
14  may answer.
15      THE WITNESS:  I do not know.
16  BY MR. DE ROSE:
17      Q   All right.  Let's go back to Exhibit 2C.
18      And when we're done, Officer, you'll give
19  all your exhibits, you just make a stack of them, to
20  the court reporter.  The lawyers are going to keep
21  theirs.  They've got their copy.  And I will talk to
22  you about it.

46

1      A   Understood.
2      Q   Now, did you review this particular Event
3  Query at any time in your life before today?
4      A   Yes.
5      Q   Now, this is clearly an Event Query that is
6  going over the police dispatch ban that you're
7  receiving in your squad car?
8      MR. POLICK:  Again, object to the foundation, but
9  you can answer.
10      THE WITNESS:  Again, I don't know how they prepare
11  it, but from looking at this exhibit, it looks like
12  it's directed towards police.
13  BY MR. DE ROSE:
14      Q   All right.  And you'll see at the top, again,
15  it's priority 1A, right?
16      A   Correct.
17      Q   And DG must be district.  What's the G for?
18      MR. POLICK:  Again, object to the foundation.  You
19  may answer.
20      THE WITNESS:  Again, I don't know.  I can only
21  speculate that it stands for district given which is
22  the 10th.

47

1  BY MR. DE ROSE:
2      Q   And that is your district, right?
3      A   That is the district I was working that
4  night, yes.
5      Q   And it says service beat 1033, and then
6  disposition or DISP.  What does that stand for?
7      MR. POLICK:  Again, object to the foundation.  You
8  may answer.
9      THE WITNESS:  From my experience, every dispatcher
10  gives a disposition for every call that they dispatch
11  out to the police officers.
12  BY MR. DE ROSE:
13      Q   All right.  Can you tell from this document
14  who is the dispatcher who is making these entries?
15      A   No, I can't.  From this document it looks
16  like it's at least two different dispatchers.
17      Q   And where are you picking up the identifica-
18  tion of the two dispatchers?
19      A   Well, if you look at the event chronology,
20  you have a column labeled date.  Next to it is
21  activity.  Next to it is work station.  Work station is
22  where you find the dispatcher work station.  Police

48

1  Department 41 and Police Department 40 are our
2  dispatchers for our zone.
3      And then there's actually a third one that
4  I recognize just by knowing the terminology that Fire
5  Department 87 is the initial work station.
6      Q   So let's go down to Police Department 41 and
7  40.  The first time we see it, it looks like the
8  dispatcher put out a call at 3:39.  Do you see that?
9      MR. POLICK:  Again, object to the foundation.  You
10  can answer.
11  BY MR. DE ROSE:
12      Q   To the 10th District?
13      A   Again, I don't know how they prepare it and
14  when they receive the calls and when they dispatch
15  them, if the times are correct.  But from just looking
16  at Exhibit 2C at 3:39, it looks like the call was
17  dispatched by PD41.
18      Q   And if that's so, the Fire Department had
19  been dispatched, by the documents we looked at earlier,
20  at least 10 or 15 minutes earlier, weren't they?
21      MR. POLICK:  Again, object to the foundation.  You
22  may answer.

Pages 45 to 48

Stevan Vidljinovic
September 4, 2013

49

1      MR. YAMIN:  Same objection.
2      THE WITNESS:  I don't recall when the fire was
3  dispatched and how they were dispatched, just because I
4  don't know the workings of being an OEMC dispatcher.
5  All I can tell you is that from reading this document,
6  that at 3:39 a police dispatcher 41 did dispatch the
7  call to a police officer.
8  BY MR. DE ROSE:
9      Q   And that officer was on beat 1033R, and those
10  were the two officers you identified earlier as -- who
11  were they again?
12     A   Officer Alamillo and Officer Valdovinos.
13     Q   All right.  When they get dispatched at that
14  point, can you hear that they are being dispatched?
15     A   Yes.  Normally you can hear when a police
16  officer is dispatched to a job.
17     Q   Do you remember what kind of a response they
18  made when they got dispatched?
19     MR. POLICK:  Again, object to the foundation.  You
20  may answer.
21     THE WITNESS:  I can't speak for Officer Alamillo
22  or Valdovinos.

50

1  BY MR. DE ROSE:
2      Q   All right.  But it looks like they
3  acknowledged the call just seven seconds later, do you
4  see that, at 3:39 and .18 seconds?
5      MR. POLICK:  Object to the foundation.  You may
6  answer.
7      THE WITNESS:  Again, I don't know how this
8  document is prepared, but just by reading it, an
9  activity of acknowledgment is shown at 3:39 by beat
10  1033 Robert.
11  BY MR. DE ROSE:
12     Q   Do you remember hearing that acknowledgment
13  that night?
14     A   I don't recall hearing the acknowledgment.
15     Q   All right.  Now let's look just a little bit
16  further.  About two minutes later, it looks like beat
17  1033R made a request over the police radio.  Do you see
18  that?
19     A   Yes, I do.
20     Q   All right.  Now, had you heard anything going
21  over the radio during those intervening two minutes
22  from 3:39 to 3:41 that you remember at all?

51

1      A   I don't recall.
2      Q   All right.  And he put in, that beat 1033 put
3  in a request for a Taser, didn't they?
4      MR. POLICK:  Again, objection to the foundation,
5  but you may answer.
6      THE WITNESS:  From reading the document, it looks
7  like beat 1033R requested a Taser at 3:41 in the
8  morning.
9  BY MR. DE ROSE:
10     Q   Do you remember hearing that request?
11     A   I recall hearing a request for a Taser.
12     Q   And did you recognize the name of the officer
13  or the voice of the officer who was communicating that
14  request?
15     A   I don't specifically remember if I recognized
16  the voice of the officer requesting the Taser.
17     Q   When you heard the request for a Taser, you
18  had a Taser on you that night, didn't you?
19     A   Yes, I was equipped with a Taser that night.
20     Q   Do you know if there were other officers in
21  the 10th District in the geographical area where the
22  officer was making the request who were also armed with

52

1  Tasers?
2      A   I can't speak for other officers.  I know I
3  was specifically equipped with a Taser that night.
4      Q   All right.  And when you hear the request for
5  a Taser, do you automatically go to any location in the
6  10th District, or you've got to wait for an assignment
7  to go to the location?
8      A   Normally, when an officer requests a Taser,
9  that generally means that they need assistance, and
10  then geographic limitations don't apply.
11     Q   All right.  So having heard that, if nobody
12  specifically had requested you, you would go to that
13  location if you were not otherwise engaged, right?
14     A   Not knowing if anybody else was equipped with
15  a Taser that night, and knowing that I was, if an
16  officer was requesting a Taser, I would go.
17     Q   All right.  Do you remember what you were
18  doing when you heard the request for a Taser?
19     A   Specifically, no, I don't recall.
20     Q   But you do remember that you dropped whatever
21  you were doing and went to the location, correct?
22     MR. POLICK:  Objection to the form.  You may

Pages 49 to 52

Stevan Vidljinovic
September 4, 2013

53

1    answer.
2        THE WITNESS:  Yes.
3    BY MR. DE ROSE:
4        Q   All right.  And I don't know if we
5    established this yet, but who was driving your squad
6    car that night, you or your partner?
7        MR. POLICK:  Asked and answered.  You may answer
8    again.
9        THE WITNESS:  I don't recall who was driving.
10   BY MR. DE ROSE:
11       Q   So we look at the next entry and it concerns
12   your vehicle and we see now this is just four seconds
13   after he makes the request, there is a note of an
14   assist by 1011R; that's your squad car, right?
15       A   Yes.  On that given night that was our squad
16   car, yes.
17       Q   So do you remember receiving an actual
18   assignment over the air just four seconds later saying
19   you go to that one, 1011R?
20       A   I don't remember receiving the specific
21   assignment to go there.
22       Q   And you do not remember if you or your

54

1    partner communicated with the dispatcher about going to
2    that location, do you?
3        A   I do not remember.
4        Q   And there is an acknowledgment at 3:42 in the
5    morning, 3:42 and 11/10ths seconds.  The acknowledgment
6    is by your squad car.  Do you see that?  So that's
7    about a minute later.
8        A   Yes.
9        Q   All right.  So seeing that, you would not
10   dispute that either you or your partner got on the air
11   and said we acknowledge the call, we're on our way?
12       A   Again, I don't know whether he went over the
13   air or he went through the PDT to say that we were
14   responding to the call.  I don't know the nature of how
15   we responded, but it shows that we did acknowledge it
16   at 3:42.
17       Q   And when you said the PDT, what's that?
18       A   That's a computer terminal that's equipped in
19   every, mostly in every squad car.  Some squad cars do
20   not have it.
21       Q   So I take it on the morning of July 22nd, you
22   and your partner were on your way at that point for

55

1    2451 South Albany Avenue; is that correct?
2        A   We were on our way to that location when a
3    Taser was requested.
4        Q   And how long does it take you from your
5    geographical responsible area to get over to that area?
6        MR. YAMIN:  In general?
7        MR. DE ROSE:  Yes.
8        MR. YAMIN:  Then objection to the form.
9    BY MR. DE ROSE:
10       Q   Well, let's say that night?
11       A   That depends on the time of day.  At 3:41
12   when a Taser was requested, at 3:41 in the morning,
13   traffic is relatively light, so it would not take long
14   at all.
15       Q   And when you got a call like that, and you
16   already indicated it seems to indicate to you an
17   officer needs assistance, I would take it you would
18   activate your emergency equipment to get from whatever
19   you were doing over to that address on Albany?
20       A   Correct.
21       Q   So if you had video equipment in the car,
22   once you activated your emergency equipment, your

56

1    video/audio recording equipment was automatically
2    activated, wasn't it?
3        MR. POLICK:  Again, object to the foundation.  It
4    assumes facts not in evidence.  But you may answer over
5    the objection.
6        MR. YAMIN:  Also object to form.
7        THE WITNESS:  I don't recall if we did have
8    equipment equipped in our vehicle.  But normally, yes,
9    if you do activate your emergency equipment, if you do
10   have equipment, that equipment will be activated.
11   BY MR. DE ROSE:
12       Q   And you are trained that you're not supposed
13   to turn off the video/audio equipment until after the
14   assignment is completely done, are you not?
15       MR. POLICK:  Objection to the form.  You may
16   answer it.
17       THE WITNESS:  Yes, you're supposed to keep it
18   recording.
19   BY MR. DE ROSE:
20       Q   And are you told that if you turn it off
21   before you complete the particular call or assignment,
22   you have to fill out certain paperwork and explain why

Pages 53 to 56

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

---

57

1  you turned it off?
2      A  I don't recall if you have to fill out
3  certain paperwork if you turn it off prematurely.  I
4  know that if I do have it equipped in my car, I never
5  turn it off prematurely, so I've never had to deal with
6  that.
7      Q  All right.  The Supervisor working that
8  night, the Sergeant, the Sergeants' cars, they have
9  video equipment and audio recording equipment also,
10  don't they?
11      MR. POLICK:  Objection to the foundation.  You may
12  answer.
13      THE WITNESS:  Some do, some don't.
14  BY MR. DE ROSE:
15      Q  Do you know if Sergeant -- I forgot his last
16  name.
17      A  Kearns.
18      Q  Did Sergeant Kearns' vehicle have video/audio
19  equipment on it that night?
20      A  I can't answer for Sergeant Kearns.  I don't
21  know whether his vehicle had video/audio equipment
22  equipped.

---

58

1      Q  And as you went to that location, you saw and
2  heard other squad cars arriving at the location, didn't
3  you?
4      A  I don't recall if I heard other squad cars
5  arriving at that location.
6      Q  But you saw other squad cars arriving?
7      A  When I arrived at the location, I saw
8  1033 Robert.  I don't recall seeing anybody else.
9      Q  So you believe you got there before Sergeant
10  Kearns?
11      A  I don't recall seeing Sergeant Kearns.  I
12  can't answer whether I got there before or after.  All
13  I know is initially when I arrived on scene at 2451
14  South Albany, I don't recall seeing Sergeant Kearns.
15      Q  Is it fair to say by that answer, you don't
16  recall seeing Sergeant Kearns on the scene at all that
17  night?
18      MR. POLICK:  Objection.  Misstates the witness's
19  testimony.  You may answer over the objection.
20      THE WITNESS:  The question was asked whether I saw
21  other squad cars.  I answered initially when I arrived
22  on scene, I don't recall seeing Sergeant Kearns.

---

59

1  BY MR. DE ROSE:
2      Q  All right.  But sometime after you arrived on
3  the scene and closely in time to your arrival on the
4  scene, you saw other squad cars arrive, did you not?
5      MR. YAMIN:  Objection to the form.
6      MR. POLICK:  Join.  You may answer.
7      THE WITNESS:  I don't know specifically what squad
8  cars, but I do know that there were a couple other
9  squad cars there.
10  BY MR. DE ROSE:
11      Q  And where did you situate your squad car when
12  you got to the scene?
13      A  I don't know.  I don't recall.
14      Q  Do you remember seeing Sergeant Kearns there
15  when you got to the scene?
16      MR. POLICK:  Objection.  Asked and answered.  You
17  may answer over the objection.
18      THE WITNESS:  Throughout the duration of the
19  actual event, from when we arrived to the moment that
20  we left, I recall seeing Sergeant Kearns.
21  BY MR. DE ROSE:
22      Q  And on the scene while you were there, do you

---

60

1  recall seeing Officer Valenzuela?
2      A  Yes.
3      Q  Do you recall seeing Officer Gonzalez?
4      A  Yes.
5      Q  Do you recall seeing Officer Valdovinos?
6      A  Yes.
7      Q  Do you recall seeing Officer Alamillo?
8      A  Yes.
9      Q  Do you recall seeing Officer DeMonica?
10      A  I do not recall.
11      Q  Do you recall seeing Officer Lopez?
12      A  I do not recall.
13      Q  And you do recall seeing Sergeant Kearns?
14      A  Yes.
15      Q  And how about Watch Commander Lieutenant
16  Robert Dubiel?
17      A  I do not recall.
18      Q  All right.  So can you estimate how long it
19  took you from the time you got the call until the time
20  you actually stepped out of your squad car at the
21  location?
22      A  By the time that we received the call for the

---

Pages 57 to 60

Stevan Vidljinovic
September 4, 2013

---

61

1  request for a Taser to the time that we actually exited
2  our vehicle, a matter of minutes, a couple minutes.
3      Q   A couple of minutes?
4      A   Roughly.
5      Q   All right.  Now, when you arrived on the
6  scene, there was a fire truck there, wasn't there?
7      A   I don't recall seeing a fire truck.
8      Q   Did you actually go to the address 4551 South
9  Albany?  Is that the address you were going to?
10     MR. YAMIN:  I think you misstated the address,
11 just so the record is clear.
12     THE WITNESS:  Yes.
13     MR. DE ROSE:  Excuse me.  Counselor, you're
14 absolutely right.
15     MR. YAMIN:  Just so it's clear.
16     MR. DE ROSE:  I withdraw the question or strike
17 the question.
18 BY MR. DE ROSE:
19     Q   You went to the location 2451 South Albany
20 Avenue?
21     A   That's where we went, to 2451 South Albany.
22     Q   And what kind of a building is located there?

---

62

1      A   It's mainly residential apartment buildings.
2      Q   Was it an apartment building or just a
3  single-family residence?
4      A   Speaking of 2451 South Albany in particular?
5      Q   Yes.
6      A   I don't recall.  I know that when we
7  responded, we responded to the area of 25th and Albany,
8  the intersection.
9      Q   So you were only going to the general area of
10 that block?
11     A   Well, the location shows that it is closer to
12 25th Street, so our route to get there to assist beat
13 1033 Robert was to take 25th Street from Kedzie.
14     Q   Is it fair to say you cannot picture in your
15 mind now what the building located at the address 2451
16 South Albany looks like?
17     A   Yes.  I don't recall what 2451 South Albany
18 looks like in particular.
19     Q   All right.  So when you got there to that
20 scene, do you remember seeing a Fire Department
21 ambulance?
22     A   I don't recall whether I -- I don't recall

---

63

1  when I saw the ambulance.  I know that throughout the
2  duration while I was on scene, I did see an ambulance.
3  I just don't know when.
4      Q   All right.  And you say you don't recall
5  seeing a big red fire truck there, though, with men,
6  firemen?
7      MR. YAMIN:  Objection.  Misstates his testimony.
8      MR. POLICK:  Same objection.  You may answer over
9  the objection.
10     THE WITNESS:  I don't recall seeing a fire truck.
11 BY MR. DE ROSE:
12     Q   Do you recall seeing firefighters, five or
13 six firefighters in firefighter equipment, on the
14 scene?
15     A   I don't recall seeing firefighters on the
16 scene with equipment.
17     Q   All right.  Do you recall seeing any
18 paramedics on the scene?
19     A   Throughout the duration while I was on the
20 scene, I did see paramedics; I just can't pinpoint what
21 time.
22     Q   And how many paramedics did you see on the

---

64

1  scene?
2      A   I believe there were two paramedics at the
3  scene.
4      Q   Were they in uniform?
5      A   They were in Chicago Fire Department Polo's
6  and slacks, regular attire for paramedics for the
7  Chicago Fire Department.
8      Q   So that's like the uniform for paramedics?
9      A   Correct.
10     Q   Do you remember, were they both female, both
11 male?
12     A   I don't recall the gender.
13     Q   All right.  When you first arrived on the
14 scene, did you talk to any of the paramedics?
15     A   I don't recall speaking with any paramedics
16 when I first arrived on scene.
17     Q   All right.  Sometime during the night did you
18 have any conversation with any of the paramedics?
19     A   I don't recall having a conversation with the
20 paramedics.
21     Q   Any of them that night?
22     A   I don't recall.

---

Pages 61 to 64

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

65

1      Q   Did you learn the identity of the paramedics,
2  the names of who they were?
3      MR. POLICK:  Objection to the form.
4         John, you mean does he know now, or did he
5  know back then?
6      MR. DE ROSE:  Yes.
7  BY MR. DE ROSE:
8      Q   Have you learned their names or their
9  identity?
10     A   I don't know the names of the paramedics.
11     Q   So is it fair to say you never learned the
12  paramedics' names that night and don't remember asking
13  for any identification or identifiers of them at all
14  that night?
15     A   That night, correct, I do not recall.
16     Q   And you don't know if you've ever met those
17  paramedics again after that?
18     A   If I can't recall them on scene, I don't know
19  whether I would have met them later.
20     Q   All right.  So when you first got on the
21  scene, where did you go?
22     A   I believe I approached Officer Alamillo, who

66

1  was one of the two people that were on 1033 Robert that
2  requested the Taser.
3      Q   And you recognized him right away, right?
4      MR. POLICK:  Object to the form.  You may answer.
5      THE WITNESS:  Correct.
6  BY MR. DE ROSE:
7      Q   And you know he was one of the two officers
8  in squad car 1033?
9      A   Yes, he was one of the two in 1033R squad
10  car.
11     Q   And when you approached him, where were you
12  physically located, the two of you?
13     A   I don't recall.
14     Q   Did your partner go with you as you
15  approached Alamillo?
16     A   I don't recall.
17     Q   All right.  So had you and your partner
18  developed any kind of a plan of action as you were
19  driving over to the scene?
20     MR. YAMIN:  Objection.
21     MR. POLICK:  Join.  You may answer.
22     THE WITNESS:  All we know is that while responding

67

1  to the scene, en route, we knew that they needed a
2  Taser.  We would talk to the officer that requested a
3  Taser, and then we would take it from there.
4  BY MR. DE ROSE:
5      Q   All right.  Was your partner also armed with
6  a Taser that night?
7      A   Normally only one car was allowed one Taser.
8  So he was not.
9      Q   So if you had it, he did not have it; we can
10  be pretty sure of that?
11     A   Yes.
12     Q   By the way, does he have occasion when he
13  wears the Taser and you don't?
14     A   At that time, no.
15     Q   He wasn't authorized to carry a Taser at that
16  time?
17     A   I do not believe he took the class.
18     Q   Has he since taken the class and now
19  authorized to do that?
20     A   I can't speak for him.  I don't know.
21     Q   All right.  When you walked up to Officer
22  Alamillo, was he standing there alone, wherever there

68

1  was?
2      A   I don't recall who Officer Alamillo was
3  standing with, if he was standing with anybody or
4  alone.
5      Q   All right.  What did you say to him and what
6  did he say to you?
7      A   A generalization of the conversation?
8  Because I don't know verbatim what we spoke about.  I
9  know that through past experiences, if somebody were to
10  request police assistance and if it asked for a Taser
11  specifically, I would go over there, ask him what do
12  you need a Taser for; he would give me a general
13  synopsis of the events that occurred.
14     Q   So you think you asked him that night what do
15  you need a Taser for?
16     A   It's safe to say I probably did ask him that
17  night.
18     Q   And was he in contact with any person at that
19  moment, grappling with anyone?
20     A   I do not recall.  I do not believe so.
21     Q   You think you would remember if he was
22  grappling with someone as you walked up to him, don't

Pages 65 to 68

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

69

1  you?
2      MR. YAMIN:  Object to form.
3      MR. POLICK:  Join in the objection.  You can
4  answer.
5      THE WITNESS:  I don't recall if he was in contact
6  with anybody.
7  BY MR. DE ROSE:
8      Q   So when you asked him what do you need a
9  Taser for, what did he tell you?
10     **A   Not verbatim, but the initial call was assist**
11  **a CFD for apparent drug overdose.  And he directed me**
12  **toward the subject in question that was having the**
13  **apparent drug overdose.**
14     Q   And when he directed you towards this person,
15  was he suggesting to you that you were to use your
16  Taser on this person?
17     **A   No.  It was just a tool that he would like to**
18  **have in case we did need it, but our whole objective**
19  **was to get him medical assistance, which was to**
20  **peacefully escort him to the ambulance which would**
21  **transport him to a hospital.**
22     Q   Well, did Officer Alamillo, did he tell you

70

1  that the person had already verbalized that he did not
2  want any help from the Chicago Fire Department or its
3  paramedics?
4      **A   I can't speak for Officer Alamillo,**
5  **specifically.  All I know is that during my interaction**
6  **with Mr. Lopez, he was incoherent, incomprehensible,**
7  **and I could not make out anything that he was saying.**
8      Q   All right.  So you yourself, before you took
9  any action, did you talk to anybody on the scene to
10  determine, other than Officer Alamillo, if this
11  individual was refusing medical attention?
12     MR. YAMIN:  Objection as to if he took any action.
13     MR. POLICK:  Join.
14  BY MR. DE ROSE:
15     Q   Did you try and talk to anyone to say what's
16  going on?
17     MR. POLICK:  Object to the form.  You can go ahead
18  and answer.
19     THE WITNESS:  I believe I only spoke to Officer
20  Alamillo.  I don't believe I spoke to anybody else on
21  scene.  I don't recall speaking to anybody else on
22  scene.

71

1  BY MR. DE ROSE:
2      Q   I take it that he did not tell you this man
3  had verbalized already that he was refusing any medical
4  attention?
5      MR. POLICK:  Objection.  Assumes facts not in
6  evidence.  You may answer over the objection.
7      THE WITNESS:  Again, I can't speak for Officer
8  Alamillo.  I do not know the conversation that he had
9  with Mr. Lopez.
10  BY MR. DE ROSE:
11     Q   Did you ask Officer Alamillo, has the man
12  refused medical attention?
13     **A   Generally when I come on scene, if it's an**
14  **officer that needs assist, I will go to the officer**
15  **that requested the assist and ask him what he needs an**
16  **assist for.  He said this individual, Mr. Lopez, was**
17  **apparently, apparently he was having a drug overdose.**
18  **The CFD needed to place him in the**
19  **ambulance to transport him to a hospital.  He was**
20  **incoherent.  And our whole objective was to try to**
21  **peacefully try to place him in the ambulance and**
22  **transport him to a hospital so he could receive medical**

72

1  **attention.  That was our objective.**
2      Q   Did you ask Officer Alamillo how he made the
3  determination that this man was suffering from a drug
4  overdose?
5      **A   Officer Alamillo didn't make that**
6  **determination; it was the call that was dispatched to**
7  **Officer Alamillo initially.**
8      Q   So someone on the dispatch told him that this
9  was an overdose victim?
10     **A   Looking at Exhibit 2C, fire dispatcher 87**
11  **from the work station said that they need CPD for drug**
12  **overdose.  That's when they dispatched the call to**
13  **1033R, which is Officer Alamillo and Officer**
14  **Valdovinos.**
15     Q   At any time that night did you determine how
16  someone determined that this was for a drug overdose?
17     **A   Again, I don't know the workings of OEMC and**
18  **dispatchers and how they present documents.  All I know**
19  **is that an officer requested a Taser and assistance,**
20  **and I responded.**
21     Q   All right.  Well, let me show you one other
22  exhibit for a moment.  And you can keep that one there,

Pages 69 to 72

Stevan Vidljinovic
September 4, 2013

73

1 because we'll need it.
2    **A   Okay.**
3    Q   14B. Officer, I put before you Plaintiff's
4 Exhibit 14B and it looks like a Special Order of the
5 Chicago Police Department Regarding Alcohol and Drug
6 Dependent Persons. Have you ever seen this Special
7 Order before?
8    **A   Yes.**
9    Q   When Special Orders come out, do you have
10 your own book of all the Special Orders of the police
11 department?
12    **A   They are accessible on-line.**
13    Q   And from time to time you have course study
14 in these different Special Orders and how they affect
15 your operations and work as a police officer?
16    **A   From time to time, yes.**
17    Q   Now, this Order is a rather old one. It goes
18 all the way back to July of 1992. Do you see that?
19    **A   Yes. That's the effective date.**
20    Q   And I want you to look with me at Paragraph
21 2B. And I want to read into the record, and I'm going
22 to -- yes, let me read it into the record and then

74

1 we'll have some questions for you.
2         It says, "Persons who, in the professional
3 judgment of the police officer, are identified as being
4 intoxicated in a public place and who may present a
5 danger to themselves or others and who have apparently
6 not violated a criminal law or committed an Ordinance
7 violation may, if they consent, be assisted to their
8 home if it is located in the district of occurrence.
9         "They may also be assisted to a public
10 treatment facility, a private treatment facility or
11 other health facility, if they consent, and such a
12 facility is located in the district of occurrence or
13 immediately adjacent districts. If the person refuses
14 the assistance offered, no further police action will
15 be taken."
16         Do you see where I just read?
17    **A   Yes.**
18    MR. POLICK: Object under the Rule of Completeness.
19 BY MR. DE ROSE:
20    Q   Did I read that accurately into the record as
21 you followed along?
22    MR. POLICK: Same objection under the Rule of

75

1 Completeness. You may answer.
2    THE WITNESS: Yes.
3 BY MR. DE ROSE:
4    Q   All right. Had you knowledge of this
5 particular Special Order before you went out in your
6 performance of duties on the 22nd of July, 2011?
7    **A   Yes.**
8    Q   All right. I notice that some of the words
9 in the paragraph I read the words "if they consent" are
10 in full caps, and the word "refuses" is in caps. Do
11 you see that?
12    **A   Yes, sir.**
13    Q   Do you know why the words "if they consent"
14 and the word "refuses" are in caps there?
15    **A   To make your argument.**
16    Q   Pardon?
17    **A   To make your argument.**
18    Q   To make my argument about what?
19    **A   That you're saying that your client, Mr.**
20 **Lopez, did not consent to medical services or**
21 **assistance, and that he actually refused is what you**
22 **said. I said that I spoke or attempted to speak to**

76

1 **Mr. Lopez and he was incomprehensible and I could not**
2 **understand what he was saying.**
3    Q   Well, let me ask you a few questions.
4         Also calling your attention to paragraph
5 E, and then I've got questions about all of this.
6 E reads, for the record, "Sworn members who transport
7 an individual to a facility for treatment will make
8 every reasonable effort to protect the person's health
9 and safety."
10         Did I read that correctly?
11    MR. POLICK: Again, object under the Rule of
12 Completeness. You may answer.
13    THE WITNESS: Yes.
14 BY MR. DE ROSE:
15    Q   As you went on that assignment that night,
16 did you understand that you had any duty to protect the
17 health and safety of a citizen who was not violating
18 any law and who you were going in assistance of?
19    MR. POLICK: Objection to the form, but you may
20 answer.
21    THE WITNESS: As I responded to the call as
22 requested for Taser by 1033R, when I arrived on scene

Pages 73 to 76

Stevan Vidljinovic
September 4, 2013

77

1    he directed me to the individual that CFD initially
2    asked assistance for, and our whole objective was to
3    peacefully attempt to get him on the ambulance to
4    transport him to a hospital without using any force,
5    because he seemed to be incoherent, and we could not
6    understand what he was trying to convey to us.
7    BY MR. DE ROSE:
8        Q   Did you ask anybody when you arrived on the
9    scene, did any of you understand what he was saying?
10       **A   I only recall speaking to Officer Alamillo**
11   **and when I spoke -- I can't speak for anybody else.  I**
12   **don't recall speaking to anybody else.  But when I**
13   **spoke to him, I know that Mr. Lopez did not make sense,**
14   **for lack of a better phrase.**
15       Q   By the way, do you speak Spanish?
16       **A   I speak a little Spanish.**
17       Q   When you first approached Mr. Lopez -- by the
18   way, the man you approached you later learned to be
19   Jose Lopez; is that not true?
20       **A   Yes.**
21       Q   Describe him for us.
22       **A   He was a male Hispanic who to me appeared to**

78

1    be middle-aged.  That's all I recall.
2        Q   How tall was he?
3        **A   I don't recall how tall he was.**
4        Q   How tall are you, Officer?
5        **A   I'm 6'2".**
6        Q   Is it fair to say that he was considerably
7    shorter than you?
8        MR. YAMIN:  Objection to the form.
9        MR. POLICK:  Join.  You may answer.
10       THE WITNESS:  It's not fair.  I don't recall how
11   tall he was, so I don't know if he was considerably
12   shorter than me.
13   BY MR. DE ROSE:
14       Q   Well, if he was 5'7", would you consider that
15   considerably shorter than you?
16       MR. YAMIN:  Objection.
17       MR. POLICK:  Objection to form.  You may answer.
18       THE WITNESS:  I don't know if I would say
19   considerably.  If he was 5'7", he was shorter than me.
20   BY MR. DE ROSE:
21       Q   And how much did you weigh at that time?
22       **A   I don't recall.  225.**

79

1        Q   To your knowledge, had you ever met this man
2    before that night, or that early morning hour, in your
3    life?
4        **A   To my knowledge, no.**
5        Q   Did you see any women out there on the scene
6    where you were engaged with the officer and then later
7    with Mr. Lopez?
8        **A   Well, throughout the duration while I was on**
9    **scene, I eventually saw one Hispanic female.**
10       Q   Describe her.
11       **A   Again, a female that appeared to be of**
12   **Hispanic descent, maybe mid-30's.  I don't recall**
13   **anything else specific.**
14       Q   Can you give us the color of her hair?
15       **A   I don't recall the color of her hair.**
16       Q   Or the length of it; anything like that?
17       **A   No, I cannot.  I don't recall.**
18       Q   Do you remember her body build in anyway?
19   Was she slender or plump or anything like that?
20       **A   I don't recall.**
21       Q   Do you remember how she was dressed?
22       **A   No, I do not.**

80

1        Q   You never talked to her at all that night?
2        **A   I don't recall ever speaking to her that**
3    **night.**
4        Q   All right.  Well, the gentleman you came to
5    learn was Jose Lopez, how was he dressed?
6        **A   I don't recall how he was dressed.**
7        Q   It was summertime.  Was that a particularly
8    warm night, or anything about the temperature you
9    remember?
10       **A   I don't remember what the temperature was**
11   **like on that given night.**
12       Q   Jose Lopez wasn't in shorts or anything, that
13   you remember?
14       **A   Again, I don't recall what he was wearing.**
15       Q   All right.  And when you first had your
16   attention directed to him, was his back to you, or was
17   he looking in your direction?
18       **A   I don't recall which way he was facing.**
19       Q   All right.  And do you recall where you saw
20   him located when you first started to take him in your
21   view?
22       **A   I believe it was somewhere on the street.  I**

Pages 77 to 80

Stevan Vidljinovic
September 4, 2013

81

1    don't know an approximate address.
2        Q   Was there anybody standing around him at that
3    time?
4        A   I don't recall anybody standing around him.
5        Q   And where was the partner of Officer Alamillo
6    as you had your attention directed to Mr. Lopez?
7        A   I don't recall.
8        Q   Did it then become your assignment after
9    Alamillo had called for the assistance of a Taser, was
10   it now your job to take the action in the case?
11       A   No.  It was a call for a request for a Taser;
12   police officer needed assistance.  It was still the
13   assignment of the originally dispatched beat, which was
14   1033R.
15       Q   So that would be Alamillo and who else?
16       A   Alamillo and Valdovinos.
17       Q   So it's still their call, so I take it you
18   would follow behind them and let them take the
19   immediate action?
20       MR. YAMIN:  Objection to the form.
21       MR. POLICK:  Join in that objection.  You may
22   answer.

82

1        THE WITNESS:  Every situation dictates a different
2    course of action.  I don't recall who took the lead or
3    who did not take the lead.  I know that it varies.
4    BY MR. DE ROSE:
5        Q   All right.  So we're clear on the record,
6    this fire department needs police assistance for a drug
7    overdose, you were able to equate that with a 40
8    year-old male, from the earlier call, who was having
9    difficulty breathing?
10       MR. YAMIN:  Objection to the form.
11       MR. POLICK:  Yes.  Are we talking about Mr. Lopez?
12       MR. DE ROSE:  Yes.
13       THE WITNESS:  I do not recall anything about a 40
14   year-old male.  All I recall by reading Exhibit 2C, is
15   that 1033 Robert requested a Taser.
16   BY MR. DE ROSE:
17       Q   All right.  The Chicago Police Department
18   Event Query we looked at earlier talks about a 40
19   year-old man having difficulty breathing, remember?
20       A   I recall reading Exhibit 2B regarding a 40
21   year-old man having chest pains with no further
22   information.

83

1        Q   And so you didn't draw the connection of
2    these two being for the same man?
3        A   Again, I don't recall a call of a 40 year-old
4    man having chest pains, so how could I make the
5    connection to the request for Taser and the job that
6    1033R was handling at that time?
7        Q   All right.  But my question is a little bit
8    different.
9            You yourself, as you were out there
10   hearing about officer needs assistance with a Taser,
11   you did not remember or you did not have in your memory
12   at all that the man they needed to have help with had
13   been complaining of difficulty breathing?
14       A   I don't recall the initial call of a man
15   having chest pains, so I cannot make the connection
16   that Mr. Lopez was that individual.
17       Q   So before you took any action, did you
18   yourself, officer, ask the officer who you were talking
19   to, has the man consented to be put in the ambulance?
20       A   A general conversation that I would have had
21   with Officer Alamillo when I arrived on the scene would
22   be why are you requesting a Taser.  And I can't speak

84

1    verbatim what he told me, but it would have been
2    something along the lines of we're trying to get this
3    guy in the ambulance and he seems to be having a drug
4    overdose and we want to try to get him to the hospital
5    to get him treatment.
6        Q   All right.  But I'm asking, did he either
7    tell you that the man was refusing to get in the
8    ambulance, or did you ask him has the man consented to
9    getting into the ambulance?
10       A   I don't recall him telling me.
11       Q   And you didn't inquire yourself?
12       A   I don't recall myself inquiring.  I'm not
13   sure.
14       Q   All right.  Well, in the exhibit I just read
15   in there the last sentence of B, it says "If the person
16   Refuses, the assistance offered, no further police
17   action will be taken."
18           Is it fair to say that you did not inquire
19   or were not advised by anyone whether the man was
20   refusing the assistance at that time?
21       MR. POLICK:  As to 14B, the Special Order, I'll
22   object under the Rule of Completeness.

Pages 81 to 84

Stevan Vidljinovic
September 4, 2013

85

1    MR. YAMIN:  Also objection to form, compound.
2    MR. POLICK:  You may answer.
3    THE WITNESS:  No, it's not fair to say, because me
4  and my partner, Officer Guettler, approached Mr. Lopez
5  and asked him personally and attempted to escort him
6  peacefully into the ambulance.  So at that time we
7  found out whether he refused medical attention or not.
8  BY MR. DE ROSE:
9    Q   All right.  So as you and your partner
10  approached him, where were the two officers who had the
11  assignment?
12    **A   I believe that me, my partner, Officer**
13  **Guettler, and Officer Alamillo approached Mr. Lopez.  I**
14  **don't recall where officer Valdovinos was on scene.**
15    Q   As you approached the man, did you approach
16  him from behind?
17    **A   I don't recall what direction he was facing**
18  **or which route we approached him from.**
19    Q   But he was walking away from you, wasn't he?
20    MR. YAMIN:  Objection to form.
21    MR. POLICK:  Join.  You may answer.
22    THE WITNESS:  I don't recall whether he was

86

1  walking away from me or standing there.
2  BY MR. DE ROSE:
3    Q   But he was about a block and-a-half from that
4  location that was in the dispatch, wasn't he?  He was
5  on 25th Street?
6    MR. YAMIN:  Object to form and foundation.
7    MR. POLICK:  Join in those objections.  You may
8  answer.
9    THE WITNESS:  I don't recall the approximate
10  distance where he was at the given location that it
11  occurred.
12  BY MR. DE ROSE:
13    Q   All right.  You didn't have to run to catch
14  up with him, did you?
15    **A   I don't recall running.**
16    Q   Do you think you would remember if you had to
17  run to catch up with him?
18    **A   I don't run a lot, so yes, I probably would**
19  **remember.**
20    Q   And if he was walking away from the house at
21  the address of the call, you believe that you just had
22  to walk at a little faster pace to catch up with him?

87

1    MR. YAMIN:  Objection to the form.
2    MR. POLICK:  Join in the objection.  It calls for
3  speculation.  You can answer over the objection.
4    THE WITNESS:  Again, I don't recall the
5  approximate address that Mr. Lopez was standing at, so
6  I cannot answer whether he was walking away from a
7  particular location or walking away from me.
8  BY MR. DE ROSE:
9    Q   All right.  Let me ask you about a couple of
10  more exhibits.
11      Did you believe that that day, you were
12  doing this assignment in assistance of the paramedics?
13    **A   I believe that I was asked by 1033R, who**
14  **requested a Taser, that I was assisting them.  I don't**
15  **recall their initial dispatch job.**
16    Q   All right.  Exhibit 14A.  Now, this is also a
17  Special Order of the Chicago Police Department, a
18  little later than the last one we looked at.  It's
19  dated 27 September, 1995, and it's Special Order
20  SO3-08.  Have you ever seen this Special Order before?
21    **A   Yes, I have probably come across this Special**
22  **Order in the past.**

88

1    Q   And did you know of this Order as of the
2  22nd of July, 2011 when you were out on the street
3  talking to the officer before approaching Mr. Lopez?
4    **A   I had prior knowledge of the guidelines of**
5  **the Order in question.**
6    Q   All right.  And it's called Assisting Chicago
7  Fire Department Paramedics.  Do you see that at the
8  top?
9    **A   Yes.**
10    Q   And it looks like its purpose, No. 1, is,
11  "This directive establishes Department policy regarding
12  requests for assistance by the Chicago Fire Department
13  paramedics."  Do you see that?
14    **A   Yes.**
15    Q   All right.  And under its policy the Chicago
16  Police Department writes, "It is the policy of the
17  department to assist Chicago Fire Department paramedics
18  in transporting a patient to a hospital whenever a
19  Chicago Fire Department paramedic declares that the
20  situation constitutes a medical emergency and requires
21  police assistance."  And then in bold it says,
22  "Department members will not assist in the transporting

Pages 85 to 88

Stevan Vidljinovic
September 4, 2013

89

1      of a patient who objects to transportation or medical
2      treatment on religious grounds."  Do you see that?
3          **A   Yes.**
4          Q   First of all, am I clear that you did not
5      talk yourself to any fire department paramedic before
6      you approached Jose Lopez that night?
7          MR. POLICK:  Objection.  Misstates the witness's
8      testimony.  You may answer over the objection.
9          THE WITNESS:  I don't recall speaking to any
10     paramedics on the scene.
11     BY MR. DE ROSE:
12         Q   At any time that night?
13         **A   I don't recall.**
14         Q   All right.  So it's fair to say that no fire
15     department paramedic declared in your presence that
16     there was a medical emergency that required your
17     assistance?
18         MR. POLICK:  Again, objection to the form.  You
19     can answer.
20         THE WITNESS:  I don't recall.
21     BY MR. DE ROSE:
22         Q   All right.  And now we're down to procedures.

90

1      And under A it says -- by the way, up above that the
2      reference is to peace officer assistance during
3      emergencies and Emergency Medical Services Systems Act.
4      Are you familiar with either of those learned
5      treatises?
6          MR. POLICK:  Objection to the form of the
7      question.  Where are you referring to in the --
8          MR. DE ROSE:  Under 4, the references.
9          MR. POLICK:  Paragraph 4, okay.
10         MR. DE ROSE:  Yes.
11         MR. POLICK:  Those are a Municipal Code and
12     Illinois Compiled Statutes.
13         MR. DE ROSE:  Right.
14         MR. POLICK:  Not learned treatises.  So object on
15     those grounds, but you can answer over the objection.
16         MR. DE ROSE:  And counsel, I called them learned
17     treatises because they are normally drafted by members
18     of our esteemed professional lawyers, but he may not
19     agree they are learned.
20         MR. POLICK:  I call them Municipal Codes and
21     Illinois Compiled Statutes.
22         MR. DE ROSE:  You are definitely right.

91

1      BY MR. DE ROSE:
2          Q   Sir, are you familiar with those references?
3          **A   I'm familiar with a generalization of many**
4      **Municipal Codes and Compiled Statutes.**
5          Q   Let's look under procedures.  It says, "A
6      member will assist Chicago Fire Department paramedics
7      in transporting a patient whenever a Chicago Fire
8      Department paramedic declares a medical emergency and,
9      1, requests assistance in restraining an adult patient
10     who has not objected to transportation or medical
11     treatment on religious grounds."  Do you see that?
12         **A   Yes.**
13         Q   Did you have this particular Special Order in
14     mind when you went to work on this call that evening?
15         MR. YAMIN:  Objection.
16         MR. POLICK:  I'm going to object under the Rule of
17     Completeness.
18         MR. YAMIN:  And to form.
19         MR. POLICK:  You may answer over those objections.
20         THE WITNESS:  Generally, I don't recall what I had
21     in mind en route to the request for Taser.  All I know
22     is that a police officer asked for assistance, asked

92

1      for a Taser, so I tried my best to speedily arrive in
2      the area.
3      BY MR. DE ROSE:
4          Q   So you thought you were assisting a police
5      officer and not necessarily a Chicago Fire Department
6      paramedic?
7          MR. POLICK:  Objection to form.  You may answer.
8          THE WITNESS:  1033R requested a Taser.  1033R is a
9      Chicago Police beat number.  And I somehow, either over
10     the air or through the computer, acknowledged the
11     assist, so I assumed that I was assisting a police
12     officer.
13     BY MR. DE ROSE:
14         Q   All right.  Now look at B, because I want to
15     read that into the record also.  It says, "In most life
16     threatening situations, the patient is not actively
17     resisting.  However, members are authorized to employ
18     the minimum amount of force necessary to overcome the
19     amount of force exerted by the patient resisting
20     medical assistance or transportation."  Do you see
21     that?
22         MR. POLICK:  Again, object under the Rule of

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

93

1  Completeness.  You can answer.
2      THE WITNESS:  Yes, I see it.
3  BY MR. DE ROSE:
4      Q   Can you estimate at all how many policemen
5  were on the scene that night before you used your
6  Taser?
7      **A   I don't recall how many were on the scene,**
8  **specifically, before I used my Taser.  I know I was**
9  **there.  I know my partner, Officer Guettler was there,**
10 **Officer Alamillo and Officer Valdovinos.  I know that I**
11 **saw Officer Valenzuela and Officer Gonzalez during the**
12 **duration, as well as Sergeant Kearns.**
13     Q   And at least two paramedics, right?
14     **A   As well as two paramedics, at least, that**
15 **were on scene during the duration of the event.**
16     Q   And if there were also six firemen on the
17 scene, you have no recollection of that?
18     **A   I don't recall seeing any firemen.**
19     Q   All right.  So as you remember it, there were
20 at least seven or eight men on the scene to deal with
21 Jose Lopez?
22     MR. YAMIN:  Objection.

94

1      THE WITNESS:  That's not what I said.
2          Throughout the duration of the event there
3  were possibly seven police officers and two paramedics,
4  but I do not know when they arrived on scene.  It could
5  have been before or after.
6  BY MR. DE ROSE:
7      Q   All right.  So but before you unholstered
8  your Taser gun, I take it you know for a fact the four
9  of you were there?
10     **A   Yes.**
11     Q   All right.  And you are, I think you said,
12 6'2"?
13     **A   Correct.**
14     Q   What's the height of your partner?
15     **A   Roughly 6 feet.**
16     Q   And about approximately how much did he
17 weigh?
18     **A   At the time in question, I don't recall how**
19 **much he weighed.  Approximately 170 pounds.**
20     Q   And the two other officers, approximately how
21 tall were they?
22     **A   Officer Alamillo is approximately close to 6**

95

1      **feet.  Officer Valdovinos is 5'7", if I have to take a**
2  **rough guess.**
3      Q   All right.  But is it fair to say, you're in
4  pretty good physical condition.  Would you say the
5  other three officers were all in pretty good physical
6  condition also?
7      MR. YAMIN:  Objection to the form.
8      MR. POLICK:  Join in the objection.  You may
9  answer.
10     THE WITNESS:  I can't speak for the physical
11 condition of other officers.
12 BY MR. DE ROSE:
13     Q   I mean they didn't look unusually portly from
14 having had a donut tour duty, right?  They looked like
15 they were not overweight?
16     MR. YAMIN:  Objection to the form.
17     MR. POLICK:  Join in that objection.  You may
18 answer.
19     THE WITNESS:  They weren't busting at the seams.
20 BY MR. DE ROSE:
21     Q   There was more than a sufficient amount of
22 manpower among the four of you to physically overpower

96

1  Jose Lopez that night if you felt like you had to do
2  so, wasn't there?
3      MR. YAMIN:  Objection to form.  Calls for
4  speculation.
5      MR. POLICK:  Join in those objections.  You may
6  answer.
7      THE WITNESS:  Our objective was never to overpower
8  Mr. Lopez.  And when we approached him initially, after
9  me and my partner, Officer Guettler, arrived on the
10 scene, it was only myself, Officer Guettler and Officer
11 Alamillo.  I don't recall where officer Valdovinos was,
12 so it was just the three of us.
13 BY MR. DE ROSE:
14     Q   But the three of you, you were satisfied,
15 although you had no plan to do so, the three of you
16 were physically capable of restraining Jose Lopez
17 physically if you had to?
18     **A   Again, every situation dictates a different**
19 **course of action.**
20         **The behavior that your client, Mr. Lopez,**
21 **was displaying when I approached him was behavior that**
22 **was similar to other individuals that were under the**

Pages 93 to 96

Stevan Vidljinovic
September 4, 2013

97

1    influence of substances such as PCP or cocaine where
2    they are given strength that it takes -- it has, in my
3    personal recollection, taken five or six officers to
4    restrain just one individual.
5        Q    And you don't remember if there were that
6    many and many more officers on the scene that night?
7        A    All I can recall is initially approaching
8    Mr. Lopez, there was three of us.
9        Q    All right.  So did you make a plan of attack
10   with Officer Alamillo that when we go over there, we'll
11   be able to tase him and then we can put him in the
12   ambulance?
13       A    No such plan was ever made.  We never made a
14   plan of attack.  All I did when I spoke to Officer
15   Alamillo was to ask him why he requested a Taser.  And
16   this is not verbatim, but he told me that, "We're
17   trying to escort Mr. Lopez peacefully into the
18   ambulance and transport him to a medical facility to
19   seek treatment."
20           There was no plan of attack comprised by
21   the three of us.
22       Q    As far as you know it, does the Municipal

98

1    Code of the Chicago Police Department allow you to take
2    people into physical custody for medical treatment
3    whether they consent or not?
4        A    Again, every situation dictates a different
5    course of action.  It solely depends on the behavior
6    and actions of that individual.
7        Q    I want to look at Exhibit 14C.  Now, this
8    is an excerpt from the Municipal Code of the City of
9    Chicago entitled Peace Officer Assistance During
10   Emergencies.  Have you ever seen this?
11       A    Specifically, I don't recall seeing this.
12       Q    I want to read in the record; then I'm going
13   to ask you a few questions about it.  It says, "A peace
14   officer may assist an emergency medical technician, as
15   defined in the Illinois Emergency Medical Services
16   Systems Act 210 ILCS 50/1, et seq, in transporting a
17   person to a hospital licensed to provide comprehensive
18   emergency treatment services when the officer is
19   informed by an emergency medical technician that the
20   situation constitutes an emergency as defined in the
21   Emergency Medical Services Systems Act and that person
22   is in need of immediate hospitalization to protect such

99

1    person or others from physical harm.  The provisions of
2    this section shall not apply when the person sought to
3    be transported objects to transportation or medical
4    treatment on religious grounds."  Do you see that?
5        A    Yes.
6        Q    Were you ever taught that a citizen of the
7    community has a right to refuse medical treatment or
8    attention of any kind by police officers or fire
9    department personnel if they just don't want the
10   treatment?
11       MR. YAMIN:  Objection to form.
12       MR. POLICK:  Join in the objection.  You may
13   answer.
14       THE WITNESS:  Yes, we were taught that individuals
15   had the right to deny any medical treatment or
16   assistance.
17   BY MR. DE ROSE:
18       Q    All right.  And you had been taught that even
19   before you went out on this particular assignment that
20   night?
21       A    Yes.  It's something that they teach you in
22   the Academy initially.

100

1        Q    All right.  But you made no inquiry as you
2    went up to Jose Lopez whether he had already, because
3    he had been on the scene for several minutes, been
4    refusing medical treatment and attention?
5        MR. POLICK:  Objection to form.  He may answer.
6        THE WITNESS:  I don't recall how long Mr. Lopez
7    was on the scene prior to my arrival.  All I know is
8    that when I arrived, I spoke to Officer Alamillo, and
9    then the three of us along with Officer Guettler
10   approached Mr. Lopez to inquire whether he needed
11   medical assistance, at which time he was incoherent and
12   I could not understand him.
13   BY MR. DE ROSE:
14       Q    So my question still stands.  No one told you
15   before you approached him he has been refusing
16   attention for the last 10 or 15 minutes?
17       MR. POLICK:  Objection.  Assumes facts not in
18   evidence.  You may answer over the objection.
19       THE WITNESS:  I don't recall anybody telling me.
20       MR. POLICK:  John, if I can just interject for a
21   minute.  It's just about 1:00.  I don't know how much
22   further you've got to go, but --

Pages 97 to 100

Stevan Vidljinovic
September 4, 2013

---

101

1    MR. DE ROSE:  Oh, I've got enough.  Off the
2  record.
3               (There was a break taken, after
4               which the deposition was resumed
5               as follows:)
6    MR. DE ROSE:  Would you read back the last
7  question and answer, please?
8               (The record was so read
9               by the court reporter.)
10 BY MR. DE ROSE:
11   Q  All right.  So as you started towards Jose
12 Lopez, were you in the front of the group of three of
13 you, as you remember it?  Were you walking abreast?
14 How did that turn out?
15   **A  I don't recall the formation that we were**
16 **walking when we approached Mr. Lopez.**
17   Q  And you had not made up any decision as to
18 who was going to address him first or talk to him?
19   **A  No.  In my training, it doesn't matter**
20 **whether you're dispatched to the job or you're**
21 **assisting on-the-job; everybody has the power to assess**
22 **the situation.  So me and my partner, along with**

---

102

1  **Officer Alamillo, went along with the small synopsis**
2  **that we were given from Officer Alamillo to assess the**
3  **situation by trying to engage in a conversation with**
4  **Mr. Lopez.**
5    Q  Now, as you remember it, all three of you
6  being in uniform, you had a full complement of the
7  accouterments on your utility or service belt?
8    **A  I can't speak for the other two officers.**
9  **And I don't specifically recall what I had equipped on**
10 **my belt.  I know that I had my service weapon,**
11 **handcuffs, two Magazines and a Taser.**
12   Q  All right.  And you don't believe any of the
13 other two men who were with you had a Taser at the
14 time?
15   **A  I don't recall any of them, either one of**
16 **them having a Taser.**
17   Q  As you walked up to my client, did you
18 understand that the other officers were expecting you
19 to draw out your Taser before you went up to him?
20   MR. POLICK:  Objection to the form of the question
21 what somebody else believed he was going to do.  You
22 can answer over the objection.

---

103

1    THE WITNESS:  I can't speak for the other
2  officers.  I know that when I respond to an assist
3  requiring a Taser, when I exit my vehicle, I take out
4  the Taser and have it readily accessible in the event
5  that we might need it.
6  BY MR. DE ROSE:
7    Q  So it's in your hand, but probably pointed
8  down?
9    **A  Correct.**
10   Q  So as you walked up to him, you had the Taser
11 at your side?
12   **A  I don't recall where I had it.  I knew that**
13 **it was in my hand.**
14   Q  All right.  But out of its holster?
15   **A  Yes.**
16   Q  Did you notice if either of the other
17 officers had any weapon in their hand such as an ASP,
18 or their service revolver?
19   **A  I can't speak for the other officers.  I**
20 **don't recall them having anything in their hands.**
21   Q  So were you believe the only one who had a
22 weapon at the ready if needed?

---

104

1    **A  Yes.**
2    Q  And you did not have your handcuffs at the
3  ready; they were still in your utility belt?
4    **A  Yes, they were still in my belt.**
5    Q  And your partner normally carries handcuffs,
6  doesn't he?
7    **A  Yes.**
8    Q  And you didn't see either of the other two
9  officers with handcuffs in their hands?
10   **A  I don't recall seeing anything in anybody's**
11 **hands.  I can't speak for the other two officers.**
12   Q  All right.  So as you went up to my client,
13 you said you don't remember ever having to run.  Did
14 you have to walk?  Was he walking and you had to walk
15 at a faster pace to catch up with him?
16   **A  I don't recall how quickly I had to, or not**
17 **so quickly I had to move to get to your client.  I**
18 **don't recall if it was just a walk or a brisk walk.**
19 **I'm not sure.**
20   Q  Are you walking on the sidewalk, or are you
21 walking on the street or on the parkway?  What are you
22 walking on?

---

Pages 101 to 104

Stevan Vidljinovic
September 4, 2013

105

1      A   We were on the street.  Your client was also
2  on the street.  So we were approaching him, all of us,
3  on the street.
4      Q   This would be on Albany, or on 25th Street?
5      A   I don't recall specifically which street.
6  All I know is that we were on a street.
7      Q   All right.  Well, was traffic on the
8  particular street you were on blocked by squad cars and
9  fire vehicles, fire department vehicles?
10     A   I don't recall if they were blocked.  The
11 only vehicles I do recall when I arrived on scene were
12 my vehicle, 1033 Roberts', an ambulance, throughout the
13 duration, not initially, so I don't recall.
14     Q   Well, is it fair to say you don't remember
15 any traffic, civilian traffic of any kind, such as cars
16 or trucks, going down the street as you were walking in
17 the street?
18     A   I don't remember any civilian traffic.
19     Q   At any time?
20     A   During the time of the event.
21     Q   All right.  Can you estimate for us how long
22 it took you to get in the immediate vicinity of my

106

1  client?
2      A   As opposed to when I exited my vehicle, or
3  after I spoke to Officer Alamillo?
4      Q   Yeah, after you spoke to the officer.  You're
5  right.  From the time you left your vehicle, how long
6  do you think it took you to get right up next to my
7  client?
8      A   Half a minute maybe, maybe a minute max.
9  Half a minute or so.
10     Q   And is it fair to say during that half a
11 minute my client was walking?
12     A   I don't recall what your client was doing.  I
13 was speaking to Officer Alamillo.  He directed me
14 towards your client.  All I know is that your client
15 was standing in the street.  I don't even know what
16 direction.
17     Q   All right.  Standing in the street.  You
18 don't know if he was walking or just standing
19 stationary?
20     A   I don't know his movements.
21     Q   As you walked up to my client, did you notice
22 what he was doing with his arms and hands, if anything?

107

1      A   I observed him with his fists clenched.
2      Q   Were his hands at his side with his fists
3  clenched, or did he have them up in a perpendicular, or
4  I guess at a 90-degree angle at his waist?
5      A   All I recall is that your client had his
6  fists clenched.  I don't recall how his arms were
7  positioned.
8      Q   Did he have a hat on that day?
9      A   I don't recall his clothing.
10     Q   Can you tell us, do you remember, did he have
11 any facial hair?
12     A   I do not recall any facial hair.
13     Q   All right.  Can you picture his face in your
14 mind as you're recounting this today?
15     A   He just looked like a middle-aged Hispanic
16 man.
17     Q   But can you actually picture that in your
18 mind now as you tell us that description?  Because that
19 is a description.
20     A   Nothing specific.  The only thing that I can
21 recall is that he was a middle-aged Hispanic male,
22 nothing specific.

108

1      Q   And you neither knew of and no one had told
2  you that he was wanted by the police for anything?
3      A   Please repeat the question.
4      Q   You neither knew that Jose Lopez, or no other
5  policeman or anybody else told you that he was wanted
6  by the police?
7      A   I spoke to Officer Alamillo on scene and all
8  he said to me was that he seems to be under the
9  influence of a substance, and we tried to escort him to
10 the ambulance so that he can be transported to a
11 medical facility.  Nothing more was said to me.
12     Q   All right.  So then the answer to my question
13 would be that you didn't know of anybody claiming he
14 was wanted by the police, there was a warrant out for
15 him, or anything like that?
16     A   I didn't inquire for such information.
17     Q   All right.  As far as you know, he was not
18 fleeing from police custody as you saw him out there at
19 the street; am I correct?
20     A   He was standing in the street.  That's all I
21 can recall.
22     Q   So he wasn't fleeing at that point?

Pages 105 to 108

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

109

1    A    He was standing by himself in the street.  So
2  yes, it would be a safe assumption to say that he was
3  not fleeing.
4    Q    All right.  So you remember the three of you
5  walking up to him.  Did he turn and face you, or did
6  you have to go around to get in front of him?
7    A    I don't recall what direction we went around
8  to, we went about to speak to Mr. Lopez.  All I know is
9  that when we did approach him, the three of us, Officer
10  Guettler was the one that initiated the conversation to
11  see whether he needed medical assistance.
12    Q    Did you three officers strategically position
13  yourself in a different position around Jose Lopez's
14  body so that you would be off to one side, your partner
15  in another, and Officer Guettler in a third position?
16    MR. YAMIN:  Objection to the form.
17    MR. POLICK:  Join.  You can answer.
18    THE WITNESS:  Given the behavior and the manner
19  that Mr. Lopez was standing with his fists clenched,
20  in my prior experiences, I described it as somewhat of
21  an agressive manner.  So I was, through my training,
22  bladed and ready to react, depending on how Mr. Lopez

110

1  was going to react, while my partner was speaking to
2  him.
3  BY MR. DE ROSE:
4    Q    All right.  You say bladed.  That's a word
5  I'm not used to.  What does the word bladed mean?
6    A    You're just angled with your weapon away from
7  the individual.
8    Q    All right.  So the way you were bladed, where
9  was your hand that you had your Taser weapon in?  Was
10  that blocking his view of the weapon?
11    MR. POLICK:  Objection to the form of the question
12  and to the foundation as to what Mr. Lopez could see.
13  You can answer over the objection.
14    THE WITNESS:  My Taser was in my right hand and it
15  was further away from Mr. Lopez.
16  BY MR. DE ROSE:
17    Q    So it would be obstructing some of his view
18  of the weapon as you were in your position?
19    MR. YAMIN:  Objection.
20    MR. POLICK:  Objection.  Same objection as to the
21  foundation what Mr. Lopez could see.  You can answer
22  over the objection.

111

1    THE WITNESS:  The reason why we stand in a bladed
2  position is we can't predict an individual's actions,
3  so we try to make it as safe for us and everybody else
4  around him, so we try to keep our weapons as far away
5  from the individual that we're interacting with as
6  possible.
7  BY MR. DE ROSE:
8    Q    As you walked up to him did you say that you
9  had a Taser in your hand so that you could at least let
10  him know that you had the Taser?
11    A    When we walked up to him, the only
12  conversation that we had with Mr. Lopez was asking him
13  whether he needed medical treatment.
14    Q    And by the way, when you asked that, before
15  you asked that he seemed to be standing up under his
16  own power and steam?
17    A    He was upright on his own, yeah, his own
18  power and steam.
19    Q    And he wasn't teetering or falling over as
20  you noticed him?
21    A    All I recall is him standing upright in the
22  street with his fists clenched.

112

1    Q    All right.  But he wasn't waddling from
2  side-to-side or anything like that?
3    A    I don't recall him swaying.
4    Q    All right.  He appeared to you from your
5  vantage point to be a formidable, powerful man that you
6  wanted to be careful with.  Is that a fair statement?
7    A    In my vantage point, he appeared to be under
8  the influence of a substance.  With my experience in
9  situations, I've known that people that are influenced
10  with certain substances, for example, cocaine or PCP,
11  can, regardless of stature or size, can prove to be
12  formidable for anybody that's a larger individual.  So
13  yes, I was in a bladed position in the event that that
14  was the conclusion.
15    Q    So what is your answer to my question?  Did
16  he appear to be physically formidable as he stood
17  there, without waddling and teetering and falling over?
18    A    His behavior, I drew the conclusion that he
19  had the potential, if he wanted to, to be formidable.
20    Q    All right.  Now, so we're very clear on this,
21  no one told you and you did not know as you stood there
22  in front of him that he was under the influence of

Pages 109 to 112

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

113

1  anything. Is that fair to say?
2      MR. POLICK: Objection. Misstates the witness's
3  testimony. He can answer over the objection.
4      THE WITNESS: Again, earlier I stated that in our
5  job, in our training --
6  BY MR. DE ROSE:
7      Q  No, no.
8      A  I know. Let me finish though.
9          In our job, in our training, we come to a
10  scene, and it doesn't whether you're the preliminary
11  investigator, the first person on a scene or assisting,
12  you can assess the situation. And by me assessing
13  Mr. Lopez, it looked like he was under the influence of
14  a substance that I have come to know as PCP or cocaine,
15  because I have dealt with individuals that have been
16  under that same substance.
17      Q  All right. Now, are you finished with that?
18      A  Yes, I am.
19      MR. DE ROSE: Move to strike it as not responsive
20  to my question. Would you read back my question? And
21  I just want to see if you can answer it.
22

114

1          (The record was so read
2           by the court reporter.)
3      THE WITNESS: Through my experience, I believed
4  that your client was under the influence of something.
5  BY MR. DE ROSE:
6      Q  All right. I'm going to ask the question one
7  more time. I know what you're saying, and you have
8  your own conclusions; I'm not going to argue with you
9  about that.
10          My question is, had anybody told you, or
11  did he tell you himself that my client was under the
12  influence of alcohol or any drug?
13      MR. POLICK: Objection. Asked and answered. You
14  can answer over the objection.
15      THE WITNESS: Nobody told me. He was incoherent,
16  so he could not tell me. And I assumed with reasonable
17  belief that he was.
18      MR. DE ROSE: All right. Move to strike the last
19  part.
20  BY MR. DE ROSE:
21      Q  Just listen to the question. Counsel are
22  writing notes. They will follow up.

115

1      A  Okay, understood.
2      Q  Because I know you have your own conclusions,
3  and you're entitled to them.
4          All right. So as you were positioned off
5  in the bladed position, what did your partner say to
6  Jose Lopez?
7      A  Not verbatim, but my partner approached him
8  and asked him if he was okay, if he needed any medical
9  treatment.
10      Q  Is that all of it, or you think he mentioned
11  something more?
12      A  I can't specifically speak for what my
13  partner said to him. I know I was standing next to my
14  partner. All I know with respect to Mr. Lopez is he
15  tried to see if he needed medical treatment and if he
16  was all right.
17      Q  And did Jose Lopez respond to him?
18      A  No. Jose Lopez was incoherent. We could not
19  make out what he was saying, at which time my partner
20  approached Jose Lopez and tried to peacefully escort
21  him to the ambulance.
22      Q  All right. We'll get to that.

116

1      A  Okay.
2      Q  But when you say he was incoherent and you
3  could not make out what he was saying, was he talking
4  in Spanish?
5      A  No, he was not.
6      Q  What language was he talking in?
7      A  He was just making sounds and words. He was
8  saying nothing that was comprehensible to --
9      Q  Can you remember any of the words he was
10  using?
11      A  I don't recall. He was just mumbling and
12  saying sounds and different words that didn't make
13  sense to anybody on scene.
14      Q  Well, if you heard a word like no or I don't
15  want help, would you be able to recognize those words?
16      MR. POLICK: Objection to the incomplete
17  hypothetical. It assumes facts not in evidence. You
18  may answer with those objections.
19      THE WITNESS: Of course I would recognize those
20  words.
21  BY MR. DE ROSE:
22      Q  All right. But as you sit here now, you

Pages 113 to 116

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

117

1    don't remember what specific words he said?
2        MR. POLICK:  Objection.  Asked and answered.
3    BY MR. DE ROSE:
4        Q   Is that correct?
5        A   I don't know --
6        MR. YAMIN:  Also, excuse me, mischaracterizes his
7    testimony.
8        MR. POLICK:  Join in that objection as well.  Go
9    ahead and answer.
10       THE WITNESS:  I don't recall the words and sounds
11   he was making when he was trying to make conversation.
12   BY MR. DE ROSE:
13       Q   Can you mimic the sounds for us now?
14       A   It would be any one of us making a sound or
15   making words, not making sense and not conveying a
16   message, I guess.  Like he would be incomprehensible to
17   another human being.
18       Q   Well, did you tell the man that you could not
19   understand him?
20       A   I didn't speak to Mr. Lopez.  My partner was
21   speaking to Mr. Lopez.
22       Q   Did you hear your partner saying, "I cannot

118

1    understand your words and sounds?"
2        A   I don't recall.  I can't speak for my
3    partner.  I don't recall specifically what he said.  I
4    just know the general conversation that they had.
5        Q   All right.  Did you move closer to see if you
6    could understand what Jose Lopez was saying?
7        A   We were approximately five feet from each
8    other, so he was speaking, saying words and making
9    sounds very loudly.  So I didn't need to move closer.
10       Q   He had a higher voice than normal
11   conversational speech, a louder voice?
12       A   He was just making, like noises were just
13   coming out of his mouth, just words and sounds.  And I
14   was standing five feet away from him.  There was no
15   reason for me to step closer.
16       Q   Did you think he was hollering those words
17   and sounds, or did you think he was using a
18   conversational tone?
19       A   His tone was a little bit more aggressive
20   than a conversational tone.
21       Q   Was your partner raising his voice when he
22   talked to Mr. Lopez?

119

1        A   No.  I've worked with my partner long enough.
2    He deals with people in a very mild manner and calmly.
3        Q   All right.  So after you heard these sounds
4    and words, what is the next thing that happened?
5        A   My partner approached Mr. Lopez even closer
6    and attempted to escort him peacefully to the
7    ambulance.
8        Q   All right.  When you say he approached
9    closer, he went right up to Jose Lopez, right next to
10   him?
11       A   He was fairly close to him, yes.
12       Q   And did he put his hands on Jose Lopez?
13       A   I don't recall.  All I know is that he
14   pointed to the ambulance and not verbatim said, "Hey,
15   Buddy, let's go see if we can get you checked out.
16   Let's get you some help."
17       Q   All right.  Now, as he moved closer to Jose
18   Lopez and said that, did you also maintain your bladed
19   position, but move closer?
20       A   I don't recall myself moving closer.  I was
21   pretty much approximately five feet from Mr. Lopez the
22   whole time.

120

1        Q   So you stayed about that distance.  And what
2    was the other officer, Alamillo, doing at this time?
3        A   I don't recall.  I know that he came with us
4    to attempt to speak to Mr. Lopez, but I don't recall
5    what happened the minute that my partner started to
6    speak to him.
7        Q   All right.  Did Alamillo now move closer as
8    your partner moved closer to Mr. Lopez while you stayed
9    five feet away?
10       A   Again, I don't recall the actions of Officer
11   Alamillo.  I know that he came with us to approach
12   Mr. Lopez to see if he was okay and try to attempt to
13   escort him to an ambulance; but from the minute that my
14   partner began to speak to Mr. Lopez, I don't recall the
15   actions of Mr. Alamillo, nor where he was standing.
16       Q   All right.  And so when your partner goes up
17   closer and says, "Come on, Buddy, let's see if we can
18   get you some -- I think you said, "get you some help in
19   the ambulance?"
20       A   He directed his hand, pointed to the
21   ambulance.  That's like a gesture to say let's see if
22   we can help you out, so general conversation.

Pages 117 to 120

Stevan Vidljinovic
September 4, 2013

---

121

1       Q   All right.  So as your partner gestured with
2   his one hand towards the ambulance, did he put his
3   second hand on my client's elbow, arm or back in any
4   way?
5       A   I can't speak for Officer Guettler.  I don't
6   know what he did with his other hand.  I know that he
7   gestured towards the ambulance.  I believe I saw him
8   gesture towards the ambulance with his other hand.
9       Q   All right.  But at that point you don't know
10  if Officer Guettler was in physical contact with Jose
11  Lopez?
12      A   I do not know.
13      Q   All right.  And so what was the next thing
14  that happened?
15      A   Mr. Lopez, with his fists still clenched,
16  began to flail his arms and swing in the direction of
17  Officer Guettler.  I wasn't too far away, so swinging
18  in our general direction.
19      Q   All right.  So let's get this.
20          His hands in the clenched fists, as you
21  walked up, they were outstretched, or were they down at
22  his side?

---

122

1       A   Again, I don't know the position of his arms.
2       Q   All right.  So when he started to flail them,
3   did he raise them up over his head?
4       A   I mean he just began to flail, no particular
5   direction.  He just began to move his arms about.
6       Q   You didn't see him trying to pull away from a
7   guiding gesture that your partner had put on his
8   shoulder or arm?
9       A   I can't recall.
10      Q   And he was considerably shorter than your
11  partner, wasn't he?
12          MR. YAMIN:  Objection.  Asked and answered.
13          MR. POLICK:  Join in the objection.
14          MR. YAMIN:  And objection as to form.
15          THE WITNESS:  Again, I can't say how you measure
16  considerably, but yes, he was shorter than my partner.
17  BY MR. DE ROSE:
18      Q   When he started you say flailing his arms,
19  did he flail both arms, left and right, or only one
20  arm?
21      A   He flailed both.
22      Q   And by flailing, you mean he went off to the

---

123

1   side from his arm, or up and down from his shoulder?
2       A   When someone says flailing, in my belief it's
3   not a particular motion.  He's just moving his arms
4   about in every which direction.
5       Q   And that's about how you would describe it,
6   his arms were going everywhere?
7       A   Yes.  Initially he was flailing his arms
8   before he proceeded to try to take a swing at my
9   partner.
10      Q   Now, you say initially before he tried to
11  take a swing at your partner.  How long was he flailing
12  his arms while you and your partner and Officer
13  Alamillo were out there?  A couple of minutes, minute
14  and-a-half?
15      A   Seconds.
16      Q   Seconds?
17      A   From the moment that he began to flail, he
18  only flailed for a matter of seconds and then became to
19  direct those clenched fists at my partner.
20      Q   All right.  When he started to flail, did
21  your partner -- every which way when he was flailing
22  his hands, did your partner and you move back and

---

124

1   retreat at all?
2       A   My partner was, Officer Guettler was closer
3   to Mr. Lopez because he was talking to him and trying
4   to see what the situation was and attempting to get him
5   in the ambulance.  So I know that my partner tried to
6   avoid getting struck.
7       Q   So how far back did he move?
8       A   I don't know how far back he moved.  He tried
9   to move far back enough so as not to be struck.
10      Q   When you were five feet away still, did your
11  partner go a distance greater than that five feet so
12  that he now is either abreast or behind you?
13      A   No.  My partner was still in front of me.
14      Q   All right.  And at this point there had been
15  no physical contact between Jose Lopez and anyone else
16  that you saw, correct?
17      A   That I personally observed, no.
18      Q   All right.  And the very next thing you
19  remember after your partner stepped back, did Jose
20  Lopez swing more than one of his clenched fists?
21      A   I don't recall, but I believe that he swung
22  multiple times in the direction of my partner and

---

Pages 121 to 124

Stevan Vidljinovic
September 4, 2013

---

125

1  myself, because we were in the general area.
2     Q   All right.  You're five feet away from him.
3  Did your distance from him ever get closer than five
4  feet?
5     A   I never approached Mr. Lopez.  Mr. Lopez
6  flailed his arms and was moving about.  So he moved
7  towards my partner's direction.  My partner backed off,
8  which made him closer to me.  So yes, Mr. Lopez was
9  nearing my --
10    Q   How close were you to Mr. Lopez at the
11  closest interval that you were before you used your
12  Taser that night?
13    A   Approximately three to five feet.
14    Q   All right.  And is it fair to say, being
15  three to five feet away from him, from that vantage
16  point he was unable to reach you with his fists?
17    A   Again, dealing with individuals who displayed
18  similar behavior to Mr. Lopez, they were able to do
19  things physically that I did not think initially they
20  were able to do.  So that's why the Taser was
21  requested; that's why I had it readily accessible,
22  because --

---

126

1        MR. DE ROSE:  All right, stop.  I am going to move
2  to strike that as non-responsive.
3  BY MR. DE ROSE:
4     Q   Maybe you didn't understand my question.
5        From your vantage point three to five feet
6  away, are you satisfied that he did not have a reach
7  long enough that he could touch you if he continued to
8  flail from three to five feet away from you?
9        MR. POLICK:  Objection.  Asked and answered.  He
10  can answer over the objection.
11       THE WITNESS:  I felt that my partner and my life
12  was in danger, so I felt that he was capable of doing
13  many things because he was under the influence of some
14  kind of substance.
15       MR. DE ROSE:  Move to strike that.
16  BY MR. DE ROSE:
17    Q   Listen to the question.
18    A   Okay.
19    Q   You don't get to answer what's in your mind
20  at the time.
21    A   Okay.
22    Q   From your vantage point three to five feet

---

127

1  away from him, is it fair to say that you were
2  satisfied that the man was beyond the reach of you?
3     A   I do not know Mr. Lopez's reach, so I can't
4  say to that.
5     Q   Did you see my client, Mr. Lopez, come into
6  physical contact with your partner that night?
7     A   Your client attempted, but --
8     Q   The answer is no, you did not?
9     A   Attempted to make physical contact with my
10  partner.  My partner was quick enough to react and
11  attempt to get out of the way.
12    Q   All right.  Did you see either your partner
13  or Officer Alamillo try to reach forward and grab and
14  control my client when they saw him flailing his arms?
15    A   I don't recall seeing anybody trying to
16  control your client as he was flailing his arms.
17    Q   As a matter of fact, you told them to clear
18  away from him, didn't you?
19    A   No.  I believed that my partner, as well as
20  myself, were in fear of receiving a battery, so I gave
21  the command Taser Taser Taser and deployed my Taser in
22  the center mass area of Mr. Lopez.

---

128

1        MR. DE ROSE:  All right.  Well, move to strike
2  that.  We'll get to all of that.  Would you read that
3  question back and see if he can answer just this
4  question?
5  BY MR. DE ROSE:
6     Q   We'll get to what you did or why you did it,
7  okay?
8     A   Okay.
9              (The record was so read
10             by the court reporter.)
11       THE WITNESS:  I don't recall saying anything to
12  anybody.
13  BY MR. DE ROSE:
14    Q   All right.  But you just indicated for us a
15  moment ago you said Taser Taser Taser, correct?
16    A   My mistake.  I don't recall saying those
17  words, "get away from him," to anybody.
18    Q   All right.  But you do recall using the words
19  Taser Taser Taser?
20    A   Yes.
21    Q   All right.  Had you heard anything else said
22  before you said Taser Taser Taser?

---

Pages 125 to 128

Stevan Vidljinovic
September 4, 2013

129

1    **A    From the moment that he started flailing his**
2    **arms?**
3        Q    Yes.
4    **A    No, I don't recall hearing anything else up**
5    **until the moment that I said Taser Taser Taser.**
6        Q    All right.  And when you said Taser Taser
7    Taser, that was a signal that you used to tell your
8    brother officers to get out of the way; I'm about to
9    use the Taser weapon, right?
10   **A    Through the training, when I got certified by**
11   **the Taser, that is protocol in the Chicago Police**
12   **Department to give that command prior to using it.**
13       Q    All right.  And they tell you to use those
14   three words because, as you're trained, that is a
15   warning to other officers to get out of the way?
16   **A    You want people surrounding you to be aware**
17   **that you are using a Taser.**
18       Q    They are not to take any kind of a position,
19   are they?
20       MR. YAMIN:  Objection to form.
21       THE WITNESS:  I don't believe that it dictates for
22   them to take a particular position.  It's just to make

130

1    them aware that a Taser is about to be deployed.
2    BY MR. DE ROSE:
3        Q    Let's talk about that training that you got.
4            When you went to the North Side Police
5    Training Center there were several of you officers
6    receiving your training, weren't there?
7    **A    Yes.**
8        Q    And you were advised that during the day each
9    of you were going to have the very unpleasant
10   experience of being tased, weren't you?
11   **A    That's incorrect.**
12       Q    Oh, when you went there they didn't tell you
13   that was going to happen?
14   **A    They said being tased is a voluntary act.**
15   **You can choose to be tased or choose not to be tased.**
16       Q    And if none of you would volunteer, then they
17   weren't going to use the Taser on anybody that day, as
18   far as you knew?
19   **A    I don't know what they would have done,**
20   **because people did volunteer.  So I don't know what**
21   **their backup plan would have been if nobody**
22   **volunteered.**

131

1        Q    Did they get a lot of volunteers?
2    **A    I don't recall.  A handful.**
3        Q    Were you one of the volunteers?
4    **A    No, I was not.**
5        Q    Why not?
6    **A    Because I just chose not to be tased.  It was**
7    **a decision that they gave us that I made.**
8        Q    All right.  Did they tell you what would be
9    the effect if you were tased?
10   **A    Something to the extent of two probes**
11   **entering the body and sending an electromagnetic wave**
12   **between point A and point B.**
13       Q    And did they tell you how that feels when
14   that happens before they asked for volunteers?
15   **A    They didn't go into any specifics.  They just**
16   **said that you become incapacitated; you have no control**
17   **over your body.**
18       Q    All right.  Now, these are the two different
19   instructors, they were both there when they asked for
20   volunteers?
21   **A    At least two different instructors, yes.**
22       Q    And did you guys give a round of applause to

132

1    the volunteers when they said they would let it happen
2    to them?
3    **A    I don't recall.**
4        MR. YAMIN:  Object to form.
5    BY MR. DE ROSE:
6        Q    You did not want to volunteer because you
7    suspected this was a pretty uncomfortable experience,
8    right?
9        MR. YAMIN:  Objection.  Asked and answered, and
10   calls for speculation.
11       MR. POLICK:  Join in the objections.
12       THE WITNESS:  I just chose not to volunteer.
13   BY MR. DE ROSE:
14       Q    No particular reason?
15   **A    No particular reason.**
16       Q    All right.  And in the room where the
17   volunteers were going to be energized by the Taser
18   weapon, there were mats on the floor, weren't there?
19   **A    I don't recall if there were mats on the**
20   **floor.**
21       Q    Well, did the rest of you officers stand
22   around while these volunteers got tased?

Pages 129 to 132

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

133

1       MR. YAMIN:  Objection to form.
2       THE WITNESS:  No.  The officer that was about to
3   get tased was being held upright by two other officers
4   that were in the class.
5   BY MR. DE ROSE:
6       Q   All right.  But I mean your vantage point
7   while the different five volunteers had it done to
8   them, you were standing around the area where the
9   volunteers were tased, right, so you could all watch
10  what happened?
11      A   Again, I don't know how many volunteers
12  specifically, but it was in an auditorium, so we were
13  sitting on carpeted seats of the auditorium.
14      Q   Oh, you were seated.  Were they like up on
15  the stage?
16      A   They were still on the ground level in front
17  of the stage, so not too far from the stage.
18      Q   So from where you were seated it was only
19  about five or six, maybe ten feet, at most, from where
20  the tasing event took place?
21      A   That's a good ballpark estimation, about
22  10 feet, 15 feet.

134

1       Q   And the instructors told all of you in the
2   training session that these volunteers are going to
3   have a spotter on either side of them?
4       A   Yes.  That's the way that they did that.
5       Q   And they explained what the purpose of the
6   spotters was, didn't they?
7       A   Yes.
8       Q   What do you remember your instructors told
9   you was the purpose of a spotter?
10      A   One was to brace the individual that was
11  being tased.
12      Q   To catch them when they were tased?
13      A   To bring them down lightly when they were
14  tased.
15      Q   Were they told, the spotters, to be in
16  physical contact with the person who was about to be
17  tased?
18      A   Each spotter on each side had one arm
19  underneath the individual that was about to be tased
20  under each of their arms.
21      Q   And that was already even before Taser darts
22  were expelled?

135

1       A   Correct.
2       Q   And by the way, did you get to be one of the
3   spotters that day?
4       A   I don't recall whether I was a spotter or
5   not.
6       Q   Did they get volunteer spotters?
7       A   People just willingly would go up.
8       Q   And they instructed what they expected the
9   spotter to do?
10      A   Yes.
11      Q   And did the instructors say when the Taser
12  darts are expelled into the individual, be prepared
13  because the individual can fall any way imaginable;
14  front, back, or to the side?
15      A   They just said that it incapacitates your
16  body, so you have no control; so just be prepared to
17  hold them up and bring them down lightly.  They didn't
18  specify which direction they would fall.
19      Q   And did the instructors say to bring them
20  down lightly so they are not injured?
21      A   They were told to bring them down lightly.  I
22  mean, an assumption can be made that to avoid injury,

136

1   yes.
2       Q   And each one of these volunteers that was
3   tased that day in your training instruction, each one
4   of them always had a spotter on either side of them
5   when each one of them was tased; is that correct?
6       A   Yes.
7       Q   There was nobody who was a volunteer who was
8   tased without the assistance of spotters on either side
9   of them?
10      A   Not to my knowledge.
11      Q   Did the instructors tell you where in the
12  body you were to tase someone?
13      A   Center mass.
14      Q   Center mass, front side or back side?
15      A   Front side.
16      Q   And center mass means what, below the chest,
17  at the chest level?
18      A   The torso area.
19      Q   All right.  So anywhere in the front torso,
20  from the top of the shoulders all the way down to the
21  waistband?
22      A   You want to avoid the head.  So anywhere

Pages 133 to 136

Stevan Vidljinovic
September 4, 2013

137

1  underneath the neck line to the waistband would be
2  considered center mass.
3       Q   Did they tell you that it was less dangerous
4  if you could tase a suspect on his back side?
5       A   I don't recall them saying that.
6       Q   Did they tell you you could tase a suspect on
7  his back side?
8       A   No, I don't recall.
9       Q   So by your training, you always wanted to be
10 facing the suspect and trying to tase them in center
11 mass front, right?
12      A   In ideal situations, yes.
13      Q   And you know what a dry stun is, don't you?
14      A   Yes.
15      Q   And that's without the use of the deployment
16 of the darts, right?
17      A   That's correct.
18      Q   Have you been trained how to do the dry tase?
19      A   We were told about it by the instructors as
20 another option while carrying the Taser, but I don't
21 recall us being shown in particular a dry stun example.
22      Q   Did they tell you which was the preferable

138

1  use of the Taser gun?
2       A   Every situation dictates itself.  In order to
3  dry stun somebody, you would have to dislodge the
4  cartridge that's already in the Taser and try to come
5  up to close proximity of the person to try to dry stun
6  them.
7       Q   And when you dry stun them, you actually put
8  the muzzle of the Taser gun right up against the person
9  and pull the trigger just like you would when you expel
10 the darts?
11      A   Yes.
12      Q   In your experience or your training, once you
13 pull the trigger and you're either dry stunning, or the
14 two darts reach the person's body, there is an
15 electrical current that is produced in the person's
16 body, correct?
17      A   After making contact?
18      Q   Yes.
19      A   Yes.
20      Q   And for how long is that electrical current
21 going on inside of someone's body?
22      A   For as long as you have the Taser on.

139

1       Q   And how long -- if you hold the Taser trigger
2  down, you can hold it down continuously?
3       A   Our instructors when I took the Taser program
4  said that by Department regulations, we're only allowed
5  to tase somebody for five seconds, no more.
6       Q   So do you watch with your watch how long that
7  is?
8       A   No.
9       Q   Are you counting 1,001, 1,002 or something
10 like that?
11      A   I don't recall if I was counting at that
12 time.
13      Q   A single pull of the trigger on the Taser gun
14 it expels a single charge for five seconds, doesn't it?
15      A   I know that if you pull the trigger and hold
16 onto it, you can only hold onto it for five seconds.
17 That's my understanding of the use of the Taser through
18 the training that I had.
19      Q   And you know that you can then pull the Taser
20 trigger an additional time or multiple additional times
21 and put another charge into the individual?
22      A   The trigger is used to deploy the prongs.

140

1  There's an actual toggle switch that turns the Taser on
2  and off.
3       Q   All right.  So if you had to put additional
4  charges into an individual, there is a method that you
5  can do that with the gun after the darts have already
6  been expelled; is that not correct?
7       A   I don't recall if we were taught to perform
8  additional charges with the Taser after the prongs have
9  already been in the subject.  I don't recall that.
10      Q   But do you know how to do it?
11      A   It would be fairly easy to figure it out.
12 You would just turn the toggle back on and hold down
13 the trigger.
14      Q   All right.  So you just learned that
15 yourself, or somebody taught you that, just turning the
16 toggle back on and off?
17      A   It's taught that the toggle cuts the bumper,
18 cuts the electricity.
19      Q   Were you taught how many volts of electricity
20 passed through one's body after one Taser, or during
21 one Taser event?
22      A   I'm sure they told us, but I don't recall the

Pages 137 to 140

Stevan Vidljinovic
September 4, 2013

141

1    exact number.
2        Q   If I suggested 12,000 volts, do you remember
3    hearing that?
4        A   Again, I don't recall a specific number.  I
5    can't even begin to speculate.
6        Q   Were you instructed that tasing of a person
7    will normally make that person go to the ground?
8        A   We were instructed that tasing somebody would
9    incapacitate them and have them lose control of their
10   muscles and eventually collapse.
11       Q   All right.  Those volunteers that went
12   through the tasing event there in your training
13   session, did they appear, before the event took place,
14   to be nervous and worried about what they were about to
15   experience?
16       A   I don't recall the behavior of the
17   volunteers.
18       Q   Every one of the volunteers who you watched
19   that day, they lost physical control so that they, if
20   they didn't have spotters, would have gone to the
21   ground, correct?
22       A   There was one individual in my mind I

142

1    remember that was still was upright.
2        Q   Some guys or gals can really take a --
3        A   It all depends on the individual.
4        Q   And the person that you remember still
5    standing -- by the way, I saw Seagal do that in a
6    police movie years ago, so I picture Seagal doing it.
7            This person that you saw doing this, was
8    he as big as Seagal, or a huge man like that?
9        A   I don't recall the stature of the person that
10   still was upright during the tasing.
11       Q   But you don't know how much holding was going
12   on by the two spotters, right?
13       A   I do not.  I can't speak for the spotters.  I
14   do not.  I was not holding it.
15       Q   Well, if I tell you Seagal had no spotters
16   and he stood up during it, you didn't see that movie,
17   did you?
18       A   No, I did not.
19       Q   When you said Taser Taser Taser, did you tell
20   your partner and Officer Alamillo, "You guys have got
21   to get over on the sides of him as a spotter?"
22       A   No, no.  It's a command given to make

143

1    everybody aware that a Taser is about to be deployed.
2    Nothing else is said.
3        Q   Well, did you wait to deploy the Taser until
4    you had a spotter on either side of him?
5        A   No, I did not.  I was in fear of receiving a
6    battery from the behavior that Mr. Lopez displayed.  He
7    went from being an active resister to an assailant, so
8    I used a less lethal device that I had readily
9    accessible to gain compliance.
10       MR. DE ROSE:  All right.  Move to strike
11   everything that you said after the words, "No, I did
12   not," as non-responsive to my question.
13       THE WITNESS:  Okay.
14   BY MR. DE ROSE:
15       Q   You're going to get a chance today to say all
16   that, but not necessarily in my questioning.
17       A   Understood.
18       Q   All right.  So when you pointed your Taser,
19   you said Taser Taser Taser and then you pointed it at
20   Jose Lopez, correct?
21       A   The command is to say the word three times.
22   So I said Taser Taser Taser and then deployed the Taser

144

1    in the direction of Mr. Lopez.
2        Q   You pointed it at him first, right?
3        A   Yes.
4        Q   And then you knew that the darts were poised
5    and ready to be fired when you pulled the trigger?
6        A   Correct.
7        Q   And Mr. Lopez is standing out in the street
8    at this point; he's not running away from you?
9        A   No.  He's aggressively approaching me,
10   swinging, in the area that I was standing.
11       Q   All right.  But he's in the street?
12       A   Yes.
13       Q   And the street was a typical City of Chicago
14   street made of asphalt on the top, as you remember it?
15   It wasn't a cement street?
16       A   I assume that it was an asphalt street, yes.
17       Q   And when you deployed the Taser, into which
18   part of Jose Lopez's body did you see the darts go?
19       A   I did not see personally where they went.  I
20   directed the Taser to the center mass area of Jose
21   Lopez's body.
22       Q   If there were two Taser darts in his stomach

Pages 141 to 144

Stevan Vidljinovic
September 4, 2013

145

1   later when he was at the hospital, would that be the
2   general area of target that you were using?
3       **A   Yes.**
4       Q   And were you taught how fast these darts
5   travel through the air when you deploy them from the
6   Taser weapon?
7       **A   I'm sure the course covered it.  I don't**
8   **recall exactly.**
9       Q   Did you ever have any refresher courses in
10  use the Taser?
11      **A   That I do not recall.**
12      Q   All right.  Give me one second.  I want to
13  just ask if you were -- I'm going to go with Exhibit
14  No. 10, 11 and 12.
15          Have you ever seen this document,
16  Plaintiff's Exhibit 10 before, sir?
17      **A   Yes.**
18      Q   All right.  You see it's talking about a
19  Taser and they give information on it, and it indicates
20  that it's downloaded by Robert Dubiel.  That was your
21  Lieutenant Watch Commander that night, right?
22      **A   Correct.**

146

1       Q   And it talks about a serial number of this
2   particular Taser.  This is the Taser that you actually
3   used that night?
4       **A   I don't recall the specific serial number of**
5   **the Taser that I used.**
6       Q   But you made a record of it sometime later,
7   didn't you, when you had to make certain reports about
8   the firing of the Taser gun?
9       **A   Yes.**
10      Q   And we'll get to your reports in a minute.
11  This is a Model X26.  Do you see that?
12      **A   Yes.**
13      Q   Now, Taser International has available by
14  2011 video and audio reproduction capabilities once the
15  Taser becomes unholstered and before deployment right
16  through deployment.  Are you aware that Taser
17  International makes such an issue?
18      MR. POLICK:  Objection to the foundation.  He can
19  answer over the foundation.
20      THE WITNESS:  I was aware, but none of them were
21  accessible to Chicago police officers that were working
22  in any of the districts at that time.

147

1   BY MR. DE ROSE:
2       Q   All right.  And as you were aware, the
3   purpose of that audio/video recording capabilities is
4   to record what exactly the officer is confronting when
5   he discharges the weapon, correct?
6       MR. POLICK:  Objection to the form of the question
7   and to foundation.  You can answer it over the
8   objection.
9       THE WITNESS:  Again, I don't work for Taser
10  International.  I don't know the reasoning behind it.
11  It is a safe assumption to say that that probably would
12  be correct.
13  BY MR. DE ROSE:
14      Q   Well, how did you learn that they had that
15  available?
16      **A   I believe word-of-mouth.  I believe another**
17  **officer told me.**
18      Q   All right.  And it looks like this exhibit
19  was generated on July 22nd, 2011, the same day you went
20  out there, at 4:38 in the morning.  Do you see that?
21      **A   Yes.**
22      Q   And that would be about an hour after you

148

1   discharged the Taser, correct?
2       **A   Yes, roughly an hour after.**
3       Q   All right.  Because if you look at the bottom
4   entry there, on that same day you discharged your Taser
5   at 3:46 A.M., right?
6       **A   According to the entry, yes.**
7       Q   Is that about the time that you remember
8   discharging?
9       MR. POLICK:  Objection to the foundation.  You can
10  answer it.
11      THE WITNESS:  I don't know how Lieutenant Dubiel
12  prepares the reports, and I don't know the workings of
13  OEMC.  But roughly around that time would be a good
14  assumption that that's around the time that I
15  discharged my Taser.
16  BY MR. DE ROSE:
17      Q   All right.  And we see handwriting underneath
18  that.  It says Lieutenant S-a-h-n-a-s.
19      **A   Sahnas.**
20      Q   Do you know him?
21      **A   He was at that time the Supervisor for the**
22  **day shift.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

149

1      Q   All right.  So in the 10th District, right?
2      A   Correct.
3      Q   And he was not on duty when you discharged
4  the Taser that night?
5      A   I don't recall Lieutenant Sahnas's schedule.
6  I don't know whether he was on duty.  I can't speak for
7  him.
8      Q   All right.  Let's go to the next document.
9  It's Exhibit No. 11.
10     MR. POLICK:  I'm going to object to this document
11  on the grounds that it has not been produced to the
12  defendants in this case.  I don't know if it's been
13  produced to Mr. Yamin, but I don't recall it being
14  produced to the attorneys for the defendant officers
15  and paramedics in this case.
16     MR. YAMIN:  I haven't seen it.
17     MR. DE ROSE:  I would suggest that I did produce
18  them.  But in the event that I did not, I will be using
19  these throughout the depositions, and so I want to make
20  sure you take a copy of this with you.
21     MR. POLICK:  I'll take a copy of it.  I'm
22  objecting to it because it's not been produced.  I have

150

1  no idea where this document comes from, who wrote it,
2  who the author is; if it's a corporation, if it's the
3  International Association of Chiefs of Police, if it's
4  Taser International.  There's no indication from this
5  document as to who its author is.  This might have been
6  pulled off the Internet, for all I know.
7      MR. DE ROSE:  It was probably pulled off the
8  Internet.
9      MR. POLICK:  Well, I object on those grounds as
10  well.
11     MR. DE ROSE:  I'll have to check and see if I gave
12  it to you.  I thought I did.
13     MR. POLICK:  You're free to ask my client
14  questions about it, but you're going to get a standing
15  objection to this document because, number one, it's
16  never been produced to my knowledge.  I have never seen
17  it before, and I have no idea where this document comes
18  from.  So if you're going to ask my client any
19  questions concerning Plaintiff's Exhibit No. 11, which
20  is entitled Protocol For Deployment of Tasers, I'm
21  going to have a standing objection to that for the
22  reasons I previously stated.  There's no foundation.

151

1  And I don't even think this has been produced to us.
2      MR. DE ROSE:  All right.  And I will respect that
3  standing objection.  So you will not have waived it.
4  If you don't repeat that one throughout the
5  questioning, it will probably get us sound further.
6      MR. POLICK:  Right.  I'll have a standing
7  objection to any questions you ask my client about it.
8      MR. DE ROSE:  All right.
9  BY MR. DE ROSE:
10     Q   Now, sir, this Exhibit No. 11, counsel for
11  the City has already indicated what its title is, and
12  it says it's by Scott Roberts, eHOW Contributor,
13  updated on April 15th, 2010.  Do you know who Scott
14  Roberts is?
15     A   I do not.
16     Q   All right.  And it looks like it bears a date
17  before the date of your involvement with Jose Lopez,
18  correct?
19     A   It does.
20     Q   All right.  Now, look at the first paragraph.
21  It says, "Those state and local law enforcement
22  agencies develop their own protocols for the deployment

152

1  of Tasers, they generally follow guidelines put forth
2  by the Police Executive Research Forum (PERF) and the
3  International Association of Chiefs of Police (IACP).
4      "Taser International, the largest
5  manufacturer of Tasers, also recommends protocols for
6  safe and effective deployment of the weapons, which
7  incapacitate people through electric probes that either
8  cause uncontrollable muscle spasms (neuromuscular
9  incapacitation, also known as NMI), or painful electric
10  shocks, ("drive stun").
11     "NMI is usually more effective and is more
12  commonly used."
13     Do you see where I just read?
14     A   Yes.
15     Q   When you were trained by the Chicago Police
16  Department, they only told you about dry stun and they
17  were teaching you the neuromuscular incapacitation with
18  the darts?
19     A   Yes.
20     Q   And now it talks about probe areas under
21  there.  And it says, "In 2009, Taser International
22  issued a training bulletin to law enforcement agencies

Pages 149 to 152

Stevan Vidljinovic
September 4, 2013

153

1  urging them to avoid shooting probes into people's
2  chests, as doing so may increase the risks of cardiac
3  problems."
4        Do you see where I just read?
5    **A   Yes.**
6    MR. POLICK:  If you're not going to read any
7  further, I'll object under the Rule of Completeness.
8    MR. DE ROSE:  All right.  I won't go any -- well,
9  I'm going to read one more part.
10 BY MR. DE ROSE:
11   Q   Well, just look at the next line.  "Officers
12 should -- and this is only a half a sentence; and
13 counsel would be correct, I'm not completing it.
14 "Officers should ideally shoot probes into the back."
15 Do you see that?
16   MR. POLICK:  Again, object to the Rule of
17 Completeness.  Taken out of context.  It doesn't
18 complete the paragraph.  And there are indications that
19 what you're reading there is not an absolute, based on
20 the completeness of the document.
21 BY MR. DE ROSE:
22   Q   All right.  Do you see where I just read?

154

1    **A   Yes.**
2    MR. POLICK:  Same objection.
3  BY MR. DE ROSE:
4    Q   In your training at the Chicago Police
5  Department, were you told about Taser International's
6  recommendation that you try to tase people in the back?
7    **A   I don't know how credible the originator and**
8  **the information given to me is, nor the updated date of**
9  **April 15th, 2010.  All I recall is while going through**
10 **the completion course of having a Taser, all I recall**
11 **is that the instructors I don't believe said anything**
12 **based on center mass.**
13   Q   And everybody who volunteered in your
14 training were shot with the Taser darts in front of
15 their body?
16   **A   No, they were shot in separate areas of the**
17 **body.**
18   Q   And were they ever shot in the back?
19   **A   Yes.**
20   Q   Did the instructor ever tell you that it was
21 preferable, when possible, to deploy the darts to the
22 back area of the person?

155

1    **A   I do not recall if an instructor specified**
2  **that.**
3    Q   An on those occasions when you saw the
4  volunteers tasered in the front area, did they always
5  fall forward, or did they fall backwards?
6    **A   I don't recall how any of the volunteers that**
7  **were tased fell.**
8    Q   All right.  I want you to look under Field
9  Use, No. 2 part of this.  And I'm going to read you one
10 sentence here.  After the 2 it says, "Whenever
11 possible, officers should avoid deploying Tasers."
12 Then after a few kinds of people it says, "People
13 located in an area where a fall could result in serious
14 injury or death."  Do you see where I just read?
15   MR. POLICK:  Again, object under the Rule of
16 Completeness, but you can answer over the objection.
17   THE WITNESS:  Yes, I see where you just read.
18 BY MR. DE ROSE:
19   Q   When you deployed the Taser on Jose Lopez out
20 there in the street, were you aware that there was a
21 potential that he would fall to the street and strike a
22 portion of his body violently in the fall?

156

1    **A   I, through my training, have observed people**
2  **lose control of their muscles, and their body would**
3  **collapse.  I've also observed somebody stand upright**
4  **while being tased.  So prior to tasing Jose Lopez, I**
5  **couldn't predict how he would react to the Taser.**
6    Q   But you were aware through your use of
7  spotters in your training that there was potential he
8  could fall very fast to the street there where you were
9  confronting, correct?
10   **A   Anybody losing control of their muscles could**
11 **collapse to the ground beneath them, yes.**
12   Q   So is your answer that you were aware of the
13 potential that Jose Lopez, when you deployed the Taser
14 to him, would fall to the street and he could strike a
15 portion of his body?
16   **A   I believe that after deploying my Taser to**
17 **Jose Lopez, he could collapse to the street, yes.**
18   Q   All right, thank you.
19        And then I want you to go to the next page
20 under No. 3.  And I'm going to start with the second
21 sentence on the top of the page.  It says, "The
22 manufacturer warns that the involuntary muscle spasms

Pages 153 to 156

Stevan Vidljinovic
September 4, 2013

157

1    Tasers cause could be injurious to people with
2    pre-existing health problems like osteoporosis,
3    hernias, spinal injuries, or soft tissue damage, to
4    name a few.  Also, the spasms could cause severe
5    exhaustion in people under the influence of drugs or
6    suffering from any number of respiratory or mental
7    health problems."
8            Do you see where I just read?
9        MR. POLICK:  Objection under the Rule of
10   Completeness.  Taken out of context.  You may answer
11   over the objection.
12       THE WITNESS:  Yes, I see where you just read.
13   BY MR. DE ROSE:
14       Q   Were you trained that using a Taser on a
15   person who is under the influence of drugs can be
16   exacerbating any injuries the recipient of your
17   Taser darts is going to suffer?
18       MR. POLICK:  Objection to the form of the
19   question.
20       MR. YAMIN:  Also objection; misstates what was
21   just read to him.
22       MR. POLICK:  Join in that objection.

158

1    BY MR. DE ROSE:
2        Q   You may answer?
3        MR. POLICK:  You can answer over the objections.
4        THE WITNESS:  I was trained to use a Taser when an
5    individual displayed a behavior that could be described
6    as an assailant.  And if somebody was in fear of
7    receiving a battery, as well as myself or fellow
8    officers, that's when I was trained to use a Taser.  I
9    don't recall anything else.
10   BY MR. DE ROSE:
11       Q   All right.  So then in answer to my question,
12   you say you don't recall ever being advised that using
13   a Taser against a person who you believe is under the
14   influence of drugs will exacerbate the effects on that
15   person?
16       A   I cannot recall.
17       MR. DE ROSE:  All right.  Let me look at No. 12,
18   please.
19       MR. POLICK:  Again, as to Plaintiff's Exhibit 12,
20   I'll represent for the record that this has never been
21   produced to counsel for the defendant officers during
22   the course of this litigation, which is months since

159

1    the discovery at this point.  I can't speak for counsel
2    for the City, but I know this has not been produced to
3    us.
4            This appears to be some type of Chicago
5    Tribune article regarding the use of Tasers.  So I'll
6    object to it as hearsay, and rank hearsay as that.
7        And if you ask my client any questions
8    about this document, I will have a standing objection
9    to it on those grounds, that it's never been produced
10   to us and it's hearsay.  And I have a standing
11   objection for those reasons with regard to anything in
12   this particular article.
13       MR. YAMIN:  It also has not been produced to the
14   City, and the City joins in those objections.
15   BY MR. DE ROSE:
16       Q   All right.  As counsel just observed, this is
17   a document taken off the Internet by Chicago Tribune
18   reporters Dan Hinkel, H-i-n-k-e-l, and Alex Richards on
19   July 20th, 2012.  Did you read this article in the
20   Tribune when it came out?
21       MR. POLICK:  Objection to the relevance, in
22   addition to my standing objection to this Internet

160

1    hearsay article.
2        THE WITNESS:  I don't recall ever reading this
3    article.
4    BY MR. DE ROSE:
5        Q   All right.  And it says at the top, "Jolt of
6    reality:  Shootings persist as Chicago police Taser use
7    skyrockets.  Use of devices marketed as means to limit
8    gunfire rose more than 300 percent in two years data
9    show."
10           Did you ever hear reports like that as a
11   police Officer that the use of the Taser gun had risen
12   300 percent from 2010 to 2012?
13       MR. POLICK:  Again, object to the relevance and to
14   the foundation for those figures.  This is a hearsay
15   document, and I think contained in it is hearsay,
16   since the author is not here to tell us where in fact
17   he got or made up these figures.
18           So with those objections, in addition to
19   my standing objection to this exhibit, you may answer.
20       THE WITNESS:  I don't know how credible the
21   information is, or the source, but I don't recall
22   hearing those figures.

Pages 157 to 160

Stevan Vidljinovic
September 4, 2013

161

1  BY MR. DE ROSE:
2    Q  Are you aware that the Chicago Police
3  Department is keeping data records of the frequency of
4  the deployment of a Taser by its members?
5    **A  I do not know if they are keeping it**
6  **individually by members.**
7    Q  And you have never been provided as part of
8  your training any documentation from the Chicago Police
9  Department about any increases or decreases in the use
10  of Tasers?
11    **A  I don't recall receiving any such**
12  **documentation.**
13    Q  And I want to go four paragraphs up from the
14  bottom of the first page of Plaintiff's Exhibit 12.  It
15  reads for the record, "The numbers raise questions
16  about how often police use the weapons to diffuse
17  confrontations that might otherwise escalate to use of
18  deadly force.
19      "Civil lawyers and department critics have
20  alleged that, rather than deploying Tasers to subdue
21  dangerous criminals, officers have sometimes drawn them
22  on mildly obstinate suspects."

162

1      Do you see where I just read?
2    MR. POLICK:  Object under the grounds of the Rule
3  of Completeness.  It's being taken out of context in
4  this three-page Internet article.  It's hearsay.  It's
5  irrelevant.  And in addition to my standing objections
6  to this document, you may answer over the objections.
7  BY MR. DE ROSE:
8    Q  Do you see where I just read?
9    **A  I do see were you just read.**
10    Q  All right.  First of all, you had no
11  information that Jose Lopez that night was a dangerous
12  criminal, did you?
13    **A  At which time are we speaking of?**
14    Q  When you went out to the scene, you had the
15  Taser gun in your hand, and at the moment you deployed
16  it?
17    **A  Yes.  He became from an active resister to an**
18  **assailant.  An assailant is described as someone who is**
19  **dangerous that can cause death or great bodily harm to**
20  **people that surround him.**
21    Q  So in your opinion, he was a dangerous
22  criminal when you deployed your Taser?

163

1    MR. YAMIN:  Objection.  That misstates his
2  testimony.
3    MR. POLICK:  Join in the objection.
4    MR. YAMIN:  The word criminal was not stated by
5  the deponent.
6    MR. POLICK:  Join in that objection.
7  Argumentative.
8  BY MR. DE ROSE:
9    Q  All right.  I'm going to ask this question.
10  When you pulled the trigger on the Taser gun, is it
11  fair to say that you had no information that Jose Lopez
12  was a dangerous criminal that should be apprehended,
13  because you knew of no criminal activity he had been
14  engaged in a moment prior to that, or any other time in
15  his life?
16    MR. POLICK:  All right.  I'm going to object to
17  that question as to the form, because it's a compound
18  question.  There's about three questions involved in
19  that question.  And again, the question I think is
20  ambiguous.  You can answer it if you understand it.
21    MR. DE ROSE:  Let me withdraw it.
22    MR. YAMIN:  I will also object it's been asked and

164

1  answered and mischaracterizes the previous testimony of
2  the deponent.
3  BY MR. DE ROSE:
4    Q  All right.  As you walked up to Jose Lopez
5  and before he made whatever gesture you determined,
6  before that, is it fair to say you had no information
7  that Jose Lopez was a dangerous criminal wanted by the
8  police?
9    MR. POLICK:  Objection.  Again, that's a compound
10  question, dangerous criminal and wanted by the police.
11    MR. DE ROSE:  All right.
12    MR. POLICK:  So again, I'm going to object to the
13  form of the question.  And again, I think it's been
14  asked and answered.
15    MR. DE ROSE:  All right.  Let me strike the
16  question.
17  BY MR. DE ROSE:
18    Q  Before you walked up to him and deployed your
19  Taser weapon, is it fair to say you had no information
20  that Jose Lopez was wanted by the police?
21    **A  Our objective when we were walking up to**
22  **Mr. Lopez was to seek medical assistance.  He was not a**

Pages 161 to 164

Stevan Vidljinovic
September 4, 2013

165

1    **criminal, but he did display aggressive manners that he**
2    **could be dangerous --**
3         MR. DE ROSE:  All right, stop.
4         MR. POLICK:  Let him finish his answer.  You asked
5    a compound question, and I think he's allowed to finish
6    his answer.
7    BY MR. DE ROSE:
8         Q    Finish your answer.
9         MR. POLICK:  You can do what you want afterwards,
10   but please don't interrupt him while he's answering
11   your question.  He has a right to answer your question
12   to the best of his ability.  You may not like it, but
13   he has a right to do it.  You can do what you want
14   afterward, but please don't cut him off.  Nobody's
15   cutting you off.
16        THE WITNESS:  He expressed behavior that I have
17   observed in the past that could make him a dangerous
18   individual.
19        MR. DE ROSE:  Move to strike the answer as not
20   responsive to my question.  Miss Reporter, will you
21   read my question?
22

166

1    BY MR. DE ROSE:
2         Q    And sir, can you confine your answer to just
3    answer the question posed?
4         A    Yes.
5              **(The question was so read**
6              **by the court reporter.)**
7         MR. POLICK:  Asked and answered.  You may answer
8    over the objection.  Go ahead.
9         THE WITNESS:  I do not have any recollection of
10   anybody telling me anything of Jose Lopez's criminal
11   history, or whether he was wanted by the police.
12   BY MR. DE ROSE:
13        Q    All right.  And Jose Lopez stood his ground
14   as you and the other officers walked up to him; is that
15   correct?
16        MR. POLICK:  Objection to the form of the
17   question.
18        MR. YAMIN:  Object to form.
19        MR. POLICK:  You can answer over the objection.
20        THE WITNESS:  He was standing in the street by
21   himself, with his fists clenched to his side.
22

167

1    BY MR. DE ROSE:
2         Q    He was not attempting to escape or run away
3    from you?
4         A    **I don't recall him attempting to escape or**
5    **run away.**
6         Q    All right.  Thank you.
7              In your police training in the last few
8    years, you were trained about the use of force model
9    that the police department wants to use?
10        MR. POLICK:  Objection to the form.  You can
11   answer it.
12        THE WITNESS:  Yes.
13   BY MR. DE ROSE:
14        Q    And how long was your training in the use of
15   force model?
16        A    **It's continuous.  We started in the Academy.**
17   **They introduce the use of force model to us.  They**
18   **threw out scenarios, because every scenario dictates a**
19   **different action by a police officer, given the**
20   **behavior and the actions of the individual in the**
21   **scenario.  And then through the Internet, in-service**
22   **training, etc.**

168

1         Q    All right.  And you learned there are
2    gradations of force that you're allowed to use,
3    depending on the behavior of the person that you are
4    confronting in the course of your police duties?
5         A    Yes.
6         Q    And your first level of force to be used is
7    verbal, word-of-mouth, isn't it?
8         A    **Yes, that's a way that we try to gain**
9    **compliance initially, depending on the behavior of the**
10   **individual.**
11        Q    And you try to use persuasion or commands,
12   correct?
13        A    **Again, every situation is different.**
14   **Depending on the individual, those are tactics that we**
15   **do use.**
16        Q    It sounds like your partner, when he walked
17   up to Jose Lopez, was using the very basic and first
18   step of the use of force continuum, right?  He was
19   trying to use persuasion?
20        A    **My partner was attempting to get him into the**
21   **ambulance, so that is a way that you could see it, yes;**
22   **he was trying to use persuasion.**

Pages 165 to 168

Stevan Vidljinovic
September 4, 2013

---

169

1    Q  And your partner, you told us, gestured
2  toward the ambulance and he said, "Come on, Buddy.
3  Let's see if we can get you some help." That's a
4  persuasive effort, right?
5    **A  Yes.**
6    Q  And after your partner said that, did your
7  partner ever escalate his verbal communication with
8  Jose Lopez to an order or a command that he should get
9  into the ambulance?
10    MR. YAMIN:  Objection to the form, scope.
11    MR. POLICK:  Join.  You can answer.
12    THE WITNESS:  Again, depending on the behavior of
13  the individual that we're speaking of, my partner
14  didn't have time to verbally command him with anything
15  else.
16  BY MR. DE ROSE:
17    Q  So you heard no verbal commands; you only
18  heard persuasion?
19    **A  I heard my partner having a conversation with**
20  **him to try to get him into the ambulance, yes.**
21    Q  And that is the lowest level on the force on
22  the continuum of force hierarchy, right?

---

170

1    **A  Speaking to an individual would be considered**
2  **the lowest form, yes.**
3    Q  And then as you talk to the person, there are
4  uses of various kinds of weapons that are at your
5  disposal that you can deploy against a person to make
6  them follow your wishes or commands, correct?
7    **A  Depending on the situation, we have several**
8  **tools that we can use to get compliance from an**
9  **individual.**
10    Q  And the first one you use, and the least
11  violent of those tools, are the handcuffs, right?
12    MR. YAMIN:  Objection to the form.
13    MR. POLICK:  Join.  You may answer over the
14  objection.
15    THE WITNESS:  Mr. Lopez was never to be placed in
16  custody.  Our main objective was to get him medical
17  treatment.  So I did not have the handcuffs readily
18  accessible.
19  BY MR. DE ROSE:
20    Q  All right.  But in the continuum, as you're
21  taught, the first weapon available to you officers are
22  the handcuffs, correct?

---

171

1    **A  Again, depending on the situation and the**
2  **individual.**
3    Q  And then the second level of weapons
4  available to you, and normally on one or the other of
5  your utility belts, is the ASP, correct, the
6  collapsible baton?
7    **A  The collapsible baton is also a tool that we**
8  **can use that we've been trained in.**
9    Q  And it's much lower on the continuum than any
10  firearms you have on your person, isn't it, according
11  to your training?
12    **A  Again, it depends on the situation.  We also**
13  **have OC spray that we can use.**
14    Q  We're going to get to that.  That's right.
15    Your collapsible baton is lower on the
16  continuum of weapons to be used than is OC spray, isn't
17  it?
18    **A  I don't know -- I don't recall the model for**
19  **certain which one comes before the other, because**
20  **again, it all dictates on what the individual is being**
21  **classified as, and then you react to that individual**
22  **and you have certain options that you can use.**

---

172

1    Q  Did you have on your utility belt, pepper
2  spray or OC spray?
3    **A  I normally do carry it out, so there was**
4  **probably a good chance that I did have it.**
5    Q  Does your partner carry either OC spray or
6  pepper spray?
7    MR. YAMIN:  On that occasion?
8    MR. DE ROSE:  Yes, that's right, of course.
9  BY MR. DE ROSE:
10    Q  On that day?
11    **A  I can't speak for my partner.  I don't know**
12  **what he had on his utility belt.**
13    Q  Do you know if he has a habit of normally
14  carrying one or the other?
15    **A  He normally makes it a point to carry a**
16  **retractable baton and OC spray, yes.**
17    Q  All of those items we just talked about,
18  handcuffs, collapsible baton and the OC and pepper
19  spray, those are all lower down on the continuum of
20  force that you were taught to use, right?  You were to
21  consider the use of those first?
22    **A  As opposed to lethal?**

---

Pages 169 to 172

Stevan Vidljinovic
September 4, 2013

173

1      Q   Yes.
2      **A   Yes, they are lower than using lethal force.**
3      Q   All right.  And then after all those, the
4  next item of use is the Taser, correct?
5      MR. YAMIN:  Object to the question, in that it
6  misstates the use of force continuum.
7      MR. DE ROSE:  Well, let's find it.
8      MR. POLICK:  I will join in that objection.
9      MR. DE ROSE:  Give me a minute.
10  BY MR. DE ROSE:
11     Q   So you don't have to guess, I know training
12  was a while ago, and things might have changed.  Let's
13  see what I can find here.
14        Sir, do you ever remember seeing this
15  General Order of the Chicago Police Department before
16  your experience and training?
17     **A   Yes.**
18     Q   And it is General Order Number 02-08-01A.
19  It's the Use of Force Model.  Were you trained in this
20  when you were in the Academy?
21     **A   Yes.**
22     Q   And because its effective date was in August

174

1  of 2003, right, that would be before you did your
2  training?
3      MR. POLICK:  I'm going to object to the form of
4  the question.  It implies that there was no such Order
5  prior to that time.  This may be an update to the Order
6  that was in existence, but to imply that there was no
7  such Order prior to the time this officer attended the
8  academy is incorrect.  I object on those grounds.
9      MR. DE ROSE:  Well, I surely did not mean that
10  implication by the question.
11  BY MR. DE ROSE:
12     Q   What I'm suggesting is this particular Order
13  in front of you has an effective date prior to your
14  joining the police department and going through the
15  Academy, right?
16     **A   Yes.  On Exhibit 20 the effective day is 15**
17  **August, 2003, which was prior to me entering the**
18  **Academy.**
19     Q   All right.  Now, I want you to look down on
20  that first page under Department policy and look at
21  letter B.  And it says, "Whenever reasonable, members
22  will exercise persuasion, advice, and warning prior to

175

1  the use of physical force."  Do you see where I just
2  read?
3      **A   Yes, I see where you just read.**
4      Q   And the word physical is like in bold.  Do
5  you notice that?
6      MR. POLICK:  Where is this you're talking about?
7      MR. DE ROSE:  On the first page under 2B.
8      MR. POLICK:  Okay.
9  BY MR. DE ROSE:
10     Q   Is the word physical in bold there on your
11  copy?
12     **A   It's slightly bolder.**
13     Q   All right.  Now, go to Page 2.  They have
14  that illustration No. 1.  It looks like step things.
15  Were you taught about what the meaning of this
16  illustration No. 1 was when you were in the Academy?
17     **A   Yes.**
18     Q   So they distinguish between cooperative
19  subjects, resisters and I can't read that other word.
20     **A   Assailants.**
21     Q   Assailants, right?
22     **A   Correct.**

176

1      Q   And they taught you to distinguish the
2  differences, correct?
3      **A   Yes.**
4      Q   Let's go to Exhibit 21.  This is General
5  Order 02-08-02.  Have you received this General Order
6  from the Police Department over the period of your
7  training with the department?
8      **A   I believe throughout the training, that I**
9  **have received this Order.**
10     Q   All right.  Let's go down it.  First of all,
11  under Policy, under A it says, "Members will maintain a
12  courteous and professional demeanor when dealing with
13  the public."  Were you trained that that was the way
14  you were supposed to do it?
15     **A   Yes.**
16     Q   And 2B, "Before taking any police action,
17  sworn members will identify themselves as police
18  officers unless identification would jeopardize the
19  safety of the member or others or compromise the
20  integrity of an investigation."  You were trained in
21  that, also?
22     **A   Yes.**

Pages 173 to 176

Stevan Vidljinovic
September 4, 2013

177

1    Q  All right.  You tell us as you walked up to
2  this man, you thought he was incoherent; is that
3  correct?
4    **A  We believed that he was incoherent after**
5  **trying to have a conversation with him.**
6    Q  Did any of you officers identify yourself as
7  a Chicago Police Officer?
8    **A  I can't speak for Officer Guettler or Officer**
9  **Alamillo, because I don't recall.  I know what Officer**
10  **Guettler spoke about to Mr. Lopez.  I was in my Chicago**
11  **Police Department-issued vest with my star and my name**
12  **tag and my uniform, not in plain clothes.  So I did not**
13  **verbally say that I was a police officer, although what**
14  **I was wearing is, how would you say, department-**
15  **mandated uniform for anybody working a beat.**
16    Q  Did you hear any police officer in your
17  presence at any time that night identify themselves as
18  a police officer?
19    **A  I can't speak for anybody else.  I don't**
20  **recall myself saying that to Mr. Lopez.**
21    Q  And you thought Mr. Lopez was incoherent.
22  Did you believe that Mr. Lopez could understand what

178

1  you were saying to him?
2    MR. POLICK:  Objection as to what Mr. Lopez
3  understood.  You can answer over the objection.
4    THE WITNESS:  I can't speak for Mr. Lopez and what
5  he comprehended what was going on.  All I could speak
6  for is that I could not understand Mr. Lopez.
7  BY MR. DE ROSE:
8    Q  Did you believe, because you could not
9  understand him and he was incoherent, that he couldn't
10  understand anything you guys were saying?
11    MR. POLICK:  Objection.  Calls for speculation.
12  He's not competent to answer what Mr. Lopez thought.
13  You can answer under the objection.
14  BY MR. DE ROSE:
15    Q  I'm talking about your belief, not what you
16  thought.
17    MR. POLICK:  That's a different question.
18    MR. DE ROSE:  That's what I'm asking.  Stop.
19  Would you re-read my question, please?  And this is the
20  only one I want you to answer.
21          (The question was so read
22          by the court reporter.)

179

1    MR. POLICK:  Why don't you restate it?
2    MR. DE ROSE:  All right.  Let me restate it.
3  BY MR. DE ROSE:
4    Q  And just please try to answer this question.
5      Sir, because you perceived that Mr. Lopez
6  was incoherent, did you believe that he could not
7  understand what officers were saying to him at that
8  time?
9    MR. POLICK:  Same objection.  Calls for
10  speculation.  You can answer.
11    THE WITNESS:  Again, I can't speculate what Mr.
12  Lopez was thinking.
13  BY MR. DE ROSE:
14    Q  Nobody is asking you that.  I'm asking you
15  what you believe.
16    MR. POLICK:  And he's answering you, so please let
17  him answer your question.
18    THE WITNESS:  He appeared to be under the
19  influence of a substance.  I have never been under the
20  influence of that substance, so I do not know whether
21  somebody can comprehend another individual when they
22  are speaking to him; therefore, I can't speculate how

180

1  Mr. Lopez comprehended or didn't comprehend us.  All I
2  know is that he was incoherent to me.
3    MR. DE ROSE:  Move to strike that answer as not
4  responsive.
5  BY MR. DE ROSE:
6    Q  Is it fair to say then, you have no belief as
7  to whether he could understand you or not?
8    **A  It's fair to say that I don't know whether**
9  **Mr. Lopez could understand me or not.**
10    Q  Thank you.
11      All right.  Now let's go down to Level of
12  Force Response Options Guidelines.  "A.  A cooperative
13  subject is a person who is compliant without the need
14  for physical force.  And the following response options
15  are appropriate when dealing with a cooperative
16  subject:"  You can use social control, police presence.
17      "Social control/police presence is
18  established through identification of authority and
19  proximity to the subject.  Police presence may result
20  in conforming behavior."
21    **A  Yes, I was taught that.**
22    Q  I'm on to Page 2 now.  "Social control/police

Pages 177 to 180

Stevan Vidljinovic
September 4, 2013

181

1   presence, used alone, is the only force option which is
2   appropriate for use with subjects who are cooperative
3   without the need for direction from law enforcement
4   personnel." Were you taught that?
5       **A   With subjects who were cooperative, yes, I**
6   **was taught that.**
7       Q    Then they have verbal control. "Verbal
8   control consists of persuasion, advice and warning. It
9   includes instruction or direction from a member in the
10  form of verbal statements or commands. Verbal control
11  may result in conforming behavior.
12          "Whenever practical, members will attempt
13  to de-escalate confrontations by utilizing verbal
14  control techniques prior to, during, and after the use
15  of physical force." Do you see that?
16      **A   Yes, I do.**
17      Q    And you were trained in that; is that
18  correct?
19      **A   Yes, I was.**
20      Q    If the man had been able to be understood by
21  you and said, "No, I do not want to go to the
22  ambulance," would you have just turned and walked away?

182

1       MR. POLICK: Objection. It's an incomplete
2   hypothetical and a hypothetical unsupported by any
3   facts heretofore in evidence, and therefore, it calls
4   for speculation. You may answer.
5       THE WITNESS: If an individual who didn't appear
6   to be a harm to himself and people around him could
7   convey that he did not need medical assistance, then it
8   is his right to deny it.
9   BY MR. DE ROSE:
10      Q    We saw that earlier Illinois Code, a
11  statement that said if a person on the street refuses
12  your aide and assistance, you just walk away and your
13  activity is terminated, correct?
14      MR. POLICK: I'm going to object to the form of
15  the question, since I don't know what Illinois Code or
16  Statute you are referring to.
17      MR. DE ROSE: We looked at it earlier, but let me
18  turn back to the number.
19      MR. POLICK: Okay. If you could direct us to what
20  you're looking at, that would be helpful.
21      MR. DE ROSE: Okay.
22

183

1   BY MR. DE ROSE:
2       Q    14B. Turn again to 14B just for a moment.
3   You remember when we went through that earlier?
4       MR. POLICK: 14B?
5       MR. DE ROSE: I believe so. Let me turn to it in
6   mine.
7       MR. POLICK: I show 14B to be a Chicago Police
8   Department Special Order entitled Alcohol and Drug
9   Dependent Persons.
10      MR. DE ROSE: All right. That's not what I
11  wanted. Hold on.
12  BY MR. DE ROSE:
13      Q    Yes, 14B. That's what I wanted to talk to
14  you about. That is a Chicago Police Department Special
15  Order of how you are to deal with alcohol and drug
16  dependent persons when you come upon them in the public
17  way, right?
18      **A   Yes, that's what the Special Order specifies.**
19      Q    Look under B, the very last sentence, and
20  there is a word in the middle that is all in caps. The
21  word is REFUSES. And the sentence reads, "If the
22  person REFUSES the assistance offered, no further

184

1   police action will be taken." Do you see that?
2       MR. POLICK: Again, object under the Rule of
3   Completeness. It's taken out of context. It's also
4   irrelevant, because this refers to a person being
5   intoxicated. You may answer over the objection.
6       THE WITNESS: Yes, I see that what you just read.
7   BY MR. DE ROSE:
8       Q    All right. You think this Special Order only
9   applies to people who are intoxicated?
10      **A   2B states in bold print, "intoxicated in a**
11  **public place."**
12      Q    Well, let's look at the top of that. Under
13  purpose, "This directive facilitates Department
14  compliance with the Alcoholism and Other Drug Abuse and
15  Dependency Act, (20 ILCS 301.)" Do you see that?
16      **A   Yes.**
17      Q    So you believe that this policy only concerns
18  alcohol dependence?
19      MR. POLICK: Objection. Misstates the witness's
20  testimony.
21      THE WITNESS: The way that I read it, I believe
22  that when the word intoxicated is involved, it means

Stevan Vidljinovic
September 4, 2013

185

1  alcohol.
2  BY MR. DE ROSE:
3      Q    Have you ever heard of the principle that
4  when one is under drug use, they are intoxicated by
5  drugs?
6      A    **Through my training and knowledge, usually**
7  **when somebody is under drug use, it is described as**
8  **under the influence of drugs.**
9      Q    All right.  That's just like you've been
10  trained when one is under the influence of alcohol,
11  it's under the influence of alcohol, right; the very
12  same kind of thing?
13      A    **Correct.  But intoxicated has never been used**
14  **for somebody who was under the influence of drugs,**
15  **which is what Mr. Lopez displayed.**
16      Q    All right.  Let me go back to where we were.
17          So you did not think it was at all
18  required for you officers there to see if he was
19  refusing your help in any way that night?
20      A    **As a police officer responding to the scene,**
21  **initially, that's the conversation, that was the**
22  **objective that we were trying to gain from talking to**

187

1  the other men on the street that night tried to just
2  grab my client, overpower him and restrain his movement
3  and put him in the ambulance, did you?
4      MR. POLICK:  Objection to the compound nature of
5  the question.  It also misstates the witness's
6  testimony.  You may answer over those objections.
7      THE WITNESS:  Again, my partner, Officer Guettler,
8  approached to try to persuade Mr. Lopez, and as he
9  neared Mr. Lopez, Mr. Lopez flailed his arms and began
10  to direct --
11  BY MR. DE ROSE:
12      Q    Sir, I'm going to interrupt.
13      MR. POLICK:  No, you asked him a question, and
14  he's allowed to answer it.
15      MR. DE ROSE:  This is not my question.
16      MR. POLICK:  You asked him a compound question
17  that had about three or four parts to it.  So if you
18  want to ask him a succinct question, do it, but you
19  cannot ask a compound question of that nature.  I've
20  made my objection.  I cannot tell the witness not to
21  answer that question, but you cannot cut him off of his
22  answer.  If you want to ask a succinct question, go

186

1  **Mr. Lopez.**
2      Q    But you, yourself, never tried to determine
3  if he was refusing any help or attendance of any kind?
4      A    **Of course I was.  If my partner was asking**
5  **the questions, that doesn't mean that I wasn't**
6  **listening to the answer.  And I made the assessment**
7  **that he was incoherent, under the influence of what I**
8  **believed to be PCP and cocaine; therefore, he could not**
9  **answer for himself whether he wanted to go or not.  He**
10  **was not making any sense.**
11      Q    So in any event, there were several options
12  available to you to restrain him, for whatever reason
13  you might have, and limit his freedom of motion to put
14  him in the ambulance before you go to the level of
15  using a Taser, wasn't there?
16      MR. POLICK:  Objection.  It's irrelevant.  You can
17  answer over the objection.
18      THE WITNESS:  Again, my partner displayed some of
19  those techniques and attempted to persuade Mr. Lopez to
20  go to the ambulance.
21  BY MR. DE ROSE:
22      Q    And neither you nor your partner or any of

188

1  ahead.
2      MR. DE ROSE:  All right.  I will withdraw the
3  question.
4      MR. YAMIN:  I also want to make an objection on
5  different grounds, John.
6          I've been here for several hours, and
7  you've asked many questions.  No one has interrupted
8  you.  We have three defense counsel and a deponent, and
9  everyone has been polite and allowed you to ask your
10  questions in their entirety.
11          Now, I understand that you have issues
12  with some of the answers that the officer has given,
13  but he's entitled, as we all are, to make a record.
14  And if you want ultimately to move to strike an answer,
15  I understand that procedurally that's okay, but I think
16  as a matter of courtesy, that the deponent should be
17  allowed to speak his -- to give what he believes is a
18  complete answer.  Then we have a record that if this
19  ever goes before a Judge, where the Judge can see what
20  the officer has said in its entirety, and the Judge can
21  assess whether your motion to strike or whatever your
22  objection is is based on.

Pages 185 to 188

Stevan Vidljinovic
September 4, 2013

189

1          What I've seen repeatedly is the witness
2   being cut off and not allowed to complete his answer.
3   You're anticipating, in my opinion, that he's going to
4   give an answer that's unacceptable to you, and I don't
5   think that's right.  I think he should get the
6   opportunity to complete his answer, and then you should
7   take it from there.
8          MR. DE ROSE:  All right.
9          MR. YAMIN:  I would appreciate that.
10         MR. DE ROSE:  And I don't mean any disrespect to
11  either the deponent or his able counsel here, and I
12  know you're all very experienced.
13  BY MR. DE ROSE:
14     Q   Sir, I'm going to withdraw that last question
15  and I'm going to ask a very little question.
16         I know that you've said now on the record,
17  and I don't think I've cut you off very many times.
18  We've heard many times what was in your head when you
19  took the action you took and what you thought and what
20  you observed.  I'm going to ask very little questions,
21  and I want you to see if you can answer just my
22  question.

190

1          When I'm done, counsel can go back and ask
2   you why you answered any one of these questions a
3   certain way.  But my questions will be very small.  And
4   they are not asking for your philosophy or why you did
5   what you did, but what you did and what you observed,
6   that's all.  Okay?
7          Sir, is it fair to say that neither you,
8   nor the other officers who you remember being right in
9   the vicinity at the time tried to grab and overpower
10  Jose Lopez before you deployed your Taser gun?
11     A   **It's fair to say that nobody tried to**
12  **overpower Jose Lopez.  We tried to persuade him to go**
13  **into the ambulance.**
14     Q   All right, thank you.
15         And none of you used any of the lesser
16  weapons available to you before you used your Taser
17  that night; is that correct?
18         MR. POLICK:  Objection to the relevance.
19         MR. YAMIN:  This is where I was coming from that
20  led to, I think led to making as exhibits the CPD Use
21  of Force Models or, as you said, Directives.
22         I think that's an inaccurate

191

1   characterization of what the models show; also what the
2   directives show.  There is no hierarchy, lesser to
3   greater, in terms of these other modes of compliance.
4          Under Exhibit 21, Roman Numeral III B and
5   2, so that's Pages 3 and 4 as they are numbered at the
6   bottom corner I think.  Four techniques are listed
7   under little letters, small letters a, b, c and d.
8   And I want to go to number Roman Numeral III, capital
9   letter B, Arabic numeral 2, small letters a through g;
10  those are options that are listed as all of which are
11  equally available alternatives.  They are not listed as
12  in terms of a hierarchy of use.
13         So it's not as if you use, according to
14  this directive, you can only use b if you've tried a,
15  you can only use c if you've tried b and a; you can
16  only use d if you use a, b and c.  And that's from the
17  plain language of the directive.
18         So based on the exhibit itself on its
19  face, I object to the question.
20         MR. DE ROSE:  All right.  Counsel, I was getting
21  to that.  I have not gotten there yet.  I appreciate
22  your interpretation of it.

192

1          And for the record, we all know that the
2   Taser was added to this section much later than it was
3   originally.  Don't we realize that the Taser was added
4   later?
5          MR. YAMIN:  Well, I'm not sure what you mean by
6   later, but --
7          MR. DE ROSE:  It wasn't in the original Special
8   Order when it was put out, was it?
9          MR. POLICK:  He's just referring to the Addendum
10  on Page 6 and 7, George.
11         MR. YAMIN:  Okay.  I will read it.  Yes.
12         MR. DE ROSE:  All right.  Well, we're off on a
13  tangent.
14  BY MR. DE ROSE:
15     Q   Let me ask you, so you agree that although
16  you had handcuffs and you had OC spray, and your
17  partner had at least handcuffs and probably OC spray,
18  neither one of you suggested the use of it?  Is that
19  fair to say?
20     A   **It's fair to say that my partner verbally**
21  **tried to gain compliance from your client.**
22         MR. DE ROSE:  Wait a minute, sir.  Move to strike.

Pages 189 to 192

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

193

 1    Will you read back my question back?
 2           (The question was so read
 3            by the court reporter.)
 4    THE WITNESS:  At that time we didn't deal because
 5    we wanted to assess the situation.  The only way we
 6    could do that was by talking to him.  So no, we didn't
 7    assume to use handcuffs or OC spray.
 8    BY MR. DE ROSE:
 9    Q    And even lower on the use of force model
10    there are certain pain holds that you can use against
11    or striking stunning moves that you are trained that
12    you can use against an uncooperative subject or an
13    active resister, are you not?
14    A    Yes.
15    Q    And neither one of you, as far as you
16    remember, tried to use any kind of a stunning blow
17    against him or a pressure hold or any kind of a grapple
18    with him?
19    A    Given your client's actions, he didn't give
20    us the time to do that.
21    Q    Sir --
22    A    So we didn't have that as an option.

194

 1    Q    So by your answer, I guess you're saying no,
 2    we didn't try to use a stunning action against your
 3    client, correct?
 4    MR. POLICK:  Again, misstating the witness's
 5    testimony.  You can answer over the objection.
 6    THE WITNESS:  Again, your client did not give us
 7    the option because of his actions.
 8    MR. DE ROSE:  Move to strike.
 9    BY MR. DE ROSE:
10    Q    Can you answer the question?
11    A    I did.
12    Q    Try yes or no.
13    A    Every situation dictates a cause and a
14    reaction to how somebody acts.
15           If your client did not start to flail his
16    arms, did not start to throw clenched fists in the
17    direction of my partner and myself, when I already had
18    a Taser readily accessible because that was the nature
19    of the call, to assist requesting a Taser, I could have
20    used control tactics, I could have used grappling.  But
21    since he went from an active resister to an assailant,
22    I was justified to use a Taser, especially when it was

195

 1    readily accessible.
 2    MR. DE ROSE:  Move to strike that.
 3    BY MR. DE ROSE:
 4    Q    My question to you is you never tried to use
 5    a stunning technique that you were taught in the
 6    Department; is that correct?
 7    MR. POLICK:  Objection.  Asked and answered, and
 8    it's irrelevant.
 9    BY MR. DE ROSE:
10    Q    Can you answer that yes or no?
11    A    My answer is that your client didn't give me
12    that option.
13    MR. DE ROSE:  All right.  Move to strike.
14    BY MR. DE ROSE:
15    Q    Is your answer also that you did not do that?
16    MR. POLICK:  Did not do what?
17    BY MR. DE ROSE:
18    Q    Try to use a stunning technique that you were
19    taught to use?
20    A    Of course I did not do that.  I didn't have
21    the opportunity to because of what your client acted.
22    MR. DE ROSE:  All right.  Move to strike

196

 1    everything from beyond --
 2    MR. POLICK:  I'm going to object to the relevance
 3    of other means of course.
 4    MR. DE ROSE:  All right.  Let's go on.
 5    BY MR. DE ROSE:
 6    Q    So when you said Taser Taser Taser, you were
 7    expecting the officers to step back and leave my client
 8    standing alone when you expelled your weapon, correct?
 9    A    I can't speculate what the other officers
10    were going to do.  I said --
11    Q    What did they do?
12    MR. POLICK:  Objection.  Let him answer your
13    question before you interrupt his answer with another
14    question.  That's not fair.  Let him answer your first
15    question, then you can ask him another question.
16    MR. DE ROSE:  All right, counsel.
17    MR. POLICK:  He's not interrupting you when you
18    ask your questions.  He's patiently listening to your
19    questions and trying his best to answer them.  You
20    can't cut him off by asking him another question in the
21    middle of his answer.  That, sir, is inappropriate, and
22    I object to it, and I'm not going to tolerate it.  And

Pages 193 to 196

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

197

1    you know what?  We're going to take a break right now.
2         MR. DE ROSE:  But before we do, we're going to
3    make my observation on the record.
4              I suggest that this gentleman is not
5    listening to the question; he's giving whatever answer
6    he wants.  My questions are very simple, and he can say
7    yes or no to them.  I'm not asking him for his reasons
8    why.
9              Go ahead.  Take your break.
10        MR. POLICK:  I object to your characterization of
11   my client's answers.
12             (There was a break taken, after
13              which the deposition was resumed
14              as follows:)
15   BY MR. DE ROSE:
16        Q    All right, Officer.  I want to take you back
17   to Exhibit 21 that's there in front of you which is the
18   General Order 02-08-02, okay?
19        A    Got it.
20        Q    And as counsel as I were noticing before, I
21   want you to go to Page 3.  And under 2, it talks about
22   an active resister, and they describe, "A person whose

198

1    actions attempt to create distance between that person
2    and the member's reach.  This type of resistance
3    includes gestures ranging from evasive movement of the
4    arms, through flailing arms, to full flight by
5    running."  Do you see that?
6        A    Yes, I do.
7        Q    And you believe he was an active resister
8    because he was flailing his arms and made the fist that
9    you thought was going in the direction of your partner?
10        A    That's incorrect.  The fist that was going in
11   the direction of my partner made him an assailant.
12        Q    An assailant, even higher?
13        A    Correct.
14        Q    All right.  Well, let's look where they talk
15   about stunning.  It's right underneath what I just
16   read.  It says, "Stunning is diffused-pressure striking
17   or slapping and is an attempt to increase control by
18   disorienting the subject and interfering with the
19   subject's ability to resist."  Do you see that?
20        A    Yes.
21        Q    By the way, at the moment you were
22   confronting my client, did you have the power to place

199

1    him under arrest?
2        A    It was never our objective to place your
3    client under arrest.
4        Q    Did you have any reason to place him under
5    arrest as you were talking to him and before the
6    flailing of arms?
7        A    No.  Our whole objective was to transport him
8    to a medical facility and seek treatment.
9        Q    And of course, if he refused that, you did
10   not have authority seize him, correct?
11        MR. POLICK:  Objection to the hypothetical, not
12   supported by the evidence.  You may answer over the
13   objection.
14        THE WITNESS:  Your client was incoherent, so we
15   could not tell whether he refused it or accepted it.
16   BY MR. DE ROSE:
17        Q    Did you ask your partner if he understood my
18   client?
19        A    I was standing next to my partner when he was
20   talking to your client.  I did not understand what your
21   client was saying.  And a conversation between me and
22   my partner never took place.

200

1        Q    So the answer is you never asked your
2    partner, did you understand the words and the sounds he
3    just used?
4        A    No, that conversation never took place.
5        Q    All right.  So let's go on.
6              Now, when you pulled the trigger on the
7    Taser, were you directly in front of my client?
8        A    Yes.
9        Q    And your partner was off to which side of
10   you?
11        A    I believe it was to my right side.
12        Q    And where was the other officer?
13        A    Again, I don't recall where Officer Alamillo
14   was positioned at the time that your client began to
15   flail his arms.
16        Q    All right.  Do you believe he was out of your
17   view; the only one in front of you was my client?
18        A    It's safe to say that since I can't recall
19   where he was standing, then he was out of my view.  I
20   could see Mr. Lopez and my partner attempting to engage
21   in a conversation with your client.
22        Q    All right.  But on the basis of the questions

Pages 197 to 200

Stevan Vidljinovic
September 4, 2013

201

1    or answers you gave me earlier, you believe you were on
2    the same street as where the ambulance was, because
3    your partner gestured to the ambulance, correct?
4        MR. POLICK: Objection. Misstates the witness's
5    testimony. You may answer over the objection.
6        THE WITNESS: I never said where the ambulance
7    was. My partner just gestured to where the ambulance
8    was. The approximate location where the ambulance was
9    located, I don't recall.
10   BY MR. DE ROSE:
11      Q   The ambulance wasn't even in your view when
12   you confronted my client, was it?
13      **A   I don't recall.**
14      Q   Well, when you say your partner gestured to
15   the ambulance, did you see him pointing or gesturing to
16   wherever the ambulance was situated?
17      **A   If my partner gestured to the ambulance, I
18   would assume that my partner was gesturing to the
19   direction where, the general vicinity where the
20   ambulance was located.**
21      Q   And you don't know if it was completely
22   around the corner from where you were and a block away

202

1    from where you were, do you?
2      **A   That given situation, my whole focus was
3   centered on Mr. Lopez.**
4      Q   All right. Now, can you answer my question?
5        Where you were situated when your partner
6   gestured, you don't know if you were around the corner
7   and a block, a total of one full block away from where
8   the ambulance was situated?
9        MR. POLICK: Objection. Asked and answered. He
10   can answer over the objection.
11        THE WITNESS: Again, since I was centered on Mr.
12   Lopez, and I don't recall the ambulance being there,
13   then I don't know where the ambulance was located
14   precisely.
15   BY MR. DE ROSE:
16      Q   All right. Very good.
17        So in any event, when you discharged the
18   Taser, the two prongs struck my client on the front of
19   his body, somewhere in center mass, correct?
20      **A   That's correct.**
21      Q   And what happened to my client when that
22   happened?

203

1      **A   Your client collapsed to the floor.**
2      Q   All right. The floor, or the street?
3      **A   The ground beneath him, the street.**
4      Q   All right. And did he fall forward onto his
5   face area, or how did he fall?
6      **A   I don't specifically recall how your client's
7   body fell to the street.**
8      Q   Were you still looking at him at the time?
9      **A   My eyes were always on your client. I just
10   don't recall, because of the amount of time that has
11   passed since the actual occurrence, of how your client
12   fell to the street.**
13      Q   All right. When he fell, did you see his
14   head strike the pavement of the street?
15      **A   When he collapsed, I saw his body collapse to
16   the street. I can't recall if I saw a particular body
17   part strike anything.**
18      Q   All right. By a collapse, do you mean he
19   just like slithered down, or he actually went forward,
20   backward or to his side, straight down?
21      **A   My idea of collapse is his body went from
22   standing in an upright position, collapsing down to the**

204

1    **street. I don't recall which movement and which
2   direction each body part was taking. All I know is
3   that after I tasered Mr. Lopez, he fell, he collapsed
4   to the street.**
5      Q   You heard a loud thud when his head hit the
6   street pavement, didn't you?
7        MR. POLICK: Objection. Argumentative. Assumes
8   facts not in evidence. You may answer over the
9   objection.
10        THE WITNESS: I do not recall hearing a thud.
11   BY MR. DE ROSE:
12      Q   And you don't know what part of his body hit
13   the pavement first?
14        MR. POLICK: Objection. Asked and answered. You
15   may answer over the objection.
16        THE WITNESS: I do not recall which part of his
17   body made contact with the ground first after he
18   collapsed.
19   BY MR. DE ROSE:
20      Q   Did you notice him breaking his fall with his
21   hands in any way?
22      **A   I did not notice that action.**

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

205

1    Q   Did it appear to you that he did not break
2    the fall when he hit the street?
3    **A   Again, after I deployed the Taser in the**
4    **direction of Mr. Lopez, all I saw was his body**
5    **collapse, not in any specific manner, to the street.**
6    Q   All right.  And then did you go up to him and
7    take the Taser darts out of his body?
8    **A   No, I did not.**
9    Q   What did you do?
10   **A   The probes are not to be taken from the**
11   **subject that's been tased by a Department member.  The**
12   **probes are to be taken out by somebody with a medical**
13   **background, either a paramedic, nurse or doctor.**
14   Q   You weren't trained in your Taser training of
15   how to take the barbs out?
16   **A   The actual probes you're speaking of?**
17   Q   Yes.
18   **A   We were trained to cut it, inventory it,**
19   **along with the Taser cartridge.  We were never trained**
20   **to pull probes out of subjects that have just recently**
21   **been tased.**
22   Q   All right.  So you've never yourself tried to

206

1    extract the actual dart from the body?
2    MR. POLICK:  Objection.  Asked and answered.  You
3    can answer over the objection.
4    THE WITNESS:  No, I haven't.
5    BY MR. DE ROSE:
6    Q   All right.  So did you walk up to him and cut
7    off the lines from the darts?
8    **A   No.  I believe initially, we handcuffed Mr.**
9    **Lopez.**
10   Q   Well, when he fell, was he face-down, or was
11   he on his side or his back?
12   **A   I don't recall the position that he was on**
13   **the street.  All I know is that we handcuffed him, to**
14   **my knowledge.**
15   Q   Whose handcuffs were used?
16   **A   I don't recall whose handcuffs were used.**
17   Q   But only one person's handcuffs?
18   **A   Only one pair of handcuffs.  I don't know**
19   **whose.**
20   Q   Well, did you have to the three of you rush
21   him and get on top of him?
22   **A   Nobody rushed Mr. Lopez.  After his body**

207

1    **collapsed to the ground, someone handcuffed him to gain**
2    **physical control of him because of his behavior prior**
3    **to being tased.**
4    Q   All right.  I don't want to jump through
5    this.
6        When you went up to him, did you have to
7    turn him over and put his hands behind his back in
8    order to handcuff him?
9    **A   Again, I don't recall the position that he**
10   **was in when I approached him after tasing him.**
11   Q   Was he handcuffed with his hands in front of
12   him or behind him?
13   **A   I don't recall.  All I know is that I believe**
14   **we handcuffed him.  I do not know what position he was**
15   **handcuffed in.**
16   Q   Protocol with the Chicago Police Department
17   is to handcuff someone behind their back, right, if
18   possible?
19   **A   Yes, the operative phrase being if possible.**
20   **Every situation dictates a different method.**
21   Q   And you didn't make any notes, mental notes
22   or part of your police report, of whether he was

208

1    handcuffed in front of his back or behind his back?
2    **A   I don't recall knowing whether he was**
3    **handcuffed in front or behind, so I don't recall**
4    **whether I made reports specifying that.**
5    Q   All right.  The three of you that you
6    remember being there, were all three of you in contact
7    with Jose Lopez's body when he was being positioned to
8    be handcuffed?
9    **A   I don't recall.**
10   MR. YAMIN:  Object to the form.
11   BY MR. DE ROSE:
12   Q   Do you recall just standing there while
13   someone else did the handcuffing?
14   **A   Again, I don't recall.**
15   Q   Jose Lopez let out a very loud sound right
16   after you tasered him, and he hit the ground, didn't
17   he?
18   MR. POLICK:  Objection.  Argumentative, assumes
19   facts not in evidence.  You may answer over the
20   objection.
21   THE WITNESS:  Again, I don't recall any sound
22   following me tasering your client and him collapsing to

Stevan Vidljinovic
September 4, 2013

209

1 the ground.
2 BY MR. DE ROSE:
3    Q    Was he still making incoherent words and
4 sounds as he was being handcuffed?
5    **A    I do not recall.**
6    Q    Were his eyes open after you handcuffed him?
7    **A    I don't recall.**
8    Q    Then did you stand him up and walk him back
9 to the ambulance?
10    **A    I believe the paramedics brought a gurney**
11 **over to the area where Jose Lopez's body collapsed to**
12 **the street and they placed him on the gurney,**
13 **restrained him, and then that's when we, I believe we**
14 **took the handcuffs off.**
15    Q    All right.  Where did the paramedics come
16 from with the gurney that they brought over to where
17 you were?
18    **A    I don't recall any paramedics during the**
19 **occurrence of me tasing Jose Lopez, so it's a safe**
20 **assumption that they came from behind me.**
21    Q    But somewhere behind you; you don't know if
22 it was around the block or anything?

210

1    **A    I don't know the exact location.**
2    Q    All right.  When they came up, was one of
3 them a female paramedic and one of them a male
4 paramedic?
5    **A    Again, I don't recall the gender of the**
6 **paramedics.**
7    Q    Did any firemen come up to you at the time?
8    **A    Again, I don't recall any firemen being on**
9 **the scene.**
10    Q    Is it fair to say that you yourself never
11 came into physical contact, nor did my client come into
12 physical contact with you that night before you
13 deployed your Taser?
14    **A    Yes, it's fair to say.**
15    Q    Is it fair to say that my client never came
16 into physical contact with your partner or any other
17 police officer there that you saw prior to your
18 deploying your Taser?
19    **A    Your client's actions made us feel in fear of**
20 **our well-being, as well as the well-being around**
21 **others.  So he never physically came into contact with**
22 **us, but that's also not to say that he wasn't**

211

1 **attempting to come into contact with us; hence, that's**
2 **why I deployed the Taser.**
3       MR. DE ROSE:  Move to strike the answer, because
4 I'm going to see if I can get a clean answer to the
5 question.  I move to strike it as non-responsive.
6          Would you read my question back and see if
7 he can just answer that question?
8                (The question was so read
9                  by the court reporter.)
10       THE WITNESS:  There's no way that I can answer
11 that without articulating why he did not come into
12 contact with us, because of the behavior of your
13 client.
14 BY MR. DE ROSE:
15    Q    So you're not able to answer the question, is
16 that what you're saying?
17    **A    No, I'm able to answer the question, just it**
18 **can't be answered as a simple yes or no.**
19    Q    All right, Officer.  We'll see if someone
20 else agrees with you later on that point.
21          But anyway, was my client kicking and
22 flailing any more after he hit the pavement on that

212

1 street?
2    **A    Again, I don't recall the position that your**
3 **client fell and collapsed to the street, nor do I**
4 **recall any movement of your client.**
5    Q    You don't recall any movement.  Could it have
6 been that there was absolutely no movement by him?
7    **A    I can't speculate, because if I don't recall,**
8 **then there could have been and there couldn't have**
9 **been.  So I just don't recall of him moving after being**
10 **tased.**
11    Q    Well, when the paramedics came up, did you
12 just go away, or did you stay there to see what they
13 were doing?
14    **A    I cut the wires to the Taser and observed the**
15 **paramedics lift Jose Lopez into a gurney.**
16    Q    They were, just the two of them picked his
17 body up and put him on the gurney?
18    **A    My best recollection, yes.**
19    Q    And was he still handcuffed when they put him
20 onto the gurney?
21    **A    I don't recall whether he was uncuffed prior**
22 **or after being restrained in the gurney.**

Pages 209 to 212

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

213

1    Q   Who uncuffed him?
2    A   I don't recall.
3    Q   Would you expect it would be the officer
4  whose handcuffs they were?
5    A   Not necessarily.
6    Q   All right.  Do you know if you used your
7  handcuffs that day?
8    A   I don't recall using my handcuffs.
9    Q   I mean on this event?
10   A   Correct.  I don't recall using my handcuffs
11  on that given event.
12   Q   And you don't know whose handcuffs were used?
13   A   That's correct.
14   Q   Do you remember ever touching my client's
15  body that day at any time yourself with your hands in
16  any way, or any other part of your body?
17   A   Immediately preceding the Taser?
18   Q   Either immediately preceding the Taser, or
19  after?
20   A   I remember assisting nurses at Mt. Sinai
21  Hospital to restrain him in a hospital bed.
22   Q   All right.  We'll get into that part.

214

1        Out there on the street, is it fair to say
2  you don't remember as you sit here now, ever coming
3  into physical contact with my client's person?
4    A   I don't recall placing hands on your client.
5    Q   Now, who picked up the gurney?
6    A   I don't recall.
7    Q   Were any police officers involved in picking
8  up the gurney, if you know?
9    A   I do not know.
10   Q   All right.  And somebody walked from where
11  you had tased him back to where the ambulance was,
12  carrying the gurney with him on it?
13   A   Please repeat the question.
14   Q   Well, was this gurney on wheels, or is it one
15  that you pick up and walk with?
16   A   I believe it was on wheels.
17   Q   All right.  So he was wheeled back to the
18  ambulance, correct?
19   A   Correct.
20   Q   Did you accompany the wheeling of him in the
21  gurney back to the ambulance?
22   A   I was in the general area, yeah.

215

1    Q   And you kind of walked with them as somebody
2  pushed the gurney along?
3    A   I wouldn't say I necessarily walked with
4  them.  They pushed the gurney towards the ambulance,
5  and I was in the area.  I don't recall how far the
6  ambulance was and how long I walked along them, if I
7  walked along them at all.
8    Q   Well, were you there when they put the gurney
9  into the ambulance?
10   A   Again, I was in the general area.
11   Q   Did you see any other people on the street
12  in that general area where the gurney was going into the
13  ambulance?
14   A   Only the officers that I've mentioned and the
15  two paramedics.
16   Q   Two paramedics and your partner and one other
17  officer?
18   A   No.  My partner, Officer Guettler, Officer
19  Valdovinos, Officer Alamillo, Officer Gonzales, Officer
20  Valenzuela and Sergeant Kearns.
21   Q   Where were they all situated when you
22  remember seeing them on the scene?

216

1    A   They were in the general area of the scene.
2  I don't know specifically where they were,
3  approximately.
4    Q   Did Sergeant Kearns arrive on the scene
5  before you walked up to my client?
6    A   I don't recall seeing Sergeant Kearns prior
7  to engaging in a conversation or attempting to engage
8  in a conversation with Mr. Lopez.
9    Q   But you did engage in conversations with
10  Sergeant Kearns at some time on the scene, didn't you?
11   A   I don't recall speaking to Sergeant Kearns on
12  the scene.  All I know is that he was there.
13   Q   Being your Superior Officer on the street
14  that night on your shift, if he had told you, "Do not
15  use your Taser on this man," would you have followed
16  that order?
17   A   My getting a direct order from an immediate
18  Supervisor?  No, because I think I was justified to use
19  it.
20   Q   So you would have just ignored his order?
21   A   We don't need permission from a Sergeant to
22  deploy a Taser, especially if the subject that's being

Pages 213 to 216

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

217

1    tased has the capacity to cause great bodily harm or
2    death to my part, myself, or other people around him.
3        Q   So I know you don't need authority from your
4    Supervisor to use the Taser.  But if your Sergeant
5    tells you, "When you approach that man, do not use the
6    Taser," are you obliged to follow that order?
7        MR. YAMIN:  Objection.  Incomplete hypothetical.
8        MR. POLICK:  Join in the objection.  You can
9    answer.
10       THE WITNESS:  It completely depends on when he
11   tells me prior to me reaching him.  Does he tell me
12   when I'm 30 feet away from your client and I don't know
13   that he seems to be under the influence of what I, in
14   my experience, believe to be PCP and I've had run-ins
15   with people with PCP?  Or is he telling me right when
16   he flails his arms?  There are different scenarios that
17   can happen which would dictate how I would react to
18   that type of demand.
19   BY MR. DE ROSE:
20       Q   As you walked up with your Taser, did you
21   hide the fact that you had the Taser out and at the
22   ready from the two officers whom you remember walking

218

1    up with you to Jose Lopez?
2        MR. YAMIN:  Objection to form.
3        MR. POLICK:  Join.  You may answer.
4        THE WITNESS:  No, I didn't hide it, because
5    Officer Alamillo who accompanied us to talk to Mr.
6    Lopez is the one that requested the Taser.
7    BY MR. DE ROSE:
8        Q   And you understood he wanted the Taser, and
9    you there to use the Taser in order to get Jose Lopez
10   in that ambulance, correct?
11       A   That is incorrect.  He did not want to use
12   the Taser.  He requested the Taser --
13       Q   How do you know that?
14       A   Because we talked when he gave me a synopsis
15   of the events that were going on, and our objective was
16   to get him medical treatment, so we tried to persuade
17   him into the ambulance.
18       Q   All right.  Did the officer who you were
19   talking to before you went up to my client say, "We
20   don't want to use the Taser if we don't have to?"
21       A   He didn't specify.
22       Q   All right.  As you walked up with the Taser

219

1    visible to those officers, the two that you remember on
2    the scene, neither one of you told you, "Do not use the
3    Taser, did they?"
4        A   I don't recall having a conversation like
5    that with the other two officers.
6        Q   All right.  And when you said Taser Taser
7    Taser, did the Sergeant or any of the other police
8    officers who you know were on the scene say, "Do not
9    tase him?"
10       A   Again, I did not know the Sergeant was on the
11   scene prior to me tasing him.  I saw him after the
12   Taser incident occurred.  And I did not hear anybody
13   say anything.  All I remember was me giving the command
14   Taser Taser Taser.
15       Q   All right.  And so no other officer was on
16   the scene trying to intervene and stop you from tasing
17   my client, as understand it; is that correct?
18       MR. POLICK:  Objection to the incomplete
19   hypothetical.  Assumes facts not in evidence.  You may
20   answer over the objection.
21       THE WITNESS:  The only officer that I can speak
22   for is my partner, Officer Guettler, and he was

220

1    avoiding getting struck from your client, so he did not
2    say anything.
3    BY MR. DE ROSE:
4        Q   All right.  Nor did the other officer next to
5    you say, "Don't use the Taser," correct?
6        A   I don't recall if there was even an officer
7    next to me.  All I recall is me, Officer Guettler and
8    Mr. Lopez.
9        Q   All right.  But the other Officer Alamillo,
10   you never heard him saying, "Don't use the Taser?"
11       A   I never heard anybody.
12       Q   Of any of those officers on the scene?
13       A   I didn't hear anybody utter those words.
14       Q   All right, thank you.
15           As my client laid on that gurney, was he
16   moving?
17       A   I don't recall.
18       Q   You don't recall if his arms were flailing or
19   his legs were flailing or anything like that?
20       A   Well, it would be hard for his arms or legs
21   to flail, because he was restrained, but I don't recall
22   any movement.

Pages 217 to 220

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

221

1    Q   Well, who restrained him?
2    MR. POLICK:  Objection.  Asked and answered.
3    THE WITNESS:  The paramedics.
4    BY MR. DE ROSE:
5    Q   And how did they restrain him on the gurney?
6    A   The way that I've seen paramedics restrain
7    other individuals on the gurney, it's a strap that goes
8    across the body at certain portions of your body.
9    Q   And you're just giving that answer from your
10   usual recollection, or do you remember the various
11   belts and restraints actually being applied to my
12   client that night?
13   A   I don't recall particularly.  I'm giving you
14   an assumption of what I have experienced in other
15   situations, so I don't recall with Mr. Lopez
16   particularly.
17   Q   All right.  When Mr. Lopez was loaded into
18   the ambulance, do you remember anybody protesting about
19   the fact that you folks had tasered him out there on
20   the street?
21   MR. YAMIN:  Objection to form; "you folks"
22   particularly.

222

1    MR. POLICK:  Join in the objection.  You can
2    answer.
3    BY MR. DE ROSE:
4    Q   By that I meant you police officers.
5    MR. YAMIN:  I still object.
6    MR. POLICK:  Join in the objection.  You may
7    answer.
8    THE WITNESS:  Did any police officers protest?
9    MR. DE ROSE:  No, no.  It's a bad question, and I
10   think counsel's right.
11   BY MR. DE ROSE:
12   Q   Did you see any civilians, people who you
13   could tell were not police officers, protesting the
14   fact that Jose Lopez had been tasered and put on the
15   gurney?
16   MR. YAMIN:  Objection, form.
17   MR. POLICK:  Join.  You may answer.
18   THE WITNESS:  The only civilian that I recall on
19   the scene throughout the duration of the occurrence was
20   an Hispanic female, but I don't recall her saying
21   anything to that extent.
22

223

1    BY MR. DE ROSE:
2    Q   Did she say anything that you heard?
3    A   Again, I don't recall her saying anything to
4    me in particular.  I can't speak for any other
5    officers.
6    Q   Did you ever talk to her yourself?
7    A   No, I did not.
8    Q   You don't know her name?
9    A   At the time of the occurrence?  No, I did
10   not.
11   Q   Do you know it now?
12   A   I would have to refer to my notes.  I don't
13   know it off the top of my head.
14   Q   Do you have your notes with you?
15   MR. POLICK:  You mean the reports?
16   THE WITNESS:  Yes, the reports.
17   BY MR. DE ROSE:
18   Q   Your report, or other people's reports?
19   A   Other people's reports, the people that were
20   at the scene, the reports that were generated.
21   Q   You've looked at your reports before coming
22   here, haven't you?

224

1    A   Yes.
2    Q   Can we turn, I think it's Exhibit 6.
3    MR. YAMIN:  Can we go off the record for just a
4    second?
5             (There was a discussion held off
6              the record, after which the
7              deposition resumed as follows:)
8    BY MR. DE ROSE:
9    Q   Now, Exhibit 6 we have placed in front of you
10   is an Officer's Battery Report.  Is this a report -- it
11   looks like it was generated on the computer.  Are you
12   the one who generated this report?
13   A   Yes.
14   Q   All right.  And you've got your name first on
15   Officer Information, right?
16   A   Correct.
17   Q   All right.  And if you go over to the
18   Incident Information, you have the box checked
19   outdoors; and address of occurrence, 3038 West 25th
20   Street.  Do you see that?
21   A   I do.
22   Q   Does that refresh your memory as to the

Pages 221 to 224

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

225

1    location in the geographical area of the 10th District
2    where you had this event with Jose Lopez?
3        A   Obviously, since this report was made not
4    long after the incident, this address would probably be
5    more accurate than what I recall.  I still don't
6    recall -- I know that he was on the street.  I still
7    don't recall whether he was on 25th Street or Albany.
8        Q   Well, but if you put that address in there,
9    why would you put that 25th Street address if you
10   weren't actually at that location?
11       MR. POLICK:  Objection.  Misstates the witness's
12   testimony.  You can answer over the objection.
13       THE WITNESS:  Earlier I stated that I don't recall
14   where I was at.  But since this report was generated
15   only moments after the incident, it would be more fresh
16   in my mind, so that is a more accurate address.
17   BY MR. DE ROSE:
18       Q   All right.  And if one is standing in the
19   street at that address, one cannot see the address on
20   Albany that was initially communicated in the dispatch,
21   can they?
22       MR. POLICK:  Objection as to what someone else can

226

1    see.  You may answer over the objection.
2    BY MR. DE ROSE:
3        Q   You.  I'm talking about you, you couldn't
4    see?
5        A   I would have to physically be standing at
6    3038 West 25th Street to see if I could see the address
7    on Albany.  I can't answer that.
8        Q   And right now you don't know; is that
9    correct?
10       A   I'm saying I can't answer it.
11       Q   All right.  And the date of occurrence you've
12   got as 22 July, 2011 at 3:54 P.M.  Because this was
13   more fresh in your memory at the time, are you
14   satisfied that that was the time you deployed the
15   Taser?
16       A   Again, I can't answer.  If I generated the
17   report and it said 3:54 A.M., that means that I
18   generated the Officer's Battery Report at 3:54 A.M.  I
19   don't know.
20       Q   So is this the time you generated the report?
21       A   That's the time that I initially thought,
22   after it occurred, is what the time I felt it happened,

227

1    is what I'm trying to say.
2        Q   And you were trying to be as accurate as you
3    could, weren't you?
4        A   Yes.
5        Q   And then your next line, it says day of week
6    and you've got Friday.  You're satisfied that at that
7    time you would be careful to put the right day of the
8    week that this occurred at 3:54 A.M., right?
9        A   I would have to look at a calendar, but if it
10   was Friday, it was Friday.  If it was another day, then
11   it was an oversight on my part.  But I'm satisfied that
12   it was Friday.
13       Q   All right.  And then on number of officers
14   battered, you put the number 1.  Do you see that?
15       A   Yes.
16       Q   Who was the officer who was battered?
17       A   My understanding of the actual field that
18   says number of officers battered was the fact of
19   officers completing an Officer's Battery Report, so I
20   placed 1, because nobody else was completing an
21   Officer's Battery Report.
22       Q   You saw no officers that night battered, did

228

1    you?
2        A   Are you asking me if your client struck any
3    of my fellow officers or myself?  Is that what you're
4    asking?
5        Q   I can't answer questions.
6            Do you know the definition of the word
7    battery?
8        A   Yes.
9        Q   What do you understand it is?
10       A   It's to inflict harm upon somebody through
11   physical contact.
12       Q   All right.  And I thought you told us earlier
13   that you saw no officer battered or have physical
14   contact from my client.  Am I correct?
15       A   Yes.
16       Q   All right.  So why did you put the number 1
17   in there of number of officers battered?
18       A   Because when I was finishing the report, my
19   understanding of what they were asking for were people
20   that weren't battered, but they were filling out an
21   Officer Battery Report, so I put 1 because I was the
22   only one filling out an Officer Battery Report.

Pages 225 to 228

Stevan Vidljinovic
September 4, 2013

229

1    Q    All right.
2    A    It was a mistake on my part.
3    Q    I see.  So where it says number of officers
4 battered, you only put down the number of officers you
5 knew were filling out a Battery Report?
6    A    Under my understanding, yes.  That was my
7 understanding at the time.
8    Q    All right.  And that night you filled out
9 this report that evening before you went off duty,
10 right?
11    A    That's not correct.
12    Q    When did you --
13    A    Before I went off duty?
14    Q    Yes.
15    A    Oh, I thought you asked before I went on
16 duty.  Yes, before I checked off and went off duty, I
17 filled out the report, that's correct.
18    Q    You were required to do that by Special
19 Orders of the Chicago Police Department, weren't you?
20    A    Yes, it's protocol.
21    Q    And did your Supervisor, the Sergeant, tell
22 you you have to fill out an Officer's Battery Report

230

1 before you go home?
2    A    No.  It's just something that I knew I had to
3 do.
4    Q    All right.  And then it says were there
5 assisting units on the scene, and you fill out the box
6 that says yes.  Do you see that?
7    A    Yes.
8    Q    And then the next question is if yes, how
9 many assisting officers were present at the time of the
10 battery, excluding you or your partner, and you put a
11 number 7.  Where did you get that number from?
12    A    I might have misread it and did not see
13 excluding you and your partners, because there were
14 seven of us there.  There was a lot happening at the
15 time, and I had to inventory Taser complete a TR, as
16 well as an Officer Battery Report.  So I probably
17 assumed there were seven of us, which is the seven that
18 I recall being at the scene.
19    Q    There weren't as many as nine of you at the
20 scene?
21    A    Sitting here right now today, I don't recall
22 any more than seven police officer.

231

1    Q    By the way, this report that you did that
2 night, your Sergeant, Supervising Sergeant, he had to
3 approve it that night before you left work, didn't he?
4    A    I believe that an Officer's Battery Report is
5 approved by the Watch Commander, which is Lieutenant
6 Dubiel.
7    Q    So you didn't show this to Sergeant Kearns?
8    A    I don't recall if I did or not.
9    Q    All right.  And then it says manner of
10 attack, and they've got several boxes; shot, shot at,
11 stabbed, cut, struck with a blunt force, and then
12 finally they have other, including verbal threats.  Do
13 you see that?
14    A    Correct.
15    Q    And that's the one that you put down here,
16 including verbal threats, correct?
17    A    Correct.
18    Q    What verbal threats did you hear Jose Lopez
19 utter out of his mouth?
20    A    In the report it says other.  It doesn't
21 specify including verbal threats.  They are just using
22 that as an example.  So it doesn't necessarily mean

232

1 that I was verbally threatened by your client.
2    Q    My question is, did you hear my client utter
3 a single verbal threat to anyone that night?
4    A    I heard your client utter words and sounds
5 that I could not make out, so no.
6    Q    All right, thank you.
7         Now, look down at type of activity on the
8 other side, and you have checked one box called
9 disturbance - mental patient.  Why did you fill out
10 that box?
11    A    I'm sorry, where?
12    Q    Under type of activity.
13    A    Okay.
14    Q    And you checked the box disturbance - mental
15 patient.  Why did you pick that box?
16    A    I checked that box because that was the only
17 option that I felt described what the actual incident
18 was pulled for.  It was pulled for a mental health
19 transport; so I tried to make it coincide with the
20 initial report, so I put disturbance - mental patient.
21    Q    Well, did you think you were going over there
22 to that scene to treat a mental patient?

Pages 229 to 232

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

233

1    A   I don't recall knowing what I was going -- I
2 knew I was going over there per a request for a Taser.
3 That's why there are so many options.  And the reports
4 are done after the occurrence.
5    Q   All right.  But did anybody that night tell
6 you that Jose Lopez was a mental patient?
7    A   No.  The report that was generated by Officer
8 Alamillo was a mental health transport, so I assumed
9 that that was the closest description of my type of
10 activity, was disturbance - mental patient.  That's why
11 I checked that box.
12    Q   So it's fair to say, although that box is
13 checked, no one ever that night told you that Jose
14 Lopez was a mental patient to be transported to a
15 mental facility?
16    A   The box that was checked was the most
17 accurate type of activity that I was given in that
18 field.
19    Q   Well, you've got disturbance - other.
20       My question still stands, and it is, is it
21 fair to say that no one that night described Jose Lopez
22 to you as a mental patient?

234

1    A   The only person I spoke to on the scene was
2 Officer Alamillo, and I don't recall him saying that he
3 was a mental patient.
4    Q   All right.  So you picked that particular box
5 describing a mental patient because you thought it was
6 the most ethical, applicable box in that particular
7 portion, correct?
8    A   Due to the actions that we took afterwards by
9 generating a report regarding a mental health
10 transport, yes, I did.
11    Q   Did you believe this was a mental health
12 transport?
13    A   Yes.  Our objective was to seek medical
14 treatment for Mr. Lopez.  And our objective was still,
15 even after a Taser was deployed on your client, was to
16 seek him medical treatment.
17    Q   In your training, is a mental health
18 transport the same thing as a medical transport?
19    A   I don't understand what you're trying to ask
20 me.
21    Q   I'm asking you, when you transport people who
22 have not exhibited any mental problems, do you still

235

1 call them mental patients because you're transporting
2 them to the hospital?
3    A   In my experience, I believe that the closest
4 title that can be used for transporting somebody to the
5 hospital, and the most justifiable one, is the mental
6 health transport, because that is the report that is
7 generated for him.
8       I do not believe, I could be wrong, that
9 there is a medical health transport.
10    Q   All right.  And then they ask for type of
11 injury to officer.  When you see these kinds of
12 questions, did it dawn on you that they wanted you to
13 describe a battery on a police officer, not just an
14 officer filling out a Battery Report?
15    A   When I see these questions, I looked at the
16 options and I chose the most apparent option, which at
17 the time was none apparent/none.
18    Q   So by now as you're working through this
19 report, did you realize this was to be a report by an
20 officer who had suffered a battery or observed a
21 brother officer suffer a battery?
22    A   No, because they would not give me the option

236

1 of none apparent or none at all for type of injury to
2 officer.
3    Q   All right.  So that didn't click anything off
4 for you, right?
5    A   No, it did not.
6    Q   All right.  And then on the offender
7 information, you write male, white Hispanic, and the
8 date of birth of 8 May, 1962.  Where did you get that
9 information from?
10    A   I believe that I would have had to have
11 talked to the person that generated the original
12 report, which is Officer Alamillo.
13    Q   So Officer Alamillo had some kind of a
14 document from the man that told you his date of birth
15 was 8 May, 1962?
16    A   I don't recall how Officer Alamillo obtained
17 that information.
18    Q   All right.  On your report I don't see where
19 you've named the man.  Is there a place where you name
20 him?
21    A   I don't see a specific field where you have
22 to name the individual.  He's named in the Tactical

Pages 233 to 236

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

237

1    Report that we make that's attached to this.
2        Q    All right.  There's another report that goes
3    with it, correct?
4        A    Correct, a TR.
5        Q    And there's a field here for a CB number, and
6    that would be a central booking number if you were
7    generating a report to arrest somebody, correct?
8        A    If somebody was in custody, yes, we would
9    have generated a CB number.
10       Q    And you didn't generate a CB number for this
11   case because this man was not under arrest; is that not
12   true?
13       A    That's correct, he was not under arrest.
14       Q    All right.  And there's also a field for an
15   IR number, and that's an Individual Registered number
16   for anybody who had any kind of a history with the
17   police.  You didn't fill a number in there either, did
18   you?
19       A    It doesn't appear that I did.
20       Q    Did you try to get -- you didn't try to get a
21   CB number because you weren't arresting him, right?
22       A    Yes.  Our objective was never to arrest Mr.

238

1    Lopez.
2        Q    Did you try to get his IR number, if he had
3    one, when you filled out this report?
4        A    I can't recall.  I would assume that I would
5    try to fill out the report as complete as possible, and
6    a number of things could have been an issue.  Maybe a
7    computer wasn't working, maybe it was running too slow,
8    maybe I just couldn't find it; hence why the field is
9    empty.
10       Q    Look at the next question that you were asked
11   for an answer to.  Was the offender's activity drug
12   related, and you checked unknown.  Why did you pick
13   that?
14       A    Because I have no medical experience.
15            If they were to ask me was the offender's
16   activity the activity of somebody who might be under
17   the influence of drugs through your past experiences,
18   then yes, I would have checked yes.  But since I don't
19   have medical experience, nor do I have a background in
20   medicine, I checked unknown because I felt that that
21   was the most efficient out of the three options that I
22   had.

239

1        Q    You understood that each of you police
2    officers are expected to fill this out, and the vast
3    majority of you don't have medical experience, right?
4        A    Yes.
5        Q    And they are asking you, was the offender's
6    activity drug related, and you said unknown.  Did you
7    believe his activity was drug related?
8        A    Reading the report, I put unknown because I
9    don't have that professional opinion.  I don't have the
10   background in that to be definite and say.  I can only
11   assume and have reasonable suspicion that he might be
12   under the influence, which is what I assumed.
13       Q    All right.  Besides filling out that
14   Officer's Battery Report, you are required by Police
15   Special Orders to fill out a Tactical Response Report
16   when you discharge a fire weapon, right, a firearm?
17       A    You have to fill out a Tactical Response
18   Report for many reasons, yes.
19       Q    All right.  Exhibit No. 7.  Now, this,
20   Officer, is another report you filled out before you
21   got off duty that day, right?
22       A    That's correct.

240

1        Q    And down on the bottom, although these are,
2    because they are computer-generated, you don't sign
3    them any more, but you filled it out on the 22nd of
4    July, 2011 at 4:52 and 36 seconds on that day, right,
5    36/100ths of a second?
6        A    That's when I submitted it, yes.
7        Q    All right.  And it looks like just six
8    minutes later, Sergeant Kearns signed, having reviewed
9    your report and approving it, correct?
10       A    By reading the report, yes, that's what it
11   looks like.
12       Q    All right.  So let's look at the information
13   you put in this.  At the very top, again you say the
14   date of the incident was 22 July, 2011 at 3:54 A.M. in
15   the morning, right?
16       A    Yes, that's what it says.
17       Q    And again, you put down the address 3038 West
18   25th Street, Chicago, Illinois, 60623.  Did you get
19   that address from Sergeant Kearns, or someone else, to
20   put in there?
21       A    I don't recall where I had gotten the
22   address.  Personally in my past experiences I would

Stevan Vidljinovic
September 4, 2013

241

1  have written the address down in an approximate, like a
2  specific location when an incident occurred, so I
3  probably wrote that down individually.
4      Q   So did you like have a notebook out there on
5  the street with you that you were making notes so you
6  could --
7      A   I have pieces of paper that we call contact
8  cards when we come into contact with somebody, and I
9  usually just jot down something on those contact cards.
10  I don't have a note pad, per se.
11     Q   So you make hand pen-written and printed
12  entries on these contact cards?
13     A   I'm saying that in my past experiences,
14  that's what I've done. I don't recall if that's what I
15  did here in particular, but that's something that I
16  would have done in an incident like this.
17     Q   Where is the contact card that you would have
18  done in this case?
19     A   I discarded it, because I already used the
20  information that I wrote down on it and applied it to
21  the report that I needed.
22     Q   When you say discarded, you threw it away?

242

1      A   Yes, I discarded it. I had no further use
2  for it.
3      Q   Sergeant Kearns didn't tell you to keep every
4  note that you make about this event?
5      A   Seeing that the only note that I made was the
6  address of occurrence, if that's what I did, I don't
7  recall. All I'm saying is that in past experiences
8  that's what I would have done in an incident such as
9  this. So if I did do that, I discarded it.
10         Sergeant Kearns being a visiting Sergeant,
11  I don't recall him having any conversation like that
12  with me.
13     Q   All right. Now let's look at the third line.
14         Well, first of all, on the second line you
15  indicate on that night you were 6'2" and 225 pounds.
16  Was that an accurate description of you that night?
17     A   Yes, that's fairly accurate.
18     Q   All right. And if you go to the next line,
19  it indicates that your unit and beat of assignment was
20  the 10th District and car 1011R, correct?
21     A   Correct.
22     Q   And that was all accurate, right?

243

1      A   Yes.
2      Q   And then if you look over a couple, first it
3  says you were on duty. That's accurate, right?
4      A   Yes.
5      Q   And then the question is member injured, and
6  you struck the section that says no, right?
7      A   Yes, under member injured I checked no.
8      Q   Because to your knowledge, no police officer
9  was injured that night, right?
10     A   Well, the report specifies just me, not any
11  other police officers, so it was the member that's
12  generating the report injured and I put no, because I
13  was not injured.
14     Q   Is there any place on your report to say if
15  the man who you used the Taser on is injured?
16     A   Yes. It's under subject information.
17     Q   All right. We'll get to that. Here we go.
18         First of all, you've got the name of Jose
19  A. Lopez. Where did you get that name and that middle
20  initial?
21     A   I would assume Officer Alamillo, who was
22  generating the original report.

244

1      Q   Did you write that down on the contact card
2  so you would have it when you went to write your
3  report?
4      A   I believe we were both in 10th District doing
5  the reports at the same time, so I might have just
6  asked him.
7      Q   I see. So were you both like in one room at
8  the same desk filling out your separate reports?
9      A   I don't recall what computers we were using
10  at the time, but I believe that we were both in the
11  10th District.
12     Q   And as you're filling out the report, do you
13  ask him do you have anything that gives us this
14  fellow's name?
15     A   I would ask him, when I come to the subject
16  information, what the subject's last name, first name
17  and middle initial was, if he had that information
18  obtained.
19     Q   And you remember actually looking at
20  identification that he had taken from Jose Lopez?
21     A   I don't recall where he obtained the
22  information, or where he was looking. He told me that

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

245

1  the last name was Lopez, the first name was Jose, who
2  had a middle initial A as in Adam.
3      Q   All right. I take it that it was Officer
4  Alamillo that told you his date of birth was 8 May,
5  1962, right?
6      A   In my past experiences, if I were to fill out
7  a TR or an Officer Battery Report, information that I
8  need, I would go directly to the person generating the
9  original report, which was Officer Alamillo.
10     Q   So he gave you that information, right?
11     A   I can't recall specifically, but there's a
12  good chance that it was him that gave it to me.
13     Q   And had you measured Jose Lopez, or where you
14  put the height and weight of the man on the report, is
15  that in some kind of an identification document that
16  you and Alamillo were sharing together?
17     A   Again, that information that I asked Officer
18  Alamillo, I don't know where he obtained the
19  information, but he gave me a height of 5'6" and a
20  weight of 180.
21     Q   And if you were 6'2" and he was 5'6", that
22  would make him what, six inches shorter than you, or

246

1  eight inches?
2      A   Approximately eight inches shorter than me.
3      Q   And approximately 45 pounds lighter than you?
4      A   My weight of 225 and his weight of 180, yes,
5  I'm 45 pounds heavier than Mr. Lopez.
6      Q   All right. You put on here the address 2451
7  South Albany Avenue, Chicago, Illinois, 60623 for
8  Mr. Lopez, correct?
9      A   That's what it says on the report, yes.
10     Q   So if we look at the address of the
11  occurrence you have at the top of 3038 West 25th Street
12  and compare it to the address of 2451 South Albany
13  Avenue, can you tell us approximately how far apart
14  those two addresses are?
15     A   Again, I wouldn't be able to give you an
16  approximate distance of how far the address of the
17  occurrence was from the actual address of Mr. Lopez.
18     Q   All right. And how did you settle on that
19  address of 2451 South Albany as the man's residence
20  address?
21     A   Again, it would be information that I
22  obtained from whoever was creating the original report.

247

1      Q   If, as a matter of fact, Jose Lopez lived
2  with his wife and children in Summit, Illinois, not at
3  that Chicago address, that's something you did not
4  know; is that fair to say?
5      A   It's fair to say that the residence address
6  Jose Lopez was 2451 South Albany, which I obtained from
7  another officer.
8      Q   All right. And you leave the telephone
9  number blank. Is that because you couldn't find a
10  phone number for him anywhere?
11     A   I would assume that if I left the field
12  blank, it's because I didn't have that information to
13  write in there.
14     Q   All right. In the next box, box 30, you were
15  asked was the subject armed, and you choose the box no,
16  correct?
17     A   Correct.
18     Q   After you tased him, did you search him?
19     A   I do not recall searching him.
20     Q   Well, it would be good police work not to put
21  a man in a gurney that's to be put in an ambulance if
22  he has a gun or any kind of a weapon on him, on his

248

1  person; isn't that right?
2      A   Usually by protocol, what we would do if the
3  man is not under arrest is do a protective pat-down for
4  weapons. And after tasing Mr. Lopez, I believe someone
5  did a protective pat-down for weapons, or he would not
6  have entered and been allowed into the ambulance.
7      Q   All right. But did you watch the patting
8  down of him?
9      A   I can't answer for any other police officers.
10  I know that I did not perform the protective pat-down
11  for weapons.
12     Q   So the answer is you don't remember watching
13  the pat-down?
14     A   I don't recall a protective pat-down by the
15  officers that were on the scene.
16     Q   All right. And then your next box, the
17  question asked, subject injured, and you answer no.
18  Why did you put that on there?
19     A   Because I saw no visible sign of injury on
20  Mr. Lopez.
21     Q   Well, were his eyes open? Was he still
22  talking?

Pages 245 to 248

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

249

1       **A   Immediately after tasing him, I don't recall**
2  **if his eyes were open.  That information was more**
3  **geared towards when I went to the hospital after Mr.**
4  **Lopez was dropped off by Chicago Fire Department**
5  **paramedics.**
6       Q   While you were in the hospital, how long did
7  you stay there that night?
8       **A   I don't recall.**
9       Q   As much as an hour or two?
10      **A   No, not that long.  I was there strictly to**
11 **help restrain Mr. Lopez into a hospital bed and assist**
12 **the nurses.  So a matter of minutes.**
13      Q   Did you stay when the doctors came in to
14 examine him?
15      **A   No, I never spoke to a doctor.**
16      Q   Did you follow up within the next day or two
17 to find out that Jose Lopez had a fractured skull and
18 was bleeding internally in his brain?
19      **A   I was not privy to that information after the**
20 **incident.**
21      Q   Did you ever learn that?
22      MR. POLICK:  Objection to anything he may have

250

1  discussed with his attorney that's protected by
2  attorney/client privilege.  And I would direct the
3  witness not to answer anything that infringes upon that
4  privilege.
5          If you want to rephrase your question to
6  put it outside that realm, Mr. DeRose, then I will
7  allow him to answer.
8       MR. DE ROSE:  All right.  That's fair enough.
9  BY MR. DE ROSE:
10      Q   Did any of the officers who were out there on
11 that scene that night ever tell you that they learned
12 that Jose Lopez got a fractured skull that night and
13 had several brain surgeries as a result of internal
14 bleeding, starting with the very next day?
15      MR. POLICK:  Again, I'm going to object on the
16 grounds of attorney/client privilege, since I represent
17 all the officers in this case.  So if you want to
18 qualify your question and ask him in such a way that is
19 just, for example, have you heard from anyone other
20 than your attorney, I'll allow him to answer the
21 question.
22      MR. DE ROSE:  All right.

251

1       MR. POLICK:  But if you're going to not qualify
2  it, then I'm going to direct him not to answer on the
3  grounds of privilege.
4  BY MR. DE ROSE:
5       Q   And sir, if I'm not making myself clear by
6  any question I ask you at any time in this deposition,
7  I never want to know what you and your august attorneys
8  are discussing with you.  I only ever want to know
9  statements you are learning from members of the Chicago
10 Police Department or civilians who might talk to you
11 about Jose Lopez, and that's all.  I want you to have
12 that clearly in your head.  I am not ever trying to
13 gather from you what you and your lawyers talk about.
14      **A   Understood.**
15      Q   All right.
16          Did any officer or civilian tell you that
17 Jose Lopez had a fractured skull when they brought him
18 to the hospital?
19      **A   I do not recall anybody saying anything**
20 **regarding Jose Lopez and any injury the minute that he**
21 **was tased to the minute that I left the hospital, or**
22 **the minute that I finished the report.**

252

1       Q   It says where was medical treatment obtained,
2  and you've got Mt. Sinai Hospital.  You went there,
3  right?
4       **A   Correct.**
5       Q   And obviously, your partner went with you?
6       **A   He did not -- I do not believe that he came**
7  **into the hospital with me.**
8       Q   So he just drove with you there and waited in
9  the car?
10      **A   Correct, because I was not going to take a**
11 **long time.  We had to come back to the station to**
12 **finish our reports.**
13      Q   And then it says by whom, and you have the
14 name Dr. Orellana, O-r-e-l-l-a-n-a.  Where did you get
15 that name?
16      **A   Again, it's probably information that I**
17 **received from the original officer who generated the**
18 **original Case Report.**
19      Q   And that officer is Officer --
20      **A   Alamillo.**
21      Q   Did Officer Alamillo tell you that he talked
22 to Dr. Orellana that night?

Pages 249 to 252

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

253

1   A I didn't ask him.  The field asked by whom
2 was medical treatment obtained, and he said Mt. Sinai
3 Hospital and Dr. Orellana.
4   Q All right.  But did he tell you that Dr.
5 Orellana said the man has a skull fractured and is
6 bleeding internally?
7   A I don't recall Officer Alamillo ever telling
8 me any conversation that he would have had with Dr.
9 Orellana, if he had one.
10   Q And you did not ask the doctor any questions?
11   A I did not have a conversation with Dr.
12 Orellana.
13   Q All right.  And then you've got condition,
14 hospitalized, and under influence.  Do you see that?
15   A Yes.
16   Q Why did you check the box under influence?
17   A Because I thought that it was a field that
18 was appropriate what I felt was happening at the time.
19   Q Under influence of what?
20   A It doesn't specify.  He had behavior and
21 demeanor that could have been similar to someone under
22 the influence or under the influence of drugs, under

254

1 the influence of any other type of narcotic; PCP,
2 cocaine.  That's what I assumed.
3   Q How about alcohol?
4   A I can't answer for Mr. Lopez, because I don't
5 know how he acts when he's under the influence of
6 alcohol.  Through my training and my experience, when I
7 deal with somebody that displayed the same behavior as
8 Mr. Lopez, usually that meant that they were under the
9 influence of a narcotic, which would be mainly PCP or
10 cocaine.
11   Q But no doctor that night told you that Jose
12 Lopez was under the influence of a narcotic or PCP, did
13 he?
14   A Again, I don't recall having a conversation
15 with any doctor.
16   Q No nurse or no paramedic or anybody else ever
17 said to you that night, as you were making out this
18 report, the man was under the influence of a narcotic
19 or a drug or alcohol or anything, did they?
20   A Well, the initial request for police from CFD
21 was CPD for drug overdose.  So after coming back to the
22 station and filling out my reports, what I generally do

255

1 is I print this out.  So that was originally the nature
2 of the call.
3   Q All right.
4   A But nobody specifically -- I didn't have a
5 specific conversation with anybody that said that.
6   Q All right.  And then they want to see what
7 the subject's actions were, and you struck two boxes;
8 did not follow verbal directions.  Do you see that?
9   A Yes.
10   Q And the verbal directions you're talking
11 about are the persuasive suggestions by your partner,
12 "Why don't we go over to the ambulance and get you some
13 help," right?
14   A Yes, that could be one of the verbal
15 directions that we used, yes.
16   Q Well, were there other verbal directions that
17 he refused to follow?
18   A I can't speak for anybody else.  All I know
19 is my conversation that my partner had with him
20 generally was revolved around, "Hey, let's try to get
21 you some help, let's go to the ambulance," which he did
22 not follow.

256

1   Q All right.  So that was the only verbal
2 direction you had in mind when you wrote this report?
3   A That is the only verbal direction that I saw
4 him not follow personally.
5   Q Then you strike another box under subject's
6 actions, you marked the box he stiffened and was dead
7 weight.  Why did you put that in there?
8   A Well, in my previous experiences, when
9 somebody stiffens their body, they are clenching their
10 fists, they are making their body tighter, and it's
11 more of an agressive manner when they stiffen.  They
12 don't allow anybody to get compliance through any type
13 of escort hold or anything like that, anything of that
14 nature.
15   So I observed him stiffening, meaning that
16 his fists were clenched.  I don't know what kind of
17 position his arms were in.  All I remember is that his
18 fists were clenched, and when my partner approached him
19 to try to persuade him to go in the ambulance, that's
20 when he upgraded from passive resister to an assailant.
21   Q You never saw the man as dead weight until
22 after you tasered him though; is that fair to say?

Pages 253 to 256

Stevan Vidljinovic
September 4, 2013

257

1       **A   Dead weight is more of an example.  I mean**
2   **it's not a definition of stiffened.**
3       Q   You didn't mean to say that you thought he
4   was trying to be dead weight so you couldn't take him
5   into custody?
6       **A   I'm sorry.  Repeat that question, please.**
7       Q   You are not saying that the man made himself
8   dead weight to resist your taking him into your
9   physical control, did you?
10      **A   Again, I don't know if he was dead weight.**
11  **Dead weight is just an example used to describe stiff**
12  **and not to define it.**
13      Q   All right.  And now here in this report if we
14  go down further we say that you give the Taser dart
15  numbers.  Do you see that, X00-565370?
16      **A   I do.**
17      Q   Now, is that the number of the gun, or the
18  actual darts?
19      **A   That's the model number of the Taser itself.**
20      Q   The Taser gun?
21      **A   Yes.**
22      Q   So although it says Taser dart, the

258

1   individual darts don't get actual numbers, do they?
2       **A   That I do not know.**
3       Q   All right.  And then it says weapon serial
4   number.  This is the number that's on the Taser weapon?
5       **A   Yes.**
6       Q   And where is that Taser dart number that you
7   got?
8       **A   The dart number?**
9       Q   Yes, X00-565370?
10      **A   It's usually underneath -- I can't recall**
11  **whether it's a serial number or the model number that's**
12  **underneath the handle, and then there's one along the**
13  **frame or the slide underneath that, but I can't recall**
14  **which one is which.**
15      Q   All right.  And just a little lower it says
16  who fired first shot, member or offender, and you
17  indicate member.  Do you see that?
18      **A   Yes.**
19      Q   And as a matter of fact, no one else fired a
20  shot that night but you; isn't that correct?
21      **A   It asks who fired the first shot, and I**
22  **checked member, which was me.  That's correct, nobody**

259

1   else.
2       Q   All right.  And down in case information it
3   says notifications, OC or Taser incident.  That would
4   be OC spray, right?
5       **A   Yes.**
6       Q   And notifications are the place that you have
7   to notify that you discharged your Taser?
8       **A   That's correct.**
9       Q   What's OEMC, the first box you checked off?
10      **A   That's our dispatch unit.  We go over the**
11  **air.  We give them a beat number of who deployed the**
12  **Taser.**
13      Q   All right.  The very next entry -- first of
14  all, OEMC, what do those initials stand for?
15      **A   It's operations command.  I mean I don't know**
16  **exactly what the initials for OEMC stand for.  I know**
17  **that it's our dispatch unit.**
18      Q   All right.  And then the very next box,
19  you've checked that, and it says Desk Sergeant and
20  Watch Commander, District of Occurrence, and you've
21  checked that off?
22      **A   Yes.**

260

1       Q   That they were also notified?
2       **A   Yes.  If I checked it off that means they**
3   **would have been notified.**
4       Q   But that particular X in that box, was that
5   hand-made?  Because it doesn't look to be quite as
6   clear as the other boxes you're filling out.  Did you
7   fill that out after the fact?
8       **A   I can't recall.  All I know is that I checked**
9   **the box saying that I notified the Desk Sergeant Watch**
10  **Commander, District of Occurrence.**
11      Q   Are you knowledgeable of what happens with
12  these Tactical Response Reports and the Officer's
13  Battery Reports after you fill them out?
14      **A   I know that copies are sent to different**
15  **places.  I don't know what is done with them**
16  **afterwards.**
17      Q   Do you know if a Criminal Register number, a
18  CR number, was taken out on this case concerning your
19  activities that night?
20      MR. POLICK:  Again, if you're going to qualify
21  that with regard to information other than, have you
22  heard from anyone other than your attorney, I'll allow

Pages 257 to 260

Stevan Vidljinovic
September 4, 2013

261

1   him to answer.
2       MR. DE ROSE:  All right.
3       MR. POLICK:  If you're going to keep it
4   unqualified, then I'm going to direct him not to
5   answer.
6       MR. DE ROSE:  All right.  Then I want to qualify
7   so that I don't ever draw that kind of an inference
8   from you.
9   BY MR. DE ROSE:
10      Q   Every question I ask you only concerns
11  information you get from sources other than your
12  attorneys.  Do we have that understanding together?
13  And I'll try to remember to qualify it, so let me do
14  it.  Now I'll qualify it.
15          Other than any conversation you may have
16  had with your attorneys, did you ever learn that there
17  was a Criminal Register number taken out on the
18  activities that police officers had with Jose Lopez on
19  that evening?
20      **A   I don't recall the CR number.**
21      MR. POLICK:  I think you misspoke, John.  I think
22  you said Criminal Register number.  It's Complaint

262

1   Register number.  There's no criminal charge here.
2       MR. DE ROSE:  I apologize.
3       MR. POLICK:  That's all right.
4       MR. DE ROSE:  I've probably done that a few
5   million times in my life, Joe.
6   BY MR. DE ROSE:
7       Q   Did Sergeant Kearns ever talk to you that
8   night about what happened out there?
9       MR. POLICK:  Again, other than in the presence of
10  your attorney.
11  BY MR. DE ROSE:
12      Q   Other than in the presence of your lawyers?
13      **A   While I was in the 10th District generating**
14  **the TRR and OBR reports, I had a conversation with**
15  **Sergeant Kearns where I gave him a synopsis of what**
16  **happened and what occurred.**
17      Q   Did he say he saw what happened when it
18  happened?
19      **A   I don't recall Sergeant Kearns saying**
20  **anything of that nature.  All I remember in general is**
21  **telling him what occurred on my end.**
22      Q   Did he tell you he was out on the scene

263

1   before you deployed your Taser?
2       **A   I don't recall Sergeant Kearns saying**
3   **anything to that extent.  All I know is since he had to**
4   **approve the TRR report, he asked me what happened, I**
5   **gave him a quick synopsis, and that was that.**
6       Q   Did you tell him that the man never touched
7   anyone on the street?
8       **A   I told him that my partner, Officer Guettler,**
9   **and myself were in fear of receiving a battery or great**
10  **bodily harm, and that's why I tased him because he went**
11  **from being a -- he went to become an assailant.**
12      MR. DE ROSE:  All right.  Move to strike.
13  BY MR. DE ROSE:
14      Q   That's not my question.
15      **A   But that's what I told him.**
16      Q   Thank you.
17      **A   You're welcome.**
18      Q   My question is, did you tell the Sergeant
19  that the man never touched anyone on the street in your
20  presence?
21      **A   My Sergeant asked me what happened.  I told**
22  **him what happened and why I deployed the Taser.  My**

264

1   **Sergeant never asked me if anybody touched me or not.**
2       Q   All right.  So I take it you never
3   volunteered the fact that you and the other officers
4   were never touched in any way?
5       **A   I gave the information that my Sergeant asked**
6   **for.**
7       Q   So the answer is no, I never told him that we
8   were not touched in any way?
9       **A   I don't recall my Sergeant ever asking me**
10  **that, so I don't recall ever saying it.**
11      Q   All right.  Did your Sergeant that night, he
12  went to the hospital too, didn't he?
13      **A   I don't recall whether he was at the hospital**
14  **or not.**
15      Q   But there were other officers at the hospital
16  besides you, weren't there, who had been out at the
17  street?
18      **A   The only officer I recall at the hospital was**
19  **Officer Alamillo, because it's protocol; if you are**
20  **generating the original report, you have to get such**
21  **information as the doctor's name and the condition of**
22  **the subject.**

Pages 261 to 264

Stevan Vidljinovic
September 4, 2013

265

1    Q   What condition did he tell you he got of Jose
2  Lopez when he was at the hospital from the doctor?
3    A   I asked him was he injured because that was
4  relevant to my report, and I don't believe, I did not
5  see any visible sign of injury.  And I asked him for
6  what the doctor's name was, and his condition was that
7  he was hospitalized and under the influence.
8    Q   All right.  You kind of answered a little
9  different.
10         Did you ask him what condition the doctor
11  said the man was in when he examined him?
12    A   When an officer generates an original report,
13  those are questions that they would ask him.  I don't
14  recall whether I asked him that specific question.
15    Q   Have you ever seen a police report generated
16  in this case that the man had a skull fracture and was
17  hemorrhaging from his brain?
18    A   I don't recall any visible sign of injury, so
19  I don't recall any reports stating such a degree.
20    Q   He looked fine to you, didn't he?
21    A   Hence why I said no visible sign of injury.
22    Q   And you never went back to visit him in the

266

1  hospital and see that half of his skull was missing,
2  did you?
3         MR. POLICK:  Objection to the form of the
4  question.  It's compound.
5         THE WITNESS:  I never visited Mr. Lopez again.
6  BY MR. DE ROSE:
7    Q   And did you ever inquire, without anything to
8  your lawyers, did you ever inquire of anybody what
9  happened to that man I tased and they took to Mt.
10  Sinai?
11    A   Seeing that he had no visible sign of injury
12  at the time of the occurrence, I don't recall I ever
13  inquired how he was doing thereafter.
14    Q   All right.  Before you got a lawyer in this
15  case, you were served with a copy of the Complaint,
16  were you not?
17    A   I believe I was.
18    Q   Did you read it?
19    A   I believe I did.
20    Q   And did you notice that the day following
21  your tasering of him, that his skull was cut open and a
22  flap of his skull was placed in his stomach and a

267

1  quarter of his brain was cut away?
2    A   I don't recall that specific description.  I
3  know that I obtained such a document, I know that I
4  read it over, but I can't recall specifically what was
5  in the document.
6    Q   Well, did you see references of what they
7  did, before they started to talk about the Counts on
8  the facts of the case, what the doctors at Mt. Sinai
9  Hospital did to him over the next several months?
10    A   I don't recall what was done to Mr. Lopez
11  after the incident.
12    Q   Did you notice in the Complaint the assertion
13  that Mr. Lopez has been in a coma for several years?
14         MR. POLICK:  I would object to the form of the
15  question.  You call it an assertion that's in the
16  Complaint.  It's an allegation to which this officer
17  has responded to in his Answer.
18         MR. DE ROSE:  All right.
19  BY MR. DE ROSE:
20    Q   By the way, you read your Answer before you
21  signed it, right?
22         MR. POLICK:  Objection.  The defendant is not

268

1  required to sign the Answer to the Complaint.
2         MR. DE ROSE:  All right.  And that's true.
3  BY MR. DE ROSE:
4    Q   Did you read the Answer that was filed in
5  your behalf in this Complaint, in this case?
6    A   I believe I did, but I don't recall
7  specifics.
8    Q   All right.  And this is Exhibit 51.
9         Exhibit No. 51, it says on the first page
10  are Defendant Stevan Vidljinovic's Answers to
11  Plaintiff's First Set of Interrogatories.  Did you
12  review this before even considering signing it?
13         MR. POLICK:  All right.  Let me make my objections
14  here.
15         First of all, his name is Vidljinovic.
16  Secondly, you were asking him questions about his
17  answer to the Complaint in this case and various
18  allegations in the Complaint.  We now have before the
19  defendant what's been marked as Plaintiff's Exhibit 51,
20  which is Defendant Vidljinovic's Answers to Plaintiff's
21  First Set of Interrogatories.  So this is a document
22  that is different than what you were previously asking

Pages 265 to 268

Stevan Vidljinovic
September 4, 2013

269

1  him about.
2      MR. DE ROSE:  That is correct.
3      MR. POLICK:  Take your time and look at it.
4      MR. DE ROSE:  Yes.  Take a moment.  And I'm not
5  trying to tell you this is a copy of the Complaint.
6  That's Exhibit No. 1, but I'm not going to show you
7  that today, or we'll never get done.
8  BY MR. DE ROSE:
9      Q  Sir, did you sign this document, Page 12?
10     **A  Yes.**
11     Q  And you negate that you were first duly sworn
12  on oath, and state that you've read the foregoing
13  document and the answers made herein are true, correct
14  and complete, to the best of your knowledge and belief,
15  correct?
16     MR. POLICK:  Did you say that he negate, or he
17  stated?
18     MR. DE ROSE:  I'm sorry.  He stated.  If I said
19  negate I apologize.
20     MR. POLICK:  It sounded like it.  I might be
21  wrong.  It's been a long day.
22

270

1  BY MR. DE ROSE:
2      Q  Do you remember signing that on the 31st of
3  January, 2013?
4      **A  It shows that I did sign it 31 January, 2013,**
5  **yes.**
6      Q  Before a Notary Public, right?
7      **A  Yes.**
8      Q  And your eminent lawyer, was he with you to
9  sign right after you, Mr. Gallardo?
10     **A  I don't recall whether he was with me or not,**
11  **but it seems that he has signed it.**
12     Q  All right.  I want you to go back.  I want to
13  just look at one question and answer with you.  Go to
14  Page 3.  And the Interrogatory that you're being asked
15  to answer is Interrogatory No. 5.  And it says, "For
16  the individually-named defendants, please describe in
17  detail your interactions with Jose Lopez, including any
18  physical contact you had with him."
19         And your answer is, "Officer Vidljinovic
20  objects to this Interrogatory as vague as to the term
21  'interactions,' and requesting detailed information
22  that is more properly the subject of a deposition.

271

1      Subject to and without waiving these objections,
2  Officer Vidljinovic states that when he was on the
3  scene he observed the plaintiff pacing and mumbling,
4  and that plaintiff appeared to be under the influence
5  of some substance.
6      "Officer Vidljinovic observed his partner,
7  Officer Guettler, try to speak with the plaintiff, but
8  plaintiff did not respond and at some point walked
9  away.
10     "When Officer Guettler tried to escort
11  plaintiff by the arm, plaintiff became combative,
12  clenched his fists and started swinging.  Officer
13  Vidljinovic tased plaintiff to protect his partner and
14  other officers."
15         Just that far, is that the way you
16  remember this happening, or the way you've been telling
17  us today?
18     MR. POLICK:  Objection to the form of the
19  question, but you can answer over the objection.
20     THE WITNESS:  As opposed to the specifics that I
21  didn't recall whether he was pacing, the subject was
22  mumbling.  We could not comprehend him.

272

1      My partner, Officer Guettler, tried to
2  speak with the plaintiff and persuade him into an
3  ambulance, which he did not respond.
4      Here it states that at some point he
5  walked away.  Again, I don't recall whether he was
6  pacing, or whether he was walking away.  The elements
7  that I do recall are that my partner attempted to have
8  a conversation with him, he began to become combative
9  and swing his arms.
10  BY MR. DE ROSE:
11     Q  All right.  So let me ask on each of those,
12  I'm going to break it down a little bit.
13         Where you signed this document attesting
14  to its accuracy, it says in this answer when you were
15  on the scene, you observed the plaintiff pacing and
16  mumbling.  You didn't tell us anything about pacing
17  today, did you?
18     **A  I said I did not recall whether he was**
19  **pacing.  I recalled him standing on the street.**
20     Q  All right.  Why did you sign this, the
21  truthfulness of this document, if you did not observe
22  Jose Lopez pacing?

Pages 269 to 272

Stevan Vidljinovic
September 4, 2013

273

1    **A   Reading --**
2    MR. POLICK:  Objection to the form of the
3  question.  It misstates the witness's testimony.  You
4  may answer over the objection.
5    THE WITNESS:  Reading the Interrogatory and
6  signing it in January, early this year, the events were
7  more fresh in my mind.  Asking me the questions today,
8  I sufficiently supplied you with all the elements that
9  I did observe.  And if I did not observe something or I
10  couldn't recall, I simply stated that I couldn't
11  recall.  That doesn't mean that he wasn't facing, and
12  that doesn't mean that he didn't pull away.  This given
13  date and time, I just don't recall.
14    Q   All right.  Today you don't recall.  But if
15  this was taken many months ago and you attested to its
16  accuracy, would you believe that this description is
17  more accurate than the one you gave today during your
18  deposition so far, that you actually observed him
19  pacing and mumbling?
20    **A   Reading it today, yes, I believe that there**
21  **is a fair assumption that this might be more accurate.**
22  **The elements that I did pose to you --**

274

1    Q   And I don't want to know about --
2    **A   I just want to finish really quick.  Can I**
3  **finish?**
4    Q   No, because you've answered my question.
5    **A   Well, I have to articulate myself in order to**
6  **answer.**
7    Q   Well, you've answered enough.
8    MR. POLICK:  No, you can't cut him off, John.  You
9  can move to strike, but you can't cut him off.
10    MR. DE ROSE:  All right.  I'll move to strike.
11    MR. POLICK:  But you can't move to strike when he
12  hasn't answered.
13    MR. DE ROSE:  Okay.  I move to withdraw the
14  question.
15    MR. POLICK:  Okay.  You can move to withdraw the
16  question.
17    MR. DE ROSE:  Thank you.
18    MR. POLICK:  You're welcome.
19  BY MR. DE ROSE:
20    Q   Now.  Very simply, is your memory now
21  refreshed, as you look at this document, that you
22  observed my client pacing when you first walked up to

275

1  him?
2    **A   Reading this now, seeing that I have signed**
3  **it, I would say that it is accurate that I probably**
4  **observed the plaintiff pacing and mumbling.**
5    Q   Is your memory now refreshed as to how he was
6  pacing?
7    **A   It's still not refreshed.  I don't recall how**
8  **he was pacing and if he was pacing at all.  All I know**
9  **is that if I answered the Interrogatory No. 5 as I was**
10  **pacing, then he was.**
11    MR. DE ROSE:  Thank you.  Move to strike the rest
12  of the plaintiff's answer after he indicated he doesn't
13  recall how my client was pacing.
14    MR. POLICK:  My client is not the plaintiff in
15  this case.  He is the defendant, named defendant in
16  this case.  So you can't strike something that he
17  isn't.  He's not the plaintiff.
18    MR. DE ROSE:  If I made an observation of him as a
19  plaintiff, I apologize to you.  I mean to strike all of
20  the deponent's answer after he indicated that he did
21  not recall how my client was pacing, because that
22  really was all I was asking.

276

1  BY MR. DE ROSE:
2    Q   All right.  Let's go down a little further.
3    You wrote in this document and attested to
4  it that Officer Guettler tried to escort plaintiff by
5  the arm.  Do you see that?
6    **A   Yes.**
7    Q   Earlier on in this deposition I specifically
8  asked you if you observed your partner take hold or
9  grab Jose Lopez's arm or elbow and gently try to escort
10  him over to the ambulance.  Do you remember that?
11    **A   I remember you asking that question, yes.**
12    Q   And you indicated that he did not, did you
13  not, in the deposition?
14    MR. POLICK:  Objection to the form of the
15  question.  Double negative, compound.
16    MR. DE ROSE:  All right.  Let me withdraw it.
17  BY MR. DE ROSE:
18    Q   You want to change your earlier answers in
19  this deposition, seeing this answer that you have
20  attested to, indicating now that your partner tried to
21  escort my plaintiff by the arm?
22    MR. POLICK:  Objection to the form of the

Pages 273 to 276

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

277

1  question.
2        If you're trying to impeach him, it's an
3  improper impeachment, and it misstates the witness's
4  testimony. He's not trying to change his answers here;
5  I think he's trying to explain them to you. So again,
6  I'll object to the form of the question. It's improper
7  impeachment.
8    MR. DE ROSE: All right. I'll withdraw the
9  question.
10  BY MR. DE ROSE:
11    Q  Is your memory now refreshed that your
12  partner tried to escort Jose Lopez by the arm?
13    **A  Reading this document today, there is a**
14  **chance that Officer Guettler tried to escort Mr. Lopez**
15  **by the arm.**
16    Q  And do you believe that the observation
17  you're making in this Answers to Interrogatories is
18  more properly accurate than the testimony you gave
19  earlier today, because you signed this document months
20  ago?
21    **A  I believe that the testimony that I gave**
22  **today was truthful about the elements that you asked,**

278

1  **and I tried to answer the questions as best as I could.**
2  **Since this documentation was taken and I signed off on**
3  **it months ago, there is a chance that this might be**
4  **more accurate.**
5    Q  All right. What arm did your partner take
6  hold of on Jose Lopez that night?
7    **A  Reading this, I don't recall what arm. And**
8  **earlier today I didn't even recall that he grabbed him**
9  **by the arm. All I recalled was that he gestured to him**
10  **and tried to persuade him to go into an ambulance.**
11    Q  When you say now grabbed my client by the
12  arm, did you see my client raise his arm to try to
13  break the grip on his arm that your partner had?
14    MR. POLICK: I'm going to object to the form of
15  the question because it assumes facts not in evidence
16  and it's improper impeachment.
17        What the Interrogatory says is, "Officer
18  Guettler tried to escort plaintiff by the arm." It
19  does not say that Officer Guettler grabbed plaintiff by
20  the arm. So I'm going to object to this on the grounds
21  that it is improper impeachment. And he can answer
22  over that objection.

279

1    MR. DE ROSE: But excuse me. I'm going to make
2  this clear.
3  BY MR. DE ROSE:
4    Q  Aren't you the one that said grabbed by the
5  arm? I never used those words, did I, before you gave
6  that answer, your last answer?
7    **A  I don't know. And if I did, I was mistaken.**
8  **I did not mean to use that phrase.**
9    MR. DE ROSE: All right. Miss Reporter, will you
10  read his last answer before this one, just his answer,
11  or my question and his answer?
12        (The record was so read
13        by the court reporter.)
14  BY MR. DE ROSE:
15    Q  All right. So the first use of the words
16  "grabbed by the arm" were used by you. Do you remember
17  him grabbing my client by the arm at any time?
18    **A  From what I just heard, the first use was**
19  **used by you.**
20      **I don't recall him grabbing. All I recall**
21  **him doing was persuading him to try to get into an**
22  **ambulance. The method that he used to try to persuade**

280

1  **him I did not recall, except that he gestured to the**
2  **ambulance. Today I did not recall.**
3    Q  Why did you use the word -- first of all, I'm
4  not going to even go back to that question, because
5  it's not worth it for where we're at.
6        But look at -- you signed the document
7  that said that your partner tried to escort plaintiff
8  by the arm. Why did you pick those particular words to
9  put in this document?
10    **A  When I said that Officer Guettler tried to**
11  **escort your plaintiff by the arm, I was describing an**
12  **action that at the time of signing the document, I**
13  **might have believed that he did.**
14      **The operative word in the document and in**
15  **the answer is tried. I don't know if he ever came into**
16  **contact with his arm. I don't know if he ever grabbed**
17  **his arm. All it says, that he attempted, tried to**
18  **escort the plaintiff by the arm.**
19    Q  And why did you pick the arm? Why not some
20  other part of the man's anatomy, like his back or his
21  shoulder?
22    **A  Because normally, the way we're trained, an**

Pages 277 to 280

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

281

1  escort hold is by the arm. And if he was attempting to
2  escort him to the ambulance, it would be by the arm,
3  which I don't even know if he made the contact with,
4  because I did emphasize tried.
5      Q   All right. And right after that you indicate
6  plaintiff became combative. Is that when you saw my
7  client raise his arm and start flailing both of them?
8      A   When your client's fists were clenched and he
9  started swinging them, that happened at the same time
10  that he was becoming combative. That was just a
11  description of him being combative.
12      Q   And all of that was after you believe your
13  partner tried to escort the plaintiff, my client, by
14  his arm. Is that why you wrote this this way?
15      A   I answered to you earlier today that my
16  partner tried to gesture him to the ambulance, at which
17  time your client flailed his arms and began swinging
18  clenched fists towards my partner's direction. And I
19  was in the general vicinity; so, to protect my partner
20  and other police officers, that is why I tased Mr.
21  Lopez. He became combative and became an assailant.
22      Q   So this is very clear, by this answer you

282

1  don't mean to say that any police officer was in
2  physical contact with my client when erased and flailed
3  his arm?
4      A   I do not recall anybody having physical
5  contact with your client as regards to Officer Guettler
6  at the moment that he flailed his arms, because that
7  was the only person I could see.
8      Q   Which side, or where was Officer Guettler in
9  relation to the arm or arms that my client flailed when
10  Officer Guettler tried to escort him by an arm? Which
11  arm was the officer at?
12      MR. POLICK: Asked and answered. He may answer
13  over the objection.
14      THE WITNESS: If the defendant was facing me,
15  Officer Guettler was to my right, so he would be
16  closest to Mr. Lopez's left arm if he attempted to
17  escort him by his arm.
18      MR. DE ROSE: All right, good.
19  BY MR. DE ROSE:
20      Q   I just want to ask you a few questions about
21  the last sentence of this Interrogatory. It writes,
22  "He recalls," and I guess he means you, "plaintiff

283

1  being combative at the hospital and assisted hospital
2  personnel in getting plaintiff under control." Do you
3  see that?
4      A   Yes.
5      Q   So how long did you stay at the hospital
6  before you left?
7      MR. POLICK: Objection. Asked and answered. You
8  can answer over the objection.
9      THE WITNESS: Not long. I don't know an
10  approximate time.
11  BY MR. DE ROSE:
12      Q   As many as ten minutes?
13      A   Again, I don't know an approximate time.
14      Q   Were you the one that helped take the
15  restraining straps off of my client's body?
16      A   I don't recall me ever saying or doing that.
17      Q   All right. And you say you assisted the
18  hospital personnel in getting Jose Lopez under control.
19  How did you do that?
20      A   I believe that when I was assisting hospital
21  personnel, I was holding down an arm of Jose Lopez
22  while they were trying to restrain him.

284

1      Q   They were trying to put the straps on him
2  again after they took them off?
3      A   I believe they were trying to restrain him
4  to -- if it was to put the straps on, I can't answer
5  that. I don't recall what they were attempting to do.
6  All I know is that they needed assistance, and I
7  attempted to hold Jose Lopez by the arm to try to gain
8  compliance.
9      Q   And was there another officer there holding
10  down his other arm?
11      A   I don't recall if there was another officer
12  or not inside the hospital.
13      Q   And how long did you hold down -- you only
14  held down one arm, I take it?
15      A   Correct.
16      Q   Left or right?
17      A   I don't recall.
18      Q   And did you hold it down until a different
19  kind of restraining mechanism was put on that arm?
20      A   I held Jose Lopez by the arm until they
21  gained compliance from him, until they properly
22  restrained him.

Pages 281 to 284

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

285

1    Q   Did you look at his face while you were
2   holding his arm?
3    **A   Yes.**
4    Q   His eyes were closed, weren't they?
5    **A   If he was combative, I don't believe that his**
6   **eyes were closed.**
7    Q   You thought he was wide-eyed and open and
8   looking at you folks?
9    **A   He was still incoherent at the hospital, but**
10  **he was being combative.  All I know is that I went**
11  **there to assist the nurses and the other employees of**
12  **the hospital to gain compliance by him.**
13   Q   When you say he was being combative, was he
14  trying to hit you or one of them people?
15   **A   He was displaying the behavior that he**
16  **displayed on the street prior to me tasing him.  He had**
17  **his fists clenched and he was flailing them around, so**
18  **we tried to restrain him to get him medical treatment.**
19   Q   He did not utter a single word you could
20  understand once he got in the hospital; is that true?
21   **A   He didn't utter a single word that I could**
22  **understand, period, the whole time I was in contact**

286

1   **with him.**
2    Q   Well, you told us out on the street he was
3   uttering words; you just couldn't understand them?
4    **A   Right.  He didn't utter words that I could**
5   **understand.**
6    Q   All right.  Now in the hospital, was he still
7   uttering words, or just sounds?
8    **A   He was acting the same as he was when he was**
9   **on the street uttering words and sounds that I could**
10  **not comprehend.**
11   Q   All right.  Did it appear to you that he was
12  in any kind of pain?
13   **A   I saw no physical sign of injury.  I did not**
14  **believe that he was in any kind of pain.  All I know is**
15  **that he was being combative, and I attempted to assist**
16  **the hospital personnel to gain his compliance.**
17   Q   All right.  And just one more, because I'm
18  going to quit on here.
19       Interrogatory No. 8, it's on Page 4, and
20  I'm just going to read you your answer.  "Officer
21  Vidljinovic objects to this Interrogatory to the extent
22  that it requests information protected by the

287

1   attorney/client privilege and the attorney work-product
2   doctrine.  Subject to and without waiving these
3   objections, Officer Vidljinovic states that he had
4   contact with Sergeant Mark Kearns and Lieutenant Robert
5   Dubiel regarding the Tactical Response Report, and
6   refers plaintiff to the documents previously produced.
7   He also had contact with hospital staff at Mt. Sinai
8   Hospital."
9       Who were the hospital staff that you had
10  contact with?
11   **A   Specifically, I don't recall.  I know that**
12  **there were nurses in the room.**
13   Q   Female or mail?
14   **A   Mt. Sinai at that time has both genders, so I**
15  **can't be gender specific.**
16   Q   So you have no picture in your mind as you're
17  answering this question of who or what the hospital
18  staff personnel looked like who you were talking to?
19   **A   All I know is that there was hospital**
20  **personnel inside the room while I was trying to gain**
21  **Mr. Lopez's compliance.  I could not specifically tell**
22  **you who they were.**

288

1    Q   Did they tell you they had to rush him to the
2   Emergency Room?
3       MR. POLICK:  Objection to the form of the
4   question, because it assumes facts not in evidence.
5   You may answer over the objection.
6       THE WITNESS:  I did not have a conversation with
7   the hospital staff.  All I did was try to gain control
8   of Mr. Lopez while they were attempting to gain
9   compliance.
10  BY MR. DE ROSE:
11   Q   And you never inquired of any hospital staff
12  at Mt. Sinai within the next few days, or of your
13  command staff in the 10th District, how is this man
14  doing; how did it turn out for him?
15       MR. POLICK:  Objection.  That's been asked and
16  answered.  And it's also a compound question.  You may
17  answer over the objections.
18       THE WITNESS:  The only hospital staff personnel
19  that I inquired about was Dr. Orellana for my report
20  purposes.  And after that, no, I never inquired.
21  BY MR. DE ROSE:
22   Q   And your only inquiry of him was what's your

Pages 285 to 288

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

289

1   name?
2       **A   I asked Officer Alamillo, who originally**
3   **generated the original Case Report, because it was a**
4   **field that I needed for my Technical Response Officer**
5   **Battery Report.**
6       Q   And just one more for you.
7           Did you have any concern for the physical
8   well-being of the man you had just tasered and went
9   down to the street that night, after that night?
10      MR. POLICK:  Again, I'm going to object to the
11  form of the question.  But you may answer.
12      THE WITNESS:  Seeing that he had no visible sign
13  of injury, and seeing that he was very uncooperative
14  and very aggressive and very combative, I did my job by
15  gaining his compliance, by helping hospital staff
16  restrain him.  And then I filled out the proper
17  paperwork.  After that, I did not inquire about Mr.
18  Lopez after that.
19      MR. DE ROSE:  All right.  I just want that answer
20  stricken as not responsive.  This will be my last
21  question.  Will you read it back?
22

290

1                   (The question was so read
2                    by the court reporter.)
3       MR. POLICK:  Again, my objections to the question
4   will stand.  You may answer over the objections.
5       THE WITNESS:  Yes, if I tasered somebody, I might,
6   depending on the situation and if I observed injury,
7   inquire whether that man was okay.
8           After the incident was done, I assumed
9   from everything that I observed, that Mr. Lopez was
10  okay, so I did not inquire thereafter.
11      MR. DE ROSE:  All right.  Move to strike those
12  portions of the answer that do not respond to the
13  question.  But otherwise, I have no objection to those
14  responsive portions.
15          I have no further questions, counsel.  You
16  may inquire.
17      MR. POLICK:  I have a few follow-up.
18              EXAMINATION
19          By:  Mr. Polick
20      Q   Officer, you indicated at the beginning of
21  the deposition that you have only been assigned to the
22  10th District; is that correct?

291

1       **A   That's correct.**
2       Q   Have you been detailed to any units other
3   than the 10th District?
4       **A   Yes, I have.**
5       Q   And where have you been detailed?
6       **A   I've been detailed to Unit 211, the area**
7   **Central PSN Dentyne.**
8       Q   Okay.  And by detailed, does that mean that
9   you are on loan to that unit; that you were still
10  technically assigned, for Department purposes, to the
11  10th District?
12      **A   Technically, yes.**
13      Q   And how long have you been detailed to Unit
14  211?  When did you start that detail?
15      **A   Initially the detail was to Unit 214, which**
16  **ended up becoming unit 211.  So I have been detailed to**
17  **unit 214/211, it will be two years in November.**
18      Q   You told us earlier that you were in a marked
19  Chicago Police Department squad car on the evening of
20  this occurrence, July 22nd of 2011, correct?
21      **A   Correct.**
22      Q   And you were in a full Chicago Police

292

1   Department issued uniform?
2       **A   That's correct.**
3       Q   Was Officer Guettler, your partner, also in a
4   Chicago Police Department uniform?
5       **A   Yes, he was.**
6       Q   And how about Officer Alamillo, was he also
7   in a CPD uniform?
8       **A   Yes, he was.**
9       Q   And the other officers that you told us you
10  recall being on the scene of the occurrence, were they
11  also in Chicago Police Department uniform?
12      **A   My best recollection, yes.**
13      Q   You said that the shift you were working
14  started at either 9:30 or 10:30, and if you started at
15  9:30, you usually ended your tour of duty around 6:00;
16  and if you started at 10:30, your tour of duty would
17  end at around 7:30 A.M.  Strike that.  Let me restate
18  that.
19          You indicated that the Midnight shift you
20  were working on either started at 9:00 P.M. and ran to
21  6:00 A.M., or started at 10:30 P.M. and ran to 7:30
22  A.M., correct?

Pages 289 to 292

Stevan Vidljinovic
September 4, 2013

293

1    A   Correct.
2    Q   On the date of this occurrence, July 22nd of
3  2011, do you recall if you started at 9:00 P.M., or at
4  10:30 P.M.?
5    A   9:00 P.M.
6    Q   And that's the best of your recollection?
7    A   Yes.
8    Q   And I believe you testified that you think
9  you went on patrol after roll call at approximately
10  9:30 P.M. that evening, correct?
11    A   Correct.
12    Q   You also told us that when you are listening
13  to radio traffic or communications in your squad car,
14  you're doing that over what is called Zone 10, correct?
15    A   Correct.
16    Q   And that is a police dispatcher that you are
17  receiving those communications from?
18    A   Correct.
19    Q   You are aware that the City of Chicago has a
20  911 emergency call system?
21    A   Yes.
22    Q   And that citizens who need emergency

294

1  assistance can call 911, and either the police or the
2  fire department will be dispatched?
3    A   Correct.
4    Q   When a citizen makes a 911 call to the 911
5  center, are you able to hear those calls over your
6  radio in the squad car, Zone 10?
7    A   Not the ones that are dispatched to the fire
8  side of OEMC.
9    Q   How about the actual telephone call of the
10  citizen to the 911 center, are you able to hear those
11  calls over your radio?
12    A   No.
13    Q   Okay.  You get your information from the
14  police dispatcher who is receiving the call from a
15  citizen, correct?
16    A   Correct.
17    Q   On a day-to-day basis you engage in what
18  would be described as normal conversation with friends
19  and co-workers, correct?
20    A   Correct.
21    Q   Were you able to have any type of normal
22  conversation with Mr. Jose Lopez on July 22nd of 2011?

295

1    A   No.
2    Q   Was Mr. Lopez able to communicate to you in
3  anything that could be described as normal conversation
4  on July 22nd of 2011?
5    A   No.
6    Q   Going to the Taser that you deployed at the
7  scene, you indicated that the trigger of that Taser is
8  what jettisons the probes, and that there is then a
9  toggle switch that controls the electric current,
10  correct?
11    A   Correct.
12    Q   How many times did you press the trigger of
13  the Taser that you deployed?
14    A   Once.
15    Q   And did you manipulate in any way the toggle
16  switch on that Taser after you pulled the trigger of
17  the Taser?
18    A   I did it to turn off the electromagnetic
19  waves.
20    Q   And after you turned it off to cut off the
21  electromagnetic waves, did you ever re-engage the
22  toggle switch to send more electric waves into Mr.

296

1  Lopez?
2    A   No.
3    Q   Did you ever dry stun Mr. Lopez with the
4  Taser?
5    A   No.
6    Q   Approximately how far away from Mr. Lopez
7  were you when you deployed your Taser?
8    A   Approximately three to five feet.
9        MR. DE ROSE:  While he's looking, just an
10  observation.  That's the way you should answer
11  questions.  When he's giving you a direct question,
12  just go to it.
13        All right.  Go ahead.
14  BY MR. POLICK:
15    Q   You indicated that you observed no signs of
16  physical injury to Mr. Lopez, correct?
17    A   Correct.
18    Q   Did you notice if he was bleeding in any way
19  from any of your observations, first at the scene of
20  the occurrence?
21    A   No.
22    Q   Did you notice any signs of bleeding to Mr.

Pages 293 to 296

Stevan Vidljinovic
September 4, 2013

297

1    Lopez when you were at Mt. Sinai Hospital?
2        A   No.
3        Q   You were asked questions about the Event
4    Queries that were marked as Exhibits 2C, 2G and 2B.
5            Have you ever personally prepared an Event
6    Query of the type that were marked as those exhibits?
7        A   No.
8        Q   With regard to Exhibit 2C, you indicated from
9    your reading of that document, that it appeared that
10   the initial police dispatch was a need for CPD for drug
11   overdose, correct?
12       A   Correct.
13       Q   Do you recall actually hearing the police
14   dispatcher make that call over your Zone 10 radio?
15       A   I do not recall.
16       Q   Would you consider a person who is having a
17   drug overdose to be an emergency situation?
18       A   Yes.
19       Q   I want to direct your attention to the
20   Special Order from the Chicago Police Department that
21   was marked as Plaintiff's Exhibit 14B that's entitled
22   Alcohol and Drug Dependent Persons.  You were asked

298

1    some questions about that Special Order, correct?
2        A   Correct.
3        Q   I want to direct your attention to Section 2A
4    of that Special Order which I'm going to read into the
5    record.
6            "Persons who, in the professional judgment
7    of the police officer, are identified as being
8    incapacitated in a public place will be taken into
9    protective custody and immediately transported to a
10   detoxification facility.  If no detoxification facility
11   in the district of occurrence or immediately adjacent
12   districts, the person will be taken to the nearest
13   hospital approved by the Chicago Department of Health
14   to participate an Emergency Room Service.  A list of
15   those hospitals is contained in the Department
16   directive entitled 'Squadrol Operating Procedures.'"
17           You indicated that Mr. Lopez, in your
18   opinion, was under the influence of some type of
19   narcotic which you believed to be either PCP or
20   cocaine, correct?
21       A   Correct.
22       Q   And that based on your observation of Mr.

299

1    Lopez's actions, he was incoherent and incomprehensible,
2    correct?
3        A   Correct.
4        Q   Did you believe him to be a danger to
5    himself?
6        A   Yes.
7        Q   Did you believe him to be a danger to others?
8        A   Yes.
9        Q   Did you believe he was incapacitated in a
10   public place because of that condition?
11       A   Yes.
12       Q   And was it your judgment that he should be
13   taken into protective custody for his safety?
14       A   Yes.
15       Q   After seeing Mr. Lopez at Mt. Sinai Hospital
16   on July 22nd of 2011, did you ever see him again?
17       A   No.
18       MR. POLICK:  I don't have any further questions.
19   Mr. DeRose might have a follow-up.
20       MR. DE ROSE:  Just a couple on what counsel did.
21
22

300

1            RE-EXAMINATION
2            By:  Mr. DeRose
3        Q   You told counsel that Jose Lopez had no
4    normal conversation with you that night, in the few
5    moments you were in his presence, before you used your
6    Taser; is that correct?
7        A   Nothing that I would have described as normal
8    conversation.
9        Q   All right.  You were aware that other members
10   of the Chicago Fire Department had been in his presence
11   for at least 15 minutes before you arrived?
12       MR. POLICK:  Objection to the form of the
13   question.  You can answer.
14       THE WITNESS:  I was not aware.
15   BY MR. DE ROSE:
16       Q   You didn't know if anybody else had been with
17   him during that 15-minute period?
18       A   I know that beat 1033R, Officer Alamillo and
19   Valdovinos, and the two paramedics -- I don't know them
20   specifically, from the Chicago Fire -- were on scene.
21   I don't know how much contact they had with Mr. Lopez
22   or how long they were on scene.

Pages 297 to 300

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

301

1    Q   And the ambulance, you don't know, or do you
2   know, the ambulance didn't even arrive on the scene
3   until ten minutes after the fire truck, did it?
4        MR. POLICK:  Objection.  Calls for speculation.
5   You can answer over the objection.
6        THE WITNESS:  I don't recall a fire truck being
7   there, and I don't recall initially when the ambulance
8   arrived on scene.
9   BY MR. DE ROSE:
10       Q   If, even before you got there, Jose Lopez had
11  said to personnel of the Chicago Fire Department over a
12  10- to 15-minute period that he did not want medical
13  assistance or attention, is that something you would
14  have wanted to know?
15       MR. POLICK:  Objection to the form of the
16  hypothetical.  It's incomplete and assumes facts not in
17  evidence.  You may answer over the objection.
18       THE WITNESS:  When you come to a scene, you'd like
19  to know as much information that's given.
20  BY MR. DE ROSE:
21       Q   But you, yourself, never talked to any of the
22  paramedics or anyone else who was on the scene, other

302

1   than that one officer?
2        **A   Again, I recall the paramedics there; I just**
3   **do not know when they arrived on scene, if they were**
4   **already on scene.**
5            **Initially when I arrived on scene, I**
6   **recall going straight to Officer Alamillo, asking him**
7   **for a quick synopsis of what was going on.**
8        Q   All right.  Now, the Event Queries that
9   counsel asked you about, you said I never drafted
10  those, but you can tell from those Event Queries we've
11  shown you that two dispatchers who worked the 10th
12  District are making entries on those Queries, right?
13       **A   You can assume that there are two work**
14  **stations at work, usually manned by one dispatcher**
15  **each.  I can't speculate whether it was one or two.**
16       Q   Did you recognize the voice of either one of
17  those dispatchers that night?
18       **A   I don't recall which dispatchers were working**
19  **that night.**
20       Q   All right.  Sometimes you recognize the voice
21  of the particular dispatcher, and you'll even call them
22  by their first name, hello Gladys, or something like

303

1   that; is that not true?
2        **A   That is true.**
3        Q   All right.  So it's fair to say, as you try
4   to think back on that night, you cannot recall the
5   names of the dispatchers involved?
6        **A   Yes, it's fair to say that the dispatchers**
7   **that I'm familiar with on Zone 10, I cannot recall**
8   **whether they were working that night or not.**
9        Q   And you didn't recognize the voice of the
10  persons who were talking to you?
11       **A   I don't recall recognizing the voice of the**
12  **dispatchers on that given night.**
13       Q   As you understand it, the section that
14  counsel just read to you about a person that you
15  believe is under the influence of a narcotic drug, you
16  have the right to take them for their own protection to
17  a detoxification facility, right?
18       **A   It's right that somebody that's incapacitated**
19  **in a public place will be taken into protective custody**
20  **and immediately transported into a detoxification**
21  **facility.  If there isn't one in the district of**
22  **occurrence or adjacent districts, they will be taken to**

304

1   a hospital, nearest hospital.
2        Q   I know what that says.  My question to you
3   now is, was it your intention to take Mr. Lopez to a
4   detoxification facility that night?
5        **A   Our objective, which was our objective the**
6   **whole time all the way up to Mr. Lopez's actions that**
7   **caused us to tase him, was to seek medical treatment**
8   **for him.**
9        Q   All right.  Now, with that being your
10  intention, do you know that a citizen of the community
11  has a right to refuse medical attention or treatment of
12  any kind?
13       MR. POLICK:  Objection.  That's been asked and
14  answered several times.  You can answer over the
15  objection.
16       THE WITNESS:  I do know that.
17           Having a conversation with Mr. Lopez, I
18  could not understand anything that he was saying, so I
19  could not make that assumption.
20       MR. DE ROSE:  All right.  Move to strike the rest
21  of the answer that was beyond the words "I do know
22  that."

Pages 301 to 304

Stevan Vidljinovic
September 4, 2013

305

1        I have no further, counsel.
2        MR. POLICK:  Just a few follow-up on that.
3            RE-EXAMINATION
4            By:  Mr. Polick
5        Q   Did Mr. Jose Lopez ever say to you
6    specifically, "I do not want to go to the hospital?"
7        A   I did not have a normal conversation with
8    Mr. Jose Lopez.  He never said anything that I could
9    understand or make sense of specifically.
10       Q   And who took Mr. Jose Lopez to Mt. Sinai
11   Hospital?  Was it a police officer, or was it the
12   Chicago Fire Department paramedics?
13       A   Chicago Fire Department paramedics.
14       Q   So Mr. Lopez was placed in the Chicago Fire
15   Department ambulance and transported by Chicago Fire
16   Department paramedics to Mt. Sinai Hospital?
17       A   Correct.
18       MR. POLICK:  I have nothing further.
19           RE-EXAMINATION
20           By:  Mr. DeRose
21       Q   Just on that.  Did one of the police officers
22   ride in the ambulance with the paramedics and Mr. Lopez

306

1    over to Mt. Sinai?
2        A   Normal protocol, sometimes a police officer
3    does ride, especially if a paramedic requests them to
4    ride, if the subject is combative.
5            That given date, I do not recall
6    specifically if somebody rode with Mr. Lopez in the
7    ambulance.
8        Q   Did you and your partner follow the ambulance
9    to the Mt. Sinai Hospital?
10       A   Yes, we did.
11       Q   Did you help take the gurney out of the
12   ambulance with any other officer's help?
13       A   I don't recall taking the gurney out of the
14   ambulance or assisting the paramedics.
15       Q   And I take it that when the ambulance arrived
16   there, you didn't see an officer step out of the
17   ambulance with, before, or after the gurney?
18       A   Again, if I did, I would have recalled
19   somebody riding with him.  I don't recall.
20       MR. DE ROSE:  All right.  I have no further
21   questions.  Counsel?
22       MR. POLICK:  None from me.

307

1        MR. DE ROSE:  All right.
2        MR. POLICK:  Signature is reserved.
3        MR. DE ROSE:  All right.  With that, you're free
4    to go.
5        THE WITNESS:  Thank you.


8            AND FURTHER DEPONENT SAITH NOT

308

1    STATE OF ILLINOIS  )
2                       ) SS.
2    COUNTY OF DU PAGE  )
3        I, GLORIA APOSTOLOS SIOLIDIS, C.S.R., in and for
4    the State of Illinois do hereby certify that OFFICER
5    STEVAN VIDLJINOVIC was first duly sworn by me to
6    testify the truth; that the above deposition was
7    recorded in shorthand and reduced to typewriting by me;
8    that the deposition is a true, correct and complete
9    transcript of the entire testimony given by the said
10   witness at the time and place hereinabove set forth,
11   and that signature is hereby reserved by said witness.
12       I further certify that I am not counsel for, nor
13   in any way related to any of the parties to this suit,
14   nor am I in any way interested in the outcome thereof.
15       In witness hereof, I have hereunto set my hand and
16   affixed my Notarial Seal this 7th day of September,
17   A.D., 2013.
18
19   _____
         GLORIA APOSTOLOS SIOLIDIS
20       CSR License #084-0001205
21
22

Pages 305 to 308

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

309

1    STATE OF ILLINOIS )
                        ) SS.
2    COUNTY OF DU PAGE )

3

4        I HEREBY CERTIFY that I have read the
5    foregoing transcript of my deposition given at the time
6    and place aforesaid, consisting of pages 1 through 307
7    inclusive, and I do again subscribe and make oath that
8    the same is a true, correct, and complete transcript of
9    my deposition so given as aforesaid as it now appears
10   or inclusive of any corrections or additions attached
11   hereto.

12

13

14   _____
                OFFICER STEVAN VIDLJINOVIC
15

16

     SUBSCRIBED AND SWORN TO
17   before me this _____ day of
     _____ A.D., 2013.

18

19

20   _____
         Notary Public

21

22

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

310

| A | | | | | |
|---|---|---|---|---|---|
| **A-1-a-...** 43:2 | **academy** 11:12,20 14:19,22 16:2 99:22 167:16 173:20 174:8,15 174:18 175:16 | 243:3 273:17 273:21 275:3 277:18 278:4 **accura...** 74:20 **acknow...** 54:11,15 **acknow...** 50:3 | 120:10 120:15 167:20 193:19 194:7 198:1 210:19 234:8 255:7 256:6 299:1 | 194:14 254:5 **actual** 10:15 28:21 53:17 59:19 140:1 203:11 205:16 206:1 | 225:4,8 225:9,16 225:19 225:19 226:6 240:17 240:19 240:22 241:1 242:6 |
| **A.D** 308:17 309:17 | | | | | |
| **A.M** 1:18 33:3,6 148:5 226:17 226:18 227:8 240:14 292:17 292:21 292:22 | **accepted** 199:15 **access...** 73:12 103:4 125:21 143:9 146:21 170:18 194:18 195:1 | 92:10 **acknow...** 50:9,12 50:14 54:4,5 **act** 90:3 98:16,21 130:14 184:15 | 304:6 **activate** 26:3 55:18 56:9 **activated** 55:22 56:2,10 **active** 143:7 | 227:17 232:17 246:17 257:18 258:1 294:9 **Adam** 245:2 **add** 18:18 **added** 192:2,3 | 246:6,10 246:12 246:16 246:17 246:19 246:20 247:3,5 **addresses** 246:14 **adjacent** 74:13 |
| **abbrev...** 37:1 | | | | | |
| **ability** 6:16 165:12 198:19 | | | | | |
| **able** 21:7 82:7 97:11 116:15 125:18 125:20 181:20 189:11 211:15 211:17 246:15 294:5,10 294:21 295:2 | **accide...** 14:3 **accide...** 13:20 **accomm...** 9:8 **accomp...** 218:5 **accompany** 10:14 214:20 **accomp...** 9:12 | **acted** 195:21 **acting** 29:17 286:8 **action** 66:18 70:9,12 74:14 81:10,19 82:2 83:17 84:17 96:19 | 162:17 193:13 194:21 197:22 198:7 **actively** 92:16 **activi...** 260:19 261:18 **activity** 36:16 37:1 47:21 | 298:11 303:22 **addition** 159:22 160:18 162:5 **additi...** 23:1 29:5 139:20 139:20 140:3,8 **additions** 309:10 | 298:11 303:22 **admini...** 4:5 **ADRIAN** 1:8 **adult** 91:9 **ADVD** 37:1 **advice** 174:22 181:8 **advised** 18:17 84:19 |
| **abreast** 101:13 124:12 | **accout...** 102:7 **accuracy** 272:14 273:16 | 98:5 167:19 176:16 184:1 | 50:9 163:13 182:13 | **address** 35:1,9 55:19 61:8,9 | 130:8 158:12 **affect** 73:14 |
| **absolute** 153:19 | **accurate** 225:5,16 227:2 | 189:19 194:2 204:22 | 232:7,12 233:10 233:17 | 61:10 62:15 81:1 | **affirm...** 10:3 **affixed** 308:16 |
| **absolu...** 61:14 212:6 | 233:17 242:16 242:17 | 280:12 **actions** 98:6 | 238:11 238:16 238:16 | 86:21 87:5 101:18 | **aforesaid** 309:6,9 **afterward** |
| **Abuse** 184:14 | 242:22 | 111:2 | 239:6,7 **acts** | 224:19 | 165:14 |

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

311

| | | | | | |
|---|---|---|---|---|---|
| **agencies** | 60:7 | 253:7 | 256:12 | 201:2,3 | 12:1,4 |
| 151:22 | 65:22 | 264:19 | 260:22 | 201:6,7 | 14:16 |
| 152:22 | 66:15 | 289:2 | **allowed** | 201:8,11 | 86:3 |
| **aggres...** | 67:22 | 292:6 | 8:1 | 201:15 | 123:14 |
| 118:19 | 68:2 | 300:18 | 18:14 | 201:16 | **angle** |
| 165:1 | 69:22 | 302:6 | 67:7 | 201:17 | 107:4 |
| 289:14 | 70:4,10 | **Albany** | 139:4 | 201:20 | **angled** |
| **aggres...** | 70:20 | 35:2,10 | 165:5 | 202:8,12 | 110:6 |
| 144:9 | 71:8,11 | 38:14 | 168:2 | 202:13 | **answer** 6:7 |
| **ago** 14:8,9 | 72:2,5,7 | 55:1,19 | 187:14 | 209:9 | 6:11 7:8 |
| 14:17 | 72:13 | 58:14 | 188:9,17 | 214:11 | 7:13,18 |
| 128:15 | 77:10 | 61:9,19 | 189:2 | 214:18 | 7:20 |
| 142:6 | 81:5,9 | 61:21 | 248:6 | 214:21 | 8:13,15 |
| 173:12 | 81:15,16 | 62:4,7 | **altern...** | 215:4,6 | 8:21 |
| 273:15 | 83:21 | 62:16,17 | 191:11 | 215:9,13 | 9:16,18 |
| 277:20 | 85:13 | 105:4 | **ambiguous** | 218:10 | 10:4,5 |
| 278:3 | 93:10 | 225:7,20 | 163:20 | 218:17 | 12:14 |
| **agree** | 94:22 | 226:7 | **ambulance** | 221:18 | 13:2 |
| 90:19 | 96:11 | 246:7,12 | 41:16 | 247:21 | 17:6 |
| 192:15 | 97:10,15 | 246:19 | 62:21 | 248:6 | 19:16 |
| **agrees** | 100:8 | 247:6 | 63:1,2 | 255:12 | 23:19 |
| 211:20 | 102:1,2 | **alcohol** | 69:20 | 255:21 | 24:2 |
| **aggressive** | 106:3,13 | 73:5 | 71:19,21 | 256:19 | 27:6,16 |
| 109:21 | 108:7 | 114:12 | 77:3 | 272:3 | 28:4 |
| 256:11 | 120:2,7 | 183:8,15 | 83:19 | 276:10 | 30:8 |
| **ahead** | 120:11 | 184:18 | 84:3,8,9 | 278:10 | 31:7 |
| 35:18 | 120:15 | 185:1,10 | 85:6 | 279:22 | 33:10 |
| 70:17 | 123:13 | 185:11 | 97:12,18 | 280:2 | 35:18 |
| 117:9 | 127:13 | 254:3,6 | 105:12 | 281:2,16 | 36:13 |
| 166:8 | 142:20 | 254:19 | 108:10 | 301:1,2 | 37:4,17 |
| 188:1 | 177:9 | 297:22 | 115:21 | 301:7 | 37:18 |
| 197:9 | 200:13 | **Alcoho...** | 119:7,14 | 305:15 | 38:7,16 |
| 296:13 | 215:19 | 184:14 | 120:13 | 305:22 | 39:2,13 |
| **aide** | 218:5 | **Alex** | 120:19 | 306:7,8 | 40:2,15 |
| 182:12 | 220:9 | 159:18 | 120:21 | 306:12 | 41:11 |
| **air** 38:11 | 233:8 | **allega...** | 121:2,7 | 306:14 | 42:4,15 |
| 39:11 | 234:2 | 267:16 | 121:8 | 306:15 | 43:16 |
| 41:4 | 236:12 | **allega...** | 124:5 | 306:17 | 44:11 |
| 53:18 | 236:13 | 268:18 | 168:21 | **amount** | 45:5,14 |
| 54:10,13 | 236:16 | **alleged** | 169:2,9 | 19:2 | 46:9,19 |
| 92:10 | 243:21 | 161:20 | 169:20 | 92:18,19 | 47:8 |
| 145:5 | 245:4,9 | **allotted** | 181:22 | 95:21 | 48:10,22 |
| 259:11 | 245:16 | 19:2 | 186:14 | 203:10 | 49:20 |
| **Alamillo** | 245:18 | **allow** 7:21 | 186:20 | **anatomy** | 50:6 |
| 1:9 43:1 | 252:20 | 98:1 | 187:3 | 280:20 | 51:5 |
| 49:12,21 | 252:21 | 250:7,20 | 190:13 | **and-a-...** | 53:1,7 |

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

| | | | | | |
|---|---|---|---|---|---|
| 56:4,16 | 157:10 | 204:8,15 | 280:15 | 287:17 | 237:16 |
| 57:12,20 | 158:2,3 | 206:3 | 281:22 | **answers** | 251:19 |
| 58:12,15 | 158:11 | 208:19 | 282:12 | 7:14 | 254:16 |
| 58:19 | 160:19 | 211:3,4 | 283:8 | 10:15 | 255:5,18 |
| 59:6,17 | 162:6 | 211:7,10 | 284:4 | 21:1 | 256:12 |
| 63:8 | 163:20 | 211:15 | 286:20 | 188:12 | 264:1 |
| 66:4,21 | 165:4,6 | 211:17 | 288:5,17 | 197:11 | 266:8 |
| 69:4 | 165:8,11 | 217:9 | 289:11 | 201:1 | 282:4 |
| 70:18 | 165:19 | 218:3 | 289:19 | 268:10 | 300:16 |
| 71:6 | 166:2,3 | 219:20 | 290:4,12 | 268:20 | **anybody's** |
| 75:1 | 166:7,19 | 221:9 | 296:10 | 269:13 | 104:10 |
| 76:12,20 | 167:11 | 222:2,7 | 300:13 | 276:18 | **anyway** |
| 78:9,17 | 169:11 | 222:17 | 301:5,17 | 277:4,15 | 79:18 |
| 81:22 | 170:13 | 225:12 | 304:14 | **antici...** | 211:21 |
| 85:2,21 | 178:3,12 | 226:1,7 | 304:21 | 189:3 | **apart** |
| 86:8 | 178:13 | 226:10 | **answered** | **ANTONIO** | 246:13 |
| 87:3,6 | 178:20 | 226:16 | 53:7 | 1:7 | **apartment** |
| 89:8,19 | 179:4,10 | 228:5 | 58:21 | **anybody** | 62:1,2 |
| 90:15 | 179:17 | 238:11 | 59:16 | 7:1 | **apologize** |
| 91:19 | 180:3 | 248:9,12 | 114:13 | 52:14 | 262:2 |
| 92:7 | 182:4 | 248:17 | 117:2 | 58:8 | 269:19 |
| 93:1 | 184:5 | 250:3,7 | 122:12 | 68:3 | 275:19 |
| 95:9,18 | 186:6,9 | 250:20 | 126:9 | 69:6 | **APOSTOLOS** |
| 96:6 | 186:17 | 251:2 | 132:9 | 70:9,20 | 2:2 |
| 99:13 | 187:6,14 | 254:4 | 164:1,14 | 70:21 | 308:3,19 |
| 100:5,18 | 187:21 | 261:1,5 | 166:7 | 77:8,11 | **apparent** |
| 101:7 | 187:22 | 264:7 | 190:2 | 77:12 | 69:11,13 |
| 102:22 | 188:14 | 267:17 | 195:7 | 81:2,4 | 235:16 |
| 108:12 | 188:18 | 267:20 | 202:9 | 100:19 | 236:1 |
| 109:17 | 189:2,4 | 268:1,4 | 204:14 | 108:5,13 | **appare...** |
| 110:13 | 189:6,21 | 268:17 | 206:2 | 112:12 | 235:17 |
| 110:21 | 194:1,5 | 270:13 | 211:18 | 114:10 | **appare...** |
| 112:15 | 194:10 | 270:15 | 221:2 | 116:13 | 71:17,17 |
| 113:3,21 | 195:10 | 270:19 | 265:8 | 127:15 | 74:5 |
| 114:14 | 195:11 | 271:19 | 274:4,7 | 128:12 | **Appeals** |
| 116:18 | 195:15 | 272:14 | 274:12 | 128:17 | 5:14 |
| 117:9 | 196:12 | 273:4 | 275:9 | 130:17 | **appear** |
| 126:10 | 196:13 | 274:6 | 281:15 | 156:10 | 112:16 |
| 126:19 | 196:14 | 275:12 | 282:12 | 166:10 | 141:13 |
| 127:8 | 196:19 | 275:20 | 283:7 | 177:15 | 182:5 |
| 128:3 | 196:21 | 276:19 | 288:16 | 177:19 | 205:1 |
| 146:19 | 197:5 | 278:1,21 | 304:14 | 219:12 | 237:19 |
| 147:7 | 199:12 | 279:6,6 | **answering** | 220:11 | 286:11 |
| 148:10 | 200:1 | 279:10 | 7:16 | 220:13 | **appeared** |
| 155:16 | 201:5 | 279:10 | 165:10 | 221:18 | 2:11,16 |
| 156:12 | 202:4,10 | 279:11 | 179:16 | 233:5 | 2:21 |

Stevan Vidljinovic
September 4, 2013

313

| | | | | | |
|---|---|---|---|---|---|
| 77:22 | 119:5,8 | 246:2,3 | 75:18 | 67:5 | **arrived** |
| 79:11 | 125:5 | 246:13 | **Argume...** | 247:15 | 58:7,13 |
| 112:4,7 | 187:8 | 293:9 | 163:7 | **arms** | 58:21 |
| 179:18 | 207:10 | 296:6,8 | 204:7 | 106:22 | 59:2,19 |
| 271:4 | 256:18 | **April** | 208:18 | 107:6 | 61:5 |
| 297:9 | **approa...** | 151:13 | **arm** 21:7 | 121:16 | 64:13,16 |
| **appears** | 88:3 | 154:9 | 121:3 | 122:1,5 | 76:22 |
| 45:1 | 97:7 | **Arabic** | 122:8,20 | 122:18 | 77:8 |
| 159:4 | 105:2 | 191:9 | 123:1 | 122:19 | 83:21 |
| 309:9 | 144:9 | **area** 31:15 | 134:18 | 123:3,6 | 94:4 |
| **applause** | **approp...** | 31:17,18 | 271:11 | 123:7,12 | 96:9 |
| 131:22 | 5:13 | 32:3,6 | 276:5,9 | 125:6 | 100:8 |
| **applic...** | 180:15 | 32:11,19 | 276:21 | 127:14 | 105:11 |
| 234:6 | 181:2 | 35:5,5 | 277:12 | 127:16 | 300:11 |
| **applied** | 253:18 | 39:20,22 | 277:15 | 129:2 | 301:8 |
| 221:11 | **approve** | 41:6,7 | 278:5,7 | 134:20 | 302:3,5 |
| 241:20 | 231:3 | 41:18 | 278:9,12 | 187:9 | 306:15 |
| **applies** | 263:4 | 51:21 | 278:12 | 194:16 | **arriving** |
| 184:9 | **approved** | 55:5,5 | 278:13 | 198:4,4 | 58:2,5,6 |
| **apply** 5:15 | 231:5 | 62:7,9 | 278:18 | 198:8 | **article** |
| 52:10 | 298:13 | 92:2 | 278:20 | 199:6 | 159:5,12 |
| 99:2 | **approving** | 125:1 | 279:5,16 | 200:15 | 159:19 |
| **apprec...** | 240:9 | 127:22 | 279:17 | 217:16 | 160:1,3 |
| 34:12 | **approx...** | 133:8 | 280:8,11 | 220:18 | 162:4 |
| 189:9 | 81:1 | 136:18 | 280:16 | 220:20 | **articu...** |
| 191:21 | 86:9 | 144:10 | 280:17 | 256:17 | 274:5 |
| **appreh...** | 87:5 | 144:20 | 280:18 | 272:9 | **articu...** |
| 163:12 | 201:8 | 145:2 | 280:19 | 281:17 | 211:11 |
| **approach** | 241:1 | 154:22 | 281:1,2 | 282:6,9 | **asked** 16:6 |
| 85:15 | 246:16 | 155:4,13 | 281:7,14 | **arrest** | 25:5 |
| 109:9 | 283:10 | 203:5 | 282:3,9 | 199:1,3 | 53:7 |
| 120:11 | 283:13 | 209:11 | 282:10 | 199:5 | 58:20 |
| 217:5 | **approx...** | 214:22 | 282:11 | 237:7,11 | 59:16 |
| **approa...** | 13:14,16 | 215:5,10 | 282:16 | 237:13 | 68:10,14 |
| 65:22 | 14:8,9 | 215:12 | 282:17 | 237:22 | 69:8 |
| 66:11,15 | 14:10,16 | 216:1 | 283:21 | 248:3 | 77:2 |
| 77:17,18 | 19:12 | 225:1 | 284:7,10 | **arresting** | 85:5 |
| 85:4,10 | 22:19 | 291:6 | 284:14 | 237:21 | 87:13 |
| 85:13,15 | 23:7,13 | **areas** | 284:19 | **arrival** | 91:22,22 |
| 85:18 | 27:20 | 152:20 | 284:20 | 59:3 | 111:14 |
| 89:6 | 94:16,19 | 154:16 | 285:2 | 100:7 | 111:15 |
| 96:8,21 | 94:20,22 | **argue** 10:9 | **ARMANDO** | **arrive** | 114:13 |
| 100:10 | 118:7 | 10:10 | 1:9 | 59:4 | 115:8 |
| 100:15 | 119:21 | 114:8 | **armed** 19:1 | 92:1 | 117:2 |
| 101:16 | 125:13 | **argument** | 19:6,9 | 216:4 | 122:12 |
| 115:7,20 | 216:3 | 75:15,17 | 51:22 | 301:2 | 126:9 |

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

314

| | | | | | |
|---|---|---|---|---|---|
| 131:14 | 196:20 | 186:6 | 39:7 | **Associ...** | 97:20 |
| 131:19 | 197:7 | **assign** | 52:9 | 150:3 | 231:10 |
| 132:9 | 228:2,4 | 34:8 | 55:17 | 152:3 | **attempt** |
| 163:22 | 228:19 | **assigned** | 68:10 | **assume** | 77:3 |
| 164:14 | 234:21 | 12:6,7 | 69:19 | 8:16 | 120:4,12 |
| 165:4 | 239:5 | 22:6 | 72:19 | 144:16 | 127:11 |
| 166:7 | 264:9 | 25:15,21 | 74:14 | 193:7 | 181:12 |
| 187:13 | 268:16 | 26:7 | 75:21 | 201:18 | 198:1,17 |
| 187:16 | 268:22 | 32:2 | 76:18 | 238:4 | **attempted** |
| 188:7 | 273:7 | 33:8,11 | 77:2 | 239:11 | 75:22 |
| 195:7 | 275:22 | 35:6 | 81:9,12 | 243:21 | 85:5 |
| 200:1 | 276:11 | 43:6 | 82:6 | 247:11 | 119:6 |
| 202:9 | 302:6 | 290:21 | 83:10 | 302:13 | 127:7,9 |
| 204:14 | **asks** | 291:10 | 84:16,20 | **assumed** | 186:19 |
| 206:2 | 258:21 | **assign...** | 87:12 | 92:11 | 272:7 |
| 221:2 | **ASP** 103:17 | 14:19 | 88:12,21 | 114:16 | 280:17 |
| 229:15 | 171:5 | 31:14 | 89:17 | 230:17 | 282:16 |
| 238:10 | **asphalt** | 35:9 | 90:2 | 233:8 | 284:7 |
| 244:6 | 144:14 | 52:6 | 91:9,22 | 239:12 | 286:15 |
| 245:17 | 144:16 | 53:18,21 | 92:20 | 254:2 | **attemp...** |
| 247:15 | **assailant** | 56:14,21 | 98:9 | 290:8 | 124:4 |
| 248:17 | 143:7 | 76:15 | 99:16 | **assumes** | 167:2,4 |
| 253:1 | 158:6 | 81:8,13 | 100:11 | 56:4 | 168:20 |
| 263:4,21 | 162:18 | 85:11 | 109:11 | 71:5 | 200:20 |
| 264:1,5 | 162:18 | 87:12 | 136:8 | 100:17 | 211:1 |
| 265:3,5 | 194:21 | 99:19 | 164:22 | 116:17 | 216:7 |
| 265:14 | 198:11 | 242:19 | 182:7,12 | 204:7 | 281:1 |
| 270:14 | 198:12 | **assign...** | 183:22 | 208:18 | 284:5 |
| 276:8 | 256:20 | 18:22 | 284:6 | 219:19 | 288:8 |
| 277:22 | 263:11 | **assist** | 294:1 | 278:15 | **attend...** |
| 282:12 | 281:21 | 40:6 | 301:13 | 288:4 | 15:17,20 |
| 283:7 | **Assail...** | 53:14 | **assisted** | 301:16 | 186:3 |
| 288:15 | 175:20 | 62:12 | 74:7,9 | **assump...** | **attended** |
| 289:2 | 175:21 | 69:10 | 283:1,17 | 109:2 | 174:7 |
| 297:3,22 | **assertion** | 71:14,15 | **assisting** | 135:22 | **attendees** |
| 302:9 | 267:12 | 71:16 | 87:14 | 147:11 | 17:22 |
| 304:13 | 267:15 | 88:17,22 | 88:6 | 148:14 | **attention** |
| **asking** | **assess** | 91:6 | 92:4,11 | 209:20 | 41:8 |
| 65:12 | 101:21 | 92:11 | 101:21 | 221:14 | 70:11 |
| 84:6 | 102:2 | 98:14 | 113:11 | 273:21 | 71:4,12 |
| 111:12 | 113:12 | 103:2 | 213:20 | 304:19 | 72:1 |
| 178:18 | 188:21 | 194:19 | 230:5,9 | **attached** | 76:4 |
| 179:14 | 193:5 | 249:11 | 283:20 | 237:1 | 80:16 |
| 179:14 | **assessing** | 285:11 | 306:14 | 309:10 | 81:6 |
| 186:4 | 113:12 | 286:15 | **ASSOCI...** | **attack** | 85:7 |
| 190:4 | **assess...** | **assist...** | 2:6 | 97:9,14 | 99:8 |

Stevan Vidljinovic
September 4, 2013

315

100:4,16
297:19
298:3
301:13
304:11
**attested**
273:15
276:3,20
**attesting**
272:13
**attire**
13:6
64:6
**attorney**
250:1,21
260:22
262:10
287:1
**attorn...**
250:2,16
287:1
**attorneys**
7:22
149:14
251:7
261:12
261:16
**attuned**
38:20
**audio** 26:3
27:10
57:9
146:14
**audio/...**
27:14
28:10
29:7
147:3
**audito...**
133:12
133:13
**august**
173:22
174:17
251:7
**author**

150:2,5
160:16
**authority**
180:18
199:10
217:3
**author...**
67:15,19
92:17
**automa...**
26:5
52:5
56:1
**available**
18:20
19:4,12
20:18,21
21:4
27:7
146:13
147:15
170:21
171:4
186:12
190:16
191:11
**Avenue**
35:2
38:14
55:1
61:20
246:7,13
**avoid**
124:6
135:22
136:22
153:1
155:11
**avoiding**
220:1
**aware**
129:16
130:1
143:1
146:16
146:20

147:2
155:20
156:6,12
161:2
293:19
300:9,14

**B**

**b** 3:6
84:15
92:14
131:12
174:21
183:19
191:4,7
191:9,14
191:15
191:16
**back** 14:22
16:7
21:10,12
34:12
45:17
65:5
73:18
80:16
101:6
113:20
121:3
123:22
124:7,8
124:9,19
128:3
135:14
136:14
137:4,7
140:12
140:16
153:14
154:6,18
154:22
182:18
185:16
190:1
193:1,1
196:7

197:16
206:11
207:7,17
208:1,1
209:8
211:6
214:11
214:17
214:21
252:11
254:21
265:22
270:12
280:4,20
289:21
303:4
**backed**
125:7
**backgr...**
205:13
238:19
239:10
**backup**
130:21
**backward**
203:20
**backwards**
155:5
**bad** 222:9
**ballpark**
19:17
133:21
**ban** 46:6
**barbs**
205:15
**based**
153:19
154:12
188:22
191:18
298:22
**basic**
168:17
**basis**
200:22
294:17

**bathroom**
43:21
**baton**
171:6,7
171:15
172:16
172:18
**battered**
227:14
227:16
227:18
227:22
228:13
228:17
228:20
229:4
**battery**
127:20
143:6
158:7
224:10
226:18
227:19
227:21
228:7,21
228:22
229:5,22
230:10
230:16
231:4
235:13
235:14
235:20
235:21
239:14
245:7
260:13
263:9
289:5
**bear** 5:7
**bears**
151:16
**beat** 24:19
25:15
31:14,18
35:9

38:20
39:4,6
39:19
40:7
42:11,17
43:4,8
45:9,10
45:10
47:5
49:9
50:9,16
51:2,7
62:12
81:13
92:9
177:15
242:19
259:11
300:18
**beats** 43:7
**becoming**
281:10
291:16
**bed** 213:21
249:11
**began**
120:14
121:16
122:4,5
123:17
187:9
200:14
272:8
281:17
**beginning**
19:20
20:11
24:16
27:8
290:20
**behalf**
2:11,16
2:21
268:5
**behavior**
96:20,21

Stevan Vidljinovic
September 4, 2013

316

| | | | | | |
|---|---|---|---|---|---|
| 98:5 | 103:21 | 286:14 | 245:4 | 135:16 | 240:1 |
| 109:18 | 121:7 | 293:8 | **bit** 50:15 | 136:12 | **box** 224:18 |
| 112:18 | 124:21 | 299:4,7 | 83:7 | 138:14 | 230:5 |
| 125:18 | 129:21 | 299:9 | 118:19 | 138:16 | 232:8,10 |
| 141:16 | 147:16 | 303:15 | 272:12 | 138:21 | 232:14 |
| 143:6 | 147:16 | **believed** | **bladed** | 140:20 | 232:15 |
| 158:5 | 154:11 | 102:21 | 109:22 | 144:18 | 232:16 |
| 165:16 | 156:16 | 114:3 | 110:4,5 | 144:21 | 233:11 |
| 167:20 | 158:13 | 127:19 | 110:8 | 154:15 | 233:12 |
| 168:3,9 | 176:8 | 177:4 | 111:1 | 154:17 | 233:16 |
| 169:12 | 177:22 | 186:8 | 112:13 | 155:22 | 234:4,6 |
| 180:20 | 178:8 | 280:13 | 115:5 | 156:2,15 | 247:14 |
| 181:11 | 179:6,15 | 298:19 | 119:18 | 202:19 | 247:14 |
| 207:2 | 183:5 | **believes** | **blank** | 203:7,15 | 247:15 |
| 211:12 | 184:17 | 188:17 | 247:9,12 | 203:16 | 248:16 |
| 253:20 | 184:21 | **belt** 18:15 | **bleeding** | 203:21 | 253:16 |
| 254:7 | 198:7 | 18:19 | 249:18 | 204:2,12 | 256:5,6 |
| 285:15 | 200:11 | 102:7,10 | 250:14 | 204:17 | 259:9,18 |
| **belief** | 200:16 | 104:3,4 | 253:6 | 205:4,7 | 260:4,9 |
| 114:17 | 201:1 | 172:1,12 | 296:18 | 206:1,22 | **boxes** |
| 123:2 | 206:8 | **belts** | 296:22 | 208:7 | 231:10 |
| 178:15 | 207:13 | 171:5 | **block** | 209:11 | 255:7 |
| 180:6 | 209:10 | 221:11 | 62:10 | 212:17 | 260:6 |
| 269:14 | 209:13 | **beneath** | 86:3 | 213:15 | **brace** |
| **believe** | 214:16 | 156:11 | 201:22 | 213:16 | 134:10 |
| 14:13 | 217:14 | 203:3 | 202:7,7 | 221:8,8 | **brain** |
| 15:13 | 231:4 | **best** 1:3 | 209:22 | 256:9,10 | 249:18 |
| 18:8,10 | 234:11 | 92:1 | **blocked** | 283:15 | 250:13 |
| 20:8 | 235:3,8 | 165:12 | 105:8,10 | **bold** 88:21 | 265:17 |
| 22:21 | 236:10 | 196:19 | **blocking** | 175:4,10 | 267:1 |
| 24:19 | 239:7 | 212:18 | 110:19 | 184:10 | **brakes** 9:5 |
| 28:1 | 244:4,10 | 269:14 | **blow** | **bolder** | **branch** |
| 30:18 | 248:4 | 278:1 | 193:16 | 175:12 | 15:6,8 |
| 40:21 | 252:6 | 292:12 | **blue** 25:7 | **book** 73:10 | **break** 9:8 |
| 42:22 | 265:4 | 293:6 | **blunt** | **booking** | 9:17 |
| 58:9 | 266:17 | **better** | 231:11 | 237:6 | 43:21 |
| 64:2 | 266:19 | 30:4 | **bodily** | **border** | 44:2 |
| 65:22 | 268:6 | 77:14 | 162:19 | 31:20,21 | 101:3 |
| 67:17 | 273:16 | **beyond** | 217:1 | **borders** | 197:1,9 |
| 68:20 | 273:20 | 127:2 | 263:10 | 31:20 | 197:12 |
| 70:19,20 | 277:16 | 196:1 | **body** 1:14 | **borrow** | 205:1 |
| 80:22 | 277:21 | 304:21 | 10:14 | 30:11 | 272:12 |
| 85:12 | 281:12 | **big** 63:5 | 79:18 | **bottom** | 278:13 |
| 86:21 | 283:20 | 142:8 | 109:14 | 148:3 | **breaking** |
| 87:11,13 | 284:3 | **birth** | 131:11 | 161:14 | 204:20 |
| 102:12 | 285:5 | 236:8,14 | 131:17 | 191:6 | **breathing** |

Stevan Vidljinovic
September 4, 2013

317

| | | | | | |
|---|---|---|---|---|---|
| 82:9,19 | **C.S.R** 2:2 | 44:15 | 24:17 | 172:3,5 | 157:1,4 |
| 83:13 | 308:3 | **called** | 26:7,18 | 172:15 | 162:19 |
| **brilliant** | **calendar** | 1:20 4:8 | 28:9 | **carrying** | 194:13 |
| 7:8 | 227:9 | 6:22 | 33:19 | 137:20 | 217:1 |
| **bring** | **call** 9:9 | 81:9 | 38:20 | 172:14 | **caused** |
| 34:12 | 16:2 | 88:6 | 42:13,19 | 214:12 | 304:7 |
| 134:13 | 20:20 | 90:16 | 42:21 | **cars** 25:20 | **CB** 237:5,9 |
| 135:17 | 30:15,18 | 232:8 | 46:7 | 27:3,13 | 237:10 |
| 135:19 | 31:4,11 | 293:14 | 53:6,14 | 54:19 | 237:21 |
| 135:21 | 32:13,21 | **calling** | 53:16 | 57:8 | **cement** |
| **brisk** | 35:14,21 | 76:4 | 54:6,19 | 58:2,4,6 | 144:15 |
| 104:18 | 37:9 | **calls** 24:2 | 55:21 | 58:21 | **center** |
| **broadcast** | 38:1,20 | 38:19 | 57:4 | 59:4,8,9 | 33:22 |
| 33:15 | 39:5,7 | 39:3 | 59:11 | 105:8,15 | 127:22 |
| **brother** | 40:12 | 42:6 | 60:20 | **cartridge** | 130:5 |
| 129:8 | 41:14,17 | 48:14 | 66:8,10 | 138:4 | 136:13 |
| 235:21 | 42:1,8 | 87:2 | 67:7 | 205:19 | 136:14 |
| **brought** | 44:7,16 | 96:3 | 242:20 | **case** 5:9 | 136:16 |
| 209:10 | 47:10 | 132:10 | 252:9 | 8:12 | 137:2,10 |
| 209:16 | 48:8,16 | 178:11 | 291:19 | 10:9 | 144:20 |
| 251:17 | 49:7 | 179:9 | 293:13 | 25:16 | 154:12 |
| **Brown** 1:9 | 50:3 | 182:3 | 294:6 | 38:12 | 202:19 |
| **Buddy** | 54:11,14 | 294:5,11 | **card** | 69:18 | 294:5,10 |
| 119:15 | 55:15 | 301:4 | 241:17 | 81:10 | **centered** |
| 120:17 | 56:21 | **calmly** | 244:1 | 149:12 | 202:3,11 |
| 169:2 | 60:19,22 | 119:2 | **cardiac** | 149:15 | **central** |
| **build** | 69:10 | **capabi...** | 153:2 | 237:11 | 31:21 |
| 79:18 | 72:6,12 | 146:14 | **CARDIEL** | 241:18 | 35:11 |
| **building** | 76:21 | 147:3 | 1:3 | 250:17 | 237:6 |
| 61:22 | 81:11,17 | **capable** | **cards** | 252:18 | 291:7 |
| 62:2,15 | 82:8 | 96:16 | 241:8,9 | 259:2 | **Cermak** |
| **buildings** | 83:3,14 | 126:12 | 241:12 | 260:18 | 35:10 |
| 62:1 | 86:21 | **capaci...** | **careful** | 265:16 | **certain** |
| **bulletin** | 90:20 | 1:13 | 112:6 | 266:15 | 19:2 |
| 152:22 | 91:14 | **capacity** | 227:7 | 267:8 | 56:22 |
| **bumper** | 194:19 | 217:1 | **carefully** | 268:5,17 | 57:3 |
| 140:17 | 235:1 | **capital** | 38:21 | 275:15 | 112:10 |
| **busting** | 241:7 | 191:8 | **CARONE** 2:9 | 275:16 | 146:7 |
| 95:19 | 255:2 | **caps** 75:10 | 2:9 | 289:3 | 171:19 |
| **busy** 39:15 | 267:15 | 75:10,14 | **carpeted** | **catch** | 171:22 |
| 40:8 | 293:9,20 | 183:20 | 133:13 | 86:13,17 | 190:3 |
| _____ | 294:1,4 | **car** 22:7,9 | **carries** | 86:22 | 193:10 |
| **C** | 294:9,14 | 22:10 | 104:5 | 104:15 | 221:8 |
| **c** 1:10 | 297:14 | 23:9 | **carry** | 134:12 | **certif...** |
| 191:7,15 | 302:21 | 24:6,7,8 | 18:14 | **cause** | 18:7 |
| 191:16 | **call-t...** | 24:9,12 | 67:15 | 152:8 | **certified** |

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

318

| | | | | | |
|---|---|---|---|---|---|
| **certify** | 238:20 | 129:11 | **chrono...** | **clean** | 106:14 |
| 308:4,12 | 243:7 | 144:13 | 47:19 | 211:4 | 106:14 |
| 309:4 | 258:22 | 146:21 | **Circuit** | **clear** 9:21 | 106:21 |
| **CFD** 41:22 | 259:9,19 | 152:15 | 5:13 | 10:16 | 107:5 |
| 42:8 | 259:21 | 154:4 | **circum...** | 61:11,15 | 114:4,11 |
| 69:11 | 260:2,8 | 159:4,17 | 13:21 | 82:5 | 127:5,7 |
| 71:18 | **chest** | 160:6 | **citizen** | 89:4 | 127:14 |
| 77:1 | 37:10 | 161:2,8 | 76:17 | 112:20 | 127:16 |
| 254:20 | 38:14 | 173:15 | 99:6 | 127:17 | 150:13 |
| **chance** | 44:8 | 177:7,10 | 294:4,10 | 251:5 | 150:18 |
| 143:15 | 82:21 | 183:7,14 | 294:15 | 260:6 | 151:7 |
| 172:4 | 83:4,15 | 207:16 | 304:10 | 279:2 | 159:7 |
| 245:12 | 136:16 | 229:19 | **citizens** | 281:22 | 187:2 |
| 277:14 | 136:17 | 240:18 | 293:22 | **clearly** | 192:21 |
| 278:3 | **chests** | 246:7 | **City** 1:13 | 7:5 46:5 | 194:3,6 |
| **change** | 153:2 | 247:3 | 2:13,18 | 251:12 | 194:15 |
| 276:18 | **Chicago** | 249:4 | 2:21 | **clenched** | 195:11 |
| 277:4 | 1:14 | 251:9 | 10:20 | 107:1,3 | 195:21 |
| **changed** | 2:13,15 | 291:19 | 11:2 | 107:6 | 196:7 |
| 22:3 | 2:18,20 | 291:22 | 12:12 | 109:19 | 198:22 |
| 173:12 | 2:22 | 292:4,11 | 18:22 | 111:22 | 199:3,14 |
| **charac...** | 10:20 | 293:19 | 98:8 | 121:15 | 199:18 |
| 191:1 | 11:2,11 | 297:20 | 144:13 | 121:20 | 199:20 |
| 197:10 | 11:12,14 | 298:13 | 151:11 | 123:19 | 199:21 |
| **charge** | 12:2,12 | 300:10 | 159:2,14 | 124:20 | 200:7,14 |
| 139:14 | 15:6,8 | 300:20 | 159:14 | 166:21 | 200:17 |
| 139:21 | 15:16,20 | 301:11 | 293:19 | 194:16 | 200:21 |
| 262:1 | 18:22 | 305:12 | **Civil** 1:22 | 256:16 | 201:12 |
| **charges** | 33:16,22 | 305:13 | 161:19 | 256:18 | 202:18 |
| 140:4,8 | 34:1,3 | 305:14 | **civilian** | 271:12 | 202:21 |
| **check** | 34:19 | 305:15 | 105:15 | 281:8,18 | 203:1,9 |
| 20:20 | 36:19 | **Chiefs** | 105:18 | 285:17 | 203:11 |
| 28:22 | 41:15,20 | 150:3 | 222:18 | **clenching** | 208:22 |
| 150:11 | 44:19 | 152:3 | 251:16 | 256:9 | 210:11 |
| 253:16 | 45:1 | **children** | **civilians** | **click** | 210:15 |
| **checked** | 64:5,7 | 247:2 | 222:12 | 236:3 | 211:13 |
| 119:15 | 70:2 | **choose** | 251:10 | **client** | 211:21 |
| 224:18 | 73:5 | 130:15 | **claiming** | 75:19 | 212:3,4 |
| 229:16 | 82:17 | 130:15 | 108:13 | 96:20 | 214:4 |
| 232:8,14 | 87:17 | 247:15 | **class** | 102:17 | 216:5 |
| 232:16 | 88:6,12 | **choosing** | 67:17,18 | 104:12 | 217:12 |
| 233:11 | 88:15,17 | 7:10 | 133:4 | 104:17 | 218:19 |
| 233:13 | 88:19 | **chose** | **classi...** | 105:1 | 219:17 |
| 233:16 | 91:6,7 | 131:6 | 39:3 | 106:1,7 | 220:1,15 |
| 238:12 | 92:5,9 | 132:12 | 40:5,13 | 106:11 | 221:12 |
| 238:18 | 98:1,9 | 235:16 | 171:21 | 106:12 | 228:2,14 |

Stevan Vidljinovic
September 4, 2013

319

| | | | | | |
|---|---|---|---|---|---|
| 232:1,2 | 120:7,8 | collap... | 150:1,17 | 51:13 | 18:18 |
| 232:4 | 120:17 | 171:6,7 | 171:19 | commun... | comple... |
| 234:15 | 124:2 | 171:15 | coming | 36:19 | 56:14 |
| 274:22 | 125:3,8 | 172:18 | 118:13 | 38:13 | 201:21 |
| 275:13 | closest | collap... | 190:19 | 41:4 | 217:10 |
| 275:14 | 35:11 | 203:22 | 214:2 | 169:7 | comple... |
| 275:21 | 125:11 | 208:22 | 223:21 | commun... | 74:18 |
| 278:11 | 233:9 | color | 254:21 | 42:2 | 75:1 |
| 278:12 | 235:3 | 79:14,15 | command | 293:13 | 76:12 |
| 279:17 | 282:16 | column | 127:21 | 293:17 | 84:22 |
| 281:7,13 | clothes | 47:20 | 129:12 | community | 91:17 |
| 281:17 | 177:12 | coma | 142:22 | 99:7 | 93:1 |
| 282:2,5 | clothing | 267:13 | 143:21 | 304:10 | 153:7,17 |
| 282:9 | 107:9 | combative | 169:8,14 | compare | 153:20 |
| client's | co-wor... | 271:11 | 219:13 | 246:12 | 155:16 |
| 121:3 | 294:19 | 272:8 | 259:15 | competent | 157:10 |
| 193:19 | cocaine | 281:6,10 | 288:13 | 178:12 | 162:3 |
| 197:11 | 97:1 | 281:11 | Commander | Compiled | 184:3 |
| 203:6 | 112:10 | 281:21 | 1:12 | 90:12,21 | comple... |
| 210:19 | 113:14 | 283:1 | 20:13 | 91:4 | 153:13 |
| 213:14 | 186:8 | 285:5,10 | 21:6 | compla... | 227:19 |
| 214:3 | 254:2,10 | 285:13 | 29:10 | 83:13 | 227:20 |
| 281:8 | 298:20 | 286:15 | 30:17,20 | Complaint | comple... |
| 283:15 | Code 90:11 | 289:14 | 60:15 | 261:22 | 154:10 |
| clipboard | 98:1,8 | 306:4 | 145:21 | 266:15 | compli... |
| 20:7 | 182:10 | come 8:14 | 231:5 | 267:12 | 143:9 |
| close | 182:15 | 21:10,12 | 259:20 | 267:16 | 168:9 |
| 35:12 | Codes | 35:21 | 260:10 | 268:1,5 | 170:8 |
| 39:20,22 | 90:20 | 39:8 | commands | 268:17 | 184:14 |
| 94:22 | 91:4 | 71:13 | 168:1 | 268:18 | 191:3 |
| 119:11 | coincide | 73:9 | 169:17 | 269:5 | 192:21 |
| 125:10 | 232:19 | 87:21 | 170:6 | comple... | 256:12 |
| 138:5 | collapse | 113:9,14 | 181:10 | 102:6 | 284:8,21 |
| closed | 141:10 | 120:17 | commis... | complete | 285:12 |
| 285:4,6 | 156:3,11 | 127:5 | 2:3 | 7:12,13 | 286:16 |
| closely | 156:17 | 138:4 | committed | 56:21 | 287:21 |
| 59:3 | 203:15 | 169:2 | 74:6 | 153:18 | 288:9 |
| closer | 203:18 | 183:16 | commonly | 188:18 | 289:15 |
| 35:10 | 203:21 | 209:15 | 152:12 | 189:2,6 | compliant |
| 62:11 | 205:5 | 210:7,11 | commun... | 230:15 | 180:13 |
| 118:5,9 | collapsed | 211:1,11 | 295:2 | 238:5 | compound |
| 118:15 | 203:1,15 | 241:8 | commun... | 269:14 | 85:1 |
| 119:5,9 | 204:3,18 | 244:15 | 54:1 | 308:8 | 163:17 |
| 119:17 | 207:1 | 252:11 | 225:20 | 309:8 | 164:9 |
| 119:19 | 209:11 | 301:18 | commun... | completed | 165:5 |
| 119:20 | 212:3 | comes 21:8 | 34:2 | 14:18,20 | 187:4,16 |

Stevan Vidljinovic
September 4, 2013

187:19
266:4
276:15
288:16
compre...
179:21
180:1
271:22
286:10
compre...
178:5
180:1
compre...
116:8
compre...
98:17
comprised
97:20
compro...
176:19
computer
54:18
92:10
224:11
238:7
comput...
240:2
computers
244:9
concern
39:19
289:7
concerned
35:2
concer...
38:20
41:9
150:19
260:18
concerns
53:11
184:17
261:10
conclu...
112:14
112:18

conclu...
114:8
115:2
condition
95:4,6
95:11
253:13
264:21
265:1,6
265:10
299:10
conduct
30:14,18
confine
166:2
confined
31:15
confor...
180:20
181:11
confro...
161:17
181:13
confro...
201:12
confro...
147:4
156:9
168:4
198:22
confuse
32:15
connec...
83:1,5
83:15
consent
74:7,11
75:9,13
75:20
98:3
consented
83:19
84:8
consider
78:14
172:21

297:16
consid...
78:6,11
78:15,19
122:10
122:16
consid...
6:1
consid...
137:2
170:1
consid...
268:12
consis...
309:6
consists
181:8
consti...
88:20
98:20
consult
9:13
consul...
9:17
contact
68:18
69:5
121:10
124:15
127:6,9
134:16
138:17
204:17
208:6
210:11
210:12
210:16
210:21
211:1,12
214:3
228:11
228:14
241:7,8
241:9,12
241:17
244:1

270:18
280:16
281:3
282:2,5
285:22
287:4,7
287:10
300:21
contained
160:15
298:15
context
153:17
157:10
162:3
184:3
continue
22:22
continued
126:7
contin...
12:22
contin...
167:16
contin...
139:2
continuum
168:18
169:22
170:20
171:9,16
172:19
173:6
Contri...
151:12
control
127:14
127:16
131:16
135:16
141:9,19
156:2,10
180:16
181:7,8
181:10
181:14

194:20
198:17
207:2
257:9
283:2,18
288:7
contro...
180:17
180:22
controls
295:9
conver...
64:18,19
68:7
71:8
83:20
102:3
109:10
111:12
117:11
118:4
120:22
169:19
177:5
185:21
199:21
200:4,21
216:7,8
219:4
242:11
253:8,11
254:14
255:5,19
261:15
262:14
272:8
288:6
294:18
294:22
295:3
300:4,8
304:17
305:7
conver...
118:11
118:18

118:20
conver...
216:9
convey
77:6
182:7
conveying
117:15
cooper...
175:18
180:12
180:15
181:2,5
copies
260:14
copy 18:10
34:13
45:21
149:20
149:21
175:11
266:15
269:5
corner
191:6
201:22
202:6
corpor...
1:14
150:2
correct
4:18
10:4
11:8,18
12:3
18:5,11
18:16
20:22
21:5
24:5,20
24:21
26:5,6
28:13,14
32:16
33:4
40:13

Stevan Vidljinovic
September 4, 2013

321

| | | | | | |
|---|---|---|---|---|---|
| 41:3 | 199:10 | 294:16 | **Counselor** | 178:22 | 261:17 |
| 42:2 | 201:3 | 294:19 | 61:13 | 193:3 | 261:22 |
| 46:16 | 202:19 | 294:20 | **counting** | 211:9 | 262:1 |
| 48:15 | 202:20 | 295:10 | 139:9,11 | 279:13 | **criminals** |
| 52:21 | 213:10 | 295:11 | **Counts** | 290:2 | 161:21 |
| 55:1,20 | 213:13 | 296:16 | 267:7 | **courteous** | **critics** |
| 64:9 | 214:18 | 296:17 | **COUNTY** | 176:12 | 161:19 |
| 65:15 | 214:19 | 297:11 | 308:2 | **courtesy** | **Crown** 25:3 |
| 66:5 | 218:10 | 297:12 | 309:2 | 188:16 | 26:21 |
| 94:13 | 219:17 | 298:1,2 | **couple** | **courtroom** | **CSR** 308:20 |
| 103:9 | 220:5 | 298:20 | 59:8 | 6:22 | **current** |
| 108:19 | 224:16 | 298:21 | 61:2,3 | **covered** | 138:15 |
| 117:4 | 226:9 | 299:2,3 | 87:9 | 10:2 | 138:20 |
| 124:16 | 228:14 | 300:6 | 123:13 | 145:7 | 295:9 |
| 128:15 | 229:11 | 305:17 | 243:2 | **covers** 5:6 | **custody** |
| 135:1 | 229:17 | 308:8 | 299:20 | **CPD** 42:9 | 98:2 |
| 136:5 | 231:14 | 309:8 | **course** | 72:11 | 108:18 |
| 137:17 | 231:16 | **correc...** | 8:10 | 190:20 | 170:16 |
| 138:16 | 231:17 | 309:10 | 43:22 | 254:21 | 237:8 |
| 140:6 | 234:7 | **correctly** | 73:13 | 292:7 | 257:5 |
| 141:21 | 237:3,4 | 4:17 | 82:2 | 297:10 | 298:9 |
| 143:20 | 237:7,13 | 76:10 | 96:19 | **CR** 13:13 | 299:13 |
| 144:6 | 239:22 | **counsel** | 98:5 | 260:18 | 303:19 |
| 145:22 | 240:9 | 6:11 | 116:19 | 261:20 | **cut** 165:14 |
| 147:5,12 | 242:20 | 90:16 | 145:7 | **cracked** | 187:21 |
| 148:1 | 242:21 | 114:21 | 154:10 | 28:21 | 189:2,17 |
| 149:2 | 246:8 | 151:10 | 158:22 | **create** | 196:20 |
| 151:18 | 247:16 | 153:13 | 168:4 | 198:1 | 205:18 |
| 153:13 | 247:17 | 158:21 | 172:8 | **created** | 206:6 |
| 156:9 | 252:4,10 | 159:1,16 | 186:4 | 13:13 | 212:14 |
| 166:15 | 258:20 | 188:8 | 195:20 | 35:17 | 231:11 |
| 168:12 | 258:22 | 189:11 | 196:3 | **creating** | 266:21 |
| 170:6,22 | 259:8 | 190:1 | 199:9 | 246:22 | 267:1 |
| 171:5 | 269:2,13 | 191:20 | **courses** | **credible** | 274:8,9 |
| 173:4 | 269:15 | 196:16 | 145:9 | 154:7 | 295:20 |
| 175:22 | 284:15 | 197:20 | **court** 1:1 | 160:20 | **cuts** |
| 176:2 | 290:22 | 290:15 | 4:3  5:12 | **criminal** | 140:17 |
| 177:3 | 291:1,20 | 299:20 | 5:13,14 | 74:6 | 140:18 |
| 181:18 | 291:21 | 300:3 | 6:15  9:6 | 162:12 | **cutting** |
| 182:13 | 292:2,22 | 302:9 | 13:5 | 162:22 | 165:15 |
| 185:13 | 293:1,10 | 303:14 | 16:9 | 163:4,12 | |
| 190:17 | 293:11 | 305:1 | 45:20 | 163:13 | **D** |
| 194:3 | 293:14 | 306:21 | 101:9 | 164:7,10 | **d** 1:6,6 |
| 195:6 | 293:15 | 308:12 | 114:2 | 165:1 | 3:1 |
| 196:8 | 293:18 | **counsel's** | 128:10 | 166:10 | 191:7,9 |
| 198:13 | 294:3,15 | 222:10 | 166:6 | 260:17 | 191:16 |

Stevan Vidljinovic
September 4, 2013

| | | | | | |
|---|---|---|---|---|---|
| D-u-b-... | 25:14 | day-to... | 66:6 | 143:10 | 186:21 |
| 31:2 | 40:21 | 294:17 | 67:4 | 143:14 | 187:11 |
| damage | 47:20 | days 18:21 | 69:7 | 147:1,13 | 187:15 |
| 157:3 | 73:19 | 33:11 | 70:14 | 148:16 | 188:2 |
| Dan 159:18 | 151:16 | 288:12 | 71:1,10 | 149:17 | 189:8,10 |
| danger | 151:17 | DE 1:9 2:6 | 74:19 | 150:7,11 | 189:13 |
| 74:5 | 154:8 | 2:6,7 | 75:3 | 151:2,8 | 191:20 |
| 126:12 | 173:22 | 4:1 | 76:14 | 151:9 | 192:7,12 |
| 299:4,7 | 174:13 | 12:16 | 77:7 | 153:8,10 | 192:14 |
| dangerous | 226:11 | 13:9 | 78:13,20 | 153:21 | 192:22 |
| 137:3 | 236:8,14 | 16:6,11 | 82:4,12 | 154:3 | 193:8 |
| 161:21 | 240:14 | 19:18 | 82:16 | 155:18 | 194:8,9 |
| 162:11 | 245:4 | 23:21 | 85:8 | 157:13 | 195:2,3 |
| 162:19 | 273:13 | 27:11,21 | 86:2,12 | 158:1,10 | 195:9,13 |
| 162:21 | 293:2 | 28:7 | 87:8 | 158:17 | 195:14 |
| 163:12 | 306:5 | 30:13 | 89:11,21 | 159:15 | 195:17 |
| 164:7,10 | dated | 31:9 | 90:8,10 | 160:4 | 195:22 |
| 165:2,17 | 87:19 | 33:14 | 90:13,16 | 161:1 | 196:4,5 |
| DANIEL | dawn | 34:7,17 | 90:22 | 162:7 | 196:16 |
| 1:10 | 235:12 | 36:1,17 | 91:1 | 163:8,21 | 197:2,15 |
| dart 206:1 | day 15:13 | 37:6 | 92:3,13 | 164:3,11 | 199:16 |
| 257:14 | 15:14 | 38:3,9 | 93:3 | 164:15 | 201:10 |
| 257:22 | 21:18 | 38:18 | 94:6 | 164:17 | 202:15 |
| 258:6,8 | 23:13,15 | 39:9,17 | 95:12,20 | 165:3,7 | 204:11 |
| darts | 55:11 | 40:10,18 | 96:13 | 165:19 | 204:19 |
| 134:21 | 87:11 | 41:19 | 99:17 | 166:1,12 | 206:5 |
| 135:12 | 107:8 | 42:10,20 | 100:13 | 167:1,13 | 208:11 |
| 137:16 | 130:8,17 | 43:18,22 | 101:1,6 | 169:16 | 209:2 |
| 138:10 | 135:3 | 44:5,17 | 101:10 | 170:19 | 211:3,14 |
| 138:14 | 136:3 | 45:8,16 | 103:6 | 172:8,9 | 217:19 |
| 140:5 | 141:19 | 46:13 | 110:3,16 | 173:7,9 | 218:7 |
| 144:4,18 | 147:19 | 47:1,12 | 111:7 | 173:10 | 220:3 |
| 144:22 | 148:4,22 | 48:11 | 113:6,19 | 174:9,11 | 221:4 |
| 145:4 | 172:10 | 49:8 | 114:5,18 | 175:7,9 | 222:3,9 |
| 152:18 | 174:16 | 50:1,11 | 114:20 | 178:7,14 | 222:11 |
| 154:14 | 213:7,15 | 51:9 | 116:21 | 178:18 | 223:1,17 |
| 154:21 | 227:5,7 | 53:3,10 | 117:3,12 | 179:2,3 | 224:8 |
| 157:17 | 227:10 | 55:7,9 | 122:17 | 179:13 | 225:17 |
| 205:7 | 239:21 | 56:11,19 | 126:1,3 | 180:3,5 | 226:2 |
| 206:7 | 240:4 | 57:14 | 126:15 | 182:9,17 | 250:8,9 |
| 257:18 | 249:16 | 59:1,10 | 126:16 | 182:21 | 250:22 |
| 258:1 | 250:14 | 59:21 | 128:1,5 | 183:1,5 | 251:4 |
| data 160:8 | 266:20 | 61:13,16 | 128:13 | 183:10 | 261:2,6 |
| 161:3 | 269:21 | 61:18 | 130:2 | 183:12 | 261:9 |
| date 20:5 | 308:16 | 63:11 | 132:5,13 | 184:7 | 262:2,4 |
| 21:15 | 309:17 | 65:6,7 | 133:5 | 185:2 | 262:6,11 |

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

323

| | | | | | |
|---|---|---|---|---|---|
| 263:12 | 183:15 | 188:8 | 88:12,16 | 15:19 | 234:15 |
| 263:13 | 193:4 | **define** | 88:17,17 | **depend...** | 259:11 |
| 266:6 | 254:7 | 257:12 | 88:19,22 | 184:18 | 263:1,22 |
| 267:18 | **dealing** | **defined** | 89:5,15 | **Depend...** | 295:6,13 |
| 267:19 | 125:17 | 98:15,20 | 91:6,8 | 184:15 | 296:7 |
| 268:2,3 | 176:12 | **definite** | 92:5 | **dependent** | **deploying** |
| 269:2,4 | 180:15 | 239:10 | 98:1 | 73:6 | 155:11 |
| 269:8,18 | **deals** | **defini...** | 99:9 | 183:9,16 | 156:16 |
| 270:1 | 119:2 | 90:22 | 105:9 | 297:22 | 161:20 |
| 272:10 | **dealt** | **defini...** | 129:12 | **depending** | 210:18 |
| 274:10 | 113:15 | 228:6 | 139:4 | 39:15 | **deploy...** |
| 274:13 | **death** | 257:2 | 152:16 | 109:22 | 137:15 |
| 274:17 | 155:14 | **degree** | 154:5 | 168:3,9 | 146:15 |
| 274:19 | 162:19 | 265:19 | 161:3,9 | 168:14 | 146:16 |
| 275:11 | 217:2 | **demand** | 161:19 | 169:12 | 150:20 |
| 275:18 | **decide** 8:3 | 1:12 | 167:9 | 170:7 | 151:22 |
| 276:1,16 | **decides** | 217:18 | 173:15 | 171:1 | 152:6 |
| 276:17 | 44:16 | **demeanor** | 174:14 | 290:6 | 161:4 |
| 277:8,10 | **decision** | 176:12 | 174:20 | **depends** | **deponent** |
| 279:1,3 | 101:17 | 253:21 | 176:6,7 | 55:11 | 4:2 8:14 |
| 279:9,14 | 131:7 | **DeMonica** | 177:14 | 98:5 | 163:5 |
| 282:18 | **declared** | 60:9 | 183:8,14 | 142:3 | 164:2 |
| 282:19 | 89:15 | **demons...** | 184:13 | 171:12 | 188:8,16 |
| 283:11 | **declares** | 10:13 | 195:6 | 217:10 | 189:11 |
| 288:10 | 88:19 | **Dentyne** | 205:11 | **deploy** | 307:8 |
| 288:21 | 91:8 | 291:7 | 207:16 | 139:22 | **depone...** |
| 289:19 | **decreases** | **deny** 99:15 | 229:19 | 143:3 | 275:20 |
| 290:11 | 161:9 | 182:8 | 249:4 | 145:5 | **deposed** |
| 296:9 | **defeats** | **depart...** | 251:10 | 154:21 | 8:12 |
| 299:20 | 6:12 | 2:13,18 | 291:10 | 170:5 | **deposi...** |
| 300:15 | **defendant** | 11:17 | 291:19 | 216:22 | 1:17 3:7 |
| 301:9,20 | 2:16 | 15:7,9 | 292:1,4 | **deployed** | 4:18 5:1 |
| 304:20 | 149:14 | 34:3,19 | 292:11 | 127:21 | 5:10 |
| 306:20 | 158:21 | 36:19 | 294:2 | 130:1 | 6:11,19 |
| 307:1,3 | 267:22 | 41:21 | 297:20 | 143:1,22 | 8:10 |
| **de-esc...** | 268:10 | 44:19 | 298:13 | 144:17 | 34:14 |
| 181:13 | 268:19 | 45:2,11 | 298:15 | 155:19 | 44:3 |
| **dead** 256:6 | 268:20 | 48:1,1,5 | 300:10 | 156:13 | 101:4 |
| 256:21 | 275:15 | 48:6,18 | 301:11 | 162:15 | 197:13 |
| 257:1,4 | 275:15 | 62:20 | 305:12 | 162:22 | 224:7 |
| 257:8,10 | 282:14 | 64:5,7 | 305:13 | 164:18 | 251:6 |
| 257:11 | **defend...** | 70:2 | 305:15 | 190:10 | 270:22 |
| **deadly** | 1:15 | 73:5,11 | 305:16 | 205:3 | 273:18 |
| 161:18 | 149:12 | 82:6,17 | **Depart...** | 210:13 | 276:7,13 |
| **deal** 57:5 | 270:16 | 87:17 | 177:11 | 211:2 | 276:19 |
| 93:20 | **defense** | 88:7,11 | **depart...** | 226:14 | 290:21 |

Stevan Vidljinovic
September 4, 2013

324

| | | | | | |
|---|---|---|---|---|---|
| 308:6,8 | 259:19 | 167:18 | 296:11 | **direct...** | **dislodge** |
| 309:5,9 | 260:9 | 171:20 | 297:19 | 190:21 | 138:3 |
| **deposi...** | **detail** | 194:13 | 298:3 | 191:2 | **disori...** |
| 2:1 5:15 | 270:17 | 207:20 | **directed** | **directly** | 198:18 |
| 34:9 | 291:14 | **differ...** | 39:4 | 200:7 | **DISP** 47:6 |
| 149:19 | 291:15 | 176:2 | 46:12 | 245:8 | **dispatch** |
| **DeRose** 3:4 | **detailed** | **different** | 69:11,14 | **discarded** | 24:2 |
| 4:12 | 270:21 | 8:15 | 77:1 | 241:19 | 33:16,22 |
| 250:6 | 291:2,5 | 12:5 | 80:16 | 241:22 | 42:18 |
| 299:19 | 291:6,8 | 16:18 | 81:6 | 242:1,9 | 46:6 |
| 300:2 | 291:13 | 47:16 | 106:13 | **discharge** | 47:10 |
| 305:20 | 291:16 | 73:14 | 120:20 | 14:3 | 48:14 |
| **descent** | **determ...** | 82:1 | 144:20 | 239:16 | 49:6 |
| 79:12 | 72:3,6 | 83:8 | **direction** | **discha...** | 72:8 |
| **describe** | **determine** | 96:18 | 6:6 | 13:17,20 | 86:4 |
| 77:21 | 70:10 | 98:4 | 10:13 | 14:4 | 87:15 |
| 79:10 | 72:15 | 109:13 | 80:17 | 148:1,4 | 225:20 |
| 123:5 | 186:2 | 116:12 | 85:17 | 148:15 | 259:10 |
| 197:22 | **determ...** | 131:18 | 106:16 | 149:3 | 259:17 |
| 235:13 | 72:16 | 131:21 | 109:7 | 202:17 | 297:10 |
| 257:11 | 164:5 | 133:7 | 121:16 | 259:7 | **dispat...** |
| 270:16 | **detoxi...** | 167:19 | 121:18 | **discha...** | 37:21 |
| **described** | 298:10 | 168:13 | 122:5 | 147:5 | 41:15 |
| 109:20 | 298:10 | 178:17 | 123:4 | **discha...** | 42:6 |
| 158:5 | 303:17 | 188:5 | 124:22 | 13:8 | 44:16 |
| 162:18 | 303:20 | 207:20 | 125:7 | 148:8 | 48:17,19 |
| 185:7 | 304:4 | 217:16 | 135:18 | **discip...** | 49:3,3 |
| 232:17 | **develop** | 260:14 | 144:1 | 12:11,18 | 49:13,14 |
| 233:21 | 151:22 | 265:9 | 181:3,9 | 13:1 | 49:16,18 |
| 294:18 | **developed** | 268:22 | 194:17 | 14:12 | 72:6,12 |
| 295:3 | 66:18 | 284:18 | 198:9,11 | **discip...** | 81:13 |
| 300:7 | **device** | **diffic...** | 201:19 | 12:19 | 101:20 |
| **descri...** | 28:22 | 82:9,19 | 204:2 | 13:4,6 | 294:2,7 |
| 234:5 | 143:8 | 83:13 | 205:4 | 13:10 | **dispat...** |
| 280:11 | **devices** | **diffuse** | 256:2,3 | **discovery** | 34:2 |
| **descri...** | 160:7 | 161:16 | 281:18 | 1:17 2:1 | 35:14 |
| 107:18 | **DG** 40:21 | **diffus...** | **direct...** | 159:1 | 36:10 |
| 107:19 | 46:17 | 198:16 | 255:8,10 | **discuss** | 47:9,14 |
| 233:9 | **dictate** | **direct** | 255:15 | 5:18 6:5 | 47:22 |
| 242:16 | 217:17 | 123:19 | 255:16 | **discussed** | 48:8 |
| 267:2 | **dictates** | 182:19 | **directive** | 5:7 | 49:4,6 |
| 273:16 | 82:1 | 187:10 | 88:11 | 250:1 | 54:1 |
| 281:11 | 96:18 | 216:17 | 184:13 | **discus...** | 72:10 |
| **design...** | 98:4 | 250:2 | 191:14 | 251:8 | 293:16 |
| 20:16 | 129:21 | 251:2 | 191:17 | **discus...** | 294:14 |
| **desk** 244:8 | 138:2 | 261:4 | 298:16 | 224:5 | 297:14 |

Stevan Vidljinovic
September 4, 2013

325

302:14
302:21
**dispat...**
39:10,16
47:16,18
48:2
72:18
302:11
302:17
302:18
303:5,6
303:12
**dispat...**
33:21
**display**
165:1
**displayed**
125:17
143:6
158:5
185:15
186:18
254:7
285:16
**displa...**
96:21
285:15
**disposal**
170:5
**dispos...**
47:6,10
**dispute**
54:10
**disres...**
189:10
**distance**
86:10
120:1
124:11
125:3
198:1
246:16
**distin...**
175:18
176:1
**district**

1:1,1
5:12,12
12:8
13:7
19:2,12
25:1,20
26:8,11
27:13
29:18,19
29:21,22
30:5,11
40:22
42:13
46:17,21
47:2,3
48:12
51:21
52:6
74:8,12
149:1
225:1
242:20
244:4,11
259:20
260:10
262:13
288:13
290:22
291:3,11
298:11
302:12
303:21
**districts**
12:5
74:13
146:22
298:12
303:22
**distur...**
232:9,14
232:20
233:10
233:19
**DIVISION**
1:2
**doctor**

205:13
249:15
253:10
254:11
254:15
265:2,10
**doctor's**
264:21
265:6
**doctors**
249:13
267:8
**doctrine**
287:2
**document**
34:20
35:18,21
36:3
37:12,15
37:17
38:2
40:16
44:11,14
44:21
47:13,15
49:5
50:8
51:6
145:15
149:8,10
150:1,5
150:15
150:17
153:20
159:8,17
160:15
162:6
236:14
245:15
267:3,5
268:21
269:9,13
272:13
272:21
274:21
276:3

277:13
277:19
280:6,9
280:12
280:14
297:9
**docume...**
161:8,12
278:2
**documents**
45:7
48:19
72:18
287:6
**doing**
32:15
52:18,21
55:19
87:12
106:12
106:22
120:2
126:12
142:6,7
153:2
212:13
244:4
266:13
279:21
283:16
288:14
293:14
**donut**
95:14
**Double**
276:15
**download**
29:4
**downlo...**
145:20
**dozen**
19:17
**Dr** 252:14
252:22
253:3,4
253:8,11

288:19
**drafted**
90:17
302:9
**draw** 83:1
102:19
261:7
**drawn**
161:21
**dressed**
79:21
80:5,6
**drew**
112:18
**drive**
23:10,15
152:10
**driven**
26:17
**driver**
23:16,22
24:4
**driving**
23:9
24:7,17
25:1,3
26:21
53:5,9
66:19
**dropped**
52:20
249:4
**drove**
252:8
**drug** 69:11
69:13
71:17
72:3,11
72:16
73:5
82:6
84:3
114:12
183:8,15
184:14
185:4,7

238:11
239:6,7
254:19
254:21
297:10
297:17
297:22
303:15
**drugs**
157:5,15
158:14
185:5,8
185:14
238:17
253:22
**dry** 137:13
137:18
137:21
138:3,5
138:7,13
152:16
296:3
**DU** 308:2
309:2
**Dubiel**
1:12
30:22
31:10
60:16
145:20
148:11
231:6
287:5
**Due** 234:8
**duly** 4:4,9
269:11
308:5
**duration**
59:18
63:2,19
79:8
93:12,15
94:2
105:13
222:19
**duties**

Stevan Vidljinovic
September 4, 2013

326

| | | | | | |
|---|---|---|---|---|---|
| 75:6 | **eastern** | 205:13 | 288:2 | 36:15 | 55:22 |
| 168:4 | 1:2 | 213:18 | 293:20 | **entered** | 56:1,8,9 |
| **duty** 11:14 | 31:21 | 237:17 | 293:22 | 36:10 | 56:10,10 |
| 19:21 | **easy** | 292:14 | 297:17 | 248:6 | 56:13 |
| 21:3,9 | 140:11 | 292:20 | 298:14 | **entering** | 57:9,9 |
| 29:6 | **effect** | 294:1 | **eminent** | 131:11 | 57:19,21 |
| 30:16 | 131:9 | 298:19 | 270:8 | 174:17 | 63:13,16 |
| 31:4 | **effective** | 302:16 | **emphasize** | **entire** | **equipped** |
| 32:18 | 73:19 | **elbow** | 281:4 | 39:11 | 20:14 |
| 33:3,12 | 152:6,11 | 121:3 | **employ** | 308:9 | 26:21 |
| 76:16 | 173:22 | 276:9 | 92:17 | **entirety** | 27:3,10 |
| 95:14 | 174:13 | **electric** | **employed** | 188:10 | 27:14 |
| 149:3,6 | 174:16 | 152:7,9 | 10:19 | 188:20 | 28:9 |
| 229:9,13 | **effects** | 295:9,22 | **Employee** | **entitled** | 51:19 |
| 229:16 | 158:14 | **electr...** | 1:9 | 98:9 | 52:3,14 |
| 229:16 | **efficient** | 138:15 | **employees** | 115:3 | 54:18 |
| 239:21 | 238:21 | 138:20 | 285:11 | 150:20 | 56:8 |
| 243:3 | **effort** | **electr...** | **empty** | 183:8 | 57:4,22 |
| 292:15 | 76:8 | 140:18 | 238:9 | 188:13 | 102:9 |
| 292:16 | 169:4 | 140:19 | **en** 67:1 | 297:21 | **erased** |
| | **eHOW** | **electr...** | 91:21 | 298:16 | 282:2 |
| ——————— | 151:12 | 131:11 | **ended** | **entries** | **escalate** |
| **E** | **eight** | 295:18 | 33:13 | 37:13 | 161:17 |
| **E** 1:11  3:1 | 15:15 | 295:21 | 291:16 | 47:14 | 169:7 |
| 3:6  76:5 | 93:20 | **elements** | 292:15 | 241:12 | **escape** |
| 76:6 | 246:1,2 | 272:6 | **ends** 7:9 | 302:12 | 167:2,4 |
| **ear** 38:20 | **eight-...** | 273:8,22 | **energized** | **entry** | **escort** |
| **earlier** | 15:17 | 277:22 | 132:17 | 36:16 | 69:20 |
| 21:1 | **either** | **Eleventh** | **enforc...** | 53:11 | 85:5 |
| 25:6 | 4:18 | 29:21 | 151:21 | 148:4,6 | 97:17 |
| 48:19,20 | 54:10 | 30:5 | 152:22 | 259:13 | 108:9 |
| 49:10 | 84:6 | **emerge...** | 181:3 | **equally** | 115:20 |
| 82:8,18 | 90:4 | 90:3 | **engage** | 191:11 | 119:6 |
| 113:4 | 92:9 | 98:10 | 102:3 | **equate** | 120:13 |
| 182:10 | 102:15 | **emergency** | 200:20 | 82:7 | 256:13 |
| 182:17 | 103:16 | 26:4 | 216:7,9 | **equipment** | 271:10 |
| 183:3 | 104:8 | 33:6,16 | 294:17 | 25:21 | 276:4,9 |
| 201:1 | 124:12 | 55:18,22 | **engaged** | 26:3,4,8 | 276:21 |
| 225:13 | 127:12 | 56:9 | 52:13 | 26:11,22 | 277:12 |
| 228:12 | 134:3 | 88:20 | 79:6 | 27:10,14 | 277:14 |
| 276:7,18 | 136:4,8 | 89:16 | 163:14 | 28:10,13 | 278:18 |
| 277:19 | 138:13 | 90:3 | **engaging** | 28:16 | 280:7,11 |
| 278:8 | 143:4 | 91:8 | 216:7 | 29:8 | 280:18 |
| 281:15 | 152:7 | 98:14,15 | **engine** | 33:15 | 281:1,2 |
| 291:18 | 172:5 | 98:18,19 | 41:16 | 34:4 | 281:13 |
| **early** 79:2 | 189:11 | 98:20,21 | **enter** | 55:18,21 | 282:10 |
| 273:6 | | | | | |

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

327

282:17
especi...
   40:8
   194:22
   216:22
   306:3
establ...
   35:17
   53:5
   180:18
establ...
   88:11
esteemed
   90:18
estimate
   60:18
   93:4
   105:21
estima...
   133:21
et 98:16
ethical
   234:6
evasive
   198:3
evening
   30:15
   91:14
   229:9
   261:19
   291:19
   293:10
event
   13:11
   14:2
   21:16
   34:20
   36:7,20
   38:10
   41:2
   43:10
   44:20
   46:2,5
   47:19
   59:19
   82:18

93:15
94:2
103:4
105:20
112:13
133:20
140:21
141:12
141:13
149:18
186:11
202:17
213:9,11
225:2
242:4
297:3,5
302:8,10
events
   68:13
   218:15
   273:6
eventu...
   79:9
   141:10
everybody
   101:21
   111:3
   143:1
   154:13
evidence
   56:4
   71:6
   100:18
   116:17
   182:3
   199:12
   204:8
   208:19
   219:19
   278:15
   288:4
   301:17
exacer...
   158:14
exacer...
   157:16

exact
   141:1
   210:1
exactly
   145:8
   147:4
   259:16
EXAMIN...
   3:4 4:11
   290:18
examine
   4:9
examined
   4:9
   265:11
example
   39:6
   112:10
   137:21
   231:22
   250:19
   257:1,11
excerpt
   98:8
exchange
   23:8
excluding
   230:10
   230:13
excuse
   61:13
   117:6
   279:1
Executive
   152:2
exercise
   174:22
exerted
   92:19
exhaus...
   157:5
exhibit
   3:9,10
   3:11,12
   3:13,14
   3:15,16

3:17,18
3:19,20
3:21,22
34:19
40:11
41:13
42:7
43:18,20
45:17
46:11
48:16
72:10,22
73:4
82:14,20
84:14
87:16
98:7
145:13
145:16
147:18
149:9
150:19
151:10
158:19
160:19
161:14
174:16
176:4
191:4,18
197:17
224:2,9
239:19
268:8,9
268:19
269:6
297:8,21
exhibited
   234:22
exhibits
   34:8
   45:19
   87:10
   190:20
   297:4,6
existence
   174:6

exit 103:3
exited
   61:1
   106:2
expect 5:5
   5:15
   213:3
expected
   135:8
   239:2
expecting
   102:18
   196:7
expedite
   12:21
expel
   138:9
expelled
   134:22
   135:12
   140:6
   196:8
expels
   139:14
experi...
   5:2 47:9
   112:8
   114:3
   130:10
   132:7
   138:12
   141:15
   173:16
   217:14
   235:3
   238:14
   238:19
   239:3
   254:6
experi...
   189:12
   221:14
experi...
   68:9
   109:20
   238:17

240:22
241:13
242:7
245:6
256:8
explain
   56:22
   277:5
explained
   134:5
expressed
   165:16
extent
   131:10
   222:21
   263:3
   286:21
extract
   206:1
eyes 203:9
   209:6
   248:21
   249:2
   285:4,6

                F

face
   107:13
   109:5
   191:19
   203:5
   285:1
face-down
   206:10
facial
   107:11
   107:12
facili...
   184:13
facility
   74:10,10
   74:11,12
   76:7
   97:18
   108:11
   199:8

Stevan Vidljinovic
September 4, 2013

328

| | | | | | |
|---|---|---|---|---|---|
| 233:15 | 95:3 | 91:2,3 | 125:2,4 | 140:11 | 32:17 |
| 298:10 | 105:14 | 303:7 | 125:13 | **figures** | 265:20 |
| 298:10 | 106:10 | **famili...** | 125:15 | 160:14 | **fingers** |
| 303:17 | 112:6 | 32:10 | 126:5,8 | 160:17 | 9:6 |
| 303:21 | 113:1 | **far** 11:7 | 126:22 | 160:22 | **finish** |
| 304:4 | 125:14 | 31:20 | 133:19 | **file** 18:10 | 113:8 |
| **facing** | 127:1 | 35:8 | 133:22 | **filed** | 165:4,5 |
| 80:18 | 163:11 | 97:22 | 133:22 | 268:4 | 165:8 |
| 85:17 | 164:6,19 | 108:17 | 217:12 | **fill** 20:8 | 252:12 |
| 137:10 | 180:6,8 | 111:4 | 296:8 | 24:15 | 274:2,3 |
| 273:11 | 190:7,11 | 121:17 | **fell** 155:7 | 56:22 | **finished** |
| 282:14 | 192:19 | 124:7,8 | 203:7,12 | 57:2 | 7:20 8:6 |
| **fact** 94:8 | 192:20 | 124:9 | 203:13 | 229:22 | 20:9 |
| 127:17 | 196:14 | 130:18 | 204:3 | 230:5 | 113:17 |
| 160:16 | 210:10 | 133:17 | 206:10 | 232:9 | 251:22 |
| 217:21 | 210:14 | 193:15 | 212:3 | 237:17 | **finishes** |
| 221:19 | 210:15 | 215:5 | **fellow** | 238:5 | 21:9 |
| 222:14 | 214:1 | 246:13 | 158:7 | 239:2,15 | **finishing** |
| 227:18 | 233:12 | 246:16 | 228:3 | 239:17 | 228:18 |
| 247:1 | 233:21 | 271:15 | **fellow's** | 245:6 | **fire** 34:3 |
| 258:19 | 247:4,5 | 273:18 | 244:14 | 260:7,13 | 41:15,15 |
| 260:7 | 250:8 | 296:6 | **felt** 96:1 | **filled** | 48:4,18 |
| 264:3 | 256:22 | **fast** 145:4 | 126:11 | 229:8,17 | 49:2 |
| **facts** 56:4 | 273:21 | 156:8 | 126:22 | 238:3 | 61:6,7 |
| 71:5 | 303:3,6 | **faster** | 226:22 | 239:20 | 62:20 |
| 100:17 | **fairly** | 86:22 | 232:17 | 240:3 | 63:5,10 |
| 116:17 | 119:11 | 104:15 | 238:20 | 289:16 | 64:5,7 |
| 182:3 | 140:11 | **fear** | 253:18 | **filling** | 70:2 |
| 204:8 | 242:17 | 127:20 | **female** | 228:20 | 72:10 |
| 208:19 | **fall** | 143:5 | 16:15 | 228:22 | 82:6 |
| 219:19 | 135:13 | 158:6 | 64:10 | 229:5 | 88:7,12 |
| 267:8 | 135:18 | 210:19 | 79:9,11 | 235:14 | 88:17,19 |
| 278:15 | 155:5,5 | 263:9 | 210:3 | 239:13 | 89:5,14 |
| 288:4 | 155:13 | **Federal** | 222:20 | 244:8,12 | 91:6,7 |
| 301:16 | 155:21 | 1:21 | 287:13 | 254:22 | 92:5 |
| **fail** 4:17 | 155:22 | **feel** | **field** | 260:6 | 99:8 |
| **fair** 7:11 | 156:8,14 | 210:19 | 155:8 | **finally** | 105:9,9 |
| 7:12 | 203:4,5 | **feels** | 227:17 | 231:12 | 239:16 |
| 39:20 | 204:20 | 131:13 | 233:18 | **find** 29:7 | 249:4 |
| 58:15 | 205:2 | **feet** 94:15 | 236:21 | 47:22 | 294:2,7 |
| 62:14 | **falling** | 95:1 | 237:5,14 | 173:7,13 | 300:10 |
| 65:11 | 111:19 | 118:7,14 | 238:8 | 238:8 | 300:20 |
| 78:6,10 | 112:17 | 119:21 | 247:11 | 247:9 | 301:3,6 |
| 84:18 | **familiar** | 120:9 | 253:1,17 | 249:17 | 301:11 |
| 85:3 | 24:13 | 124:10 | 289:4 | **fine** 4:22 | 305:12 |
| 89:14 | 90:4 | 124:11 | **figure** | 9:3 | 305:13 |

Stevan Vidljinovic
September 4, 2013

| | | | | | |
|---|---|---|---|---|---|
| 305:14 | 204:13 | 120:9 | **flails** | 266:20 | 52:22 |
| 305:15 | 204:17 | 124:10 | 217:16 | **follows** | 55:8 |
| **firearm** | 224:14 | 124:11 | **flap** | 4:10 | 56:6,15 |
| 239:16 | 242:14 | 125:2,3 | 266:22 | 44:4 | 59:5 |
| **firearms** | 243:2,18 | 125:13 | **fleeing** | 101:5 | 65:3 |
| 171:10 | 244:16 | 125:15 | 108:18 | 197:14 | 66:4 |
| **fired** | 245:1 | 126:5,8 | 108:22 | 224:7 | 69:2 |
| 144:5 | 258:16 | 126:22 | 109:3 | **footage** | 70:17 |
| 258:16 | 258:21 | 133:7,19 | **flight** | 29:3,4,5 | 76:19 |
| 258:19 | 259:9,13 | 139:5,14 | 198:4 | **force** 77:4 | 78:8,17 |
| 258:21 | 268:9,11 | 139:16 | **floor** | 92:18,19 | 81:20 |
| **firefi...** | 268:15 | 296:8 | 132:18 | 161:18 | 82:10 |
| 63:13 | 268:21 | **flail** | 132:20 | 167:8,15 | 85:1,20 |
| **firefi...** | 269:11 | 121:16 | 203:1,2 | 167:17 | 86:6 |
| 63:12,13 | 274:22 | 122:2,4 | **focus** | 168:2,6 | 87:1 |
| 63:15 | 279:15 | 122:19 | 25:10 | 168:18 | 89:18 |
| **firemen** | 279:18 | 123:17 | 202:2 | 169:21 | 90:6 |
| 63:6 | 280:3 | 123:20 | **folks** | 169:22 | 91:18 |
| 93:16,18 | 296:19 | 126:8 | 221:19 | 172:20 | 92:7 |
| 210:7,8 | 302:22 | 194:15 | 221:21 | 173:2,6 | 95:7,16 |
| **firing** | 308:5 | 200:15 | 285:8 | 173:19 | 96:3 |
| 146:8 | **fist** 198:8 | 220:21 | **follow** | 175:1 | 99:11 |
| **first** 4:9 | 198:10 | **flailed** | 6:13 8:1 | 180:12 | 100:5 |
| 7:3 8:11 | **fists** | 122:21 | 8:4,5 | 180:14 | 102:20 |
| 34:18 | 107:1,2 | 123:18 | 81:18 | 181:1,15 | 109:16 |
| 37:15,15 | 107:6 | 125:6 | 114:22 | 190:21 | 110:11 |
| 48:7 | 109:19 | 187:9 | 152:1 | 193:9 | 122:14 |
| 64:13,16 | 111:22 | 281:17 | 170:6 | 231:11 | 129:20 |
| 65:20 | 121:15 | 282:2,6 | 217:6 | **foregoing** | 132:4 |
| 77:17 | 121:20 | 282:9 | 249:16 | 269:12 | 133:1 |
| 80:15,20 | 123:19 | **flailing** | 255:8,17 | 309:5 | 147:6 |
| 89:4 | 124:20 | 122:18 | 255:22 | **forgot** | 157:18 |
| 101:18 | 125:16 | 122:22 | 256:4 | 16:6 | 163:17 |
| 113:11 | 166:21 | 123:2,7 | 306:8 | 57:15 | 164:13 |
| 144:2 | 194:16 | 123:11 | **follow-up** | **forgotten** | 166:16 |
| 151:20 | 256:10 | 123:21 | 290:17 | 9:1,2 | 166:18 |
| 161:14 | 256:16 | 127:14 | 299:19 | **form** 13:3 | 167:10 |
| 162:10 | 256:18 | 127:16 | 305:2 | 23:18 | 169:10 |
| 168:6,17 | 271:12 | 129:1 | **followed** | 24:16 | 170:2,12 |
| 170:10 | 281:8,18 | 198:4,8 | 5:17 | 27:5 | 174:3 |
| 170:21 | 285:17 | 199:6 | 74:21 | 31:6 | 181:10 |
| 172:21 | **five** 11:3 | 211:22 | 216:15 | 33:9 | 182:14 |
| 174:20 | 63:12 | 220:18 | **following** | 38:22 | 208:10 |
| 175:7 | 97:3 | 220:19 | 43:12 | 39:13 | 218:2 |
| 176:10 | 118:7,14 | 281:7 | 180:14 | 40:1 | 221:21 |
| 196:14 | 119:21 | 285:17 | 208:22 | 41:10 | 222:16 |

Stevan Vidljinovic
September 4, 2013

330

| | | | | | |
|---|---|---|---|---|---|
| 266:3 | 49:19 | 227:10 | 110:15 | **genders** | 235:7 |
| 267:14 | 50:5 | 227:12 | 151:5 | 287:14 | 236:11 |
| 271:18 | 51:4 | **friend**1:3 | 153:7 | **general** | 237:9 |
| 273:2 | 56:3 | **friends** | 183:22 | 30:12 | 252:17 |
| 276:14 | 57:11 | 294:18 | 242:1 | 55:6 | 265:15 |
| 276:22 | 86:6 | **front** | 257:14 | 62:9 | 289:3 |
| 277:6 | 110:12 | 41:14 | 276:2 | 68:12 | **generates** |
| 278:14 | 110:21 | 101:12 | 290:15 | 83:20 | 265:12 |
| 288:3 | 146:18 | 109:6 | 299:18 | 118:4 | **genera...** |
| 289:11 | 146:19 | 112:22 | 305:1,18 | 120:22 | 234:9 |
| 300:12 | 147:7 | 124:13 | 306:20 | 121:18 | 237:7 |
| 301:15 | 148:9 | 133:16 | 307:8 | 125:1 | 243:12 |
| **formation** | 150:22 | 135:14 | 308:12 | 145:2 | 243:22 |
| 101:15 | 160:14 | 136:14 | | 173:15 | 245:8 |
| **formid...** | **four**53:12 | 136:15 | ——————— | 173:18 | 262:13 |
| 112:5,12 | 53:18 | 136:19 | G | 176:4,5 | 264:20 |
| 112:16 | 94:8 | 137:11 | **G**46:17 | 197:18 | **gentleman** |
| 112:19 | 95:22 | 154:14 | **G-u-e-...** | 201:19 | 80:4 |
| **forth** | 161:13 | 155:4 | 22:13 | 214:22 | 197:4 |
| 152:1 | 187:17 | 174:13 | **gain**143:9 | 215:10 | **gentlemen** |
| 308:10 | 191:6 | 197:17 | 168:8 | 215:12 | 39:21 |
| **Forum** | **fracture** | 200:7,17 | 185:22 | 216:1 | **gently** |
| 152:2 | 265:16 | 202:18 | 192:21 | 262:20 | 276:9 |
| **forward** | **fractured** | 207:11 | 207:1 | 281:19 | **geogra...** |
| 127:13 | 249:17 | 208:1,3 | 284:7 | **genera...** | 31:15,17 |
| 155:5 | 250:12 | 224:9 | 285:12 | 68:7 | 31:18 |
| 203:4,19 | 251:17 | **full**7:11 | 286:16 | 91:3 | 32:10 |
| **found**85:7 | 253:5 | 7:13 | 287:20 | **generally** | 39:7,20 |
| **founda...** | **frame** | 15:14 | 288:7,8 | 52:9 | 41:6 |
| 27:15 | 258:13 | 75:10 | **gained** | 71:13 | 52:10 |
| 28:3 | **FRANCO**2:9 | 102:6 | 284:21 | 91:20 | **geogra...** |
| 30:7 | **free** | 198:4 | **gaining** | 152:1 | 32:3,5 |
| 35:16 | 150:13 | 202:7 | 289:15 | 254:22 | 32:19 |
| 36:12 | 307:3 | 291:22 | **Gallardo** | 255:20 | 35:5,8 |
| 37:3,15 | **freedom** | **fully-...** | 2:14 | **generate** | 51:21 |
| 37:17 | 186:13 | 12:2 | 270:9 | 237:10 | 55:5 |
| 38:6,15 | **frequency** | **gals**142:2 | **generated** | 225:1 | |
| 40:14 | 161:3 | **furlough** | **garners** | 147:19 | **George** |
| 41:11 | **frequent** | 30:10 | 40:6 | 223:20 | 2:19 |
| 42:3,14 | 39:16 | **further** | **gather** | 224:11 | 192:10 |
| 43:15 | **fresh** | 37:1,11 | 251:13 | 224:12 | **Geraldine** |
| 44:10 | 225:15 | 37:22 | **geared** | 225:14 | 1:8 |
| 45:4,13 | 226:13 | 50:16 | 249:3 | 226:16 | **gesture** |
| 46:8,18 | 273:7 | 74:14 | **gender** | 226:18 | 120:21 |
| 47:7 | **Friday** | 82:21 | 64:12 | 226:20 | 121:8 |
| 48:9,21 | 227:6,10 | 84:16 | 210:5 | 233:7 | 122:7 |
| | | 100:22 | 287:15 | | |

Stevan Vidljinovic
September 4, 2013

331

164:5
281:16
**gestured**
121:1,7
169:1
201:3,7
201:14
201:17
202:6
278:9
280:1
**gestures**
10:14
198:3
**gesturing**
201:14
201:18
**getting**
84:9
124:6
191:20
216:17
220:1
283:2,18
**give** 5:4
6:4 8:13
9:11
20:10
25:18
27:18
32:1
43:18
45:18
68:12
79:14
129:12
131:22
145:12
145:19
173:9
188:17
189:4
193:19
194:6
195:11
235:22

246:15
257:14
259:11
**given** 5:1
6:18
17:18
18:7,9
25:14
40:22
46:21
53:15
80:11
86:10
97:2
102:2
109:18
142:22
154:8
167:19
188:12
193:19
202:2
213:11
233:17
273:12
301:19
303:12
306:5
308:9
309:5,9
**gives**
47:10
244:13
**giving**
197:5
219:13
221:9,13
296:11
**Gladys**
302:22
**GLORIA** 2:1
308:3,19
**go** 6:11
14:22
18:22
20:17,20

35:18
40:6,9
41:8
42:1
45:17
48:6
52:5,7
52:12,16
53:19,21
61:8
65:21
66:14
68:11
70:17
71:14
97:10
100:22
109:6
117:8
119:15
124:11
131:15
135:7
141:7
144:18
145:13
149:8
153:8
156:19
161:13
166:8
175:13
176:4,10
180:11
181:21
185:16
186:9,14
186:20
187:22
190:1,12
191:8
196:4
197:9,21
200:5
205:6
212:12

224:3,17
230:1
242:18
243:17
245:8
255:12
255:21
256:19
257:14
259:10
270:12
270:13
276:2
278:10
280:4
296:12
296:13
305:6
307:4
**goes** 26:5
73:17
120:16
188:19
221:7
237:2
**going** 4:16
5:4,10
7:15
9:20
12:20
19:20
20:13,14
21:12
34:8
37:14
45:20
46:6
50:20
54:1
61:9
62:9
70:16
73:21
76:18
91:16
98:12

101:18
102:21
105:16
110:1
114:6,8
123:6
126:1
130:9,13
130:17
132:17
134:2
138:21
142:11
143:15
145:13
149:10
150:14
150:18
150:21
153:6,9
154:9
155:9
156:20
157:17
163:9,16
164:12
171:14
174:3,14
178:5
182:14
187:12
189:3,14
189:15
189:20
196:2,10
196:22
197:1,2
198:9,10
211:4
215:12
218:15
232:21
233:1,2
250:15
251:1,2
252:10

260:20
261:3,4
269:6
272:12
278:14
278:20
279:1
280:4
286:18
286:20
289:10
295:6
298:4
302:6,7
**Gonzales**
215:19
**Gonzalez**
1:8 60:3
93:11
**good** 95:4
95:5
133:21
148:13
172:4
202:16
245:12
247:20
282:18
**gotten**
191:21
240:21
**grab**
127:13
187:2
190:9
276:9
**grabbed**
278:8,11
278:19
279:4,16
280:16
**grabbing**
279:17
279:20
**gradat...**
168:2

Stevan Vidljinovic
September 4, 2013

332

grade
  17:18,20
grapple
  193:17
grappling
  68:19,22
  194:20
grasping
  17:10
great
  162:19
  217:1
  263:9
greater
  124:11
  191:3
grip
  278:13
ground
  14:1,3,4
  133:16
  141:7,21
  156:11
  166:13
  203:3
  204:17
  207:1
  208:16
  209:1
grounds
  12:21,22
  89:2
  90:15
  91:11
  99:4
  149:11
  150:9
  159:9
  162:2
  174:8
  188:5
  250:16
  251:3
  278:20
group
  101:12

guard 8:19
  9:14
guess 8:11
  8:13
  43:9
  95:2
  107:4
  117:16
  173:11
  194:1
  282:22
guessed
  8:18
guessing
  8:18
Guettler
  1:6
  22:13,14
  23:6
  26:17
  32:9
  85:4,13
  93:9
  96:9,10
  100:9
  109:10
  109:15
  121:5,10
  121:17
  124:2
  177:8,10
  187:7
  215:18
  219:22
  220:7
  263:8
  271:7,10
  272:1
  276:4
  277:14
  278:18
  278:19
  280:10
  282:5,8
  282:10
  282:15

292:3
guidel...
  88:4
  152:1
  180:12
guiding
  122:7
gun 20:1
  94:8
  138:1,8
  139:13
  140:5
  146:8
  160:11
  162:15
  163:10
  190:10
  247:22
  257:17
  257:20
gunfire
  160:8
gurney
  209:10
  209:12
  209:16
  212:15
  212:17
  212:20
  212:22
  214:5,8
  214:12
  214:14
  214:21
  215:2,4
  215:8,12
  220:15
  221:5,7
  222:15
  247:21
  306:11
  306:13
  306:17
Gutrey
  32:12,14
guy 84:3

guys 34:7
  131:22
  142:2,20
  178:10

_____
H
H 1:12  3:6
H-i-n-...
  159:18
habit
  172:13
hair 79:14
  79:15
  107:11
  107:12
half 27:12
  27:22
  28:6
  106:8,9
  106:10
  153:12
  266:1
half-hour
  33:12
hand 4:3
  7:17
  103:7,13
  103:17
  110:9,14
  111:9
  120:20
  121:2,3
  121:6,8
  162:15
  241:11
  308:15
hand-made
  260:5
handcuff
  207:8,17
handcu...
  206:8,13
  207:1,11
  207:14
  207:15
  208:1,3

208:8
  209:4,6
  212:19
handcu...
  208:13
handcuffs
  102:11
  104:2,5
  104:9
  170:11
  170:17
  170:22
  172:18
  192:16
  192:17
  193:7
  206:15
  206:16
  206:17
  206:18
  209:14
  213:4,7
  213:8,10
  213:12
handful
  131:2
handle
  258:12
handling
  83:6
hands
  103:20
  104:9,11
  106:22
  107:2
  119:12
  121:20
  123:22
  204:21
  207:7,11
  213:15
  214:4
handwr...
  148:17
happen
  130:13

132:1
  217:17
happened
  119:4
  120:5
  121:14
  133:10
  202:21
  202:22
  226:22
  262:8,16
  262:17
  262:18
  263:4,21
  263:22
  266:9
  281:9
happening
  42:18
  230:14
  253:18
  271:16
happens
  131:14
  260:11
hard 4:16
  10:10
  220:20
harm 8:22
  99:1
  162:19
  182:6
  217:1
  228:10
  263:10
harmed
  14:2
Harry 1:6
hat 107:8
head 10:11
  122:3
  136:22
  189:18
  203:14
  204:5
  223:13

Stevan Vidljinovic
September 4, 2013

333

| | | | | | |
|---|---|---|---|---|---|
| 251:12 | 279:18 | **helped** | 236:7 | 145:1 | 147:22 |
| **health** | **hearing** | 283:14 | **history** | 213:21 | 148:2 |
| 74:11 | 38:11 | **helpful** | 166:11 | 213:21 | 249:9 |
| 76:8,17 | 50:12,14 | 182:20 | 237:16 | 235:2,5 | **hours** |
| 157:2,7 | 51:10,11 | **helping** | **hit** 204:5 | 249:3,6 | 15:15 |
| 232:18 | 83:10 | 289:15 | 204:12 | 249:11 | 21:22 |
| 233:8 | 129:4 | **hemorr...** | 205:2 | 251:18 | 35:15,22 |
| 234:9,11 | 141:3 | 265:17 | 208:16 | 251:21 | 188:6 |
| 234:17 | 160:22 | **herein...** | 211:22 | 252:2,7 | **house** |
| 235:6,9 | 204:10 | 308:10 | 285:14 | 253:3 | 86:20 |
| 298:13 | 297:13 | **hereof** | **hold** 4:19 | 264:12 | **huge** 142:8 |
| **hear** 6:2 | **hearsay** | 308:15 | 135:17 | 264:13 | **human** |
| 7:4,5 | 159:6,6 | **hereto** | 139:1,2 | 264:15 | 117:17 |
| 33:21 | 159:10 | 309:11 | 139:15 | 264:18 | **hypoth...** |
| 38:20 | 160:1,14 | **hereto...** | 139:16 | 265:2 | 41:11 |
| 39:22 | 160:15 | 182:3 | 140:12 | 266:1 | 116:17 |
| 49:14,15 | 162:4 | **hereunto** | 183:11 | 267:9 | 182:2,2 |
| 52:4 | **heavier** | 308:15 | 193:17 | 283:1,1 | 199:11 |
| 117:22 | 246:5 | **hernias** | 256:13 | 283:5,18 | 217:7 |
| 160:10 | **height** | 157:3 | 276:8 | 283:20 | 219:19 |
| 177:16 | 94:14 | **Hey** 119:14 | 278:6 | 284:12 | 301:16 |
| 219:12 | 245:14 | 255:20 | 281:1 | 285:9,12 | |
| 220:13 | 245:19 | **hide** | 284:7,13 | 285:20 | **I** |
| 231:18 | **held** 133:3 | 217:21 | 284:18 | 286:6,16 | **IACP** 152:3 |
| 232:2 | 224:5 | 218:4 | **holding** | 287:7,8 | **idea** 150:1 |
| 294:5,10 | 284:14 | **hierarchy** | 142:11 | 287:9,17 | 150:17 |
| **heard** 7:18 | 284:20 | 169:22 | 142:14 | 287:19 | 203:21 |
| 50:20 | **hello** | 191:2,12 | 283:21 | 288:7,11 | **ideal** |
| 51:17 | 302:22 | **high** 41:2 | 284:9 | 288:18 | 137:12 |
| 52:11,18 | **help** 6:9 | 44:9 | 285:2 | 289:15 | **ideally** |
| 58:2,4 | 6:13 | 45:3 | **holds** | 297:1 | 153:14 |
| 116:14 | 40:8 | **higher** | 193:10 | 298:13 | **identi...** |
| 119:3 | 70:2 | 118:10 | **hollering** | 299:15 | 47:17 |
| 128:21 | 83:12 | 198:12 | 118:16 | 304:1,1 | **identi...** |
| 169:17 | 116:15 | **highest** | **holster** | 305:6,11 | 65:13 |
| 169:18 | 119:16 | 41:1,5 | 103:14 | 305:16 | 176:18 |
| 169:19 | 120:18 | **Hinkel** | **home** 74:8 | 306:9 | 180:18 |
| 185:3 | 120:22 | 159:18 | 230:1 | **hospit...** | 244:20 |
| 189:18 | 169:3 | **Hinsdale** | **hope** 4:19 | 98:22 | 245:15 |
| 204:5 | 185:19 | 2:8 | **hospital** | **hospit...** | **identi...** |
| 220:10 | 186:3 | **Hispanic** | 69:21 | 253:14 | 49:10 |
| 220:11 | 249:11 | 77:22 | 71:19,22 | 265:7 | 74:3 |
| 223:2 | 255:13 | 79:9,12 | 77:4 | **hospitals** | 298:7 |
| 232:4 | 255:21 | 107:15 | 84:4 | 298:15 | **identi...** |
| 250:19 | 306:11 | 107:21 | 88:18 | **hour** 37:7 | 65:13 |
| 260:22 | 306:12 | 222:20 | 98:17 | 79:2 | **identi...** |

Stevan Vidljinovic
September 4, 2013

334

| | | | | | |
|---|---|---|---|---|---|
| 24:16 | 213:18 | **incident** | 301:16 | 70:11 | **inference** |
| **identify** | 249:1 | 219:12 | **incomp...** | 71:16 | 261:7 |
| 24:22 | 298:9,11 | 224:18 | 70:6 | 76:7 | **inflict** |
| 25:17 | 303:20 | 225:4,15 | 76:1 | 77:1 | 228:10 |
| 176:17 | **impeach** | 232:17 | 117:16 | 83:16 | **influence** |
| 177:6,17 | 277:2 | 240:14 | 299:1 | 97:4 | 97:1 |
| **identity** | **impeac...** | 241:2,16 | **incorrect** | 98:6 | 108:9 |
| 65:1,9 | 277:3,7 | 242:8 | 40:3 | 110:7 | 112:8,22 |
| **ignored** | 278:16 | 249:20 | 130:11 | 111:5 | 113:13 |
| 216:20 | 278:21 | 259:3 | 174:8 | 112:12 | 114:4,12 |
| **III** 191:4 | **implic...** | 267:11 | 198:10 | 134:10 | 126:13 |
| 191:8 | 174:10 | 290:8 | 218:11 | 134:19 | 157:5,15 |
| **IL** 2:8,10 | **implies** | **includes** | **increase** | 135:12 | 158:14 |
| 2:15,20 | 174:4 | 181:9 | 153:2 | 135:13 | 179:19 |
| **ILCS** 98:16 | **imply** | 198:3 | 198:17 | 139:21 | 179:20 |
| 184:15 | 174:6 | **including** | **increases** | 140:4 | 185:8,10 |
| **Illinois** | **important** | 11:20 | 161:9 | 141:22 | 185:11 |
| 1:1,14 | 7:2 | 231:12 | **indicate** | 142:3 | 185:14 |
| 2:3 5:12 | **improper** | 231:16 | 55:16 | 158:5 | 186:7 |
| 90:12,21 | 277:3,6 | 231:21 | 242:15 | 165:18 | 217:13 |
| 98:15 | 278:16 | 270:17 | 258:17 | 167:20 | 238:17 |
| 182:10 | 278:21 | **inclusive** | 281:5 | 168:10 | 239:12 |
| 182:15 | **in-ser...** | 309:7,10 | **indicated** | 168:14 | 253:14 |
| 240:18 | 15:2 | **incohe...** | 55:16 | 169:13 | 253:16 |
| 246:7 | 167:21 | 70:6 | 128:14 | 170:1,9 | 253:19 |
| 247:2 | **inaccu...** | 71:20 | 151:11 | 171:2,20 | 253:22 |
| 308:1,4 | 190:22 | 77:5 | 275:12 | 171:21 | 253:22 |
| 309:1 | **inappr...** | 100:11 | 275:20 | 179:21 | 254:1,5 |
| **illust...** | 196:21 | 114:15 | 276:12 | 182:5 | 254:9,12 |
| 175:14 | **incapa...** | 115:18 | 290:20 | 236:22 | 254:18 |
| 175:16 | 141:9 | 116:2 | 292:19 | 237:15 | 265:7 |
| **imagin...** | 152:7 | 177:2,4 | 295:7 | 258:1 | 271:4 |
| 135:13 | **incapa...** | 177:21 | 296:15 | **indivi...** | 298:18 |
| **immediate** | 131:16 | 178:9 | 297:8 | 111:2 | 303:15 |
| 29:11,13 | 298:8 | 179:6 | 298:17 | **indivi...** | **influe...** |
| 30:3 | 299:9 | 180:2 | **indicates** | 1:12 | 112:9 |
| 41:17 | 303:18 | 186:7 | 36:9 | 161:6 | **inform...** |
| 81:19 | **incapa...** | 199:14 | 145:19 | 241:3 | 36:10,15 |
| 98:22 | 135:15 | 209:3 | 242:19 | **indivi...** | 37:11,22 |
| 105:22 | **incapa...** | 285:9 | **indica...** | 270:16 | 41:8 |
| 216:17 | 152:9,17 | 299:1 | 276:20 | **indivi...** | 82:22 |
| **immedi...** | **incess...** | **incomp...** | **indica...** | 96:22 | 108:16 |
| 6:4 29:9 | 39:18 | 116:16 | 150:4 | 99:14 | 145:19 |
| 41:7 | **inches** | 182:1 | **indica...** | 113:15 | 154:8 |
| 74:13 | 245:22 | 217:7 | 153:18 | 125:17 | 160:21 |
| 213:17 | 246:1,2 | 219:18 | **indivi...** | 221:7 | 162:11 |

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

335

| | | | | | |
|---|---|---|---|---|---|
| 164:6,19 | 77:1 | 296:16 | 135:19 | 37:13 | invest... |
| 224:15 | 96:8 | inquire | 136:11 | interp... | 176:20 |
| 224:18 | 97:7 | 84:11,18 | 137:19 | 191:22 | invest... |
| 236:7,9 | 99:22 | 100:10 | 139:3 | Interr... | 113:11 |
| 236:17 | 105:13 | 108:16 | 154:11 | 268:11 | involu... |
| 240:12 | 123:7,10 | 266:7,8 | integrity | 268:21 | 156:22 |
| 241:20 | 125:19 | 289:17 | 176:20 | 277:17 | involved |
| 243:16 | 168:9 | 290:7,10 | intell... | Interr... | 163:18 |
| 244:16 | 185:21 | 290:16 | 7:12,14 | 270:14 | 184:22 |
| 244:17 | 206:8 | inquired | intention | 270:15 | 214:7 |
| 244:22 | 225:20 | 266:13 | 304:3,10 | 270:20 | 303:5 |
| 245:7,10 | 226:21 | 288:11 | intera... | 273:5 | involv... |
| 245:17 | 291:15 | 288:19 | 111:5 | 275:9 | 38:12 |
| 245:19 | 301:7 | 288:20 | intera... | 278:17 | 151:17 |
| 246:21 | 302:5 | inquiring | 70:5 | 282:21 | IR 237:15 |
| 247:12 | initials | 84:12 | intera... | 286:19 | 238:2 |
| 249:2,19 | 259:14 | inquiry | 270:17 | 286:21 | irrele... |
| 252:16 | 259:16 | 100:1 | 270:21 | interrupt | 162:5 |
| 259:2 | initiated | 288:22 | intere... | 7:16 | 184:4 |
| 260:21 | 109:10 | inside | 308:14 | 9:10,20 | 186:16 |
| 261:11 | injured | 28:20 | interf... | 165:10 | 195:8 |
| 264:5,21 | 14:5 | 29:1 | 198:18 | 187:12 | issue |
| 270:21 | 135:20 | 138:21 | interject | 196:13 | 146:17 |
| 286:22 | 243:5,7 | 284:12 | 5:19 | interr... | 238:6 |
| 294:13 | 243:9,12 | 287:20 | 100:20 | 188:7 | issued |
| 301:19 | 243:13 | instit... | internal | interr... | 152:22 |
| informed | 243:15 | 15:7 | 250:13 | 196:17 | 292:1 |
| 98:19 | 248:17 | instru... | intern... | inters... | issues |
| infringes | 265:3 | 135:8 | 249:18 | 62:8 | 188:11 |
| 250:3 | injuries | 141:6,8 | 253:6 | interval | item 173:4 |
| initial | 157:3,16 | instru... | Intern... | 125:11 | items |
| 14:18,20 | injurious | 136:3 | 146:13 | intervene | 172:17 |
| 40:12 | 157:1 | 181:9 | 146:17 | 219:16 | |
| 48:5 | injury | instru... | 147:10 | interv... | _____ |
| 69:10 | 135:22 | 31:11 | 150:3,4 | 50:21 | J |
| 83:14 | 155:14 | instru... | 152:3,4 | intoxi... | J 1:7 2:19 |
| 87:15 | 235:11 | 16:13 | 152:21 | 74:4 | January |
| 232:20 | 236:1 | 154:20 | Intern... | 184:5,9 | 270:3,4 |
| 243:20 | 248:19 | 155:1 | 154:5 | 184:10 | 273:6 |
| 244:17 | 251:20 | instru... | Internet | 184:22 | jealously |
| 245:2 | 265:5,18 | 16:18 | 150:6,8 | 185:4,13 | 9:14 |
| 254:20 | 265:21 | 17:9 | 159:17 | introduce | jeopar... |
| 297:10 | 266:11 | 131:19 | 159:22 | 167:17 | 176:18 |
| initially | 286:13 | 131:21 | 162:4 | inventory | jettisons |
| 58:13,21 | 289:13 | 134:1,8 | 167:21 | 205:18 | 295:8 |
| 72:7 | 290:6 | 135:11 | interpret | 230:15 | job 37:21 |
| | | | | | 40:5 |

Stevan Vidljinovic
September 4, 2013

336

49:16
81:10
83:5
87:15
101:20
113:5,9
289:14
**Joe** 262:5
**John** 1:6
2:6,6
43:20
65:4
100:20
188:5
261:21
274:8
**join** 27:6
27:16
28:3
31:7
33:10
39:1
41:12
59:6
66:21
69:3
70:13
78:9
81:21
85:21
86:7
87:2
95:8,17
96:5
99:12
109:17
117:8
122:13
132:11
157:22
163:3,6
169:11
170:13
173:8
217:8
218:3

222:1,6
222:17
**joining**
174:14
**joins**
159:14
**jointed**
10:1
**Jolt** 160:5
**Jose** 1:3,7
77:19
80:5,12
89:6
93:21
96:1,16
100:2
101:11
108:4
109:13
115:6,17
115:18
115:20
118:6
119:9,12
119:17
121:10
124:15
124:19
143:20
144:18
144:20
151:17
155:19
156:4,13
156:17
162:11
163:11
164:4,7
164:20
166:10
166:13
168:17
169:8
190:10
190:12
208:7,15

209:11
209:19
212:15
218:1,9
222:14
225:2
231:18
233:6,13
233:21
243:18
244:20
245:1,13
247:1,6
249:17
250:12
251:11
251:17
251:20
254:11
261:18
265:1
270:17
272:22
276:9
277:12
278:6
283:18
283:21
284:7,20
294:22
300:3
301:10
305:5,8
305:10
**JOSEPH** 1:9
2:13
**jot** 241:9
**JR** 1:8
2:19
**Judge** 1:6
1:8
188:19
188:19
188:20
**judgment**
74:3

298:6
299:12
**July** 21:16
22:15
23:1,17
24:6
26:20
27:13
29:14
30:20
35:14
43:5,13
54:21
73:18
75:6
88:2
147:19
159:19
226:12
240:4,14
291:20
293:2
294:22
295:4
299:16
**jump** 207:4
**Jury** 1:12
**justif...**
235:5
**justified**
194:22
216:18

―――――――
**K**
**Kaitlin**
2:7
43:18
**Kearns**
1:11
29:15,16
30:1,14
30:18
57:17,18
57:20
58:10,11
58:14,16

58:22
59:14,20
60:13
93:12
215:20
216:4,6
216:10
216:11
231:7
240:8,19
242:3,10
262:7,15
262:19
263:2
287:4
**Kedzie**
62:13
**keep** 7:4
18:9
20:4
33:2
45:20
56:17
72:22
111:4
242:3
261:3
**keeping**
161:3,5
**Kenneth**
31:21
**KEVIN** 2:14
**kicking**
211:21
**kill** 34:11
**kind** 5:7
6:12
12:11
13:21
14:11
17:8
18:7
20:5
24:15
25:19
26:11

28:12
33:6
34:3
36:7
38:19
39:10,21
43:12
49:17
61:22
66:18
99:8
105:15
126:14
129:18
185:12
186:3
193:16
193:17
215:1
236:13
237:16
245:15
247:22
256:16
261:7
265:8
284:19
286:12
286:14
304:12
**kinds**
12:18
155:12
170:4
235:11
**knew** 22:4
67:1
103:12
108:1,4
130:18
144:4
163:13
229:5
230:2
233:2
**know** 5:16

Stevan Vidljinovic
September 4, 2013

337

| | | | | | |
|---|---|---|---|---|---|
| 8:21,22 | 71:8 | 142:11 | 248:10 | 136:10 | 90:18 |
| 9:1,10 | 72:17,18 | 147:10 | 251:7,8 | 150:16 | 161:19 |
| 10:3,7 | 75:13 | 148:11 | 254:5 | 185:6 | 251:13 |
| 16:22 | 77:13 | 148:12 | 255:18 | 206:14 | 262:12 |
| 18:1,4 | 78:11,18 | 148:20 | 256:16 | 243:8 | 266:8 |
| 22:2 | 81:1 | 149:6,12 | 257:10 | 269:14 | **lead** 6:14 |
| 25:3 | 82:3 | 150:6 | 258:2 | **knowle...** | 82:2,3 |
| 26:14,20 | 88:1 | 151:13 | 259:15 | 260:11 | **learn** 65:1 |
| 27:19,19 | 91:21 | 154:7 | 259:16 | **known** | 80:5 |
| 28:5,5 | 93:8,9 | 159:2 | 260:8,14 | 112:9 | 147:14 |
| 29:19 | 93:10 | 160:20 | 260:15 | 152:9 | 249:21 |
| 30:4 | 94:4,8 | 161:5 | 260:17 | | 261:16 |
| 36:14,18 | 97:22 | 171:18 | 263:3 | ———— L | **learned** |
| 36:21 | 100:7,21 | 172:11 | 267:3,3 | **labeled** | 65:8,11 |
| 37:2,12 | 102:10 | 172:13 | 274:1 | 47:20 | 77:18 |
| 37:19 | 103:2 | 173:11 | 275:8 | **lack** 30:4 | 90:4,14 |
| 38:2,4 | 105:6 | 177:9 | 279:7 | 77:14 | 90:16,19 |
| 39:10 | 106:14 | 179:20 | 280:15 | **laid** | 140:14 |
| 40:19 | 106:15 | 180:2,8 | 280:16 | 220:15 | 168:1 |
| 42:5,16 | 106:18 | 182:15 | 281:3 | **language** | 250:11 |
| 42:18 | 106:20 | 189:12 | 283:9,13 | 116:6 | **learning** |
| 44:8,13 | 108:13 | 189:16 | 284:6 | 191:17 | 251:9 |
| 45:6,12 | 108:17 | 192:1 | 285:10 | **larger** | **leave** 29:1 |
| 45:15 | 109:8 | 197:1 | 286:14 | 112:12 | 196:7 |
| 46:10,20 | 111:10 | 201:21 | 287:11 | **largest** | 247:8 |
| 48:13 | 112:21 | 202:6,13 | 287:19 | 152:4 | **led** 190:20 |
| 49:4 | 113:8,14 | 204:2,12 | 300:16 | **LaSalle** | 190:20 |
| 50:7 | 114:7 | 206:13 | 300:18 | 2:14,19 | **left** 59:20 |
| 51:20 | 115:2,13 | 206:18 | 300:19 | **law** 2:9,13 | 106:5 |
| 52:2 | 115:14 | 207:13 | 300:21 | 2:18 5:5 | 122:19 |
| 53:4 | 117:5 | 207:14 | 301:1,2 | 74:6 | 231:3 |
| 54:12,14 | 118:4 | 209:21 | 301:14 | 76:18 | 247:11 |
| 57:4,15 | 119:13 | 210:1 | 301:19 | 151:21 | 251:21 |
| 57:21 | 120:3,11 | 213:6,12 | 302:3 | 152:22 | 282:16 |
| 58:13 | 121:6,6 | 214:8,9 | 304:2,10 | 181:3 | 283:6 |
| 59:7,8 | 121:9,12 | 216:2,12 | 304:16 | **lawyer** | 284:16 |
| 59:13 | 122:1 | 217:3,12 | 304:21 | 266:14 | **legs** |
| 62:6 | 124:5,8 | 218:13 | **knowing** | 270:8 | 220:19 |
| 63:1,3 | 127:3 | 219:8,10 | 48:4 | **lawyers** | 220:20 |
| 65:4,5 | 130:19 | 223:8,11 | 52:14,15 | 5:6,16 | **Leinen...** |
| 65:10,16 | 130:20 | 223:13 | 208:2 | 6:3,7,13 | 1:6 |
| 65:18 | 133:11 | 225:6 | 233:1 | 8:15 | **length** |
| 66:7,22 | 137:13 | 226:8,19 | **knowledge** | 9:14,18 | 79:16 |
| 67:20 | 139:15 | 228:6 | 75:4 | 9:19 | **lengthy** |
| 68:8,9 | 139:19 | 245:18 | 79:1,4 | 10:9 | 17:16 |
| 70:5 | 140:10 | 247:4 | 88:4 | 45:20 | **lens** 28:21 |

Stevan Vidljinovic
September 4, 2013

338

| | | | | | |
|---|---|---|---|---|---|
| **lesser** | 180:11 | 153:11 | 151:21 | 167:14 | 82:18 |
| 190:15 | 186:14 | 227:5 | **located** | 215:6 | 87:18 |
| 191:2 | **License** | 242:13 | 61:22 | 225:4 | 95:14 |
| **let's** | 2:2 | 242:14 | 62:15 | 249:6,10 | 107:15 |
| 45:17 | 308:20 | 242:18 | 66:12 | 252:11 | 113:13 |
| 48:6 | **licensed** | **lines** 84:2 | 74:8,12 | 269:21 | 182:17 |
| 50:15 | 98:17 | 206:7 | 80:20 | 283:5,9 | 223:21 |
| 55:10 | **lied** 8:17 | **list** | 155:13 | 284:13 | 235:15 |
| 91:5 | **lieute...** | 298:14 | 201:9,20 | 291:13 | 265:20 |
| 119:15 | 13:12 | **listed** 3:7 | 202:13 | 300:22 | 287:18 |
| 119:16 | 17:1 | 191:6,10 | **location** | **look** 34:18 | **looking** |
| 120:17 | 30:22 | 191:11 | 15:2,10 | 44:18 | 40:11,20 |
| 120:21 | 31:10 | **listen** | 16:3,5 | 45:7,9 | 44:6 |
| 121:19 | 60:15 | 38:21 | 41:7 | 47:19 | 46:11 |
| 130:3 | 145:21 | 40:4 | 52:5,7 | 50:15 | 48:15 |
| 149:8 | 148:11 | 114:21 | 52:13,21 | 53:11 | 72:10 |
| 169:3 | 148:18 | 126:17 | 54:2 | 73:20 | 80:17 |
| 173:7,12 | 149:5 | **listening** | 55:2 | 91:5 | 182:20 |
| 176:4,10 | 231:5 | 186:6 | 58:1,2,5 | 92:14 | 203:8 |
| 180:11 | 287:4 | 196:18 | 58:7 | 95:13 | 244:19 |
| 184:12 | **life** 46:3 | 197:5 | 60:21 | 98:7 | 244:22 |
| 196:4 | 79:3 | 293:12 | 61:19 | 148:3 | 285:8 |
| 198:14 | 92:15 | **litiga...** | 62:11 | 151:20 | 296:9 |
| 200:5 | 126:11 | 158:22 | 86:4,10 | 153:11 | **looks** 35:1 |
| 240:12 | 163:15 | **little** | 87:7 | 155:8 | 35:13 |
| 242:13 | 262:5 | 4:21 5:4 | 201:8 | 158:17 | 37:8 |
| 255:20 | **lift** | 50:15 | 210:1 | 174:19 | 41:6,14 |
| 255:21 | 212:15 | 77:16 | 225:1,10 | 174:20 | 44:7 |
| 276:2 | **light** 26:4 | 83:7 | 241:2 | 183:19 | 46:11 |
| **lethal** | 55:13 | 86:22 | **long** 10:14 | 184:12 | 47:15 |
| 143:8 | **lighter** | 87:18 | 11:1,19 | 198:14 | 48:7,16 |
| 172:22 | 246:3 | 118:19 | 14:8 | 227:9 | 50:2,16 |
| 173:2 | **lightly** | 189:15 | 15:11 | 232:7 | 51:6 |
| **letter** | 134:13 | 189:20 | 22:19 | 238:10 | 62:16,18 |
| 174:21 | 135:17 | 191:7 | 23:5 | 240:12 | 73:4 |
| 191:9 | 135:20 | 258:15 | 55:4,13 | 242:13 | 88:10 |
| **letters** | 135:21 | 265:8 | 60:18 | 243:2 | 147:18 |
| 191:7,7 | **limit** | 272:12 | 100:6 | 246:10 | 151:16 |
| 191:9 | 160:7 | 276:2 | 105:21 | 260:5 | 175:14 |
| **level** 40:5 | 186:13 | **lived** | 106:5 | 269:3 | 224:11 |
| 40:6 | **limita...** | 247:1 | 119:1 | 270:13 | 240:7,11 |
| 133:16 | 39:8 | **loaded** | 123:11 | 274:21 | **Lopez** 1:3 |
| 136:17 | **limita...** | 221:17 | 126:7 | 280:6 | 1:10 |
| 168:6 | 7:2 | **loan** 30:5 | 138:20 | 285:1 | 60:11 |
| 169:21 | 52:10 | 291:9 | 138:22 | **looked** | 70:6 |
| 171:3 | **line** 137:1 | **local** | 139:1,6 | 48:19 | 71:9,16 |

Stevan Vidljinovic
September 4, 2013

339

| | | | | | |
|---|---|---|---|---|---|
| 75:20 | 124:3,15 | 220:8 | 297:1 | 258:15 | 277:17 |
| 76:1 | 124:20 | 221:15 | 298:17 | **lowest** | 302:12 |
| 77:13,17 | 125:5,5 | 221:17 | 299:15 | 169:21 | **male** 16:15 |
| 77:19 | 125:8,10 | 222:14 | 300:3,21 | 170:2 | 16:16 |
| 79:7 | 125:18 | 225:2 | 301:10 | **LUIS** 1:10 | 37:9 |
| 80:5,12 | 127:5,22 | 231:18 | 304:3,17 | **lunch** | 38:13 |
| 81:6 | 143:6,20 | 233:6,14 | 305:5,8 | 33:12 | 44:7 |
| 82:11 | 144:1,7 | 233:21 | 305:10 | **LUQUE-...** | 64:11 |
| 83:16 | 151:17 | 234:14 | 305:14 | 1:10 | 77:22 |
| 85:4,13 | 155:19 | 238:1 | 305:22 | **lying** 8:16 | 82:8,14 |
| 87:5 | 156:4,13 | 243:19 | 306:6 | ———— | 107:21 |
| 88:3 | 156:17 | 244:20 | **Lopez's** | **M** | 210:3 |
| 89:6 | 162:11 | 245:1,13 | 109:13 | **M** 2:13 | 236:7 |
| 93:21 | 163:11 | 246:5,8 | 127:3 | **machine** | **males** |
| 96:1,8 | 164:4,7 | 246:17 | 144:18 | 6:15,21 | 16:20 |
| 96:16,20 | 164:20 | 247:1,6 | 144:21 | **Magazines** | **malfun...** |
| 97:8,17 | 164:22 | 248:4,20 | 166:10 | 102:11 | 29:9 |
| 100:2,6 | 166:13 | 249:4,11 | 208:7 | **Magist...** | **man** 71:2 |
| 100:10 | 168:17 | 249:17 | 209:11 | 1:8 | 71:11 |
| 101:12 | 169:8 | 250:12 | 276:9 | **mail** | 72:3 |
| 101:16 | 170:15 | 251:11 | 282:16 | 287:13 | 77:18 |
| 102:4 | 177:10 | 251:17 | 287:21 | **main** | 79:1 |
| 108:4 | 177:20 | 251:20 | 299:1 | 170:16 | 82:19,21 |
| 109:8,19 | 177:21 | 254:4,8 | 304:6 | **maintain** | 83:2,4 |
| 109:22 | 177:22 | 254:12 | **lose** 141:9 | 119:18 | 83:12,14 |
| 110:12 | 178:2,4 | 261:18 | 156:2 | 176:11 | 83:19 |
| 110:15 | 178:6,12 | 265:2 | **losing** | **majority** | 84:7,8 |
| 110:21 | 179:5,12 | 266:5 | 156:10 | 239:3 | 84:19 |
| 111:12 | 180:1,9 | 267:10 | **lost** | **making** | 85:15 |
| 113:13 | 185:15 | 267:13 | 141:19 | 7:22 | 107:16 |
| 115:6,14 | 186:1,19 | 270:17 | **lot** 10:9 | 47:14 | 112:5 |
| 115:17 | 187:8,9 | 272:22 | 24:8 | 51:22 | 117:18 |
| 115:18 | 187:9 | 277:12 | 86:18 | 116:7 | 127:2 |
| 115:20 | 190:10 | 277:14 | 131:1 | 117:11 | 142:8 |
| 117:20 | 190:12 | 278:6 | 230:14 | 117:14 | 177:2 |
| 117:21 | 200:20 | 281:21 | **loud** 204:5 | 117:15 | 181:20 |
| 118:6,22 | 202:3,12 | 283:18 | 208:15 | 117:15 | 216:15 |
| 119:5,9 | 204:3 | 283:21 | **louder** | 118:8,12 | 217:5 |
| 119:12 | 205:4 | 284:7,20 | 118:11 | 138:17 | 236:14 |
| 119:18 | 206:9,22 | 288:8 | **loudly** 7:5 | 186:10 | 236:19 |
| 119:21 | 208:15 | 289:18 | 118:9 | 190:20 | 237:11 |
| 120:4,8 | 209:19 | 290:9 | **lower** | 209:3 | 243:15 |
| 120:12 | 212:15 | 294:22 | 171:9,15 | 241:5 | 245:14 |
| 120:14 | 216:8 | 295:2 | 172:19 | 251:5 | 247:21 |
| 121:11 | 218:1,6 | 296:1,3 | 173:2 | 254:17 | 248:3 |
| 121:15 | 218:9 | 296:6,16 | 193:9 | 256:10 | 253:5 |

Stevan Vidljinovic
September 4, 2013

| | | | | | |
|---|---|---|---|---|---|
| 254:18 | 297:4,6 | 110:5 | 70:11 | 91:6 | 234:3,5 |
| 256:21 | 297:21 | 122:4,22 | 71:3,12 | 176:19 | 234:9,11 |
| 257:7 | **marketed** | 133:6 | 71:22 | 181:9 | 234:17 |
| 263:6,19 | 160:7 | 135:22 | 75:20 | 205:11 | 234:22 |
| 265:11 | **MARS** 26:4 | 174:9 | 85:7 | 243:5,7 | 235:1,5 |
| 265:16 | **mass** | 186:5 | 88:20 | 243:11 | **mention** |
| 266:9 | 127:22 | 189:10 | 89:1,16 | 258:16 | 42:9 |
| 288:13 | 136:13 | 192:5 | 90:3 | 258:17 | **mentioned** |
| 289:8 | 136:14 | 203:18 | 91:8,10 | 258:22 | 115:10 |
| 290:7 | 136:16 | 213:9 | 92:20 | **member's** | 215:14 |
| **man's** | 137:2,11 | 223:15 | 97:18 | 198:2 | **message** |
| 246:19 | 144:20 | 231:22 | 98:2,14 | **members** | 117:16 |
| 280:20 | 154:12 | 257:1,3 | 98:15,19 | 76:6 | **messages** |
| **mandated** | 202:19 | 259:15 | 98:21 | 88:22 | 34:3 |
| 177:15 | **mats** | 273:11 | 99:3,7 | 90:17 | **met** 65:16 |
| **manipu...** | 132:18 | 273:12 | 99:15 | 92:17 | 65:19 |
| 295:15 | 132:19 | 275:19 | 100:4,11 | 161:4,6 | 79:1 |
| **manned** | **matter** 6:2 | 279:8 | 108:11 | 174:21 | **method** |
| 43:1 | 8:17 | 282:1 | 109:11 | 176:11 | 140:4 |
| 302:14 | 10:10 | 291:8 | 111:13 | 176:17 | 207:20 |
| **manner** | 22:21 | **meaning** | 115:8,15 | 181:12 | 279:22 |
| 109:18 | 61:2 | 175:15 | 164:22 | 251:9 | **mid-30's** |
| 109:21 | 101:19 | 256:15 | 170:16 | 300:9 | 79:12 |
| 119:2 | 123:18 | **means** 5:21 | 182:7 | **memory** | **middle** |
| 205:5 | 127:17 | 33:5 | 199:8 | 83:11 | 183:20 |
| 231:9 | 188:16 | 36:18 | 205:12 | 224:22 | 196:21 |
| 256:11 | 247:1 | 37:2,10 | 218:16 | 226:13 | 243:19 |
| **manners** | 249:12 | 52:9 | 234:13 | 274:20 | 244:17 |
| 165:1 | 258:19 | 136:16 | 234:16 | 275:5 | 245:2 |
| **Mannheim** | **matters** | 160:7 | 234:18 | 277:11 | **middle...** |
| 2:10 | 5:6 6:14 | 184:22 | 235:9 | **men** 63:5 | 78:1 |
| **manning** | 12:21 | 196:3 | 238:14 | 93:20 | 107:15 |
| 42:21 | 39:19 | 226:17 | 238:19 | 102:13 | 107:21 |
| **manpower** | **max** 106:8 | 260:2 | 239:3 | 187:1 | **Midnight** |
| 95:22 | **maximum** | 282:22 | 252:1 | **mental** | 21:21 |
| **MANUEL** 1:8 | 27:3 | **meant** 25:6 | 253:2 | 157:6 | 22:1 |
| **manufa...** | **mean** 5:20 | 222:4 | 285:18 | 207:21 | 292:19 |
| 152:5 | 9:4 10:3 | 254:8 | 301:12 | 232:9,14 | **mild** 119:2 |
| 156:22 | 10:5 | **measure** | 304:7,11 | 232:18 | **mildly** |
| **Mark** 1:11 | 27:9 | 122:15 | **medicine** | 232:20 | 161:22 |
| 287:4 | 37:22 | **measured** | 238:20 | 232:22 | **million** |
| **marked** | 38:5 | 245:13 | **meeting** | 233:6,8 | 262:5 |
| 25:8 | 42:16 | **mechanism** | 31:12 | 233:10 | **mimic** |
| 256:6 | 43:9 | 284:19 | **Melrose** | 233:14 | 117:13 |
| 268:19 | 65:4 | **medical** | 2:10 | 233:15 | **mind** 62:15 |
| 291:18 | 95:13 | 69:19 | **member** | 233:22 | 91:14,21 |

Stevan Vidljinovic
September 4, 2013

| | | | | | |
|---|---|---|---|---|---|
| 107:14 | 266:1 | 59:19 | **mouth** | **moves** | **N** |
| 107:18 | **misspoke** | 68:19 | 118:13 | 193:11 | **N** 2:9  3:1 |
| 126:19 | 261:21 | 72:22 | 231:19 | **movie** | **name** 4:13 |
| 141:22 | **misstated** | 123:17 | **move** | 142:6,16 | 4:17 |
| 225:16 | 61:10 | 128:15 | 104:17 | **moving** | 16:12 |
| 256:2 | **misstates** | 129:1,5 | 113:19 | 119:20 | 31:1 |
| 273:7 | 58:18 | 162:15 | 114:18 | 123:3 | 43:2 |
| 287:16 | 63:7 | 163:14 | 118:5,9 | 125:6 | 51:12 |
| **minds** 8:16 | 89:7 | 183:2 | 119:19 | 212:9 | 57:16 |
| **mine** 19:7 | 113:2 | 198:21 | 120:7 | 220:16 | 157:4 |
| 183:6 | 157:20 | 269:4 | 122:5 | **Mt** 213:20 | 177:11 |
| **minimum** | 163:1 | 282:6 | 123:22 | 252:2 | 223:8 |
| 92:18 | 173:6 | **moments** | 124:7,9 | 253:2 | 224:14 |
| **minute** | 184:19 | 225:15 | 126:1,15 | 266:9 | 236:19 |
| 54:7 | 187:5 | 300:5 | 128:1 | 267:8 | 236:22 |
| 100:21 | 201:4 | **MONICA** 1:9 | 143:10 | 287:7,14 | 243:18 |
| 106:8,8 | 225:11 | **monitor** | 165:19 | 288:12 | 243:19 |
| 106:9,11 | 273:3 | 28:20,21 | 180:3 | 297:1 | 244:14 |
| 120:5,13 | 277:3 | 38:19 | 188:14 | 299:15 | 244:16 |
| 123:13 | **missta...** | **months** | 192:22 | 305:10 | 244:16 |
| 146:10 | 194:4 | 11:22 | 194:8 | 305:16 | 245:1,1 |
| 173:9 | **mistake** | 14:21 | 195:2,13 | 306:1,9 | 252:14 |
| 192:22 | 128:16 | 22:21 | 195:22 | **multiple** | 252:15 |
| 251:20 | 229:2 | 23:1 | 211:3,5 | 124:22 | 264:21 |
| 251:21 | **mistaken** | 32:9 | 263:12 | 139:20 | 265:6 |
| 251:22 | 279:7 | 158:22 | 274:9,10 | **mumbling** | 268:15 |
| **minutes** | **mistak...** | 267:9 | 274:11 | 116:11 | 289:1 |
| 48:20 | 13:8 | 273:15 | 274:13 | 271:3,22 | 302:22 |
| 50:16,21 | **misund...** | 277:19 | 274:15 | 272:16 | **named** |
| 61:2,2,3 | 25:5 | 278:3 | 275:11 | 273:19 | 236:19 |
| 100:3,16 | **model** 20:3 | **morning** | 290:11 | 275:4 | 236:22 |
| 123:13 | 20:5 | 22:5 | 304:20 | **municipal** | 275:15 |
| 240:8 | 146:11 | 35:15,22 | **moved** | 1:14 | **names** 65:2 |
| 249:12 | 167:8,15 | 36:11 | 119:17 | 90:11,20 | 65:8,10 |
| 283:12 | 167:17 | 38:11 | 120:8 | 91:4 | 65:12 |
| 300:11 | 171:18 | 41:5 | 124:8 | 97:22 | 303:5 |
| 301:3 | 173:19 | 51:8 | 125:6 | 98:8 | **narcotic** |
| **mischa...** | 193:9 | 54:5,21 | **movement** | **muscle** | 254:1,9 |
| 117:6 | 257:19 | 55:12 | 187:2 | 152:8 | 254:12 |
| 164:1 | 258:11 | 79:2 | 198:3 | 156:22 | 254:18 |
| **mispro...** | **models** | 147:20 | 204:1 | **muscles** | 298:19 |
| 32:16 | 190:21 | 240:15 | 212:4,5 | 141:10 | 303:15 |
| 43:2 | 191:1 | **motion** | 212:6 | 156:2,10 | **nature** |
| **misread** | **modes** | 123:3 | 220:22 | **muzzle** | 12:17 |
| 230:12 | 191:3 | 186:13 | **movements** | 138:8 | 54:14 |
| **missing** | **moment** | 188:21 | 106:20 | | |

Stevan Vidljinovic
September 4, 2013

342

| | | | | | |
|---|---|---|---|---|---|
| 187:4,19 | 81:12 | 96:7 | 32:3,8 | 242:15 | **normally** |
| 194:18 | 83:12 | 97:13 | 35:6 | 242:16 | 23:15 |
| 255:1 | 100:10 | 125:5 | 39:15 | 243:9 | 43:6 |
| 256:14 | 103:22 | 150:16 | 42:22 | 249:7 | 49:15 |
| 262:20 | 109:11 | 150:16 | 47:4 | 250:11 | 52:8 |
| **near** 15:5 | 111:13 | 158:20 | 50:13 | 250:12 | 56:8 |
| 16:1,2,4 | 115:8,15 | 159:9 | 51:18,19 | 252:22 | 67:7 |
| **neared** | 241:21 | 161:7 | 52:3,15 | 254:11 | 90:17 |
| 187:9 | 284:6 | 170:15 | 53:6,15 | 254:17 | 104:5 |
| **nearest** | 289:4 | 179:19 | 55:10 | 258:20 | 141:7 |
| 298:12 | **needs** 9:9 | 185:13 | 57:8,19 | 260:19 | 171:4 |
| 304:1 | 29:5 | 186:2 | 58:17 | 262:8 | 172:3,13 |
| **nearing** | 39:6 | 195:4 | 64:17,21 | 264:11 | 172:15 |
| 125:9 | 55:17 | 199:2,22 | 65:12,14 | 278:6 | 280:22 |
| **necess...** | 71:14,15 | 200:1,4 | 65:15 | 289:9,9 | **north** 2:10 |
| 25:17 | 82:6 | 201:6 | 67:6 | 300:4 | 2:14,19 |
| 27:9 | 83:10 | 205:19 | 68:14,17 | 302:17 | 15:5 |
| 92:5 | **negate** | 205:22 | 72:15 | 302:19 | 16:1,2,4 |
| 143:16 | 269:11 | 210:10 | 76:15 | 303:4,8 | 29:21 |
| 213:5 | 269:16 | 210:15 | 79:2 | 303:12 | 31:19 |
| 215:3 | 269:19 | 210:21 | 80:1,3,8 | 304:4 | 130:4 |
| 231:22 | **negative** | 220:10 | 80:11 | **nine** | **Northern** |
| **necessary** | 10:5 | 220:11 | 89:6,12 | 230:19 | 1:1 5:12 |
| 92:18 | 276:15 | 237:22 | 93:5 | **nine-hour** | **Notarial** |
| **neck** 137:1 | **neither** | 249:15 | 96:1 | 33:11 | 308:16 |
| **need** 5:21 | 7:11 | 251:7 | 97:6 | **NMI** 152:9 | **Notary** 4:6 |
| 9:9,12 | 108:1,4 | 256:21 | 99:20 | 152:11 | 270:6 |
| 52:9 | 186:22 | 263:6,19 | 125:12 | **Nobody's** | 309:20 |
| 68:12,15 | 190:7 | 264:1,2 | 127:6 | 165:14 | **note** 53:13 |
| 69:8,18 | 192:18 | 264:4,7 | 145:21 | **nod** 10:13 | 241:10 |
| 72:11 | 193:15 | 265:22 | 146:3 | **noises** | 242:4,5 |
| 73:1 | 219:2 | 266:5 | 149:4 | 118:12 | **notebook** |
| 98:22 | **nervous** | 269:7 | 162:11 | **non-dr...** | 241:4 |
| 103:5 | 141:14 | 279:5 | 177:17 | 24:1 | **notes** 7:22 |
| 118:9 | **network** | 288:11 | 185:19 | **non-re...** | 114:22 |
| 180:13 | 33:17 | 288:20 | 187:1 | 126:2 | 207:21 |
| 181:3 | 42:2 | 301:21 | 190:17 | 143:12 | 207:21 |
| 182:7 | **neurom...** | 302:9 | 210:12 | 211:5 | 223:12 |
| 216:21 | 152:8,17 | 305:8 | 216:14 | **normal** | 223:14 |
| 217:3 | **never** | **NFI** 37:10 | 221:12 | 118:10 | 241:5 |
| 245:8 | 12:10 | 37:21 | 227:22 | 294:18 | **notice** |
| 293:22 | 30:3 | **night** 25:1 | 229:8 | 294:21 | 75:8 |
| 297:10 | 43:7 | 25:2 | 231:2,3 | 295:3 | 103:16 |
| **needed** | 57:4,5 | 29:18 | 232:3 | 300:4,7 | 106:21 |
| 67:1 | 65:11 | 30:2,6 | 233:5,13 | 305:7 | 175:5 |
| 71:18 | 80:1 | 31:15 | 233:21 | 306:2 | 204:20 |

Stevan Vidljinovic
September 4, 2013

| | | | | | |
|---|---|---|---|---|---|
| 204:22 | 237:15 | 13:3 | 196:2,22 | 74:22 | 151:3,7 |
| 266:20 | 237:17 | 19:15 | 197:10 | 76:19 | 154:2 |
| 267:12 | 237:21 | 27:5 | 208:10 | 78:8,16 | 155:16 |
| 296:18 | 238:2,6 | 35:16 | 222:5 | 78:17 | 157:9,11 |
| 296:22 | 247:9,10 | 36:12 | 250:15 | 81:20,21 | 157:18 |
| noticed | 257:17 | 37:3,14 | 267:14 | 82:10 | 157:20 |
| 24:19 | 257:19 | 38:6,15 | 277:6 | 85:1,20 | 157:22 |
| 111:20 | 258:4,4 | 39:13 | 278:14 | 87:1,2,3 | 159:8,11 |
| noticing | 258:6,8 | 40:14 | 278:20 | 89:7,8 | 159:21 |
| 197:20 | 258:11 | 41:10 | 289:10 | 89:18 | 159:22 |
| notifi... | 258:11 | 42:3,14 | objected | 90:6,15 | 160:19 |
| 259:3,6 | 259:11 | 44:10 | 91:10 | 91:15 | 163:1,3 |
| notified | 260:17 | 45:4,3 | objecting | 92:7 | 163:6 |
| 13:5 | 260:18 | 46:8,18 | 149:22 | 93:22 | 164:9 |
| 260:1,3 | 261:17 | 47:7 | objection | 95:7,8 | 166:8,16 |
| 260:9 | 261:20 | 48:9,21 | 5:20 | 95:16,17 | 166:19 |
| notify | 261:22 | 49:19 | 12:13,14 | 96:3 | 167:10 |
| 21:6 | 262:1 | 50:5 | 12:22 | 99:11,12 | 169:10 |
| 259:7 | numbered | 56:3,6 | 13:2 | 100:5,17 | 170:12 |
| November | 191:5 | 66:4 | 23:18 | 100:18 | 170:14 |
| 291:17 | numbers | 69:2 | 27:15,17 | 102:20 | 173:8 |
| number | 34:7,10 | 70:17 | 28:2,3 | 102:22 | 178:2,3 |
| 20:1,3,5 | 38:4 | 74:18 | 30:7,8 | 109:16 | 178:11 |
| 24:10 | 161:15 | 76:11 | 31:6 | 110:11 | 178:13 |
| 25:15,18 | 257:15 | 84:22 | 33:9 | 110:13 | 179:9 |
| 27:3 | 258:1 | 86:6 | 36:13 | 110:19 | 182:1 |
| 30:9 | numeral | 90:14 | 38:22 | 110:20 | 184:5,19 |
| 92:9 | 191:4,8 | 91:16 | 39:1 | 110:20 | 186:16 |
| 141:1,4 | 191:9 | 92:22 | 40:1,2 | 110:22 | 186:17 |
| 146:1,4 | nurse | 132:4 | 43:15,17 | 113:2,3 | 187:4,20 |
| 150:15 | 205:13 | 149:10 | 44:12 | 114:13 | 188:4,22 |
| 157:6 | 254:16 | 150:9 | 49:1 | 114:14 | 190:18 |
| 173:18 | nurses | 153:7,16 | 51:4 | 116:16 | 194:5 |
| 182:18 | 213:20 | 155:15 | 52:22 | 117:2,8 | 195:7 |
| 191:8 | 249:12 | 159:6 | 55:8 | 122:12 | 196:12 |
| 227:13 | 285:11 | 160:13 | 56:5,15 | 122:13 | 199:11 |
| 227:14 | 287:12 | 162:2 | 57:11 | 122:14 | 199:13 |
| 227:18 | _____ O _____ | 163:16 | 58:18,19 | 126:9,10 | 201:4,5 |
| 228:16 | | 163:22 | 59:5,16 | 129:20 | 202:9,10 |
| 228:17 | O-r-e-... | 164:12 | 59:17 | 132:9 | 204:7,9 |
| 229:3,4 | 252:14 | 166:18 | 63:7,8,9 | 133:1 | 204:14 |
| 230:11 | oath 4:4 | 173:5 | 65:3 | 146:18 | 204:15 |
| 230:11 | 269:12 | 174:3,8 | 66:20 | 147:6,8 | 206:2,3 |
| 237:5,6 | 309:7 | 182:14 | 69:3 | 148:9 | 208:18 |
| 237:9,10 | object | 184:2 | 70:12 | 150:15 | 208:20 |
| 237:15 | 12:20 | 191:19 | 71:5,6 | 150:21 | 217:7,8 |

Stevan Vidljinovic
September 4, 2013

344

| | | | | | |
|---|---|---|---|---|---|
| 218:2 | 288:17 | 212:14 | 19:6 | 294:8 | 68:2 |
| 219:18 | 290:3,4 | 235:20 | 21:2 | **offender** | 69:22 |
| 219:20 | **objective** | 256:15 | 155:3 | 236:6 | 70:4,10 |
| 221:2,21 | 69:18 | 271:3,6 | **occupa...** | 258:16 | 70:19 |
| 222:1,6 | 71:20 | 272:15 | 10:21 | **offend...** | 71:7,11 |
| 222:16 | 72:1 | 273:18 | **occurred** | 238:11 | 71:14,14 |
| 225:11 | 77:2 | 274:22 | 8:5 | 238:15 | 72:2,5,7 |
| 225:12 | 96:7 | 275:4 | 68:13 | 239:5 | 72:13,13 |
| 225:22 | 164:21 | 276:8 | 86:11 | **offense** | 72:19 |
| 226:1 | 170:16 | 290:6,9 | 219:12 | 4:20 | 73:3,15 |
| 249:22 | 185:22 | 296:15 | 226:22 | **offered** | 74:3 |
| 266:3 | 199:2,7 | **obstinate** | 227:8 | 74:14 | 77:10 |
| 267:22 | 218:15 | 161:22 | 241:2 | 84:16 | 78:4 |
| 271:18 | 234:13 | **obstru...** | 262:16 | 183:22 | 79:6 |
| 271:19 | 234:14 | 110:17 | 262:21 | **officer** | 81:5,12 |
| 273:2,4 | 237:22 | **obtained** | **occurr...** | 1:17 3:2 | 83:10,18 |
| 276:14 | 304:5,5 | 236:16 | 35:1 | 5:1 8:10 | 83:18,21 |
| 276:22 | **objects** | 244:18 | 42:17 | 10:22 | 85:4,12 |
| 278:22 | 89:1 | 244:21 | 45:10 | 11:1,11 | 85:13,14 |
| 282:13 | 99:3 | 245:18 | 74:8,12 | 12:2,11 | 88:3 |
| 283:7,8 | 270:20 | 246:22 | 203:11 | 13:2 | 90:2 |
| 288:3,5 | 286:21 | 247:6 | 209:19 | 14:19 | 91:22 |
| 288:15 | **obliga...** | 252:1 | 222:19 | 19:9 | 92:5,12 |
| 290:13 | 23:9 | 253:2 | 223:9 | 22:13,14 | 93:9,10 |
| 300:12 | **obliged** | 267:3 | 224:19 | 23:5 | 93:10,11 |
| 301:4,5 | 217:6 | **obviously** | 226:11 | 26:17 | 93:11 |
| 301:15 | **OBR** 262:14 | 38:21 | 233:4 | 32:8,12 | 94:22 |
| 301:17 | **observ...** | 225:3 | 242:6 | 34:21 | 95:1 |
| 304:13 | 197:3 | 252:5 | 246:11 | 36:6 | 96:9,10 |
| 304:15 | 275:18 | **OC** 171:13 | 246:17 | 39:6 | 96:10,11 |
| **object...** | 277:16 | 171:16 | 259:20 | 40:7 | 97:10,14 |
| 37:18 | 296:10 | 172:2,5 | 260:10 | 43:1,3 | 98:9,14 |
| 41:12 | 298:22 | 172:16 | 266:12 | 44:6 | 98:18 |
| 86:7 | **observ...** | 172:18 | 291:20 | 45:18 | 100:8,9 |
| 91:19 | 296:19 | 192:16 | 292:10 | 49:7,9 | 102:1,2 |
| 96:5 | **observe** | 192:17 | 293:2 | 49:12,12 | 106:3,4 |
| 116:18 | 272:21 | 193:7 | 296:20 | 49:16,21 | 106:13 |
| 132:11 | 273:9,9 | 259:3,4 | 298:11 | 51:12,13 | 108:7 |
| 158:3 | **observed** | **occasion** | 303:22 | 51:16,22 | 109:9,15 |
| 159:14 | 107:1 | 67:12 | **occurs** | 52:8,16 | 120:2,10 |
| 160:18 | 124:17 | 172:7 | 33:7 | 55:17 | 121:5,10 |
| 162:5,6 | 156:1,3 | **occasi...** | **OEMC** 49:4 | 60:1,3,5 | 121:17 |
| 187:6 | 159:16 | 24:4 | 72:17 | 60:7,9 | 123:12 |
| 268:13 | 165:17 | 26:17 | 148:13 | 60:11 | 124:2 |
| 271:1 | 189:20 | **occasions** | 259:9,14 | 65:22 | 127:13 |
| 287:3 | 190:5 | 7:17 | 259:16 | 67:2,21 | 133:2 |

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

| | | | | | |
|---|---|---|---|---|---|
| 142:20 | 235:21 | 309:14 | 166:14 | 73:2 | 298:16 |
| 147:4,17 | 236:2,12 | **officer's** | 170:21 | 90:9 | **operation** |
| 160:11 | 236:13 | 224:10 | 176:18 | 115:1,8 | 21:22 |
| 167:19 | 236:16 | 226:18 | 177:6 | 116:1 | 26:5 |
| 174:7 | 239:20 | 227:19 | 179:7 | 120:12 | 27:4 |
| 177:7,8 | 243:8,21 | 227:21 | 185:18 | 126:18 | **operat...** |
| 177:8,9 | 245:3,7 | 229:22 | 190:8 | 126:21 | 28:17 |
| 177:13 | 245:9,17 | 231:4 | 196:7,9 | 128:7,8 | **operat...** |
| 177:16 | 247:7 | 239:14 | 214:7 | 143:13 | 73:15 |
| 177:18 | 251:16 | 260:12 | 215:14 | 175:8 | 259:15 |
| 185:20 | 252:17 | 306:12 | 217:22 | 182:19 | **operative** |
| 187:7 | 252:19 | **officers** | 219:1,5 | 182:21 | 207:19 |
| 188:12 | 252:19 | 1:13 | 219:8 | 188:15 | 280:14 |
| 188:20 | 252:21 | 2:17 | 220:12 | 190:6 | **opinion** |
| 197:16 | 253:7 | 11:14 | 222:4,8 | 192:11 | 162:21 |
| 200:12 | 263:8 | 15:16,19 | 222:13 | 197:18 | 189:3 |
| 200:13 | 264:18 | 19:5,9 | 223:5 | 232:13 | 239:9 |
| 210:17 | 264:19 | 19:13 | 227:13 | 274:13 | 298:18 |
| 211:19 | 265:12 | 20:14 | 227:18 | 274:15 | **opport...** |
| 213:3 | 267:16 | 43:5 | 227:19 | 290:7,10 | 6:5  9:11 |
| 215:17 | 270:19 | 47:11 | 227:22 | 291:8 | 189:6 |
| 215:18 | 271:2,6 | 49:10 | 228:3,17 | 294:13 | 195:21 |
| 215:18 | 271:7,10 | 51:20 | 229:3,4 | **old** 37:9 | **opposed** |
| 215:19 | 271:12 | 52:2 | 230:9 | 38:13 | 106:2 |
| 215:19 | 272:1 | 66:7 | 239:2 | 44:7 | 172:22 |
| 215:19 | 276:4 | 85:10 | 243:11 | 73:17 | 271:20 |
| 216:13 | 277:14 | 94:3,20 | 248:9,15 | **on-line** | **option** |
| 218:5,18 | 278:17 | 95:5,11 | 250:10 | 73:12 | 137:20 |
| 219:15 | 278:19 | 97:3,6 | 250:17 | **on-the...** | 181:1 |
| 219:21 | 280:10 | 99:8 | 261:18 | 101:21 | 193:22 |
| 219:22 | 282:1,5 | 102:8,18 | 264:3,15 | **once** 55:22 | 194:7 |
| 220:4,6 | 282:8,10 | 103:2,17 | 271:14 | 138:12 | 195:12 |
| 220:7,9 | 282:11 | 103:19 | 281:20 | 146:14 | 232:17 |
| 224:15 | 282:15 | 104:9,11 | 292:9 | 285:20 | 235:16 |
| 227:16 | 284:9,11 | 109:12 | 305:21 | 295:14 | 235:22 |
| 228:13 | 286:20 | 129:8,15 | **OFFICES** | **one's** | **options** |
| 228:21 | 287:3 | 130:5 | 2:9 | 140:20 | 171:22 |
| 228:22 | 289:2,4 | 132:21 | **official** | **one-day** | 180:12 |
| 230:16 | 290:20 | 133:3 | 1:13 | 17:5,9 | 180:14 |
| 230:22 | 292:3,6 | 146:21 | **oh** 10:2 | **ones** 294:7 | 186:11 |
| 233:7 | 298:7 | 149:14 | 101:1 | **open** 209:6 | 191:10 |
| 234:2 | 300:18 | 153:11 | 130:12 | 248:21 | 233:3 |
| 235:11 | 302:1,6 | 153:14 | 133:14 | 249:2 | 235:16 |
| 235:13 | 305:11 | 155:11 | 229:15 | 266:21 | 238:21 |
| 235:14 | 306:2,16 | 158:8,21 | **okay** 21:14 | 285:7 | **ordeal** 9:5 |
| 235:20 | 308:4 | 161:21 | 34:15 | **Operating** | **order** 3:7 |

Stevan Vidljinovic
September 4, 2013

346

| | | | | | |
|---|---|---|---|---|---|
| 73:4,7 | 243:22 | **overwe...** | 193:10 | 70:3 | 207:22 |
| 73:17 | 245:9 | 95:15 | 286:12 | 87:12 | 213:16 |
| 75:5 | 246:22 | ———— | 286:14 | 88:7,13 | 213:22 |
| 84:21 | 252:17 | **P** | **painful** | 88:17 | 217:2 |
| 87:17,19 | 252:18 | **P** 2:6,6 | 152:9 | 89:10 | 227:11 |
| 87:20,22 | 264:20 | **P.M** 226:12 | **pains** | 91:6 | 229:2 |
| 88:1,5 | 265:12 | 292:20 | 37:10 | 93:13,14 | 280:20 |
| 91:13 | 289:3 | 292:21 | 38:14 | 94:3 | **partic...** |
| 138:2 | **origin...** | 293:3,4 | 44:8 | 149:15 | 298:14 |
| 169:8 | 81:13 | 293:5,10 | 82:21 | 209:10 | **partic...** |
| 173:15 | 192:3 | **pace** 86:22 | 83:4,15 | 209:15 | 8:7 20:5 |
| 173:18 | 255:1 | 104:15 | **pair** | 209:18 | 20:15,17 |
| 174:4,5 | 289:2 | **pacing** | 206:18 | 210:6 | 22:6,9 |
| 174:7,12 | **origin...** | 271:3,21 | **paper** | 212:11 | 23:14 |
| 176:5,5 | 154:7 | 272:6,15 | 241:7 | 212:15 | 24:17,22 |
| 176:9 | **osteop...** | 272:16 | **paperwork** | 215:15 | 25:10,12 |
| 183:8,15 | 157:2 | 272:19 | 56:22 | 215:16 | 29:7 |
| 183:18 | **outcome** | 272:22 | 57:3 | 221:3,6 | 31:15 |
| 184:8 | 308:14 | 273:19 | 289:17 | 249:5 | 32:3,10 |
| 192:8 | **outdoors** | 274:22 | **paragraph** | 300:19 | 34:9 |
| 197:18 | 224:19 | 275:4,6 | 73:20 | 301:22 | 35:20 |
| 207:8 | **outside** | 275:8,8 | 75:9 | 302:2 | 37:13,21 |
| 216:16 | 250:6 | 275:10 | 76:4 | 305:12 | 41:8,13 |
| 216:17 | **outstr...** | 275:13 | 90:9 | 305:13 | 41:14,17 |
| 216:20 | 121:21 | 275:21 | 151:20 | 305:16 | 42:7,17 |
| 217:6 | **overcome** | **pad** 241:10 | 153:18 | 305:22 | 42:19 |
| 218:9 | 92:18 | **page** 3:3,8 | **paragr...** | 306:14 | 44:14 |
| 274:5 | **overdose** | 20:9 | 161:13 | **parame...** | 46:2 |
| 297:20 | 69:11,13 | 156:19 | **paramedic** | 39:5 | 56:21 |
| 298:1,4 | 71:17 | 156:21 | 88:19 | **Pardon** | 62:4,18 |
| **Orders** | 72:4,9 | 161:14 | 89:5,15 | 75:16 | 75:5 |
| 73:9,10 | 72:12,16 | 174:20 | 91:8 | **Park** 2:10 | 87:7 |
| 73:14 | 82:7 | 175:7,13 | 92:6 | 31:22 | 91:13 |
| 229:19 | 84:4 | 180:22 | 205:13 | 35:11 | 99:19 |
| 239:15 | 254:21 | 192:10 | 210:3,4 | **parkway** | 105:8 |
| **Ordinance** | 297:11 | 197:21 | 254:16 | 104:21 | 122:4 |
| 74:6 | 297:17 | 268:9 | 306:3 | **part** 5:8 | 123:3 |
| **Orellana** | **overheard** | 269:9 | **parame...** | 18:15 | 129:22 |
| 252:14 | 34:4 | 270:14 | 2:17 | 114:19 | 132:14 |
| 252:22 | **overpower** | 286:19 | 63:18,20 | 144:18 | 132:15 |
| 253:3,5 | 95:22 | 308:2 | 63:22 | 153:9 | 137:21 |
| 253:9,12 | 96:7 | 309:2 | 64:2,6,8 | 155:9 | 146:2 |
| 288:19 | 187:2 | **pages** | 64:14,15 | 161:7 | 159:12 |
| **original** | 190:9,12 | 191:5 | 64:18,20 | 203:17 | 174:12 |
| 192:7 | **oversight** | 309:6 | 65:1,10 | 204:2,12 | 203:16 |
| 236:11 | 227:11 | **pain** | 65:12,17 | 204:16 | 223:4 |

Stevan Vidljinovic
September 4, 2013

347

| | | | | | |
|---|---|---|---|---|---|
| 234:4,6 | 121:1 | 219:22 | 232:9,15 | 119:6 | 248:10 |
| 241:15 | 122:7,11 | 230:10 | 232:20 | pen-wr... | perfor... |
| 260:4 | 122:16 | 252:5 | 232:22 | 241:11 | 75:6 |
| 280:8 | 123:9,11 | 255:11 | 233:6,10 | pending | period |
| 302:21 | 123:12 | 255:19 | 233:14 | 14:13 | 11:16,19 |
| partic... | 123:19 | 256:18 | 233:22 | people 7:3 | 14:21 |
| 44:14 | 123:21 | 263:8 | 234:3,5 | 8:12 | 24:13 |
| 80:7 | 123:22 | 271:6,13 | patiently | 17:1,4 | 176:6 |
| 221:13 | 124:2,5 | 272:1,7 | 196:18 | 43:6 | 285:22 |
| 221:16 | 124:11 | 276:8,20 | patients | 66:1 | 300:17 |
| 221:22 | 124:13 | 277:12 | 235:1 | 98:2 | 301:12 |
| parties | 124:19 | 278:5,13 | patrol | 112:9 | periodic |
| 308:13 | 124:22 | 280:7 | 293:9 | 119:2 | 9:5 |
| partner | 125:7 | 281:13 | patrolman | 129:16 | permis... |
| 22:12,17 | 126:11 | 281:16 | 11:4 | 130:20 | 216:21 |
| 22:22 | 127:6,10 | 281:19 | pattern | 135:7 | perpen... |
| 23:3 | 127:10 | 292:3 | 43:13 | 152:7 | 107:3 |
| 26:17 | 127:12 | 306:8 | patting | 154:6 | persist |
| 32:9 | 127:19 | partner's | 248:7 | 155:12 | 160:6 |
| 35:6 | 142:20 | 125:7 | pavement | 155:12 | person |
| 53:6 | 168:16 | 281:18 | 203:14 | 156:1 | 13:18 |
| 54:1,10 | 168:20 | partners | 204:6,13 | 157:1,5 | 16:17 |
| 54:22 | 169:1,6 | 23:6 | 211:22 | 162:20 | 42:8 |
| 66:14,17 | 169:7,13 | 230:13 | paying | 182:6 | 68:18 |
| 67:5 | 169:19 | parts | 41:7 | 184:9 | 69:14,16 |
| 81:5 | 172:5,11 | 23:13 | PCP 97:1 | 215:11 | 70:1 |
| 85:4,9 | 186:4,18 | 187:17 | 112:10 | 217:2,15 | 74:13 |
| 85:12 | 186:22 | pass 18:1 | 113:14 | 222:12 | 84:15 |
| 93:9 | 187:7 | pass/fail | 186:8 | 223:19 | 98:17,21 |
| 94:14 | 192:17 | 17:21 | 217:14 | 228:19 | 99:1,2 |
| 96:9 | 192:20 | passed | 217:15 | 234:21 | 113:11 |
| 101:22 | 194:17 | 18:4,6 | 254:1,9 | 285:14 | 134:16 |
| 104:5 | 198:9,11 | 140:20 | 254:12 | people's | 138:5,8 |
| 109:14 | 199:17 | 203:11 | 298:19 | 153:1 | 141:6,7 |
| 110:1 | 199:19 | passive | PD41 48:17 | 223:18 | 142:4,7 |
| 115:5,7 | 199:22 | 256:20 | PDT 54:13 | 223:19 | 142:9 |
| 115:13 | 200:2,9 | pat-down | 54:17 | pepper | 154:22 |
| 115:14 | 200:20 | 248:3,5 | peace 90:2 | 172:1,6 | 157:15 |
| 115:19 | 201:3,7 | 248:10 | 98:9,13 | 172:18 | 158:13 |
| 117:20 | 201:14 | 248:13 | peacef... | perceived | 158:15 |
| 117:22 | 201:17 | 248:14 | 69:20 | 179:5 | 168:3 |
| 118:3,21 | 201:18 | patient | 71:21 | percent | 170:3,5 |
| 119:1,5 | 202:5 | 88:18 | 77:3 | 160:8,12 | 171:10 |
| 120:5,8 | 210:16 | 89:1 | 85:6 | PERF 152:2 | 180:13 |
| 120:14 | 215:16 | 91:7,9 | 97:17 | perform | 182:11 |
| 120:16 | 215:18 | 92:16,19 | 115:20 | 140:7 | 183:22 |

Stevan Vidljinovic
September 4, 2013

348

| | | | | | |
|---|---|---|---|---|---|
| 184:4 | **persuade** | 210:11 | 133:20 | 281:6,13 | 112:5,7 |
| 197:22 | 186:19 | 210:12 | 141:13 | 282:22 | 121:9 |
| 198:1 | 187:8 | 210:16 | 184:11 | 283:2 | 124:14 |
| 214:3 | 190:12 | 214:3 | 198:22 | 287:6 | 125:16 |
| 234:1 | 218:16 | 228:11 | 199:2,4 | **plaint...** | 126:5,22 |
| 236:11 | 256:19 | 228:13 | 199:22 | 73:3 | 131:12 |
| 245:8 | 272:2 | 257:9 | 200:4 | 145:16 | 131:12 |
| 248:1 | 278:10 | 270:18 | 236:19 | 150:19 | 133:6 |
| 282:7 | 279:22 | 282:2,4 | 243:14 | 158:19 | 144:8 |
| 297:16 | **persua...** | 286:13 | 259:6 | 161:14 | 159:1 |
| 298:12 | 279:21 | 289:7 | 298:8 | 268:11 | 172:15 |
| 303:14 | **persua...** | 296:16 | 299:10 | 268:19 | 211:20 |
| **person's** | 168:11 | **physic...** | 303:19 | 268:20 | 271:8 |
| 76:8 | 168:19 | 66:12 | 308:10 | 275:12 | 272:4 |
| 138:14 | 168:22 | 95:22 | 309:6 | 297:21 | **pointed** |
| 138:15 | 169:18 | 96:16,17 | **placed** | **Plaint...** | 14:3 |
| 206:17 | 174:22 | 112:16 | 170:15 | 2:11 | 103:7 |
| **personal** | 181:8 | 125:19 | 209:12 | **plan** 33:2 | 119:14 |
| 9:8 97:3 | **persua...** | 210:21 | 224:9 | 66:18 | 120:20 |
| **person...** | 169:4 | 226:5 | 227:20 | 96:15 | 143:18 |
| 18:9 | 255:11 | **pick** | 266:22 | 97:9,13 | 143:19 |
| 22:8 | **pertai...** | 214:15 | 305:14 | 97:14,20 | 144:2 |
| 85:5 | 1:22 | 232:15 | **places** | 130:21 | **pointing** |
| 124:17 | **philos...** | 238:12 | 260:15 | **plants** 6:8 | 201:15 |
| 144:19 | 190:4 | 280:8,19 | **placing** | **play** 39:8 | **poised** |
| 240:22 | **phone** | **picked** | 214:4 | **please** 4:1 | 144:4 |
| 256:4 | 247:10 | 212:16 | **plain** | 4:3,13 | **police** |
| 297:5 | **phrase** | 214:5 | 177:12 | 16:7 | 1:13 |
| **personnel** | 77:14 | 234:4 | 191:17 | 101:7 | 2:17 |
| 18:10 | 207:19 | **picking** | **plaintiff** | 108:3 | 10:22 |
| 99:9 | 279:8 | 7:9 | 1:4,20 | 158:18 | 11:1,11 |
| 181:4 | **physical** | 47:17 | 4:8 | 165:10 | 11:12,14 |
| 283:2,18 | 95:4,5 | 214:7 | 271:3,4 | 165:14 | 12:2,8 |
| 283:21 | 95:10 | **picture** | 271:7,8 | 178:19 | 12:11 |
| 286:16 | 98:2 | 62:14 | 271:11 | 179:4,16 | 14:19,22 |
| 287:18 | 99:1 | 107:13 | 271:11 | 214:13 | 15:6,8 |
| 287:20 | 121:10 | 107:17 | 271:13 | 257:6 | 15:16 |
| 288:18 | 124:15 | 142:6 | 272:2,15 | 270:16 | 34:1,19 |
| 301:11 | 127:6,9 | 287:16 | 275:4,14 | **plump** | 36:6,19 |
| **persons** | 134:16 | **pieces** | 275:17 | 79:19 | 39:6 |
| 73:6 | 141:19 | 241:7 | 275:19 | **point** 11:5 | 40:7 |
| 74:2 | 175:1,4 | **pinpoint** | 276:4,21 | 14:1 | 41:21 |
| 183:9,16 | 175:10 | 63:20 | 278:18 | 35:11 | 44:19 |
| 297:22 | 180:14 | **place** 21:9 | 278:19 | 49:14 | 45:2,11 |
| 298:6 | 181:15 | 71:18,21 | 280:7,11 | 54:22 | 46:6,12 |
| 303:10 | 207:2 | 74:4 | 280:18 | 108:22 | 47:11,22 |

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

349

| | | | | | |
|---|---|---|---|---|---|
| 48:1,6 | 177:18 | 19:15 | 89:7,18 | 170:13 | 268:13 |
| 49:6,7 | 180:16 | 23:18 | 90:6,9 | 173:8 | 269:3,16 |
| 49:15 | 180:19 | 27:6,16 | 90:11,14 | 174:3 | 269:20 |
| 50:17 | 183:7,14 | 28:3 | 90:20 | 175:6,8 | 271:18 |
| 68:10 | 184:1 | 30:7 | 91:16,19 | 178:2,11 | 273:2 |
| 73:5,10 | 185:20 | 31:7 | 92:7,22 | 178:17 | 274:8,11 |
| 73:15 | 207:16 | 33:10 | 95:8,17 | 179:1,9 | 274:15 |
| 74:3,14 | 207:22 | 34:15 | 96:5 | 179:16 | 274:18 |
| 81:12 | 210:17 | 35:16 | 99:12 | 182:1,14 | 275:14 |
| 82:6,17 | 214:7 | 36:12 | 100:5,17 | 182:19 | 276:14 |
| 84:16 | 219:7 | 37:3,14 | 100:20 | 183:4,7 | 276:22 |
| 87:17 | 222:4,8 | 38:6,15 | 102:20 | 184:2,19 | 278:14 |
| 88:16,21 | 222:13 | 39:1,13 | 109:17 | 186:16 | 282:12 |
| 91:22 | 229:19 | 40:2,14 | 110:11 | 187:4,13 | 283:7 |
| 92:4,9 | 230:22 | 41:10 | 110:20 | 187:16 | 288:3,15 |
| 92:11 | 235:13 | 42:3,14 | 113:2 | 190:18 | 289:10 |
| 94:3 | 237:17 | 43:16,20 | 114:13 | 192:9 | 290:3,17 |
| 98:1 | 239:1,14 | 44:1,10 | 116:16 | 194:4 | 290:19 |
| 99:8 | 243:8,11 | 45:4,13 | 117:2,8 | 195:7,16 | 296:14 |
| 108:2,6 | 247:20 | 46:8,18 | 122:13 | 196:2,12 | 299:18 |
| 108:14 | 248:9 | 47:7 | 126:9 | 196:17 | 300:12 |
| 108:18 | 251:10 | 48:9,21 | 132:11 | 197:10 | 301:4,15 |
| 129:11 | 254:20 | 49:19 | 146:18 | 199:11 | 304:13 |
| 130:4 | 261:18 | 50:5 | 147:6 | 201:4 | 305:2,4 |
| 142:6 | 265:15 | 51:4 | 148:9 | 202:9 | 305:18 |
| 146:21 | 281:20 | 52:22 | 149:10 | 204:7,14 | 306:22 |
| 150:3 | 282:1 | 53:7 | 149:21 | 206:2 | 307:2 |
| 152:2,3 | 291:19 | 56:3,15 | 150:9,13 | 208:18 | **policy** |
| 152:15 | 291:22 | 57:11 | 151:6 | 217:8 | 88:11,15 |
| 154:4 | 292:4,11 | 58:18 | 153:6,16 | 218:3 | 88:16 |
| 160:6,11 | 293:16 | 59:6,16 | 154:2 | 219:18 | 174:20 |
| 161:2,8 | 294:1,14 | 63:8 | 155:15 | 221:2 | 176:11 |
| 161:16 | 297:10 | 65:3 | 157:9,18 | 222:1,6 | 184:17 |
| 164:8,10 | 297:13 | 66:4,21 | 157:22 | 222:17 | **polite** |
| 164:20 | 297:20 | 69:3 | 158:3,19 | 223:15 | 188:9 |
| 166:11 | 298:7 | 70:13,17 | 159:21 | 225:11 | **politic** |
| 167:7,9 | 305:11 | 71:5 | 160:13 | 225:22 | 1:14 |
| 167:19 | 305:21 | 74:18,22 | 162:2 | 249:22 | **Polo's** |
| 168:4 | 306:2 | 76:11,19 | 163:3,6 | 250:15 | 64:5 |
| 173:15 | **policeman** | 78:9,17 | 163:16 | 251:1 | **portion** |
| 174:14 | 108:5 | 81:21 | 164:9,12 | 260:20 | 155:22 |
| 176:6,16 | **policemen** | 82:11 | 165:4,9 | 261:3,21 | 156:15 |
| 176:17 | 93:4 | 84:21 | 166:7,16 | 262:3,9 | 234:7 |
| 177:7,11 | **Polick** | 85:2,21 | 166:19 | 266:3 | **portions** |
| 177:13 | 2:13 3:5 | 86:7 | 167:10 | 267:14 | 221:8 |
| 177:16 | 12:13,20 | 87:2 | 169:11 | 267:22 | 290:12 |

Stevan Vidljinovic
September 4, 2013

290:14
portly
 95:13
pose
 273:22
posed
 166:3
position
 23:17
 109:12
 109:13
 109:15
 110:18
 111:2
 112:13
 115:5
 119:19
 122:1
 129:18
 129:22
 203:22
 206:12
 207:9,14
 212:2
 256:17
positi...
 107:7
 115:4
 200:14
 208:7
possible
 111:6
 154:21
 155:11
 207:18
 207:19
 238:5
possibly
 94:3
potential
 112:19
 155:21
 156:7,13
potted 6:8
pounds
 94:19

242:15
246:3,5
power
 101:21
 111:16
 111:18
 198:22
powerful
 112:5
practical
 181:12
practice
 7:15
 36:6
pre-ex...
 157:2
preach
 7:15
preamble
 5:4
preceding
 19:7
 213:17
 213:18
precisely
 202:14
predict
 111:2
 156:5
prefer...
 137:22
 154:21
prelim...
 113:10
premat...
 57:3,5
prepar...
 31:4
prepare
 36:2
 37:16
 44:11,15
 45:6
 46:10
 48:13
prepared

38:2
50:8
135:12
135:16
297:5
prepares
 148:12
presence
 89:15
 177:17
 180:16
 180:17
 180:19
 181:1
 262:9,12
 263:20
 300:5,10
present
 2:5
 30:19
 72:18
 74:4
 230:9
press
 295:12
pressure
 193:17
pretty
 67:10
 95:4,5
 119:21
 132:7
previous
 164:1
 256:8
previo...
 150:22
 268:22
 287:6
PRI 40:22
principle
 185:3
print
 184:10
 255:1
printed

241:11
prior
 18:13
 22:19
 29:3
 43:5,10
 88:4
 100:7
 109:20
 129:12
 156:4
 163:14
 174:5,7
 174:13
 174:17
 174:22
 181:14
 207:2
 210:17
 212:21
 216:6
 217:11
 219:11
 285:16
priority
 39:4
 40:5,6
 40:17,22
 41:1,2,5
 42:12
 44:6,9
 44:20
 45:3,11
 46:15
private
 9:17
 15:7
 74:10
privilege
 250:2,4
 250:16
 251:3
 287:1
privy
 249:19
probably

30:11
42:1
68:16
86:18
87:21
103:7
147:11
150:7
151:5
172:4
192:17
225:4
230:16
241:3
252:16
262:4
275:3
probat...
 11:16,19
 14:21
probe
 152:20
probes
 131:10
 152:7
 153:1,14
 205:10
 205:12
 205:16
 205:20
 295:8
problem
 4:21 6:5
problems
 153:3
 157:2,7
 234:22
proced...
 188:15
Procedure
 1:22
proced...
 89:22
 91:5
 298:16
proceeded

123:8
procee...
 8:9 9:11
 34:10
produce
 149:17
produced
 138:15
 149:11
 149:13
 149:14
 149:22
 150:16
 151:1
 158:21
 159:2,9
 159:13
 287:6
profes...
 74:2
 90:18
 176:12
 239:9
 298:6
program
 18:2
 139:3
prongs
 139:22
 140:8
 202:18
pronounce
 4:17
proper
 13:5,6
 289:16
properly
 29:2
 270:22
 277:18
 284:21
protect
 76:8,16
 98:22
 271:13
 281:19

Stevan Vidljinovic
September 4, 2013

351

| | | | | | |
|---|---|---|---|---|---|
| **protected** | 176:13 | 122:7 | **quarter** | 158:11 | 211:17 |
| 250:1 | 183:16 | 138:7 | 267:1 | 163:9,17 | 214:13 |
| 286:22 | 184:11 | 139:21 | **Queries** | 163:18 | 222:9 |
| **protec...** | 270:6 | 140:3 | 36:7 | 163:19 | 230:8 |
| 303:16 | 298:8 | 152:1 | 297:4 | 163:19 | 232:2 |
| **protec...** | 299:10 | 186:13 | 302:8,10 | 164:10 | 233:20 |
| 248:3,5 | 303:19 | 187:3 | 302:12 | 164:13 | 238:10 |
| 248:10 | 309:20 | 192:8 | **Query** | 164:16 | 243:5 |
| 248:14 | **pull** 122:6 | 207:7 | 34:20 | 165:5,11 | 248:17 |
| 298:9 | 138:9,13 | 212:17 | 35:2 | 165:11 | 250:5,18 |
| 299:13 | 139:13 | 212:19 | 44:20 | 165:20 | 250:21 |
| 303:19 | 139:15 | 215:8 | 46:3,5 | 165:21 | 251:6 |
| **protest** | 139:19 | 222:14 | 82:18 | 166:3,5 | 257:6 |
| 222:8 | 205:20 | 225:8,9 | 297:6 | 166:17 | 261:10 |
| **protes...** | 273:12 | 227:7,14 | **question** | 173:5 | 263:14 |
| 221:18 | **pulled** | 228:16 | 5:22 6:8 | 174:4,10 | 263:18 |
| 222:13 | 144:5 | 228:21 | 6:12 7:9 | 178:17 | 265:14 |
| **protocol** | 150:6,7 | 229:4 | 7:16,19 | 178:19 | 266:4 |
| 13:22 | 163:10 | 230:10 | 8:2,5,7 | 178:21 | 267:15 |
| 36:14 | 200:6 | 231:15 | 8:14,21 | 179:4,17 | 270:13 |
| 129:11 | 232:18 | 232:20 | 9:15,16 | 182:15 | 271:19 |
| 150:20 | 232:18 | 239:8 | 9:19 | 187:5,13 | 273:3 |
| 207:16 | 295:16 | 240:13 | 16:8 | 187:15 | 274:4,14 |
| 229:20 | **purpose** | 240:17 | 35:19 | 187:16 | 274:16 |
| 248:2 | 2:1 8:19 | 240:20 | 58:20 | 187:18 | 276:11 |
| 264:19 | 88:10 | 243:12 | 61:16,17 | 187:19 | 276:15 |
| 306:2 | 134:5,9 | 245:14 | 69:12 | 187:21 | 277:1,6 |
| **protocols** | 147:3 | 246:6 | 83:7 | 187:22 | 277:9 |
| 151:22 | 184:13 | 247:20 | 88:5 | 188:3 | 278:15 |
| 152:5 | **purposes** | 247:21 | 90:7 | 189:14 | 279:11 |
| **prove** | 8:3 34:9 | 248:18 | 94:18 | 189:15 | 280:4 |
| 112:11 | 288:20 | 250:6 | 100:14 | 189:22 | 287:17 |
| **provide** | 291:10 | 256:7 | 101:7 | 191:19 | 288:4,16 |
| 98:17 | **pursuant** | 280:9 | 102:20 | 193:1,2 | 289:11 |
| **provided** | 1:21 | 284:1,4 | 108:3,12 | 194:10 | 289:21 |
| 161:7 | **pushed** | 284:19 | 110:11 | 195:4 | 290:1,3 |
| **provis...** | 215:2,4 | | 112:15 | 196:13 | 290:13 |
| 1:21 | **put** 28:22 | **Q** | 113:20 | 196:14 | 296:11 |
| 99:1 | 45:2 | **qualified** | 113:20 | 196:15 | 300:13 |
| **proximity** | 48:8 | 2:3 | 114:6,10 | 196:15 | 304:2 |
| 39:20 | 51:2,2 | **qualify** | 114:21 | 196:20 | **questi...** |
| 138:5 | 73:3 | 250:18 | 126:4,17 | 197:5 | 13:1 |
| 180:19 | 83:19 | 251:1 | 128:3,4 | 202:4 | 143:16 |
| **PSN** 291:7 | 97:11 | 260:20 | 143:12 | 211:5,6 | 151:5 |
| **public** | 119:12 | 261:6,13 | 147:6 | 211:7,8 | **questions** |
| 74:4,9 | 121:2 | 261:14 | 157:19 | 211:15 | 7:8,12 |

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

352

| | | | | | |
|---|---|---|---|---|---|
| 8:4 74:1 | **R** 2:14 | 156:5 | 289:21 | 274:2 | 58:11,14 |
| 76:3,5 | **radio** | 171:21 | 290:1 | 275:22 | 58:16,22 |
| 98:13 | 39:16 | 217:17 | 298:4 | **realm** | 59:13,20 |
| 150:14 | 40:4 | **reaction** | 303:14 | 250:6 | 60:1,3,5 |
| 150:19 | 50:17,21 | 194:14 | 309:4 | **reason** | 60:7,9 |
| 151:7 | 293:13 | **read** 16:7 | **readily** | 30:12 | 60:10,11 |
| 159:7 | 294:6,11 | 16:8 | 103:4 | 111:1 | 60:12,13 |
| 161:15 | 297:14 | 37:12 | 125:21 | 118:15 | 60:17 |
| 163:18 | **radios** | 73:21,22 | 143:8 | 132:14 | 61:7 |
| 186:5 | 36:20 | 74:16,20 | 170:17 | 132:15 | 62:6,17 |
| 188:7,10 | **raise** 4:3 | 75:9 | 194:18 | 186:12 | 62:22,22 |
| 189:20 | 7:17 | 76:10 | 195:1 | 199:4 | 63:4,10 |
| 190:2,3 | 122:3 | 84:14 | **reading** | **reason...** | 63:12,15 |
| 196:18 | 161:15 | 92:15 | 35:20 | 76:8 | 63:17 |
| 196:19 | 278:12 | 98:12 | 41:21 | 114:16 | 64:12,15 |
| 197:6 | 281:7 | 101:6,8 | 49:5 | 174:21 | 64:19,22 |
| 200:22 | **raising** | 113:20 | 50:8 | 239:11 | 65:15,18 |
| 228:5 | 118:21 | 114:1 | 51:6 | **reasoning** | 66:13,16 |
| 235:12 | **ran** 292:20 | 128:2,9 | 82:14,20 | 147:10 | 68:2,20 |
| 235:15 | 292:21 | 152:13 | 153:19 | **reasons** | 69:5 |
| 253:10 | **ranging** | 153:4,6 | 160:2 | 8:3 30:9 | 70:21 |
| 265:13 | 198:3 | 153:9,22 | 239:8 | 150:22 | 77:10,12 |
| 268:16 | **rank** 11:4 | 155:9,14 | 240:10 | 159:11 | 78:1,3 |
| 273:7 | 11:7 | 155:17 | 273:1,5 | 197:7 | 78:10,22 |
| 278:1 | 16:22 | 157:8,12 | 273:20 | 239:18 | 79:12,15 |
| 282:20 | 159:6 | 157:21 | 275:2 | **recall** | 79:17,20 |
| 290:15 | **re-engage** | 159:19 | 277:13 | 13:16 | 80:2,6 |
| 296:11 | 295:21 | 162:1,8 | 278:7 | 15:21 | 80:14,18 |
| 297:3 | **RE-EXA...** | 162:9 | 297:9 | 17:3,6 | 80:19 |
| 298:1 | 300:1 | 165:21 | **reads** 76:6 | 17:17,20 | 81:4,7 |
| 299:18 | 305:3,19 | 166:5 | 161:15 | 18:3 | 82:2,13 |
| 306:21 | **re-read** | 175:2,3 | 183:21 | 23:20 | 82:14,20 |
| **quick** | 178:19 | 175:19 | **ready** | 24:11 | 83:3,14 |
| 127:10 | **reach** | 178:21 | 103:22 | 27:1 | 84:10,12 |
| 263:5 | 125:16 | 184:6,21 | 104:3 | 31:8,13 | 85:14,17 |
| 274:2 | 126:6 | 192:11 | 109:22 | 38:17 | 85:22 |
| 302:7 | 127:2,3 | 193:1,2 | 144:5 | 41:16 | 86:9,15 |
| **quickly** | 127:13 | 198:16 | 217:22 | 43:14 | 87:4,15 |
| 104:16 | 138:14 | 211:6,8 | **reality** | 49:2 | 89:9,13 |
| 104:17 | 198:2 | 266:18 | 160:6 | 50:14 | 89:20 |
| **quit** | **reaching** | 267:4,20 | **realize** | 51:1,11 | 91:20 |
| 286:18 | 217:11 | 268:4 | 192:3 | 52:19 | 93:7,18 |
| **quite** | **react** | 269:12 | 235:19 | 53:9 | 94:18 |
| 260:5 | 109:22 | 279:10 | **really** | 56:7 | 96:11 |
| | 110:1 | 279:12 | 6:12 9:7 | 57:2 | 97:7 |
| **R** | 127:10 | 286:20 | 142:2 | 58:4,8 | 98:11 |

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

353

| | | | | | |
|---|---|---|---|---|---|
| 100:6,19 | 149:5,13 | 225:5,6 | 278:7,8 | 161:11 | 82:5 |
| 101:15 | 154:9,10 | 225:7,13 | 279:20 | 263:9 | 92:15 |
| 102:9,15 | 155:1,6 | 230:18 | 279:20 | 293:17 | 98:12 |
| 103:12 | 158:9,12 | 230:21 | 280:1,2 | 294:14 | 101:2,8 |
| 103:20 | 158:16 | 231:8 | 282:4 | **recess** | 114:1 |
| 104:10 | 160:2,21 | 233:1 | 283:16 | 9:12 | 128:9 |
| 104:16 | 161:11 | 234:2 | 284:5,11 | **recipient** | 146:6 |
| 104:18 | 167:4 | 236:16 | 284:17 | 157:16 | 147:4 |
| 105:5,10 | 171:18 | 238:4 | 287:11 | **recognize** | 158:20 |
| 105:11 | 177:9,20 | 240:21 | 292:10 | 48:4 | 161:15 |
| 105:13 | 200:13 | 241:14 | 293:3 | 51:12 | 188:13 |
| 106:12 | 200:18 | 242:7,11 | 297:13 | 116:15 | 188:18 |
| 107:5,6 | 201:9,13 | 244:9,21 | 297:15 | 116:19 | 189:16 |
| 107:9,12 | 202:12 | 245:11 | 301:6,7 | 302:16 | 192:1 |
| 107:21 | 203:6,10 | 247:19 | 302:2,6 | 302:20 | 197:3 |
| 108:21 | 203:16 | 248:14 | 302:18 | 303:9 | 224:3,6 |
| 109:7 | 204:1,10 | 249:1,8 | 303:4,7 | **recogn...** | 279:12 |
| 111:21 | 204:16 | 251:19 | 303:11 | 51:15 | 298:5 |
| 112:3 | 206:12 | 253:7 | 306:5,13 | 66:3 | **recorded** |
| 116:11 | 206:16 | 254:14 | 306:19 | **recogn...** | 29:5 |
| 117:10 | 207:9,13 | 258:10 | **recalled** | 303:11 | 308:7 |
| 118:2,3 | 208:2,3 | 258:13 | 272:19 | **recoll...** | **recording** |
| 119:13 | 208:9,12 | 260:8 | 278:9 | 21:17 | 28:22 |
| 119:20 | 208:14 | 261:20 | 306:18 | 43:7 | 56:1,18 |
| 120:3,4 | 208:21 | 262:19 | **recalls** | 93:17 | 57:9 |
| 120:10 | 209:5,7 | 263:2 | 282:22 | 97:3 | 147:3 |
| 120:14 | 209:18 | 264:9,10 | **receive** | 166:9 | **records** |
| 122:9 | 210:5,8 | 264:13 | 11:10 | 212:18 | 25:16 |
| 124:21 | 212:2,4 | 264:18 | 14:11,14 | 221:10 | 161:3 |
| 127:15 | 212:5,7 | 265:14 | 17:8 | 292:12 | **recoun...** |
| 128:11 | 212:9,21 | 265:18 | 48:14 | 293:6 | 107:14 |
| 128:16 | 213:2,8 | 265:19 | 71:22 | **recomm...** | **red** 63:5 |
| 128:18 | 213:10 | 266:12 | **received** | 154:6 | **reduced** |
| 129:4 | 214:4,6 | 267:2,4 | 35:14 | **recomm...** | 308:7 |
| 131:2 | 215:5 | 267:10 | 60:22 | 152:5 | **refer** |
| 132:3,19 | 216:6,11 | 268:6 | 176:5,9 | **record** | 16:22 |
| 135:4 | 219:4 | 270:10 | 252:17 | 4:14 5:8 | 223:12 |
| 137:5,8 | 220:6,7 | 271:21 | **receiving** | 8:6 | **reference** |
| 137:21 | 220:17 | 272:5,7 | 16:1 | 10:12 | 90:2 |
| 139:11 | 220:18 | 272:18 | 42:8 | 20:2,4,6 | **refere...** |
| 140:7,9 | 220:21 | 273:10 | 46:7 | 25:11 | 3:7 |
| 140:22 | 221:13 | 273:11 | 53:17,20 | 28:8,12 | **refere...** |
| 141:4,16 | 221:15 | 273:13 | 127:20 | 61:11 | 90:8 |
| 142:9 | 222:18 | 273:14 | 130:6 | 73:21,22 | 91:2 |
| 145:8,11 | 222:20 | 275:7,13 | 143:5 | 74:20 | 267:6 |
| 146:4 | 223:3 | 275:21 | 158:7 | 76:6 | **referring** |

Stevan Vidljinovic
September 4, 2013

354

| | | | | | |
|---|---|---|---|---|---|
| 90:7 | 73:5 | 265:4 | 141:2 | 226:18 | 265:15 |
| 182:16 | 82:20 | **religious** | 142:1,4 | 226:20 | 287:5 |
| 192:9 | 88:11 | 89:2 | 144:14 | 227:19 | 288:19 |
| **refers** | 159:5 | 91:11 | 148:7 | 227:21 | 289:3,5 |
| 184:4 | 234:9 | 99:4 | 173:14 | 228:18 | **reporter** |
| 287:6 | 251:20 | **remarks** | 183:3 | 228:21 | 4:1,3 |
| **refresh** | 287:5 | 37:8 | 190:8 | 228:22 | 6:15 7:1 |
| 9:10 | **regard...** | **remember** | 193:16 | 229:5,9 | 9:6 10:7 |
| 224:22 | 112:11 | 9:2 | 208:6 | 229:17 | 16:9 |
| **refreshed** | **regards** | 16:10,12 | 213:14 | 229:22 | 45:20 |
| 274:21 | 282:5 | 19:11 | 213:20 | 230:16 | 101:9 |
| 275:5,7 | **Register** | 23:16 | 214:2 | 231:1,4 | 114:2 |
| 277:11 | 260:17 | 29:13 | 215:22 | 231:20 | 128:10 |
| **refresher** | 261:17 | 31:10 | 217:22 | 232:20 | 165:20 |
| 145:9 | 261:22 | 38:11 | 219:1,13 | 233:7 | 166:6 |
| **refuse** | 262:1 | 49:17 | 221:10 | 234:9 | 178:22 |
| 99:7 | **Regist...** | 50:12,22 | 221:18 | 235:6,14 | 193:3 |
| 304:11 | 237:15 | 51:10,15 | 244:19 | 235:19 | 211:9 |
| **refused** | **regular** | 52:17,20 | 248:12 | 235:19 | 279:9,13 |
| 71:12 | 25:6,7 | 53:17,20 | 256:17 | 236:12 | 290:2 |
| 75:21 | 64:6 | 53:22 | 261:13 | 236:18 | **reporters** |
| 85:7 | **regularly** | 54:3 | 262:20 | 237:1,2 | 159:18 |
| 199:9,15 | 43:12 | 59:14 | 270:2 | 237:7 | **reports** |
| 255:17 | **regula...** | 62:20 | 271:16 | 238:3,5 | 146:7,10 |
| **refuses** | 22:17 | 64:10 | 276:10 | 239:8,14 | 148:12 |
| 74:13 | 24:7,9 | 65:12 | 276:11 | 239:15 | 160:10 |
| 75:10,14 | 32:5 | 68:21 | 279:16 | 239:18 | 208:4 |
| 84:16 | **regula...** | 79:18,21 | **repeat** | 239:20 | 223:15 |
| 182:11 | 139:4 | 80:9,10 | 108:3 | 240:9,10 | 223:16 |
| 183:21 | **related** | 80:13 | 151:4 | 241:21 | 223:18 |
| 183:22 | 238:12 | 82:19 | 214:13 | 243:10 | 223:19 |
| **refusing** | 239:6,7 | 83:11 | 257:6 | 243:12 | 223:20 |
| 70:11 | 308:13 | 86:16,19 | **repeat...** | 243:14 | 223:21 |
| 71:3 | **relation** | 93:19 | 189:1 | 243:22 | 233:3 |
| 84:7,20 | 282:9 | 97:5 | **rephrase** | 244:3,12 | 244:5,8 |
| 100:4,15 | **relati...** | 101:13 | 250:5 | 245:7,9 | 252:12 |
| 185:19 | 55:13 | 102:5 | **report** | 245:14 | 254:22 |
| 186:3 | **relevance** | 104:13 | 13:13 | 246:9,22 | 260:12 |
| **regard** | 12:13,21 | 105:14 | 29:9,11 | 251:22 | 260:13 |
| 159:11 | 12:22 | 105:18 | 207:22 | 252:18 | 262:14 |
| 260:21 | 19:15 | 107:10 | 223:18 | 254:18 | 265:19 |
| 297:8 | 159:21 | 109:4 | 224:10 | 256:2 | **represent** |
| **regarding** | 160:13 | 116:9 | 224:10 | 257:13 | 158:20 |
| 10:8 | 190:18 | 117:1 | 224:12 | 263:4 | 250:16 |
| 13:1 | 196:2 | 124:19 | 225:3,14 | 264:20 | **reprod...** |
| 41:13 | **relevant** | 134:8 | 226:17 | 265:4,12 | 146:14 |

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

| | | | | | |
|---|---|---|---|---|---|
| 50:17 | **requires** | 54:15 | **restra...** | **right** 4:3 | 64:13,17 |
| 51:3,10 | 5:5 | 62:7,7 | 209:13 | 6:11,21 | 65:20 |
| 51:11,14 | 88:20 | 72:20 | 212:22 | 7:19 | 66:3,3 |
| 51:17,22 | **requiring** | 76:21 | 220:21 | 9:13,14 | 66:17 |
| 52:4,18 | 103:3 | 267:17 | 221:1 | 10:18 | 67:5,21 |
| 53:13 | **Research** | **respon...** | 284:22 | 13:20 | 68:5 |
| 61:1 | 152:21 | 54:14 | **restra...** | 15:22 | 70:8 |
| 68:10 | **reserved** | 66:22 | 91:9 | 16:4 | 72:21 |
| 81:11 | 307:2 | 185:20 | 96:16 | 17:15 | 75:4,8 |
| 83:5 | 308:11 | **response** | 283:15 | 18:21 | 80:4,15 |
| 91:21 | **residence** | 49:17 | 284:19 | 20:11 | 80:19 |
| 233:2 | 62:3 | 180:12 | **restra...** | 21:12,20 | 82:5,17 |
| 254:20 | 246:19 | 180:14 | 221:11 | 23:5 | 83:7 |
| **requested** | 247:5 | 239:15 | **result** | 24:15 | 84:6,14 |
| 51:7 | **reside...** | 239:17 | 14:12 | 29:10 | 85:9 |
| 52:12 | 62:1 | 260:12 | 155:13 | 30:14 | 86:13 |
| 55:3,12 | **resist** | 287:5 | 180:19 | 32:18 | 87:9,16 |
| 66:2 | 198:19 | 289:4 | 181:11 | 33:15 | 88:6,15 |
| 67:2 | 257:8 | **respon...** | 250:13 | 34:6,18 | 89:14,22 |
| 71:15 | **resist...** | 24:1 | **resumed** | 35:8,13 | 90:13,22 |
| 72:19 | 198:2 | **respon...** | 44:3 | 36:2,5,9 | 92:14 |
| 76:22 | **resister** | 55:5 | 101:4 | 36:22 | 93:13,19 |
| 82:15 | 143:7 | **respon...** | 197:13 | 37:7 | 94:7,11 |
| 87:14 | 162:17 | 113:19 | 224:7 | 38:4,10 | 95:3,14 |
| 92:8 | 193:13 | 165:20 | **retrac...** | 40:11 | 97:9 |
| 97:15 | 194:21 | 180:4 | 172:16 | 41:2,20 | 99:7,15 |
| 125:21 | 197:22 | 289:20 | **retreat** | 42:11,11 | 99:18 |
| 218:6,12 | 198:7 | 290:14 | 124:1 | 42:21 | 100:1 |
| **reques...** | 256:20 | **rest** 9:5 | **review** | 44:18 | 101:11 |
| 51:16 | **resisters** | 132:21 | 46:2 | 45:1,17 | 102:12 |
| 52:16 | 175:19 | 275:11 | 268:12 | 46:14,15 | 103:14 |
| 83:22 | **resisting** | 304:20 | **reviewed** | 47:2,13 | 104:12 |
| 194:19 | 92:17,19 | **restate** | 240:8 | 49:13 | 105:7,21 |
| 270:21 | **respect** | 179:1,2 | **revolved** | 50:2,15 | 106:5,6 |
| **requests** | 115:14 | 292:17 | 255:20 | 50:20 | 106:17 |
| 52:8 | 151:2 | **restrain** | **revolver** | 51:2 | 107:13 |
| 88:12 | **respir...** | 97:4 | 103:18 | 52:4,11 | 108:12 |
| 91:9 | 157:6 | 186:12 | **Richards** | 52:13,17 | 108:17 |
| 286:22 | **respond** | 187:2 | 159:18 | 53:4,14 | 109:4 |
| 306:3 | 39:4,7 | 213:21 | **ride** | 54:9 | 110:4,8 |
| **required** | 103:2 | 221:5,6 | 305:22 | 57:7 | 110:14 |
| 89:16 | 115:17 | 249:11 | 306:3,4 | 59:2 | 112:1,4 |
| 185:18 | 271:8 | 283:22 | **riding** | 60:18 | 112:20 |
| 229:18 | 272:3 | 284:3 | 25:2 | 61:5,14 | 113:17 |
| 239:14 | 290:12 | 285:18 | 33:19 | 62:19 | 114:6,18 |
| 268:1 | **responded** | 289:16 | 306:19 | 63:4,17 | 115:4,16 |

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

| | | | | | |
|---|---|---|---|---|---|
| 116:22 | 153:8,22 | 198:15 | 237:21 | 274:10 | 151:14 |
| 118:5 | 155:8 | 200:5,11 | 239:3,13 | 276:2,16 | **rode** 306:6 |
| 119:3,8 | 156:18 | 200:16 | 239:16 | 277:8 | **roll** 20:20 |
| 119:9,9 | 158:11 | 200:22 | 239:19 | 278:5 | 30:15,18 |
| 119:17 | 158:17 | 202:4,16 | 239:21 | 279:9,15 | 31:4,11 |
| 120:7,16 | 159:16 | 203:2,4 | 240:4,7 | 281:5,5 | 32:21 |
| 121:1,9 | 160:5 | 203:13 | 240:12 | 282:15 | 293:9 |
| 121:13 | 162:10 | 203:18 | 240:15 | 282:18 | **Roman** |
| 121:19 | 163:9,16 | 205:6,22 | 242:13 | 283:17 | 191:4,8 |
| 122:2,19 | 164:4,11 | 206:6 | 242:18 | 284:16 | **room** 7:2 |
| 123:20 | 164:15 | 207:4,17 | 242:22 | 286:4,6 | 20:7 |
| 124:14 | 165:3,11 | 208:5,15 | 243:3,6 | 286:11 | 132:16 |
| 124:18 | 165:13 | 209:15 | 243:9,17 | 286:17 | 244:7 |
| 125:2,14 | 166:13 | 210:2 | 245:3,5 | 289:19 | 287:12 |
| 126:1 | 167:6 | 211:19 | 245:10 | 290:11 | 287:20 |
| 127:12 | 168:1,18 | 213:6,22 | 246:6,18 | 296:13 | 288:2 |
| 128:1,14 | 169:4,22 | 214:10 | 247:8,14 | 300:9 | 298:14 |
| 128:18 | 170:11 | 214:17 | 248:1,7 | 302:8,12 | **Roosevelt** |
| 128:21 | 170:20 | 217:15 | 248:16 | 302:20 | 31:19 |
| 129:6,9 | 171:14 | 218:18 | 250:8,22 | 303:3,16 | **rose** 2:6,6 |
| 129:13 | 172:8,20 | 218:22 | 251:15 | 303:17 | 2:7 4:1 |
| 131:8,18 | 173:3 | 219:6,15 | 252:3 | 303:18 | 12:16 |
| 132:8,16 | 174:1,15 | 220:4,9 | 253:4,13 | 304:9,11 | 13:9 |
| 133:6,9 | 174:19 | 220:14 | 255:3,6 | 304:20 | 16:6,11 |
| 136:19 | 175:13 | 221:17 | 255:13 | 306:20 | 19:18 |
| 137:11 | 175:21 | 222:10 | 256:1 | 307:1,3 | 23:21 |
| 137:16 | 176:10 | 224:14 | 257:13 | **risen** | 27:11,21 |
| 138:8 | 177:1 | 224:15 | 258:3,15 | 160:11 | 28:7 |
| 140:3,14 | 179:2 | 224:17 | 259:2,4 | **risks** | 30:13 |
| 141:11 | 180:11 | 225:18 | 259:13 | 153:2 | 31:9 |
| 142:12 | 182:8 | 226:8,11 | 259:18 | **Road** 2:7 | 33:14 |
| 143:10 | 183:10 | 227:7,8 | 261:2,6 | 2:10 | 34:7,17 |
| 143:18 | 183:17 | 227:13 | 262:3 | **Robert** | 36:1,17 |
| 144:2,11 | 184:8 | 228:12 | 263:12 | 1:12 | 37:6 |
| 145:12 | 185:9,11 | 228:16 | 264:2,11 | 43:1 | 38:3,9 |
| 145:18 | 185:16 | 229:1,8 | 265:8 | 50:10 | 38:18 |
| 145:21 | 188:2 | 229:10 | 266:14 | 58:8 | 39:9,17 |
| 146:15 | 189:5,8 | 230:4,21 | 267:18 | 60:16 | 40:10,18 |
| 147:2,18 | 190:8,14 | 231:9 | 267:21 | 62:13 | 41:19 |
| 148:3,5 | 191:20 | 232:6 | 268:2,8 | 66:1 | 42:10,20 |
| 148:17 | 192:12 | 233:5 | 268:13 | 82:15 | 43:18,22 |
| 149:1,1 | 195:13 | 234:4 | 270:6,9 | 145:20 | 44:5,17 |
| 149:8 | 195:22 | 235:10 | 270:12 | 287:4 | 45:8,16 |
| 151:2,6 | 196:4,16 | 236:3,4 | 272:11 | **Roberts** | 46:13 |
| 151:8,16 | 197:1,16 | 236:6,18 | 272:20 | 105:12 | 47:1,12 |
| 151:20 | 198:14 | 237:2,14 | 273:14 | 151:12 | 48:11 |

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

357

| | | | | | |
|---|---|---|---|---|---|
| 49:8 | 114:5,18 | 175:7,9 | 222:3,9 | 306:20 | 206:20 |
| 50:1,11 | 114:20 | 178:7,14 | 222:11 | 307:1,3 | 288:1 |
| 51:9 | 116:21 | 178:18 | 223:1,17 | **rotate** | **rushed** |
| 53:3,10 | 117:3,12 | 179:2,3 | 224:8 | 23:8 | 206:22 |
| 55:7,9 | 122:17 | 179:13 | 225:17 | **rotated** | |
| 56:11,19 | 126:1,3 | 180:3,5 | 226:2 | 23:12 | **S** |
| 57:14 | 126:15 | 182:9,17 | 250:8,9 | **rough** 95:2 | **S** 3:6 |
| 59:1,10 | 126:16 | 182:21 | 250:22 | **roughly** | **S-a-h-...** |
| 59:21 | 128:1,5 | 183:1,5 | 251:4 | 32:21 | 148:18 |
| 61:13,16 | 128:13 | 183:10 | 261:2,6 | 61:4 | **safe** 68:16 |
| 61:18 | 130:2 | 183:12 | 261:9 | 94:15 | 109:2 |
| 63:11 | 132:5,13 | 184:7 | 262:2,4 | 148:2,13 | 111:3 |
| 65:6,7 | 133:5 | 185:2 | 262:6,11 | **round** | 147:11 |
| 66:6 | 143:10 | 186:21 | 263:12 | 131:22 | 152:6 |
| 67:4 | 143:14 | 187:11 | 263:13 | **route** | 200:18 |
| 69:7 | 147:1,13 | 187:15 | 266:6 | 62:12 | 209:19 |
| 70:14 | 148:16 | 188:2 | 267:18 | 67:1 | **safety** |
| 71:1,10 | 149:17 | 189:8,10 | 267:19 | 85:18 | 76:9,17 |
| 74:19 | 150:7,11 | 189:13 | 268:2,3 | 91:21 | 176:19 |
| 75:3 | 151:2,8 | 191:20 | 269:2,4 | **Rule** 74:18 | 299:13 |
| 76:14 | 151:9 | 192:7,12 | 269:8,18 | 74:22 | **Sahnas** |
| 77:7 | 153:8,10 | 192:14 | 270:1 | 76:11 | 148:19 |
| 78:13,20 | 153:21 | 192:22 | 272:10 | 84:22 | **Sahnas's** |
| 82:4,12 | 154:3 | 193:8 | 274:10 | 91:16 | 149:5 |
| 82:16 | 155:18 | 194:8,9 | 274:13 | 92:22 | **SAITH** |
| 85:8 | 157:13 | 195:2,3 | 274:17 | 153:7,16 | 307:8 |
| 86:2,12 | 158:1,10 | 195:9,13 | 274:19 | 155:15 | **SANDRA** 1:3 |
| 87:8 | 158:17 | 195:14 | 275:11 | 157:9 | **satisfied** |
| 89:11,21 | 159:15 | 195:17 | 275:18 | 162:2 | 96:14 |
| 90:8,10 | 160:4,8 | 195:22 | 276:1,16 | 184:2 | 126:6 |
| 90:13,16 | 161:1 | 196:4,5 | 276:17 | **rules** 1:21 | 127:2 |
| 90:22 | 162:7 | 196:16 | 277:8,10 | 5:11,13 | 226:14 |
| 91:1 | 163:8,21 | 197:2,15 | 279:1,3 | 5:16,17 | 227:6,11 |
| 92:3,13 | 164:3,11 | 199:16 | 279:9,14 | 5:18 | **saw** 37:15 |
| 93:3 | 164:15 | 201:10 | 282:18 | **run** 86:13 | 58:1,6,7 |
| 94:6 | 164:17 | 202:15 | 282:19 | 86:17,18 | 58:20 |
| 95:12,20 | 165:3,7 | 204:11 | 283:11 | 104:13 | 59:4 |
| 96:13 | 165:19 | 204:19 | 288:10 | 167:2,5 | 63:1 |
| 99:17 | 166:1,12 | 206:5 | 288:21 | **run-ins** | 79:9 |
| 100:13 | 167:1,13 | 208:11 | 289:19 | 217:14 | 80:19 |
| 101:1,6 | 169:16 | 209:2 | 290:11 | **running** | 93:11 |
| 101:10 | 170:19 | 211:3,14 | 296:9 | 86:15 | 108:18 |
| 103:6 | 172:8,9 | 217:19 | 299:20 | 144:8 | 121:7 |
| 110:3,16 | 173:7,9 | 218:7 | 300:15 | 198:5 | 124:16 |
| 111:7 | 173:10 | 220:3 | 301:9,20 | 238:7 | 127:14 |
| 113:6,19 | 174:9,11 | 221:4 | 304:20 | **rush** | 142:5,7 |

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

358

| | | | | | |
|---|---|---|---|---|---|
| 155:3 | 262:19 | 304:2 | 185:20 | 95:19 | 35:3,15 |
| 182:10 | 263:2 | **scenario** | 210:9 | **search** | 36:6,11 |
| 203:15 | 264:10 | 17:14 | 215:22 | 247:18 | 36:15 |
| 203:16 | 283:16 | 167:18 | 216:1,4 | **searching** | 41:22 |
| 205:4 | 304:18 | 167:21 | 216:10 | 247:19 | 42:7,8,8 |
| 210:17 | **says** 7:2 | **scenarios** | 216:12 | **seat** 23:11 | 42:11 |
| 219:11 | 40:22 | 167:18 | 219:2,8 | **seated** | 44:21 |
| 227:22 | 41:20 | 217:16 | 219:11 | 133:14 | 46:14 |
| 228:13 | 45:10 | **scene** | 219:16 | 133:18 | 48:7,8 |
| 248:19 | 47:5 | 58:13,16 | 220:12 | **seats** | 50:4,17 |
| 256:3,21 | 74:2 | 58:22 | 222:19 | 133:13 | 53:12 |
| 262:17 | 84:15 | 59:3,4 | 223:20 | **second** | 54:6 |
| 281:6 | 88:21 | 59:12,15 | 230:5,18 | 13:11 | 63:2,20 |
| 286:13 | 90:1 | 59:22 | 230:20 | 32:1 | 63:22 |
| **saying** | 91:5 | 61:6 | 232:22 | 121:3 | 73:18 |
| 8:22 | 92:15 | 62:20 | 234:1 | 145:12 | 74:16 |
| 53:18 | 98:13 | 63:2,14 | 248:15 | 156:20 | 75:11 |
| 70:7 | 120:17 | 63:16,18 | 250:11 | 171:3 | 79:5 |
| 75:19 | 123:2 | 63:20 | 262:22 | 224:4 | 88:7,13 |
| 76:2 | 148:18 | 64:1,3 | 271:3 | 240:5 | 89:2 |
| 77:9 | 151:12 | 64:14,16 | 272:15 | 242:14 | 91:11 |
| 114:7 | 151:21 | 65:18,21 | 292:10 | **Secondly** | 92:20 |
| 115:19 | 152:21 | 66:19 | 295:7 | 7:6 | 93:2 |
| 116:3,8 | 155:10 | 67:1 | 296:19 | 268:16 | 99:4 |
| 116:12 | 155:12 | 70:9,21 | 300:20 | **seconds** | 104:8 |
| 117:22 | 156:21 | 70:22 | 300:22 | 50:3,4 | 109:11 |
| 118:6,8 | 160:5 | 71:13 | 301:2,8 | 53:12,18 | 110:12 |
| 128:11 | 174:21 | 76:22 | 301:18 | 54:5 | 110:21 |
| 128:16 | 176:11 | 77:9 | 301:22 | 123:15 | 113:21 |
| 137:5 | 198:16 | 79:5,9 | 302:3,4 | 123:16 | 115:15 |
| 177:20 | 227:5,18 | 83:21 | 302:5 | 123:18 | 118:5 |
| 178:1,10 | 229:3 | 85:14 | **schedule** | 139:5,14 | 119:15 |
| 179:7 | 230:4,6 | 89:10 | 22:2 | 139:16 | 120:12 |
| 194:1 | 231:9,20 | 93:5,7 | 149:5 | 240:4 | 120:17 |
| 199:21 | 240:16 | 93:15,17 | **scope** | **Secretary** | 120:21 |
| 211:16 | 243:3,6 | 93:20 | 169:10 | 20:9 | 122:6 |
| 220:10 | 246:9 | 94:4 | **Scott** | **section** | 124:4 |
| 222:20 | 252:1,13 | 96:10 | 151:12 | 99:2 | 127:5,12 |
| 223:3 | 257:22 | 97:6 | 151:13 | 192:2 | 128:3 |
| 226:10 | 258:3,15 | 100:3,7 | **se** 241:10 | 243:6 | 142:16 |
| 234:2 | 259:3,19 | 105:11 | **Seagal** | 298:3 | 144:18 |
| 241:13 | 268:9 | 108:7 | 142:5,6 | 303:13 | 144:19 |
| 242:7 | 270:15 | 113:10 | 142:8,15 | **see** 17:9 | 145:18 |
| 251:19 | 272:14 | 113:11 | **Seal** | 20:21 | 146:11 |
| 257:7 | 278:17 | 116:13 | 308:16 | 21:3 | 147:20 |
| 260:9 | 280:17 | 162:14 | **seams** | 25:15 | 148:17 |

Stevan Vidljinovic
September 4, 2013

| | | | | | |
|---|---|---|---|---|---|
| 150:11 | 266:1 | 87:20 | 57:8,15 | 102:7,10 | 39:11 |
| 152:13 | 267:6 | 98:10 | 57:18,20 | 103:18 | 43:10,13 |
| 153:4,15 | 276:5 | 145:15 | 58:9,11 | 298:14 | 148:22 |
| 153:22 | 278:12 | 149:16 | 58:14,16 | **services** | 216:14 |
| 155:14 | 282:7 | 150:16 | 58:22 | 75:20 | 292:13 |
| 155:17 | 283:3 | 189:1 | 59:14,20 | 90:3 | 292:19 |
| 157:8,12 | 299:16 | 221:6 | 60:13 | 98:15,18 | **shocks** |
| 162:1,8 | 306:16 | 265:15 | 93:12 | 98:21 | 152:10 |
| 162:9 | **seeing** | **seize** | 215:20 | **session** | **shoot** |
| 168:21 | 54:9 | 199:10 | 216:4,6 | 15:17 | 153:14 |
| 169:3 | 58:8,11 | **send** | 216:10 | 18:1 | **shooting** |
| 173:13 | 58:14,16 | 295:22 | 216:11 | 134:2 | 153:1 |
| 175:1,3 | 58:22 | **sending** | 216:21 | 141:13 | **Shootings** |
| 181:15 | 59:14,20 | 131:11 | 217:4 | **set** 268:11 | 160:6 |
| 184:1,6 | 60:1,3,5 | **sense** | 219:7,10 | 268:21 | **short** |
| 184:15 | 60:7,9 | 77:13 | 229:21 | 308:10 | 17:16 |
| 185:18 | 60:11,13 | 116:13 | 231:2,2 | 308:15 | 43:21 |
| 188:19 | 61:7 | 117:15 | 231:7 | **settle** | **shorter** |
| 189:21 | 62:20 | 186:10 | 240:8,19 | 246:18 | 78:7,12 |
| 198:5,19 | 63:5,10 | 305:9 | 242:3,10 | **seven** 50:3 | 78:15,19 |
| 200:20 | 63:12,15 | **sent** | 242:10 | 93:20 | 122:10 |
| 201:15 | 63:17 | 260:14 | 259:19 | 94:3 | 122:16 |
| 203:13 | 93:18 | **sentence** | 260:9 | 230:14 | 245:22 |
| 211:4,6 | 98:11 | 84:15 | 262:7,15 | 230:17 | 246:2 |
| 211:19 | 104:10 | 153:12 | 262:19 | 230:17 | **shorthand** |
| 212:12 | 127:15 | 155:10 | 263:2,18 | 230:22 | 308:7 |
| 215:11 | 173:14 | 156:21 | 263:21 | **Seventh** | **shorts** |
| 222:12 | 215:22 | 183:19 | 264:1,5 | 5:13 | 80:12 |
| 224:20 | 216:6 | 183:21 | 264:9,11 | **severe** | **shot** |
| 225:19 | 242:5 | 282:21 | 287:4 | 157:4 | 154:14 |
| 226:1,4 | 266:11 | **separate** | **sergeants** | **shake** | 154:16 |
| 226:6,6 | 275:2 | 154:16 | 30:10 | 10:11 | 154:18 |
| 227:14 | 276:19 | 244:8 | 57:8 | **sharing** | 231:10 |
| 229:3 | 289:12 | **September** | **serial** | 245:16 | 231:10 |
| 230:6,12 | 289:13 | 1:18 | 146:1,4 | **shift** | 258:16 |
| 231:13 | 299:15 | 87:19 | 258:3,11 | 20:12,12 | 258:20 |
| 235:11 | **seek** 97:19 | 308:16 | **serious** | 20:15,17 | 258:21 |
| 235:15 | 164:22 | **seq** 98:16 | 155:13 | 21:8,20 | **shotgun** |
| 236:18 | 199:8 | **Serb** 13:12 | **served** | 21:21 | 23:11,17 |
| 236:21 | 234:13 | **sergeant** | 266:15 | 22:1 | **shoulder** |
| 244:7 | 234:16 | 1:11 | **serves** | 23:14 | 122:8 |
| 253:14 | 304:7 | 17:1 | 8:19 | 24:16 | 123:1 |
| 255:6,8 | **seen** 6:10 | 29:15,16 | **service** | 27:2,4,8 | 280:21 |
| 257:15 | 17:4 | 29:17 | 42:11 | 28:9,15 | **shoulders** |
| 258:17 | 34:20 | 30:1,14 | 45:9,10 | 29:3 | 10:11 |
| 265:5 | 73:6 | 30:18 | 47:5 | 30:6 | 136:20 |

Stevan Vidljinovic
September 4, 2013

360

| | | | | | |
|---|---|---|---|---|---|
| **show** 8:6 | 142:21 | 211:18 | 116:22 | 251:17 | 194:14 |
| 72:21 | **sidewalk** | **simply** | 214:2 | 253:5 | 205:12 |
| 160:9 | 104:20 | 273:10 | **sitting** | 265:16 | 214:10 |
| 183:7 | **sign** 19:19 | 274:20 | 133:13 | 266:1,21 | 215:1 |
| 191:1,2 | 21:10 | **Sinai** | 230:21 | 266:22 | 228:10 |
| 231:7 | 240:2 | 213:20 | **situate** | **skyroc...** | 235:4 |
| 269:6 | 248:19 | 252:2 | 59:11 | 160:7 | 237:7,8 |
| **shown** 50:9 | 265:5,18 | 253:2 | **situated** | **slacks** | 238:16 |
| 137:21 | 265:21 | 266:10 | 201:16 | 64:6 | 241:8 |
| 302:11 | 266:11 | 267:8 | 202:5,8 | **slapping** | 254:7 |
| **shows** | 268:1 | 287:7,14 | 215:21 | 198:17 | 256:9 |
| 25:13 | 269:9 | 288:12 | **situation** | **slender** | 290:5 |
| 35:21 | 270:4,9 | 297:1 | 82:1 | 79:19 | 303:18 |
| 36:16 | 272:20 | 299:15 | 88:20 | **slide** | 306:6,19 |
| 40:16 | 286:13 | 305:10 | 96:18 | 258:13 | **someone's** |
| 54:15 | 289:12 | 305:16 | 98:4,20 | **slightly** | 138:21 |
| 62:11 | **signal** | 306:1,9 | 101:22 | 175:12 | **somewhat** |
| 270:4 | 129:7 | **single** | 102:3 | **slithered** | 109:20 |
| **shrug** | **signature** | 139:13 | 113:12 | 203:19 | **soon** 9:8 |
| 10:11 | 307:2 | 139:14 | 124:4 | **slow** 238:7 | **sorry** 25:8 |
| **sic** 13:12 | 308:11 | 232:3 | 138:2 | **small** | 32:13 |
| **side** 34:1 | **signed** | 285:19 | 168:13 | 102:1 | 40:19 |
| 103:11 | 22:8 | 285:21 | 170:7 | 190:3 | 232:11 |
| 107:2 | 240:8 | **single...** | 171:1,12 | 191:7,9 | 257:6 |
| 109:14 | 267:21 | 62:3 | 193:5 | **SO3-08** | 269:18 |
| 121:22 | 270:11 | **SIOLIDIS** | 194:13 | 87:20 | **sought** |
| 123:1 | 272:13 | 2:2 | 202:2 | **Soat** 1:8 | 99:2 |
| 130:4 | 275:2 | 308:3,19 | 207:20 | **social** | **sound** 7:11 |
| 134:3,18 | 277:19 | **sir** 4:13 | 290:6 | 180:16 | 7:13 |
| 135:14 | 278:2 | 10:19 | 297:17 | 180:17 | 10:12 |
| 136:4,8 | 280:6 | 75:12 | **situat...** | 180:22 | 117:14 |
| 136:14 | **signing** | 91:2 | 92:16 | **soft** 157:3 | 208:15 |
| 136:14 | 268:12 | 145:16 | 112:9 | **solely** | 208:21 |
| 136:15 | 270:2 | 151:10 | 137:12 | 98:5 | **sounded** |
| 137:4,7 | 273:6 | 166:2 | 221:15 | **somebody** | 269:20 |
| 143:4 | 280:12 | 173:14 | **six** 63:13 | 8:16,18 | **sounds** |
| 166:21 | **signs** | 179:5 | 93:16 | 68:9 | 10:6,8 |
| 200:9,11 | 296:15 | 187:12 | 97:3 | 102:21 | 116:7,12 |
| 203:20 | 296:22 | 189:14 | 133:19 | 138:3 | 117:10 |
| 206:11 | **similar** | 190:7 | 240:7 | 139:5 | 117:13 |
| 232:8 | 8:14 | 192:22 | 245:22 | 140:15 | 118:1,9 |
| 282:8 | 96:22 | 193:21 | **size** | 141:8 | 118:13 |
| 294:8 | 125:18 | 196:21 | 112:11 | 156:3 | 118:17 |
| **side-t...** | 253:21 | 251:5 | **skull** | 158:6 | 119:3 |
| 112:2 | **simple** | 269:9 | 249:17 | 179:21 | 168:16 |
| **sides** | 197:6 | **sit** 23:10 | 250:12 | 185:7,14 | 200:2 |

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

| | | | | | |
|---|---|---|---|---|---|
| 209:4 | 117:20 | 183:18 | 305:6,9 | 75:22 | 46:7 |
| 232:4 | 118:2 | 184:8 | 306:6 | 77:11,13 | 53:5,14 |
| 286:7,9 | 120:4,6 | 192:7 | **specifics** | 97:14 | 53:15 |
| **source** | 120:14 | 229:18 | 131:15 | 100:8 | 54:6,19 |
| 160:21 | 121:5 | 239:15 | 268:7 | 106:3,4 | 54:19 |
| **sources** | 142:13 | 297:20 | 271:20 | 108:7 | 58:2,4,6 |
| 261:11 | 149:6 | 298:1,4 | **specified** | 177:10 | 58:21 |
| **south** | 159:1 | **specific** | 155:1 | 234:1 | 59:4,7,9 |
| 31:20 | 172:11 | 27:18 | **specifies** | 249:15 | 59:11 |
| 35:2 | 177:8,19 | 53:20 | 183:18 | **spotter** | 60:20 |
| 38:14 | 178:4,5 | 79:13 | 243:10 | 134:3,9 | 66:8,9 |
| 55:1 | 188:17 | 107:20 | **specify** | 134:18 | 105:8 |
| 58:14 | 219:21 | 107:22 | 25:19 | 135:4,9 | 291:19 |
| 61:8,19 | 223:4 | 117:1 | 135:18 | 136:4 | 293:13 |
| 61:21 | 255:18 | 141:4 | 218:21 | 142:21 | 294:6 |
| 62:4,16 | 271:7 | 146:4 | 231:21 | 143:4 | **Squadrol** |
| 62:17 | 272:2 | 205:5 | 253:20 | **spotters** | 298:16 |
| 246:7,12 | **speaking** | 236:21 | **specif...** | 134:6,15 | **squads** |
| 246:19 | 7:7 | 241:2 | 208:4 | 135:3,6 | 26:10 |
| 247:6 | 26:15,16 | 255:5 | **speculate** | 136:8 | **SS** 308:1 |
| **Spanish** | 62:4 | 265:14 | 46:21 | 141:20 | 309:1 |
| 37:9 | 64:15 | 267:2 | 141:5 | 142:12 | **stabbed** |
| 38:1,5 | 70:21 | 287:15 | 179:11 | 142:13 | 231:11 |
| 77:15,16 | 77:10,12 | **specif...** | 179:22 | 142:15 | **stack** |
| 116:4 | 80:2 | 51:15 | 196:9 | 156:7 | 45:19 |
| **spasms** | 89:9 | 52:3,12 | 212:7 | **spray** | **staff** |
| 152:8 | 106:13 | 52:19 | 302:15 | 171:13 | 287:7,9 |
| 156:22 | 110:1 | 59:7 | **specul...** | 171:16 | 287:18 |
| 157:4 | 117:21 | 68:11 | 87:3 | 172:2,2 | 288:7,11 |
| **speak** 31:3 | 118:8 | 70:5 | 96:4 | 172:5,6 | 288:13 |
| 43:14 | 162:13 | 93:8 | 132:10 | 172:16 | 288:18 |
| 49:21 | 169:13 | 98:11 | 178:11 | 172:19 | 289:15 |
| 52:2 | 170:1 | 102:9 | 179:10 | 192:16 | **stage** |
| 67:20 | 179:22 | 105:5 | 182:4 | 192:17 | 133:15 |
| 70:4 | 205:16 | 115:12 | 301:4 | 193:7 | 133:17 |
| 71:7 | 216:11 | 118:3 | **speech** | 259:4 | 133:17 |
| 75:22 | **special** | 133:12 | 118:11 | **squad** 22:6 | **stand** |
| 77:11,15 | 31:11 | 203:6 | **speedily** | 22:9,10 | 43:16 |
| 77:16 | 73:4,6,9 | 216:2 | 92:1 | 23:9 | 47:6 |
| 83:22 | 73:10,14 | 245:11 | **spell** 31:1 | 24:6,17 | 111:1 |
| 95:10 | 75:5 | 255:4 | **spinal** | 25:20 | 132:21 |
| 102:8 | 84:21 | 267:4 | 157:3 | 26:7 | 156:3 |
| 103:1,19 | 87:17,19 | 276:7 | **Spinning** | 27:3,13 | 209:8 |
| 104:11 | 87:20,21 | 287:11 | 2:7 | 28:9 | 259:14 |
| 109:8 | 91:13 | 287:21 | **spoke** 68:8 | 42:12,19 | 259:16 |
| 115:12 | 183:8,14 | 300:20 | 70:19,20 | 42:21 | 290:4 |

Stevan Vidljinovic
September 4, 2013

362

standing
67:22
68:3,3
81:2,4
86:1
87:5
106:15
106:17
106:18
108:20
109:1,19
111:15
111:21
115:13
118:14
120:15
133:8
142:5
144:7,10
150:14
150:21
151:3,6
159:8,10
159:22
160:19
162:5
166:20
196:8
199:19
200:19
203:22
208:12
225:18
226:5
272:19
stands
40:22
46:21
100:14
233:20
star 1:6,6
1:7,7,8
1:8,9,10
1:10,11
1:12
177:11

start 6:3
19:3
21:15,16
22:4
28:8,15
29:4
156:20
194:15
194:16
281:7
291:14
started
11:13
21:3
32:18
80:20
101:11
120:5
122:2,18
123:20
129:1
167:16
267:7
271:12
281:9
292:14
292:14
292:16
292:20
292:21
293:3
starting
250:14
state 2:3
4:13
151:21
269:12
308:1,4
309:1
stated
113:4
150:22
163:4
225:13
269:17
269:18

273:10
statement
112:6
182:11
statem...
181:10
251:9
states 1:1
5:11,14
184:10
271:2
272:4
287:3
stating
265:19
station
21:10
41:15
47:21,21
47:22
48:5
72:11
252:11
254:22
statio...
106:19
stations
302:14
stature
112:11
142:9
Statute
182:16
Statutes
90:12,21
91:4
stay
212:12
249:7,13
283:5
stayed
120:1,8
steam
111:16
111:18
step

118:15
168:18
175:14
196:7
306:16
stepped
60:20
124:19
Stevan 1:6
1:17 3:2
4:7,15
268:10
308:5
309:14
stiff
257:11
stiffen
256:11
stiffened
256:6
257:2
stiffe...
256:15
stiffens
256:9
stomach
144:22
266:22
stood
112:16
112:21
142:16
166:13
stop 6:4
7:18,18
7:18
126:1
165:3
178:18
219:16
stops
25:22
stored
20:8
straight
203:20

302:6
strap
221:7
straps
283:15
284:1,4
strate...
109:12
street
2:14,19
31:19
32:19,22
33:5
62:12,13
80:22
86:5
88:2
104:21
105:1,2
105:3,4
105:5,6
105:8,16
105:17
106:15
106:17
108:19
108:20
109:1
111:22
144:7,11
144:13
144:14
144:15
144:16
155:20
155:21
156:8,14
156:17
166:20
182:11
187:1
201:2
203:2,3
203:7,12
203:14
203:16

204:1,4
204:6
205:2,5
206:13
209:12
212:1,3
214:1
215:11
216:13
221:20
224:20
225:6,7
225:9,19
226:6
240:18
241:5
246:11
263:7,19
264:17
272:19
285:16
286:2,9
289:9
strength
97:2
stretches
31:20,21
stricken
289:20
strictly
249:10
strike
13:18
61:16
113:19
114:18
126:2,15
128:1
143:10
155:21
156:14
164:15
165:19
180:3
188:14
188:21

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

363

| | | | | | |
|---|---|---|---|---|---|
| 192:22 | subdue | 179:19 | 231:2 | 40:7 | 302:7 |
| 194:8 | 161:20 | 179:20 | Superv... | 129:16 | system |
| 195:2,13 | subject | 271:5 | 13:7,10 | suspect | 36:10 |
| 195:22 | 69:12 | substa... | 20:10,12 | 137:4,6 | 45:2 |
| 203:14 | 140:9 | 97:1 | 29:10,12 | 137:10 | 293:20 |
| 203:17 | 180:13 | 112:10 | 29:13 | suspected | Systems |
| 211:3,5 | 180:16 | succes... | 30:3,6 | 132:7 | 90:3 |
| 256:5 | 180:19 | 18:18 | 57:7 | suspects | 98:16,21 |
| 263:12 | 193:12 | succinct | 148:21 | 161:22 | |
| 274:9,10 | 198:18 | 187:18 | 216:18 | suspen... | **T** |
| 274:11 | 205:11 | 187:22 | 217:4 | 14:11 | **T** 3:6 |
| 275:11 | 216:22 | suffer | 229:21 | suspicion | table 5:22 |
| 275:16 | 243:16 | 157:17 | supplied | 239:11 | 9:16 |
| 275:19 | 244:15 | 235:21 | 273:8 | suspic... | tactical |
| 290:11 | 247:15 | suffered | supported | 8:16 | 15:9,9 |
| 292:17 | 248:17 | 235:20 | 199:12 | swaying | 236:22 |
| 304:20 | 264:22 | suffering | suppose | 112:3 | 239:15 |
| striking | 270:22 | 72:3 | 37:10 | swear 4:2 | 239:17 |
| 193:11 | 271:1,21 | 157:6 | supposed | swing | 260:12 |
| 198:16 | 287:2 | suffic... | 28:16 | 121:16 | 287:5 |
| struck | 306:4 | 95:21 | 56:12,17 | 123:8,11 | tactics |
| 124:6,9 | subject's | suffic... | 176:14 | 124:20 | 168:14 |
| 202:18 | 198:19 | 273:8 | Supreme | 272:9 | 194:20 |
| 220:1 | 244:16 | suggest | 5:14 | swinging | tag 177:12 |
| 228:2 | 255:7 | 149:17 | sure 5:17 | 121:17 | take 4:20 |
| 231:11 | 256:5 | 197:4 | 6:9 | 144:10 | 5:10  6:6 |
| 243:6 | subjected | suggested | 10:14 | 271:12 | 6:16  7:1 |
| 255:7 | 12:11 | 141:2 | 14:10 | 281:9,17 | 7:3,6,10 |
| study | subjects | 192:18 | 17:21 | switch | 9:5 |
| 73:13 | 175:19 | sugges... | 28:16,21 | 140:1 | 10:12 |
| stun | 181:2,5 | 69:15 | 29:1 | 295:9,16 | 11:4 |
| 137:13 | 205:20 | 174:12 | 34:13 | 295:22 | 12:10 |
| 137:21 | submitted | sugges... | 67:10 | sworn 4:9 | 13:22 |
| 138:3,5 | 240:6 | 255:11 | 84:13 | 76:6 | 19:4 |
| 138:7 | subscribe | suit | 104:19 | 176:17 | 20:18,18 |
| 152:10 | 309:7 | 308:13 | 140:22 | 269:11 | 21:1 |
| 152:16 | SUBSCR... | Suite 2:8 | 145:7 | 308:5 | 25:14 |
| 296:3 | 309:16 | 2:15,20 | 149:20 | 309:16 | 27:9 |
| stunning | subseq... | summer... | 192:5 | swung | 28:17 |
| 138:13 | 18:12,17 | 80:7 | surely | 124:21 | 32:8 |
| 193:11 | substance | Summit | 174:9 | synopsis | 43:21 |
| 193:16 | 108:9 | 247:2 | surgeries | 68:13 | 54:21 |
| 194:2 | 112:8 | Superior | 250:13 | 102:1 | 55:4,13 |
| 195:5,18 | 113:14 | 216:13 | surround | 218:14 | 55:17 |
| 198:15 | 113:16 | Superv... | 162:20 | 262:15 | 62:13 |
| 198:16 | 126:14 | 1:11 | surrou... | 263:5 | 67:3 |

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

364

| | | | | | |
|---|---|---|---|---|---|
| 71:2 | 205:12 | 88:3 | 134:12 | 69:9,16 | 138:1,4 |
| 80:20 | 244:20 | 116:3,6 | 134:14 | 72:19 | 138:8,22 |
| 81:10,17 | 260:18 | 124:3 | 134:17 | 76:22 | 139:1,3 |
| 81:18 | 261:17 | 145:18 | 134:19 | 81:9,11 | 139:13 |
| 82:3 | 273:15 | 175:6 | 136:3,5 | 82:15 | 139:17 |
| 94:8 | 278:2 | 178:15 | 136:8 | 83:5,10 | 139:19 |
| 95:1 | 298:8,12 | 185:22 | 155:7 | 83:22 | 140:1,8 |
| 98:1 | 299:13 | 193:6 | 156:4 | 87:14 | 140:20 |
| 103:3 | 303:19 | 199:5,20 | 205:11 | 91:21 | 140:21 |
| 123:8,11 | 303:22 | 218:19 | 205:21 | 92:1,8 | 142:19 |
| 129:18 | **takes** 97:2 | 226:3 | 207:3 | 93:6,8 | 142:19 |
| 129:22 | **talk** 5:21 | 248:22 | 212:10 | 94:8 | 142:19 |
| 142:2 | 6:3 8:1 | 255:10 | 214:11 | 97:15 | 143:1,3 |
| 149:20 | 9:19 | 287:18 | 217:1 | 102:11 | 143:18 |
| 149:21 | 10:1 | 303:10 | 247:18 | 102:13 | 143:19 |
| 189:7 | 39:16 | **talks** | 251:21 | 102:16 | 143:19 |
| 197:1,9 | 45:21 | 82:18 | 263:10 | 102:19 | 143:19 |
| 197:16 | 64:14 | 146:1 | 266:9 | 103:3,4 | 143:19 |
| 205:7,15 | 67:2 | 152:20 | 271:13 | 103:10 | 143:22 |
| 245:3 | 70:9,15 | 197:21 | 281:20 | 110:9,14 | 143:22 |
| 252:10 | 89:5 | **tall** 78:2 | **Taser** 13:8 | 111:9,10 | 143:22 |
| 257:4 | 101:18 | 78:3,4 | 13:17,22 | 125:12 | 144:17 |
| 264:2 | 130:3 | 78:11 | 14:15 | 125:20 | 144:20 |
| 269:3,4 | 170:3 | 94:21 | 15:12 | 127:21 | 144:22 |
| 276:8 | 183:13 | **tangent** | 18:14,19 | 127:21 | 145:6,10 |
| 278:5 | 198:14 | 192:13 | 18:20 | 127:21 | 145:19 |
| 283:14 | 218:5 | **target** | 19:1,19 | 127:21 | 146:2,2 |
| 284:14 | 223:6 | 145:2 | 20:1,14 | 128:15 | 146:5,8 |
| 303:16 | 251:10 | **tase** 97:11 | 20:16 | 128:15 | 146:13 |
| 304:3 | 251:13 | 136:12 | 21:7,9 | 128:15 | 146:15 |
| 306:11 | 262:7 | 137:4,6 | 21:11 | 128:19 | 146:16 |
| 306:15 | 267:7 | 137:10 | 51:3,7 | 128:19 | 147:9 |
| **taken** 9:7 | **talked** | 137:18 | 51:11,16 | 128:19 | 148:1,4 |
| 44:2 | 80:1 | 139:5 | 51:17,18 | 128:22 | 148:15 |
| 67:18 | 118:22 | 154:6 | 51:19 | 128:22 | 149:4 |
| 74:15 | 172:17 | 219:9 | 52:3,5,8 | 128:22 | 150:4 |
| 84:17 | 218:14 | 304:7 | 52:15,16 | 129:5,5 | 152:4,21 |
| 97:3 | 236:11 | **tased** | 52:18 | 129:5,6 | 154:5,10 |
| 101:3 | 252:21 | 130:10 | 55:3,12 | 129:6,7 | 154:14 |
| 153:17 | 301:21 | 130:14 | 61:1 | 129:9,11 | 155:19 |
| 157:10 | **talking** | 130:15 | 66:2 | 129:17 | 156:5,13 |
| 159:17 | 5:19 6:4 | 130:15 | 67:2,3,6 | 130:1,17 | 156:16 |
| 162:3 | 36:20 | 131:6,9 | 67:7,13 | 132:17 | 157:14 |
| 184:1,3 | 39:11,18 | 132:22 | 67:15 | 134:21 | 157:17 |
| 197:12 | 82:11 | 133:3,9 | 68:10,12 | 135:11 | 158:4,8 |
| 205:10 | 83:18 | 134:11 | 68:15 | 137:20 | 158:13 |

Stevan Vidljinovic
September 4, 2013

365

| | | | | | |
|---|---|---|---|---|---|
| 160:6,11 | 233:2 | 142:10 | 247:8 | 287:21 | 163:2 |
| 161:4 | 234:15 | 156:4 | 294:9 | 288:1 | 164:1 |
| 162:15 | 243:15 | 207:10 | **tell** 8:18 | 302:10 | 184:20 |
| 162:22 | 257:14 | 209:19 | 9:2 | **telling** | 187:6 |
| 163:10 | 257:19 | 219:11 | 13:14 | 84:10 | 194:5 |
| 164:19 | 257:20 | 219:16 | 25:11 | 100:19 | 201:5 |
| 173:4 | 257:22 | 248:4 | 26:10 | 166:10 | 225:12 |
| 186:15 | 258:4,6 | 249:1 | 40:12 | 217:15 | 273:3 |
| 190:10 | 259:3,7 | 285:16 | 47:13 | 253:7 | 277:4,18 |
| 190:16 | 259:12 | **taught** | 49:5 | 262:21 | 277:21 |
| 192:2,3 | 263:1,22 | 99:6,14 | 69:9,22 | 271:16 | 308:9 |
| 194:18 | 295:6,7 | 99:18 | 71:2 | **tells** | **testing** |
| 194:19 | 295:13 | 140:7,15 | 84:7 | 217:5,11 | 17:8,12 |
| 194:22 | 295:16 | 140:17 | 107:10 | **temper...** | 17:12,19 |
| 196:6,6 | 295:17 | 140:19 | 107:18 | 80:8,10 | **thank** |
| 196:6 | 296:4,7 | 145:4 | 114:11 | **ten** 133:19 | 10:18 |
| 200:7 | 300:6 | 170:21 | 114:16 | 283:12 | 34:16 |
| 202:18 | **tasered** | 172:20 | 117:18 | 301:3 | 44:1 |
| 205:3,7 | 155:4 | 175:15 | 129:7,13 | **term** | 156:18 |
| 205:14 | 204:3 | 176:1 | 130:12 | 270:20 | 167:6 |
| 205:19 | 208:16 | 180:21 | 131:8,13 | **terminal** | 180:10 |
| 210:13 | 221:19 | 181:4,6 | 136:11 | 54:18 | 190:14 |
| 210:18 | 222:14 | 195:5,19 | 137:3,6 | **termin...** | 220:14 |
| 211:2 | 256:22 | **teach** | 137:22 | 182:13 | 232:6 |
| 212:14 | 289:8 | 99:21 | 142:15 | **termin...** | 263:16 |
| 213:17 | 290:5 | **teaching** | 142:19 | 37:19 | 274:17 |
| 213:18 | **tasering** | 17:10 | 154:20 | 42:6 | 275:11 |
| 216:15 | 208:22 | 152:17 | 160:16 | 48:4 | 307:5 |
| 216:22 | 266:21 | **Technical** | 177:1 | **terms** | **theirs** |
| 217:4,6 | **Tasers** | 289:4 | 187:20 | 191:3,12 | 45:21 |
| 217:20 | 19:3,6,9 | **techni...** | 199:15 | **test** 14:1 | **thereof** |
| 217:21 | 19:11 | 291:10 | 217:11 | 17:14,15 | 308:14 |
| 218:6,8 | 20:8,21 | 291:12 | 222:13 | 17:16 | **thing** 10:3 |
| 218:9,12 | 21:3 | **techni...** | 229:21 | 28:16,19 | 107:20 |
| 218:12 | 52:1 | 98:14,19 | 233:5 | **testified** | 119:4 |
| 218:20 | 150:20 | **technique** | 242:3 | 4:9 | 121:13 |
| 218:22 | 152:1,5 | 195:5,18 | 246:13 | 293:8 | 124:18 |
| 219:3,6 | 155:11 | **techni...** | 250:11 | **testify** | 185:12 |
| 219:6,7 | 157:1 | 181:14 | 251:16 | 6:22 | 234:18 |
| 219:12 | 159:5 | 186:19 | 252:21 | 308:6 | **things** |
| 219:14 | 161:10 | 191:6 | 253:4 | **testimony** | 10:9 |
| 219:14 | 161:20 | **teetering** | 262:22 | 58:19 | 12:18 |
| 219:14 | **tasing** | 111:19 | 263:6,18 | 63:7 | 125:19 |
| 220:5,10 | 133:20 | 112:17 | 265:1 | 89:8 | 126:13 |
| 226:15 | 141:6,8 | **telephone** | 269:5 | 113:3 | 173:12 |
| 230:15 | 141:12 | 9:9 | 272:16 | 117:7 | 175:14 |

Stevan Vidljinovic
September 4, 2013

366

| | | | | | |
|---|---|---|---|---|---|
| 238:6 | 189:19 | **three-...** | 100:11 | 279:17 | 140:1,12 |
| **think** 8:22 | 198:9 | 162:4 | 102:14 | 280:12 | 140:16 |
| 61:10 | 226:21 | **threw** | 105:19 | 281:9,17 | 140:17 |
| 68:14,21 | 228:12 | 167:18 | 105:20 | 283:10 | 295:9,15 |
| 86:16 | 229:15 | 241:22 | 106:5 | 283:13 | 295:22 |
| 94:11 | 234:5 | **throw** | 114:7 | 285:22 | **told** 20:11 |
| 106:6 | 253:17 | 194:16 | 115:19 | 287:14 | 56:20 |
| 115:10 | 257:3 | **thud** 204:5 | 119:22 | 304:6 | 72:8 |
| 118:16 | 285:7 | 204:10 | 120:2 | 308:10 | 84:1 |
| 118:17 | **threat** | **tighter** | 126:20 | 309:5 | 97:16 |
| 120:18 | 232:3 | 256:10 | 139:12 | **times** 7:5 | 100:14 |
| 125:19 | **threat...** | **time** 6:10 | 139:20 | 9:13 | 108:1,5 |
| 151:1 | 232:1 | 6:10 7:7 | 146:22 | 33:16 | 112:21 |
| 160:15 | **threat...** | 7:9 8:2 | 148:7,13 | 48:15 | 114:10 |
| 163:19 | 92:16 | 14:10 | 148:14 | 124:22 | 114:15 |
| 164:13 | **threats** | 15:12 | 148:21 | 139:20 | 127:17 |
| 165:5 | 231:12 | 20:10 | 162:13 | 143:21 | 134:1,8 |
| 184:8 | 231:16 | 22:3,20 | 163:14 | 189:17 | 134:15 |
| 185:17 | 231:18 | 24:13 | 169:14 | 189:18 | 135:21 |
| 188:15 | 231:21 | 26:14,16 | 174:5,7 | 262:5 | 137:19 |
| 189:5,5 | **three** 6:3 | 27:13 | 177:17 | 295:12 | 140:22 |
| 189:17 | 12:1,4 | 32:20 | 179:8 | 304:14 | 147:17 |
| 190:20 | 14:17 | 33:1,20 | 190:9 | **tion** 47:18 | 152:16 |
| 190:22 | 19:13 | 36:5,5 | 193:4,20 | **tissue** | 154:5 |
| 191:6 | 95:5 | 36:20,22 | 200:14 | 157:3 | 169:1 |
| 216:18 | 96:12,14 | 38:10 | 203:8,10 | **title** | 216:14 |
| 222:10 | 96:15 | 42:2 | 210:7 | 151:11 | 219:2 |
| 224:2 | 97:8,21 | 46:3 | 213:15 | 235:4 | 228:12 |
| 232:21 | 100:9 | 48:7 | 216:10 | **today** 6:3 | 233:13 |
| 261:21 | 101:12 | 55:11 | 223:9 | 9:7 46:3 | 236:14 |
| 261:21 | 102:5 | 59:3 | 226:13 | 107:14 | 244:22 |
| 277:5 | 109:4,9 | 60:19,19 | 226:14 | 143:15 | 245:4 |
| 293:8 | 109:12 | 60:22 | 226:20 | 230:21 | 254:11 |
| 303:4 | 125:13 | 61:1 | 226:21 | 269:7 | 263:8,15 |
| **thinking** | 125:15 | 63:21 | 226:22 | 271:17 | 263:21 |
| 179:12 | 126:5,8 | 67:14,16 | 227:7 | 272:17 | 264:7 |
| **third** 48:3 | 126:22 | 72:15 | 229:7 | 273:7,14 | 286:2 |
| 109:15 | 129:14 | 73:13,13 | 230:9,15 | 273:17 | 291:18 |
| 242:13 | 143:21 | 73:16,16 | 235:17 | 273:20 | 292:9 |
| **thought** | 163:18 | 78:21 | 244:5,10 | 277:13 | 293:12 |
| 25:6 | 187:17 | 81:3 | 251:6 | 277:19 | 300:3 |
| 92:4 | 188:8 | 83:6 | 252:11 | 277:22 | **tolerate** |
| 150:12 | 206:20 | 84:20 | 253:18 | 278:8 | 196:22 |
| 177:2,21 | 208:5,6 | 85:6 | 266:12 | 280:2 | **tone** |
| 178:12 | 238:21 | 89:12 | 269:3 | 281:15 | 118:18 |
| 178:16 | 296:8 | 94:18 | 273:13 | **toggle** | 118:19 |

Stevan Vidljinovic
September 4, 2013

367

| | | | | | |
|---|---|---|---|---|---|
| 118:20 | 245:7 | 130:6 | transp... | 159:5,17 | **TRR** 262:14 |
| **tool** 69:17 | **traffic** | 134:2 | 99:3 | 159:20 | 263:4 |
| 171:7 | 55:13 | 136:3 | 108:10 | **tried** 92:1 | **truck** 61:6 |
| **tools** | 105:7,15 | 137:9 | 233:14 | 108:9 | 61:7 |
| 170:8,11 | 105:15 | 138:12 | 298:9 | 115:15 | 63:5,10 |
| **top** 46:14 | 105:18 | 139:18 | 303:20 | 115:20 | 301:3,6 |
| 88:8 | 293:13 | 141:12 | 305:15 | 123:10 | **trucks** |
| 136:20 | **trained** | 152:22 | **transp...** | 124:5,8 | 105:16 |
| 144:14 | 16:17 | 154:4,14 | 88:18,22 | 186:2 | **true** 77:19 |
| 156:21 | 17:4 | 156:1,7 | 91:7 | 187:1 | 237:12 |
| 160:5 | 39:21 | 161:8 | 98:16 | 190:9,11 | 268:2 |
| 184:12 | 56:12 | 167:7,14 | 235:1,4 | 190:12 | 269:13 |
| 206:21 | 129:14 | 167:22 | **travel** | 191:14 | 285:20 |
| 223:13 | 137:18 | 171:11 | 145:5 | 191:15 | 303:1,2 |
| 240:13 | 152:15 | 173:11 | **treat** | 192:21 | 308:8 |
| 246:11 | 157:14 | 173:16 | 232:22 | 193:16 | 309:8 |
| **topic** 31:5 | 158:4,8 | 174:2 | **treatises** | 195:4 | **truth** 8:17 |
| **torso** | 167:8 | 176:7,8 | 90:5,14 | 205:22 | 308:6 |
| 136:18 | 171:8 | 185:6 | 90:17 | 218:16 | **truthful** |
| 136:19 | 173:19 | 205:14 | **treatment** | 232:19 | 277:22 |
| **total** 23:3 | 176:13 | 234:17 | 74:10,10 | 271:10 | **truthf...** |
| 202:7 | 176:20 | 254:6 | 76:7 | 272:1 | 272:21 |
| **touch** | 181:17 | **transc...** | 84:5 | 276:4,20 | **try** 4:16 |
| 126:7 | 185:10 | 8:8 | 89:2 | 277:12 | 7:15 |
| **touched** | 193:11 | 308:9 | 91:11 | 277:14 | 9:16 |
| 263:6,19 | 205:14 | 309:5,8 | 97:19 | 278:1,10 | 25:10 |
| 264:1,4 | 205:18 | **transport** | 98:2,18 | 278:18 | 70:15 |
| 264:8 | 205:19 | 69:21 | 99:4,7 | 280:7,10 | 71:20,21 |
| **touching** | 280:22 | 71:19,22 | 99:10,15 | 280:15 | 84:4 |
| 213:14 | **training** | 76:6 | 100:4 | 280:17 | 111:3,4 |
| **tour** 19:3 | 11:10 | 77:4 | 111:13 | 281:4,13 | 120:12 |
| 19:5,7,7 | 14:14 | 97:18 | 115:9,15 | 281:16 | 123:8 |
| 19:8,20 | 15:3,10 | 199:7 | 170:17 | 282:10 | 127:13 |
| 21:2,9 | 15:11,17 | 232:19 | 199:8 | 285:18 | 138:4,5 |
| 29:6 | 16:1,3,4 | 233:8 | 218:16 | **trigger** | 154:6 |
| 30:15 | 16:12 | 234:10 | 234:14 | 138:9,13 | 168:8,11 |
| 31:4,12 | 17:2,5,9 | 234:12 | 234:16 | 139:1,13 | 169:20 |
| 32:18 | 17:22 | 234:18 | 252:1 | 139:15 | 179:4 |
| 33:2,12 | 18:1,6 | 234:18 | 253:2 | 139:20 | 187:8 |
| 95:14 | 18:13,18 | 234:21 | 285:18 | 139:22 | 194:2,12 |
| 292:15 | 21:13 | 235:6,9 | 304:7,11 | 140:13 | 195:18 |
| 292:16 | 101:19 | **transp...** | **trees** | 144:5 | 237:20 |
| **tours** | 109:21 | 89:1 | 34:11 | 163:10 | 237:20 |
| 11:14 | 113:5,9 | 91:10 | **trial** 9:4 | 200:6 | 238:2,5 |
| **TR** 230:15 | 129:10 | 92:20 | 34:11 | 295:7,12 | 255:20 |
| 237:4 | 130:3,5 | 99:3 | **Tribune** | 295:16 | 256:19 |

Stevan Vidljinovic
September 4, 2013

368

| | | | | | |
|---|---|---|---|---|---|
| 261:13 | 140:12 | 217:22 | **uncuffed** | 261:12 | **unplea...** |
| 271:7 | 182:18 | 219:1,5 | 212:21 | **unders...** | 130:9 |
| 276:9 | 183:2,5 | 246:14 | 213:1 | 46:1 | **unqual...** |
| 278:12 | 207:7 | 249:9,16 | **undern...** | 115:1 | 261:4 |
| 279:21 | 224:2 | 255:7 | 134:19 | 143:17 | **unsupp...** |
| 279:22 | 288:14 | 291:17 | 137:1 | 178:3 | 182:2 |
| 284:7 | 295:18 | 300:19 | 148:17 | 181:20 | **unusually** |
| 288:7 | **turned** | 302:11 | 198:15 | 199:17 | 95:13 |
| 303:3 | 57:1 | 302:13 | 258:10 | 218:8 | **update** |
| **trying** 7:7 | 181:22 | 302:15 | 258:12 | 239:1 | 174:5 |
| 7:8,11 | 295:20 | **two-man** | 258:13 | 251:14 | **updated** |
| 7:13 | **turning** | 22:10 | **unders...** | **unhols...** | 151:13 |
| 77:6 | 29:2 | **type** 159:4 | 26:2 | 94:7 | 154:8 |
| 84:2 | 140:15 | 198:2 | 27:2 | 146:15 | **upgraded** |
| 97:17 | **turns** | 217:18 | 76:2,16 | **uniform** | 256:20 |
| 102:3 | 140:1 | 232:7,12 | 77:6,9 | 13:6 | **upright** |
| 117:11 | **two** 14:9 | 233:9,17 | 100:12 | 15:22 | 111:17 |
| 122:6 | 14:16 | 235:10 | 102:18 | 18:15 | 111:21 |
| 124:3 | 16:19 | 236:1 | 117:19 | 64:4,8 | 133:3 |
| 127:15 | 23:7,8 | 254:1 | 118:1,6 | 102:6 | 142:1,10 |
| 137:10 | 43:5,6 | 256:12 | 126:4 | 177:12 | 156:3 |
| 168:19 | 47:16,18 | 294:21 | 163:20 | 177:15 | 203:22 |
| 168:22 | 49:10 | 297:6 | 177:22 | 292:1,4 | **urging** |
| 177:5 | 50:16,21 | 298:18 | 178:6,9 | 292:7,11 | 153:1 |
| 185:22 | 64:2 | **typewr...** | 178:10 | **unit** 15:9 | **use** 8:8 |
| 196:19 | 66:1,7,9 | 308:7 | 179:7 | 15:10 | 10:4,5,6 |
| 219:16 | 66:12 | **typical** | 180:7,9 | 29:8 | 14:15 |
| 227:1,2 | 83:2 | 144:13 | 188:11 | 242:19 | 15:11 |
| 234:19 | 85:10 | | 188:15 | 259:10 | 19:20 |
| 251:12 | 93:13,14 | ——— U ——— | 199:20 | 259:17 | 69:15 |
| 257:4 | 94:3,20 | **uh-huh** | 200:2 | 291:6,9 | 129:9,13 |
| 269:5 | 102:8,11 | 10:7 | 219:17 | 291:13 | 130:17 |
| 277:2,4 | 102:13 | **uh-uh** 10:7 | 228:9 | 291:15 | 137:15 |
| 277:5 | 104:8,11 | **ultima...** | 234:19 | 291:16 | 138:1 |
| 283:22 | 131:10 | 188:14 | 285:20 | 291:17 | 139:17 |
| 284:1,3 | 131:18 | **unable** | 285:22 | **United** 1:1 | 145:10 |
| 285:14 | 131:21 | 125:16 | 286:3,5 | 5:11,14 | 155:9 |
| 287:20 | 133:3 | **unacce...** | 303:13 | **units** | 156:6 |
| **tune** 39:21 | 138:14 | 189:4 | 304:18 | 230:5 | 158:4,8 |
| **tuned** | 142:12 | **uncomf...** | 305:9 | 291:2 | 159:5 |
| 33:16 | 144:22 | 132:7 | **unders...** | **unknown** | 160:6,7 |
| **turn** 28:20 | 160:8 | **uncont...** | 27:4 | 238:12 | 160:11 |
| 56:13,20 | 202:18 | 152:8 | 139:17 | 238:20 | 161:9,16 |
| 57:3,5 | 212:16 | **uncoop...** | 227:17 | 239:6,8 | 161:17 |
| 101:14 | 215:15 | 193:12 | 228:19 | **unmarked** | 167:8,9 |
| 109:5 | 215:16 | 289:13 | 229:6,7 | 25:8 | 167:14 |

Stevan Vidljinovic
September 4, 2013

369

| | | | | | |
|---|---|---|---|---|---|
| 167:17 | **usually** | 85:14 | 169:7,17 | **video/...** | **visited** |
| 168:2,11 | 30:17 | 93:10 | 181:7,7 | 25:21 | 266:5 |
| 168:15 | 33:12 | 95:1 | 181:10 | 26:4,8 | **visiting** |
| 168:18 | 152:11 | 96:11 | 181:10 | 27:3 | 242:10 |
| 168:19 | 185:6 | 215:19 | 181:13 | 56:1,13 | **voice** 7:4 |
| 168:22 | 241:9 | 300:19 | 231:12 | 57:18,21 | 51:13,16 |
| 170:8,10 | 248:2 | **Valenz...** | 231:16 | **Vidlji...** | 118:10 |
| 171:8,13 | 254:8 | 1:7 60:1 | 231:18 | 1:6,17 | 118:11 |
| 171:22 | 258:10 | 93:11 | 231:21 | 3:2 4:7 | 118:21 |
| 172:20 | 292:15 | 215:20 | 232:3 | 4:16 | 302:16 |
| 172:21 | 302:14 | **vantage** | 255:8,10 | 268:15 | 302:20 |
| 173:4,6 | **utility** | 112:5,7 | 255:14 | 270:19 | 303:9,11 |
| 173:19 | 18:15,19 | 125:15 | 255:16 | 271:2,6 | **volts** |
| 175:1 | 102:7 | 126:5,22 | 256:1,3 | 271:13 | 140:19 |
| 180:16 | 104:3 | 133:6 | **verbal...** | 286:21 | 141:2 |
| 181:2,14 | 171:5 | **varies** | 70:1 | 287:3 | **voluntary** |
| 185:4,7 | 172:1,12 | 24:3 | 71:3 | 308:5 | 130:14 |
| 190:20 | **utilizing** | 82:3 | **verbally** | 309:14 | **volunteer** |
| 191:12 | 181:13 | **various** | 169:14 | **Vidlji...** | 130:16 |
| 191:13 | **utter** | 170:4 | 177:13 | 268:10 | 130:20 |
| 191:14 | 220:13 | 221:10 | 192:20 | 268:20 | 132:6,12 |
| 191:15 | 231:19 | 268:17 | 232:1 | **view** 80:21 | 135:6 |
| 191:16 | 232:2,4 | **vast** 239:2 | **verbatim** | 110:10 | 136:7 |
| 191:16 | 285:19 | **vehicle** | 6:16 7:1 | 110:17 | **volunt...** |
| 192:18 | 285:21 | 24:22 | 68:8 | 200:17 | 130:22 |
| 193:7,9 | 286:4 | 25:4,9 | 69:10 | 200:19 | 154:13 |
| 193:10 | **uttering** | 25:11,12 | 84:1 | 201:11 | 264:3 |
| 193:12 | 286:3,7 | 25:14,17 | 97:16 | **violated** | **volunt...** |
| 193:16 | 286:9 | 25:19 | 115:7 | 74:6 | 131:1,3 |
| 194:2,22 | | 27:7,8 | 119:14 | **violating** | 131:14 |
| 195:4,18 | ___V___ | 28:13,17 | **vest** 29:1 | 76:17 | 131:20 |
| 195:19 | **v** 1:5 | 53:12 | 177:11 | **violation** | 132:1,17 |
| 216:15 | **V-a-l-...** | 56:8 | **Vic** 25:3 | 74:7 | 132:22 |
| 216:18 | 43:3 | 57:18,21 | **vicinity** | **violent** | 133:7,9 |
| 217:4,5 | **V-i-d-...** | 61:2 | 105:22 | 170:11 | 133:11 |
| 218:9,11 | 4:15 | 103:3 | 190:9 | **violently** | 134:2 |
| 218:20 | **vague** | 105:12 | 201:19 | 155:22 | 136:2 |
| 219:2 | 270:20 | 106:2,5 | 281:19 | **visible** | 141:11 |
| 220:5,10 | **VALADEZ** | **vehicles** | **victim** | 219:1 | 141:17 |
| 242:1 | 1:8 | 27:22 | 72:9 | 248:19 | 141:18 |
| 279:8,15 | **Valdov...** | 105:9,9 | **Victoria** | 265:5,18 | 155:4,6 |
| 279:18 | 1:7 43:3 | 105:11 | 26:21 | 265:21 | |
| 280:3 | 49:12,22 | **verbal** | **video** 26:2 | 266:11 | ___W___ |
| **uses** 170:4 | 60:5 | 10:15 | 55:21 | 289:12 | **waddling** |
| **usual** | 72:14 | 17:12 | 57:9 | **visit** | 112:1,17 |
| 221:10 | 81:16 | 168:7 | 146:14 | 265:22 | **waist** |

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

370

| | | | | | |
|---|---|---|---|---|---|
| 107:4 | 85:19 | 187:18 | 174:22 | 295:19 | 296:10 |
| **waistband** | 86:1,20 | 187:22 | 181:8 | 295:21 | 296:18 |
| 136:21 | 87:6,7 | 188:4,14 | **warns** | 295:22 | 304:6 |
| 137:1 | 101:13 | 189:21 | 156:22 | **way** 6:18 | 308:13 |
| **wait** 52:6 | 101:16 | 191:8 | **warrant** | 10:1 | 308:14 |
| 143:3 | 104:14 | 197:16 | 108:14 | 14:5 | **we'll** 8:16 |
| 192:22 | 104:20 | 197:21 | **wasn't** | 18:13 | 9:10 |
| **waited** | 104:21 | 207:4 | 56:2 | 26:2 | 34:13 |
| 252:8 | 104:22 | 218:11 | 61:6 | 54:11,22 | 39:7 |
| **waived** | 105:16 | 218:20 | 67:15 | 55:2 | 73:1 |
| 151:3 | 106:11 | 250:5,17 | 80:12 | 67:12 | 74:1 |
| **waiving** | 106:18 | 251:7,8 | 85:19 | 73:18 | 97:10 |
| 271:1 | 109:5 | 251:11 | 86:4 | 77:15,18 | 115:22 |
| 287:2 | 164:21 | 255:6 | 96:2 | 80:18 | 128:2,6 |
| **walk** 86:22 | 217:22 | 261:6 | 108:22 | 90:1 | 146:10 |
| 104:14 | 272:6 | 270:12 | 111:19 | 110:8 | 211:19 |
| 104:14 | **want** 6:9,9 | 270:12 | 112:1 | 111:14 | 213:22 |
| 104:18 | 8:4,11 | 274:1,2 | 121:17 | 121:4 | 243:17 |
| 104:18 | 8:19 | 276:18 | 122:11 | 123:21 | 269:7 |
| 182:12 | 9:19 | 282:20 | 144:15 | 127:11 | **we're** 9:20 |
| 206:6 | 10:4,5,6 | 289:19 | 186:5,15 | 129:8,15 | 26:15,16 |
| 209:8 | 10:10 | 297:19 | 192:7 | 134:4 | 35:10 |
| 214:15 | 20:18 | 298:3 | 201:11 | 135:2,13 | 45:18 |
| **walked** | 21:15,16 | 301:12 | 210:22 | 136:20 | 54:11 |
| 67:21 | 34:18 | 305:6 | 238:7 | 142:5 | 82:5 |
| 68:22 | 44:18 | **wanted** | 273:11 | 168:8 | 84:2 |
| 102:17 | 70:2 | 108:2,5 | **watch** 1:12 | 176:13 | 89:22 |
| 103:10 | 73:20,21 | 108:14 | 20:9,12 | 183:17 | 97:16 |
| 106:21 | 84:4 | 112:6,19 | 21:6 | 184:21 | 111:5 |
| 111:8,11 | 92:14 | 137:9 | 29:10 | 185:19 | 112:20 |
| 121:21 | 98:7,12 | 164:7,10 | 30:17,20 | 190:3 | 139:4 |
| 164:4,18 | 99:9 | 164:20 | 60:15 | 193:5 | 169:13 |
| 166:14 | 113:21 | 166:11 | 133:9 | 198:21 | 171:14 |
| 168:16 | 116:15 | 183:11 | 139:6,6 | 204:21 | 192:12 |
| 177:1 | 129:16 | 183:13 | 145:21 | 211:10 | 197:1,2 |
| 181:22 | 132:6 | 186:9 | 231:5 | 213:16 | 280:5,22 |
| 214:10 | 136:22 | 193:5 | 248:7 | 221:6 | **we've** |
| 215:1,3 | 145:12 | 218:8 | 259:20 | 231:1 | 171:8 |
| 215:6,7 | 149:19 | 235:12 | 260:9 | 250:18 | 189:18 |
| 216:5 | 155:8 | 301:14 | **watched** | 264:4,8 | 302:10 |
| 217:20 | 156:19 | **wants** | 141:18 | 267:20 | **weapon** |
| 218:22 | 161:13 | 167:9 | **watching** | 271:15 | 102:10 |
| 271:8 | 165:9,13 | 197:6 | 248:12 | 271:16 | 103:17 |
| 272:5 | 174:19 | **warm** 80:8 | **wave** | 280:22 | 103:22 |
| 274:22 | 178:20 | **warning** | 131:11 | 281:14 | 110:6,9 |
| **walking** | 181:21 | 129:15 | **waves** | 295:15 | 110:10 |

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

| | | | | | |
|---|---|---|---|---|---|
| 129:9 | **went** 11:16 | **weren't** | **withdraw** | 70:19 | 179:11 |
| 132:18 | 15:2 | 8:6 21:4 | 61:16 | 71:7 | 179:18 |
| 145:6 | 18:10 | 48:20 | 163:21 | 75:2 | 182:5 |
| 147:5 | 21:2 | 95:19 | 188:2 | 76:13,21 | 184:6,21 |
| 164:19 | 30:15 | 130:6,10 | 189:14 | 78:10,18 | 186:18 |
| 170:21 | 31:12 | 130:17 | 274:13 | 82:1,13 | 187:7,20 |
| 196:8 | 41:4 | 132:18 | 274:15 | 85:3,22 | 189:1 |
| 239:16 | 52:21 | 205:14 | 276:16 | 86:9 | 193:4 |
| 247:22 | 54:12,13 | 225:10 | 277:8 | 87:4 | 194:6 |
| 258:3,4 | 58:1 | 227:3 | **witness** | 89:9,20 | 199:14 |
| **weapons** | 61:19,21 | 228:20 | 1:20 3:2 | 91:20 | 201:6 |
| 111:4 | 75:5 | 229:19 | 4:5,8 | 92:8 | 202:11 |
| 152:6 | 76:15 | 230:19 | 12:15 | 93:2 | 204:10 |
| 161:16 | 91:14 | 237:21 | 13:4 | 94:1 | 204:16 |
| 170:4 | 99:19 | 264:16 | 16:10 | 95:10,19 | 206:4 |
| 171:3,16 | 100:2 | 285:4 | 19:17 | 96:7 | 208:21 |
| 190:16 | 102:1,19 | **west** 31:20 | 23:20 | 99:14 | 211:10 |
| 248:4,5 | 104:12 | 224:19 | 27:7,18 | 100:6,19 | 217:10 |
| 248:11 | 109:7,8 | 226:6 | 28:5 | 103:1 | 218:4 |
| **wearing** | 119:9 | 240:17 | 30:9 | 109:18 | 219:21 |
| 80:14 | 122:22 | 246:11 | 31:8 | 110:14 | 221:3 |
| 177:14 | 130:4,12 | **Wheel** 2:7 | 33:11 | 111:1 | 222:8,18 |
| **wears** | 141:11 | **wheeled** | 35:20 | 113:4 | 223:16 |
| 67:13 | 143:7 | 214:17 | 36:14 | 114:3,15 | 225:13 |
| **week** 227:5 | 144:19 | **wheeling** | 37:5,19 | 116:19 | 250:3 |
| 227:8 | 147:19 | 214:20 | 38:8,17 | 117:10 | 266:5 |
| **weigh** | 162:14 | **wheels** | 39:3,15 | 122:15 | 271:20 |
| 78:21 | 183:3 | 214:14 | 40:3,16 | 126:11 | 273:5 |
| 94:11 | 194:21 | 214:16 | 41:13 | 128:11 | 282:14 |
| **weighed** | 203:19 | **whichever** | 42:5,16 | 129:21 | 283:9 |
| 94:19 | 203:21 | 20:10 | 44:13 | 132:12 | 288:6,18 |
| **weight** | 207:6 | **white** 25:7 | 45:6,15 | 133:2 | 289:12 |
| 245:14 | 218:19 | 236:7 | 46:10,20 | 143:13 | 290:5 |
| 245:20 | 229:9,13 | **wide-eyed** | 47:9 | 146:20 | 300:14 |
| 246:4,4 | 229:15 | 285:7 | 49:2,21 | 147:9 | 301:6,18 |
| 256:7,21 | 229:16 | **wife** 1:3 | 50:7 | 148:11 | 304:16 |
| 257:1,4 | 244:2 | 247:2 | 51:6 | 155:17 | 307:5 |
| 257:8,10 | 249:3 | **willingly** | 53:2,9 | 157:12 | 308:10 |
| 257:11 | 252:2,5 | 135:7 | 56:7,17 | 158:4 | 308:11 |
| **welcome** | 263:10 | **wireless** | 57:13 | 160:2,20 | 308:15 |
| 263:17 | 263:11 | 37:9 | 58:20 | 165:16 | **witness's** |
| 274:18 | 264:12 | 38:1 | 59:7,18 | 166:9,20 | 58:18 |
| **well-b...** | 265:22 | **wires** | 61:12 | 167:12 | 89:7 |
| 210:20 | 285:10 | 212:14 | 63:10 | 169:12 | 113:2 |
| 210:20 | 289:8 | **wishes** | 66:5,22 | 170:15 | 184:19 |
| 289:8 | 293:9 | 170:6 | 69:5 | 178:4 | 187:5 |

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

372

| | | | | | |
|---|---|---|---|---|---|
| 194:4 | 209:3 | 49:4 | 13:3 | 169:10 | 197:18 |
| 201:4 | 220:13 | 72:17 | 27:5,15 | 170:12 | **03:21** |
| 225:11 | 232:4 | 148:12 | 28:2 | 172:7 | 35:15,22 |
| 273:3 | 279:5,15 | **works** 26:3 | 31:6 | 173:5 | **084-00...** |
| 277:3 | 280:8 | **worried** | 33:9 | 188:4 | 308:20 |
| **witnesses** | 286:3,4 | 141:14 | 34:16 | 189:9 | **084-00...** |
| 6:10 | 286:7,9 | **worth** | 38:22 | 190:19 | 2:2 |
| **women** 79:5 | 304:21 | 280:5 | 39:14 | 192:5,11 | |
| **word** 5:20 | **work** 21:17 | **wouldn't** | 40:1 | 208:10 | **1** |
| 10:4,6 | 47:21,21 | 215:3 | 41:12 | 217:7 | **1** 88:10 |
| 30:5 | 47:22 | 246:15 | 43:15 | 218:2 | 91:9 |
| 38:5 | 48:5 | **write** | 49:1 | 221:21 | 175:14 |
| 75:10,14 | 72:11 | 236:7 | 55:6,8 | 222:5,16 | 175:16 |
| 110:4,5 | 73:15 | 244:1,2 | 56:6 | 224:3 | 227:14 |
| 116:14 | 91:14 | 247:13 | 59:5 | **yeah** 106:4 | 227:20 |
| 143:21 | 147:9 | **writes** | 61:10,15 | 111:17 | 228:16 |
| 163:4 | 231:3 | 88:16 | 63:7 | 214:22 | 228:21 |
| 175:4,10 | 247:20 | 282:21 | 66:20 | **year** 273:6 | 269:6 |
| 175:19 | 302:13 | **writing** | 69:2 | **year-old** | 309:6 |
| 183:20 | 302:14 | 114:22 | 70:12 | 82:8,14 | **1,001** |
| 183:21 | **work-p...** | **written** | 78:8,16 | 82:19,21 | 139:9 |
| 184:22 | 287:1 | 8:8 | 81:20 | 83:3 | **1,002** |
| 228:6 | **worked** | 17:12,14 | 82:10 | **years** 11:3 | 139:9 |
| 280:3,14 | 13:7 | 17:15,16 | 85:1,20 | 12:1,4 | **1:00** |
| 285:19 | 22:14 | 241:1 | 86:6 | 14:9,17 | 100:21 |
| 285:21 | 29:16 | **wrong** 5:21 | 87:1 | 14:17 | **10** 3:15 |
| **word-o...** | 30:1 | 10:6 | 91:15,18 | 19:13 | 48:20 |
| 147:16 | 43:4,7,9 | 235:8 | 93:22 | 23:7 | 100:16 |
| 168:7 | 119:1 | 269:21 | 95:7,16 | 142:6 | 133:22 |
| **words** 75:8 | 302:11 | **wrote** | 96:3 | 160:8 | 145:14 |
| 75:9,13 | **working** | 150:1 | 99:11 | 167:8 | 145:16 |
| 116:7,9 | 9:7 | 241:3,20 | 109:16 | 267:13 | 293:14 |
| 116:12 | 21:20,21 | 256:2 | 110:19 | 291:17 | 294:6 |
| 116:15 | 29:2,8 | 276:3 | 117:6 | | 297:14 |
| 116:20 | 29:20 | 281:14 | 122:12 | **z** | 301:12 |
| 117:1,10 | 47:3 | | 122:14 | **zone** 48:2 | 303:7 |
| 117:15 | 57:7 | **X** | 129:20 | 293:14 | **10:30** 1:18 |
| 118:1,8 | 146:21 | **X** 3:1,6 | 132:4,9 | 294:6 | 22:4 |
| 118:13 | 177:15 | 260:4 | 133:1 | 297:14 | 292:14 |
| 118:16 | 235:18 | **X00-56...** | 149:13 | 303:7 | 292:16 |
| 119:4 | 238:7 | 257:15 | 149:16 | | 292:21 |
| 128:17 | 292:13 | 258:9 | 157:20 | **0** | 293:4 |
| 128:18 | 292:20 | **X26** 146:11 | 159:13 | **02-08-01A** | **1011** 31:19 |
| 129:14 | 302:18 | | 163:1,4 | 173:18 | **1011R** |
| 143:11 | 303:8 | **Y** | 163:22 | **02-08-02** | 24:20 |
| 200:2 | **workings** | **Yamin** 2:19 | 166:18 | 176:5 | 25:16 |

Stevan Vidljinovic
September 4, 2013

373

| | | | | | |
|---|---|---|---|---|---|
| 53:14,19 | 290:22 | 301:12 | **2011** 21:17 | **22nd** 21:16 | **2B** 3:9 |
| 242:20 | 291:3,11 | **1536** 91:11 | 22:15 | 22:15 | 34:19 |
| **1033** 42:12 | 302:11 | **1577** 71:9 | 23:17 | 23:1,17 | 40:11 |
| 42:22 | **11** 3:16 | **158** 3:17 | 26:20 | 24:6 | 42:7 |
| 43:1 | 145:14 | **15th** 31:19 | 27:13 | 26:20 | 44:6 |
| 45:10,10 | 149:9 | 35:11 | 29:14 | 29:14 | 73:21 |
| 47:5 | 150:19 | 151:13 | 30:21 | 30:20 | 82:20 |
| 50:10 | 151:10 | 154:9 | 43:13 | 35:14 | 175:7 |
| 51:2 | **11/10ths** | **170** 94:19 | 75:6 | 43:5,13 | 176:16 |
| 58:8 | 54:5 | **174** 3:18 | 88:2 | 54:21 | 184:10 |
| 62:13 | **112030210** | **176** 3:19 | 146:14 | 75:6 | 297:4 |
| 66:1,8 | 41:22 | **18** 11:22 | 147:19 | 88:2 | **2C** 3:11 |
| 82:15 | **11733** 1:8 | 14:21 | 226:12 | 147:19 | 45:17 |
| 105:12 | **11820** 1:7 | 50:4 | 240:4,14 | 240:3 | 48:16 |
| **1033R** | **12** 3:17 | **180** 245:20 | 291:20 | 291:20 | 72:10 |
| 42:22 | 145:14 | 246:4 | 293:3 | 293:2 | 82:14 |
| 49:9 | 158:17 | **1811** 1:11 | 294:22 | 294:22 | 297:4,8 |
| 50:17 | 158:19 | **194** 1:12 | 295:4 | 295:4 | **2G** 3:10 |
| 51:7 | 161:14 | **1962** 236:8 | 299:16 | 299:16 | 43:19 |
| 66:9 | 269:9 | 236:15 | **2012** | **240** 3:21 | 44:19 |
| 72:13 | **12-C-5751** | 245:5 | 159:19 | **2451** 35:2 | 297:4 |
| 76:22 | 1:5 | **1992** 73:18 | 160:12 | 38:14 | |
| 81:14 | **12,000** | **1995** 87:19 | **2013** 1:18 | 55:1 | **3** |
| 83:6 | 141:2 | **1A** 40:17 | 270:3,4 | 58:13 | **3** 156:20 |
| 87:13 | **14123** 1:8 | 41:1 | 308:17 | 61:19,21 | 191:5 |
| 92:8,8 | **145** 3:15 | 44:7,14 | 309:17 | 62:4,15 | 197:21 |
| 300:18 | **149** 3:16 | 44:20 | **20th** | 62:17 | 270:14 |
| **10691** 21:9 | **14A** 3:13 | 46:15 | 159:19 | 246:6,12 | **3:21** 35:15 |
| **10th** 12:8 | 87:16 | | **21** 3:19 | 246:19 | 41:5 |
| 13:7 | **14B** 3:12 | **2** | 176:4 | 247:6 | **3:27** 36:11 |
| 19:12 | 73:3,4 | **2** 155:9,10 | 191:4 | **25th** 62:7 | 36:15 |
| 25:1,20 | 84:21 | 175:13 | 197:17 | 62:12,13 | **3:39** 48:8 |
| 26:8,10 | 183:2,2 | 180:22 | **210** 98:16 | 86:5 | 48:16 |
| 27:12 | 183:4,7 | 191:5,9 | **211** 291:6 | 105:4 | 49:6 |
| 29:21 | 183:13 | 197:21 | 291:14 | 224:19 | 50:4,9 |
| 42:13 | 297:21 | **20** 3:18 | 291:16 | 225:7,9 | 50:22 |
| 46:22 | **14C** 3:14 | 174:16 | **214** 291:15 | 226:6 | **3:41** 50:22 |
| 48:12 | 98:7 | 184:15 | **214/211** | 240:18 | 51:7 |
| 51:21 | **15** 2:7 | **2003** 174:1 | 291:17 | 246:11 | 55:11,12 |
| 52:6 | 48:20 | 174:17 | **22** 226:12 | **268** 3:22 | **3:42** 54:4 |
| 149:1 | 100:16 | **2009** | 240:14 | **27** 87:19 | 54:5,16 |
| 225:1 | 133:22 | 152:21 | **2227** 2:10 | **27496** 1:10 | **3:46** 148:5 |
| 242:20 | 174:16 | **2010** | **224** 3:20 | 290,304 | **3:54** |
| 244:4,11 | 300:11 | 151:13 | **225** 78:22 | 3:5 | 226:12 |
| 262:13 | **15-minute** | 154:9 | 242:15 | **299** 3:4 | 226:17 |
| 288:13 | 300:17 | 160:12 | 246:4 | **2A** 298:3 | 226:18 |

County Court Reporters, Inc.
630.653.1622

Stevan Vidljinovic
September 4, 2013

374

227:8
240:14
**30** 2:14,19
217:12
247:14
**300** 160:8
160:12
**301** 184:15
**3038**
224:19
226:6
240:17
246:11
**305** 3:4
**307** 309:6
**31** 270:4
**31st** 270:2
**34** 3:9
**3477** 1:10
**36** 240:4
**36/100ths**
240:5

___

**4**

**4** 3:4 **90** 8
90:9
191:5
286:19
**4:38**
147:20
**4:52** 240:4
**40** 48:1,7
82:7,13
82:18,20
83:3
**40-year**
37:9
38:13
44:7
**4051** 1:6
**41** 48:1,6
49:6
**428** 2:8
**43** 3:10
**45** 3:11
246:3,5

**4551** **61** 8
**4th** 1:18

___

**5**

**5** 270:15
275:9
**5'6** 245:19
245:21
**5'7** 78:14
78:19
95:1
**50/1** 98:16
**51** 3:22
268:8,9
268:19
**5174** 1:6

___

**6**

**6** 3:20
94:15,22
192:10
224:2,9
**6'2** 78:5
94:12
242:15
245:21
**6:00** 22:4
33:3,13
292:15
292:21
**6:30** 33:6
**60164** 2:10
**60521** 2:8
**60602** 2:15
2:20
**60623**
240:18
246:7

___

**7**

**7** 3:21
192:10
230:11
239:19
**7:30** 22:5
292:17

292:21
**73** 3:12
**7th** 308:16

___

**8**

**8** 236:8,15
245:4
286:19
**87** 3:13
48:5
72:10

___

**9**

**9:00** 22:4
292:20
293:3,5
**9:30** 32:21
32:22
33:1,6
292:14
292:15
293:10
**90-degree**
107:4
**900** 2:15
2:20
**911** 34:2
35:13
293:20
294:1,4
294:4,10
**9359** 37:9
38:4
**98** 3:14