*Lopez v. Stevan*

*LaKenya White*

*November 9, 2015*

**COUNTY COURT REPORTERS, INC.**
**600 S. COUNTY FARM ROAD**
**SUITE 200**
**WHEATON, IL 60187**
Phone: 630.653.1622
Fax: 630.653.4119
courtreporters@ccrreporters.com

LaKenya White
November 9, 2015

## 1

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2               EASTERN DIVISION
    JOSÉ LOPEZ, by his wife and    )
 3  next best friend, Sandra       )
    Cardiel,                       )
 4                                 )
             Plaintiff,  )  No. 12-cv-5751
 5                       )
       vs.               )  Hon. Harry D.
 6                       )  Leinenweber. Judge
    STEVAN VIDLJINOVIC, Star No. )  Presiding.
 7  4051, JOHN D. GUETTLER, Star )
    No. 5174, JOSÉ VALDOVINOS,     Hon. Geraldine
 8  Star No. 11820, ANTONIO J.     Soat Brown.
    VALENZUELA, Star No. 14123,    Magistrate Judge.
 9  MANUEL GONZALEZ, Jr, Star No.
    11733, JOSÉ F. VALDOVINOS
10  Star No. 11820, ARMANDO
    ALAMILLO, Star No. 106912,
11  JOSEPH DE MONICA, Empl. No.      JURY DEMANDED
    27496, DANIEL LOPEZ, Star No.
12  3477, SUPERVISING SERGEANT
    MARK E. KEARNS, Star No.
13  1811, and WATCH COMMANDER
    ROBERT H. DUBIEL, Star No.
14  194, individually and in
    their official capacities as
15  police officers for the City
    of Chicago, and the CITY OF
16  CHICAGO, ILLINOIS, a
    municipal corporation and a
17  body politic.
18           Defendants.
19           DISCOVERY DEPOSITION OF
                  LaKenya WHITE
20            November 9, 2015
                 11:00 A.M.
21
22
```

## 2

```
 1  herein, pursuant to the provisions of the Federal Rules
 2  of Civil Procedure pertaining to the taking of
 3  depositions for the purpose of discovery, before JENNIE
 4  SIOLIDIS, C.S.R., License #084-004818, a Notary Public
 5  duly qualified and commissioned for the State of
 6  Illinois.
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

## 3

```
 1  PRESENT:
 2           JOHN P. DeROSE AND ASSOCIATES, by
             MR. JOHN P. DeROSE
 3           15 Spinning Wheel Road
             Suite 428
 4           Hinsdale, IL  60521
 5             appeared on behalf of the Plaintiff.
 6
             CITY OF CHICAGO-DEPARTMENT OF LAW, by
 7           MS. MEERA WERTH
             30 North LaSalle Street
 8           Suite 900
             Chicago, IL  60602
 9
               appeared on behalf of the Deponent.
10
11           CITY OF CHICAGO-DEPARTMENT OF LAW,  by
             MR. MATTHEW A. HURD
12           30 North LaSalle Street
             Suite 900
13           Chicago, IL  60602
14             appeared on behalf of the
               Defendant Police Officers and
15             Paramedics.
16
             CITY OF CHICAGO-DEPARTMENT OF LAW, by
17           MR. RAOUL MOWATT
             30 North LaSalle Street
18           Suite 900
             Chicago, IL  60602
19
               appeared on behalf of the
20             Defendant CITY OF CHICAGO,
               ILLINOIS.
21
22
```

## 4

```
 1              I N D E X
 2  WITNESS: LaKenya White
                       Page No.
 3  Examination By:  Mr. DeRose        5
 4
              E X H I B I T S
 5
                         Page No.
 6
    Exhibit No. 271             20
 7
    Exhibit No. 272             33
 8
    Exhibit No. 273             77
 9
    Exhibit No. 274             84
10
            (Exhibits were retained by Mr.
11            DeRose.)
12
13
14
15
16
17
18
19
20
21
22
```

Pages 1 to 4

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

5

1        MR. DeROSE: Would you swear in the witness
2   please?
3        THE COURT REPORTER: Raise your right hand please.
4            (The oath was thereupon duly
5            administered to the witness
6            by the Notary.)
7            LaKENYA      WHITE,
8   Called as a witness by the Plaintiff herein, having
9   been just duly sworn, was examined and testified as
10  follows:
11           EXAMINATION
12           By: Mr. DeRose
13      Q   Good morning, ma'am. Would you please state
14  your name for the record?
15      A   Investigator LaKenya White, L-a-K-e-n-y-a,
16  white, W-H-I-T-E.
17      Q   Miss White, have you ever given a deposition
18  before?
19      A   Yes.
20      Q   Approximately how many times?
21      A   Between 5 to 10.
22      Q   So that'll be the first thing I want to

6

1   remind you. Keep your voice up so we don't have to
2   struggle and so all the people in the room can hear you
3   if you could please?
4       A   Yes.
5       Q   And Miss White, I have to give you a little
6   instruction, but I will make it shorter because it
7   sounds like you're pretty experienced in this
8   proceeding.
9           We will be taking this deposition
10  according to all the applicable rules of the Federal
11  District Court for the Northern District of Illinois,
12  the appropriate rules of the Seventh Circuit Court of
13  Appeals and of the United States Supreme Court that
14  apply to the taking of depositions. You need not
15  concern yourself with what those rules are. That's why
16  we have so many lawyers in the room to make sure the
17  rules are followed, and if one of them interrupts while
18  you and I are talking because they want to discuss
19  whatever the question is that's on the table, just if
20  you hear one of them start to talk, you should
21  immediately stop talking so that the other -- we can
22  discuss whatever the problem is.

7

1           We don't want you to guess here. If you
2   don't know the answer to the question, there's no harm
3   to tell us I don't know or I just don't remember.
4           We will be periodically taking breaks
5   here. And if we haven't taken a break soon enough to
6   accommodate your needs, just let us know and we'll
7   interrupt the proceedings, allow you to make an
8   important phone call or receive an important phone call
9   or even just to take a break to refresh yourself.
10          You have a right to always talk to your
11  lawyer as this case is going on. And if you want to
12  talk to your lawyer, just indicate that and we'll find
13  a way for you to get some privacy so you can talk to
14  your lawyer. All I ask if there is a question on the
15  table and we are -- try to answer that question before
16  we take the break. Is all that clear?
17      A   Yes, sir.
18      Q   Miss White, I understand you are an
19  investigator for the Independent Police Review
20  Authority; is that correct?
21      A   Yes.
22      Q   And how long have you been employed by them?

8

1       A   I've been employed by IPRA for eight years.
2       Q   And have you always been under the title of
3   investigator with IPRA?
4       A   Under IPRA, yes.
5       Q   So were you an investigator for IPRA when it
6   was found in, well, 2008 I think it was founded, wasn't
7   it?
8       A   2007.
9       Q   2007. All right. So you would have been one
10  of the very early investigators with the company, were
11  you not?
12          MS. WERTH: Objection, foundation, lacks personal
13  knowledge. You can answer.
14          THE WITNESS: Yes.
15  BY MR. DeROSE:
16      Q   Were you one of the first batch of
17  investigators who came to IPRA?
18          MS. WERTH: I'm going to object to the form of the
19  question. You mean first batch who came from where?
20          MR. DeROSE: I don't know from where. I'll get to
21  that in a minute, counsel.
22          MS. WERTH: You can answer if you understand the

Pages 5 to 8

LaKenya White
November 9, 2015

9

1    question.
2         THE WITNESS:  I don't understand the question.
3    BY MR. DeROSE:
4         Q    All right.  When you came, was IPRA already
5    up and running in 2008, 2007?
6         A    IPRA was established in 2007 and I was there,
7    yes.
8         Q    So you were there.  You were one of the --
9    you got some of the first batches of assignments that
10   IPRA gave out to its investigators?
11        A    I don't understand the question.
12        Q    Really?  All right.
13        MR. HURD:  John, before IPRA there was OPS.
14        MR. DeROSE:  I know that.
15        MR. HURD:  And many of the investigators from OPS
16   were hired onto IPRA.
17        MR. DeROSE:  All right.
18   BY MR. DeROSE:
19        Q    Is that where you were before you were at
20   IPRA, at Office of Professional Standards?
21        A    Yes.
22        Q    And how long had you been there?

10

1         A    Six, I believe six years, seven years.
2         Q    And before you were at OPS, where were you?
3         A    At the Chicago Police Department.
4         Q    What was your titled position with the
5    Chicago Police Department?
6         A    I was a clerk.
7         Q    A clerk in what branch of the Chicago Police
8    Department?
9         A    I worked for the 21st District Station.
10        Q    And as a clerk, what were your assignments?
11        A    I was activity clerk.  My assignments
12   included recording the daily activities for police
13   officers.
14        Q    Were you ever a Chicago Police Officer on the
15   street in uniform?
16        A    Never.
17        Q    Were you ever authorized in the Chicago
18   Police Department to carry weapons?
19        A    Never.
20        Q    When you went to the Office of Professional
21   Standards, was your -- what was your titled position?
22        A    I was an intake aide.

11

1         Q    And as an intake aide, what were your
2    responsibilities?
3         A    My responsibilities as an intake aide was to
4    log all complaints and register those complaints with a
5    CR number.
6         Q    Now, prior to working for OPS and the Chicago
7    Police Department as a clerk, did you have any other
8    law enforcement experience or background?
9         A    No.
10        Q    So your first job in law enforcement was with
11   the Chicago Police Department as a clerk?
12        A    Yes, sir.
13        Q    And before that, were you gainfully employed
14   anywhere?
15        A    Yes, sir.
16        Q    Where?
17        A    Chicago Public Library.
18        Q    And that would be librarian-type work with no
19   weapons and things like that; is that correct?
20        A    To that effect, yes, sir.
21        Q    And what was your titled position over there?
22        A    Library page.

12

1         Q    And before working for the Chicago Public
2    Library, where did you work, if anywhere?
3         A    I was in high school.
4         Q    I was going to say, we've got to get back to
5    your education eventually.  All right.
6              And post-high school, do you have any
7    formal education?
8         A    Yes, sir.
9         Q    What formal education have you pursued since
10   then?
11        A    I have my Bachelor's in criminal justice.
12        Q    And where did you get that Bachelor's Degree?
13        A    In Chicago State.
14        Q    And what is your Bachelor's Degree in, what's
15   your major study?
16        A    Arts.
17        Q    Have you ever had any formal training in law
18   enforcement work?
19        A    I don't understand the question.
20        Q    Well, have you ever been trained -- this is
21   other than being an investigator.  Have you ever taken
22   any courses in law enforcement, the kind of activities

Pages 9 to 12

LaKenya White
November 9, 2015

### 13

1  police officers are involved in?
2      MS. WERTH: I'm going to object to the form of the
3  question. Are you asking her other than as an IPRA
4  investigator?
5      MR. DeROSE: Yes. I'm asking her early -- I'm
6  asking her about education and training, not positions
7  now.
8      MS. WERTH: Well, just to clarify, I think she's
9  had some training and education while she's being at
10 IPRA, so just to clarify.
11     MR. DeROSE: I'll get to that.
12 BY MR. DeROSE:
13     Q  We're going to come up to IPRA. Before you
14 went to IPRA, did you have any formal course training
15 in law enforcement work at college or high school or
16 anywhere in between?
17     A  I believe so.
18     Q  Where did you get that law enforcement
19 training?
20     A  In college.
21     Q  And what was it in, what were they teaching
22 you, what major subjects?

### 14

1      MR. MOWATT: I'm going to object to the form of
2  that question and to it being compound.
3      MR. DeROSE: Well, that is true, it is. But I'm
4  trying to help her when I see her -- excuse me.
5  BY MR. DeROSE:
6      Q  In college, what course study did you take in
7  law enforcement?
8      A  I took criminal justice classes. I can't
9  recall what classes I took.
10     Q  Were they several different semesters or one
11 semester of study?
12     A  Several.
13     Q  And when you left -- by the way, did you go
14 to college while you were at OPS?
15     A  No.
16     Q  What were the years that you were in college?
17     A  I went to college in 2000 and then I went
18 back in 2010.
19     Q  Was that in between working for OPS or IPRA,
20 or was it while you were also working at Office of
21 Professional Standards or IPRA?
22     A  It was in between working at the police

### 15

1  station and OPS.
2      Q  So how long -- what was the period that you
3  worked for OPS?
4      A  From the end of 2000 I believe, 2001, until
5  it changed to IPRA in 2007.
6      Q  So you were taking college courses over that
7  seven-year period?
8      MS. WERTH: Objection. That's not what she said.
9  You can answer.
10     THE WITNESS: No, that's not what I stated prior.
11 BY MR. DeROSE:
12     Q  How long did it take you to complete your
13 college study and get your degree?
14     A  When I went from 2000, 2001, I did not
15 complete, I stopped. I went back in 2010.
16     Q  And how long once you went back in 2010, how
17 long did you stay to get your degree?
18     A  Took to 2014.
19     Q  So you were a full-time student when you were
20 in college?
21     A  Yes.
22     Q  Did you leave -- I thought we said you

### 16

1  started at IPRA in 2008?
2      MS. WERTH: No, that's not what she said. IPRA
3  was --
4      MR. DeROSE: Oh, please, counsel, let her say it.
5      MS. WERTH: Okay.
6      MR. DeROSE: Whatever she's going to say, she'll
7  say.
8      THE WITNESS: No, I stayed. I never left IPRA or
9  OPS, so IPRA was established in 2007.
10 BY MR. DeROSE:
11     Q  But you went back to college in 2010; am I
12 correct?
13     A  Yes.
14     Q  So you were working at IPRA while you went to
15 college; am I correct on that?
16     A  Yes, you are.
17     Q  And you continued to work throughout your
18 college career at IPRA, correct?
19     A  Yes, sir.
20     Q  Were you considered a full-time student at
21 college while you were working at IPRA?
22     A  Some semesters, yes.

Pages 13 to 16

LaKenya White
November 9, 2015

17

1    Q   Were you a full-time investigator for IPRA at
2  all times?
3    A   Yes.
4    Q   So you would take -- I would expect a lot of
5  course study you were doing was at night?
6    A   That's correct.
7    Q   And your IPRA was a regular daytime job?
8    A   Yes, sir.
9    Q   And have your hours of employment for IPRA
10  remained the same over the period that you've been an
11  investigator?
12    A   Yes, sir.
13    Q   It's always a daytime assignment as an
14  investigator?
15    A   Yes, sir.
16    Q   And how many hours -- I mean excuse me.  What
17  are your hours of employment at IPRA?
18    A   Typically 8:00 to 4:00.
19    Q   And your titled position has always been that
20  of an investigator while you're at IPRA?
21    A   Yes.
22    Q   It's never -- have you gotten any promotions

18

1  while you've been there?
2    A   Yes.
3    Q   And what is the nature of the promotions?
4    A   I don't understand the question.
5    Q   Do they still call you an investigator though
6  you got a promotion, or is it investigators 1, 2, 3 or
7  anything like that?
8    A   Investigator 1, 2, 3.
9    Q   There you go.  And what is your titled
10  position now?
11    A   Investigator 2.
12    Q   When did you get that titled position?
13    A   I believe it was 2013.
14    Q   And what additional responsibilities and
15  duties do you have as an Investigator 2 over and above
16  what you had as an Investigator 1?
17    A   None.
18    Q   Same kind of job assignments; is that
19  correct?
20    A   Yes, sir.
21    Q   And is the Investigator 2 because of the
22  quality of your work and your experience, is that how

19

1  you get to be an Investigator 2 from an Investigator 1?
2    A   Yes, sir.
3    Q   And Investigator 3 is as high as you can go
4  in that particular agency; is that correct?
5    A   Yes, sir.
6    Q   The case of José Lopez, when did it first
7  come to your attention?
8    A   Can I review the case log, sir?
9    Q   Yes.  Do we have it or you have it?
10    MS. WERTH:  You have it.  We produced everything
11  to you.  Case log.
12    MR. MOWATT:  I think she's referring to the
13  documents that I just brought today.
14    MR. DeROSE:  All right.  Would you put that packet
15  in front of the witness and she can tell us what is the
16  case log?  And then I'm going to mark that.
17    MR. MOWATT:  I believe the entire --
18    MR. HURD:  No, the case log is the end of it.
19    THE WITNESS:  It's the end, okay.
20  BY MR. DeROSE:
21    Q   Before we do that, there is a packet of paper
22  that counsel has presented to me.  Did you gather all

20

1  that paper pursuant to the notice of deposition today?
2    MS. WERTH:  Objection to the form of the question.
3  You're asking her whether she gathered papers in
4  response to her deposition?
5    MR. DeROSE:  Yes.
6    MS. WERTH:  We produced all the papers that --
7    MR. DeROSE:  Ma'am, you've got to listen --
8  BY MR. DeROSE:
9    Q   The paper in front of you, young lady, did
10  you -- are you the one who put it all together?
11    A   Are you talking about this file?
12    Q   Yes.
13    A   This is the investigation, yes.
14    Q   So you put that whole packet together even
15  before the notice of deposition, I take it?
16    MS. WERTH:  I'm going to object to what you mean
17  by put it together.  You can answer if you know what
18  he's asking you.
19    THE WITNESS:  I don't know what you're technically
20  trying to ask me.
21  BY MR. DeROSE:
22    Q   Who gathered the papers that are in front of

Pages 17 to 20

LaKenya White
November 9, 2015

21

1    you?
2         A    I did.
3         Q    All right.  Thank you.  Now, you've pulled
4    some papers off the bottom of the pile.  What is that
5    group of papers you've pulled off?
6         A    The case log.
7         Q    How many pages approximately is that?
8         A    Three and-a-half.
9         MS. WERTH:  Do you want to mark it as an exhibit?
10        MR. DeROSE:  Yes, I do.  Would you be so kind,
11   Miss Reporter, as to mark that as Exhibit -- what's the
12   last exhibit in that folder?
13        MR. CARONE:  It looks like the last one is 270.
14        MR. DeROSE:  Would you mark that Exhibit 271
15   please?
16             (The document was so marked
17              by the court reporter.)
18        MR. DeROSE:  Off the record.
19             (There was a discussion held off
20              the record, after which the
21              deposition resumed as follows:)
22        MR. HURD:  Are we back on the record?

22

1         MR. DeROSE:  Yes, we're back on the record.
2    BY MR. DeROSE:
3         Q    Miss White, the court reporter has just
4    marked an exhibit as Exhibit 271.  Is all the
5    handwriting on this document, is it all your
6    handwriting?
7         MS. WERTH:  She needs to be able to see it, John.
8         THE WITNESS:  Everything except the first line.
9    BY MR. DeROSE:
10        Q    And who wrote the first line?
11        MS. WERTH:  Objection to foundation.  You can
12   answer if you know.
13        THE WITNESS:  According to the investigator case
14   log, the first line was typed by Investigator Morley,
15   and Intake Aide Tousant.  And that's T-o-u-s-a-n-t.
16   Morley is M-o-r-l-e-y.
17   BY MR. DeROSE:
18        Q    Who are those investigators?
19        MS. WERTH:  Objection to form.  You can answer.
20        THE WITNESS:  Well, I only stated one investigator
21   and she works at our office, and that's Investigator
22   Morley.  And Intake Aide Tousant, he also used to work

23

1    in our office.
2    BY MR. DeROSE:
3         Q    Does it indicate on that document when they
4    typed that portion you're talking about is typed?
5         A    Yes, sir.
6         Q    When did they type it?
7         A    According to the investigator log, it was the
8    24th of July, 2012.
9         Q    What occasions, if you know, to make those
10   typed entries on the top of the log?
11        A    I'm sorry?
12        Q    What occasions or what causes them to make
13   those entries on the top of the log?
14        MS. WERTH:  Objection, foundation, lacks personal
15   knowledge.
16        THE WITNESS:  To the best of my knowledge,
17   typically you will insert that once you receive a log
18   number for the case.
19   BY MR. DeROSE:
20        Q    And who gives it the log number?
21        A    The log number can be given by an
22   investigator, supervisor, intake aide.

24

1         Q    What causes an investigator or aide or
2    supervisor to give a case a log number?
3         A    You can get a complaint by telephone, you can
4    get a complaint by fax, you can get a civil suit, it
5    depends.
6         Q    Does IPRA start investigations when they get
7    notice that a Tasing has occurred?
8         MR. MOWATT:  I'm going to object to foundation and
9    I'm going to take this time to point out that
10   Investigator White is not here as a 30(b)(6) witness.
11   She is here as a fact witness.  Go ahead and answer.
12        THE WITNESS:  I'm sorry.  Can you repeat the
13   question?
14
15   BY MR. DeROSE:
16        Q    Based on your experience, does IPRA open an
17   investigation once it learns of a Tasing incident?
18        MR. MOWATT:  Same objection.
19        THE WITNESS:  I would not say it opens an
20   investigation, based on my experience.  It starts to
21   gather reports.
22

Pages 21 to 24

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

25

```
 1    BY MR. DeROSE:
 2       Q   As soon as it learns of a Tasing incident, is
 3    that what you're saying?
 4       A   Yes, sir.
 5       Q   And how does IPRA receive information of
 6    Tasing incidents?
 7       MS. WERTH: Objection. She's not a 30(b)(6)
 8    witness, counsel. So to the extent --
 9       MR. DeROSE: Counsel, you can have those --
10       MS. WERTH: Let me make my objection. This is
11    just an objection for the record. You can carry on.
12    I'm not telling her not to answer the question.
13            She's not a 30(b)(6) witness. She's not
14    here to talk about how IPRA operates, in a general
15    sense. She's here to talk about her role in this
16    particular investigation.
17            To the extent you're going to ask her
18    questions about how IPRA does things, she's not going
19    to be answer them --
20       MR. DeROSE: How do you know that, counsel?
21       MS. WERTH: Let me finish because she doesn't
22    speak for IPRA. To the extent she knows, she can
```

26

```
 1    answer as far as she knows.
 2       MR. DeROSE: Thank you.
 3       MR. MOWATT: Similarly I'm just going to have a
 4    running objection to any questions that ask her to
 5    speak about IPRA's general policies and procedures.
 6       MS. WERTH: Also, I don't believe in any standing
 7    or running objections, so I'm going to have to object
 8    each time a question like that is asked.
 9    BY MR. DeROSE:
10       Q   Miss, do you know is IPRA required to open an
11    investigation when they learn of a Tasing incident in
12    the city of Chicago?
13       A   That I'm not aware of.
14       Q   Now, the entry that was made there --
15       MR. DeROSE: Would you give out Exhibit 252 and
16    give 251 to each of them please?
17    BY MR. DeROSE:
18       Q   Miss White, as an investigator, do you get
19    the quarterly reports that the Independent Police
20    Review Authority puts out to the general public?
21       A   What do you mean do I get them?
22       Q   Do you receive a copy of them and review
```

27

```
 1    them?
 2       A   No.
 3       Q   Have you ever reviewed Independent Police
 4    Review Authority quarterly reports?
 5       A   Maybe once.
 6       Q   This report that I put in front of you as
 7    Exhibit 251, it covers the period from July 1st, 2013,
 8    to September 30th, 2013. Do you see that on the front
 9    page?
10       A   Yes.
11       Q   I want to refer you to a couple of statements
12    in the report. Go to Page 2 please.
13       MS. WERTH: I'm sorry. Page what?
14       MR. DeROSE: 2.
15    BY MR. DeROSE:
16       Q   At the very top it says, "This report is
17    filed pursuant to Municipal Code Section 2-57-110."
18    Are you familiar with a requirement that the
19    Independent Police Review Authority makes quarterly
20    reports to the citizens of Chicago and the general
21    public?
22       A   Am I familiar?
```

28

```
 1       Q   Yes.
 2       A   Yes.
 3       Q   I would take it you probably never read that
 4    particular section of the municipal code, have you?
 5       A   I don't recall.
 6       Q   And it says under quarterly overview there it
 7    says, "During the third quarter of 2013, IPRA initiated
 8    508 investigations. This includes the 110
 9    investigations resulting from notifications of a Taser
10    discharge." Do you see that?
11       A   Yes.
12       MR. MOWATT: I'm going to object to this line of
13    questioning as it's outside the relevant timeframe for
14    this case. The Tasing of Mr. Lopez took place in July
15    of 2011.
16       MR. DeROSE: Well, that counsel, it might have
17    been when the case started but that surely shouldn't be
18    the breath of the information from IPRA is all I can
19    tell you.
20    BY MR. DeROSE:
21       Q   Ma'am, the 110 investigations resulting from
22    notifications of a Taser discharge they're talking
```

Pages 25 to 28

LaKenya White
November 9, 2015

---

29

1    about there, is the Chicago Police Department required
2    to notify you when a Tasing incident occurs?
3         MS. WERTH: I'm going to object to the form of the
4    question. You can answer if you understand it.
5         THE WITNESS: As far as I know, yes.
6    BY MR. DeROSE:
7         Q   And who is supposed to notify you, the man
8    who used the Taser or is there some other delegate from
9    the Chicago Police Department?
10        MR. MOWATT: I'll object to foundation. Go ahead.
11        MS. WERTH: Excuse me. By you, you mean IPRA?
12        MR. DeROSE: Yes, ma'am.
13        THE WITNESS: As far as I know, a supervisor.
14   BY MR. DeROSE:
15        Q   Now, I want you to look down to Page 3 and
16   they've got a list of investigations that were opened
17   and closed and the case load of IPRA, but down there
18   under number one, the footnote says, "Pursuant to
19   the IPRA ordinance, certain events trigger an IPRA
20   investigation, even in the absence of an allegation of
21   misconduct. The term notification refers to those
22   events that IPRA investigates where there is no alleged

---

30

1    misconduct." Do you understand what that is saying?
2         MS. WERTH: I'm going to object to the form of the
3    question. You can answer it if you understand what
4    this is saying.
5         THE WITNESS: Yes.
6    BY MR. DeROSE:
7         Q   So even if there has been no allegation of
8    misconduct by a police officer, is someone in the
9    police department supposed to notify IPRA of a Tasing
10   event?
11        A   I'm sorry. Can you repeat that question?
12        MR. DeROSE: Read it back please.
13            (The record was so read
14             by the court reporter.)
15        MS. WERTH: I'm going to object to that as an
16   incomplete hypothetical and on foundation grounds, but
17   you can answer.
18        THE WITNESS: Well, you said by a police officer
19   so, no, that wouldn't be correct.
20   BY MR. DeROSE:
21        Q   What I'm trying to find out, is IPRA to be
22   notified of every Tasing event even if there has been

---

31

1    no allegation of police misconduct?
2         A   Yes.
3         Q   And if you look down at No. 2, they talk
4    about investigations reopened in that second footnote
5    there. What occasions the reopening of an
6    investigation?
7         MS. WERTH: Take your time to read that.
8         THE WITNESS: So are you asking me to read this?
9    What's the question?
10   BY MR. DeROSE:
11        Q   My question is what occasions a file being
12   closed and later reopened, how does that occur?
13        MS. WERTH: Objection to form of the question;
14   overbroad, vague. You can answer if you know.
15        THE WITNESS: Well, according to what you're
16   having me read, No. 2 states reopened because of the
17   settlement of litigation, new evidence, or the results
18   of the command channel review process.
19   BY MR. DeROSE:
20        Q   Do you get files that you have closed and are
21   later reopened, you yourself as an investigator?
22        MS. WERTH: Objection to form of the question.

---

32

1         THE WITNESS: You asked me do I or have I? Which
2    one are you asking me?
3    BY MR. DeROSE:
4         Q   Either one. Do you or have you in the past?
5         A   Maybe one.
6         Q   Are you authorized to close a file on your
7    own or does someone have to be higher than you in IPRA
8    to close a file?
9         A   A supervisor has to approve it.
10        Q   And then are you authorized to reopen a file
11   on your own or must a supervisor reopen it?
12        A   A supervisor or somebody from administration
13   has to approve a reopen case.
14        Q   And sometimes you ask yourself as an
15   investigator, can we reopen an investigation that
16   you're working on?
17        MS. WERTH: Objection to form of the question.
18   Does she ask herself whether she should open? Is that
19   the question?
20        MR. DeROSE: Would you read that back please?
21            (The record was so read
22             by the court reporter.)

---

Pages 29 to 32

LaKenya White
November 9, 2015

33

1     MR. DeROSE: I apologize, counsel, you're correct.
2 I didn't mean that.
3 BY MR. DeROSE:
4     Q   Do you yourself sometimes take an
5 investigation that you have closed and go to a
6 supervisor and ask them to reopen the investigation?
7     A   No.
8     Q   I want you to look at Page 5 of this
9 particular quarterly report, and down on the bottom
10 there on No. 7 about four lines down it reads, "IPRA
11 implemented procedures to issue log numbers for all
12 uses of Taser and shootings, regardless of the method
13 of notification. In addition, CPD issued a reminder to
14 CPD personnel to provide notifications to IPRA." Do
15 you see that?
16     A   Yes, I do.
17     Q   So when José Lopez was Tasered on July 23rd,
18 2011, a log number would have been given to his
19 incident if the procedures were followed?
20     A   Yes.
21     Q   Was there a log number issued for the Tasing
22 of José Lopez on July 23rd, 2011?

34

1     A   Yes.
2     Q   And can you tell from that log who issued --
3 from that log in front of you that we -- what is the
4 number again?
5     MR. MOWATT: 271.
6     MS. WERTH: Exhibit 271.
7 BY MR. DeROSE:
8     Q   Can you tell us who issued it?
9     A   Not according to this, no.
10     Q   Is there anything in the file there that will
11 tell you who issued the original log number?
12     A   Yes.
13     Q   Would you please find the document that does
14 that and we'll mark it our next exhibit?
15         Is that the document?
16     A   Yes, sir.
17     MR. DeROSE: Miss Reporter, will you mark that our
18 next number?
19         (The document was so marked
20          by the court reporter.)
21 BY MR. DeROSE:
22     Q   All right. Exhibit No. 272 indicates that it

35

1 was a report given by Lieutenant of Police Robert
2 Dubieal, D-U-B-I-E-A-L.
3     MS. WERTH: Is that a question?
4     MR. DeROSE: Yeah.
5 BY MR. DeROSE:
6     Q   Is that correct?
7     MR. DeROSE: That's what I'm asking her.
8     THE WITNESS: I'm sorry. Repeat that.
9     MS. WERTH: Could we make a copy of this so then
10 you can --
11     MR. DeROSE: Yeah, but I'm not -- all right.
12 Let's -- I don't know if we want to make five copies.
13     MS. WERTH: All right. So then give her time to
14 look at it before she can answer it.
15     THE WITNESS: What's the question?
16 BY MR. DeROSE:
17     Q   I'm going to let you hold it. Who reported
18 the incident?
19     A   According to the face sheet, it was
20 Lieutenant Robert Dubieal.
21     Q   When did you first get assigned this case
22 yourself?

36

1     A   According to the case log, it was 26 July,
2 2012.
3     Q   That would be about a year and three days
4 after the event happened, correct?
5     A   About a year and four days.
6     Q   Can you tell from the initial report who was
7 first assigned to the case, if anyone?
8     A   I need to see the rest of that.
9     Q   All right.
10     MR. MOWATT: In the meantime, I'll object to form.
11     MS. WERTH: I'll also object to not having --
12 you're showing her exhibits without copies for all the
13 counsel who are present which makes it very awkward.
14     MR. DeROSE: Well, if you want to interrupt --
15 let's stop for a moment. Note the time and I'll
16 have -- I think Donna's not even there.
17     MS. WERTH: It would be very helpful if we could
18 all have a copy of whatever you're questioning her on
19 since we represent different interests.
20     MR. DeROSE: I don't need it.
21 BY MR. DeROSE:
22     Q   First of all, will you read into the record

Pages 33 to 36

LaKenya White
November 9, 2015

---

37

1  the report that Lieutenant Dubieal gave to IPRA, Miss?
2      MR. MOWATT: I'm going to object to form.
3      MS. WERTH: I'm objecting to the form as well.
4  I'm not sure what you want her to do.
5  BY MR. DeROSE:
6      Q   Ma'am, hand me the last exhibit please.
7          There is a place in this initial report
8  where the investigator or the reporting lieutenant can
9  describe the incident, is there not?
10         Oh, forget it. Forget it, ma'am. We'll
11 do it my way.
12         Can you tell us who was first assigned to
13 investigate this case?
14     MS. WERTH: Are you still referring to this
15 document?
16     MR. DeROSE: I'm asking her from any document
17 there in the pack.
18 BY MR. DeROSE:
19     Q   Can you tell us who was first assigned to
20 investigate the case?
21     MS. WERTH: Okay. You can look through this whole
22 thing if you need to.

---

38

1      THE WITNESS: I was first assigned to investigate
2  this case on the 26th of July, 2012, according to the
3  investigator case log.
4  BY MR. DeROSE:
5      Q   Why did it take the IPRA a year and four days
6  to assign you to investigate the case?
7      MS. WERTH: Objection, foundation. Objection,
8  lacks personal knowledge.
9      MR. MOWATT: Join.
10     THE WITNESS: I don't know. I cannot answer for
11 IPRA.
12 BY MR. DeROSE:
13     Q   So when the case is given a file number, do
14 you know if an investigator is supposed to be assigned
15 to investigate the case?
16     MS. WERTH: Objection, foundation. Objection,
17 form of the question.
18     MR. MOWATT: I'll also add objection to the
19 incomplete hypothetical. Go ahead and answer.
20     THE WITNESS: To the best of my knowledge, no, not
21 all the time.
22

---

39

1  BY MR. DeROSE:
2      Q   Why not?
3      MR. MOWATT: I renew any objection for foundation.
4      MS. WERTH: I'm going to object. She's not a
5  30(b)(6) witness. She's here to answer questions about
6  her role in this particular investigation.
7  BY MR. DeROSE:
8      Q   Why -- ma'am, again, the question stands.
9  Why does IPRA not assign an investigator to investigate
10 the Tasing case, in this case, for one year?
11     MS. WERTH: Objection, asked and answered. You
12 can answer it again.
13     THE WITNESS: To the best of my knowledge, there
14 was no allegation of misconduct.
15 BY MR. DeROSE:
16     Q   So you're saying they don't investigate all
17 incidents, even without a charge of misconduct?
18     MR. MOWATT: I'm going to object to form and also
19 argumentative. Go ahead and answer.
20     THE WITNESS: Repeat that question for me please.
21     MR. DeROSE: Miss Reporter?
22         (The record was so read

---

40

1          by the court reporter.)
2      MS. WERTH: I'm going to object to misleading.
3  BY MR. DeROSE:
4      Q   You can answer, ma'am.
5      A   The question is ambiguous. I don't
6  understand it at all.
7      Q   Do they investigate questions without
8  allegations of misconduct in the use of the Taser?
9      MR. MOWATT: I'll object to form.
10     THE WITNESS: Can you repeat that for me?
11         (The record was so read
12         by the court reporter.)
13     MS. WERTH: Objection to form of the question --
14 to the question. I'm not sure what you mean by do they
15 investigate all questions. You can answer if you
16 understand.
17     THE WITNESS: No, I don't understand.
18 BY MR. DeROSE:
19     Q   Do you know -- let me take you some
20 background here. Exhibit No. 253.
21     MR. MOWATT: John, can you identify what this is?
22     MR. DeROSE: It is a newspaper article I believe

---

Pages 37 to 40

LaKenya  White
November 9, 2015

41

1    from the Chicago Tribune, but I notice this one doesn't
2    adequately state that.  I'm just going to ask her if
3    she's ever heard any of these allegations.
4    BY MR. DeROSE:
5        Q   Have you ever read -- seen this article
6    before, ma'am?
7        A   No, I have not.
8        Q   I want you to look in the third paragraph
9    down.  It says, "In practice little changed and IPRA
10   today is no better than the system it replaced.  Like
11   its predecessor, IPRA rarely sustains allegations
12   against police officers in the many cases in which
13   citizens claim they have been abused by on-duty police
14   officers.  And, also like it's predecessor, IPRA
15   routinely ducks the important cases."  Do you see where
16   I just read?
17       A   Yes.
18       Q   Have you ever heard that allegation made
19   about your agency before?
20       A   Yes.
21       Q   Would you believe that a case of Tasing of a
22   man who has been paralyzed since the day of Tasing for

42

1    the last four years and will never walk again would be
2    an important case for you to investigate?
3        MS. WERTH:  Objection to the form of the question;
4    argumentative, incomplete hypothetical.
5    BY MR. DeROSE:
6        Q   You may answer.
7        MR. MOWATT:  I'll join in those objections.
8        THE WITNESS:  I believe every case is important to
9    investigate.
10   BY MR. DeROSE:
11       Q   Are some cases considered more important than
12   other cases?
13       MR. MOWATT:  I'll object to the form.
14       THE WITNESS:  Not to me, no.
15   BY MR. DeROSE:
16       Q   How many Taser cases in your years of
17   experience with IPRA have you yourself investigated?
18       A   Several.
19       MS. WERTH:  I was going to object --
20   BY MR. DeROSE:
21       Q   Do you have any idea how many?
22       MS. WERTH:  Overbroad.  Maybe you could put a

43

1    timeline on this?
2        MR. DeROSE:  I did.
3        MS. WERTH:  Ever since she's been at IPRA?
4        MR. DeROSE:  Yes.
5        MS. WERTH:  But also at OPS?
6        MR. DeROSE:  No, I just said IPRA.
7        MS. WERTH:  Okay.  So since IPRA.
8        THE WITNESS:  Numerous.
9    BY MR. DeROSE:
10       Q   Have any of them resulted in death of the
11   person who was Tased?
12       MS. WERTH:  Objection, foundation, lacks personal
13   knowledge.  You can answer if you know.
14       MR. DeROSE:  Well, I don't know how that would
15   lack personal knowledge, but go ahead.
16       THE WITNESS:  To the best of my knowledge, no.
17   BY MR. DeROSE:
18       Q   Have any of the cases, besides the José
19   Lopez, resulted in permanent paralysis to the person
20   who was Tased?
21       MS. WERTH:  Objection, misleading, assumes that
22   Mr. Lopez is paralyzed as a result of the Tasing.  The

44

1    question is misleading and I would ask counsel to
2    rephrase it, but if you want her to answer, she will.
3        THE WITNESS:  I need the question repeated please.
4            (The record was so read
5             by the court reporter.)
6        MR. MOWATT:  I'm going to also object to form and
7    to the extent it calls for a medical conclusion.
8    BY MR. DeROSE:
9        Q   You may answer, ma'am.
10       A   I'm not able to answer that question as the
11   way that it is formed because I don't know what
12   injuries would result from a Taser, so I'm not able to
13   answer the question.
14       Q   Do you know what injuries resulted from the
15   event of the Tasing of Mr. Lopez?
16       MR. MOWATT:  I'm going to object to the extent
17   that it calls for a medical conclusion and to form.
18       THE WITNESS:  I cannot quantify that answer, sir.
19   BY MR. DeROSE:
20       Q   Did you investigate the injuries that José
21   Lopez sustained in this case?
22       MR. MOWATT:  I'm going to object to form.

