TAB 43

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOSE LOPEZ, by his wife and next best friend, Sandra Cardiel, | ) ) ) | |
| Plaintiff, | ) ) ) | No. 12 C 5751 |
| v. | ) ) | Judge Leinenweber |
| STEVAN VIDLJINOVIC, Star No. 4051, et al. | ) ) ) | Magistrate Judge Brown |
| Defendants. | ) ) | |

### AFFIDAVIT OF LANCE BECVAR

I, Lance Becvar, affirm under oath as follows:

1. I have been employed by the Chicago Police Department for 26 years, and I currently hold the rank of sergeant.

2. I am currently assigned to the Public Safety Information Technology Division (PSIT) of the Office of Emergency Management and Communications.

3. I have been assigned to this position since January 2009.

4. My duties with PSIT include being in charge of the day-to-day operations of in-car cameras for the Chicago Police Department, including maintenance of the cameras, recovery of video and answering requests for information about the system.

5. As part of my duties, I am generally familiar with the policies and practices of the Chicago Police Department with regard to the in-car video recordings made by police vehicles, as well as the manner in which in-car video recordings are made.

6. Recording devices commonly referred to as "dash cams" are used in some Chicago Police vehicles. In 2011, not all Chicago Police vehicles were equipped with dash cams. In fact, even today, many Chicago Police vehicles do not have dash cams.

7. The cameras contained in the dash cam systems utilized by the Chicago Police Department record the view in front of the vehicle. The cameras do not revolve. I would describe the extent of the camera view as a 45 degree cone starting from the camera going outward to the front of the vehicle.

8. The cameras are limited in that they can only record what is within the camera's view -- namely, what is shown in the direction that the camera is facing and within the area of the cone. Accordingly, if an event occurs outside of the camera's view, it cannot be recorded by the dash cam.

9. Of the vehicles that are equipped with dash cams, the dash cams passively record what occurs during a shift. Those passive recordings are routinely recycled on a day-to-day basis.

10. An officer may start an "event video" of a dash cam recording to be uploaded, in one of three ways: by activating the emergency equipment in his vehicle; by pressing a button on a microphone on the officer's person; or by pressing a button on a monitor within his patrol car.

11. An officer may end the "event video" of a dash cam recording by pressing a button on a monitor within his patrol car. Once the officer does so, a post-event pop-up screen will appear on the monitor in which the officer can select a related classification for the event.

12. At the end of the shift, an officer typically uploads video from a dash cam pertaining to specific events into Chicago Police Department servers, if the officer has recorded "event videos" during his tour of duty.

13. Event videos are normally retained for 90 days, absent a specific request to preserve them. However, an event video will be preserved automatically on an indefinite basis for eleven classifications on the post-event pop-up screen. A non-criminal mental health transport classification is not one of the eleven events that will retain an event video on an indefinite basis.

14. It is the regular practice of the Chicago Police Department to maintain various records about dash cam videos, including records that show which vehicles are equipped with dash cams, which cars uploaded dash cam video recordings, whether those video recordings have been retained, and the dash cam video recordings themselves.

15. Those records are kept in the ordinary course of business, made at or near the time of the events they document by a person who has knowledge of the information they contain, and relied upon by other Chicago Police Department personnel.

16. As part of my duties, I was tasked with searching Chicago Police Department records to determine whether any of the police vehicles that responded to the incident that gave rise to this lawsuit were equipped with dash cams, if the dash cams for the vehicles in question were functioning at the time of the incident, and if any dash cam videos pertaining to this incident still exist.

17. It is my understanding that the incident that gave rise to this lawsuit occurred between 3:30 a.m. and 4:00 a.m. on July 22, 2011.

18. Upon information and belief, and based upon review of the Attendance & Assignment records for the 10th District, 1st watch on July 22, 2011(FCRL 18-23), the police vehicles that responded to this incident are #7994, #7977 and #8509.

19. To the extent that police vehicle #6774 (a squadrol) may have responded to the incident, squadrols in the 10th District have never been equipped with dash cams. Accordingly, there were no dash cam video recordings from vehicle #6774 that pertain to the incident that gave rise to this lawsuit.

20. My investigation showed that vehicles #7994 and #7977 were not equipped with dash cams at the time of the incident. Thus, there were no dash cam video recordings from either of those vehicles that pertain to the incident that gave rise to this lawsuit.

21. My investigation further showed that vehicle #8509 was equipped with a dash cam on the date of the incident, but there are no event video recordings at or around the time frame of the incident (3:30 a.m. to 4:00 a.m.).

22. The passive video that vehicle #8509 recorded on July 22, 2011 has been recycled, in accordance with Chicago Police Department practice and the normal operation of the dash cam recording system.

23. The Coban Digital Video Management System (DVMS) server shows that only three specific events that had dash cam event video recordings from vehicle #8509 were uploaded between midnight (12:00 a.m.) and 6:00 a.m. on July 22, 2011.

24. One of these events occurred at 12:50 a.m. and the second occurred at 1:23 a.m. Neither of these event video recordings presently exists.

25. A third event video, recorded at about 5:28 a.m. on July 22, 2011, has been retained.

26. As part of my investigation, I also did a search of all police vehicles assigned to the 10th District (the district of occurrence) on July 22, 2011, from 3:30 a.m. to 4:00 a.m. There were twenty-four vehicles equipped with a dash cam assigned to the 010th District, including vehicle #8509. None of the police vehicles so equipped had event video recordings during this time period.

27. Further, I searched the Coban Digital Video Management System (DVMS) server, which stores video citywide, for all event video recordings that were uploaded between 3:00 a.m. and 4:59 a.m. on July 22, 2011. No event video recordings that were uploaded on that date and during that time period were from a 10th District vehicle.

28. In addition to the Attendance & Assignment records previously noted in paragraph 18, I also reviewed the Original Case Incident Report (FCRL1-2) and the Coban Digital Video Maintenance System (DVMS) during my investigation.

29. If sworn as a witness, I can competently testify to the above.

Affiant further sayeth not.

Under penalties as provided by law, the undersigned certifies that the statements set forth herein are true and correct, except as to matters therein stated to be on information and belief, and as to such matters, the undersigned certifies as aforesaid that he verily believes the same to be true.

_____
Sgt. Lance Becvar #1748

SIGNED and SWORN to
before me on this  /S
day of October, 2014.

_____
Notary Public

OFFICIAL SEAL
DARWIN OLORTEGUI
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:04/27/17