*Lopez v. City of Chicago, et al.*
Case No. 2012 CV 5751

# EXHIBIT A

## **A REVIEW OF THE CASE**
Jose Lopez v City of Chicago
Case #: 12-C-5751

## **REPORTED DETAILS:**

On July 22, 2011, Ms. Guzman said Mr. Lopez came to her home after work, had dinner, played with the children and went to bed between 10:00 p.m. and 11:00 p.m. At about 1:30 AM, he awakened Ms. Guzman complaining that he was having a hard time breathing and was experiencing chest pains. Ms. Guzman called for an ambulance against Mr. Lopez's wishes.

First to arrive in the answer to the emergency call was a fire truck with four firefighters on board. The firefighter/paramedic on the scene believed that Mr. Lopez was acting erratically. He was pacing back and forth and mumbling. The firefighter/paramedic testified that he was unable to understand what Mr. Lopez was saying even though the firefighters tried to speak to him in both English and Spanish.

On the other hand, Ms. Guzman testified that Mr. Lopez was telling the firefighters in English that he was fine and did not want any help from them or to go anywhere with them. She quoted him as saying, "No, no, no, I'm okay. Don't worry. I don't need attention." Ms. Guzman testified that he kept walking away from them. Mr. Lopez testified that the firefighters went walking with him and asked him what was happening. Mr. Lopez kept responding, "I don't need attention. Please go."

An ambulance with two paramedics arrived 13 minutes after the arrival of the fire truck. Mr. Lopez was pointed out to the paramedics by the fire truck company personnel as the gentleman who was walking down the street. Mr. Lopez was about 25 feet away, throwing his arms in the air and to his side while making moaning sounds, but he was not hitting or swinging his arms at anyone.

Paramedic Mendoza testified that a person can refuse attention if they can answer questions appropriately. The paramedics will ask to assess the individual and be sure the person is in his right mind. Then they call it into the hospital as a refusal and everything gets documented.
If a citizen refuses to even allow the paramedic to examine and assess him, the person can only walk away from them if the paramedic feels that the person is safe enough and doing fine. If there are signs the person is going to hurt himself or someone else, then the paramedics call the police.

The paramedics did not approach Mr. Lopez and had not gotten close enough to him to assess him or his physical symptoms. Instead, a call for police assistance was made to help with what the paramedics believed to be a suspected overdose victim. The paramedics decided to stay back by the ambulance until the police arrived.

At no time that morning did Mr. Lopez attempt to come into physical contact or to strike any of the firefighters or paramedics. Mr. Lopez was walking away from the paramedics and firefighters when the police arrived.

2

According to Officers Alamillo and Valdovinos, the first police officers on the scene, Mr. Lopez was not talking to them and was pacing back and forth and mumbling. Although no one on the scene told Officer Alamillo that there was a medical emergency, he believed Mr. Lopez showed signs of being on PCP. Mr. Lopez was not being placed under arrest and was not trying to escape from Officers Alamillo and Valdovinos. He did not make a violent movement towards Officer Alamillo or his partner. According to the dispatch records, within a couple minutes of their arrival on the scene, they called for a police officer who was armed with a Taser "just to have an option if something went wrong".

Officers Vidljinovic and Guettler arrived on the scene. Officer Vidljinovic had a Taser which was "just a tool he would have in case they needed it". Officer Vidljinovic testified that the whole objective was to get the man medical assistance and to peaceably escort him to the ambulance which would transport him to a hospital. He remembers at least six police officers and Sergeant Kearns being on the scene.

Even before they approached Mr. Lopez, Firefighter Kairis claims and that he heard one of the police officers say that they were going to tase him if he did not comply with the orders of the police. As they approached, Firefighter Kairis watched intently because he had never seen anyone tased before and he was very interested in what was going to happen.

Each of the officers on the scene that morning was equipped with OC spray and a retractable baton on his utility belt.

Officers Vidljinovic, Guettler, Alamillo, and Valdovinos approached Mr. Lopez together as he was walking away from them on the sidewalk and was not engaging in any criminal activity. Officer Vidljinovic claims the officers did not discuss a plan of action before approaching Mr. Lopez. When he walked up to Mr. Lopez, Officer Vidljinovic had the Taser gun in his hand. The Taser gun was out of its holster and Officer Vidljinovic's handcuffs were still on his belt.

Officer Guettler stated he tried to talk with Mr. Lopez and guide him to the ambulance, but Mr. Lopez was not cooperating. Other officers also stated they had tried talking to Mr. Lopez to no avail to encourage him to be evaluated by the paramedics. Officer Vidljinovic could not make out anything Mr. Lopez was saying. He did not ask and did not know if his partner could understand Mr. Lopez. Officer Vidljinovic said, "I can't speculate at all if Mr. Lopez comprehended or didn't comprehend us. All I know is that he was incoherent to me." Officer Vidljinovic took up a "bladed" position and was ready to react depending upon how Mr. Lopez was going to act.