Pages 41 to 44

LaKenya White
November 9, 2015

45

1    MS. WERTH: I'll join in the objection to form.
2    THE WITNESS: My job was not to investigate his
3    injuries. My job was to investigate the excessive
4    force used.
5    BY MR. DeROSE:
6    Q    As part of your investigation, do you
7    investigate at all what the end result of the Tasing
8    is?
9    MR. MOWATT: I'm going to object to the assumption
10   of facts not in evidence, that the end result of the
11   Tasing was anything.
12   MS. WERTH: I'm also going to object to the tone.
13   It's argumentative. But, you know, go ahead and answer
14   if you know.
15   THE WITNESS: And can you repeat that question
16   again for me please?
17            (The record was so read
18             by the court reporter.)
19   THE WITNESS: Again, I investigate the excessive
20   force. That's it. I cannot determine the cause of the
21   injury.
22

46

1    BY MR. DeROSE:
2    Q    Let me ask you if you've ever heard these
3    allegations. Recently -- now in the fourth paragraph
4    down it says, "Recently, IPRA issued its required
5    quarterly report. The report included a
6    self-congratulatory announcement that IPRA had
7    "sustained" 80 complaints of officer misconduct." Do
8    you see that?
9    A    Yes, sir.
10   Q    And it goes on to talk about what they
11   sustained were complaints about domestic violence or
12   off-duty misconduct. Do you normally investigate
13   complaints of officer off-duty misconduct?
14   A    Yes.
15   Q    And now look at the last sentence in the
16   paragraph. "Of the 80 cases, less than a handful
17   included a sustained finding that an officer had
18   committed misconduct in the line of duty directed at a
19   Chicago citizen." Do you agree with that?
20   MR. MOWATT: Objection, foundation.
21   MS. WERTH: Objection, it calls for speculation.
22   You can answer if you agree with this sentence or not,

47

1    if you know.
2    THE WITNESS: I can't tell you if I agree with
3    that or not. I would have to see the cases. I don't
4    know.
5    BY MR. DeROSE:
6    Q    And now look at the top of the next page.
7    "Measured against the total universe of allegations,
8    the rate of sustained findings is miniscule when an
9    on-duty officer was accused of abusing a citizen. IPRA
10   imposes discipline in less than 2 percent of those
11   cases." Are you aware of that statistic?
12   MS. WERTH: Objection to the form of the question.
13   MR. MOWATT: Objection to foundation as well.
14   MS. WERTH: And objection to foundation. You can
15   answer.
16   THE WITNESS: No, I am not aware.
17   BY MR. DeROSE:
18   Q    Do you get the statistics of cases that
19   you're working on with the other IPRA investigators in
20   the Chicago Independent Police Review Authority of the
21   Chicago Police Department?
22   A    No.

48

1    Q    You've never looked at any statistics?
2    A    I might have looked at the statistics, but
3    it's been a while. It's been a year or two. I don't
4    know.
5    Q    In your years as working as an investigator
6    for IPRA, have you yourself ever recommended the
7    finding of a sustained use of excessive force by a
8    police officer on duty against a citizen of the city of
9    Chicago?
10   A    Absolutely.
11   Q    Do you have any idea what percentage of your
12   investigations have resulted in such findings?
13   A    I cannot give you the percentage. I'm not
14   aware.
15   Q    Are you part of a team of investigators over
16   at IPRA?
17   MS. WERTH: Objection to form of the question.
18   Are you talking about now --
19   MR. DeROSE: Yes.
20   MS. WERTH: Or over a period of time?
21   Currently?
22   MR. DeROSE: Yes, ma'am, everything's current

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

49

1   unless I tell her something different.
2       MS. WERTH: Currently are you a member of a team?
3       THE WITNESS: Yes, I am.
4   BY MR. DeROSE:
5       Q   And how do they designate your team of
6   investigators?
7       MS. WERTH: Objection to form. Objection to lacks
8   personal knowledge. You can answer if you know.
9       THE WITNESS: I'm not certain what you're trying
10  to ask me.
11  BY MR. DeROSE:
12      Q   What is your team called? How do you know
13  who's in your team?
14      **A   My team is called the rapid response section.**
15      Q   And the rapid response section, they try to
16  go out upon learning of an event even before there is a
17  complaint filed; is that not correct?
18      **A   In some cases.**
19      Q   What case requires a rapid response
20  investigator to go out as opposed to an investigator
21  assigned to another case?
22      MS. WERTH: Objection to the form of the question;

50

1   overbroad.
2       THE WITNESS: That's a compound question so you're
3   going to have to break that up for me.
4   BY MR. DeROSE:
5       Q   What occasioned you as a rapid response
6   investigator to go out and investigate a case?
7       **A   It depends on a case and it depends on what**
8   **the supervisor tells me to do.**
9       Q   So you only go out to investigate cases your
10  supervisor assigns to you?
11      **A   Yes, sir.**
12      Q   I want you to look at Exhibit No. 255.
13          Showing you Exhibit No. 255, this is an
14  article from the Chicago Tribune in July 2012, about a
15  year after Mr. Lopez was Tased and about six days
16  before you went out on your investigation on the 26th
17  of July. Have you ever read this article?
18      **A   I need time to look at it.**
19      Q   Well, we'll look at it together. It's
20  titled, "Jolt of reality: Shooting persists as Chicago
21  Police Taser use skyrockets. Use of devices marketed
22  as means to limit gunfire rose more than 300 percent in

51

1   2 years, data show." Were you aware of that when you
2   got this investigation in 2012?
3       MS. WERTH: I'm sorry. Aware of what?
4       MR. DeROSE: That the use of the Taser gun had
5   increased more than 300 percent in the 2 years
6   preceding that.
7       THE WITNESS: I can't say that I was aware. I
8   don't know.
9   BY MR. DeROSE:
10      Q   Look down about the very middle of the page.
11  It says, "In 2010, the city armed hundreds more
12  officers with the weapon, fueling a 329 percent jump in
13  Taser use, from 195 incidents in 2009 to 836 in 2011.
14  Yet shootings by police didn't drop significantly
15  during that period, according to figures from the
16  city's Independent Police Review Authority." Did you
17  see those statistics from your department?
18      MS. WERTH: I'm sorry. What statistics?
19      MR. DeROSE: The statistics that say that Taser --
20  the statistics mentioned in that sentence.
21      THE WITNESS: No.
22  BY MR. DeROSE:

52

1       Q   Do you ever get any of the statistics that
2   are being gathered by the Independent Police Review
3   Authority?
4       MR. MOWATT: I'll object to that question; it was
5   asked and answered.
6       THE WITNESS: Again, I don't receive the
7   statistics. They're online.
8   BY MR. DeROSE:
9       Q   Did you know by July of 2012 that the use of
10  the Taser had risen 329 percent in the last two years
11  prior to that date?
12      MR. MOWATT: I'm going to object to that question;
13  includes facts not in evidence.
14      MS. WERTH: Join.
15      THE WITNESS: Again, I was not aware.
16  BY MR. DeROSE:
17      Q   Who was the supervisor who assigned you the
18  José Lopez case on 26 July, 2012?
19      **A   That's Supervisor Lorenzo Davis.**
20      Q   Was he in charge of your team at the time?
21      **A   Yes, sir.**
22      Q   Now Lorenzo Davis has since been fired from

Pages 49 to 52

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

53

1    IPRA, hasn't he?
2        A    Yes.
3        Q    And he was fired from IPRA for what reason,
4    as far as you know?
5        MS. WERTH:  Objection to lacks foundation,
6    personal knowledge, as to the reason.
7        THE WITNESS:  That I'm not aware of.
8    BY MR. DeROSE:
9        Q    Did you get along with Investigator Davis?
10       A    Yes, I got along with Supervisor Davis.
11       Q    He was called supervisor.  Were you in his
12   team for several years?
13       MS. WERTH:  At which point?
14       MR. DeROSE:  At any point.
15       MS. WERTH:  Objection, vague.  You can answer.
16       THE WITNESS:  Yes.
17   BY MR. DeROSE:
18       Q    How long had you been in Lorenzo Davis's
19   team?
20       A    I believe from 2011 to 2014.
21       Q    Did you know that Lorenzo Davis was making
22   sustained findings in his investigations and his higher

54

1    ups than him were telling him to change his findings?
2        MS. WERTH:  Objection, lacks personal knowledge,
3    foundation.
4        MR. MOWATT:  I'll join those and I'll also object
5    to assuming facts not in evidence.
6        THE WITNESS:  Can you repeat the question again?
7    I'm sorry.
8            (The record was so read
9             by the court reporter.)
10       MR. MOWATT:  I'll also add objection to form.
11       THE WITNESS:  No, I did not know.
12   BY MR. DeROSE:
13       Q    Were you following in the newspaper the
14   allegations made by Supervisor Lorenzo Davis about why
15   his employment with IPRA occurred?
16       A    No.
17       Q    You haven't read any articles about the
18   termination of Supervisor Davis?
19       A    I have.
20       Q    What do you understand -- have you ever
21   talked to him about why he was terminated?
22       A    No.

55

1        MR. DeROSE:  Could I see Exhibit No. --
2        THE WITNESS:  Can I take a break?
3        MR. MOWATT:  For the record, we've been doing this
4    for about an hour and 11 minutes.
5            (There was a break taken, after
6             which the deposition was resumed
7             as follows:)
8        MR. DeROSE:  We're back on the record.  Would you
9    please give the witness and all counsel Exhibit 254?
10   BY MR. DeROSE:
11       Q    Miss White, you tell us that you read some of
12   the accounts of the firing of your former Supervisor
13   Lorenzo Davis.
14       MR. MOWATT:  I'm going to object because --
15       MS. WERTH:  I don't think she ever said that.
16       MR. DeROSE:  I thought she did.
17   BY MR. DeROSE:
18       Q    Did you read some newspaper accounts of it?
19       A    I might have read one or two.
20       Q    Do you remember reading this account in the
21   Huffington Post?
22       A    No.

56

1        Q    Just look at the top.  The headline, "Chicago
2    just fired an investigator trying to hold cops
3    accountable for unjustified shootings," did you ever
4    see quotes like that in any articles you read?
5        MS. WERTH:  Objection to the form of the question;
6    vague.  You can answer.
7        THE WITNESS:  I cannot recall.
8        MR. MOWATT:  And also going to object insofar as
9    Mr. Davis was terminated outside the timeframe of the
10   José Lopez case, but go ahead.
11   BY MR. DeROSE:
12       Q    Turn to the second page of the exhibit, if
13   you could.  Your former supervisor is quoted in saying,
14   "The Independent Police Review Authority is being used
15   to deflect protest and criticism from the police
16   department.  What they're concerned about is the
17   careers of the police officers."  Did you ever hear
18   your supervisor say that around you when you were
19   working at IPRA?
20       A    No.
21       Q    Did you both work in the same offices in the
22   same building?

Pages 53 to 56

LaKenya  White
November 9, 2015

57

1    A   Yes, sir.
2    Q   Were you all in the same office, you and the
3  other members of Lorenzo Davis's team?
4    A   Yes, sir.
5    Q   And he was there with you at all times?
6    MS. WERTH:  Objection to the form of the question.
7  Objection to all times.  You can answer.
8    THE WITNESS:  I don't know what all times means.
9  BY MR. DeROSE:
10   Q   And go to the next page.  Do you recognize
11 the picture on that page?
12   A   Yes, sir.
13   Q   Is that Lorenzo Davis, your former
14 supervisor?
15   A   Yes.
16   Q   The second paragraph under his picture, it's
17 quoting as saying, "Davis said that during his seven
18 years at the agency, he and his team submitted findings
19 on 13 police shootings and found six of those
20 unjustified."
21   MS. WERTH:  I'm going to object to that it says
22 anything in quotes.  There's nothing in this paragraph

58

1  that you just read is in quotes.
2    MR. DeROSE:  Thank you.
3  BY MR. DeROSE:
4    Q   You may answer.  You can read it yourself.
5  Do you agree -- well, strike that.  Did you know that
6  Davis was making findings of unjustified police
7  shootings while you were in his team?
8    MR. MOWATT:  I'm going to object to the form.  I'm
9  also going to object insofar as police shootings and
10 Tasings are completely separate uses of force.
11   MS. WERTH:  And I'm going to object to lacks
12 personal knowledge.
13 BY MR. DeROSE:
14   Q   You may answer.
15   A   I'm only aware of my shootings.
16   Q   Did you make findings of unjustified
17 shootings in some of your investigations?
18   A   I have made finding of unjustified, yes.
19   Q   And how many times have you made that
20 finding?
21   A   Currently right now, one.
22   Q   That's the only one you ever made of

59

1  unjustified shooting?
2    MS. WERTH:  Just to clarify, are you asking the
3  whole time she's been with IPRA?
4    MR. DeROSE:  Yes.
5    MR. MOWATT:  And you're also asking her personally
6  as opposed to --
7    MR. DeROSE:  I'm asking her, yes, sir.
8    THE WITNESS:  As of this date, yes, one.
9  BY MR. DeROSE:
10   Q   As of this date as we're sitting here now?
11   A   Yes.
12   Q   And how many police shootings have you
13 investigated?
14   A   Several.
15   Q   Would you say over the years you've been with
16 IPRA you've investigated more than 20 police shootings?
17   A   I would say between 10 and 15.
18   Q   And in the one that you've made a finding of
19 an unjustified use of force or an unjustified shooting,
20 did the person die?
21   A   Yes.
22   Q   What is the name of the person who died?

60

1    A   Do I have to disclose that information?
2    Q   These are -- if you want it to be
3  confidential, you can so indicate, but you'll answer
4  all these questions here today and then counsel and I
5  will fight later about whether that should actually be
6  confidential.  I don't necessarily agree.
7    MS. WERTH:  Well, I'm going to ask that this
8  answer be put under seal because it has nothing to do
9  with anyone and the family of whoever it was who died
10 probably doesn't want this bandied about.
11   MR. DeROSE:  I bet they want it out more than IPRA
12 and the police department want it.
13   MS. WERTH:  We would ask that it be put under
14 seal.
15   THE WITNESS:  What was the name, I'm sorry, of?
16 BY MR. DeROSE:
17   Q   Of the person who died, got shot, and you
18 said it was an unjustified shooting?
19   A   Rekia Boyd.
20   Q   How do you spell Rekia?
21   A   R-E-K-I-A, Boyd, B-O-Y-D.
22   Q   Has the police officer in that case been

Pages 57 to 60

LaKenya White
November 9, 2015

61

1    suspended or terminated from the police department?
2         MS. WERTH:  Objection, lacks personal knowledge,
3    foundation.  You can answer if you know.
4         THE WITNESS:  To the best of my knowledge, that
5    case is pending.
6    BY MR. DeROSE:
7         Q   Have you recommended that the IPRA make a
8    finding in that case based on your investigation?
9         A   A finding has been made.
10        Q   And you recommended that, correct?
11        A   That is correct.
12        Q   In the same page on the exhibit we're looking
13   at on the -- by the way, was Lorenzo Davis your
14   supervisor when you investigated the Rekia Boyd case?
15        A   For most of it, yes.
16        Q   Now, look at the bottom of the page, the
17   last --
18        MR. HURD:  Now can we go off the confidential?
19        MR. DeROSE:  Yes.  Thank you.  That -- unless she
20   objects to it.
21        MS. WERTH:  No.
22

62

1    BY MR. DeROSE:
2         Q   Three lines up from the bottom it says,
3    "Davis alleged he was told to change findings to
4    exonerate officers in at least three investigations
5    which he said he resisted."  When you were in his team,
6    were any findings that you or your supervisor
7    recommended, were you told to make any changes in those
8    findings?
9         A   No, none of my cases.
10        Q   Do you know what three cases or three
11   investigations Lorenzo Boyd is referring to here when
12   he says he was asked to change the findings?
13        MS. WERTH:  I'm sorry.  Who is Lorenzo Boyd?
14        MR. MOWATT:  Lorenzo Davis.
15        MR. DeROSE:  Lorenzo Davis.  I'm sorry.  Thank
16   you.
17        THE WITNESS:  I have no clue what three cases
18   those are.
19   BY MR. DeROSE:
20        Q   He never shared with you that he was being
21   pressured to make changes to the findings by him and
22   his team?

63

1         A   No.
2         Q   Look at the next page.  Second paragraph in
3    reads, "Davis said he has no bias against cops, as his
4    recent performance review alleged.  He said part of
5    IPRA's problem is that it's run by people who worked in
6    law enforcement for most of their careers, instead of
7    civilians without strong ties to police."  Do you see
8    where I just read?
9         A   Yes, sir.
10        Q   Did he ever make those statements over the
11   time that he was your supervisor working over there at
12   IPRA?
13        A   I've heard him make that statement before.
14        Q   Would you say that all the investigators on
15   your team are -- have former careers in law enforcement
16   as police officers?
17        MS. WERTH:  Objection to foundation.  You can
18   answer if you know.  Lacks personal knowledge.
19        THE WITNESS:  I don't believe anybody on my team
20   was a former police officer or had experience in law
21   enforcement, besides Lorenzo Davis.
22

64

1    BY MR. DeROSE:
2         Q   Well, the people -- are there investigators
3    at IPRA who are former police officers?
4         A   Yes.
5         Q   And are they at the investigator level or
6    higher?
7         MS. WERTH:  Objection to foundation; lacks
8    personal knowledge.  You can answer.
9         THE WITNESS:  To the best of my knowledge, there
10   are some.  There are investigators and there are some
11   higher administration.
12   BY MR. DeROSE:
13        Q   And the investigators, the ones who have no
14   law enforcement background, where do they get their
15   training?
16        MS. WERTH:  Objection to foundation; lacks
17   personal knowledge as to where other IPRA investigators
18   get their training.
19        THE WITNESS:  I can't tell you where they get
20   their training.  I do know, however, we get on-the-job
21   training.
22

Pages 61 to 64

LaKenya White
November 9, 2015

65

```
 1    BY MR. DeROSE:
 2       Q   You're being trained by who on the job?
 3       MS. WERTH:  I'm going to object.  Just to clarify,
 4    are you asking her now about her training as an
 5    investigator?  If that's what you're asking, she'll
 6    answer.
 7       MR. DeROSE:  Go ahead.
 8       MS. WERTH:  Is that what you're asking?
 9       THE WITNESS:  What's the question please?
10       MR. DeROSE:  Read the question back.
11            Counsel, you're going to have to listen
12    closer or we're never going to get done today.
13       MS. WERTH:  Counsel, with all respect to you, you
14    have to make your questions a little tighter.  They're
15    very broad and objectionable.
16       MR. DeROSE:  All right.  Thank you.  Withdraw the
17    question.
18    BY MR. DeROSE:
19       Q   Where did you get your training to be an
20    investigator?
21       A   I received on-the-job training.
22       Q   From who?
```

66

```
 1       A   From IPRA.
 2       Q   And who at IPRA are the persons who are doing
 3    the training?
 4       A   It's an ambiguous question.
 5       MS. WERTH:  Just go through all the training you
 6    get.  Would that be okay with you if she tells you what
 7    training she gets?
 8       MR. DeROSE:  Yes, please.
 9    BY MR. DeROSE:
10       Q   Who's training you?  I want to know who, the
11    people.
12       MS. WERTH:  There's not one person, right?
13       THE WITNESS:  No.
14       MS. WERTH:  You can just go through the whole
15    thing.
16       MR. DeROSE:  Thank you, counsel.
17       THE WITNESS:  I received training -- when I first
18    started, I received training from superior
19    investigators who had been on the job.
20    BY MR. DeROSE:
21       Q   Were they former police officers?
22       A   No.
```

67

```
 1       Q   In the last two years, where have you gotten
 2    your training?
 3       A   I received training from ISP which is the
 4    Illinois State Police.  I received training from the
 5    Chicago Police Department; we have an annual training
 6    with them.  I received --
 7       Q   Is that over at the police academy?
 8       MS. WERTH:  She hasn't finish.
 9       MR. DeROSE:  I understand.
10       MS. WERTH:  You just interrupted her.
11       MR. DeROSE:  Yeah.
12    BY MR. DeROSE:
13       Q   Is that done at the Chicago Police Academy,
14    ma'am?
15       A   Yes, sir.
16       Q   And how often do you get the Chicago Police
17    Academy for training?
18       A   That's annual training.
19       Q   Once a year?  How long is your training when
20    you go there?
21       A   Sometimes it's more than once a year.  That's
22    your answer to your first question.
```

68

```
 1            How often, it depends.  We might go there
 2    once a year, we might go there twice a year, it depends
 3    on what the scheduled training is.
 4       Q   And what do they teach you at the Chicago
 5    Police Academy?
 6       A   It depends on what administration feels we
 7    need to be taught.
 8       Q   Are you talking about the policies and
 9    procedures of the Chicago Police Officers?
10       A   Yes.
11       Q   Are you talking about the -- when you're
12    talking about the police procedures, let's stay there,
13    are you actually given copies of police procedure to
14    study and have explained to you?
15       A   Yes.
16       Q   And have you had any training in Chicago
17    Police Department use of force procedures?
18       A   Yes.
19       Q   And have you had training in Chicago Police
20    Department procedures in rendering aid to persons who
21    are believed to be either intoxicated from alcohol or
22    incapacitated or intoxicated from drugs?
```

Pages 65 to 68

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

69

1      MS. WERTH:  Objection to the form of the question;
2  compound, confusing.  You can answer.
3      THE WITNESS:  I cannot recall.  I believe so.
4  BY MR. DeROSE:
5      Q    When was your last time that you were trained
6  at the Chicago Police Department about police
7  procedures then?
8      A    **In September.**
9      Q    And September of this year?
10     A    **Yes, sir.**
11     Q    And did they teach you about police
12  procedures then?
13     A    **I've learned some things.  I can't recall**
14  **what.**
15     Q    Are you given tests afterwards to see how
16  well you grasped what you were taught?
17     A    **No.**
18     Q    We'll get into that a little further later.
19         I want you to look about five lines up
20  from the bottom of the page.  It says,
21  "Officer-involved shootings can take a long time to
22  investigate -- sometimes more than three years --

70

1  because of their complexity.  But Davis said some cases
2  were intentionally delayed."  Are you aware of any of
3  your investigations being intentionally delayed?
4      A    **No.**
5      Q    In the case of José Lopez, you got assigned
6  it a year and three or four days after he was Tased.
7  How long did it take you to investigate it?
8      A    **According to the investigator case log, I**
9  **closed the case in January -- on January 27th, 2014.**
10     Q    So it looks like it took you about a year
11  and-a-half to close this case?
12     A    **Yes.**
13     Q    Tell us what you first did when you got
14  assigned the case on 26 July, 2012?
15     A    **Let's see.  According to the investigator**
16  **case log --**
17     Q    Before you do that, can you testify without
18  looking at your log?  Do you remember anything about
19  this case without looking at papers?
20     A    **I remember emailing you and you emailing me.**
21     Q    But do you remember anything you did in your
22  investigation without looking at this case, without

71

1  looking at these papers?
2      A    **I remember gathering documents, yes, sir.**
3      Q    So is it -- all right.  Let me go on with
4  you.  Tell me what the first thing you did.  Can you
5  tell me that without looking at the log?
6      A    **Without looking at the log, I can probably**
7  **tell you that the first thing I did was acknowledge the**
8  **case, which I did a conflict certification.**
9      Q    What does that mean?  What do you have to do
10  by a conflict certification?
11     A    **A conflict certification just states that I**
12  **don't know anybody involved in this case.**
13     Q    And you do that by you have some paperwork in
14  front of you to find out who are the people involved?
15     A    **Yes, sir.**
16     Q    And how many people did you determine
17  initially were involved so you could make up your mind
18  that you didn't know any of those people?
19     A    **I don't recall how many people were involved**
20  **in the case.**
21     Q    Without looking at documentation?
22     A    **Yes, sir.**

72

1      Q    Would you look and see how many people you
2  certified you didn't have any involvement with and show
3  us the paperwork?
4      A    **According to the -- I would have went by the**
5  **original case report and the face sheet.**
6      Q    Can you pull out the pieces of paper that you
7  would look to determine how many people were involved?
8  And we're going to mark that as an exhibit and then you
9  can tell us how many you were certifying you were not
10  related to or knew anything about.
11     A    **The case report.  The civil suit had no names**
12  **initially.**
13     MS. WERTH:  So I'm going to make an objection to
14  the extent you're asking her -- she sits here today,
15  few years later, what she -- who were the people who
16  she considered while making her conflict certification
17  report.  To that extent, I will object.  To that extent
18  you're asking --
19     MR. DeROSE:  On what ground, counsel?
20     MS. WERTH:  To the extent you're asking her to
21  identify some of the papers she looked at, you know, to
22  the best of her recollection as she sits here today,

Pages 69 to 72

LaKenya White
November 9, 2015

73

1    okay, go ahead.  I don't know what purpose that serves.
2        MR. DeROSE:  Yes, ma'am, please.
3    BY MR. DeROSE:
4        Q   Who did you initially believe you were to
5    reinvestigate?
6        MS. WERTH:  What?
7        MR. MOWATT:  I object to the form of that
8    question.
9        MS. WERTH:  So do I.
10   BY MR. DeROSE:
11       Q   Who did you believe you were initially
12   assigned to investigate?
13       **A   According to the face sheet, initially it was**
14   **unknown, so nobody at the initial time.  I didn't know**
15   **who I was investigating.**
16       Q   So how did you find out who you were going to
17   investigate?
18       **A   According to the face sheet, it was alleged**
19   **that Mr. Lopez was Tasered, so that tells me that I**
20   **will be investigating the officer who Tasered Mr.**
21   **Lopez.**
22       Q   Only the officer who Tasered him and nobody

74

1    else?
2        **A   According to the face sheet, yes, because I'm**
3    **only going by the face sheet at this time, yes.**
4        Q   So how did you find out who Tasered him?
5        **A   The department reports.**
6        Q   And where did you get them?
7        **A   Online.**
8        Q   And you have the ability over there at IPRA
9    now to call up all reports; you don't even have to ask
10   for somebody to bring them over to you; isn't that
11   correct?
12       **A   For the most part, yes.**
13       Q   So when you got the police reports, what else
14   did you ask for?
15       **A   Typically what I would ask for is ambulance**
16   **report, medical records, 911 tapes.**
17       Q   Did you in this case?
18       **A   Yes, I did.**
19       Q   And did you get the ambulance reports?
20       **A   Yes.**
21       Q   Did you get the 911 tapes?
22       **A   No.**

75

1        Q   Why not?
2        **A   They were no longer available.**
3        Q   Why?
4        MR. MOWATT:  Objection to foundation.
5        MS. WERTH:  I'll join in that.
6    BY MR. DeROSE:
7        Q   Why were they not available?
8        **A   I believe they were past their -- I believe**
9    **that they were past their date expiration that I can't**
10   **answer for you.**
11       Q   Did you ask if any tapes had been saved by
12   the police department after this Tasing?
13       **A   There was nobody in the police department to**
14   **ask that question that I know of.**
15       Q   Did you ask anybody at the Office of
16   Emergency Messages and Communications?
17       MR. MOWATT:  Emergency Management and
18   Communications.
19       MS. WERTH:  Are you asking her all this without
20   being able to look at her records as she sits here, is
21   it her recollection?
22       MR. DeROSE:  Yes, right now I am.

76

1        THE WITNESS:  Yes, that's where I got that
2    information from.
3    BY MR. DeROSE:
4        Q   Did you ask if there were any videotapes or
5    audiotapes from the incident available to the police
6    department?
7        MS. WERTH:  If you recall.
8        THE WITNESS:  I checked to see if there were pods
9    available.
10   BY MR. DeROSE:
11       Q   What are PODs?
12       **A   PODs are Police Observation Devices.  They're**
13   **the blue flashing cameras.**
14       Q   Those are the cameras that are on the
15   streets?  Is that what you're talking about?
16       **A   Yes, sir.**
17       Q   On the street poles.  Did you ask whether
18   there were any in-squad videos available, the cameras
19   in the squad cars?
20       **A   I cannot recall.  I would have to look at the**
21   **file.**
22       Q   All right.  Go ahead and look at the file.  I

LaKenya White
November 9, 2015

                                                                        77

1   want you to tell us what you did as part of your
2   investigation and then identify the pages.  Do they all
3   have Bates numbers on the bottom?
4       MS. WERTH:  These are called Bates numbers right
5   here.
6   BY MR. DeROSE:
7       Q   So if you have a Bates number, tell us what
8   document you're referring to.
9       A   And what do you want me to refer to again?
10  I'm sorry.
11      Q   Tell us what you did in your investigation.
12      MR. MOWATT:  I believe the last question had to do
13  with if the investigator asked as to the assistance of
14  the in-car cameras --
15      MR. DeROSE:  Just let her go.
16  BY MR. DeROSE:
17      Q   Tell us what you did.  You got the
18  assignment.  Now what'd you do?
19      MS. WERTH:  So I understand the question, you're
20  asking her to tell you everything she did in this
21  investigation?
22      MR. DeROSE:  No.  I'm asking her to tell us what

                                                                        78

1   she did when she originally got the investigation.  I'm
2   going to stop -- I'm not going to let her narrative
3   answer go on.
4   BY MR. DeROSE:
5       Q   Go ahead, ma'am.  Find some documents that
6   tell you what you initially did.
7       A   Okay.  So to begin, as I stated, I obtained
8   the conflict certification.
9       Q   And what is the Bates number on that?
10      A   2002.
11      Q   Would you take that number and -- can I have
12  that document please and give it to the reporter?
13      MR. DeROSE:  What's the last number?  Would you
14  make that 273?
15          (The document was so marked
16          by the court reporter.)
17  BY MR. DeROSE:
18      Q   And tell us what that means, what's the
19  significance of Exhibit 273?
20      MS. WERTH:  I'm going to object to its being asked
21  and answered, but you can tell him again what that is.
22      THE WITNESS:  That's the conflict certification.

                                                                        79

1   It just states that I do not know anybody in the case.
2   BY MR. DeROSE:
3       Q   So once you filled out the statement you
4   indicated you had no -- I guess that indicated there
5   was no conflict of interest that you could perceive; is
6   that correct?
7       A   Yes, sir.
8       Q   And who were the people that you had
9   determined you had no conflict of interest with?
10      A   Again, as I stated earlier, it was the names
11  that were provided on the face sheet.
12      Q   And what are those names?  Just give us the
13  names.
14      A   Mr. Lopez, and it was the officer that
15  Tasered Mr. Lopez.
16      Q   And what was his name?
17      A   I'm going to spell his name because I cannot
18  pronounce it.  So for the record, it's
19  V-I-D-L-J-I-N-O-V-I-C.
20      Q   And what's his first name?
21      A   Sorry.  Stevan, S-T-E-V-A-N.
22      Q   Did you go and interview Officer Stevan?

                                                                        80

1       A   No, I did not.
2       Q   Have you ever interviewed him?
3       A   No, I did not.
4       Q   What next did you do?
5       A   I reviewed the civil suit.
6       Q   And that was the suit that had been filed
7   just three days earlier by me?
8       A   On the 23rd of July, yes.
9       Q   And when you read the initial complaint, then
10  what did you do?
11      A   I can't tell you what I did after I read the
12  initial complaint.  I do not recall.
13      Q   Do your notes indicate?
14      A   I continued with my investigation.
15      Q   What did you do?
16      A   The next thing I did was obtain the Taser
17  notification that was filed in July 2011.
18      Q   Once you got -- do you have that there?
19      A   Yes.
20      Q   Can we have that please?  We're going to put
21  that --
22      A   It's already been tagged.

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

81

1    Q   And what's his number on the bottom?
2       MS. WERTH: Counsel, the number is 272. It says
3   Deposition Exhibit 272. It doesn't say whose
4   deposition.
5       MR. DeROSE: All right. Thank you.
6   BY MR. DeROSE:
7    Q   And then once you obtained that, what did you
8   do?
9    A   I next obtained the case, the original case
10  incident report.
11   Q   And once you obtained that, what did your
12  investigation consist of?
13   A   I read it and -- I read it and determined
14  that Mr. Lopez was transported by ambulance, and I also
15  read that he was under the influence of PCP, cocaine,
16  and alcohol.
17   Q   And then what did you do?
18   A   I next obtained the Tactical Response Report
19  which is a TRR.
20   Q   And just backing up, when you read in the
21  report that he was under the influence of alcohol,
22  cocaine, and what else you said, did you believe that?

82

1       MS. WERTH: Objection to what she believed. You
2   can answer.
3       THE WITNESS: I can't tell you what I believed
4   because I didn't have all the information, so I can't
5   tell you initially what I believed.
6   BY MR. DeROSE:
7    Q   So you initially when you read the report,
8   you don't take it at face value, you have to
9   investigate further?
10   A   That's correct, sir.
11   Q   So now you got the ambulance report and --
12   A   No, now I have the TRR.
13   Q   And then how did that help your
14  investigation?
15   A   The TRR just tells me the officer version of
16  the incident.
17   Q   And did you read that?
18   A   Yes, sir.
19   Q   Did you contact any of the officers who are
20  named in that report then?
21   A   No.
22   Q   Why not?

83

1    A   Because at the time I'm doing a preliminary
2   investigation and I do not have a sworn affidavit.
3    Q   A sworn affidavit from who?
4    A   From anybody who witnessed this incident.
5    Q   So then what did you do?
6    A   The next thing I did was obtain the Taser
7   download sheet.
8    Q   And did that help your investigation in any
9   way?
10      MS. WERTH: I'm going to object to the form of the
11  question. You can answer.
12      THE WITNESS: The Taser download just tells me
13  that on the 22nd of July, 2011 at approximately it says
14  08:46 --
15      MS. WERTH: Just answer. Did it help you in any
16  way?
17      THE WITNESS: Yeah, yes.
18  BY MR. DeROSE:
19   Q   In what way did that further your
20  investigation?
21   A   It just let me know that this officer used a
22  Taser.

84

1    Q   Then what did you do?
2    A   The next thing I did was obtain the Chicago
3   Police Department Event Query.
4    Q   And did that further your investigation?
5    A   Yes.
6    Q   In what way?
7    A   It lets me know why the police responded to
8   the location.
9    Q   Did you understand from that how long the
10  police had been at the scene before they used their
11  Taser?
12   A   No.
13   Q   Did you understand from -- did you only get
14  the event query from the Chicago Police Department or
15  also from the Chicago Fire Department?
16      MR. MOWATT: I'm going to object to the form, but
17  go ahead and answer.
18      THE WITNESS: I don't understand the question.
19  I'm sorry.
20  BY MR. DeROSE:
21   Q   Let me see the event query you got. We'll
22  mark that as an exhibit. How many pages is it?

Pages 81 to 84

LaKenya White
November 9, 2015

85

1    **A   It's four several different attachments.**
2        MR. DeROSE:  Would you mark this the next number?
3            (The document was so marked
4            by the court reporter.)
5    BY MR. DeROSE:
6        Q   Exhibit 274 looks to me to be -- it appears
7    to be an event query from the Chicago Police Department
8    only.  Is it your understanding that that's what it is?
9    I'm going to give it to you right now.  Here you go.
10   Here.
11       MR. MOWATT:  Just for the record, event queries
12   come from the Office of Emergency Management and
13   Communication rather than from the police department or
14   the fire department.
15   BY MR. DeROSE:
16       Q   Is that the only one you got, the event query
17   from the Chicago Police Department?
18       **A   As he stated, it comes from the Office of**
19   **Emergency Management and Communication so it's a**
20   **collaboration of both.**
21       Q   Can you see the fire department's entries on
22   there?

86

1        **A   Yes, I do.**
2        Q   What time did the fire department first
3    arrive on scene?
4        MS. WERTH:  According to this event query.
5        MR. DeROSE:  I withdraw the question.
6    BY MR. DeROSE:
7        Q   Miss, did you understand as part of your
8    investigation in this case that the fire department was
9    on scene 13 minutes before the police were ever called?
10       **A   Is it my understanding?**
11       Q   Yes.
12       **A   I know that they were on the scene.**
13       Q   Do you know how long?
14       **A   From this day you're asking me?  I cannot**
15   **recall.**
16       Q   From your investigation, do you know if they
17   were on the scene more than 13 minutes before the
18   police were called?
19       **A   I cannot recall.**
20       Q   From your investigation, were the police
21   called by the fire department?
22       **A   Yes.**

87

1        Q   And who called them?
2        **A   From my investigation, one of the paramedics**
3    **called.**
4        Q   And had that paramedic who called -- by the
5    way, did you talk to the paramedics yourself?
6        **A   Yes.**
7        Q   Did you talk to any of the police officers
8    who were on the scene in this case?
9        **A   No, I did not have a sworn affidavit, as I**
10   **stated before.**
11       Q   So you can't talk to a police officer without
12   a sworn affidavit?
13       MR. MOWATT:  I'm going to object to the extent
14   that that question requires a legal conclusion to
15   foundation to the argumentative nature of the question.
16   BY MR. DeROSE:
17       Q   You may answer the question.
18       **A   Not if they are accused officers, according**
19   **to my knowledge.**
20       Q   But you knew from your investigation that
21   there were as many as nine police officers on the
22   scene, didn't you?

88

1        MS. WERTH:  I'm going to object to the tone and to
2    the question as argumentative.
3        THE WITNESS:  At what point?
4    BY MR. DeROSE:
5        Q   At what point in your investigation did you
6    realize there was more than the officer with the Taser
7    gun who was on the scene?
8        **A   According to the case report, I realized**
9    **there were more.**
10       Q   How many more?  You don't know without
11   looking at that report?
12       **A   No.**
13       Q   How many more were there?
14       **A   Two, possibly three.**
15       Q   Two or three officers, that's all your
16   investigation revealed?
17       MS. WERTH:  I'm going to object to this question
18   about what her investigation revealed as she sits here
19   now looking at these documents which you've just handed
20   her, a pile that is about six inches high, without
21   previously having marked exhibits to show her
22   specifically.  You are asking her to go through all

Pages 85 to 88

LaKenya White
November 9, 2015

89

1    these.
2        MR. DeROSE:  We don't have to look -- forget the
3    exhibits.
4        MS. WERTH:  You know, you haven't prepared
5    exhibits to show her and ask specific exhibits.
6        MR. DeROSE:  Oh, I do.  I have lots of them
7    prepared.
8        MS. WERTH:  Show her exhibits and ask her --
9        MR. DeROSE:  No, excuse me.  Counsel, you will not
10   tell me how to handle a deposition.
11       MS. WERTH:  Right, but if you want to -- you know,
12   we are going to leave in four hours.
13       MR. DeROSE:  I know so we're going to just do it
14   without the exhibits.
15   BY MR. DeROSE:
16       Q    What do you understand as part of your
17   investigation were the amount of officers who were on
18   the scene?
19       A    **Again, what point are you talking about?**
20       Q    At any point.  As you sit here now, how many
21   officers does your investigation reveal were present on
22   the scene?