Only Officers Guettler and Vidljinovic said they observed Mr. Lopez was becoming combative and clenching his fists in an aggressive manner. No one on the scene reported at any time that they had been struck by Mr. Lopez in any way. Officer Guettler approached Mr. Lopez and stated he touched Mr. Lopez on the elbow to direct him over to the ambulance. Officer Vidljinovic testified that as he approached, Mr. Lopez's clenched fists were at his sides. Mr. Lopez just began to flail in no particular direction. He just began to move his arms about in every which direction.

Officer Guettler said that as he approached, he had to get out of the way to avoid getting struck

3

as Mr. Lopez was flailing around. There was no physical contact between them. Officer Vidljinovic stated he saw this and said, "Taser! Taser! Taser!" and deployed his Taser hitting Mr. Lopez.

Mr. Lopez fell backward and his head struck the street. Officer Vidljinovic was instructed that tasing somebody would incapacitate that person and cause him to lose control of his muscles and eventually collapse. Unlike the circumstances under which the officers received their training in the use of the Taser, no particular precautions were taken concerning the location where Mr. Lopez was expected to fall, no spotters were used, and no attempt to break his fall was employed. Prior to tasing Mr. Lopez, Officer Vidljinovic testified that he could not predict how Mr. Lopez would react to the Taser. Officer Vidljinovic did not recall ever being trained or advised that using a Taser on a person who is under the influence of drugs will exacerbate the effects on that person.

On the scene, no one reported seeing any visible signs of injury to Mr. Lopez. The police officers handcuffed Mr. Lopez, and the paramedics got him on the stretcher and into the ambulance and transported him to Mt. Sinai Hospital where he was found to have brain injuries.

## OPINIONS AND BASES THEREOF

My professional experience is that described in my CV (attached hereto). After reviewing the documents described in Attachment # 3 and based upon my education, training and experience, I have formed the professional opinions stated below.

**It is my opinion, which I hold to a reasonable degree of professional certainty, that Officers Vidljinovic and Guettler of the Chicago Police Department used excessive force in subduing Mr. Lopez by approaching him, laying hands on him and utilizing the Electronic Controlled Device (ECD).**

I do not believe that any properly trained law enforcement officer would have reason to believe that physically confronting Mr. Lopez and utilizing an Electronic Controlled Device (ECD) on him was reasonable under the circumstances. The standards that police departments rely on to guide them in the use of ECDs are twofold. The standard for ECDs has been established in the International Association of Chiefs of Police (IACP) documents since 2004. There are also two court cases out of the Ninth Circuit of the United States District Court, *Beaver v. City of Federal Way* and *Bryan v. McPherson*. Both of these cases have been used by law enforcement agencies as guidelines for the use of ECDs. Both cases stated that the standard for analyzing claims of excessive force was established by the Supreme Court in *Graham v. Connor*. It held that excessive force claims are to be analyzed under the Fourth Amendment's "objective reasonableness" standard. This "objective reasonableness" is measured from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, and allows for the fact that "police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation." The Court further held that relevant factors in the reasonableness inquiry include "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat

4

to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight."

The principles are also thoroughly discussed by the IACP /National Law Enforcement Policy Center. The IACP has been a guiding organization for police departments for many years and is accepted as an organization that helps to define issues in law enforcement. In Volume 16, Number 4, Winter/Spring 2005 issue of *Policy Review*, it conveys a recommendation that "with respect to CEDs (conducted energy devices), including the TASER, we are recommending, subject to situational factors, that they not be used against subjects who are demonstrating only passive resistance" and that an individual should not be tased more than three times under normal conditions. When an officer is making this determination, it is essential that the three-prong test under *Graham v. Connor* be observed.

The first factor to determine is severity of the crime. Mr. Lopez had not committed any crime. As stated by the officers on the scene, Officers Vidljinovic, Guettler, Alamillo, Valdovinos, Valenzuela, Demonica, Gonzalez and Sgt. Kerns, along with paramedics Mendoza and Cheatham, Mr. Lopez was flailing and swinging his arms. He was speaking in slurred speech and was not making sense. Many of these same officers and paramedics also said that they never saw Mr. Lopez with clenched fists and, with the exception of Officers Vidljinovic and Guettler, no officer, firefighter, or paramedic ever said that they saw Mr. Lopez attack a police officer, paramedic or any civilian. He was just not listening to officers and was pacing back and forth swinging his arms and speaking incoherently. He was not being aggressive toward them or any bystanders. The paramedics, firefighters and police officers on the scene believed that Mr. Lopez might be under the influence of PCP or have a mental problem, either of which would make it difficult for him to follow directions.