90

1        MR. MOWATT:  I'm going to object to form.  Go
2    ahead and answer.
3        MS. WERTH:  As you sit here.  He doesn't want you
4    to look at documents; am I correct, counsel?
5        MR. DeROSE:  That's correct.
6        MS. WERTH:  As you sit here, he wants you to tell
7    him how many officers were on the scene.
8        THE WITNESS:  As I sit here, I cannot recall how
9    many officers were on the scene until you updated your
10   civil suit.
11   BY MR. DeROSE:
12       Q    And when I -- what do you mean by updated my
13   civil suit?
14       A    **Until you added on officers to the civil**
15   **suit.**
16       Q    So were you waiting for further developments
17   in court before you took any further action?
18       MR. MOWATT:  I'm going to object to form and to
19   the argumentative nature of that question.  Go ahead
20   and answer.
21       MS. WERTH:  I'm going to join in that.
22       THE WITNESS:  No, that's not what I stated.  I was

91

1    waiting to obtain a sworn affidavit.
2    BY MR. DeROSE:
3        Q    Why?
4        A    **Because I needed the sworn affidavit to**
5    **interview the police officers in the case.**
6        Q    And who do you need the sworn affidavit from?
7        MR. MOWATT:  I'm going to object as asked and
8    answered.  Go ahead and answer.
9        THE WITNESS:  Again, I need a sworn affidavit from
10   somebody who witnessed the incident.
11   BY MR. DeROSE:
12       Q    And if you don't go to those people yourself,
13   you'll never get a sworn affidavit; is that fair to
14   say?
15       MS. WERTH:  Objection, argumentative.
16       MR. MOWATT:  I'll join and I'll also add that it
17   assumes facts not in evidence.  Go ahead and answer.
18       THE WITNESS:  Can you repeat?  What was that
19   question again?
20       MR. DeROSE:  Withdraw it.
21   BY MR. DeROSE:
22       Q    You didn't need -- you didn't try to go to

92

1    any of the police officers and ask for a sworn
2    affidavit?
3        MR. MOWATT:  I'm going to object to --
4        MS. WERTH:  I'm going to object to the misleading
5    nature of this question.  She's already testified that
6    she needs a sworn affidavit from someone who witnessed
7    the incident.
8    BY MR. DeROSE:
9        Q    You had names of people who witnessed the
10   incident in the official police reports, didn't you?
11       A    **I had names of Miss Escondido I believe, now**
12   **known as Miss Guzman I believe, yes, I had her**
13   **information, but that was it.**
14       Q    Do you ever go and talk to the other officers
15   besides the officer who activated the Taser gun?
16       A    **No.**
17       Q    Why not?
18       A    **Again, I did not have a sworn affidavit.**
19       Q    What efforts did you take to get a sworn
20   affidavit from any of the firefighters or paramedics
21   who were on the scene?
22       A    **I took a statement from the paramedics.**

Pages 89 to 92

LaKenya White
November 9, 2015

---

93

1    Their counsel advised me that they were not going to
2    sign the sworn affidavit.
3        Q    They were with counsel when you talked to
4    them?
5        A    Yes, sir.
6        Q    And did you try to talk to any of the
7    firefighters who were on the fire truck?
8        A    No, I was not able to get their information.
9        Q    Why not?
10       A    I was not able to get their information.
11       Q    I know.  I said why not?
12       A    I requested that report from the Chicago Fire
13   Department for the truck and they were not able to
14   locate that information.
15       Q    About four months after my original
16   complaint, by September of 2012, you had a list of
17   about 11 police officers named who were being sued,
18   correct?
19       A    If this is what you're saying without me
20   looking, yes.
21       Q    There were lots of them?
22       A    Okay.

---

94

1        Q    And did you go and try to interview any of
2    those officers?
3        MR. MOWATT:  I'm going to object to asked and
4    answered.  She has testified numerous times that
5    without a sworn affidavit from a complainant, she
6    cannot interview officers accused of misconduct.  But
7    go ahead and answer again.
8        THE WITNESS:  Again, as he stated, at that point
9    they're accused and I cannot interview them without a
10   sworn affidavit.
11   BY MR. DeROSE:
12       Q    Who tells you you cannot interview them?
13       MS. WERTH:  You know, counsel, it's by state law
14   just so you know, so IPRA investigators are not allowed
15   to interview police officers, accused police officers,
16   without a sworn affidavit, state law.  I don't know the
17   exact citation of the law, but we can provide it to you
18   if you want.
19   BY MR. DeROSE:
20       Q    Back on that exhibit that we were just
21   looking at with the picture of Lorenzo Davis on it.  Do
22   you remember?

---

95

1        A    Yes, sir.
2        MS. WERTH:  This one.
3        MR. DeROSE:  Yes, that's the one.
4    BY MR. DeROSE:
5        Q    I want you to go to the page after that where
6    they have the picture of the police officers arresting
7    that young lady.  Do you have that?  Probably two pages
8    up.  And in the second paragraph is written, "IPRA has
9    been criticized before for delays.  The Chicago Tribune
10   reported that IPRA took more than five years to file
11   excessive force charges and recommend the firing of an
12   officer who allegedly cracked a man in the head with
13   his baton in 2012.  The case was dismissed in 2012
14   because the statute of limitations had expired."  Do
15   you see that?
16       A    Yes.
17       Q    Was that one of your cases?
18       A    No.
19       Q    Is it unusual for you to take a year
20   and-a-half to conclude your investigation of Mr. Lopez?
21       MR. MOWATT:  I'm going to object to the form of
22   that question.

---

96

1        MS. WERTH:  Join.  You can answer.
2        THE WITNESS:  The way that you ask it, of Mr.
3    Lopez, I can't answer that question.
4    BY MR. DeROSE:
5        Q    All right.  So now we're back on the Lopez
6    case.  And after you got my list of police officers,
7    what next did you do?
8        A    You want me to remember this again without
9    viewing the file?
10       Q    You don't have to -- you can have your log in
11   front of you.  Tell me what next you did.  Use anything
12   you want in front of you.
13           And by the way, as you're flipping these
14   papers, did you have all the papers you flipped over
15   already before you did anything else?
16       MS. WERTH:  I'm going to object to the form of
17   this question.  I don't know what it means.
18   BY MR. DeROSE:
19       Q    I asked you what next you did and you flipped
20   the papers.  You flipped over about a third of the
21   papers.  The papers you flipped, how did they come to
22   you?

---

LaKenya White
November 9, 2015

97

```
 1          MR. MOWATT:  John, I'm going to object to you're
 2   asking questions within questions.  This isn't
 3   inception.  You have to let her answer whatever
 4   question you put in front of her and then --
 5   BY MR. DeROSE:
 6      Q    Don't look in the file.
 7          MR. DeROSE:  You know what?  She's sitting turning
 8   pages, counsel.  I'll never get done here.
 9   BY MR. DeROSE:
10      Q    Miss, what next do you remember doing in this
11   case?
12               This won't be funny in the courtroom.  I
13   want you to know that, young lady.
14          MS. WERTH:  Oh, don't threaten her, counsel.
15          MR. DeROSE:  You're sitting there laughing.
16          MS. WERTH:  You are waiving your finger at her and
17   telling her this won't be funny.
18          MR. DeROSE:  Counsel, I haven't --
19          MS. WERTH:  I consider that intimidating the
20   witness.
21          MR. DeROSE:  You may consider that, but your
22   behavior at this deposition has not be very good
```

98

```
 1   either.  I've seen you whispering in her ear about five
 2   times and I've said nothing.  If you want a conference,
 3   you should ask for it, but you should not whisper to
 4   your client while she's under interrogation, and you
 5   have been doing that throughout this deposition.
 6          MS. WERTH:  I have not spoken to her when a
 7   question has been pending.  You want us to go outside
 8   to speak, we'll be happy to do that.
 9          MR. DeROSE:  I ask you not to be talking to her
10   while this deposition is going on without asking
11   permission if you have something important to say.
12          MS. WERTH:  Okay.
13          MR. DeROSE:  And the two of you were smiling a
14   moment ago and this is not funny.
15          THE WITNESS:  Excuse me.  I was not smiling.  I
16   was trying to understand what you're asking me because
17   you are jumping from question to question and you're
18   not allowing --
19          MR. DeROSE:  That's the way we lawyers do it.
20          THE WITNESS:  But you're not allowing me to answer
21   the question.
22
```

99

```
 1   BY MR. DeROSE:
 2      Q    All right.  Miss, when you got the list of
 3   all those officers, what next did you do?
 4      A    Without looking at the file, I cannot tell
 5   you.
 6      Q    You have no recollection what you did?
 7      A    No, sir.
 8      Q    Did you go and interview anyone?
 9      A    At some point, I did interview the
10   paramedics.
11      Q    And what occasioned your going out to
12   interview paramedics?
13      A    I don't understand.
14      Q    What caused you to do that as part of your
15   investigation?
16      A    Because they were witnesses to the incident.
17      Q    And where did you get their names?
18      A    The ambulance report.
19      Q    You actually wrote an interview of the
20   paramedics, correct?
21      A    Yes, sir.
22      Q    Can you go to the -- with relative ease --
```

100

```
 1   never mind.  I'm going to --
 2          MS. WERTH:  I'm not sure what relative means.
 3          MR. DeROSE:  Counsel, I --
 4          MS. WERTH:  If you have the report, give it to
 5   her.
 6          MR. DeROSE:  Thank you, counsel, please.
 7   BY MR. DeROSE:
 8      Q    Would you get out 201 and I believe 202.
 9   Now, Miss White, Exhibit 201, is that all your
10   handwriting on the first page there?
11      A    Yes.
12      Q    And at the bottom, it is signed by you and
13   two other people.  Do you see that?
14      A    Yes.
15      Q    Do you recognize either of the other two
16   signatures?
17      A    One is Miss Cheatham and the other one is her
18   representative.
19      Q    Was her representative an attorney?
20      A    I can't answer for that.  I don't know.
21      Q    Was her representative a male or a female?
22      A    It was a male.
```

Pages 97 to 100

LaKenya White
November 9, 2015

101

1    Q  And where did you interview her?
2    **A  I interviewed her on 35th at the**
3  **headquarters.**
4    Q  And it looks like you went to investigate her
5  on the 23rd of October, 2012?
6    MR. MOWATT: I'm going to object to the form.
7    MS. WERTH: So am I. She wasn't investigating
8  her.
9  BY MR. DeROSE:
10    Q  You went to interview her on the 23rd of
11  October, 2012?
12    **A  Yes.**
13    Q  And were you alone?
14    **A  Yes, I believe so.**
15    MR. MOWATT: By alone, do you mean no other people
16  from IPRA? Because there clearly were at least the
17  interviewee and the other person.
18    MR. DeROSE: Yes, counsel. Yes, counsel.
19    MR. MOWATT: Okay.
20  BY MR. DeROSE:
21    Q  Would she talk and you would write or would
22  you ask her questions in order to write down the

102

1  information you have here?
2    MR. MOWATT: I'm going to object to the form.
3    MS. WERTH: I would object to the form. Maybe if
4  you --
5    MR. DeROSE: Maybe if you just --
6  BY MR. DeROSE:
7    Q  Did you ask her questions or did you just
8  allow her to talk narratively?
9    **A  Typically I do both.**
10    Q  Now, normally when one is talking with you,
11  you have to ask them to stop while you write down in
12  longhand. Is that a fair statement?
13    MR. MOWATT: I'll object to the form. Go ahead.
14    THE WITNESS: No, not necessarily true, no.
15  BY MR. DeROSE:
16    Q  Were you able to write as fast as she was
17  talking?
18    **A  I can't recall that.**
19    Q  Well, let's get down to the point of the
20  investigation, about five lines down you write, "Miss
21  Cheatham recalled that she responded to an incident
22  regarding the patient subject José Lopez." Did you

103

1  write that as fast as she said it?
2    **A  I can't recall.**
3    Q  And she says, "Upon arrival, Miss Cheatham
4  observed Mr. Lopez to not be coherent and appeared to
5  be under the influence of drugs and alcohol." Do you
6  see that?
7    **A  Yes.**
8    Q  Did she tell you whether she ever went up to
9  Mr. Lopez when she first got there?
10    **A  I would need to read the whole interview in**
11  **its entirety.**
12    Q  I know but I'm asking what you remember.
13    **A  I can't recall.**
14    Q  Let's read further. "Miss Cheatham could not
15  recall what Mr. Lopez was doing, but states he was
16  combative by flailing his arms."
17    MR. MOWATT: John, I'm going to object. If the
18  witness needs to read the entire statement, she needs
19  to read the entire statement.
20    MR. DeROSE: We'll get to it, counsel, my way.
21  BY MR. DeROSE:
22    Q  Did she say he was striking anybody when he

104

1  was failing his arms?
2    **A  I wrote what she stated so I can tell you if**
3  **she said anything else further.**
4    Q  Did you ask her if anyone was struck by the
5  flailing arms?
6    **A  I cannot recall.**
7    Q  Did you ask her how long she was on the scene
8  before Lopez was Tased?
9    **A  Again, I would need to read the statement in**
10  **its full entirety.**
11    MR. MOWATT: Why don't we have her read the entire
12  statement so she can better answer your questions,
13  John?
14    MR. DeROSE: We'll do it counsel's way. Read both
15  of those statements and we're going to charge this as
16  time to the four hours, counsel?
17    MR. MOWATT: Yeah.
18  BY MR. DeROSE:
19    Q  Before we do that, do you have any
20  recollection of what your investigation of this Tasing
21  incident involved?
22    MS. WERTH: Objection to the form of the question.

Pages 101 to 104

LaKenya White
November 9, 2015

105

1    THE WITNESS: I'm not sure what you're trying to
2  ask me.
3  BY MR. DeROSE:
4    Q  Do you have recollection of this case at all
5  without looking at these papers?
6    A  **Bits and pieces, yes.**
7    Q  What are the bits -- let's -- you tell us
8  what you remember.
9    A  **As far as what?  I'm not understanding.**
10   Q  Your investigation, what this case involved,
11 and how you determined what you determined.
12   A  **I didn't determine anything.  This case was
13 closed because of no affidavit.**
14   Q  What does that mean, closed because of no
15 affidavit?
16   A  **That means that I didn't have a sworn
17 affidavit at the time I closed this case to go any
18 further.**
19   Q  And when did you close it again, 2015 did you
20 say?
21   MR. MOWATT:  Objection, mischaracterizes her
22 testimony.

106

1    MS. WERTH:  Let her answer the question.  You said
2  when did you close it.  She's trying to answer your
3  question, you ask her another question or you make some
4  statement.  I think the question is when did you close
5  it.
6    MR. HURD:  January 7th, 2014.
7    THE WITNESS:  January 27th.
8    MR. HURD:  January 27th, sorry.
9    THE WITNESS:  According to the case log.
10 BY MR. DeROSE:
11   Q  And do you have to get permission to close
12 it?
13   MR. MOWATT:  I'll object to it as asked and
14 answered.
15   THE WITNESS:  A supervisor has to approve it.
16 BY MR. DeROSE:
17   Q  Who was the supervisor that approved the
18 closing of this case?
19   A  **Lorenzo Davis.**
20   Q  Did you tell him that you had already
21 received 11 depositions taken under oath from all the
22 police officers in the case?

107

1    MR. MOWATT:  I'm going to object because that
2  assumes facts not in evidence and it's also an
3  argumentative question.  Go ahead and answer.
4    MS. WERTH:  I'm going to join in that objection
5  and I'm going to object to the form of the question as
6  to scope of time, did you tell him when.
7  BY MR. DeROSE:
8    Q  Did you tell him that you had those 11
9  depositions?
10   A  **No, because that's not accurate how you're
11 stating it.**
12   Q  When did you get the depositions?
13   A  **I would need to check to see when the first
14 email came out.**
15   MS. WERTH:  I'll also object to which depositions
16 specifically are you talking about?  You're talking
17 about when did you get the depositions; which
18 depositions, counsel?
19 BY MR. DeROSE:
20   Q  Go ahead, ma'am.  Check your records.
21   A  **I need to see the emails.**
22   Q  Where are they?

108

1    MS. WERTH:  You don't have them ready to ask her
2  questions about them?
3  BY MR. DeROSE:
4    Q  Ma'am, do you -- wait a minute.  Did you
5  receive the depositions before you asked Lorenzo Davis
6  for permission to terminate the case?
7    A  **No.**
8    Q  Did you then reopen the case?
9    MR. MOWATT:  I'll object to the form, but go ahead
10 and answer.
11   THE WITNESS:  No.
12 BY MR. DeROSE:
13   Q  Why not?
14   A  **Again, because I had not received a sworn
15 affidavit.**
16   Q  When you got the depositions, did you read
17 them?
18   A  **Yes.**
19   Q  Did you notice that they were all under oath?
20   A  **Yes.**
21   Q  Did you believe that that could stand as a
22 sworn affidavit?

Pages 105 to 108

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

109

1       **A   I do know that a deposition can act as a**
2   **sworn affidavit.**
3       Q   And did you accept it as a sworn affidavit?
4       **A   Did I accept what?**
5       Q   The different depositions that were sent to
6   you.
7       **A   But which one are you talking about?**
8       Q   I'm talking about all the depositions.
9       MS. WERTH:  Counsel, can we just go off the record
10  for a second?  Is that okay?
11      MR. DeROSE:  Sure.
12          (There was a discussion held off
13           the record, after which the
14           deposition resumed as follows:)
15  BY MR. DeROSE:
16      Q   Which depositions did I send you?
17      **A   I can't account for all the depositions that**
18  **you sent me.**
19      MR. DeROSE:  Can you give everybody Exhibit 263
20  please?
21      MR. MOWATT:  Out of curiosity, are there
22  Exhibits 1 through 200 that we're going to get or did

110

1   you just start at 250?
2       MR. DeROSE:  All the exhibits I've marked in this
3   case bear a number and they're all going to --
4       MS. WERTH:  And while you are doing that, we'll
5   just take a short break.
6          (There was a break taken, after
7           which the deposition was resumed
8           as follows:)
9   BY MR. DeROSE:
10      Q   I want you to look at Exhibit No. 263, Miss
11  White.  Do you remember getting this email from me?
12      **A   Yes, sir.**
13      Q   And just prior to that, you had sent a letter
14  to José Lopez and an address telling him that the file
15  was being closed?
16      **A   I didn't send out the letter per se.**
17      Q   Who closed the file on José Lopez?  Was it
18  your investigator?
19      MS. WERTH:  What?
20  BY MR. DeROSE:
21      Q   I mean was it your supervisor?
22      **A   He approved that the case be closed, yes.**

111

1       Q   And then does a letter go out to the citizen
2   telling them that the case is closed?
3       **A   Yes.**
4       Q   And then I called you and told you that José
5   Lopez would never be able to give you a statement,
6   didn't I?
7       **A   At some point we had a conversation.  I don't**
8   **know if it was before or after.**
9       Q   Look at Exhibit 263.  It's dated March 24th,
10  2014 and it says, "Miss White, as we discussed last
11  week, attached please find materials that I hope will
12  help you further your investigation into the José Lopez
13  case.  I am attaching a copy of the fourth amended
14  complaint, the deposition of Officer Alamillo, and
15  Officer Guettler, the officers who arrived first on the
16  scene and immediately requested that an officer with a
17  Taser be sent, and the deposition of Officer
18  Vidljinovic, the officer who actually Tased my client
19  within four minutes after the initial arrival of the
20  Chicago Police Department in response to the summons by
21  paramedics from the Chicago Fire Department."  Had you,
22  when you got this email, already perceived from the

112

1   report you had received that José Lopez was Tased
2   within four minutes of the officers' arrival?
3       MS. WERTH:  Objection to the form of the question,
4   but you can answer.
5       THE WITNESS:  I'm sorry.  What's the question?
6   What are you asking me?
7   BY MR. DeROSE:
8       Q   Had you perceived from the materials you had
9   read already and after -- and before you closed the
10  case, that José Lopez was Tased within four minutes of
11  the police officers arriving on the scene?
12      **A   I cannot recall what I perceived.**
13      Q   Then I also wrote in here, "I am also
14  attaching a summation of the dispatch records from the
15  Chicago Fire Department and the Chicago Police
16  Department which will show that the fire department
17  personnel were on the scene for 15 minutes trying to
18  convince my client to get in an ambulance."  Did you
19  already know that information when I sent you this
20  email?
21      MR. MOWATT:  I'm going to object insofar as
22  counsel's assuming facts that are not in evidence.  I

Pages 109 to 112

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

113

1    would also object as we've -- according to what we have
2    litigated, that this represents an unethical contact
3    with a person who is represented in a matter that they
4    were represented in, but go ahead and answer.
5         MS. WERTH:  Also, I would object to saying that
6    counsel's email to the witness and assuming that
7    everything in it is true.  So when you say did you know
8    this before I sent it to you, she only knows what
9    you're telling her in this email once she receives the
10   email.
11        MR. DeROSE:  Well, thank you, counsel, but that's
12   not really a fair way to put it.
13   BY MR. DeROSE:
14        Q   Did you already know before I sent you the
15   email from the materials you read that the fire
16   department personnel had been on scene 15 minutes
17   before José Lopez -- before the police were even
18   called?
19        MR. MOWATT:  I'll renew my objections.
20        THE WITNESS:  I cannot recall.
21   BY MR. DeROSE:
22        Q   And then I wrote to you further, "When he

114

1    refused all medical attention, which is his right to
2    do, police were summoned, he was Tased, and rushed to
3    Mount Sinai Hospital."  Do you see where I just read?
4         A   Yes.
5         Q   Do you believe from your investigation in
6    this case that José Lopez had a right to refuse medical
7    attention?
8         MR. MOWATT:  I'm going to --
9         MS. WERTH:  Objection --
10        MR. MOWATT:  I'll object to the extent that it
11   calls for a legal conclusion.
12        MS. WERTH:  And speculation and, yeah, legal
13   conclusion.
14        MR. MOWATT:  And also to the extent that it
15   assumes facts that are not necessarily in evidence, but
16   go ahead and answer.
17        THE WITNESS:  What I concluded was that Mr. Lopez
18   was not in his right frame of mind.
19   BY MR. DeROSE:
20        Q   Do you also understand that he had been
21   refusing medical attention?
22        A   I understand that the paramedics were trying

115

1    **to get him into the ambulance and they could not leave**
2    **him there because it's a liability.**
3         Q   And who told you that?
4         A   **The paramedics.**
5         Q   Did you then go and look up any case law or
6    any laws of the state of Illinois or the city of
7    Chicago to see if Mr. Lopez had a right to refuse
8    medical attention?
9         MS. WERTH:  Objection, calls for a legal
10   conclusion.  You can answer if you looked up any law.
11        MR. MOWATT:  I'll join.
12        THE WITNESS:  I spoke to my supervisor, Lorenzo
13   Davis.
14   BY MR. DeROSE:
15        Q   And did he tell you that the man had no right
16   to refuse medical attention?
17        MS. WERTH:  Objection, argumentative.  You're
18   asking her -- you're assuming that Lorenzo Davis told
19   her -- your question assumes that Lorenzo Davis told
20   her something, so it's facts not in evidence, so all
21   those objections.
22        MR. MOWATT:  I'll join to those objections and

116

1    also add form.  Go ahead and answer please.
2         THE WITNESS:  What was the question?
3    BY MR. DeROSE:
4         Q   Did your supervisor tell you that Mr. Lopez
5    had no right to refuse medical attention?
6         A   **My supervisor --**
7         MS. WERTH:  Do you recall?
8         THE WITNESS:  I don't recall.
9         MS. WERTH:  Don't guess.  I'm sure Mr. DeRose
10   doesn't want you to guess.
11        THE WITNESS:  I wasn't about to guess, but I don't
12   recall.
13   BY MR. DeROSE:
14        Q   And you'll notice that at the bottom of 263
15   it indicates are included the depositions of Officer
16   Alamillo.  Did you read it?
17        A   Yes.
18        Q   I gave you the deposition of Officer
19   Guettler.  Did you read it?
20        A   Yes.
21        Q   And I gave you the deposition of Officer
22   Vidljinovic.  Did you read it?

Pages 113 to 116

LaKenya White
November 9, 2015

117

1    **A  Yes.**
2    MR. MOWATT: At the beginning of the second page,
3  John, I think you were looking for the summation of the
4  dispatch logs.
5  BY MR. DeROSE:
6    Q  Now, when you read those depositions, did you
7  note that any of the officers knew that Lopez was
8  refusing medical attention?
9    **A  What do you mean?**
10    Q  What do I mean is did you see in there where
11  the officers state under oath that they knew that Lopez
12  was refusing medical attention?
13    **A  I believe I recall that.**
14    Q  And does that have any impact on your
15  investigation?
16    MS. WERTH: Objection to the form of the question;
17  overbroad, ambiguous. Impact, don't know what you
18  mean.
19    THE WITNESS: I don't know what you mean. What
20  impact?
21  BY MR. DeROSE:
22    Q  Any impact on whether they had a right to

118

1  Tase him in the first place. That's what you were
2  investigating, wasn't it?
3    **A  Yes.**
4    Q  Did it have any impact on your investigation
5  when those officers stated he was refusing medical
6  attention and refusing to go in the ambulance?
7    **A  Every statement has an impact.**
8    Q  What impact did it have on your
9  investigation?
10    **A  That he was refusing to get into the**
11  **ambulance and they had to Taser him because he was a**
12  **liability.**
13    Q  Later on I sent to you additional
14  depositions, did I not?
15    **A  I believe so.**
16    Q  And were they of the paramedics?
17    **A  I don't believe so.**
18    Q  Were they of all the other police officers on
19  the scene?
20    MS. WERTH: Do you recall which --
21    THE WITNESS: I don't recall.
22    MS. WERTH: -- depositions he sent you as you sit

119

1  here today?
2  BY MR. DeROSE:
3    Q  What do you mean by -- did you just say that
4  the officers had to Tase him because he was a
5  liability?
6    **A  I'm sorry. What did you say?**
7    Q  Did I hear you say a moment ago that the
8  officers had to Tase Mr. Lopez because he was a
9  liability?
10    **A  What I meant was that Mr. Lopez was not in**
11  **his right frame of mind and he needed immediate medical**
12  **assistance.**
13    Q  So did they have a right to Tase him?
14    MS. WERTH: Objection, calls for a legal
15  conclusion.
16    THE WITNESS: They had a right to get him to the
17  hospital.
18    MR. DeROSE: Could we have that larger exhibit
19  there passed out to everybody please?
20  BY MR. DeROSE:
21    Q  We're looking at Exhibit 256. This is the
22  Annual Report from the Independent Police Review

120

1  Authority. Did you look at this report ever?
2    **A  No.**
3    Q  Do you know that the Independent Police
4  Review Authority does put out an Annual Report?
5    **A  Yes, I am aware.**
6    Q  I want you to go down to Page 6.
7    Do you know who the chief administrator of
8  IPRA is?
9    MS. WERTH: Are you talking about now, current?
10    MR. DeROSE: Yes.
11    THE WITNESS: Yes.
12  BY MR. DeROSE:
13    Q  Who?
14    **A  Scott Ando, A-N-D-O.**
15    Q  All right. Talk about back in 2011 when this
16  happened, 2012, who was the chief administrator?
17    **A  Ilana Rosenzweig.**
18    Q  Looking at Page 6 there at the second to the
19  last paragraph she writes in the second line, "IPRA has
20  been able to reduce the average number of cases
21  currently held by our investigators. It has increased
22  the percent of investigations to completed in less than

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

121

1  six months to 70 percent, completed 95 and 96 percent
2  of cases closed in 2011 and 2012 respectively in less
3  than three years, and continues to work to close older
4  investigations." Were you aware of that?
5       MS. WERTH: Objection to the form of the question.
6  Are you asking her if she's aware that Ilana Rosenzweig
7  has --
8       MR. DeROSE: Oh, please, counsel, I asked the
9  question.
10      MS. WERTH: What are you asking her?
11      MR. DeROSE: I'm asking her if she was aware of
12 what I just read.
13      MR. MOWATT: I'm going to object to the form of
14 the question. Go ahead and answer.
15      THE WITNESS: I'm not sure what you are exactly
16 trying to ask me.
17 BY MR. DeROSE:
18      Q   I'm asking you are you aware of that volume
19 of cases that your agency was closing?
20      **A   At what point?**
21      Q   As you sit here today.
22      **A   So you're saying right now?**

122

1       Q   Right.
2       **A   I can't say that I was aware.  I don't know.**
3       Q   I want you to --
4       MR. DeROSE: Let me have Page 13 please.
5       MR. MOWATT: By the way, John, this copy has the
6  page numbers cut off so it's hard to tell which pages
7  we're referring to.  I believe there is a page that's
8  the first subheading is DocuShare.  Is that it?
9       MR. DeROSE: That's it, right.
10 BY MR. DeROSE:
11      Q   Do you know what DocuShare is, miss?
12      **A   Yes, I do.**
13      Q   And is that the system that allows you to get
14 documents on your own without having to go and seek
15 them from the Chicago Police Department?
16      **A   It's one of the systems.**
17      Q   And that helps increase -- I want you to go
18 to Page 14.
19      MR. MOWATT: That's the next page.
20 BY MR. DeROSE:
21      Q   And it says investigative training.  And down
22 at the bottom it says, "Interviews are the primary

123

1  source of evidence in most investigations.  Thus, the
2  interviews investigators conduct are essential to a
3  fair and thorough investigation.  That goal can best be
4  achieved when investigators have the necessary skills
5  to organize and conduct an interview." Do you see
6  that?
7       **A   Yes.**
8       Q   And in this case, you only interviewed two
9  people; is that correct?
10      **A   Yes.**
11      Q   Why didn't you interview anyone else than
12 those two?
13      MR. MOWATT: I'll object to this question as asked
14 and answered and also argumentative.
15      MS. WERTH: I'm going to join in that.  You've
16 already gone over that with her.
17 BY MR. DeROSE:
18      Q   Why didn't you talk to the commander who had
19 filed the complaint?
20      MR. MOWATT: I'm going to object to the form.
21 BY MR. DeROSE:
22      Q   Who had filed the notification?

124

1       MS. WERTH: I'm going to object to the form and
2  assumes -- it states facts that are not in evidence.
3       MR. DeROSE: Can I see Page 15 please?  It should
4  be the next one, gentlemen.
5  BY MR. DeROSE:
6       Q   And this talks about the Chicago Police
7  Department Training Academy, and you tell us you go
8  there, correct?
9       **A   Correct.**
10      Q   And if you look down two paragraphs up from
11 the bottom it says, "During IPRA's annual CPD training
12 in September 2012, investigators receive training on
13 CPD detention lockup procedures."  And then go on
14 further, the next sentence, "They also receive training
15 on CPD policies for responding to calls for service
16 involving people afflicted with mental illness."  Do
17 you remember what you were talking about with respect
18 to that?
19      **A   I can't tell you verbatim or I can't surmise
20 what I was talking about without looking at documents.**
21      MR. DeROSE: Would you do me a favor and give all
22 of us Exhibits 24 and 25?

Pages 121 to 124

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

125

```
 1   BY MR. DeROSE:
 2       Q   When you were in the police academy for
 3   training, did they ever teach you about this particular
 4   special order where persons subject to involuntary or
 5   voluntary admission are non-arrestees?
 6       A   I believe so.  I cannot recall.
 7       Q   Well, look under 2D.  I want to see if you
 8   considered this at all when you were reviewing the
 9   materials.  2D on the first page.
10       MS. WERTH:  Are we on Exhibit 24?
11       MR. DeROSE:  Yes, ma'am.
12   BY MR. DeROSE:
13       Q   And it's written, "A police officer may take
14   a person into custody and transport him or her to a
15   mental health facility when the police officer has
16   reasonable grounds to believe that the person is
17   subject to involuntary admission and in need of
18   immediate hospitalization to protect such person or
19   others from physical harm."  Were you considering that?
20       MR. MOWATT:  I'm going to object.
21       MS. WERTH:  I'm going to object to the form of the
22   question, considering.  Were you considering that when?
```

126

```
 1   BY MR. DeROSE:
 2       Q   This policy, when you were doing your
 3   investigation.
 4       A   I reviewed this policy, yes.
 5       Q   As part of that investigation, correct?
 6       A   Yes.
 7       Q   Is that policy in this file?  Did you copy it
 8   for the file?
 9       A   This policy -- no.
10       Q   I want to ask you about -- by the way, did
11   you understand from your investigation that Lopez was
12   not being arrested?
13       MS. WERTH:  Objection to the form of the question;
14   calls for her to speculate as to whether he was being
15   arrested.
16       MR. MOWATT:  I will also -- I'll join those
17   objections and I will also object to the extent that it
18   calls for a legal conclusion.  Go ahead and answer.
19       THE WITNESS:  What was the question?
20   BY MR. DeROSE:
21       Q   Did you understand that Lopez was not being
22   arrested by the police that day?
```

127

```
 1       A   It was my understanding that he was not being
 2   placed under arrest.
 3       Q   And because the officers all stated that
 4   under oath, correct?
 5       MR. MOWATT:  I'll object to the form and also to
 6   the argumentative nature of that question.  You can go
 7   ahead and answer.
 8       THE WITNESS:  I believe they stated that.  I can't
 9   recall.
10   BY MR. DeROSE:
11       Q   And did you understand that there were seven
12   squad cars out there that day?
13       A   I can't recall how many squad cars were out
14   there that day.
15       Q   You were supposed to investigate to find out
16   if there are any in-car video systems that you can use
17   to see what was recorded out at the scene, aren't you?
18       MS. WERTH:  I'm going to object to the form of the
19   question as to what she's supposed to do at any given
20   time.  You can answer.
21   BY MR. DeROSE:
22       Q   You may answer.
```

128

```
 1       A   I'm sorry.  What was the question?
 2       Q   Are you not, as part of IPRA, supposed to
 3   investigate to find out if there are any in-squad
 4   videos available?
 5       A   Yes, that's one of my duties, yes.
 6       Q   And did you find out if there were any
 7   in-squad videos available at all in this case?
 8       A   No, because this case was over a year old.
 9       Q   And so you didn't even check to see?
10       MR. MOWATT:  Objection to the extent that that
11   mischaracterizes her testimony.
12       MS. WERTH:  And argumentative.
13       THE WITNESS:  I did not check to see because it
14   was over a year old.
15   BY MR. DeROSE:
16       Q   So you don't know if there were videos
17   available now or not because you've never looked?
18       MS. WERTH:  Objection to the form of the question.
19   BY MR. DeROSE:
20       Q   Is that a fair statement?
21       A   I was never made aware that there was video
22   related to this case and it was not documented in any
```

Pages 125 to 128

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

---

129

1  **reports that was video related to this case.**
2      MR. DeROSE:  Would you get out Exhibit 14 A and 14
3  B?
4      MR. MOWATT:  You stapled 14 A, 14 B, and 14 C all
5  in this one you just handed us.
6  BY MR. DeROSE:
7      Q   When you were at the police academy, were you
8  taught these special orders and the first one, 14 A,
9  talks about assisting Chicago Fire Department
10  Paramedics?
11     MS. WERTH:  I'm going to object to the form of the
12  question.  You can answer.
13     THE WITNESS:  I cannot recall.
14  BY MR. DeROSE:
15     Q   Well, as part of your investigation, did you
16  look to find out if there were police department
17  special orders regarding assisting fire department
18  personnel?
19     **A   Yes.**
20     Q   And did you find some?
21     **A   Yes.**
22     Q   And are they in the packet of materials you

---

130

1  brought today, whatever you found?
2      MS. WERTH:  She didn't bring any materials today.
3      MR. DeROSE:  Somebody brought that big volume of
4  material.
5      MR. MOWATT:  John, I brought that at your request.
6  It was all materials you've already been provided, but
7  you wanted us to bring it, so I brought it.
8      MR. DeROSE:  So she didn't know.  I see.
9  BY MR. DeROSE:
10     Q   I want you to look with me now under policy.
11  It says, "It is a policy of the department to assist
12  Chicago Fire Department Paramedics in transporting a
13  patient to a hospital whenever a Chicago Police
14  Department Paramedic declares that the situation
15  constitutes a medical emergency and requires police
16  assistance."  Do you see where I just read?
17     **A   Yes.**
18     Q   Did the paramedics tell you when you talked
19  to them that they never got close enough to José Lopez
20  to examine him and they had not declared a medical
21  emergency?
22     **A   Repeat that question again.  I'm sorry.**

---

131

1      MR. DeROSE:  Please read it to her.
2      (The record was so read
3          by the court reporter.)
4      THE WITNESS:  I can't recall if they told me they
5  got close to him and I do not know if they declared a
6  medical emergency.
7  BY MR. DeROSE:
8      Q   Well, you just had an opportunity a few
9  minutes ago to reread the statements from the
10  paramedics and they do not claim in there that they
11  ever declared a medical emergency, did they?
12     MR. MOWATT:  I'm going to object because you
13  literally cut her off and switched paths before she had
14  a chance to review any of these documents that you just
15  referred to.
16     MR. DeROSE:  All right.  Stop it.  Let's do it
17  this way.
18  BY MR. DeROSE:
19     Q   In their depositions, do you remember the
20  paramedics saying they never got close enough to José
21  Lopez to even examine him before he was Tased?
22     MR. MOWATT:  I'm going to object because the

---

132

1  witness testified that she was not provided the
2  depositions of the paramedics by you.
3  BY MR. DeROSE:
4      Q   Is that true?
5      **A   That's absolutely true.**
6      Q   Down under procedure it says, "A member will
7  assist the Chicago Fire Department Paramedics in
8  transporting a patient whenever a Chicago Fire
9  Department Paramedic declares a medical emergency and
10  requests assistance in restraining an adult patient who
11  has not objected to transportation or medical treatment
12  on religious grounds."  Do you see that?
13     **A   I see that.**
14     Q   In your training, were you told there were
15  any other reasons why a person can refuse medical
16  treatment or attention other than on religious grounds?
17     MS. WERTH:  Objection to the form of the question.
18     MR. MOWATT:  I'm also going to object in that Miss
19  White is not a 30(b)(6) witness even for IPRA.  She
20  certainly is not a 30(b)(6) witness in terms of the
21  Chicago Police Department's general orders.  Go ahead
22  and answer.

---

Pages 129 to 132

LaKenya White
November 9, 2015

---

133

1    THE WITNESS: Can you repeat the question?
2    MR. DeROSE: No, I'll repeat it.
3    BY MR. DeROSE:
4    Q   Were you ever taught and used as part of your
5    investigation that a citizen of the community can
6    refuse medical attention or transportation on grounds
7    other than religious grounds?
8    A   Was I ever taught that?  No.
9    MR. MOWATT: I'm renewing my objections, by the
10   way.
11   BY MR. DeROSE:
12   Q   I want you to look at Exhibit 14 B, two pages
13   down.  Do you remember being taught this special order
14   when you were over at the police academy?
15   A   I cannot recall.
16   Q   I want you to look at B under procedures.
17   And it says, "Persons who in the professional judgment
18   of the police officer are identified as being
19   intoxicated in a public place and who may present a
20   danger to themselves or others and who have apparently
21   not violated a criminal law or committed an ordinance
22   violation may -- and in big letters -- if they consent,

134

1    be assisted to their home if it is located in the
2    district.  They may also be assisted to a public
3    treatment facility, a private treatment facility, or
4    other health facility -- again in large letters -- if
5    they consent, and such a facility is located in the
6    district of occurrence."
7    Did you know of this special order when
8    you did this investigation?
9    MR. MOWATT: I'm going to renew my objections as
10   to Miss White's knowledge of the general orders of the
11   Chicago Police Department, being beyond the scope of
12   this deposition.
13   BY MR. DeROSE:
14   Q   You may answer.
15   A   Did I know of this general order?
16   Q   This is a special order.
17   A   I'm sorry.  Special order.
18   Q   Did you know of it when you were doing your
19   investigation?
20   A   I became aware, yes.
21   Q   The last sentence of that paragraph says, "If
22   the person refuses -- in big letters -- the assistance

135

1    offered, no further police action will be taken." Were
2    you aware of that when you closed this file?
3    A   That question is ambiguous and it's
4    misleading. I'm sorry. Because this case was closed
5    based on a no affidavit, not because of this, so when
6    you ask me this question, I can't answer it truthfully
7    because you're combining too many questions.
8    Q   Miss, you know today as you sit there that
9    José Lopez has been in a comatose state since the day
10   of the Tasing, don't you?
11   A   You're telling me that now, so yes.
12   Q   But I told you that when I talked to you two
13   years ago and sent you all the affidavits, didn't I?
14   MS. WERTH: I'm going to object to arguing with
15   the witness.
16   MR. DeROSE: I'm not arguing.
17   MS. WERTH: Yes, you are.
18   MR. DeROSE: Excuse me, counsel.
19   BY MR. DeROSE:
20   Q   Didn't I tell you when I first sent you all
21   those depositions that José Lopez was not able to
22   communicate with you?