Firefighter Daniel Kairis stated that the he had a clear view and witnessed the police action up to and during the tasing. Even before they approached Mr. Lopez, Firefighter Kairis claims he heard someone say that they were going to tase him if he did not comply with the orders of the police. As they approached, Firefighter Kairis watched intently because he had never seen anyone tased before and he was very interested in what was going to happen. He stated that the police made a wide circle around Mr. Lopez so that he could not run away. However, he was the only one in the entire scene area that heard that. All other officers stated they only heard an officer yell, "Taser, Taser, Taser," and then the Taser was deployed. In the Chicago Police Department Special Order S04-20-02, <u>Persons subject to involuntary or voluntary admission non-arrestees</u>, it states that "A peace officer may take a person into custody and transport him or her to a mental health facility when the peace officer has reasonable grounds to believe that the person is subject to involuntary admission and in need of immediate hospitalization to protect such person or other from physical harm." There is no mention by any officer or paramedic on the scene who stated that this situation needed **IMMEDIATE** action. No one was in danger of being harmed, and the firefighters and paramedics had been there for over 15 minutes just watching Mr. Lopez pace back and forth. Within two to four minutes of their arrival on the scene, the police had tased Mr. Lopez, he had fallen to the ground, been handcuffed, strapped to the stretcher, and taken by the ambulance to the hospital.

The second factor is whether the suspect poses an immediate threat to the safety of the officers or others. There was nothing that justified any level of force to be used by any officer of the

5

Chicago Police Department. Mr. Lopez made no assertive move toward any officer or medical professional. He was being very consistent in his behavior, even though the paramedics and/or some of the police thought that was abnormal mental behavior. Mr. Lopez was making no aggressive move toward the officers or medical professionals. Police officers, as well as the medical staff, said he was not acting in a threatening manner. It is my opinion that the actions of the Officers of the Chicago Police Department in using force on Mr. Lopez would not have been made by competent law enforcement officers under the same circumstances.

It appears that Officers Vidljinovic and Guettler's own heightened anxiety overwhelmed them, and they made a conscious decision to become aggressive. The choice to respond in this way was not essential and was tactically a poor decision which should not have been made with the information they had at the time. No reasonable law enforcement officer in these officers' positions would have believed that they had probable cause to physically approach or apply their ECDs to control Mr. Lopez. This opinion is not based on 20/20 hindsight but rather on my training of thousands of agents and police officers in the techniques of a felony arrest. Mr. Lopez posed no threat or implied threat at any time during this situation. The only resistance Mr. Lopez demonstrated before he was pressured by the police was, at most, a passive resistance by swinging his arms at nothing and/or no one in particular and speaking incoherently. Officers Guettler and Vidljinovic are the only two officers who said they felt threatened by Mr. Lopez; yet several other officers, paramedics and firefighters witnessed the tasing, and none of them stated they felt either of these two officers looked like they were in danger.

It appears that either the Chicago Police Department failed to properly train its force regarding the use of Tasers, or the officers involved in the incident ignored their training. The department's ECD training material states that after a subject has been tased, the officers should use that period of opportunity to apply handcuffs or otherwise gain control over the subject. Taser training materials also warns of the possibility of Sudden Unexpected Death which can occur after tasing a subject who exhibits such symptoms as bizarre behavior, signs of overheating or profuse sweating, disrobing, lack of pain response, obesity, diabetes, protracted physical struggle, mania, agitation, excited delirium and positional restraint. These are all factors which the officers should have known, or knew and ignored. In the Chicago Police Department's training for <u>Protocol for Deployment of Tasers</u>, it states, "Spasms could cause severe exhaustion in people under the influence of drugs or suffering from any number of respirator or mental health problems." Several of the police officers on the scene said that they thought Mr. Lopez had a mental problem or that he was on a drug such as PCP, and yet a Taser was still called for and utilized when it was not necessary. Mental health professionals should have been called in to deal with Mr. Lopez and try to calm him down so that he could be transported to a mental health facility or released.