136

1    A   Yes, you told me that, and the case was
2    closed at that point.
3    Q   And so you would not reopen it because he
4    couldn't give you an affidavit?
5    MS. WERTH: Mischaracterizes her evidence.
6    BY MR. DeROSE:
7    Q   You may answer.
8    A   The case was not reopened because I had no --
9    the deposition you gave me provided no further
10   information and Miss Guzman's testimony, who was the
11   witness, did not provide any further information.
12   Q   Do you only take the information from the
13   civilian witnesses or do you also take the information
14   from other police officers and paramedics who are on
15   the scene?
16   A   I take into account everybody's statement.
17   Q   Other police officers on the scene said that
18   José Lopez was refusing medical attention, did they
19   not?
20   A   According to what I -- from what I recall, I
21   believe so, yes.
22   Q   And the officer walked up to Mr. Lopez with

---

Pages 133 to 136

LaKenya White
November 9, 2015

137

1    the Taser already out of the holster, didn't he?
2        MS. WERTH:  Objection to the form of the question;
3    it's misleading and assumes facts not in evidence as to
4    what she knew.
5        MR. DeROSE:  That's not true, counsel.  This is
6    your first deposition.  You don't know what's in
7    evidence.
8        MS. WERTH:  Oh, really?  It's my first deposition?
9        MR. DeROSE:  With us today in this case.
10       MS. WERTH:  Well, I do know what is in evidence at
11   this deposition.
12   BY MR. DeROSE:
13       Q    Ma'am, in the depositions you read, did you
14   notice that the officer who Tased José Lopez walked up
15   to him with his Taser out of the holster?
16       MS. WERTH:  Just answer whether you know or not.
17       THE WITNESS:  From what I recall, I believe so.  I
18   don't know if it's the way that you stated, but yes.
19   BY MR. DeROSE:
20       Q    Do you remember the officers' testifying that
21   they had talked together before they approached Lopez?
22       MR. MOWATT:  I am going to object to the form of

138

1    the question.
2        THE WITNESS:  I don't recall.
3    BY MR. DeROSE:
4        Q    Do you know how many officers approached
5    Lopez?
6        A    I don't recall.
7        Q    Do you recall anyone testifying that there
8    were four officers standing around Lopez when he was
9    Tased?
10       A    I cannot recall how many officers were
11   standing around Mr. Lopez when he was Tased.
12       Q    Was that at all important to your
13   investigation as to whether excessive force was used on
14   Mr. Lopez?
15       MS. WERTH:  Objection to the form of the question.
16   Objection, argument.
17       THE WITNESS:  The importance of this case was to
18   see if excessive force was used, yes.
19   BY MR. DeROSE:
20       Q    And the two people you did take the statement
21   from both said as paramedics they were a block away
22   when José Lopez was Tased, didn't they?

139

1        MR. MOWATT:  Are you now going to let her review
2    the statements of these paramedics so that --
3        MR. DeROSE:  Go ahead, take a minute.
4        MS. WERTH:  So now you want her to review the
5    paramedic statements to be able to answer your
6    question, correct?
7        MR. MOWATT:  Counsel, there's about an hour
8    remaining in the deposition.
9    BY MR. DeROSE:
10       Q    I don't want to take time to read the other
11   one right now because we only have an hour.  You just
12   read the statement you took from which paramedic?
13       A    Miss Cheatham.
14       Q    Haven't you read those interviews that you
15   took in preparation for this deposition?
16       A    I glanced over them, yes.
17       Q    Did they refresh your memory of what those
18   people said?
19       A    Somewhat, yes, somewhat.
20       Q    And you learned from them that they were a
21   block away when José Lopez was Tased; is that not
22   correct?

140

1        A    Yes, they were away and Miss Guzman was a
2    block away, yes.
3        Q    Neither of the paramedics identify that lady
4    by name, do they?
5        A    No.
6        Q    And as a matter of fact, each of those two
7    paramedics had very limited recall of this entire
8    event; is that not correct?
9        MS. WERTH:  Objection.
10       MR. MOWATT:  I'm going to object to the form.
11       THE WITNESS:  I don't believe that's correct.
12       MS. WERTH:  Objection to lacks personal knowledge
13   as to what they recalled, what other paramedics
14   recalled.
15   BY MR. DeROSE:
16       Q    You wrote in your report from the female
17   paramedic that she could not even remember that there
18   was a fire truck on the scene; is that not correct?
19   Didn't you just read that?
20       A    That's correct.
21       Q    And she also told you that there was some law
22   that required her to take Mr. Lopez in the ambulance;

LaKenya White
November 9, 2015

141

1  is that right?
2     **A  That's correct.**
3     Q  Did you ask her what the law was, where it
4  was, so you could look at it?
5     **A  No, because she's part of the fire**
6  **department, so no.**
7     Q  And so you never determined what law she was
8  referring to?
9     MS. WERTH:  Objection, argumentative, asked and
10  answered.
11     **A  No.**
12     Q  I want you to look at Exhibit 14 C.
13       It is part of the municipal code of the
14  city of Chicago and it talks about a peace officer's
15  assistance during emergencies. It's at 4-68-110. Do
16  you see it?
17     **A  Yes.**
18     Q  Did you ever look at this particular
19  municipal code of the city of Chicago?
20     **A  I believe I reviewed this, yes.**
21     Q  And it says, "A peace officer may assist an
22  emergency medical technician as defined in the Illinois

142

1  Emergency Medical Service Systems Act (210 ILCS 50/1 et
2  seq.) in transporting a person to a hospital licensed
3  to provide comprehensive emergency treatment services
4  when the officer is informed by an emergency medical
5  technician that the situation constitutes an emergency
6  as defined in the Emergency Medical Services Systems
7  Act and that person is in need of immediate
8  hospitalization to protect such person or others from
9  physical harm. This provision of this section shall
10  not apply when the person sought to be transported
11  objects to transportation or medical treatment on
12  religious grounds." Do you see that?
13     **A  Yes.**
14     Q  Did you determine that that was the law that
15  she was referring to?
16     MS. WERTH:  Objection. This question -- you're
17  talking about Miss Cheatham, the paramedic?
18     MR. DeROSE:  Yes, ma'am.
19     MS. WERTH:  She's already answered the question as
20  to Miss Cheatham.
21  BY MR. DeROSE:
22     Q  You can answer again. Did you determine when

143

1  you say you read this that this was the law she was
2  referring?
3     **A  No, I can't say I determined that. I don't**
4  **know.**
5     Q  Well, why did you go look at this law?
6     MS. WERTH:  Objection, mischaracterizes her
7  evidence. You asked her if she's ever looked at this
8  and she said yes, and now you're saying why did she
9  look at this.
10     MR. DeROSE:  Please, ma'am, that's not an --
11     MS. WERTH:  But you're deflating --
12     MR. DeROSE:  Counsel, no speaking objections.
13  You're supposed to -- you can object on a basis of a
14  federal rule I'm violating, but please, I don't need
15  a --
16     MS. WERTH:  Mischaracterizes her evidence.
17  Misleading.
18  BY MR. DeROSE:
19     Q  Did you look, ma'am, at this law as part of
20  this investigation?
21     **A  Yes.**
22     Q  All right. Why?

144

1     **A  Because I'm investigating policeman's**
2  **conduct.**
3     Q  And did you understand that this was the law?
4  Was it your understanding that this was the law that
5  Miss Cheatham must have been referring to?
6     MS. WERTH:  Objection, calls for speculation.
7  Objection, seeks information to which she has no
8  personal knowledge as to what Miss Cheatham must have
9  been referring to.
10     MR. MOWATT:  Join in those objections and I'm also
11  going to object to the extent that it calls for a legal
12  conclusion.
13  BY MR. DeROSE:
14     Q  You may answer.
15     **A  Again, I did not determine what law Miss**
16  **Cheatham was referring to.**
17     Q  Looking at this Exhibit 14 C, do you know if
18  there are other grounds why a person can refuse medical
19  attention other than on religious grounds?
20     MR. MOWATT:  I am going to, again, object to the
21  extent that you're asking questions that call for a
22  legal conclusion.

Pages 141 to 144

LaKenya White
November 9, 2015

145

1    MS. WERTH:  I'm going to join in that.
2    THE WITNESS:  No, I'm not aware.
3    BY MR. DeROSE:
4    Q    When you got the interviews of the two
5    paramedics, did either one of them tell you that they
6    ever got close enough to Lopez before he was Tased to
7    examine him and declare a medical emergency?
8    MR. MOWATT:  I am going to object to form.
9    MS. WERTH:  I'll join.
10   THE WITNESS:  I can't -- Miss Cheatham?  No.
11   Again, I would have to review Mr. Mendoza's statement
12   which you told me I had no time to review.
13   BY MR. DeROSE:
14   Q    So as you sit here now, nobody told you they
15   had declared a medical emergency that you remember?
16   **A    I don't believe I asked.**
17   Q    Did either of the paramedics tell you that
18   Lopez was trying to escape or run away from the police
19   officers?
20   **A    Not that I recall.**
21   Q    What are the circumstances by your training
22   that a police officer is allowed to Taser a citizen of

146

1    the community?
2    MR. MOWATT:  I am going to object as this witness
3    is utterly and completely incompetent in terms of
4    answering what the Chicago Police Department's
5    standards are in terms of when a citizen may be Tased.
6    You have already had a 30(b)(6) witness specifically on
7    this topic.  But you can go ahead and answer.
8    THE WITNESS:  Can you read the question again?
9    MR. DeROSE:  Withdraw the question.
10   BY MR. DeROSE:
11   Q    What, as you understand it, is the
12   circumstances under which a police officer is allowed
13   to Taser a witness or a citizen of the community?
14   Strike it because I want it as a clear question for
15   you.
16   **A    Okay.**
17   Q    What are the circumstances, as you understand
18   it as an investigator from IPRA, as to when a police
19   officer can Taser a citizen of the community?
20   MS. WERTH:  Objection to the form of the question,
21   overbroad.  You can answer.
22   MR. MOWATT:  I'll join.

147

1    THE WITNESS:  My understanding when a citizen can
2    be Tasered is if they're resisting arrest, in some
3    cases where they're refusing medical treatment and
4    they're not in their right mental state of mind and
5    they cannot reasonably make decisions as to go into the
6    hospital and they put they self in harm's way.
7    BY MR. DeROSE:
8    Q    That second circumstance, did you see any
9    writings anywhere in your training that allows the
10   circumstance you just said where an officer can Taser a
11   person who needs to be transported to a hospital?
12   MR. MOWATT:  I'm going to object to the incomplete
13   hypothetical to form and foundation.
14   BY MR. DeROSE:
15   Q    You may answer.
16   **A    Repeat that question.**
17   Q    All right.  I will.
18   MR. DeROSE:  Read it back because I don't want to
19   repeat that one.
20              (The record was so read
21               by the court reporter.)
22   THE WITNESS:  Somewhere in my training I -- I

148

1    would have to look at the general orders.  I can't
2    answer that question without the general orders being
3    presented in front of me, or special orders.
4    BY MR. DeROSE:
5    Q    Have you ever been trained that the use of a
6    Taser is more than minimal force -- it's more than
7    minimum force to be used against a person?
8    MR. MOWATT:  I'm going to object to the form of
9    that question.
10   MS. WERTH:  I will join in that form.
11   THE WITNESS:  And I do not understand that
12   question at all.
13   BY MR. DeROSE:
14   Q    Let me make this a little easier for you.
15   Have you ever been taught that it is unreasonable for
16   officers to deploy a Taser against a misdemeanant who
17   is not actively resisting arrest?
18   MR. MOWATT:  I am going to object to the extent
19   that you're calling for a legal conclusion and I would
20   also object to the form.
21   MS. WERTH:  Yeah, I'm going to object to the form
22   of the question.  It's overbroad.  You're asking her --

Pages 145 to 148

LaKenya White
November 9, 2015

149

1      MR. DeROSE: I'm asking her training.
2      MS. WERTH: -- broad questions, has she ever read
3  this or that. You can answer.
4  BY MR. DeROSE:
5      Q    You may answer.
6      A    I haven't been trained that.
7      Q    Have you ever been trained that if someone is
8  not resisting arrest, an officer may not Taser them?
9      MR. MOWATT: I'm going to object to form and also
10 I am going to object to the extent that it calls for a
11 legal conclusion, to the extent that it calls for
12 speculation, to the extent that it's an incomplete
13 hypothetical.
14     THE WITNESS: That's not accurate as you're
15 stating it, no, that's not accurate.
16 BY MR. DeROSE:
17     Q    It's not accurate that --
18     MR. DeROSE: Read the question back.
19         (The record was so read
20          by the court reporter.)
21 BY MR. DeROSE:
22     Q    And you're saying that's not accurate?

150

1      A    That's not accurate as you're stating it,
2  yes.
3      Q    Do you believe that Lopez was resisting
4  arrest that day?
5      MS. WERTH: Objection, it calls for speculation.
6  You can answer.
7      MR. MOWATT: I'll join in that objection.
8      THE WITNESS: According to the paramedics he was
9  combative, so that is a form of resisting. And again,
10 he was under the influence which is stated also in his
11 medical records.
12 BY MR. DeROSE:
13     Q    Ma'am, what did the paramedics say that he
14 was doing that was combative?
15     A    Both paramedics, which I can't account,
16 again, from Mr. Mendoza because you won't let me read
17 his statement, stated that he was combative, he was
18 flailing his arms, he appeared to be under the
19 influence of drugs, and he was refusing to get medical
20 treatment which can cause harm to himself.
21     Q    Did you ask the paramedics if he touched a
22 single person that day?

151

1      MR. MOWATT: I am going to object because that
2  question has been asked and answered.
3      MS. WERTH: And to the form of the question in
4  terms of vagueness and overbroad.
5      THE WITNESS: I can't recall what I asked the
6  paramedics, again, as I stated before.
7  BY MR. DeROSE:
8      Q    Did you ask the paramedics if he struck
9  anyone?
10     MR. MOWATT: Same objections.
11     THE WITNESS: Again, I cannot recall what I asked
12 the paramedics.
13 BY MR. DeROSE:
14     Q    I sent you depositions on more than one
15 occasion, correct?
16     A    Yes.
17     Q    And did you read them all?
18     A    Yes, sir.
19     Q    And then after you read the depositions and
20 reviewed the reports that I sent you, what next did you
21 do?
22     A    I spoke to my supervisor regarding this

152

1  incident.
2      Q    And what did you say to him?
3      A    I said -- I discussed the case with him.
4      Q    And what did he say to you?
5      A    I can't recall verbatim what he stated to me
6  but I know we did review the general orders.
7      Q    And besides reviewing the general orders,
8  what else did you tell him about the case after reading
9  the depositions?
10     A    I think we discussed Mr. Lopez's medical
11 condition and what he was diagnosed with and that he
12 tested positive for PCP and cocaine.
13     Q    He did not test positive for both of them I
14 can assure you.
15         Do you believe you saw records that said
16 he tested positive for both of them or is that what you
17 told your supervisor?
18     A    That's what's in the medical records and I
19 can show that to you.
20     Q    All right. Show me both of them.
21     MS. WERTH: I'll just make a notation here.
22 Whether or not he tested positive or not is beside the

LaKenya White
November 9, 2015

153

1  point in Miss White's investigation, so I'm not sure
2  what we're getting at here other than wasting time.
3      MR. DeROSE: Well, let's ask her that.
4  BY MR. DeROSE:
5      Q   Is it beside your point whether a person
6  tested positive for one or both of those drugs as part
7  of this investigation in the Lopez case?
8      MR. MOWATT: John, can you let her answer your
9  last pending question? If you ask her another one --
10     MS. WERTH: Are you withdrawing your other
11  question? You were asking her to point to you --
12     MR. DeROSE: All right. Stop. You're doing a
13  great job on me, counsel, both of you.
14     THE WITNESS: You too.
15     MS. WERTH: You're doing a great job too.
16  BY MR. DeROSE:
17     Q   I wanted to ask you did you tell your
18  supervisor the extent of injury that Mr. Lopez had
19  sustained because he wouldn't get in the ambulance?
20     MR. MOWATT: I'm going to object to the form of
21  that question.
22     MS. WERTH: I'm going to object to the form of

154

1  that question as well.
2      MR. HURD: I think it's on causation, objection to
3  the legal conclusion.
4      THE WITNESS: My supervisor was aware of the
5  injuries, however our job was to investigate the
6  excessive force in this case.
7  BY MR. DeROSE:
8      Q   And what did you understand the injuries
9  were?
10     **A   Well, according to you when I spoke to you,**
11  **and I believe I spoke to Mr. Carone, that he was brain**
12  **dead, that was my understanding.**
13     Q   Who told you he was brain dead?
14     **A   I believe it was either you or Mr. Carone.**
15  **It is in my investigative case log as well.**
16     Q   That somebody told you he was brain dead, not
17  that he had severe brain surgeries?
18     MR. CARONE: It would be brain damage.
19     THE WITNESS: Maybe brain damage. I knew he had
20  issues so if that's what you're asking me.
21  BY MR. DeROSE:
22     Q   So after you read all those materials and had

155

1  that talk with your supervisor, did you go to tried to
2  do any further investigation in the case?
3      MR. MOWATT: I'm going to object to the form
4  because I'm unclear as to what point you're talking
5  about.
6      MS. WERTH: Yeah, so am I. We're going around and
7  around in this. At which point in time --
8  BY MR. DeROSE:
9      Q   After you talked to your supervisor and told
10  him what you found in the documents you read, what next
11  did you do?
12     **A   We discussed the case.**
13     Q   And what did you say to him and what did he
14  say to you?
15     **A   I can't remember verbatim what he stated.**
16  **However, I remember telling him whatever I read in the**
17  **depositions. We had a discussion about what was**
18  **related in the depositions.**
19     Q   And then what happened?
20     **A   What do you mean and then what --**
21     Q   What did you do after you had the discussion?
22     **A   We had a discussion. We talked about it. I**

156

1  **can't tell you.**
2      Q   Then what did you do?
3      **A   We eventually decided not to reopen it.**
4      Q   Why not?
5      **A   Because based on the depositions, it provided**
6  **no further information from what we already knew.**
7      Q   The depositions were 300 pages long each.
8  You had all the information before you even started
9  reading the depositions of what occurred out there on
10  the street?
11     MS. WERTH: I am going to object to this
12  argumentative type of question.
13  BY MR. DeROSE:
14     Q   You may answer.
15     **A   I didn't hear a question. What was the**
16  **question?**
17     Q   The question was you didn't learn a single
18  new thing after reading all those depositions?
19     MS. WERTH: Objection to the form of the question.
20  And objection, arguing with the witness. Objection,
21  mischaracterizes her prior testimony.
22     THE WITNESS: What I stated was it didn't add

Pages 153 to 156

LaKenya White
November 9, 2015

157

1    anything that I already didn't know.
2    BY MR. DeROSE:
3        Q   Now just generally you say you've handled
4    about 15 or 20 Taser cases in your experience for the
5    Independent Police Review Authority; is that correct?
6        MR. MOWATT:  Objection to the extent it
7    mischaracterizes her testimony.
8        MS. WERTH:  I'll join.
9        THE WITNESS:  I think I said 10 or 15.  I don't
10   know.  But I had numerous.
11   BY MR. DeROSE:
12       Q   Of the 10 or 15 cases you yourself have
13   investigated, have you ever found the use of force to
14   be unwarranted and excessive?
15       **A   In a Taser incident?**
16       Q   Yes.
17       **A   I believe so.**
18       Q   How many times?
19       **A   I cannot recall.**
20       Q   And did you recommend that the finding of
21   excessive force be sustained by the IPRA?
22       **A   I can't recall that either.**

158

1        Q   What did you do in that one case you believe
2    where you found the use of excessive force, what did
3    you do when you made that determination?
4        **A   In the one case of what?  I'm sorry.**
5        Q   You said you believe you found the use of a
6    Taser to have been excessive on one occasion.  Did you
7    recommend to your supervisor that there be a finding
8    sustained that the officer used excessive force?
9        **A   I believe so, yes.**
10       Q   And what was that case, the name of the case?
11       **A   I cannot recall that.**
12       Q   And when was that, years ago or recently?
13       **A   That would have been years ago.**
14       Q   And on the other 15 occasions when you
15   reviewed these uses of force, you found them all to be
16   justified; is that fair to say?
17       MR. MOWATT:  I am going to object to the form and
18   to the mischaracterization of her testimony.
19       MS. WERTH:  I am going to join in that.
20       THE WITNESS:  No, that's not safe to say at all.
21   BY MR. DeROSE:
22       Q   You found him not to be the use of excessive

159

1    force?
2        MS. WERTH:  Objection to the form and
3    mischaracterizing her testimony.
4        THE WITNESS:  I'm not saying that either.
5    BY MR. DeROSE:
6        Q   What are you saying?  Why didn't you do
7    anything in the other 10 or 15 cases?
8        MS. WERTH:  Objection, argumentative and
9    mischaracterizes her evidence.  She never testified
10   that she didn't do anything in those cases --
11       MR. DeROSE:  I'm not asking her what she --
12       MS. WERTH:  -- failed to do anything in those
13   cases.  You're mischaracterizing her evidence.
14   BY MR. DeROSE:
15       Q   In the 10 to 15 other cases besides the one
16   where you found the use of excessive force, did you
17   find in those other cases that there was no use of
18   excessive force when the persons were Tased?
19       MR. MOWATT:  I'll object to the form of that
20   question.
21       THE WITNESS:  I don't understand that question.
22

160

1    BY MR. DeROSE:
2        Q   You say you only found the use of excessive
3    force one time?
4        **A   Okay.**
5        Q   What did you find in the other 10 to 15
6    cases?
7        MS. WERTH:  Objection, overbroad.  You can answer
8    if you recall.
9        THE WITNESS:  I cannot recall but if it wasn't
10   sustained, then it was either unfounded, not sustained
11   or exonerated.  I cannot tell you which one was what.
12   BY MR. DeROSE:
13       Q   In the Lopez case, the one we're here about
14   today, when you closed the file what was your finding?
15       MR. MOWATT:  Objection to the extent that it
16   assumes facts not in evidence and objection to form.
17   Go ahead and answer please.
18       THE WITNESS:  My finding was no affidavit.
19   BY MR. DeROSE:
20       Q   No affidavit, that's the finding?  So you
21   didn't do any further investigation at all when you
22   made the finding of no affidavit?

LaKenya White
November 9, 2015

161

1      MS. WERTH: Objection, mischaracterizes her
2  evidence. She's already talked to you about what she
3  did after you called her up.
4      THE WITNESS: An investigation was done in this
5  case. It was started when I first got this case. It
6  continued on until I closed the new affidavit. I also
7  continued looking into it once you sent me the
8  depositions.
9  BY MR. DeROSE:
10    Q   And then what happened?
11     MS. WERTH: Objection to the form of the question
12  as to then what happened. We've gone over this. You
13  can answer again.
14     THE WITNESS: Upon further review the case
15  remained closed.
16  BY MR. DeROSE:
17    Q   Closed because there was no affidavit?
18    **A   Closed because there was no further**
19  **information based on the information that you gave me.**
20    Q   As you sit here now, based on your
21  investigation do you believe that there was the use of
22  appropriate force to get José Lopez into that

162

1  ambulance?
2     MS. WERTH: Objection, calls for a legal
3  conclusion.
4     MR. MOWATT: Objection also to the form, to
5  foundation, to the incomplete hypothetical.
6     THE WITNESS: Repeat the question please.
7  BY MR. DeROSE:
8    Q   I will. Based on your investigation, do you
9  believe there was an appropriate use of force to get
10  José Lopez into that ambulance?
11     MR. MOWATT: I'm going to renew my objections.
12     MS. WERTH: Join.
13     THE WITNESS: Based on the evidence that I've
14  gathered, based on the depositions that you sent me,
15  based on the medical records Mr. Lopez was under the
16  influence, the officers -- he was not in his right
17  state of mind. The officers used the force necessary
18  to get him medical treatment.
19  BY MR. DeROSE:
20    Q   And so therefore, your finding personally as
21  an investigator is that this was not an excessive use
22  of force?

163

1      MS. WERTH: Objection, mischaracterizes her
2  evidence. She's already told you.
3     MR. DeROSE: Please, counsel.
4     MS. WERTH: If she doesn't give you the answer you
5  don't like, it doesn't mean you can keep asking her
6  again. You're badgering the witness. It's coming very
7  close to that now, counsel.
8      Ask her the questions, she's giving you
9  the answer, and you keep asking her the same question
10  in different ways.
11     MR. MOWATT: I am going to object to form, to
12  mischaracterization of her testimony. I am going to
13  object to also the incomplete hypothetical.
14  BY MR. DeROSE:
15    Q   Are you aware in your investigation that the
16  911 call was made because Lopez was reported to be
17  having chest pains and difficulty breathing?
18    **A   Yes.**
19    Q   And did that have any impact on your
20  investigation?
21     MS. WERTH: Objection to form. You can answer.
22     THE WITNESS: Every piece of evidence in this case

164

1  had an impact in my investigation.
2  BY MR. DeROSE:
3    Q   Are there any exceptions to having the sworn
4  affidavit requirement in order for you to go forward
5  with your investigation?
6     MR. MOWATT: Objection to the extent that it calls
7  for a legal conclusion. You may go ahead and answer.
8     THE WITNESS: I'm sorry. Can you break that down?
9  What did you say again?
10  BY MR. DeROSE:
11    Q   In that -- to your Annual Report, there is a
12  section I want you to look at.
13     MR. MOWATT: Which exhibit are you talking about?
14     MR. HURD: 256.
15     MR. MOWATT: 256 is what you're talking about?
16     MR. DeROSE: Yeah.
17     MR. MOWATT: Do you know what page approximately?
18     MR. DeROSE: Yes, I will if you give me a moment.
19     MR. MOWATT: You can have all the moments you want
20  for approximately another 32 minutes.
21  BY MR. DeROSE:
22    Q   Let me have a two-minute break and I'll get

Pages 161 to 164

LaKenya White
November 9, 2015

165

1    back to you guys. A few minutes.
2        (There was a break taken, after
3        which the deposition was resumed
4        as follows:)
5    MR. DeROSE: Back on the record.
6    BY MR. DeROSE:
7        Q   Was a complaint register number ever issued
8    by IPRA for this case?
9        A   A log number was issued.
10       Q   Is that different than a complaint register
11   number?
12       A   It's not really different. A log number
13   starts the complaint process.
14       Q   You're saying it's not really different but
15   in a CR or a complaint register number, isn't that
16   something that there has to be a finding made of
17   unfounded or founded and sustained?
18       A   Once the affidavit is obtained.
19       Q   So do I understand that there was no actual
20   CR number ever given to this file, only this log number
21   you're talking about?
22       A   That's about correct, yes.

166

1        Q   Are there any -- under the Uniform Peace
2    Officers' Disciplinary Act, which is the act that
3    guides your investigations, right?
4        MS. WERTH: Objection to form of the question,
5    vague, overbroad.
6        MR. MOWATT: I will join those objections and also
7    add foundation and to the extent it calls for a legal
8    conclusion.
9        THE WITNESS: I don't know the uniform police act
10   verbatim.
11   BY MR. DeROSE:
12       Q   Are there any exceptions to obtaining a sworn
13   affidavit before you start your investigation?
14       A   If there's a police-involved shooting.
15       Q   Or of serious injury?
16       A   No. Or death in police custody.
17       Q   And that's only two you can think of?
18       A   Yes, sir.
19       Q   I want you to go back to No. 256.
20           First of all, I want you to look at
21   Page 19, the Rapid Pilot Program.
22       MR. HURD: Improvements to investigative

167

1    procedures.
2        MR. DeROSE: There you go.
3    BY MR. DeROSE:
4        Q   And you told us you were on the Rapid Pilot
5    Intake Program at one time?
6        MR. MOWATT: I am going to object to the extent
7    that that question mischaracterizes her testimony.
8    BY MR. DeROSE:
9        Q   Is that correct, miss?
10       A   No, that's not correct.
11       Q   You were never on as part of this program?
12       A   This is a program, I am a part of the rapid
13   response section. That's not the same thing.
14       Q   Oh, they're two different things, all right.
15   I'll just mention and see if you agree with that, the
16   second paragraph in the middle of the page under Rapid
17   Pilot Program it says, "The Rapid Team at IPRA." Is
18   that you?
19       A   That is me now, yes.
20       Q   "The Rapid Team at IPRA consists of intake
21   aides and investigators who are responsible for
22   gathering information about new allegations of

168

1    misconduct in the first few hours after the allegation
2    is made. The investigators spend more time in the
3    field tracking down evidence, such as video recordings,
4    that could be lost if not gathered immediately." Is
5    that one of your assignments in this day and age?
6        A   Yes, it is.
7        Q   And how long have you been a part of the
8    Rapid Team at IPRA?
9        A   Since May of this year.
10       Q   When you initially got this assignment, you
11   were not part of the Rapid Response Team?
12       A   That is correct.
13       Q   Now I want you to look at the very next page,
14   Page 20, under phase goals for completing older
15   investigations. Are you aware that there has been
16   criticism of IPRA because some investigations have
17   stayed open too many years?
18       A   Yes, I am aware.
19       Q   And are you also as an investigator assigned
20   to try to wrap up some of those older cases?
21       A   I'm assigned to investigate them thoroughly
22   and wrap them up once I complete my investigation.

Pages 165 to 168

LaKenya White
November 9, 2015

169

1    Q   And if you look under that paragraph it says,
2    "In conjunction with the Rapid Pilot Project, at the
3    beginning of 2011, IPRA began phase goals for
4    investigators to bring their case loads more current.
5    This focused investigators and their supervisors on
6    completing their older and often more complex
7    investigations." Do you see where I just read?
8    A   Yes, sir.
9    Q   Did you consider this a complex
10   investigation?
11       MR. MOWATT:  By this you're referring to the Lopez
12   case?
13       MR. DeROSE:  Lopez case.
14       THE WITNESS:  I would consider this a complex
15   investigation.
16   BY MR. DeROSE:
17   Q   And you yourself never interviewed anyone
18   else in this case but the two paramedics, correct?
19       MR. MOWATT:  I will object to this question as
20   having been asked and answered several times in this.
21       MS. WERTH:  I will join in that.
22       MR. DeROSE:  Please, I'm building to something,

170

1    counsel.
2    BY MR. DeROSE:
3    Q   Is that correct?
4    A   I did interview the paramedics, yes.
5    Q   What was more complex about this
6    investigation than your run-of-the-mill investigations?
7        MS. WERTH:  Objection to the form of the question.
8    You can answer.
9        THE WITNESS:  I don't know what run of the mill
10   means.
11   BY MR. DeROSE:
12   Q   You said you thought this was a more complex
13   investigation.  Why?
14   A   Well, because of the injuries.
15   Q   And had you obtained medical records yourself
16   of the injuries to Mr. Lopez before I sent them to you?
17   A   You never sent me any medical records.
18   Q   I disagree, but all right.  So where did you
19   get your medical records from?
20   A   I requested those medical records.
21   Q   From where?
22   A   I would have to look at the file.  I believe

171

1    one, to the best of my knowledge, was Kendrick and the
2    other one was an RPM -- I don't know, some type of
3    specialty hospital.
4    Q   And did they show that the man was
5    permanently disabled now and in a comatose state?
6    A   I can't attest to what those medical records
7    state at this point right now.
8    Q   Did you understand that he was very seriously
9    injured?
10   A   Again, as we stated earlier, I spoke to you
11   and I spoke to Mr. Carone and I learned that he had
12   brain damage.
13   Q   I want you to go down to -- go to Page 22 and
14   on the very bottom it'll say investigations in bold,
15   investigations of officer-involved shootings.
16       By the way, when they talk about
17   officer-involved shootings over there at IPRA, are they
18   only referring to use of the firearm or is a Taser
19   weapon also a shooting of a person?
20   A   Just a firearm.
21   Q   So this portion right down here, you don't
22   think they're considering at all the use of a Taser

172

1    weapon on an individual in the community?
2    A   To the best of my knowledge, no.
3    Q   All right.  See what they write.
4    "Limitations on Interviewing Involved Officers.  Since
5    IPRA's inception in 2007, there have been several
6    changes to how officer-involved shootings are
7    investigated.  In the previous Annual Report, IPRA
8    explained that Chicago Police Department officers
9    ceased their voluntary participation in the Roundtable
10   forcing IPRA to compel statements from officers
11   involved in shootings.  When the last report was
12   published, FOP" -- or it's one of the unions --
13       MS. WERTH:  Fraternal Order of Police.
14   BY MR. DeROSE:
15   Q   (Continued.)  "was challenging IPRA's ability
16   to compel those statements."  Are you aware of that?
17   A   Yes.
18   Q   Now look at the next paragraph.  "As a result
19   of an arbitration, it was determined that IPRA could
20   compel statements from non-shooting, witness officers
21   within two hours of an officer-involved shooting
22   incident.  However, IPRA is now required to wait 24 to

Pages 169 to 172

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

173

1  36 hours before compelling a statement from a shooting
2  officer." Do you see that?
3      **A  Yes, sir.**
4      Q   Now Lopez was Tased, he wasn't shot, but in
5  light of the injuries that you found out he had
6  sustained after that Tasing, were you not allowed to go
7  and interview any of those non-shooting officers?
8      MR. MOWATT: I'm going to object on the grounds of
9  relevance. The witness has already testified that this
10 section has nothing to do with Tasing. I am also going
11 to object to this question as having being asked and
12 answered several times as to whether or not she could
13 interview any officers in connection with this
14 incident.
15     MS. WERTH: I'll join in that.
16 BY MR. DeROSE:
17     Q   You may answer.
18     **A  Again, this did not qualify as this incident**
19 **because it is not a shooting; so therefore, this did**
20 **not qualify in the Lopez case.**
21     Q   So as IPRA works today, if someone is Tased
22 and you don't get a statement from the person who was

174

1  Tased or someone else who's out there, you have no
2  right to interview any of the officers who are on the
3  scene; is that what I'm hearing?
4      MR. MOWATT: I am going to object to the
5  incomplete hypothetical, the call for speculation,
6  foundation, form.
7      THE WITNESS: Can you read that question?
8      MS. WERTH: And I'm going to join in that.
9      MR. DeROSE: No, I'm going to ask it again.
10 BY MR. DeROSE:
11     Q   As you understand the limitations on the
12 Independent Police Review Authority today, is it fair
13 to say that you cannot compel the statement from an
14 officer who uses his Taser or any other officers on the
15 scene if you do not have an affidavit from a witness
16 concerning misconduct?
17     MR. MOWATT: I am going to renew my previous
18 objections.
19     MS. WERTH: I will join.
20     THE WITNESS: To the best of my knowledge, yes.
21 BY MR. DeROSE:
22     Q   If you have done 15 to 20 Taser

175

1  investigations in your experience, is every Taser
2  incident that's reported in the city of Chicago
3  investigated by all the different investigators put
4  together?
5      MS. WERTH: Objection to form of the question,
6  lacks personal knowledge.
7      MR. MOWATT: And I'll join. Also foundation.
8      THE WITNESS: I have no idea. I'm not certain.
9  BY MR. DeROSE:
10     Q   Do you know if every Tasing incident in the
11 city of Chicago that you're getting notification of by
12 the Chicago Police Department is investigated?
13     MR. MOWATT: I'll renew those objections.
14     MS. WERTH: Objection to personal knowledge. You
15 can answer if you know.
16     THE WITNESS: I am not certain, to the best of my
17 knowledge -- I am not certain.
18 BY MR. DeROSE:
19     Q   How many investigators are on the staff at
20 the Independent Police Review Authority?
21     MS. WERTH: Objection, lack of personal knowledge.
22 You can answer if you know.

176

1      THE WITNESS: About 50.
2  BY MR. DeROSE:
3      Q   And that's full-time investigators?
4      **A  Yes, sir.**
5      Q   And if that report that we looked at earlier
6  of some-860 Taser incidents took place between 2010 and
7  2012, those 860 Taserings, if they're all being
8  investigated, would have had to be divided among you 50
9  investigators?
10     MS. WERTH: Objection, calls for speculation,
11 incomplete hypothetical, vague, overbroad.
12     MR. MOWATT: I'll join --
13     MR. HURD: Foundation.
14     MR. MOWATT: I'll join those objections including
15 foundation. And I also state that we didn't -- I am
16 not sure what you're referring to in terms of these 800
17 Tasings. I don't believe we discussed that at this
18 deposition.
19     MR. DeROSE: I believe we did, sir. Can we see
20 that exhibit again? It was about the second or third
21 exhibit that we --
22     MR. MOWATT: I thought you were referring to some

Pages 173 to 176

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

---

177

1  part of this IPRA report.  I apologize.
2      MR. DeROSE:  That's all right.
3  BY MR. DeROSE:
4      Q   Now, if the Tribune was right that there were
5  836 Tasering incidents between -- excuse me -- in the
6  year 2011, the year that my client was Tased, that
7  there were 836 Tasering incidents, each one of them
8  would have required a notice to IPRA; is that not
9  correct?
10     MR. MOWATT:  I'm going to object to the form and
11 to the mischaracterization of the Tribune report.
12     MS. WERTH:  I'm going to object on lacks
13 foundation, calls for speculation.
14 BY MR. DeROSE:
15     Q   Ma'am, that paragraph says this is taken from
16 the records of the Independent Police Review Authority.
17 Do you see that?
18     A   Yes.
19     Q   If there were 836 Tasering incidents reported
20 in 2011 and you've only done 10 or 15 Taser incidents
21 yourself as far as investigations in your career, is
22 that a -- strike that.

---

178

1      Is there a special unit of investigators
2  that investigates Taserings that are concentrated on
3  that kind of an investigation?
4      A   No, sir.
5      Q   So if there were 836 Tasering incidents in
6  2011, did you have personally a heavier volume of
7  Tasering incidents that year that you investigated?
8      MR. MOWATT:  I'm going to object to the extent
9  that it mischaracterizes the facts as stated.  The
10 Tribune article, further -- two, the Tribune article is
11 at least double hearsay.  Also I'm going to object to
12 form.  I'm going to object to foundation and the
13 incomplete hypothetical.
14     MS. WERTH:  I'll join.
15     THE WITNESS:  No.
16 BY MR. DeROSE:
17     Q   Does the Independent Police Review Authority
18 keep figures on Tasering?
19     MS. WERTH:  Objection, foundation.  You can answer
20 if you know.
21     THE WITNESS:  To the best of my knowledge, they
22 do.

---

179

1  BY MR. DeROSE:
2      Q   How many Taserings to the best of your
3  knowledge occurred last year?
4      MS. WERTH:  Objection, foundation.  Best of your
5  knowledge.
6      THE WITNESS:  I do not know.
7  BY MR. DeROSE:
8      Q   Is it more than 836 do you believe?
9      A   I don't know.  I would have to look at the
10 reports that you briefly gave me which is not
11 indicated.
12     MS. WERTH:  Just answer if you know.
13     THE WITNESS:  I have no idea.
14 BY MR. DeROSE:
15     Q   In your understanding, is the amount of
16 Tasering incidents decreasing in the last few years
17 after 2011?
18     MS. WERTH:  Objection, foundation.  You can answer
19 if you know.
20     MR. MOWATT:  I'll join that objection and add
21 relevance because the relevant timeframe is prior to
22 your client's being Tased.  Go ahead and answer.