The third factor is whether the subject is actively resisting arrest or attempting to evade arrest by flight. There was no arrest warrant for Mr. Lopez nor had he done anything illegal. Mr. Lopez did not make any evasive actions which would have demonstrated he was trying to avoid the police. If he was in a fragile mental state as several of the officers posit, he could well be frightened because he was in fear of his life as they steadily approached and surrounded him. Had Mr. Lopez been ignoring lawful commands to come to the ambulance for evaluation without resorting to physical violence, again this would be of no concern to police and the resort to the use of force. Crediting the officers' assessment that Mr. Lopez was suffering in an unstable

6

mental state, it is easy to appreciate that he made a conscious decision not to engage with the police or paramedics because he might have considered that unsafe. When Officers of the Chicago Police Department continued to approach him after he continued to display fears of the police and firefighters, they should have backed off and given him his space and called in medical professionals who are trained in psychological encounters to come in and attempt to defuse the situation. Officers stated they were trying to convince Mr. Lopez to comply with their desire to evaluate him at the ambulance.

This situation promptly became exacerbated. When Officers Vidljinovic and Guettler entered the scene, they rapidly accelerated the situation and within just a couple of minutes after Mr. Lopez did not comply, he was tased. No time was given to Mr. Lopez to calm down after these two officer responded with their Taser. This action by Officers Vidljinovic and Guettler of the Chicago Police Department made the situation more tense and unstable. At no time did Mr. Lopez evade the officers nor did he try to flee the officers.

The IACP, in the Winter/Spring 2007, Volume 18, Number 4 *Policy Review*, is very clear when it defines the limits under which the ECDs should be used. It states that "it is forbidden to use the device ….on any suspect who does not demonstrate an overt intention (1) to use violence or force against the officer or another person or (2) to flee in order to resist or avoid detention or arrest (in cases where officers would pursue on foot)."

Again, the IACP, in its Training Key #583 written in 2005, states that officers must consider the totality of the circumstances in every use-of-force situation to ensure that the best overall decision is made. One of the questions an officer needs to ask himself is whether there is a need to immediately incapacitate the subject. Officer of the Chicago Police Department had no time constraints on them. There were no other people in the area who were being negatively affected, and there was no threat to anyone if they took their time to resolve the situation. The IACP's Training Key #575, written in 2004, states that "ECD's use should be permitted only against persons who demonstrate an overt intention to use violence or force against the officer or others where other alternatives for controlling them are not reasonable or available under the circumstances." This was not a fast-moving situation where the officers had to make split-second decisions as to their safety. They had plenty of time to resolve this situation, and backup was all around them.

The quantum of force used in this situation confronting the officers must also be considered. Manpower on the scene from both the police department and fire department was more than ample to always maintain control over the situation and protect all individuals from any physical harm. If need be, there was more than ample manpower available merely take physical control over the much smaller Mr. Lopez without resorting to the use of the Taser. Officer Vidljinovic testified that he was trained in the Use of Force Model under which there are certain pain holds or striking stunning moves that the officers can use against an uncooperative subject or an active resister. He believed that Mr. Lopez did not give them time to try any of those options because of his actions. The overwhelming amount of manpower on scene and the alternatives available to them belies that statement.

A reasonable officer would have known that by physically approaching and putting hands on any individual, he is escalating the force continuum to a higher level. There is nothing in the

7

documents I read that showed Officers of the Chicago Police Department had any reason to aggressively approach Mr. Lopez; and by physically approaching him, they created the hazardous situation in which Mr. Lopez was severely injured. Mr. Lopez at no time demonstrated he was a threat to himself or the officers, and they were under no time constraints to remove him from the area. Escalating to a higher level in the use of force continuum was inappropriate in this situation. Mr. Lopez had not broken any laws. By the account of the police and medical professionals on the scene, Mr. Lopez was an individual with a mental or physical problem which was obvious. It is my opinion, which I hold to a reasonable degree of professional certainty, that the use of force applied by Officers of the Chicago Police Department in their utilization of the ECD was inappropriate under the circumstances that faced these officers on July 22, 2011.

Instead of using force to control Mr. Lopez, Officers of the Chicago Police Department should have let the psychological medical professionals control the situation and been there for a backup if needed. This would have tempered the situation and, in all likelihood, resulted in a circumstance that did not involve the use of unnecessary and unreasonable force.

Officers of the Chicago Police Department excessive and unjustified use of force violated Mr. Lopez's Fourth Amendment constitutional rights, which were clearly established prior to July 22, 2011 (the date of this incident). Any reasonable officer in the same circumstances as Officers of the Chicago Police Department should have known at that time that their conduct was in clear violation of established law, specifically the Fourth Amendment of the United States Constitution (See the materials cited above, all of which were published prior to July 22, 2011).

I base my opinions on my background and experience as a law enforcement officer with over twenty-six years of experience and as a police trainer with over thirty-five years of experience teaching arrest techniques, to include Making Arrests and Handling Subjects and Preparation for Arrest and Search Warrants. I expressly reserve the right to alter, amend, modify, or expand upon these opinions should more information be made available to me.

Submitted by,
Philip P. Hayden, Ed.D.
Consultant/Expert Witness

8