---

180

1      THE WITNESS:  I don't know.
2  BY MR. DeROSE:
3      Q   You know from your investigation of this case
4  that no police officer was disciplined for Tasing José
5  Lopez or standing by while he was Tased; is that
6  correct?
7      MS. WERTH:  Objection, foundation.  You can answer
8  if you know.
9      THE WITNESS:  That was a compound question.  Can
10 you repeat that please?
11 BY MR. DeROSE:
12     Q   You know that no police officer was
13 disciplined for Tasing Lopez after your investigation
14 of the Tasing; is that correct?
15     MS. WERTH:  Objection, foundation.  You can answer
16 if you know.
17     THE WITNESS:  That's correct because this was a no
18 affidavit case.
19 BY MR. DeROSE:
20     Q   And no police officer who was on the scene as
21 a bystander was disciplined for failure to intervene
22 when the Taser was intended to be used and then was

---

LaKenya White
November 9, 2015

181

1 used on Mr. Lopez; is that correct?
2 MS. WERTH: Objection to the form of the question.
3 Objection to personal knowledge as to whether a police
4 officer was disciplined. You can answer if you know.
5 THE WITNESS: I know that you accused several
6 police officers in this investigation which include the
7 officers that were standing nearby, and no, none of
8 them have been disciplined.
9 MR. MOWATT: John, I have a little less than ten
10 minutes.
11 MR. DeROSE: And I want to take it all.
12 MR. MOWATT: Of course you do.
13 BY MR. DeROSE:
14 Q As part of your investigation, did you know
15 that even Taser International tells officers that they
16 are not to use Tasers on persons suspected to be under
17 the influence of drugs?
18 MR. MOWATT: I'm going to object to the extent
19 that that assumes facts not in evidence. You can go
20 ahead and answer.
21 THE WITNESS: I'm not aware of that.
22

182

1 BY MR. DeROSE:
2 Q In any of your experience and your research
3 as an IPRA investigator, did you learn that Taser
4 International gives cautions against using Tasers
5 against people who are believed to be under the
6 influence of drugs?
7 MS. WERTH: I believe that's the same -- oh, maybe
8 not. Okay, sorry, go ahead. Different question.
9 MR. MOWATT: I'll renew my objections from the
10 previous question. Go ahead.
11 THE WITNESS: No, I'm not aware of anything Taser
12 International posts or states.
13 BY MR. DeROSE:
14 Q In any of your experience or research as an
15 investigator, do you understand that there is cautions
16 and warnings put out about Tasing individuals in areas
17 where they can be hurt in a fall?
18 **A Again, Taser International or whatever it is**
19 **does not have anything to do with my investigation.**
20 Q Go to the second page of 255, Exhibit 255,
21 and on the very bottom it says, "Human rights group
22 Amnesty International has counted about 500 deaths

183

1 following the use of an electric shock device in the
2 United States since 1990 though many are attributed to
3 other causes." Do you see that?
4 **A Yes.**
5 Q Are you aware that there are being reported
6 deaths from the use of the Taser?
7 MR. MOWATT: I'm going to object to the form of
8 that question.
9 MS. WERTH: I'm going to join, overbroad.
10 MR. MOWATT: And I object to the extent that it
11 calls for a medical conclusion. Go ahead and answer.
12 THE WITNESS: I'm still not aware of what causes
13 -- what issue the Taser causes.
14 BY MR. DeROSE:
15 Q And you never yourself investigated a case
16 where you believe that a person died as a result of
17 being Tased?
18 **A That is correct.**
19 Q Have you ever investigated a case with the
20 use of a Taser where you determined a person was
21 seriously injured when he was Tased by an officer who
22 was not arresting him?

184

1 MR. MOWATT: I'm going to object to the form of
2 the question.
3 MS. WERTH: I'll join.
4 THE WITNESS: Repeat that question.
5 (The record was so read
6 by the court reporter.)
7 THE WITNESS: My job, again, is to investigate the
8 excessive force. My job is not to investigate the
9 injuries.
10 BY MR. DeROSE:
11 Q And you determined in this case that no
12 excessive force was used, the Lopez case?
13 MR. MOWATT: I am going to object insofar as this
14 question has been asked and answered numerous times.
15 Also to the extent you are mischaracterizing her
16 testimony when she answered your question those
17 numerous times. Go ahead and answer yet again.
18 MS. WERTH: I will join in that objection and if
19 you ask that same question again, I will I instruct her
20 not to answer because she has answered it numerous
21 times. Go ahead.
22 THE WITNESS: Again, I have not rendered a finding

Pages 181 to 184

LaKenya White
November 9, 2015

---

185

1   in this case. The finding that was given was no
2   affidavit.
3   BY MR. DeROSE:
4      Q  So no action was taken by the Chicago Police
5   Independent Police Review Authority at all?
6     MS. WERTH: Objection, misstates her testimony,
7   mischaracterizes her testimony, blatantly inaccurate
8   that nothing was done.
9     MR. MOWATT: I will also join those objections and
10  add that it was an argumentative question that has been
11  asked and answered and asked and answered and asked and
12  answered, but go ahead.
13    THE WITNESS: There were numerous things done in
14  this investigation; I gathered reports, I talked to
15  paramedics, I obtained medical records, I attempted to
16  speak to Miss Guzman not once, not twice, but on three
17  different occasions. I also reviewed the depositions
18  that you sent to me and I took other investigative
19  steps such as obtaining the ambulance report, police
20  report, so I did a thorough investigation into this
21  matter.
22

---

186

1   BY MR. DeROSE:
2      Q  You had Miss Guzman's, Guadalupe Guzman's
3   deposition di you not?
4      **A  Yes, sir.**
5      Q  You read it?
6      **A  Yes, sir.**
7      Q  And you accepted that as an affidavit because
8   it was a statement given under oath for several hours
9   to the city of Chicago attorneys; is that not correct?
10    MR. MOWATT: I'm going to object to the form.
11    MS. WERTH: Objection to the form of the question.
12    THE WITNESS: What was the question again? I'm
13  sorry.
14  BY MR. DeROSE:
15     Q  Did you accept her deposition as an affidavit
16  so you could pursue your investigation?
17    MS. WERTH: Objection to the form of the question,
18  mischaracterizing, misleading. You can answer.
19    THE WITNESS: I reviewed her deposition.
20  BY MR. DeROSE:
21     Q  Did you accept it as an affidavit?
22     **A  Her deposition did not add anything further**

---

187

1   **to the investigation which I did not already know.**
2      Q  Did you not notice her saying that Lopez
3   continuously in English told them he wanted no help and
4   attention and they should go?
5      **A  I read that, yes.**
6      Q  And that did not help you at all in your
7   investigation?
8     MS. WERTH: Objection to the form of the question,
9   argumentative. You can answer.
10    THE WITNESS: Again, I reviewed her deposition and
11  I also reviewed the statements that I already gathered.
12  I also reviewed the medical records which established
13  that Mr. Lopez was under the influence of PCP and
14  cocaine. And that supports the claims given by the
15  paramedics which states that he was combative, he was
16  under the influence, and he was refusing medical
17  treatment which means that he could harm himself.
18  BY MR. DeROSE:
19     Q  Did you, once you had the deposition of
20  Guadalupe Lopez, have a sufficient reason that you
21  could then go and interview the standing by --
22  bystander officers and even the shooter?

---

188

1     MS. WERTH: Objection, asked and answered. She
2   has answered that many times that after she got the
3   Guzman deposition she saw no reason to reopen the case.
4   You've asked her this many times. You're just asking
5   her the same thing in a different way.
6     MR. DeROSE: No, ma'am. It's a quite different
7   question.
8     MR. MOWATT: I will object to the form of that
9   question because I honestly don't know what you were
10  trying to ask.
11      You have 30 seconds so go ahead and answer
12  to the extent that you can.
13    THE WITNESS: There is no shooter in this case.
14  You keep saying shooter. There was no shooter in this
15  case.
16      As far as the officers that were
17  bystanders, you accused them all in this case, so
18  therefore, I could not interview them as witnesses.
19     Again, Miss Guzman's statement did not add
20  anything further to this investigation which I already
21  did not know. I knew that Mr. Lopez was already
22  Tasered, so therefore, she provided no further

---

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

189

1    information. She only stated that he was Tasered and
2    there was officers around him. She gave no further
3    information in regards to the incident.
4        MR. MOWATT: And that's your four hours.
5        MR. DeROSE: Wait a minute. Let me try one.
6        MR. MOWATT: Let's not.
7        MS. WERTH: One more. Let's go one more and then
8    we're done.
9    BY MR. DeROSE:
10       Q   Anytime a subject is under the influence of
11   drugs or alcohol, are you unable to make a finding of
12   excessive force against an officer because that person
13   is under the influence of drugs or alcohol?
14       MR. MOWATT: I will object to form, foundation,
15   incomplete hypothetical, calls for speculation.
16       THE WITNESS: No, I don't believe so.
17       MR. HURD: That's it. Let's go.
18       MR. MOWATT: We'll reserve.
19       MS. WERTH: We'll reserve.
20
21
22       AND FURTHER DEPONENT SAITH NOT

190

1    STATE OF ILLINOIS  )
                         ) SS.
2    COUNTY OF DU PAGE  )
3        I, JENNIE SIOLIDIS, C.S.R., in and for the State
4    of Illinois do hereby certify that LaKENYA WHITE was
5    first duly sworn by me to testify the truth; that the
6    above deposition was recorded in shorthand and reduced
7    to typewriting by me; that the deposition is a true,
8    correct and complete transcript of the entire testimony
9    given by the said witness at the time and place
10   hereinabove set forth, and that signature is hereby
11   reserved by said witness.
12       I further certify that I am not counsel for, nor
13   in any way related to any of the parties to this suit,
14   nor am I in any way interested in the outcome thereof.
15       In witness hereof, I have hereunto set my hand and
16   affixed my Notarial Seal this 15th day of December,
17   A.D., 2015.
18
19
20       JENNIE SIOLIDIS
         CSR License #084-004818
21
22

191

1        ERRATA SHEET
2
         I, LaKENYA WHITE, have read the foregoing
3    transcript of my deposition taken on November 9th,
4    2015, and except for any corrections noted below, it is
     a true and correct transcript of my deposition
     given on the date aforesaid.
5
6        CORRECTIONS BASED ON ERRORS IN
             REPORTING OR TRANSCRIPTION
7    PAGE   LINE
8    ____   ____   _____
9    ____   ____   _____
10   ____   ____   _____
11   ____   ____   _____
12   ____   ____   _____
13   ____   ____   _____
14   ____   ____   _____
15   ____   ____   _____
16
         _____
17
18
     STATE OF ILLINOIS  )
19   COUNTY OF _____ )
20   SUBSCRIBED AND SWORN TO
     before me this ____ day  _____
21                     Notary Public
     of _____ A.D., 2015.
22

LaKenya White
November 9, 2015

192

| | | | | | |
|---|---|---|---|---|---|
| **A** | 109:17 | 91:16 | 108:15 | 38:19 | 116:16 |
| **A-N-D-O** | 136:16 | 116:1 | 108:22 | 39:19 | **alcohol** |
| 120:14 | 150:15 | 156:22 | 109:2,3 | 43:15 | 68:21 |
| **A.D** 190:17 | **accoun...** | 166:7 | 135:5 | 45:13 | 81:16,21 |
| 191:21 | 56:3 | 179:20 | 136:4 | 56:10 | 103:5 |
| **A.M** 1:20 | **accounts** | 185:10 | 160:18 | 65:7 | 189:11 |
| **ability** | 55:12,18 | 186:22 | 160:20 | 73:1 | 189:13 |
| 74:8 | **accurate** | 188:19 | 160:22 | 76:22 | **allega...** |
| 172:15 | 107:10 | **added** | 161:6,17 | 78:5 | 29:20 |
| **able** 22:7 | 149:14 | 90:14 | 164:4 | 84:17 | 30:7 |
| 44:10,12 | 149:15 | **addition** | 165:18 | 90:2,19 | 31:1 |
| 75:20 | 149:17 | 33:13 | 166:13 | 91:8,17 | 39:14 |
| 93:8,10 | 149:22 | **additi...** | 174:15 | 94:7 | 41:18 |
| 93:13 | 150:1 | 18:14 | 180:18 | 102:13 | 168:1 |
| 102:16 | **accused** | 118:13 | 185:2 | 107:3,20 | **allega...** |
| 111:5 | 47:9 | **address** | 186:7,15 | 108:9 | 40:8 |
| 120:20 | 87:18 | 110:14 | 186:21 | 113:4 | 41:3,11 |
| 135:21 | 94:6,9 | **adequa...** | **affida...** | 114:16 | 46:3 |
| 139:5 | 94:15 | 41:2 | 135:13 | 116:1 | 47:7 |
| **absence** | 181:5 | **admini...** | **affixed** | 121:14 | 54:14 |
| 29:20 | 188:17 | 5:5 | 190:16 | 126:18 | 167:22 |
| **absolu...** | **achieved** | **admini...** | **afflicted** | 127:7 | **alleged** |
| 48:10 | 123:4 | 32:12 | 124:16 | 132:21 | 29:22 |
| 132:5 | **acknow...** | 64:11 | **aforesaid** | 139:3 | 62:3 |
| **abused** | 71:7 | 68:6 | 191:4 | 146:7 | 63:4 |
| 41:13 | **act** 109:1 | **admini...** | **age** 168:5 | 160:17 | 73:18 |
| **abusing** | 142:1,7 | 120:7,16 | **agency** | 164:7 | **allegedly** |
| 47:9 | 166:2,2 | **admission** | 19:4 | 179:22 | 95:12 |
| **academy** | 166:9 | 125:5,17 | 41:19 | 181:20 | **allow** 7:7 |
| 67:7,13 | **action** | **adult** | 57:18 | 182:8,10 | 102:8 |
| 67:17 | 90:17 | 132:10 | 121:19 | 183:11 | **allowed** |
| 68:5 | 135:1 | **advised** | **ago** 98:14 | 184:17 | 94:14 |
| 124:7 | 185:4 | 93:1 | 119:7 | 184:21 | 145:22 |
| 125:2 | **activated** | **affidavit** | 131:9 | 185:12 | 146:12 |
| 129:7 | 92:15 | 83:2,3 | 135:13 | 188:11 | 173:6 |
| 133:14 | **actively** | 87:9,12 | 158:12 | **aid** 68:20 | **allowing** |
| **accept** | 148:17 | 91:1,4,6 | 158:13 | **aide** 10:22 | 98:18,20 |
| 109:3,4 | **activi...** | 91:9,13 | **agree** | 11:1,3 | **allows** |
| 186:15 | 10:12 | 92:2,6 | 46:19,22 | 22:15,22 | 122:13 |
| 186:21 | 12:22 | 92:18,20 | 47:2 | 23:22 | 147:9 |
| **accepted** | **activity** | 93:2 | 58:5 | 24:1 | **ambiguous** |
| 186:7 | 10:11 | 94:5,10 | 60:6 | **aides** | 40:5 |
| **accomm...** | **actual** | 94:16 | 167:15 | 167:21 | 66:4 |
| 7:6 | 165:19 | 105:13 | **ahead** | **Alamillo** | 117:17 |
| **account** | **add** 38:18 | 105:15 | 24:11 | 1:10 | 135:3 |
| 55:20 | 54:10 | 105:17 | 29:10 | 111:14 | **ambulance** |

LaKenya White
November 9, 2015

193

| | | | | | |
|---|---|---|---|---|---|
| 74:15,19 | 38:10,19 | 121:14 | 94:4 | approa... | 187:9 |
| 81:14 | 39:5,12 | 126:18 | 106:14 | 137:21 | ARMANDO |
| 82:11 | 39:19 | 127:7,20 | 123:14 | 138:4 | 1:10 |
| 99:18 | 40:4,15 | 127:22 | 141:10 | approp... | armed |
| 112:18 | 42:6 | 129:12 | 142:19 | 6:12 | 51:11 |
| 115:1 | 43:13 | 132:22 | 151:2 | 161:22 | arms |
| 118:6,11 | 44:2,9 | 134:14 | 169:20 | 162:9 | 103:16 |
| 140:22 | 44:10,13 | 135:6 | 173:12 | approve | 104:1,5 |
| 153:19 | 44:18 | 136:7 | 184:14 | 32:9,13 | 150:18 |
| 162:1,10 | 45:13 | 137:16 | 184:16 | 106:15 | arrest |
| 185:19 | 46:22 | 139:5 | 184:20 | approved | 127:2 |
| amended | 47:15 | 142:22 | 185:11 | 106:17 | 147:2 |
| 111:13 | 49:8 | 144:14 | 185:11 | 110:22 | 148:17 |
| Amnesty | 53:15 | 146:7,21 | 185:12 | approx... | 149:8 |
| 182:22 | 56:6 | 147:15 | 188:1,2 | 5:20 | 150:4 |
| amount | 57:7 | 148:2 | answering | 21:7 | arrested |
| 89:17 | 58:4,14 | 149:3,5 | 146:4 | 83:13 | 126:12 |
| 179:15 | 60:3,8 | 150:6 | ANTONIO | 164:17 | 126:15 |
| and-a-... | 61:3 | 153:8 | 1:8 | 164:20 | 126:22 |
| 21:8 | 63:18 | 156:14 | anybody | arbitr... | arresting |
| 70:11 | 64:8 | 160:7,17 | 63:19 | 172:19 | 95:6 |
| 95:20 | 65:6 | 161:13 | 71:12 | areas | 183:22 |
| Ando | 67:22 | 163:4,9 | 75:15 | 182:16 | arrival |
| 120:14 | 69:2 | 163:21 | 79:1 | arguing | 103:3 |
| announ... | 75:10 | 164:7 | 83:4 | 135:14 | 111:19 |
| 46:6 | 78:3 | 170:8 | 103:22 | 135:16 | 112:2 |
| annual | 82:2 | 173:17 | Anytime | 156:20 | arrive |
| 67:5,18 | 83:11,15 | 175:15 | 189:10 | argument | 86:3 |
| 119:22 | 84:17 | 175:22 | apologize | 138:16 | arrived |
| 120:4 | 87:17 | 178:19 | 33:1 | argume... | 111:15 |
| 124:11 | 90:2,20 | 179:12 | 177:1 | 39:19 | arriving |
| 164:11 | 91:8,17 | 179:18 | appare... | 42:4 | 112:11 |
| 172:7 | 94:7 | 179:22 | 133:20 | 45:13 | article |
| answer 7:2 | 96:1,3 | 180:7,15 | Appeals | 87:15 | 40:22 |
| 7:15 | 97:3 | 181:4,20 | 6:13 | 88:2 | 41:5 |
| 8:13,22 | 98:20 | 183:11 | appeared | 90:19 | 50:14,17 |
| 15:9 | 100:20 | 184:17 | 3:5,9,14 | 91:15 | 178:10 |
| 20:17 | 104:12 | 184:20 | 3:19 | 107:3 | 178:10 |
| 22:12,19 | 106:1,2 | 186:18 | 103:4 | 115:17 | articles |
| 24:11 | 107:3 | 187:9 | 150:18 | 123:14 | 54:17 |
| 25:12,19 | 108:10 | 188:11 | appears | 127:6 | 56:4 |
| 26:1 | 112:4 | answered | 85:6 | 128:12 | Arts 12:16 |
| 29:4 | 113:4 | 39:11 | applic... | 141:9 | asked 26:8 |
| 30:3,17 | 114:16 | 52:5 | 6:10 | 156:12 | 32:1 |
| 31:14 | 115:10 | 78:21 | apply 6:14 | 159:8 | 39:11 |
| 35:14 | 116:1 | 91:8 | 142:10 | 185:10 | 52:5 |

LaKenya White
November 9, 2015

194

77:13
78:20
91:7
94:3
96:19
106:13
108:5
121:8
123:13
141:9
143:7
145:16
151:2,5
151:11
169:20
173:11
184:14
185:11
185:11
185:11
188:1,4
asking
13:3,5,6
20:3,18
31:8
32:2
35:7
37:16
59:2,5,7
65:4,5,8
72:14,18
72:20
75:19
77:20,22
86:14
88:22
97:2
98:10,16
103:12
112:6
115:18
121:6,10
121:11
121:18
144:21
148:22

149:1
153:11
154:20
159:11
163:5,9
188:4
assign
38:6
39:9
assigned
35:21
36:7
37:12,19
38:1,14
49:21
52:17
70:5,14
73:12
168:19
168:21
assign...
17:13
77:18
168:10
assign...
9:9
10:10,11
18:18
168:5
assigns
50:10
assist
130:11
132:7
141:21
assist...
77:13
119:12
130:16
132:10
134:22
141:15
assisted
134:1,2
assisting
129:9,17

ASSOCI...
3:2
assumes
43:21
91:17
107:2
114:15
115:19
124:2
137:3
160:16
181:19
assuming
54:5
112:22
113:6
115:18
assump...
45:9
assure
152:14
attached
111:11
attaching
111:13
112:14
attach...
85:1
attempted
185:15
attention
19:7
114:1,7
114:21
115:8,16
116:5
117:8,12
118:6
132:16
133:6
136:18
144:19
187:4
attest
171:6
attorney

100:19
attorneys
186:9
attrib...
183:2
audiot...
76:5
Authority
7:20
26:20
27:4,19
47:20
51:16
52:3
56:14
120:1,4
157:5
174:12
175:20
177:16
178:17
185:5
author...
10:17
32:6,10
available
75:2,7
76:5,9
76:18
128:4,7
128:17
average
120:20
aware
26:13
47:11,16
48:14
51:1,3,7
52:15
53:7
58:15
70:2
120:5
121:4,6
121:11
121:18

122:2
128:21
134:20
135:2
145:2
154:4
163:15
168:15
168:18
172:16
181:21
182:11
183:5,12
awkward
36:13

———————
B
———————
B 4:4
129:3,4
133:12
133:16
B-O-Y-D
60:21
Bachel...
12:11,12
12:14
back 12:4
14:18
15:15,16
16:11
21:22
22:1
30:12
32:20
55:8
65:10
94:20
96:5
120:15
147:18
149:18
165:1,5
166:19
backgr...
11:8
40:20

64:14
backing
81:20
badgering
163:6
bandied
60:10
based
24:16,20
61:8
135:5
156:5
161:19
161:20
162:8,13
162:14
162:15
191:6
basis
143:13
batch 8:16
8:19
batches
9:9
Bates 77:3
77:4,7
78:9
baton
95:13
bear 110:3
began
169:3
beginning
117:2
169:3
behalf 3:5
3:9,14
3:19
behavior
97:22
believe
10:1
13:17
15:4
18:13
19:17

LaKenya White
November 9, 2015

195

| | | | | | |
|---|---|---|---|---|---|
| 26:6 | 182:5 | 100:12 | **building** | 162:2 | 37:13,20 |
| 40:22 | **best** 1:3 | 116:14 | 56:22 | 164:6 | 38:2,3,6 |
| 41:21 | 23:16 | 122:22 | 169:22 | 166:7 | 38:13,15 |
| 42:8 | 38:20 | 124:11 | **bystander** | 176:10 | 39:10,10 |
| 53:20 | 39:13 | 171:14 | 180:21 | 177:13 | 41:21 |
| 63:19 | 43:16 | 182:21 | 187:22 | 183:11 | 42:2,8 |
| 69:3 | 61:4 | **Boyd** 60:19 | **bystan...** | 189:15 | 44:21 |
| 73:4,11 | 64:9 | 60:21 | 188:17 | **cameras** | 49:19,21 |
| 75:8,8 | 72:22 | 61:14 | | 76:13,14 | 50:6,7 |
| 77:12 | 123:3 | 62:11,13 | ___C___ | 76:18 | 52:18 |
| 81:22 | 171:1 | **brain** | **C** 129:4 | 77:14 | 56:10 |
| 92:11,12 | 172:2 | 154:11 | 141:12 | **capaci...** | 60:22 |
| 100:8 | 174:20 | 154:13 | 144:17 | 1:14 | 61:5,8 |
| 101:14 | 175:16 | 154:16 | **C.S.R** 2:4 | **Cardiel** | 61:14 |
| 108:21 | 178:21 | 154:17 | 190:3 | 1:3 | 70:5,8,9 |
| 114:5 | 179:2,4 | 154:18 | **call** 7:8,8 | **career** | 70:11,14 |
| 117:13 | **bet** 60:11 | 154:19 | 18:5 | 16:18 | 70:16,19 |
| 118:15 | **better** | 171:12 | 74:9 | 177:21 | 70:22 |
| 118:17 | 41:10 | **branch** | 144:21 | **careers** | 71:8,12 |
| 122:7 | 104:12 | 10:7 | 163:16 | 56:22 | 71:20 |
| 125:6,16 | **beyond** | **break** 7:5 | 174:5 | 63:6,15 | 72:5,11 |
| 127:8 | 134:11 | 7:9,16 | **called** 5:8 | **Carone** | 74:17 |
| 136:21 | **bias** 63:3 | 50:3 | 49:12,14 | 21:13 | 79:1 |
| 137:17 | **big** 130:3 | 55:2,5 | 53:11 | 154:11 | 81:9,9 |
| 140:11 | 133:22 | 110:5,6 | 77:4 | 154:14 | 86:8 |
| 141:20 | 134:22 | 164:8,22 | 86:9,18 | 154:18 | 87:8 |
| 145:16 | **bits** 105:6 | 165:2 | 86:21 | 171:11 | 88:8 |
| 150:3 | 105:7 | **breaks** 7:4 | 87:1,3,4 | **carry** | 91:5 |
| 152:15 | **blatantly** | **breath** | 111:4 | 10:18 | 95:13 |
| 154:11 | 185:7 | 28:18 | 113:18 | 25:11 | 96:6 |
| 154:14 | **block** | **breathing** | 161:3 | **cars** 76:19 | 97:11 |
| 157:17 | 138:21 | 163:17 | **calling** | 127:12 | 105:4,10 |
| 158:1,5 | 139:21 | **briefly** | 148:19 | 127:13 | 105:12 |
| 158:9 | 140:2 | 179:10 | **calls** 44:7 | **case** 7:11 | 105:17 |
| 161:21 | **blue** 76:13 | **bring** | 44:17 | 19:6,8 | 106:9,18 |
| 162:9 | **body** 1:17 | 74:10 | 46:21 | 19:11,16 | 106:22 |
| 170:22 | **bold** | 130:2,7 | 114:11 | 19:18 | 108:6,8 |
| 176:17 | 171:14 | 169:4 | 115:9 | 21:6 | 110:3,22 |
| 176:19 | **bottom** | **broad** | 119:14 | 22:13 | 111:2,13 |
| 179:8 | 21:4 | 65:15 | 124:15 | 23:18 | 112:10 |
| 182:7 | 33:9 | 149:2 | 126:14 | 24:2 | 114:6 |
| 183:16 | 61:16 | **brought** | 126:18 | 28:14,17 | 115:5 |
| 189:16 | 62:2 | 19:13 | 144:6,11 | 29:17 | 123:8 |
| **believed** | 69:20 | 130:1,3 | 149:10 | 32:13 | 128:7,8 |
| 68:21 | 77:3 | 130:5,7 | 149:11 | 35:21 | 128:22 |
| 82:1,3,5 | 81:1 | **Brown** 1:8 | 150:5 | 36:1,7 | 129:1 |

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

196

| | | | | | |
|---|---|---|---|---|---|
| 135:4 | 157:4,12 | 54:1 | 41:1 | circum... | claims |
| 136:1,8 | 159:7,10 | 62:3,12 | 46:19 | 145:21 | 187:14 |
| 137:9 | 159:13 | changed | 47:20,21 | 146:12 | clarify |
| 138:17 | 159:15 | 15:5 | 48:9 | 146:17 | 13:8,10 |
| 152:3,8 | 159:17 | 41:9 | 50:14,20 | citation | 59:2 |
| 153:7 | 160:6 | changes | 56:1 | 94:17 | 65:3 |
| 154:6,15 | 168:20 | 62:7,21 | 67:5,13 | citizen | classes |
| 155:2,12 | causation | 172:6 | 67:16 | 46:19 | 14:8,9 |
| 158:1,4 | 154:2 | channel | 68:4,9 | 47:9 | clear 7:16 |
| 158:10 | cause | 31:18 | 68:16,19 | 48:8 | 146:14 |
| 158:10 | 45:20 | charge | 69:6 | 111:1 | clearly |
| 160:13 | 150:20 | 39:17 | 84:2,14 | 133:5 | 101:16 |
| 161:5,5 | caused | 52:20 | 84:15 | 145:22 | clerk 10:6 |
| 161:14 | 99:14 | 104:15 | 85:7,17 | 146:5,13 | 10:7,10 |
| 163:22 | causes | charges | 93:12 | 146:19 | 10:11 |
| 165:8 | 23:12 | 95:11 | 95:9 | 147:1 | 11:7,11 |
| 169:4,12 | 24:1 | Cheatham | 111:20 | citizens | client |
| 169:13 | 183:3,12 | 100:17 | 111:21 | 27:20 | 98:4 |
| 169:18 | 183:13 | 102:21 | 112:15 | 41:13 | 111:18 |
| 173:20 | cautions | 103:3,14 | 112:15 | city 1:15 | 112:18 |
| 180:3,18 | 182:4,15 | 139:13 | 115:7 | 1:15 3:6 | 177:6 |
| 183:15 | ceased | 142:17 | 122:15 | 3:11,16 | client's |
| 183:19 | 172:9 | 142:20 | 124:6 | 3:20 | 179:22 |
| 184:11 | certain | 144:5,8 | 129:9 | 26:12 | close 32:6 |
| 184:12 | 29:19 | 144:16 | 130:12 | 48:8 | 32:8 |
| 185:1 | 49:9 | 145:10 | 130:13 | 51:11 | 70:11 |
| 188:3,13 | 175:8,16 | check | 132:7,8 | 115:6 | 105:19 |
| 188:15 | 175:17 | 107:13 | 132:21 | 141:14 | 106:2,4 |
| 188:17 | certainly | 107:20 | 134:11 | 141:19 | 106:11 |
| cases | 132:20 | 128:9,13 | 141:14 | 175:2,11 | 121:3 |
| 41:12,15 | certif... | checked | 141:19 | 186:9 | 130:19 |
| 42:11,12 | 71:8,10 | 76:8 | 146:4 | city's | 131:5,20 |
| 42:16 | 71:11 | chest | 172:8 | 51:16 | 145:6 |
| 43:18 | 72:16 | 163:17 | 175:2,11 | civil 2:2 | 163:7 |
| 46:16 | 78:8,22 | Chicago | 175:12 | 24:4 | closed |
| 47:3,11 | certified | 1:15,16 | 185:4 | 72:11 | 29:17 |
| 47:18 | 72:2 | 3:8,13 | 186:9 | 80:5 | 31:12,20 |
| 49:18 | certify | 3:18,20 | CHICAG... | 90:10,13 | 33:5 |
| 50:9 | 190:4,12 | 10:3,5,7 | 3:6,11 | 90:14 | 70:9 |
| 62:9,10 | certif... | 10:14,17 | 3:16 | civilian | 105:13 |
| 62:17 | 72:9 | 11:6,11 | chief | 136:13 | 105:14 |
| 70:1 | challe... | 11:17 | 120:7,16 | civilians | 105:17 |
| 95:17 | 172:15 | 12:1,13 | Circuit | 63:7 | 110:15 |
| 120:20 | chance | 26:12 | 6:12 | claim | 110:17 |
| 121:2,19 | 131:14 | 27:20 | circum... | 41:13 | 110:22 |
| 147:3 | change | 29:1,9 | 147:8,10 | 131:10 | 111:2 |

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

197

| | | | | | |
|---|---|---|---|---|---|
| 112:9 | 85:12 | 165:13 | 87:14 | 72:16 | 11:19 |
| 121:2 | 96:21 | 165:15 | 114:11 | 125:8 | 16:12,15 |
| 135:2,4 | comes | compla... | 114:13 | consid... | 16:18 |
| 136:2 | 85:18 | 11:4,4 | 115:10 | 125:19 | 17:6 |
| 160:14 | coming | 46:7,11 | 119:15 | 125:22 | 18:19 |
| 161:6,15 | 163:6 | 46:13 | 126:18 | 125:22 | 19:4 |
| 161:17 | command | complete | 144:12 | 171:22 | 30:19 |
| 161:18 | 31:18 | 15:12,15 | 144:22 | consist | 33:1 |
| closer | commander | 168:22 | 148:19 | 81:12 | 35:6 |
| 65:12 | 1:13 | 190:8 | 149:11 | consists | 36:4 |
| closing | 123:18 | completed | 154:3 | 167:20 | 49:17 |
| 106:18 | commis... | 120:22 | 162:3 | consti... | 61:10,11 |
| 121:19 | 2:5 | 121:1 | 164:7 | 130:15 | 74:11 |
| clue 62:17 | committed | comple... | 166:8 | 142:5 | 79:6 |
| cocaine | 46:18 | 58:10 | 183:11 | contact | 82:10 |
| 81:15,22 | 133:21 | 146:3 | condition | 82:19 | 90:4,5 |
| 152:12 | commun... | comple... | 152:11 | 113:2 | 93:18 |
| 187:14 | 135:22 | 168:14 | conduct | continued | 99:20 |
| code 27:17 | Commun... | 169:6 | 123:2,5 | 16:17 | 123:9 |
| 28:4 | 85:13,19 | complex | 144:2 | 80:14 | 124:8,9 |
| 141:13 | Commun... | 169:6,9 | confer... | 161:6,7 | 126:5 |
| 141:19 | 75:16,18 | 169:14 | 98:2 | 172:15 | 127:4 |
| coherent | community | 170:5,12 | confid... | continues | 139:6,22 |
| 103:4 | 133:5 | comple... | 60:3,6 | 121:3 | 140:8,11 |
| collab... | 146:1,13 | 70:1 | 61:18 | contin... | 140:18 |
| 85:20 | 146:19 | compound | conflict | 187:3 | 140:20 |
| college | 172:1 | 14:2 | 71:8,10 | conver... | 141:2 |
| 13:15,20 | company | 50:2 | 71:11 | 111:7 | 151:15 |
| 14:6,14 | 8:10 | 69:2 | 72:16 | convince | 157:5 |
| 14:16,17 | compel | 180:9 | 78:8,22 | 112:18 | 165:22 |
| 15:6,13 | 172:10 | compre... | 79:5,9 | copies | 167:9,10 |
| 15:20 | 172:16 | 142:3 | confusing | 35:12 | 168:12 |
| 16:11,15 | 172:20 | concen... | 69:2 | 36:12 | 169:18 |
| 16:18,21 | 174:13 | 178:2 | conjun... | 68:13 | 170:3 |
| comatose | compel... | concern | 169:2 | cops 56:2 | 177:9 |
| 135:9 | 173:1 | 6:15 | connec... | 63:3 | 180:6,14 |
| 171:5 | compla... | concerned | 173:13 | copy 26:22 | 180:17 |
| combative | 94:5 | 56:16 | consent | 35:9 | 181:1 |
| 103:16 | complaint | concer... | 133:22 | 36:18 | 183:18 |
| 150:9,14 | 24:3,4 | 174:16 | 134:5 | 111:13 | 186:9 |
| 150:17 | 49:17 | conclude | consider | 122:5 | 190:8 |
| 187:15 | 80:9,12 | 95:20 | 97:19,21 | 126:7 | 191:4 |
| combining | 93:16 | concluded | 169:9,14 | corpor... | correc... |
| 135:7 | 111:14 | 114:17 | consid... | 1:16 | 191:3,6 |
| come 13:13 | 123:19 | conclu... | 16:20 | correct | counsel |
| 19:7 | 165:7,10 | 44:7,17 | 42:11 | 7:20 | 8:21 |

LaKenya White
November 9, 2015

198

```
16:4              couple           133:21           Davis            death            10:3,5,8
19:22             27:11            criticism        52:19,22         43:10            10:18
25:8,9            course           56:15            53:9,10          166:16           11:7,11
25:20             13:14            168:16           53:21            deaths           29:1,9
28:16             14:6             critic...        54:14,18         182:22           30:9
33:1              17:5             95:9             55:13            183:6            47:21
36:13             181:12           CSR 190:20       56:9             December         51:17
44:1              courses          curiosity        57:13,17         190:16           56:16
55:9              12:22            109:21           58:6             decided          60:12
60:4              15:6             current          61:13            156:3            61:1
65:11,13          court 1:1        48:22            62:3,14          decisions        67:5
66:16             5:3 6:11         120:2            62:15            147:5            68:17,20
72:19             6:12,13          169:4            63:3,21          declare          69:6
81:2              21:17            currently        70:1             145:7            74:5
89:9              22:3             48:21            94:21            declared         75:12,13
90:4              30:14            49:2             106:19           130:20           76:6
93:1,3            32:22            58:21            108:5            131:5,11         84:3,14
94:13             34:20            120:21           115:13           145:15           84:15
97:8,14           40:1,12          custody          115:18           declares         85:7,13
97:18             44:5             125:14           115:19           130:14           85:14,17
100:3,6           45:18            166:16           Davis's          132:9            86:2,8
101:18            54:9             cut 122:6        53:18            decrea...        86:21
101:18            78:16            131:13           57:3             179:16           93:13
103:20            85:4            _____       day 41:22        Defendant        111:20
104:16            90:17            |    D    |      86:14            3:14,20          111:21
107:18            131:3           D 1:5,7           126:22           Defend...        112:15
109:9             147:21           4:1              127:12           1:18             112:16
113:11            149:20           D-U-B-...        127:14           defined          112:16
121:8             184:6            35:2             135:9            141:22           113:16
135:18            courtroom        daily            150:4,22         142:6            122:15
137:5             97:12            10:12            168:5            deflating        124:7
139:7             covers           damage           190:16           143:11           129:9,16
143:12            27:7             154:18           191:20           deflect          129:17
153:13            CPD 33:13        154:19           days 36:3        56:15            130:11
163:3,7           33:14            171:12           36:5             degree           130:12
170:1             124:11           danger           38:5             12:12,14         130:14
190:12            124:13           133:20           50:15            15:13,17         132:7,9
counsel's         124:15           DANIEL           70:6             delayed          134:11
104:14            CR 11:5          1:11             80:7             70:2,3           141:6
112:22            165:15           data 51:1        daytime          delays           172:8
113:6             165:20           date 52:11       17:7,13          95:9             175:12
counted           cracked          59:8,10         DE 1:11          delegate         depart...
182:22            95:12            75:9             dead             29:8             85:21
COUNTY            criminal         191:4            154:12           DEMANDED         132:21
190:2             12:11            dated            154:13           1:11             146:4
191:19            14:8             111:9            154:16           depart...        depends
```

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

199

| | | | | | |
|---|---|---|---|---|---|
| 24:5 | 107:18 | 25:20 | 55:17 | 96:4,18 | 123:21 |
| 50:7,7 | 108:5,16 | 26:2,9 | 56:11 | 97:5,7,9 | 124:3,5 |
| 68:1,2,6 | 109:5,8 | 26:15,17 | 57:9 | 97:15,18 | 124:21 |
| **deploy** | 109:16 | 27:14,15 | 58:2,3 | 97:21 | 125:1,11 |
| 148:16 | 109:17 | 28:16,20 | 58:13 | 98:9,13 | 125:12 |
| **Deponent** | 116:15 | 29:6,12 | 59:4,7,9 | 98:19 | 126:1,20 |
| 3:9 | 117:6 | 29:14 | 60:11,16 | 99:1 | 127:10 |
| 189:22 | 118:14 | 30:6,12 | 61:6,19 | 100:3,6 | 127:21 |
| **deposi...** | 118:22 | 30:20 | 62:1,15 | 100:7 | 128:15 |
| 1:19 | 131:19 | 31:10,19 | 62:19 | 101:9,18 | 128:19 |
| 5:17 6:9 | 132:2 | 32:3,20 | 64:1,12 | 101:20 | 129:2,6 |
| 20:1,4 | 135:21 | 33:1,3 | 65:1,7 | 102:5,6 | 129:14 |
| 20:15 | 137:13 | 34:7,17 | 65:10,16 | 102:15 | 130:3,8 |
| 21:21 | 151:14 | 34:21 | 65:18 | 103:20 | 130:9 |
| 55:6 | 151:19 | 35:4,5,7 | 66:8,9 | 103:21 | 131:1,7 |
| 81:3,4 | 152:9 | 35:11,16 | 66:16,20 | 104:14 | 131:16 |
| 89:10 | 155:17 | 36:14,20 | 67:9,11 | 104:18 | 131:18 |
| 97:22 | 155:18 | 36:21 | 67:12 | 105:3 | 132:3 |
| 98:5,10 | 156:5,7 | 37:5,16 | 69:4 | 106:10 | 133:2,3 |
| 109:1,14 | 156:9,18 | 37:18 | 72:19 | 106:16 | 133:11 |
| 110:7 | 161:8 | 38:4,12 | 73:2,3 | 107:7,19 | 134:13 |
| 111:14 | 162:14 | 39:1,7 | 73:10 | 108:3,12 | 135:16 |
| 111:17 | 185:17 | 39:15,21 | 75:6,22 | 109:11 | 135:18 |
| 116:18 | **DeROSE** 3:2 | 40:3,18 | 76:3,10 | 109:15 | 135:19 |
| 116:21 | 3:2 4:3 | 40:22 | 77:6,15 | 109:19 | 136:6 |
| 134:12 | 4:11 5:1 | 41:4 | 77:16,22 | 110:2,9 | 137:5,9 |
| 136:9 | 5:12 | 42:5,10 | 78:4,13 | 110:20 | 137:12 |
| 137:6,8 | 8:15,20 | 42:15,20 | 78:17 | 112:7 | 137:19 |
| 137:11 | 9:3,14 | 43:2,4,6 | 79:2 | 113:11 | 138:3,19 |
| 139:8,15 | 9:17,18 | 43:9,14 | 81:5,6 | 113:13 | 139:3,9 |
| 165:3 | 13:5,11 | 43:17 | 82:6 | 113:21 | 140:15 |
| 176:18 | 13:12 | 44:8,19 | 83:18 | 114:19 | 142:18 |
| 186:3,15 | 14:3,5 | 45:5 | 84:20 | 115:14 | 142:21 |
| 186:19 | 15:11 | 46:1 | 85:2,5 | 116:3,9 | 143:10 |
| 186:22 | 16:4,6 | 47:5,17 | 85:15 | 116:13 | 143:12 |
| 187:10 | 16:10 | 48:19,22 | 86:5,6 | 117:5,21 | 143:18 |
| 187:19 | 19:14,20 | 49:4,11 | 87:16 | 119:2,18 | 144:13 |
| 188:3 | 20:5,7,8 | 50:4 | 88:4 | 119:20 | 145:3,13 |
| 190:6,7 | 20:21 | 51:4,9 | 89:2,6,9 | 120:10 | 146:9,10 |
| 191:3,4 | 21:10,14 | 51:19,22 | 89:13,15 | 120:12 | 147:7,14 |
| **deposi...** | 21:18 | 52:8,16 | 90:5,11 | 121:8,11 | 147:18 |
| 2:3 6:14 | 22:1,2,9 | 53:8,14 | 91:2,11 | 121:17 | 148:4,13 |
| 106:21 | 22:17 | 53:17 | 91:20,21 | 122:4,9 | 149:1,4 |
| 107:9,12 | 23:2,19 | 54:12 | 92:8 | 122:10 | 149:16 |
| 107:15 | 24:15 | 55:1,8 | 94:11,19 | 122:20 | 149:18 |
| 107:17 | 25:1,9 | 55:10,16 | 95:3,4 | 123:17 | 149:21 |

LaKenya White
November 9, 2015

200

| | | | | | E |
|---|---|---|---|---|---|
| 151:7,13 | 185:3 | different | 109:12 | 66:2 | E 1:12 4:1 |
| 153:3,4 | 186:1,14 | 14:10 | 155:17 | 83:1 | 4:4 |
| 153:12 | 186:20 | 36:19 | 155:21 | 97:10 | ear 98:1 |
| 153:16 | 187:18 | 49:1 | 155:22 | 98:5 | earlier |
| 154:7,21 | 188:6 | 85:1 | dismissed | 103:15 | 79:10 |
| 155:8 | 189:5,9 | 109:5 | 95:13 | 110:4 | 80:7 |
| 156:13 | describe | 163:10 | dispatch | 126:2 | 171:10 |
| 157:2,11 | 37:9 | 165:10 | 112:14 | 134:18 | 176:5 |
| 158:21 | designate | 165:12 | 117:4 | 150:14 | early 8:10 |
| 159:5,11 | 49:5 | 165:14 | district | 153:12 | 13:5 |
| 159:14 | detention | 167:14 | 1:1,1 | 153:15 | ease 99:22 |
| 160:1,12 | 124:13 | 175:3 | 6:11,11 | domestic | easier |
| 160:19 | determ... | 182:8 | 10:9 | 46:11 | 148:14 |
| 161:9,16 | 158:3 | 185:17 | 134:2,6 | Donna's | EASTERN |
| 162:7,19 | determine | 188:5,6 | divided | 36:16 | 1:2 |
| 163:3,14 | 45:20 | diffic... | 176:8 | double | education |
| 164:2,10 | 71:16 | 163:17 | DIVISION | 178:11 | 12:5,7,9 |
| 164:16 | 72:7 | directed | 1:2 | download | 13:6,9 |
| 164:18 | 105:12 | 46:18 | document | 83:7,12 | effect |
| 164:21 | 142:14 | disabled | 21:16 | drop 51:14 | 11:20 |
| 165:5,6 | 142:22 | 171:5 | 22:5 | drugs | efforts |
| 166:11 | 144:15 | disagree | 23:3 | 68:22 | 92:19 |
| 167:2,3 | determ... | 170:18 | 34:13,15 | 103:5 | eight 8:1 |
| 167:8 | 79:9 | discharge | 34:19 | 150:19 | either |
| 169:13 | 81:13 | 28:10,22 | 37:15,16 | 153:6 | 32:4 |
| 169:16 | 105:11 | Discip... | 77:8 | 181:17 | 68:21 |
| 169:22 | 105:11 | 166:2 | 78:12,15 | 182:6 | 98:1 |
| 170:2,11 | 141:7 | discip... | 85:3 | 189:11 | 100:15 |
| 172:14 | 143:3 | 47:10 | docume... | 189:13 | 145:5,17 |
| 173:16 | 172:19 | discip... | 71:21 | DU 190:2 | 154:14 |
| 174:9,10 | 183:20 | 180:4,13 | docume... | Dubieal | 157:22 |
| 174:21 | 184:11 | 180:21 | 128:22 | 35:2,20 | 159:4 |
| 175:9,18 | develo... | 181:4,8 | documents | 37:1 | 160:10 |
| 176:2,19 | 90:16 | disclose | 19:13 | DUBIEL | electric |
| 177:2,3 | device | 60:1 | 71:2 | 1:13 | 183:1 |
| 177:14 | 183:1 | discovery | 78:5 | ducks | email |
| 178:16 | devices | 1:19 2:3 | 88:19 | 41:15 | 107:14 |
| 179:1,7 | 50:21 | discuss | 90:4 | duly 2:5 | 110:11 |
| 179:14 | 76:12 | 6:18,22 | 122:14 | 5:4,9 | 111:22 |
| 180:2,11 | di 186:3 | discussed | 124:20 | 190:5 | 112:20 |
| 180:19 | diagnosed | 111:10 | 131:14 | duties | 113:6,9 |
| 181:11 | 152:11 | 152:3,10 | 155:10 | 18:15 | 113:10 |
| 181:13 | die 59:20 | 155:12 | DocuShare | 128:5 | 113:15 |
| 182:1,13 | died 59:22 | 176:17 | 122:8,11 | duty 46:18 | emailing |
| 183:14 | 60:9,17 | discus... | doing 17:5 | 48:8 | 70:20,20 |
| 184:10 | 183:16 | 21:19 | 55:3 | | |

LaKenya White
November 9, 2015

201

| | | | | | |
|---|---|---|---|---|---|
| emails | entry | 112:22 | 184:8,12 | 182:20 | 144:21 |
| 107:21 | 26:14 | 114:15 | 189:12 | exhibits | 148:18 |
| emerge... | ERRATA | 115:20 | excuse | 4:10 | 149:10 |
| 141:15 | 191:1 | 123:1 | 14:4 | 36:12 | 149:11 |
| emergency | ERRORS | 124:2 | 17:16 | 88:21 | 149:12 |
| 75:16,17 | 191:6 | 136:5 | 29:11 | 89:3,5,5 | 153:18 |
| 85:12,19 | escape | 137:3,7 | 89:9 | 89:8,14 | 157:6 |
| 130:15 | 145:18 | 137:10 | 98:15 | 109:22 | 160:15 |
| 130:21 | Escondido | 143:7,16 | 135:18 | 110:2 | 164:6 |
| 131:6,11 | 92:11 | 159:9,13 | 177:5 | 124:22 | 166:7 |
| 132:9 | essential | 160:16 | exhibit | exonerate | 167:6 |
| 141:22 | 123:2 | 161:2 | 4:6,7,8 | 62:4 | 178:8 |
| 142:1,3 | establ... | 162:13 | 4:9 21:9 | exoner... | 181:18 |
| 142:4,5 | 9:6 16:9 | 163:2,22 | 21:11,12 | 160:11 | 183:10 |
| 142:6 | 187:12 | 168:3 | 21:14 | expect | 184:15 |
| 145:7,15 | et 142:1 | 181:19 | 22:4,4 | 17:4 | 188:12 |
| Empl 1:11 | event | exact | 26:15 | experi... | |
| employed | 30:10,22 | 94:17 | 27:7 | 11:8 | F |
| 7:22 8:1 | 36:4 | exactly | 34:6,14 | 18:22 | F 1:9 |
| 11:13 | 44:15 | 121:15 | 34:22 | 24:16,20 | face 35:19 |
| employ... | 49:16 | Examin... | 37:6 | 42:17 | 72:5 |
| 17:9,17 | 84:3,14 | 4:3 5:11 | 40:20 | 63:20 | 73:13,18 |
| 54:15 | 84:21 | examine | 50:12,13 | 157:4 | 74:2,3 |
| enforc... | 85:7,11 | 130:20 | 55:1,9 | 175:1 | 79:11 |
| 11:8,10 | 85:16 | 131:21 | 56:12 | 182:2,14 | 82:8 |
| 12:18,22 | 86:4 | 145:7 | 61:12 | experi... | facility |
| 13:15,18 | 140:8 | examined | 72:8 | 6:7 | 125:15 |
| 14:7 | events | 5:9 | 78:19 | expira... | 134:3,3 |
| 63:6,15 | 29:19,22 | except... | 81:3 | 75:9 | 134:4,5 |
| 63:21 | eventu... | 164:3 | 84:22 | expired | fact 24:11 |
| 64:14 | 12:5 | 166:12 | 85:6 | 95:14 | 140:6 |
| English | 156:3 | excessive | 94:20 | explained | facts |
| 187:3 | everybody | 45:3,19 | 100:9 | 68:14 | 45:10 |
| entire | 109:19 | 48:7 | 109:19 | 172:8 | 52:13 |
| 19:17 | 119:19 | 95:11 | 110:10 | extent | 54:5 |
| 103:18 | everyb... | 138:13 | 111:9 | 25:8,17 | 91:17 |
| 103:19 | 136:16 | 138:18 | 119:18 | 25:22 | 107:2 |
| 104:11 | everyt... | 154:6 | 119:21 | 44:7,16 | 112:22 |
| 140:7 | 48:22 | 157:14 | 125:10 | 72:14,17 | 114:15 |
| 190:8 | evidence | 157:21 | 129:2 | 72:17,20 | 115:20 |
| entirety | 31:17 | 158:2,6 | 133:12 | 87:13 | 124:2 |
| 103:11 | 45:10 | 158:8,22 | 141:12 | 114:10 | 137:3 |
| 104:10 | 52:13 | 159:16 | 144:17 | 114:14 | 160:16 |
| entries | 54:5 | 159:18 | 164:13 | 126:17 | 178:9 |
| 23:10,13 | 91:17 | 160:2 | 176:20 | 128:10 | 181:19 |
| 85:21 | 107:2 | 162:21 | 176:21 | 144:11 | failed |

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

202

| | | | | | |
|---|---|---|---|---|---|
| 159:12 | 32:10 | 158:7 | 92:20 | flashing | 161:22 |
| failing | 34:10 | 160:14 | 93:7 | 76:13 | 162:9,17 |
| 104:1 | 38:13 | 160:18 | firing | flipped | 162:22 |
| failure | 76:21,22 | 160:20 | 55:12 | 96:14,19 | 184:8,12 |
| 180:21 | 95:10 | 160:22 | 95:11 | 96:20,21 | 189:12 |
| fair 91:13 | 96:9 | 162:20 | first 5:9 | flipping | forcing |
| 102:12 | 97:6 | 165:16 | 5:22 | 96:13 | 172:10 |
| 113:12 | 99:4 | 184:22 | 8:16,19 | focused | foregoing |
| 123:3 | 110:14 | 185:1 | 9:9 | 169:5 | 191:2 |
| 128:20 | 110:17 | 189:11 | 11:10 | folder | forget |
| 158:16 | 126:7,8 | findings | 19:6 | 21:12 | 37:10,10 |
| 174:12 | 135:2 | 47:8 | 22:8,10 | followed | 89:2 |
| fall | 160:14 | 48:12 | 22:14 | 6:17 | form 8:18 |
| 182:17 | 165:20 | 53:22 | 35:21 | 33:19 | 13:2 |
| familiar | 170:22 | 54:1 | 36:7,22 | following | 14:1 |
| 27:18,22 | filed | 57:18 | 37:12,19 | 54:13 | 20:2 |
| family | 27:17 | 58:6,16 | 38:1 | 183:1 | 22:19 |
| 60:9 | 49:17 | 62:3,6,8 | 66:17 | follows | 29:3 |
| far 26:1 | 80:6,17 | 62:12,21 | 67:22 | 5:10 | 30:2 |
| 29:5,13 | 123:19 | finger | 70:13 | 21:21 | 31:13,22 |
| 53:4 | 123:22 | 97:16 | 71:4,7 | 55:7 | 32:17 |
| 105:9 | files | finish | 79:20 | 109:14 | 36:10 |
| 177:21 | 31:20 | 25:21 | 86:2 | 110:8 | 37:2,3 |
| 188:16 | filled | 67:8 | 100:10 | 165:4 | 38:17 |
| fast | 79:3 | fire 84:15 | 103:9 | footnote | 39:18 |
| 102:16 | find 7:12 | 85:14,21 | 107:13 | 29:18 | 40:9,13 |
| 103:1 | 30:21 | 86:2,8 | 111:15 | 31:4 | 42:3,13 |
| favor | 34:13 | 86:21 | 118:1 | FOP 172:12 | 44:6,17 |
| 124:21 | 71:14 | 93:7,12 | 122:8 | force 45:4 | 44:22 |
| fax 24:4 | 73:16 | 111:21 | 125:9 | 45:20 | 45:1 |
| federal | 74:4 | 112:15 | 129:8 | 48:7 | 47:12 |
| 2:1 6:10 | 78:5 | 112:16 | 135:20 | 58:10 | 48:17 |
| 143:14 | 111:11 | 113:15 | 137:6,8 | 59:19 | 49:7,22 |
| feels 68:6 | 127:15 | 129:9,17 | 161:5 | 68:17 | 54:10 |
| female | 128:3,6 | 130:12 | 166:20 | 95:11 | 56:5 |
| 100:21 | 129:16 | 132:7,8 | 168:1 | 138:13 | 57:6 |
| 140:16 | 129:20 | 140:18 | 190:5 | 138:18 | 58:8 |
| field | 159:17 | 141:5 | five 35:12 | 148:6,7 | 69:1 |
| 168:3 | 160:5 | firearm | 69:19 | 154:6 | 73:7 |
| fight 60:5 | finding | 171:18 | 95:10 | 157:13 | 83:10 |
| figures | 46:17 | 171:20 | 98:1 | 157:21 | 84:16 |
| 51:15 | 48:7 | fired | 102:20 | 158:2,8 | 90:1,18 |
| 178:18 | 58:18,20 | 52:22 | flailing | 158:15 | 95:21 |
| file 20:11 | 59:18 | 53:3 | 103:16 | 159:1,16 | 96:16 |
| 31:11 | 61:8,9 | 56:2 | 104:5 | 159:18 | 101:6 |
| 32:6,8 | 157:20 | firefi... | 150:18 | 160:3 | 102:2,3 |

LaKenya  White
November 9, 2015

203

104:22
107:5
108:9
112:3
116:1
117:16
121:5,13
123:20
124:1
125:21
126:13
127:5,18
128:18
129:11
132:17
137:2,22
138:15
140:10
145:8
146:20
147:13
148:8,10
148:20
148:21
149:9
150:9
151:3
153:20
153:22
155:3
156:19
158:17
159:2,19
160:16
161:11
162:4
163:11
163:21
166:4
170:7
174:6
175:5
177:10
178:12
181:2
183:7

184:1
186:10
186:11
186:17
187:8
188:8
189:14
**formal**
12:7,9
12:17
13:14
**formed**
44:11
**former**
55:12
56:13
57:13
63:15,20
64:3
66:21
**forth**
190:10
**forward**
164:4
**found** 8:6
57:19
130:1
155:10
157:13
158:2,5
158:15
158:22
159:16
160:2
173:5
**founda...**
8:12
22:11
23:14
24:8
29:10
30:16
38:7,16
39:3
43:12
46:20

47:13,14
53:5
54:3
61:3
63:17
64:7,16
75:4
87:15
147:13
162:5
166:7
174:6
175:7
176:13
176:15
177:13
178:12
178:19
179:4,18
180:7,15
189:14
**founded**
8:6
165:17
**four** 33:10
36:5
38:5
42:1
70:6
85:1
89:12
93:15
104:16
111:19
112:2,10
138:8
189:4
**fourth**
46:3
111:13
**frame**
114:18
119:11
**Fraternal**
172:13
**friend** 1:3

**front**
19:15
20:9,22
27:6,8
34:3
71:14
96:11,12
97:4
148:3
**fueling**
51:12
**full**
104:10
**full-time**
15:19
16:20
17:1
176:3
**funny**
97:12,17
98:14
**further**
69:18
82:9
83:19
84:4
90:16,17
103:14
104:3
105:18
111:12
113:22
124:14
135:1
136:9,11
155:2
156:6
160:21
161:14
161:18
178:10
186:22
188:20
188:22
189:2,22
190:12

——— G ———
**gainfully**
11:13
**gather**
19:22
24:21
**gathered**
20:3,22
52:2
162:14
168:4
185:14
187:11
**gathering**
71:2
167:22
**general**
25:14
26:5,20
27:20
132:21
134:10
134:15
148:1,2
152:6,7
**generally**
157:3
**gentlemen**
124:4
**Geraldine**
1:7
**getting**
110:11
153:2
175:11
**give** 6:5
24:2
26:15,16
35:13
48:13
55:9
78:12
79:12
85:9
100:4
109:19

111:5
124:21
136:4
163:4
164:18
**given** 5:17
23:21
33:18
35:1
38:13
68:13
69:15
127:19
165:20
185:1
186:8
187:14
190:9
191:4
**gives**
23:20
182:4
**giving**
163:8
**glanced**
139:16
**go** 14:13
18:9
19:3
24:11
27:12
29:10
33:5
38:19
39:19
43:15
45:13
49:16,20
50:6,9
56:10
57:10
61:18
65:7
66:5,14
67:20
68:1,2

LaKenya White
November 9, 2015

204

71:3
73:1
76:22
77:15
78:3,5
79:22
84:17
85:9
88:22
90:1,19
91:8,12
91:17,22
92:14
94:1,7
95:5
98:7
99:8,22
102:13
105:17
107:3,20
108:9
109:9
111:1
113:4
114:16
115:5
116:1
118:6
120:6
121:14
122:14
122:17
124:7,13
126:18
127:6
132:21
139:3
143:5
146:7
147:5
155:1
160:17
164:4,7
166:19
167:2
171:13

171:13
173:6
179:22
181:19
182:8,10
182:20
183:11
184:17
184:21
185:12
187:4,21
188:11
189:7,17
**goal** 123:3
**goals**
168:14
169:3
**goes** 46:10
**going** 7:11
8:18
12:4
13:2,13
14:1
16:6
19:16
20:16
24:8,9
25:17,18
26:3,7
28:12
29:3
30:2,15
35:17
37:2
39:4,18
40:2
41:2
42:19
44:6,16
44:22
45:9,12
50:3
52:12
55:14
56:8
57:21

58:8,9
58:11
60:7
65:3,11
65:12
72:8,13
73:16
74:3
78:2,2
78:20
79:17
80:20
83:10
84:16
85:9
87:13
88:1,17
89:12,13
90:1,18
90:21
91:7
92:3,4
93:1
94:3
95:21
96:16
97:1
98:10
99:11
100:1
101:6
102:2
103:17
104:15
107:1,4
107:5
109:22
110:3
112:21
114:8
121:13
123:15
123:20
124:1
125:20
125:21

127:18
129:11
131:12
131:22
132:18
134:9
135:14
137:22
139:1
140:10
144:11
144:20
145:1,8
146:2
147:12
148:8,18
148:21
149:9,10
151:1
153:20
153:22
155:3,6
156:11
158:17
158:19
162:11
163:11
163:12
167:6
173:8,10
174:4,8
174:9,17
177:10
177:12
178:8,11
178:12
181:18
183:7,9
184:1,13
186:10
**GONZALEZ**
1:9
**good** 5:13
97:22
**gotten**
17:22

67:1
**grasped**
69:16
**great**
153:13
153:15
**ground**
72:19
**grounds**
30:16
125:16
132:12
132:16
133:6,7
142:12
144:18
144:19
173:8
**group** 21:5
182:21
**Guadalupe**
186:2
187:20
**guess** 7:1
79:4
116:9,10
116:11
**Guettler**
1:7
111:15
116:19
**guides**
166:3
**gun** 51:4
88:7
92:15
**gunfire**
50:22
**guys** 165:1
**Guzman**
92:12
140:1
185:16
188:3
**Guzman's**
136:10

186:2,2
188:19

---

**H**

**H** 1:13  4:4
**hand** 5:3
37:6
190:15
**handed**
88:19
129:5
**handful**
46:16
**handle**
89:10
**handled**
157:3
**handwr...**
22:5,6
100:10
**happened**
36:4
120:16
155:19
161:10
161:12
**happy** 98:8
**hard** 122:6
**harm** 7:2
125:19
142:9
150:20
187:17
**harm's**
147:6
**Harry** 1:5
**head** 95:12
**headline**
56:1
**headqu...**
101:3
**health**
125:15
134:4
**hear** 6:2
6:20

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

| | | | | | |
|---|---|---|---|---|---|
| 56:17 | home 134:1 | hypoth... | immedi... | 26:11 | 38:19 |
| 119:7 | Hon 1:5,7 | 30:16 | 6:21 | 29:2 | 42:4 |
| 156:15 | honestly | 38:19 | 111:16 | 33:19 | 147:12 |
| heard 41:3 | 188:9 | 42:4 | 168:4 | 35:18 | 149:12 |
| 41:18 | hope | 147:13 | impact | 37:9 | 162:5 |
| 46:2 | 111:11 | 149:13 | 117:14 | 76:5 | 163:13 |
| 63:13 | hospital | 162:5 | 117:17 | 81:10 | 174:5 |
| hearing | 114:3 | 163:13 | 117:20 | 82:16 | 176:11 |
| 174:3 | 119:17 | 174:5 | 117:22 | 83:4 | 178:13 |
| hearsay | 130:13 | 176:11 | 118:4,7 | 91:10 | 189:15 |
| 178:11 | 142:2 | 178:13 | 118:8 | 92:7,10 | increase |
| heavier | 147:6,11 | 189:15 | 163:19 | 99:16 | 122:17 |
| 178:6 | 171:3 | | 164:1 | 102:21 | increased |
| held 21:19 | hospit... | **I** | implem... | 104:21 | 51:5 |
| 109:12 | 125:18 | idea 42:21 | 33:11 | 152:1 | 120:21 |
| 120:21 | 142:8 | 48:11 | import... | 157:15 | Indepe... |
| help 14:4 | hour 55:4 | 175:8 | 138:17 | 172:22 | 7:19 |
| 82:13 | 139:7,11 | 179:13 | important | 173:14 | 26:19 |
| 83:8,15 | hours 17:9 | identi... | 7:8,8 | 173:18 | 27:3,19 |
| 111:12 | 17:16,17 | 133:18 | 41:15 | 175:2,10 | 47:20 |
| 187:3,6 | 89:12 | identify | 42:2,8 | 189:3 | 51:16 |
| helpful | 104:16 | 40:21 | 42:11 | incidents | 52:2 |
| 36:17 | 168:1 | 72:21 | 98:11 | 25:6 | 56:14 |
| helps | 172:21 | 77:2 | 138:12 | 39:17 | 119:22 |
| 122:17 | 173:1 | 140:3 | imposes | 51:13 | 120:3 |
| herein... | 186:8 | IL 3:4,8 | 47:10 | 176:6 | 157:5 |
| 190:10 | 189:4 | 3:13,18 | Improv... | 177:5,7 | 174:12 |
| hereof | Huffin... | Ilana | 166:22 | 177:19 | 175:20 |
| 190:15 | 55:21 | 120:17 | in-car | 177:20 | 177:16 |
| hereunto | Human | 121:6 | 77:14 | 178:5,7 | 178:17 |
| 190:15 | 182:21 | ILCS 142:1 | 127:16 | 179:16 | 185:5 |
| high 12:3 | hundreds | Illinois | in-squad | include | indicate |
| 13:15 | 51:11 | 1:1,16 | 76:18 | 181:6 | 7:12 |
| 19:3 | HURD 3:11 | 2:6 3:20 | 128:3,7 | included | 23:3 |
| 88:20 | 9:13,15 | 6:11 | inaccu... | 10:12 | 60:3 |
| higher | 19:18 | 67:4 | 185:7 | 46:5,17 | 80:13 |
| 32:7 | 21:22 | 115:6 | incapa... | 116:15 | indicated |
| 53:22 | 61:18 | 141:22 | 68:22 | includes | 79:4,4 |
| 64:6,11 | 106:6,8 | 190:1,4 | inception | 28:8 | 179:11 |
| Hinsdale | 154:2 | 191:18 | 97:3 | 52:13 | indicates |
| 3:4 | 164:14 | illness | 172:5 | including | 34:22 |
| hired 9:16 | 166:22 | 124:16 | inches | 176:14 | 116:15 |
| hold 35:17 | 176:13 | immediate | 88:20 | incomp... | indivi... |
| 56:2 | 189:17 | 119:11 | incident | 146:3 | 172:1 |
| holster | hurt | 125:18 | 24:17 | incomp... | indivi... |
| 137:1,15 | 182:17 | 142:7 | 25:2 | 30:16 | 1:14 |

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

206

| | | | | | |
|---|---|---|---|---|---|
| **indivi...** | 73:4,11 | **intere...** | 123:2 | 101:7 | 133:5 |
| 182:16 | 73:13 | 190:14 | 139:14 | 118:2 | 134:8,19 |
| **influence** | 78:6 | **interests** | 145:4 | 144:1 | 138:13 |
| 81:15,21 | 82:5,7 | 36:19 | **intimi...** | **invest...** | 143:20 |
| 103:5 | 168:10 | **Intern...** | 97:19 | 20:13 | 153:1,7 |
| 150:10 | **initiated** | 181:15 | **intoxi...** | 24:17,20 | 155:2 |
| 150:19 | 28:7 | 182:4,12 | 68:21,22 | 25:16 | 160:21 |
| 162:16 | **injured** | 182:18 | 133:19 | 26:11 | 161:4,21 |
| 181:17 | 171:9 | 182:22 | **invest...** | 29:20 | 162:8 |
| 182:6 | 183:21 | **interr...** | 37:13,20 | 31:6 | 163:15 |
| 187:13 | **injuries** | 98:4 | 38:1,6 | 32:15 | 163:20 |
| 187:16 | 44:12,14 | **interrupt** | 38:15 | 33:5,6 | 164:1,5 |
| 189:10 | 44:20 | 7:7 | 39:9,16 | 39:6 | 166:13 |
| 189:13 | 45:3 | 36:14 | 40:7,15 | 45:6 | 168:22 |
| **inform...** | 154:5,8 | **interr...** | 42:2,9 | 50:16 | 169:10 |
| 25:5 | 170:14 | 67:10 | 44:20 | 51:2 | 169:15 |
| 28:18 | 170:16 | **interr...** | 45:2,3,7 | 61:8 | 170:6,13 |
| 60:1 | 173:5 | 6:17 | 45:19 | 70:22 | 178:3 |
| 76:2 | 184:9 | **intervene** | 46:12 | 77:2,11 | 180:3,13 |
| 82:4 | **injury** | 180:21 | 50:6,9 | 77:21 | 181:6,14 |
| 92:13 | 45:21 | **interview** | 69:22 | 78:1 | 182:19 |
| 93:8,10 | 153:18 | 79:22 | 70:7 | 80:14 | 185:14 |
| 93:14 | 166:15 | 91:5 | 73:12,17 | 81:12 | 185:20 |
| 102:1 | **insert** | 94:1,6,9 | 82:9 | 82:14 | 186:16 |
| 112:19 | 23:17 | 94:12,15 | 101:4 | 83:2,8 | 187:1,7 |
| 136:10 | **insofar** | 99:8,9 | 127:15 | 83:20 | 188:20 |
| 136:11 | 56:8 | 99:12,19 | 128:3 | 84:4 | **invest...** |
| 136:12 | 58:9 | 101:1,10 | 154:5 | 86:8,16 | 24:6 |
| 136:13 | 112:21 | 103:10 | 168:21 | 86:20 | 28:8,9 |
| 144:7 | 184:13 | 123:5,11 | 184:7,8 | 87:2,20 | 28:21 |
| 156:6,8 | **instruct** | 170:4 | **invest...** | 88:5,16 | 29:16 |
| 161:19 | 184:19 | 173:7,13 | 42:17 | 88:18 | 31:4 |
| 161:19 | **instru...** | 174:2 | 59:13,16 | 89:17,21 | 48:12 |
| 167:22 | 6:6 | 187:21 | 61:14 | 95:20 | 53:22 |
| 189:1,3 | **intake** | 188:18 | 157:13 | 99:15 | 58:17 |
| **informed** | 10:22 | **interv...** | 172:7 | 102:20 | 62:4,11 |
| 142:4 | 11:1,3 | 80:2 | 175:3,12 | 104:20 | 70:3 |
| **initial** | 22:15,22 | 101:2 | 176:8 | 105:10 | 120:22 |
| 36:6 | 23:22 | 123:8 | 178:7 | 111:12 | 121:4 |
| 37:7 | 167:5,20 | 169:17 | 183:15 | 114:5 | 123:1 |
| 73:14 | **intended** | **interv...** | 183:19 | 117:15 | 166:3 |
| 80:9,12 | 180:22 | 101:17 | **invest...** | 118:4,9 | 168:15 |
| 111:19 | **intent...** | **Interv...** | 29:22 | 123:3 | 168:16 |
| **initially** | 70:2,3 | 172:4 | 178:2 | 126:3,5 | 169:7 |
| 71:17 | **interest** | **interv...** | **invest...** | 126:11 | 170:6 |
| 72:12 | 79:5,9 | 122:22 | 73:15,20 | 129:15 | 171:14 |

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

207

| | | | | | |
|---|---|---|---|---|---|
| 171:15 | 9:10,15 | 17:1,7,9 | 171:17 | 3:2,2 | **Jolt** 50:20 |
| 175:1 | 18:6 | 17:17,20 | 172:7,10 | 9:13 | **José** 1:2,7 |
| 177:21 | 22:18 | 24:6,16 | 172:19 | 22:7 | 1:9 19:6 |
| **invest...** | 47:19 | 25:5,14 | 172:22 | 40:21 | 33:17,22 |
| 122:21 | 48:15 | 25:18,22 | 173:21 | 97:1 | 43:18 |
| 154:15 | 49:6 | 26:10 | 177:1,8 | 103:17 | 44:20 |
| 166:22 | 63:14 | 28:7,18 | 182:3 | 104:13 | 52:18 |
| 185:18 | 64:2,10 | 29:11,17 | **IPRA's** | 117:3 | 56:10 |
| **invest...** | 64:13,17 | 29:19,19 | 26:5 | 122:5 | 70:5 |
| 5:15 | 66:19 | 29:22 | 63:5 | 130:5 | 102:22 |
| 7:19 8:3 | 94:14 | 30:9,21 | 124:11 | 153:8 | 110:14 |
| 8:5 | 120:21 | 32:7 | 172:5,15 | 181:9 | 110:17 |
| 12:21 | 123:2,4 | 33:10,14 | **ISP** 67:3 | **join** 38:9 | 111:4,12 |
| 13:4 | 124:12 | 37:1 | **issue** | 42:7 | 112:1,10 |
| 17:1,11 | 167:21 | 38:5,11 | 33:11 | 45:1 | 113:17 |
| 17:14,20 | 168:2 | 39:9 | 183:13 | 52:14 | 114:6 |
| 18:5,8 | 169:4,5 | 41:9,11 | **issued** | 54:4 | 130:19 |
| 18:11,15 | 175:3,19 | 41:14 | 33:13,21 | 75:5 | 131:20 |
| 18:16,21 | 176:3,9 | 42:17 | 34:2,8 | 90:21 | 135:9,21 |
| 19:1,1,3 | 178:1 | 43:3,6,7 | 34:11 | 91:16 | 136:18 |
| 22:13,14 | **involu...** | 46:4,6 | 46:4 | 96:1 | 137:14 |
| 22:20,21 | 125:4,17 | 47:9,19 | 165:7,9 | 107:4 | 138:22 |
| 23:7,22 | **involved** | 48:6,16 | **issues** | 115:11 | 139:21 |
| 24:1,10 | 13:1 | 53:1,3 | 154:20 | 115:22 | 161:22 |
| 26:18 | 71:12,14 | 54:15 | **it'll** | 123:15 | 162:10 |
| 31:21 | 71:17,19 | 56:19 | 171:14 | 126:16 | 180:4 |
| 32:15 | 72:7 | 59:3,16 | ——————— | 144:10 | **JOSEPH** |
| 37:8 | 104:21 | 60:11 | **J** | 145:1,9 | 1:11 |
| 38:3,14 | 105:10 | 61:7 | **J** 1:8 | 146:22 | **Jr** 1:9 |
| 39:9 | 172:4,11 | 63:12 | **January** | 148:10 | **Judge** 1:6 |
| 48:5 | **involv...** | 64:3,17 | 70:9,9 | 150:7 | 1:8 |
| 49:20,20 | 72:2 | 66:1,2 | 106:6,7 | 157:8 | **judgment** |
| 50:6 | **involving** | 74:8 | 106:8 | 158:19 | 133:17 |
| 53:9 | 124:16 | 94:14 | **JENNIE** 2:3 | 162:12 | **July** 23:8 |
| 56:2 | **IPRA** 8:1,3 | 95:8,10 | 190:3,19 | 166:6 | 27:7 |
| 64:5 | 8:4,5,17 | 101:16 | **job** 11:10 | 169:21 | 28:14 |
| 65:5,20 | 9:4,6,10 | 120:8,19 | 17:7 | 173:15 | 33:17,22 |
| 70:8,15 | 9:13,16 | 128:2 | 18:18 | 174:8,19 | 36:1 |
| 77:13 | 9:20 | 132:19 | 45:2,3 | 175:7 | 38:2 |
| 110:18 | 13:3,10 | 146:18 | 65:2 | 176:12 | 50:14,17 |
| 146:18 | 13:13,14 | 157:21 | 66:19 | 176:14 | 52:9,18 |
| 162:21 | 14:19,21 | 165:8 | 153:13 | 178:14 | 70:14 |
| 168:19 | 15:5 | 167:17 | 153:15 | 179:20 | 80:8,17 |
| 182:3,15 | 16:1,2,8 | 167:20 | 154:5 | 183:9 | 83:13 |
| **invest...** | 16:9,14 | 168:8,16 | 184:7,8 | 184:3,18 | **jump** 51:12 |
| 8:10,17 | 16:18,21 | 169:3 | **John** 1:7 | 185:9 | **jumping** |

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

208

98:17
JURY 1:11
justice
  12:11
  14:8
justified
  158:16

_____ K _____

KEARNS
  1:12
keep 6:1
  163:5,9
  178:18
  188:14
Kendrick
  171:1
kind 12:22
  18:18
  21:10
  178:3
knew 72:10
  87:20
  117:7,11
  137:4
  154:19
  156:6
  188:21
know 7:2,3
  7:6 8:20
  9:14
  20:17,19
  22:12
  23:9
  25:20
  26:10
  29:5,13
  31:14
  35:12
  38:10,14
  40:19
  43:13,14
  44:11,14
  45:13,14
  47:1,4
  48:4

49:8,12
51:8
52:9
53:4,21
54:11
57:8
58:5
61:3
62:10
63:18
64:20
66:10
71:12,18
72:21
73:1,14
75:14
79:1
83:21
84:7
86:12,13
86:16
88:10
89:4,11
89:13
93:11
94:13,14
94:16
96:17
97:7,13
100:20
103:12
109:1
111:8
112:19
113:7,14
117:17
117:19
120:3,7
122:2,11
128:16
130:8
131:5
134:7,15
134:18
135:8
137:6,10

137:16
137:18
138:4
143:4
144:17
152:6
157:1,10
164:17
166:9
170:9
171:2
175:10
175:15
175:22
178:20
179:6,9
179:12
179:19
180:1,3
180:8,12
180:16
181:4,5
181:14
187:1
188:9,21
knowledge
  8:13
  23:15,16
  38:8,20
  39:13
  43:13,15
  43:16
  49:8
  53:6
  54:2
  58:12
  61:2,4
  63:18
  64:8,9
  64:17
  87:19
  134:10
  140:12
  144:8
  171:1
  172:2

174:20
175:6,14
175:17
175:21
178:21
179:3,5
181:3
known
  92:12
knows
  25:22
  26:1
  113:8

_____ L _____

L-a-K-...
  5:15
lack 43:15
  175:21
lacks 8:12
  23:14
  38:8
  43:12
  49:7
  53:5
  54:2
  58:11
  61:2
  63:18
  64:7,16
  140:12
  175:6
  177:12
lady 20:9
  95:7
  97:13
  140:3
LaKENYA
  1:19 4:2
  5:7,15
  190:4
  191:2
large
  134:4
larger
  119:18

LaSalle
  3:7,12
  3:17
laughing
  97:15
law 3:6,11
  3:16
  11:8,10
  12:17,22
  13:15,18
  14:7
  63:6,15
  63:20
  64:14
  94:13,16
  94:17
  115:5,10
  133:21
  140:21
  141:3,7
  142:14
  143:1,5
  143:19
  144:3,4
  144:15
laws 115:6
lawyer
  7:11,12
  7:14
lawyers
  6:16
  98:19
learn
  26:11
  156:17
  182:3
learned
  69:13
  139:20
  171:11
learning
  49:16
learns
  24:17
  25:2
leave

15:22
89:12
115:1
left 14:13
  16:8
legal
  87:14
  114:11
  114:12
  115:9
  119:14
  126:18
  144:11
  144:22
  148:19
  149:11
  154:3
  162:2
  164:7
  166:7
Leinen...
  1:6
let's
  35:12
  36:15
  68:12
  70:15
  102:19
  103:14
  105:7
  131:16
  153:3
  189:6,7
  189:17
letter
  110:13
  110:16
  111:1
letters
  133:22
  134:4,22
level 64:5
liability
  115:2
  118:12
  119:5,9

LaKenya White
November 9, 2015

209

librar... 11:18
Library
  11:17,22
  12:2
License
  2:4
  190:20
licensed
  142:2
lieute...
  35:1,20
  37:1,8
light
  173:5
limit
  50:22
limita...
  95:14
  172:4
  174:11
limited
  140:7
line 22:8
  22:10,14
  28:12
  46:18
  120:19
  191:7
lines
  33:10
  62:2
  69:19
  102:20
list 29:16
  93:16
  96:6
  99:2
listen
  20:7
  65:11
literally
  131:13
litigated
  113:2
litiga...

31:17
little 6:5
41:9
65:14
69:18
148:14
181:9
load 29:17
loads
  169:4
locate
  93:14
located
  134:1,5
location
  84:18
lockup
  124:13
log 11:4
  19:8,11
  19:16,18
  21:6
  22:14
  23:7,10
  23:13,17
  23:20,21
  24:2
  33:11,18
  33:21
  34:2,3
  34:11
  36:1
  38:3
  70:8,16
  70:18
  71:5,6
  96:10
  106:9
  154:15
  165:9,12
  165:20
logs 117:4
long 7:22
  9:22
  15:2,12
  15:16,17

53:18
67:19
69:21
70:7
84:9
86:13
104:7
156:7
168:7
longer
  75:2
longhand
  102:12
look 29:15
  31:3
  33:8
  35:14
  37:21
  41:8
  46:15
  47:6
  50:12,18
  50:19
  51:10
  56:1
  61:16
  63:2
  69:19
  72:1,7
  75:20
  76:20,22
  89:2
  90:4
  97:6
  110:10
  111:9
  115:5
  120:1
  124:10
  125:7
  129:16
  130:10
  133:12
  133:16
  141:4,12
  141:18

143:5,9
143:19
148:1
164:12
166:20
168:13
169:1
170:22
172:18
179:9
looked
  48:1,2
  72:21
  115:10
  128:17
  143:7
  176:5
looking
  61:12
  70:18,19
  70:22
  71:1,5,6
  71:21
  88:11,19
  93:20
  94:21
  99:4
  105:5
  117:3
  119:21
  120:18
  124:20
  144:17
  161:7
looks
  21:13
  70:10
  85:6
  101:4
Lopez 1:2
  1:11
  19:6
  28:14
  33:17,22
  43:19,22
  44:15,21

50:15
52:18
56:10
70:5
73:19,21
79:14,15
81:14
95:20
96:3,5
102:22
103:4,9
103:15
104:8
110:14
110:17
111:5,12
112:1,10
113:17
114:6,17
115:7
116:4
117:7,11
119:8,13
126:11
126:21
130:19
131:21
135:9,21
136:18
136:22
137:14
137:21
138:5,8
138:11
138:14
138:22
139:21
140:22
145:6,18
150:3
153:7,18
160:13
161:22
162:10
162:15
163:16

169:11
169:13
170:16
173:4,20
180:5,13
181:1
184:12
187:2,13
187:20
188:21
Lopez's
  152:10
Lorenzo
  52:19,22
  53:18,21
  54:14
  55:13
  57:3,13
  61:13
  62:11,13
  62:14,15
  63:21
  94:21
  106:19
  108:5
  115:12
  115:18
  115:19
lost 168:4
lot 17:4
lots 89:6
  93:21

M
M-o-r-...
  22:16
ma'am 5:13
  20:7
  28:21
  29:12
  37:6,10
  39:8
  40:4
  41:6
  44:9
  48:22

LaKenya White
November 9, 2015

210

| | | | | | |
|---|---|---|---|---|---|
| 67:14 | 22:4 | 96:17 | 187:16 | minutes | 40:2 |
| 73:2 | 34:19 | 100:2 | MEERA 3:7 | 55:4 | 43:21 |
| 78:5 | 78:15 | 105:16 | member | 86:9,17 | 44:1 |
| 107:20 | 85:3 | 170:10 | 49:2 | 111:19 | 92:4 |
| 108:4 | 88:21 | 187:17 | 132:6 | 112:2,10 | 135:4 |
| 125:11 | 110:2 | meant | members | 112:17 | 137:3 |
| 137:13 | marketed | 119:10 | 57:3 | 113:16 | 143:17 |
| 142:18 | 50:21 | Measured | memory | 131:9 | 186:18 |
| 143:10 | material | 47:7 | 139:17 | 164:20 | misstates |
| 143:19 | 130:4 | medical | Mendoza | 165:1 | 185:6 |
| 150:13 | materials | 44:7,17 | 150:16 | 181:10 | moment |
| 177:15 | 111:11 | 74:16 | Mendoza's | mischa... | 36:15 |
| 188:6 | 112:8 | 114:1,6 | 145:11 | 158:18 | 98:14 |
| Magist... | 113:15 | 114:21 | mental | 163:12 | 119:7 |
| 1:8 | 125:9 | 115:8,16 | 124:16 | 177:11 | 164:18 |
| major | 129:22 | 116:5 | 125:15 | mischa... | moments |
| 12:15 | 130:2,6 | 117:8,12 | 147:4 | 105:21 | 164:19 |
| 13:22 | 154:22 | 118:5 | mention | 128:11 | MONICA |
| making | matter | 119:11 | 167:15 | 136:5 | 1:11 |
| 53:21 | 113:3 | 130:15 | mentioned | 143:6,16 | months |
| 58:6 | 140:6 | 130:20 | 51:20 | 156:21 | 93:15 |
| 72:16 | 185:21 | 131:6,11 | Messages | 157:7 | 121:1 |
| male | MATTHEW | 132:9,11 | 75:16 | 159:9 | Morley |
| 100:21 | 3:11 | 132:15 | method | 161:1 | 22:14,16 |
| 100:22 | mean 8:19 | 133:6 | 33:12 | 163:1 | 22:22 |
| man 29:7 | 17:16 | 136:18 | middle | 167:7 | morning |
| 41:22 | 20:16 | 141:22 | 51:10 | 178:9 | 5:13 |
| 95:12 | 26:21 | 142:1,4 | 167:16 | 185:7 | Mount |
| 115:15 | 29:11 | 142:6,11 | mill 170:9 | mischa... | 114:3 |
| 171:4 | 33:2 | 144:18 | mind 71:17 | 159:3,13 | MOWATT |
| Manage... | 40:14 | 145:7,15 | 100:1 | 184:15 | 3:17 |
| 75:17 | 71:9 | 147:3 | 114:18 | 186:18 | 14:1 |
| 85:12,19 | 90:12 | 150:11 | 119:11 | miscon... | 19:12,17 |
| MANUEL 1:9 | 101:15 | 150:19 | 147:4 | 29:21 | 24:8,18 |
| March | 105:14 | 152:10 | 162:17 | 30:1,8 | 26:3 |
| 111:9 | 110:21 | 152:18 | minimal | 31:1 | 28:12 |
| mark 1:12 | 117:9,10 | 162:15 | 148:6 | 39:14,17 | 29:10 |
| 19:16 | 117:18 | 162:18 | minimum | 40:8 | 34:5 |
| 21:9,11 | 117:19 | 170:15 | 148:7 | 46:7,12 | 36:10 |
| 21:14 | 119:3 | 170:17 | miniscule | 46:13,18 | 37:2 |
| 34:14,17 | 155:20 | 170:19 | 47:8 | 94:6 | 38:9,18 |
| 72:8 | 163:5 | 170:20 | minute | 168:1 | 39:3,18 |
| 84:22 | means | 171:6 | 8:21 | 174:16 | 40:9,21 |
| 85:2 | 50:22 | 183:11 | 108:4 | misdem... | 42:7,13 |
| marked | 57:8 | 185:15 | 139:3 | 148:16 | 44:6,16 |
| 21:16 | 78:18 | 187:12 | 189:5 | mislea... | 44:22 |

County Court Reporters, Inc.
630.653.1622

LaKenya  White
November 9, 2015

211

| | | | | | |
|---|---|---|---|---|---|
| 45:9 | 127:5 | 181:9,12 | **nearby** | 100:1 | 80:13 |
| 46:20 | 128:10 | 181:18 | 181:7 | 111:5 | **notice** |
| 47:13 | 129:4 | 182:9 | **necess...** | 128:17 | 20:1,15 |
| 52:4,12 | 130:5 | 183:7,10 | 60:6 | 128:21 | 24:7 |
| 54:4,10 | 131:12 | 184:1,13 | 102:14 | 130:19 | 41:1 |
| 55:3,14 | 131:22 | 185:9 | 114:15 | 131:20 | 108:19 |
| 56:8 | 132:18 | 186:10 | **necessary** | 141:7 | 116:14 |
| 58:8 | 133:9 | 188:8 | 123:4 | 159:9 | 137:14 |
| 59:5 | 134:9 | 189:4,6 | 162:17 | 167:11 | 177:8 |
| 62:14 | 137:22 | 189:14 | **need** 6:14 | 169:17 | 187:2 |
| 73:7 | 139:1,7 | 189:18 | 36:8,20 | 170:17 | **notifi...** |
| 75:4,17 | 140:10 | **municipal** | 37:22 | 183:15 | 29:21 |
| 77:12 | 144:10 | 1:16 | 44:3 | **new** 31:17 | 33:13 |
| 84:16 | 144:20 | 27:17 | 50:18 | 156:18 | 80:17 |
| 85:11 | 145:8 | 28:4 | 68:7 | 161:6 | 123:22 |
| 87:13 | 146:2,22 | 141:13 | 91:6,9 | 167:22 | 175:11 |
| 90:1,18 | 147:12 | 141:19 | 91:22 | **newspaper** | **notifi...** |
| 91:7,16 | 148:8,18 | | 103:10 | 40:22 | 28:9,22 |
| 92:3 | 149:9 | **N** | 104:9 | 54:13 | 33:14 |
| 94:3 | 150:7 | **N** 4:1 | 107:13 | 55:18 | **notified** |
| 95:21 | 151:1,10 | **name** 5:14 | 107:21 | **night** 17:5 | 30:22 |
| 97:1 | 153:8,20 | 59:22 | 125:17 | **nine** 87:21 | **notify** |
| 101:6,15 | 155:3 | 60:15 | 142:7 | **non-ar...** | 29:2,7 |
| 101:19 | 157:6 | 79:16,17 | 143:14 | 125:5 | 30:9 |
| 102:2,13 | 158:17 | 79:20 | **needed** | **non-sh...** | **November** |
| 103:17 | 159:19 | 140:4 | 91:4 | 172:20 | 1:20 |
| 104:11 | 160:15 | 158:10 | 119:11 | 173:7 | 191:3 |
| 104:17 | 162:4,11 | **named** | **needs** 7:6 | **normally** | **number** |
| 105:21 | 163:11 | 82:20 | 22:7 | 46:12 | 11:5 |
| 106:13 | 164:6,13 | 93:17 | 92:6 | 102:10 | 23:18,20 |
| 107:1 | 164:15 | **names** | 103:18 | **North** 3:7 | 23:21 |
| 108:9 | 164:17 | 72:11 | 103:18 | 3:12,17 | 24:2 |
| 109:21 | 164:19 | 79:10,12 | 147:11 | **Northern** | 29:18 |
| 112:21 | 166:6 | 79:13 | **Neither** | 1:1 6:11 | 33:18,21 |
| 113:19 | 167:6 | 92:9,11 | 140:3 | **Notarial** | 34:4,11 |
| 114:8,10 | 169:11 | 99:17 | **never** | 190:16 | 34:18 |
| 114:14 | 169:19 | **narrative** | 10:16,19 | **Notary** 2:4 | 38:13 |
| 115:11 | 173:8 | 78:2 | 16:8 | 5:6 | 77:7 |
| 115:22 | 174:4,17 | **narrat...** | 17:22 | 191:21 | 78:9,11 |
| 117:2 | 175:7,13 | 102:8 | 28:3 | **notation** | 78:13 |
| 121:13 | 176:12 | **nature** | 42:1 | 152:21 | 81:1,2 |
| 122:5,19 | 176:14 | 18:3 | 48:1 | **note** 36:15 | 85:2 |
| 123:13 | 176:22 | 87:15 | 62:20 | 117:7 | 110:3 |
| 123:20 | 177:10 | 90:19 | 65:12 | **noted** | 120:20 |
| 125:20 | 178:8 | 92:5 | 91:13 | 191:3 | 165:7,9 |
| 126:16 | 179:20 | 127:6 | 97:8 | **notes** | 165:11 |

LaKenya  White
November 9, 2015

212

165:12
165:15
165:20
165:20
**numbers**
33:11
77:3,4
122:6
**numerous**
43:8
94:4
157:10
184:14
184:17
184:20
185:13

———

**O**

**oath** 5:4
106:21
108:19
117:11
127:4
186:8
**object**
8:18
13:2
14:1
20:16
24:8
26:7
28:12
29:3,10
30:2,15
36:10,11
37:2
39:4,18
40:2,9
42:13,19
44:6,16
44:22
45:9,12
52:4,12
54:4
55:14
56:8

57:21
58:8,9
58:11
65:3
72:17
73:7
78:20
83:10
84:16
87:13
88:1,17
90:1,18
91:7
92:3,4
94:3
95:21
96:16
97:1
101:6
102:2,3
102:13
103:17
106:13
107:1,5
107:15
108:9
112:21
113:1,5
114:10
121:13
123:13
123:20
124:1
125:20
125:21
126:17
127:5,18
129:11
131:12
131:22
132:18
135:14
137:22
140:10
143:13
144:11

144:20
145:8
146:2
147:12
148:8,18
148:20
148:21
149:9,10
151:1
153:20
153:22
155:3
156:11
158:17
159:19
163:11
163:13
167:6
169:19
173:8,11
174:4
177:10
177:12
178:8,11
178:12
181:18
183:7,10
184:1,13
186:10
188:8
189:14
**objected**
132:11
**objecting**
37:3
**objection**
8:12
15:8
20:2
22:11,19
23:14
24:18
25:7,10
25:11
26:4
31:13,22

32:17
38:7,7
38:16,16
38:18
39:3,11
40:13
42:3
43:12,21
45:1
46:20,21
47:12,13
47:14
48:17
49:7,7
49:22
53:5,15
54:2,10
56:5
57:6,7
61:2
63:17
64:7,16
69:1
72:13
75:4
82:1
91:15
104:22
105:21
107:4
112:3
114:9
115:9,17
117:16
119:14
121:5
126:13
128:10
128:18
132:17
137:2
138:15
138:16
140:9,12
141:9
142:16

143:6
144:6,7
146:20
150:5,7
154:2
156:19
156:20
156:20
157:6
159:2,8
160:7,15
160:16
161:1,11
162:2,4
163:1,21
164:6
166:4
170:7
175:5,14
175:21
176:10
178:19
179:4,18
179:20
180:7,15
181:2,3
184:18
185:6
186:11
186:17
187:8
188:1
**object...**
65:15
**object...**
26:7
42:7
113:19
115:21
115:22
126:17
133:9
134:9
143:12
144:10
151:10

162:11
166:6
174:18
175:13
176:14
182:9
185:9
**objects**
61:20
142:11
**Observ...**
76:12
**observed**
103:4
**obtain**
80:16
83:6
84:2
91:1
**obtained**
78:7
81:7,9
81:11,18
165:18
170:15
185:15
**obtaining**
166:12
185:19
**occasion**
151:15
158:6
**occasi...**
50:5
99:11
**occasions**
23:9,12
31:5,11
158:14
185:17
**occur**
31:12
**occurred**
24:7
54:15
156:9

LaKenya White
November 9, 2015

| | | | | | |
|---|---|---|---|---|---|
| 179:3 | 125:15 | 91:5 | 121:8 | ones 64:13 | organize |
| occurr... | 133:18 | 92:1,14 | 137:8 | online | 123:5 |
| 134:6 | 136:22 | 93:17 | 167:14 | 52:7 | original |
| occurs | 137:14 | 94:2,6 | 182:7 | 74:7 | 34:11 |
| 29:2 | 141:21 | 94:15,15 | okay 16:5 | open 24:16 | 72:5 |
| October | 142:4 | 95:6 | 19:19 | 26:10 | 81:9 |
| 101:5,11 | 145:22 | 96:6 | 37:21 | 32:18 | 93:15 |
| off-duty | 146:12 | 99:3 | 43:7 | 168:17 | origin... |
| 46:12,13 | 146:19 | 106:22 | 66:6 | opened | 78:1 |
| offered | 147:10 | 111:15 | 73:1 | 29:16 | outcome |
| 135:1 | 149:8 | 112:11 | 78:7 | opens | 190:14 |
| office | 158:8 | 117:7,11 | 93:22 | 24:19 | outside |
| 9:20 | 173:2 | 118:5,18 | 98:12 | operates | 28:13 |
| 10:20 | 174:14 | 119:4,8 | 101:19 | 25:14 | 56:9 |
| 14:20 | 180:4,12 | 127:3 | 109:10 | opport... | 98:7 |
| 22:21 | 180:20 | 136:14 | 146:16 | 131:8 | overbroad |
| 23:1 | 181:4 | 136:17 | 160:4 | opposed | 31:14 |
| 57:2 | 183:21 | 138:4,8 | 182:8 | 49:20 | 42:22 |
| 75:15 | 189:12 | 138:10 | old 128:8 | 59:6 | 50:1 |
| 85:12,18 | officer's | 145:19 | 128:14 | OPS 9:13 | 117:17 |
| officer | 141:14 | 148:16 | older | 9:15 | 146:21 |
| 10:14 | office... | 162:16 | 121:3 | 10:2 | 148:22 |
| 30:8,18 | 69:21 | 162:17 | 168:14 | 11:6 | 151:4 |
| 46:7,13 | 171:15 | 172:4,8 | 168:20 | 14:14,19 | 160:7 |
| 46:17 | 171:17 | 172:10 | 169:6 | 15:1,3 | 166:5 |
| 47:9 | 172:6,21 | 172:20 | on-duty | 16:9 | 176:11 |
| 48:8 | officers | 173:7,13 | 41:13 | 43:5 | 183:9 |
| 60:22 | 1:15 | 174:2,14 | 47:9 | order | overview |
| 63:20 | 3:14 | 181:6,7 | on-the... | 101:22 | 28:6 |
| 73:20,22 | 10:13 | 181:15 | 64:20 | 125:4 | |
| 79:14,22 | 13:1 | 187:22 | 65:21 | 133:13 | **P** |
| 82:15 | 41:12,14 | 188:16 | once 15:16 | 134:7,15 | P 3:2,2 |
| 83:21 | 51:12 | 189:2 | 23:17 | 134:16 | pack 37:17 |
| 87:11 | 56:17 | officers' | 24:17 | 134:17 | packet |
| 88:6 | 62:4 | 112:2 | 27:5 | 164:4 | 19:14,21 |
| 92:15 | 63:16 | 137:20 | 67:19,21 | 172:13 | 20:14 |
| 95:12 | 64:3 | 166:2 | 68:2 | orders | 129:22 |
| 111:14 | 66:21 | offices | 79:3 | 129:8,17 | page 4:2,5 |
| 111:15 | 68:9 | 56:21 | 80:18 | 132:21 | 11:22 |
| 111:16 | 82:19 | official | 81:7,11 | 134:10 | 27:9,12 |
| 111:17 | 87:7,18 | 1:14 | 113:9 | 148:1,2 | 27:13 |
| 111:18 | 87:21 | 92:10 | 161:7 | 148:3 | 29:15 |
| 116:15 | 88:15 | oh 16:4 | 165:18 | 152:6,7 | 33:8 |
| 116:18 | 89:17,21 | 37:10 | 168:22 | ordinance | 47:6 |
| 116:21 | 90:7,9 | 89:6 | 185:16 | 29:19 | 51:10 |
| 125:13 | 90:14 | 97:14 | 187:19 | 133:21 | 56:12 |

LaKenya  White
November 9, 2015

214

| | | | | | |
|---|---|---|---|---|---|
| 57:10,11 | 105:5 | 136:14 | 190:13 | 51:5,12 | 173:22 |
| 61:12,16 | **paperwork** | 138:21 | **passed** | 52:10 | 183:16 |
| 63:2 | 71:13 | 139:2 | 119:19 | 120:22 | 183:20 |
| 69:20 | 72:3 | 140:3,7 | **paths** | 121:1,1 | 189:12 |
| 95:5 | **paragraph** | 140:13 | 131:13 | **percen...** | **personal** |
| 100:10 | 41:8 | 145:5,17 | **patient** | 48:11,13 | 8:12 |
| 117:2 | 46:3,16 | 150:8,13 | 102:22 | **perfor...** | 23:14 |
| 120:6,18 | 57:16,22 | 150:15 | 130:13 | 63:4 | 38:8 |
| 122:4,6 | 63:2 | 150:21 | 132:8,10 | **period** | 43:12,15 |
| 122:7,18 | 95:8 | 151:6,8 | **PCP** 81:15 | 15:2,7 | 49:8 |
| 122:19 | 120:19 | 151:12 | 152:12 | 17:10 | 53:6 |
| 124:3 | 134:21 | 169:18 | 187:13 | 27:7 | 54:2 |
| 125:9 | 167:16 | 170:4 | **peace** | 48:20 | 58:12 |
| 164:17 | 169:1 | 185:15 | 141:14 | 51:15 | 61:2 |
| 166:21 | 172:18 | 187:15 | 141:21 | **period...** | 63:18 |
| 167:16 | 177:15 | **part** 45:6 | 166:1 | 7:4 | 64:8,17 |
| 168:13 | **paragr...** | 48:15 | **pending** | **permanent** | 140:12 |
| 168:14 | 124:10 | 63:4 | 61:5 | 43:19 | 144:8 |
| 171:13 | **paralysis** | 74:12 | 98:7 | **perman...** | 175:6,14 |
| 182:20 | 43:19 | 77:1 | 153:9 | 171:5 | 175:21 |
| 190:2 | **paralyzed** | 86:7 | **people** 6:2 | **permis...** | 181:3 |
| 191:7 | 41:22 | 89:16 | 63:5 | 98:11 | **person...** |
| **pages** 21:7 | 43:22 | 99:14 | 64:2 | 106:11 | 59:5 |
| 77:2 | **paramedic** | 126:5 | 66:11 | 108:6 | 162:20 |
| 84:22 | 87:4 | 128:2 | 71:14,16 | **persists** | 178:6 |
| 95:7 | 130:14 | 129:15 | 71:18,19 | 50:20 | **personnel** |
| 97:8 | 132:9 | 133:4 | 72:1,7 | **person** | 33:14 |
| 122:6 | 139:5,12 | 141:5,13 | 72:15 | 43:11,19 | 112:17 |
| 133:12 | 140:17 | 143:19 | 79:8 | 59:20,22 | 113:16 |
| 156:7 | 142:17 | 153:6 | 91:12 | 60:17 | 129:18 |
| **pains** | **parame...** | 167:11 | 92:9 | 66:12 | **persons** |
| 163:17 | 3:15 | 167:12 | 100:13 | 101:17 | 66:2 |
| **paper** | 87:2,5 | 168:7,11 | 101:15 | 113:3 | 68:20 |
| 19:21 | 92:20,22 | 177:1 | 123:9 | 125:14 | 125:4 |
| 20:1,9 | 99:10,12 | 181:14 | 124:16 | 125:16 | 133:17 |
| 72:6 | 99:20 | **partic...** | 138:20 | 125:18 | 159:18 |
| **papers** | 111:21 | 172:9 | 139:18 | 132:15 | 181:16 |
| 20:3,6 | 114:22 | **partic...** | 182:5 | 134:22 | **pertai...** |
| 20:22 | 115:4 | 19:4 | **perceive** | 142:2,7 | 2:2 |
| 21:4,5 | 118:16 | 25:16 | 79:5 | 142:8,10 | **phase** |
| 70:19 | 129:10 | 28:4 | **perceived** | 144:18 | 168:14 |
| 71:1 | 130:12 | 33:9 | 111:22 | 147:11 | 169:3 |
| 72:21 | 130:18 | 39:6 | 112:8,12 | 148:7 | **phone** 7:8 |
| 96:14,14 | 131:10 | 125:3 | **percent** | 150:22 | 7:8 |
| 96:20,21 | 131:20 | 141:18 | 47:10 | 153:5 | **physical** |
| 96:21 | 132:2,7 | **parties** | 50:22 | 171:19 | 125:19 |

LaKenya White
November 9, 2015

215

142:9
picture
 57:11,16
 94:21
 95:6
piece
 163:22
pieces
 72:6
 105:6
pile 21:4
 88:20
Pilot
 166:21
 167:4,17
 169:2
place
 28:14
 37:7
 118:1
 133:19
 176:6
 190:9
placed
 127:2
Plaintiff
 1:4 3:5
 5:8
please 5:2
 5:3,13
 6:3 16:4
 21:15
 26:16
 27:12
 30:12
 32:20
 34:13
 37:6
 39:20
 44:3
 45:16
 55:9
 65:9
 66:8
 73:2
 78:12

80:20
100:6
109:20
111:11
116:1
119:19
121:8
122:4
124:3
131:1
143:10
143:14
160:17
162:6
163:3
169:22
180:10
pods 76:8
 76:11,12
point 24:9
 53:13,14
 88:3,5
 89:19,20
 94:8
 99:9
 102:19
 111:7
 121:20
 136:2
 153:1,5
 153:11
 155:4,7
 171:7
poles
 76:17
police
 1:15
 3:14
 7:19
 10:3,5,7
 10:12,14
 10:18
 11:7,11
 13:1
 14:22
 26:19

27:3,19
29:1,9
30:8,9
30:18
31:1
35:1
41:12,13
47:20,21
48:8
50:21
51:14,16
52:2
56:14,15
56:17
57:19
58:6,9
59:12,16
60:12,22
61:1
63:7,16
63:20
64:3
66:21
67:4,5,7
67:13,16
68:5,9
68:12,13
68:17,19
69:6,6
69:11
74:13
75:12,13
76:5,12
84:3,7
84:10,14
85:7,13
85:17
86:9,18
86:20
87:7,11
87:21
91:5
92:1,10
93:17
94:15,15
95:6

96:6
106:22
111:20
112:11
112:15
113:17
114:2
118:18
119:22
120:3
122:15
124:6
125:2,13
125:15
126:22
129:7,16
130:13
130:15
132:21
133:14
133:18
134:11
135:1
136:14
136:17
145:18
145:22
146:4,12
146:18
157:5
166:9,16
172:8,13
174:12
175:12
175:20
177:16
178:17
180:4,12
180:20
181:3,6
185:4,5
185:19
police...
 166:14
police...
 144:1

policies
 26:5
 68:8
 124:15
policy
 126:2,4
 126:7,9
 130:10
 130:11
politic
 1:17
portion
 23:4
 171:21
position
 10:4,21
 11:21
 17:19
 18:10,12
positions
 13:6
positive
 152:12
 152:13
 152:16
 152:22
 153:6
possibly
 88:14
Post 55:21
post-high
 12:6
posts
 182:12
practice
 41:9
preceding
 51:6
predec...
 41:11,14
prelim...
 83:1
prepar...
 139:15
prepared
 89:4,7

present
 3:1
 36:13
 89:21
 133:19
presented
 19:22
 148:3
Presiding
 1:6
pressured
 62:21
pretty 6:7
previous
 172:7
 174:17
 182:10
previo...
 88:21
primary
 122:22
prior 11:6
 15:10
 52:11
 110:13
 156:21
 179:21
privacy
 7:13
private
 134:3
probably
 28:3
 60:10
 71:6
 95:7
problem
 6:22
 63:5
procedure
 2:2
 68:13
 132:6
proced...
 26:5
 33:11,19

LaKenya  White
November 9, 2015

216

| | | | | | |
|---|---|---|---|---|---|
| 68:9,12 | 79:11 | **puts** 26:20 | 39:8,20 | 121:14 | 180:9 |
| 68:17,20 | 130:6 | | 40:5,13 | 123:13 | 181:2 |
| 69:7,12 | 132:1 | **Q** | 40:14 | 125:22 | 182:8,10 |
| 124:13 | 136:9 | **qualified** | 42:3 | 126:13 | 183:8 |
| 133:16 | 156:5 | 2:5 | 44:1,3 | 126:19 | 184:2,4 |
| 167:1 | 188:22 | **qualify** | 44:10,13 | 127:6,19 | 184:14 |
| **procee...** | **provision** | 173:18 | 45:15 | 128:1,18 | 184:16 |
| 6:8 | 142:9 | 173:20 | 47:12 | 129:12 | 184:19 |
| **procee...** | **provis...** | **quality** | 48:17 | 130:22 | 185:10 |
| 7:7 | 2:1 | 18:22 | 49:22 | 132:17 | 186:11 |
| **process** | **public** 2:4 | **quantify** | 50:2 | 133:1 | 186:12 |
| 31:18 | 11:17 | 44:18 | 52:4,12 | 135:3,6 | 186:17 |
| 165:13 | 12:1 | **quarter** | 54:6 | 137:2 | 187:8 |
| **produced** | 26:20 | 28:7 | 56:5 | 138:1,15 | 188:7,9 |
| 19:10 | 27:21 | **quarterly** | 57:6 | 139:6 | **questi...** |
| 20:6 | 133:19 | 26:19 | 65:9,10 | 142:16 | 28:13 |
| **profes...** | 134:2 | 27:4,19 | 65:17 | 142:19 | 36:18 |
| 9:20 | 191:21 | 28:6 | 66:4 | 146:8,9 | **questions** |
| 10:20 | **published** | 33:9 | 67:22 | 146:14 | 25:18 |
| 14:21 | 172:12 | 46:5 | 69:1 | 146:20 | 26:4 |
| 133:17 | **pull** 72:6 | **queries** | 73:8 | 147:16 | 39:5 |
| **program** | **pulled** | 85:11 | 75:14 | 148:2,9 | 40:7,15 |
| 166:21 | 21:3,5 | **query** 84:3 | 77:12,19 | 148:12 | 60:4 |
| 167:5,11 | **purpose** | 84:14,21 | 83:11 | 148:22 | 65:14 |
| 167:12 | 2:3 73:1 | 85:7,16 | 84:18 | 149:18 | 97:2,2 |
| 167:17 | **pursuant** | 86:4 | 86:5 | 151:2,3 | 101:22 |
| **Project** | 2:1 20:1 | **question** | 87:14,15 | 153:9,11 | 102:7 |
| 169:2 | 27:17 | 6:19 7:2 | 87:17 | 153:21 | 104:12 |
| **promotion** | 29:18 | 7:14,15 | 88:2,17 | 154:1 | 108:2 |
| 18:6 | **pursue** | 8:19 9:1 | 90:19 | 156:12 | 135:7 |
| **promot...** | 186:16 | 9:2,11 | 91:19 | 156:15 | 144:21 |
| 17:22 | **pursued** | 12:19 | 92:5 | 156:16 | 149:2 |
| 18:3 | 12:9 | 13:3 | 95:22 | 156:17 | 163:8 |
| **pronounce** | **put** 19:14 | 14:2 | 96:3,17 | 156:19 | **quite** |
| 79:18 | 20:10,14 | 18:4 | 97:4 | 159:20 | 188:6 |
| **protect** | 20:17 | 20:2 | 98:7,17 | 159:21 | **quoted** |
| 125:18 | 27:6 | 24:13 | 98:17,21 | 161:11 | 56:13 |
| 142:8 | 42:22 | 25:12 | 104:22 | 162:6 | **quotes** |
| **protest** | 60:8,13 | 26:8 | 106:1,3 | 163:9 | 56:4 |
| 56:15 | 80:20 | 29:4 | 106:3,4 | 166:4 | 57:22 |
| **provide** | 97:4 | 30:3,11 | 107:3,5 | 167:7 | 58:1 |
| 33:14 | 113:12 | 31:9,11 | 112:3,5 | 169:19 | **quoting** |
| 94:17 | 120:4 | 31:13,22 | 115:19 | 170:7 | 57:17 |
| 136:11 | 147:6 | 32:17,19 | 116:2 | 173:11 | |
| 142:3 | 175:3 | 35:3,15 | 117:16 | 174:7 | **R** |
| **provided** | 182:16 | 38:17 | 121:5,9 | 175:5 | **R-E-K-I-A** |

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

217

| | | | | | |
|---|---|---|---|---|---|
| 60:21 | 108:16 | 88:6 | 137:17 | **recomm...** | 170:20 |
| **Raise** 5:3 | 112:9 | **realized** | 138:2,6 | 48:6 | 171:6 |
| **RAOUL** 3:17 | 113:15 | 88:8 | 138:7,10 | 61:7,10 | 177:16 |
| **rapid** | 114:3 | **really** | 140:7 | 62:7 | 185:15 |
| 49:14,15 | 116:16 | 9:12 | 145:20 | **record** | 187:12 |
| 49:19 | 116:19 | 113:12 | 151:5,11 | 5:14 | **reduce** |
| 50:5 | 116:22 | 137:8 | 152:5 | 21:18,20 | 120:20 |
| 166:21 | 117:6 | 165:12 | 157:19 | 21:22 | **reduced** |
| 167:4,12 | 121:12 | 165:14 | 157:22 | 22:1 | 190:6 |
| 167:16 | 130:16 | **reason** | 158:11 | 25:11 | **refer** |
| 167:17 | 131:1,2 | 53:3,6 | 160:8,9 | 30:13 | 27:11 |
| 167:20 | 137:13 | 187:20 | **recalled** | 32:21 | 77:9 |
| 168:8,11 | 139:10 | 188:3 | 102:21 | 36:22 | **referred** |
| 169:2 | 139:12 | **reason...** | 140:13 | 39:22 | 131:15 |
| **rarely** | 139:14 | 125:16 | 140:14 | 40:11 | **referring** |
| 41:11 | 140:19 | **reason...** | **receive** | 44:4 | 19:12 |
| **rate** 47:8 | 143:1 | 147:5 | 7:8 | 45:17 | 37:14 |
| **read** 28:3 | 146:8 | **reasons** | 23:17 | 54:8 | 62:11 |
| 30:12,13 | 147:18 | 132:15 | 25:5 | 55:3,8 | 77:8 |
| 31:7,8 | 147:20 | **recall** | 26:22 | 79:18 | 122:7 |
| 31:16 | 149:2,18 | 14:9 | 52:6 | 85:11 | 141:8 |
| 32:20,21 | 149:19 | 28:5 | 108:5 | 109:9,13 | 142:15 |
| 36:22 | 150:16 | 56:7 | 124:12 | 131:2 | 143:2 |
| 39:22 | 151:17 | 69:3,13 | 124:14 | 147:20 | 144:5,9 |
| 40:11 | 151:19 | 71:19 | **received** | 149:19 | 144:16 |
| 41:5,16 | 154:22 | 76:7,20 | 65:21 | 165:5 | 169:11 |
| 44:4 | 155:10 | 80:12 | 66:17,18 | 184:5 | 171:18 |
| 45:17 | 155:16 | 86:15,19 | 67:3,4,6 | **recorded** | 176:16 |
| 50:17 | 169:7 | 90:8 | 106:21 | 127:17 | 176:22 |
| 54:8,17 | 174:7 | 102:18 | 108:14 | 190:6 | **refers** |
| 55:11,18 | 184:5 | 103:2,13 | 112:1 | **recording** | 29:21 |
| 55:19 | 186:5 | 103:15 | **receives** | 10:12 | **refresh** |
| 56:4 | 187:5 | 104:6 | 113:9 | **record...** | 7:9 |
| 58:1,4 | 191:2 | 112:12 | **recognize** | 168:3 | 139:17 |
| 63:8 | **reading** | 113:20 | 57:10 | **records** | **refuse** |
| 65:10 | 55:20 | 116:7,8 | 100:15 | 74:16 | 114:6 |
| 80:9,11 | 152:8 | 116:12 | **recoll...** | 75:20 | 115:7,16 |
| 81:13,13 | 156:9,18 | 117:13 | 72:22 | 107:20 | 116:5 |
| 81:15,20 | **reads** | 118:20 | 75:21 | 112:14 | 132:15 |
| 82:7,17 | 33:10 | 118:21 | 99:6 | 150:11 | 133:6 |
| 103:10 | 63:3 | 125:6 | 104:20 | 152:15 | 144:18 |
| 103:14 | **ready** | 127:9,13 | 105:4 | 152:18 | **refused** |
| 103:18 | 108:1 | 129:13 | **recommend** | 162:15 | 114:1 |
| 103:19 | **reality** | 131:4 | 95:11 | 170:15 | **refuses** |
| 104:9,11 | 50:20 | 133:15 | 157:20 | 170:17 | 134:22 |
| 104:14 | **realize** | 136:20 | 158:7 | 170:19 | **refusing** |

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

218

| | | | | | |
|---|---|---|---|---|---|
| 114:21 | 142:12 | 33:6 | 82:7,11 | 26:19 | 189:18 |
| 117:8,12 | 144:19 | 108:8 | 82:20 | 27:4,20 | 189:19 |
| 118:5,6 | **remained** | 136:3 | 88:8,11 | 74:5,9 | **reserved** |
| 118:10 | 17:10 | 156:3 | 93:12 | 74:13,19 | 190:11 |
| 136:18 | 161:15 | 188:3 | 99:18 | 92:10 | **resisted** |
| 147:3 | **remaining** | **reopened** | 100:4 | 129:1 | 62:5 |
| 150:19 | 139:8 | 31:4,12 | 112:1 | 151:20 | **resisting** |
| 187:16 | **remember** | 31:16,21 | 119:22 | 179:10 | 147:2 |
| **regarding** | 7:3 | 136:8 | 120:1,4 | 185:14 | 148:17 |
| 102:22 | 55:20 | **reopening** | 140:16 | **represent** | 149:8 |
| 129:17 | 70:18,20 | 31:5 | 164:11 | 36:19 | 150:3,9 |
| 151:22 | 70:21 | **repeat** | 172:7,11 | **repres...** | **respect** |
| **regard...** | 71:2 | 24:12 | 176:5 | 100:18 | 65:13 |
| 33:12 | 94:22 | 30:11 | 177:1,11 | 100:19 | 124:17 |
| **regards** | 96:8 | 35:8 | 185:19 | 100:21 | **respec...** |
| 189:3 | 97:10 | 39:20 | 185:20 | **repres...** | 121:2 |
| **register** | 103:12 | 40:10 | **reported** | 113:3,4 | **responded** |
| 11:4 | 105:8 | 45:15 | 35:17 | **repres...** | 84:7 |
| 165:7,10 | 110:11 | 54:6 | 95:10 | 113:2 | 102:21 |
| 165:15 | 124:17 | 91:18 | 163:16 | **request** | **respon...** |
| **regular** | 131:19 | 130:22 | 175:2 | 130:5 | 124:15 |
| 17:7 | 133:13 | 133:1,2 | 177:19 | **requested** | **response** |
| **reinve...** | 137:20 | 147:16 | 183:5 | 93:12 | 20:4 |
| 73:5 | 140:17 | 147:19 | **reporter** | 111:16 | 49:14,15 |
| **Rekia** | 145:15 | 162:6 | 5:3 | 170:20 | 49:19 |
| 60:19,20 | 155:15 | 180:10 | 21:11,17 | **requests** | 50:5 |
| 61:14 | 155:16 | 184:4 | 22:3 | 132:10 | 81:18 |
| **related** | **remind** 6:1 | **repeated** | 30:14 | **required** | 111:20 |
| 72:10 | **reminder** | 44:3 | 32:22 | 26:10 | 167:13 |
| 128:22 | 33:13 | **rephrase** | 34:17,20 | 29:1 | 168:11 |
| 129:1 | **rendered** | 44:2 | 39:21 | 46:4 | **respon...** |
| 155:18 | 184:22 | **replaced** | 40:1,12 | 140:22 | 11:2,3 |
| 190:13 | **rendering** | 41:10 | 44:5 | 172:22 | 18:14 |
| **relative** | 68:20 | **report** | 45:18 | 177:8 | **respon...** |
| 99:22 | **renew** 39:3 | 27:6,12 | 54:9 | **requir...** | 167:21 |
| 100:2 | 113:19 | 27:16 | 78:12,16 | 27:18 | **rest** 36:8 |
| **relevance** | 134:9 | 33:9 | 85:4 | 164:4 | **restra...** |
| 173:9 | 162:11 | 35:1 | 131:3 | **requires** | 132:10 |
| 179:21 | 174:17 | 36:6 | 147:21 | 49:19 | **result** |
| **relevant** | 175:13 | 37:1,7 | 149:20 | 87:14 | 43:22 |
| 28:13 | 182:9 | 46:5,5 | 184:6 | 130:15 | 44:12 |
| 179:21 | **renewing** | 72:5,11 | **reporting** | **reread** | 45:7,10 |
| **religious** | 133:9 | 72:17 | 37:8 | 131:9 | 172:18 |
| 132:12 | **reopen** | 74:16 | 191:6 | **research** | 183:16 |
| 132:16 | 32:10,11 | 81:10,18 | **reports** | 182:2,14 | **resulted** |
| 133:7 | 32:13,15 | 81:21 | 24:21 | **reserve** | 43:10,19 |

County Court Reporters, Inc.
630.653.1622

LaKenya White
November 9, 2015

219

48:12
resulting
 28:9,21
results
 31:17
resumed
 21:21
 55:6
 109:14
 110:7
 165:3
retained
 4:10
reveal
 89:21
revealed
 88:16,18
review
 7:19
 19:8
 26:20,22
 27:4,19
 31:18
 47:20
 51:16
 52:2
 56:14
 63:4
 119:22
 120:4
 131:14
 139:1,4
 145:11
 145:12
 152:6
 157:5
 161:14
 174:12
 175:20
 177:16
 178:17
 185:5
reviewed
 27:3
 80:5
 126:4

141:20
151:20
158:15
185:17
186:19
187:10
187:11
187:12
reviewing
 125:8
 152:7
right 5:3
 7:10 8:9
 9:4,12
 9:17
 12:5
 19:14
 21:3
 34:22
 35:11,13
 36:9
 58:21
 65:16
 66:12
 71:3
 75:22
 76:22
 77:4
 81:5
 85:9
 89:11
 96:5
 99:2
 114:1,6
 114:18
 115:7,15
 116:5
 117:22
 119:11
 119:13
 119:16
 120:15
 121:22
 122:1,9
 131:16
 139:11

141:1
143:22
147:4,17
152:20
153:12
162:16
166:3
167:14
170:18
171:7,21
172:3
174:2
177:2,4
rights
 182:21
risen
 52:10
Road 3:3
Robert
 1:13
 35:1,20
role 25:15
 39:6
room 6:2
 6:16
rose 50:22
Rosenz...
 120:17
 121:6
Roundt...
 172:9
routinely
 41:15
RPM 171:2
rule
 143:14
rules 2:1
 6:10,12
 6:15,17
run 63:5
 145:18
 170:9
run-of...
 170:6
running
 9:5 26:4

26:7
rushed
 114:2

——————
       S
——————
S 4:4
S-T-E-...
 79:21
safe
 158:20
SAITH
 189:22
Sandra 1:3
saved
 75:11
saw 152:15
 188:3
saying
 25:3
 30:1,4
 39:16
 56:13
 57:17
 93:19
 121:22
 131:20
 143:8
 149:22
 159:4,6
 165:14
 187:2
 188:14
says 27:16
 28:6,7
 29:18
 41:9
 46:4
 51:11
 57:21
 62:2,12
 69:20
 81:2
 83:13
 103:3
 111:10
 122:21

122:22
124:11
130:11
132:6
133:17
134:21
141:21
167:17
169:1
177:15
182:21
scene
 84:10
 86:3,9
 86:12,17
 87:8,22
 88:7
 89:18,22
 90:7,9
 92:21
 104:7
 111:16
 112:11
 112:17
 113:16
 118:19
 127:17
 136:15
 136:17
 140:18
 174:3,15
 180:20
scheduled
 68:3
school
 12:3,6
 13:15
scope
 107:6
 134:11
Scott
 120:14
se 110:16
seal 60:8
 60:14
 190:16

second
 31:4
 56:12
 57:16
 63:2
 95:8
 109:10
 117:2
 120:18
 120:19
 147:8
 167:16
 176:20
 182:20
seconds
 188:11
section
 27:17
 28:4
 49:14,15
 142:9
 164:12
 167:13
 173:10
see 14:4
 22:7
 27:8
 28:10
 33:15
 36:8
 41:15
 46:8
 47:3
 51:17
 55:1
 56:4
 63:7
 69:15
 70:15
 72:1
 76:8
 84:21
 85:21
 95:15
 100:13
 103:6

LaKenya White
November 9, 2015

107:13
107:21
114:3
115:7
117:10
123:5
124:3
125:7
127:17
128:9,13
130:8,16
132:12
132:13
138:18
141:16
142:12
147:8
167:15
169:7
172:3
173:2
176:19
177:17
183:3
**seek**
122:14
**seeks**
144:7
**seen** 41:5
98:1
**self** 147:6
**self-c...**
46:6
**semester**
14:11
**semesters**
14:10
16:22
**send**
109:16
110:16
**sense**
25:15
**sent** 109:5
109:18
110:13

111:17
112:19
113:8,14
118:13
118:22
135:13
135:20
151:14
151:20
161:7
162:14
170:16
170:17
185:18
**sentence**
46:15,22
51:20
124:14
134:21
**separate**
58:10
**September**
27:8
69:8,9
93:16
124:12
**seq** 142:2
**SERGEANT**
1:12
**serious**
166:15
**seriously**
171:8
183:21
**serves**
73:1
**service**
124:15
142:1
**services**
142:3,6
**set** 190:10
190:15
**settle...**
31:17
**seven** 10:1

57:17
127:11
**seven-...**
15:7
**Seventh**
6:12
**severe**
154:17
**shared**
62:20
**she'll**
16:6
65:5
**sheet**
35:19
72:5
73:13,18
74:2,3
79:11
83:7
191:1
**shock**
183:1
**shooter**
187:22
188:13
188:14
188:14
**shooting**
50:20
59:1,19
60:18
166:14
171:19
172:21
173:1,19
**shootings**
33:12
51:14
56:3
57:19
58:7,9
58:15,17
59:12,16
69:21
171:15

171:17
172:6,11
**short**
110:5
**shorter**
6:6
**shorthand**
190:6
**shot** 60:17
173:4
**show** 51:1
72:2
88:21
89:5,8
112:16
152:19
152:20
171:4
**showing**
36:12
50:13
**sign** 93:2
**signature**
190:10
**signat...**
100:16
**signed**
100:12
**signif...**
78:19
**signif...**
51:14
**Similarly**
26:3
**Sinai**
114:3
**single**
150:22
121:21
156:17
**SIOLIDIS**
2:4
190:3,19
**sir** 7:17
11:12,15
11:20
12:8

16:19
17:8,12
17:15
18:20
19:2,5,8
23:5
25:4
34:16
44:18
46:9
50:11
52:21
57:1,4
57:12
59:7
63:9
67:15
69:10
71:2,15
71:22
76:16
79:7
82:10,18
93:5
95:1
99:7,21
110:12
151:18
166:18
169:8
173:3
176:4,19
178:4
186:4,6
**sit** 89:20
90:3,6,8
118:22
121:21
135:8
145:14
161:20
**sits** 72:14
72:22
75:20
88:18
**sitting**

59:10
97:7,15
**situation**
130:14
142:5
**six** 10:1,1
50:15
57:19
88:20
121:1
**skills**
123:4
**skyroc...**
50:21
**smiling**
98:13,15
**Soat** 1:8
**some-860**
176:6
**somebody**
32:12
74:10
91:10
130:3
154:16
**somewhat**
139:19
139:19
**soon** 7:5
25:2
**sorry**
23:11
24:12
27:13
30:11
35:8
51:3,18
54:7
60:15
62:13,15
77:10
79:21
84:19
106:8
112:5
119:6

LaKenya White
November 9, 2015

221

| | | | | | |
|---|---|---|---|---|---|
| 128:1 | 177:13 | 1:13 | 155:15 | **stating** | 103:22 |
| 130:22 | 189:15 | **start** 6:20 | 156:22 | 107:11 | **strong** |
| 134:17 | **spell** | 24:6 | 171:10 | 149:15 | 63:7 |
| 135:4 | 60:20 | 110:1 | 178:9 | 150:1 | **struck** |
| 158:4 | 79:17 | 166:13 | 189:1 | **station** | 104:4 |
| 164:8 | **spend** | **started** | **statement** | 10:9 | 151:8 |
| 182:8 | 168:2 | 16:1 | 63:13 | 15:1 | **struggle** |
| 186:13 | **Spinning** | 28:17 | 79:3 | **statistic** | 6:2 |
| **sought** | 3:3 | 66:18 | 92:22 | 47:11 | **student** |
| 142:10 | **spoke** | 156:8 | 102:12 | **statis...** | 15:19 |
| **sounds** 6:7 | 115:12 | 161:5 | 103:18 | 47:18 | 16:20 |
| **source** | 151:22 | **starts** | 103:19 | 48:1,2 | **study** |
| 123:1 | 154:10 | 24:20 | 104:9,12 | 51:17,18 | 12:15 |
| **speak** | 154:11 | 165:13 | 106:4 | 51:19,20 | 14:6,11 |
| 25:2 | 171:10 | **state** 2:5 | 111:5 | 52:1,7 | 15:13 |
| 26:5 | 171:11 | 5:13 | 118:7 | **statute** | 17:5 |
| 98:8 | **spoken** | 12:13 | 128:20 | 95:14 | 68:14 |
| 185:16 | 98:6 | 41:2 | 136:16 | **stay** 15:17 | **subhea...** |
| **speaking** | **squad** | 67:4 | 138:20 | 68:12 | 122:8 |
| 143:12 | 76:19 | 94:13,16 | 139:12 | **stayed** | **subject** |
| **special** | 127:12 | 115:6 | 145:11 | 16:8 | 102:22 |
| 125:4 | 127:13 | 117:11 | 150:17 | 168:17 | 125:4,17 |
| 129:8,17 | **SS** 190:1 | 135:9 | 173:1,22 | **steps** | 189:10 |
| 133:13 | **staff** | 147:4 | 174:13 | 185:19 | **subjects** |
| 134:7,16 | 175:19 | 162:17 | 186:8 | **Stevan** 1:6 | 13:22 |
| 134:17 | **stand** | 171:5,7 | 188:19 | 79:21,22 | **submitted** |
| 148:3 | 108:21 | 176:15 | **statem...** | **stop** 6:21 | 57:18 |
| 178:1 | **standards** | 190:1,3 | 27:11 | 36:15 | **SUBSCR...** |
| **specialty** | 9:20 | 191:18 | 63:10 | 78:2 | 191:20 |
| 171:3 | 10:21 | **stated** | 104:15 | 102:11 | **sued** 93:17 |
| **specific** | 14:21 | 15:10 | 131:9 | 131:16 | **suffic...** |
| 89:5 | 146:5 | 22:20 | 139:2,5 | 153:12 | 187:20 |
| **specif...** | **standing** | 78:7 | 172:10 | **stopped** | **suit** 24:4 |
| 88:22 | 26:6 | 79:10 | 172:16 | 15:15 | 72:11 |
| 107:16 | 138:8,11 | 85:18 | 172:20 | **street** 3:7 | 80:5,6 |
| 146:6 | 180:5 | 87:10 | 187:11 | 3:12,17 | 90:10,13 |
| **speculate** | 181:7 | 90:22 | **states** 1:1 | 10:15 | 90:15 |
| 126:14 | 187:21 | 94:8 | 6:13 | 76:17 | 190:13 |
| **specul...** | **stands** | 104:2 | 31:16 | 156:10 | **Suite** 3:3 |
| 46:21 | 39:8 | 118:5 | 71:11 | **streets** | 3:8,12 |
| 114:12 | **stapled** | 127:3,8 | 79:1 | 76:15 | 3:18 |
| 144:6 | 129:4 | 137:18 | 103:15 | **strike** | **summation** |
| 149:12 | **Star** 1:6,7 | 150:10 | 124:2 | 58:5 | 112:14 |
| 150:5 | 1:8,8,9 | 150:17 | 182:12 | 146:14 | 117:3 |
| 174:5 | 1:10,10 | 151:6 | 183:2 | 177:22 | **summoned** |
| 176:10 | 1:11,12 | 152:5 | 187:15 | **striking** | 114:2 |

LaKenya White
November 9, 2015

222

| | | | | | |
|---|---|---|---|---|---|
| **summons** | **Supreme** | 92:1,6 | 78:11 | 161:2 | 138:9,11 |
| 111:20 | 6:13 | 92:18,19 | 82:8 | 185:14 | 138:22 |
| **superior** | **sure** 6:16 | 93:2 | 92:19 | **talking** | 139:21 |
| 66:18 | 37:4 | 94:5,10 | 95:19 | 6:18,21 | 145:6 |
| **SUPERV...** | 40:14 | 94:16 | 110:5 | 20:11 | 146:5 |
| 1:12 | 100:2 | 105:16 | 125:13 | 23:4 | 159:18 |
| **superv...** | 105:1 | 108:14 | 136:12 | 28:22 | 173:4,21 |
| 23:22 | 109:11 | 108:22 | 136:13 | 48:18 | 174:1 |
| 24:2 | 116:9 | 109:2,3 | 136:16 | 68:8,11 | 177:6 |
| 29:13 | 121:15 | 164:3 | 138:20 | 68:12 | 179:22 |
| 32:9,11 | 153:1 | 166:12 | 139:3,10 | 76:15 | 180:5 |
| 32:12 | 176:16 | 190:5 | 140:22 | 89:19 | 183:17 |
| 33:6 | **surely** | 191:20 | 181:11 | 98:9 | 183:21 |
| 50:8,10 | 28:17 | **system** | **taken** 7:5 | 102:10 | **Taser** 28:9 |
| 52:17,19 | **surgeries** | 41:10 | 12:21 | 102:17 | 28:22 |
| 53:10,11 | 154:17 | 122:13 | 55:5 | 107:16 | 29:8 |
| 54:14,18 | **surmise** | **systems** | 106:21 | 107:16 | 33:12 |
| 55:12 | 124:19 | 122:16 | 110:6 | 109:7,8 | 40:8 |
| 56:13,18 | **suspected** | 127:16 | 135:1 | 120:9 | 42:16 |
| 57:14 | 181:16 | 142:1,6 | 165:2 | 124:17 | 44:12 |
| 61:14 | **suspended** | | 177:15 | 124:20 | 50:21 |
| 62:6 | 61:1 | **T** | 185:4 | 142:17 | 51:4,13 |
| 63:11 | **sustained** | T 4:4 | 191:3 | 155:4 | 51:19 |
| 106:15 | 44:21 | **T-o-u-...** | **talk** 6:20 | 164:13 | 52:10 |
| 106:17 | 46:7,11 | 22:15 | 7:10,12 | 164:15 | 80:16 |
| 110:21 | 46:17 | **table** 6:19 | 7:13 | 165:21 | 83:6,12 |
| 115:12 | 47:8 | 7:15 | 25:14,15 | **talks** | 83:22 |
| 116:4,6 | 48:7 | **Tactical** | 31:3 | 124:6 | 84:11 |
| 151:22 | 53:22 | 81:18 | 46:10 | 129:9 | 88:6 |
| 152:17 | 153:19 | **tagged** | 87:5,7 | 141:14 | 92:15 |
| 153:18 | 157:21 | 80:22 | 87:11 | **tapes** | 111:17 |
| 154:4 | 158:8 | **take** 7:9 | 92:14 | 74:16,21 | 118:11 |
| 155:1,9 | 160:10 | 7:16 | 93:6 | 75:11 | 137:1,15 |
| 158:7 | 160:10 | 14:6 | 101:21 | **Tase** 118:1 | 145:22 |
| **superv...** | 165:17 | 15:12 | 102:8 | 119:4,8 | 146:13 |
| 169:5 | 173:6 | 17:4 | 120:15 | 119:13 | 146:19 |
| **supports** | **sustains** | 20:15 | 123:18 | **Tased** | 147:10 |
| 187:14 | 41:11 | 24:9 | 155:1 | 43:11,20 | 148:6,16 |
| **supposed** | **swear** 5:1 | 28:3 | 171:16 | 50:15 | 149:8 |
| 29:7 | **switched** | 31:7 | **talked** | 70:6 | 157:4,15 |
| 30:9 | 131:13 | 33:4 | 54:21 | 104:8 | 158:6 |
| 38:14 | **sworn** 5:9 | 38:5 | 93:3 | 111:18 | 171:18 |
| 127:15 | 83:2,3 | 40:19 | 130:18 | 112:1,10 | 171:22 |
| 127:19 | 87:9,12 | 55:2 | 135:12 | 114:2 | 174:14 |
| 128:2 | 91:1,4,6 | 69:21 | 137:21 | 131:21 | 174:22 |
| 143:13 | 91:9,13 | 70:7 | 155:9,22 | 137:14 | 175:1 |

LaKenya White
November 9, 2015

223

| | | | | | |
|---|---|---|---|---|---|
| 176:6 | 173:6,10 | 37:12,19 | 73:19 | 159:3 | 166:17 |
| 177:20 | 175:10 | 47:2 | 82:15 | 163:12 | 171:22 |
| 180:22 | 180:4,13 | 49:1 | 83:12 | 167:7 | **third** 28:7 |
| 181:15 | 180:14 | 55:11 | 94:12 | 184:16 | 41:8 |
| 182:3,11 | 182:16 | 64:19 | 181:15 | 185:6,7 | 96:20 |
| 182:18 | **Tasings** | 70:13 | **ten** 181:9 | 190:8 | 176:20 |
| 183:6,13 | 58:10 | 71:4,5,7 | **term** 29:21 | **tests** | **thorough** |
| 183:20 | 176:17 | 72:9 | **terminate** | 69:15 | 123:3 |
| **Tasered** | **taught** | 77:1,7 | 108:6 | **thank** 21:3 | 185:20 |
| 33:17 | 68:7 | 77:11,17 | **termin...** | 26:2 | **thorou...** |
| 73:19,20 | 69:16 | 77:20,22 | 54:21 | 58:2 | 168:21 |
| 73:22 | 129:8 | 78:6,18 | 56:9 | 61:19 | **thought** |
| 74:4 | 133:4,8 | 78:21 | 61:1 | 62:15 | 15:22 |
| 79:15 | 133:13 | 80:11 | **termin...** | 65:16 | 55:16 |
| 147:2 | 148:15 | 82:3,5 | 54:18 | 66:16 | 170:12 |
| 188:22 | **teach** 68:4 | 89:10 | **terms** | 81:5 | 176:22 |
| 189:1 | 69:11 | 90:6 | 132:20 | 100:6 | **threaten** |
| **Tasering** | 125:3 | 96:11 | 146:3,5 | 113:11 | 97:14 |
| 177:5,7 | **teaching** | 99:4 | 151:4 | **thereof** | **three** 21:8 |
| 177:19 | 13:21 | 103:8 | 176:16 | 190:14 | 36:3 |
| 178:5,7 | **team** 48:15 | 104:2 | **test** | **thing** 5:22 | 62:2,4 |
| 178:18 | 49:2,5 | 105:7 | 152:13 | 37:22 | 62:10,10 |
| 179:16 | 49:12,13 | 106:20 | **tested** | 66:15 | 62:17 |
| **Taserings** | 49:14 | 107:6,8 | 152:12 | 71:4,7 | 69:22 |
| 176:7 | 52:20 | 115:15 | 152:16 | 80:16 | 70:6 |
| 178:2 | 53:12,19 | 116:4 | 152:22 | 83:6 | 80:7 |
| 179:2 | 57:3,18 | 122:6 | 153:6 | 84:2 | 88:14,15 |
| **Tasers** | 58:7 | 124:7,19 | **testified** | 156:18 | 121:3 |
| 181:16 | 62:5,22 | 130:18 | 5:9 92:5 | 167:13 | 185:16 |
| 182:4 | 63:15,19 | 135:20 | 94:4 | 188:5 | **ties** 63:7 |
| **Tasing** | 167:17 | 145:5,17 | 132:1 | **things** | **tighter** |
| 24:7,17 | 167:20 | 152:8 | 159:9 | 11:19 | 65:14 |
| 25:2,6 | 168:8,11 | 153:17 | 173:9 | 25:18 | **time** 24:9 |
| 26:11 | **techni...** | 156:1 | **testify** | 69:13 | 26:8 |
| 28:14 | 20:19 | 160:11 | 70:17 | 167:14 | 31:7 |
| 29:2 | **techni...** | **telling** | 190:5 | 185:13 | 35:13 |
| 30:9,22 | 141:22 | 25:12 | **testif...** | **think** 8:6 | 36:15 |
| 33:21 | 142:5 | 54:1 | 137:20 | 13:8 | 38:21 |
| 39:10 | **telephone** | 97:17 | 138:7 | 19:12 | 48:20 |
| 41:21,22 | 24:3 | 110:14 | **testimony** | 36:16 | 50:18 |
| 43:22 | **tell** 7:3 | 111:2 | 105:22 | 55:15 | 52:20 |
| 44:15 | 19:15 | 113:9 | 128:11 | 106:4 | 59:3 |
| 45:7,11 | 28:19 | 135:11 | 136:10 | 117:3 | 63:11 |
| 75:12 | 34:2,8 | 155:16 | 156:21 | 152:10 | 69:5,21 |
| 104:20 | 34:11 | **tells** 50:8 | 157:7 | 154:2 | 73:14 |
| 135:10 | 36:6 | 66:6 | 158:18 | 157:9 | 74:3 |

LaKenya White
November 9, 2015

224

83:1
86:2
104:16
105:17
107:6
127:20
139:10
145:12
153:2
155:7
160:3
167:5
168:2
190:9
**timeframe**
28:13
56:9
179:21
**timeline**
43:1
**times** 5:20
17:2
57:5,7,8
58:19
94:4
98:2
157:18
169:20
173:12
184:14
184:17
184:21
188:2,4
**title** 8:2
**titled**
10:4,21
11:21
17:19
18:9,12
50:20
**today**
19:13
20:1
41:10
60:4
65:12

72:14,22
119:1
121:21
130:1,2
135:8
137:9
160:14
173:21
174:12
**told** 62:3
62:7
111:4
115:3,18
115:19
131:4
132:14
135:12
136:1
140:21
145:12
145:14
152:17
154:13
154:16
155:9
163:2
167:4
187:3
**tone** 45:12
88:1
**top** 23:10
23:13
27:16
47:6
56:1
**topic**
146:7
**total** 47:7
**touched**
150:21
**Tousant**
22:15,22
**tracking**
168:3
**trained**
12:20

65:2
69:5
148:5
149:6,7
**training**
12:17
13:6,9
13:14,19
64:15,18
64:20,21
65:4,19
65:21
66:3,5,7
66:10,17
66:18
67:2,3,4
67:5,17
67:18,19
68:3,16
68:19
122:21
124:7,11
124:12
124:14
125:3
132:14
145:21
147:9,22
149:1
**transc...**
190:8
191:3,4
**TRANSC...**
191:6
**transport**
125:14
**transp...**
132:11
133:6
142:11
**transp...**
81:14
142:10
147:11
**transp...**
130:12

132:8
142:2
**treatment**
132:11
132:16
134:3,3
142:3,11
147:3
150:20
162:18
187:17
**Tribune**
41:1
50:14
95:9
177:4,11
178:10
178:10
**tried**
155:1
**trigger**
29:19
**TRR** 81:19
82:12,15
**truck** 93:7
93:13
140:18
**true** 14:3
102:14
113:7
132:4,5
137:5
190:7
191:4
**truth**
190:5
**truthf...**
135:6
**try** 7:15
49:15
91:22
93:6
94:1
168:20
189:5
**trying**
22:14

14:4
20:20
30:21
49:9
56:2
98:16
105:1
106:2
112:17
114:22
121:16
145:18
188:10
**Turn** 56:12
**turning**
97:7
**twice** 68:2
185:16
**two** 48:3
52:10
55:19
67:1
88:14,15
95:7
98:13
100:13
100:15
123:8,12
124:10
133:12
135:12
138:20
140:6
145:4
166:17
167:14
169:18
172:21
178:10
**two-mi...**
164:22
**type** 23:6
156:12
171:2
**typed**
22:14

23:4,4
23:10
**typewr...**
190:7
**typically**
17:18
23:17
74:15
102:9

_____
U
_____
**unable**
189:11
**unclear**
155:4
**unders...**
7:18
8:22  9:2
9:11
12:19
18:4
29:4
30:1,3
40:6,16
40:17
54:20
67:9
77:19
84:9,13
84:18
86:7
89:16
98:16
99:13
114:20
114:22
126:11
126:21
127:11
144:3
146:11
146:17
148:11
154:8
159:21
165:19

LaKenya White
November 9, 2015

225

| | | | | | |
|---|---|---|---|---|---|
| 171:8 | ups 54:1 | value 82:8 | wait 108:4 | 139:4,10 | 147:6 |
| 174:11 | use 40:8 | verbatim | 172:22 | 141:12 | 171:16 |
| 182:15 | 48:7 | 124:19 | 189:5 | 146:14 | 188:5 |
| unders... | 50:21,21 | 152:5 | waiting | 147:18 | 190:13 |
| 85:8 | 51:4,13 | 155:15 | 90:16 | 164:12 | 190:14 |
| 86:10 | 52:9 | 166:10 | 91:1 | 164:19 | ways |
| 105:9 | 59:19 | version | waiving | 166:19 | 163:10 |
| 127:1 | 68:17 | 82:15 | 97:16 | 166:20 | we'll 7:6 |
| 144:4 | 96:11 | video | walk 42:1 | 168:13 | 7:12 |
| 147:1 | 127:16 | 127:16 | walked | 171:13 | 34:14 |
| 154:12 | 148:5 | 128:21 | 136:22 | 181:11 | 37:10 |
| 179:15 | 157:13 | 129:1 | 137:14 | wanted | 50:19 |
| unethical | 158:2,5 | 168:3 | want 5:22 | 130:7 | 69:18 |
| 113:2 | 158:22 | videos | 6:18 7:1 | 153:17 | 84:21 |
| unfounded | 159:16 | 76:18 | 7:11 | 187:3 | 98:8 |
| 160:10 | 159:17 | 128:4,7 | 21:9 | wants 90:6 | 103:20 |
| 165:17 | 160:2 | 128:16 | 27:11 | warnings | 104:14 |
| uniform | 161:21 | videot... | 29:15 | 182:16 | 110:4 |
| 10:15 | 162:9,21 | 76:4 | 33:8 | wasn't 8:6 | 189:18 |
| 166:1,9 | 171:18 | Vidlji... | 35:12 | 101:7 | 189:19 |
| unions | 171:22 | 1:6 | 36:14 | 116:11 | we're |
| 172:12 | 181:16 | 111:18 | 37:4 | 118:2 | 13:13 |
| unit 178:1 | 183:1,6 | 116:22 | 41:8 | 160:9 | 22:1 |
| United 1:1 | 183:20 | viewing | 44:2 | 173:4 | 55:8 |
| 6:13 | uses 33:12 | 96:9 | 50:12 | wasting | 59:10 |
| 183:2 | 58:10 | violated | 60:2,10 | 153:2 | 61:12 |
| universe | 158:15 | 133:21 | 60:11,12 | WATCH 1:13 | 65:12 |
| 47:7 | 174:14 | violating | 66:10 | way 7:13 | 72:8 |
| unjust... | utterly | 143:14 | 69:19 | 14:13 | 80:20 |
| 56:3 | 146:3 | violation | 77:1,9 | 37:11 | 89:13 |
| 57:20 | ————— | 133:22 | 89:11 | 44:11 | 96:5 |
| 58:6,16 | V | violence | 90:3 | 61:13 | 104:15 |
| 58:18 | V-I-D-... | 46:11 | 94:18 | 83:9,16 | 109:22 |
| 59:1,19 | 79:19 | voice 6:1 | 95:5 | 83:19 | 119:21 |
| 59:19 | vague | volume | 96:8,12 | 84:6 | 122:7 |
| 60:18 | 31:14 | 121:18 | 97:13 | 87:5 | 153:2 |
| unknown | 53:15 | 130:3 | 98:2,7 | 96:2,13 | 155:6 |
| 73:14 | 56:6 | 178:6 | 110:10 | 98:19 | 160:13 |
| unreas... | 166:5 | voluntary | 116:10 | 103:20 | 189:8 |
| 148:15 | 176:11 | 125:5 | 120:6 | 104:14 | we've 12:4 |
| unusual | vagueness | 172:9 | 122:3,17 | 113:12 | 55:3 |
| 95:19 | 151:4 | vs 1:5 | 125:7 | 122:5 | 113:1 |
| unwarr... | VALDOV... | ————— | 126:10 | 126:10 | 161:12 |
| 157:14 | 1:7,9 | W | 130:10 | 131:17 | weapon |
| updated | VALENZ... | W-H-I-T-E | 133:12 | 133:10 | 51:12 |
| 90:9,12 | 1:8 | 5:16 | 133:16 | 137:18 | 171:19 |

LaKenya White
November 9, 2015

226

172:1
weapons
10:18
11:19
week
111:11
went 10:20
13:14
14:17,17
15:14,15
15:16
16:11,14
72:4
101:4,10
103:8
WERTH 3:7
8:12,18
8:22
13:2,8
15:8
16:2,5
19:10
20:2,6
20:16
21:9
22:7,11
22:19
23:14
25:7,10
25:21
26:6
27:13
29:3,11
30:2,15
31:7,13
31:22
32:17
34:6
35:3,9
35:13
36:11,17
37:3,14
37:21
38:7,16
39:4,11

40:2,13
42:3,19
42:22
43:3,5,7
43:12,21
45:1,12
46:21
47:12,14
48:17,20
49:2,7
49:22
51:3,18
52:14
53:5,13
53:15
54:2
55:15
56:5
57:6,21
58:11
59:2
60:7,13
61:2,21
62:13
63:17
64:7,16
65:3,8
65:13
66:5,12
66:14
67:8,10
69:1
72:13,20
73:6,9
75:5,19
76:7
77:4,19
78:20
81:2
82:1
83:10,15
86:4
88:1,17
89:4,8
89:11
90:3,6

90:21
91:15
92:4
94:13
95:2
96:1,16
97:14,16
97:19
98:6,12
100:2,4
101:7
102:3
104:22
106:1
107:4,15
108:1
109:9
110:4,19
112:3
113:5
114:9,12
115:9,17
116:7,9
117:16
118:20
118:22
119:14
120:9
121:5,10
123:15
124:1
125:10
125:21
126:13
127:18
128:12
128:18
129:11
130:2
132:17
135:14
135:17
136:5
137:2,8
137:10
137:16

138:15
139:4
140:9,12
141:9
142:16
142:19
143:6,11
143:16
144:6
145:1,9
146:20
148:10
148:21
149:2
150:5
151:3
152:21
153:10
153:15
153:22
155:6
156:11
156:19
157:8
158:19
159:2,8
159:12
160:7
161:1,11
162:2,12
163:1,4
163:21
166:4
169:21
170:7
172:13
173:15
174:8,19
175:5,14
175:21
176:10
177:12
178:14
178:19
179:4,12
179:18

180:7,15
181:2
182:7
183:9
184:3,18
185:6
186:11
186:17
187:8
188:1
189:7,19
what'd
77:18
Wheel 3:3
whisper
98:3
whispe...
98:1
white 1:19
4:2 5:7
5:15,16
5:17 6:5
7:18
22:3
24:10
26:18
55:11
100:9
110:11
111:10
132:19
190:4
191:2
White's
134:10
153:1
wife 1:2
withdraw
65:16
86:5
91:20
146:9
withdr...
153:10
witness
4:2 5:1

5:5,8
8:14 9:2
15:10
16:8
19:15,19
20:19
22:8,13
22:20
23:16
24:10,11
24:12,19
25:8,13
29:5,13
30:5,18
31:8,15
32:1
35:8,15
38:11,10
38:20
39:5,13
39:20
40:10,17
42:8,14
43:8,16
44:3,18
45:2,15
45:19
47:2,16
49:3,9
50:2
51:7,21
52:6,15
53:7,16
54:6,11
55:2,9
56:7
57:8
59:8
60:15
61:4
62:17
63:19
64:9,19
65:9
66:13,17
69:3

LaKenya White
November 9, 2015

227

76:1,8
78:22
82:3
83:12,17
84:18
88:3
90:8,22
91:9,18
94:8
96:2
97:20
98:15,20
102:14
103:18
105:1
106:7,9
106:15
108:11
112:5
113:6,20
114:17
115:12
116:2,8
116:11
117:19
118:21
119:16
120:11
121:15
126:19
127:8
128:13
129:13
131:4
132:1,19
132:20
133:1
135:15
136:11
137:17
138:2,17
140:11
145:2,10
146:2,6
146:8,13
147:1,22

148:11
149:14
150:8
151:5,11
153:14
154:4,19
156:20
156:22
157:9
158:20
159:4,21
160:9,18
161:4,14
162:6,13
163:6,22
164:8
166:9
169:14
170:9
172:20
173:9
174:7,15
174:20
175:8,16
176:1
178:15
178:21
179:6,13
180:1,9
180:17
181:5,21
182:11
183:12
184:4,7
184:22
185:13
186:12
186:19
187:10
188:13
189:16
190:9,11
190:15
**witnessed**
83:4
91:10

92:6,9
**witnesses**
99:16
136:13
188:18
**work** 11:18
12:2,18
13:15
16:17
18:22
22:22
56:21
121:3
**worked**
10:9
15:3
63:5
**working**
11:6
12:1
14:19,20
14:22
16:14,21
32:16
47:19
48:5
56:19
63:11
**works**
22:21
173:21
**wouldn't**
30:19
153:19
**wrap**
168:20
168:22
**write**
101:21
101:22
102:11
102:16
102:20
103:1
172:3
**writes**

120:19
**writings**
147:9
**written**
95:8
125:13
**wrote**
22:10
99:19
104:2
112:13
113:22
140:16

——————
**X**
——————
**X** 4:1, 4
——————
**Y**
——————
**yeah** 35:4
35:11
67:11
83:17
104:17
114:12
148:21
155:6
164:16
**year** 36:3
36:5
38:5
39:10
48:3
50:15
67:19,21
68:2,2
69:9
70:6,10
95:19
128:8,14
168:9
177:6,6
178:7
179:3
**years** 8:1
10:1,1
14:16

42:1,16
48:5
51:1,5
52:10
53:12
57:18
59:15
67:1
69:22
72:15
95:10
121:3
135:13
158:12
158:13
168:17
179:16
**young** 20:9
95:7
97:13

——————
**Z**
——————

——————
**0**
——————
**08:46**
83:14
**084-00-...**
2:4
190:20

——————
**1**
——————
**1** 18:6,8
18:16
19:1
109:22
**10** 5:21
59:17
157:9,12
159:7,15
160:5
177:20
**10691 2**
1:10
**11** 55:4
93:17
106:21

107:8
**11:00** 1:20
**110** 28:8
28:21
**117** 33 1:9
**118** 20 1:8
1:10
**12-cv-...**
1:4
**13** 57:19
86:9,17
122:4
**14** 122:18
129:2,2
129:4,4
129:4,8
133:12
141:12
144:17
**141** 23 1:8
**15** 3:3
59:17
112:17
113:16
124:3
157:4,9
157:12
158:14
159:7,15
160:5
174:22
177:20
**15th**
190:16
**18** 11 1:13
**19** 166:21
**194** 1:14
**195** 51:13
**1990** 183:2
**1st** 27:7

——————
**2**
——————
**2** 18:6,8
18:11,15
18:21
19:1

LaKenya White
November 9, 2015

228

| | | | | |
|---|---|---|---|---|
| 27:12,14 | 38:2 | 50:13 | 146:6 | 177:5,7 |
| 31:3,16 | 50:14 | 182:20 | **300** 50:22 | 177:19 |
| 47:10 | 51:2 | 182:20 | 51:5 | 178:5 |
| 51:1,5 | 52:9,18 | **256** 119:21 | 156:7 | 179:8 |
| **2-57-110** | 70:14 | 164:14 | **30th** 27:8 | **84** 4:9 |
| 27:17 | 93:16 | 164:15 | **32** 164:20 | **860** 176:7 |
| **20** 4:6 | 95:13,13 | 166:19 | **329** 51:12 | |
| 59:16 | 101:5,11 | **26** 36:1 | 52:10 | **9** |
| 157:4 | 120:16 | 52:18 | **33** 4:7 | **9** 1:20 |
| 168:14 | 121:2 | 70:14 | **34** 77 1:12 | **900** 3:8,12 |
| 174:22 | 124:12 | **263** 109:19 | **35th** 101:2 | 3:18 |
| **200** 109:22 | 176:7 | 110:10 | **36** 173:1 | **911** 74:16 |
| **2000** 14:17 | **2013** 18:13 | 111:9 | | 74:21 |
| 15:4,14 | 27:7,8 | 116:14 | **4** | 163:16 |
| **2001** 15:4 | 28:7 | **26th** 38:2 | **4-68-110** | **95** 121:1 |
| 15:14 | **2014** 15:18 | 50:16 | 141:15 | **96** 121:1 |
| **2002** 78:10 | 53:20 | **270** 21:13 | **4:00** 17:18 | **9th** 191:3 |
| **2007** 8:8,9 | 70:9 | **271** 4:6 | **405** 11:7 | |
| 9:5,6 | 106:6 | 21:14 | **428** 3:3 | |
| 15:5 | 111:10 | 22:4 | | |
| 16:9 | **2015** 1:20 | 34:5,6 | **5** | |
| 172:5 | 105:19 | **272** 4:7 | **5** 4:3 5:21 | |
| **2008** 8:6 | 190:17 | 34:22 | 33:8 | |
| 9:5 16:1 | 191:3,21 | 81:2,3 | **50** 176:1,8 | |
| **2009** 51:13 | **202** 100:8 | **273** 4:8 | **50/1** 142:1 | |
| **201** 100:8 | **210** 142:1 | 78:14,19 | **500** 182:22 | |
| 100:9 | **21st** 10:9 | **274** 4:9 | **508** 28:8 | |
| **2010** 14:18 | **22** 171:13 | 85:6 | **51** 74 1:7 | |
| 15:15,16 | **22nd** 83:13 | **274** 96 1:11 | | |
| 16:11 | **23rd** 33:17 | **27th** 70:9 | **6** | |
| 51:11 | 33:22 | 106:7,8 | **6** 120:6,18 | |
| 176:6 | 80:8 | **2D** 125:7,9 | **605** 21 13:4 | |
| **2011** 28:15 | 101:5,10 | | **606** 02 3:8 | |
| 33:18,22 | **24** 124:22 | **3** | 3:13,18 | |
| 51:13 | 125:10 | **3** 18:6,8 | | |
| 53:20 | 172:22 | 19:3 | **7** | |
| 80:17 | **24th** 23:8 | 29:15 | **7** 33:10 | |
| 83:13 | 111:9 | **30** 3:7,12 | **70** 121:1 | |
| 120:15 | **25** 124:22 | 3:17 | **77** 4:8 | |
| 121:2 | **250** 110:1 | 188:11 | **7th** 106:6 | |
| 169:3 | **251** 26:16 | **30(b)(6)** | | |
| 177:6,20 | 27:7 | 24:10 | **8** | |
| 178:6 | **252** 26:15 | 25:7,13 | **8:00** 17:18 | |
| 179:17 | **253** 40:20 | 39:5 | **80** 46:7,16 | |
| **2012** 23:8 | **254** 55:9 | 132:19 | **800** 176:16 | |
| 36:2 | **255** 50:12 | 132:20 | **836** 51:13 | |