*Lopez v. City of Chicago, et al.*
Case No. 2012 CV 5751

# EXHIBIT B

COPY

# In The Matter Of:
## *Jose Lopez v.*
## *Stevan Vidljinovic*

*Phillip P. Hayden, Ed.D.*
*May 18, 2015*

*Commonwealth Court Reporters, Inc.*

540-372-6655

**Min-U-Script® with Word Index**

Jose Lopez v.
Stevan Vidljinovic

Phillip P. Hayden, Ed.D.
May 18, 2015

---

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION
 3    ─────────────────────────────────
 4    JOSE LOPEZ, by his wife        )
      and next best friend,          )
 5    Sandra Cardiel,                )
                                     )
 6          Plaintiff,               )
                                     )
 7    vs.                            )  No. 12 C 5751
                                     )
 8    STEVAN VIDLJINOVIC,            )  Judge Blakey
      Star No. 4051, et al.,         )
 9                                   )  Fredericksburg, VA
            Defendants.              )
10                                   )  May 18, 2015
11
12          Deposition of:
13                 PHILIP P. HAYDEN, Ed.D.
14    called for examination by counsel for the Defendants,
15    pursuant to notice, at the offices of Ahern Phillips,
16    LLP, 904 Princess Anne Street, Suite 305,
17    Fredericksburg, Virginia, commencing at 10:46 a.m.,
18    before Deanna A. Arend, Registered Professional
19    Reporter, Notary Public in and for the Commonwealth
20    of Virginia.
```

**Page 2**

```
 1  APPEARANCES:
 2  For the Plaintiff:
 3      JOHN P. DeROSE, ESQUIRE    (By Skype)
        CAITLYN F. DeROSE, ESQUIRE
 4      John P. DeRose & Associates
        15 Spinning Wheel Road
 5      Suite 428
        Hinsdale, Illinois  60521
 6      (630) 920-1111
        caitlyn@johnderoselaw.com
 7
 8      FRANCO N. CARONE, ESQUIRE
        Carone Law Offices
 9      1559 N. Mannheim Road
        Suite 2A
10      Stone Park, Illinois  60165
        (708) 856-8311
11      caronelawoffices@gmail.com
12
13  For the Defendants:
14      JOSEPH M. POLICK, ESQUIRE
        Chief Assistant Corporation Counsel
15      30 N. LaSalle Street
        Suite 900
16      Chicago, Illinois  60602
        (312) 744-8335
```

**Page 3**

```
 1               C-O-N-T-E-N-T-S
 2     WITNESS:  PHILIP P. HAYDEN, Ed.D.
 3                                         Page
 4  EXAMINATION BY:
 5     Mr. Polick                             4
       Mr. DeRose                           185
 6     Mr. Polick                           195
 7
               E-X-H-I-B-I-T-S
 9
10  No. 1 - Curriculum Vitae....................4
    No. 2 - Testimony & Depo List..............4
11  No. 3 - Hayden Report......................4
    No. 4 - Notice of Deposition...............7
12  No. 5 - Attachment #3....................101
    No. 6 - Attachment #4....................101
```

**Page 4**

```
 1              P-R-O-C-E-E-D-I-N-G-S
 2  Thereupon,
 3         PHILIP P. HAYDEN, Ed.D.
 4  was called as a witness and after having been first
 5  duly sworn, was deposed and testified as follows:
 6      EXAMINATION BY COUNSEL FOR DEFENDANTS
 7         (Whereupon, Deposition Exhibits 1 through 3
 8  were marked prior to the start of the deposition.)
 9  BY MR. POLICK:
10     Q    Sir, could you state your name and spell it
11  for the court reporter, please?
12     A    My name is Philip P. Hayden.  And that's
13  one "L."  P-h-i-l-i-p.  Last name Hayden,
14  H-a-y-d-e-n.
15     Q    And how do you like to be addressed?  Is it
16  Doctor?  Mister?
17     A    Dr. Hayden is fine.
18     Q    Okay.  Let the record reflect that this is
19  the deposition of Dr. Philip P. Hayden.  It's being
20  taken pursuant to agreement and notice and the
21  applicable Federal Rules of Civil Procedure and local
22  Court rules of the Northern District of Illinois.
```

**Page 17**

1 wrong. And it was more at getting them involved in
2 the whole educational process.
3  Q   Is your dissertation published?
4  A   No, it is not.
5  Q   Is it listed anywhere in your Curriculum
6 Vitae?
7  A   No, it is not.
8  Q   Okay. When did you write your
9 dissertation?
10  A   Finished it up in '97. So it took me three
11 years to do all of the research on that. So it was
12 '95, '6 and '7 that I was working on it.
13  Q   So your Doctorate is in education with a
14 specialty in adult education?
15  A   That's correct.
16  Q   All right. You're not a medical doctor,
17 correct?
18  A   I am not.
19  Q   Do you have any medical training besides
20 maybe basic first-aid?
21  A   I went through an EMT course back in 1978,
22 I believe it was. I was a first responder EMT. I

**Page 18**

1 never was certified as an EMT. But it was the same
2 training as the first responder course.
3  Q   Where did you get that training?
4  A   Suffolk County Police Department in New
5 York.
6  Q   And you said that was in 1978?
7  A   I think it was around 1978. I'm not
8 positive of the date, but it was right around that
9 time.
10  Q   And you were never certified as a first
11 responder EMT?
12  A   I was recertified as a first responder but
13 not an EMT.
14  Q   Okay.
15  A   I didn't want to go that route.
16  Q   All right. So just for clarification, you
17 were certified as a first responder? Am I
18 understanding you correctly?
19  A   That's correct.
20  Q   But never certified as an EMT?
21  A   That's correct.
22  Q   Have you ever been certified as an EMT

**Page 19**

1 paramedic?
2  A   I have not.
3  Q   And in your consulting business where you
4 consult with lawyers in litigation, do you hold
5 yourself out as having any expertise in EMT or first
6 responder training?
7  A   I do not.
8  Q   Are you a lawyer?
9  A   I am not.
10  Q   Do you have any legal training?
11  A   I have taken legal courses through the
12 college, but that was it. Or law courses.
13  Q   Okay. And so you're not a lawyer. Any
14 paralegal training?
15  A   I do not have paralegal training.
16  Q   Are you a psychiatrist or psychologist?
17  A   I am not.
18  Q   Are you a mental health professional?
19  A   I am not.
20  Q   Do you hold yourself out as having any
21 expertise as a mental health professional?
22  A   I do not.

**Page 20**

1  Q   Are you trained as a forensic scientist?
2  A   I am not.
3  Q   Do you hold yourself out as having any
4 expertise in forensic science?
5  A   I do not.
6  Q   Are you professionally licensed in any
7 field?
8  A   I am not.
9  Q   All right. Going back to your CV under
10 your professional experience, the first bullet point
11 you have listed there you say you were certified by
12 the Force Science Institute in 2014. Can you tell me
13 what type of certification that is?
14  A   The certification deals with fairly much
15 use of force situations. And I'm on the Board of the
16 Force Science Institute, and I went to this training
17 just to see if anything had changed over the years.
18 And it deals with how officers react in situations in
19 high risk situations, and then when they do react, is
20 their reaction normal, abnormal? Are there things
21 that happen, any situation that the general public
22 might look at as being not normal and yet it's a

**Page 161**

1    Q    All right. Dr. Hayden, you understand that
2 you're still under oath?
3    A    Yes, I do.
4    Q    Okay. I'm continuing on at Page 6 of your
5 report here, and I'm in the second full paragraph on
6 Page 6. You start that paragraph off by saying, It
7 appears that either the Chicago Police Department
8 failed to properly train its force regarding the use
9 of Tasers, or the officers involved in the incident
10 ignored their training.
11       Do you see that?
12    A    Yes, I do.
13    Q    Are you giving any opinion whatsoever in
14 this case as to whether the Chicago Police Department
15 failed to properly train its force regarding the use
16 of Tasers?
17    A    What I'm saying here is one of the two
18 here. They didn't train them, or the individuals out
19 there in the field are ignoring the training.
20    Q    You don't know one way or the other what
21 may have caused the officers to react the way they
22 do?

**Page 162**

1    A    I do not know.
2    Q    So it could be one or the other? Is that
3 what you're saying here in this case?
4    A    It could be one or the other or both. I
5 don't know.
6    Q    But are you making any specific opinion in
7 this case that the Chicago Police Department has
8 failed to train its officers regarding the use of
9 Tasers?
10    A    From the training material I saw, it looks
11 like the material is there to train the police
12 officers properly.
13    Q    Okay. You say at the end of that paragraph
14 that mental health professionals should have been
15 called in to deal with Mr. Lopez and try to calm him
16 down so that he could be transported to a mental
17 health facility or released. Do you see that?
18    A    Yes, I do.
19    Q    My first question with regard to that
20 sentence is: Who are the mental health professionals
21 that should have been called in to deal with
22 Mr. Lopez?

**Page 163**

1    A    Throughout the country there are a lot of
2 departments beginning to use mental health
3 professionals. They are people that might be
4 psychologists or psychiatrists. They could be just
5 people that are trained in dealing with people with
6 problems and as counselor types that would come out
7 and assist a police department when they have
8 somebody that definitely has a mental problem and
9 isn't listening, is acting strange. And they will
10 bring them out to work with them. And it's been
11 fairly successful in the cases that I've seen around
12 the country.
13    Q    Do all major metropolitan police
14 departments across the country have this sort of
15 mental health professional that you're referring to
16 here?
17    A    I can't answer that question. I do not
18 know.
19    Q    When you are making that statement here
20 that mental health professionals should have been
21 called in to deal with Mr. Lopez, are you making that
22 opinion with regard to the officers' actions, or are

**Page 164**

1 you making some sort of opinion with regard to the
2 Chicago Police Department?
3    A    Well, with the Chicago Police Department or
4 the officers, officers are not trained many times in
5 dealing with people with mental problems. So when
6 you're not trained on how to deal with people with
7 mental problems, you can exasperate a situation. You
8 can make it worse. So if you're not trained
9 properly, you really need to have somebody there that
10 is trained properly. So if you can't train the
11 department officers, you need to train somebody to
12 come out and help.
13    Q    So are you rendering an opinion here about
14 the city's policies with respect to having a mental
15 health professional available for this type of
16 situation?
17    A    I don't know on their protocol within the
18 city if they have any mental health professionals on
19 staff or if they have any contracted mental health
20 professionals. I don't know what the City of Chicago
21 has in that effect.
22    Q    So you're unable to offer any opinion with

Page 165

1 respect to the city then, correct?
2   A   That's correct.
3   Q   Based on your review of the facts of this
4 case, how long should the officers have waited before
5 they called in these mental health professionals that
6 you're referring to?
7   A   As soon as they realize that they can't
8 deal with them, and as you had the police officers
9 that arrived on the scene first, they tried to deal
10 with him, and they couldn't deal with him. And if
11 you have been out in the field long enough, you can
12 pretty much make that call pretty quick if you can
13 deal with a person or not.
14       If you can't deal with them, then it's time
15 for you to get a professional there that can deal
16 with them. Just like if you have medical -- a
17 medical problem, you have to get medical people there
18 to deal with them.
19   Q   Before forming your opinions in this case,
20 did you know what the degree of training was for
21 Chicago Fire Department paramedics with regard to
22 patients they encounter who have mental health

Page 166

1 issues?
2   A   The only thing that I understand is that if
3 they feel like they can't handle the individual, that
4 they would call the police.
5   Q   Okay. Are you aware of any other training
6 that Chicago Fire Department paramedics get with
7 regard to dealing with people who have mental health
8 issues, other than what you've just stated?
9   A   I don't know of any other training they
10 get.
11   Q   Hypothetically, let's say, based on your
12 opinion, mental health professionals were called to
13 the scene and Mr. Lopez does the same thing that he
14 was doing while the officers and paramedics were on
15 scene, what happens then?
16       MR. DeROSE: What do you mean -- objection
17 to the form of the question. What do you mean does
18 the same thing? What things are you saying in that
19 hypothetical he was doing?
20       MR. POLICK: Well, let me rephrase if it
21 wasn't clear to you, John. My question is: I'm
22 taking Dr. Hayden's opinion that mental health

Page 167

1 professionals should have been called. And my
2 hypothetical is what if the mental health
3 professionals appear on the scene and Mr. Lopez does
4 the same thing he's been doing when the paramedics
5 and police officers were there, what do -- what are
6 the obligations of anyone on the scene if Mr. Lopez
7 continues to act the way he's been acting, and we now
8 have mental health professionals on the scene?
9       MR. DeROSE: My only problem with your
10 hypothetical is all I understand he was doing is
11 walking around. Waving his arms and walking around,
12 walking away from people.
13       MR. POLICK: Well, that's your
14 understanding. I want Dr. Hayden to answer my
15 question.
16       MR. DeROSE: Well, before you say that, I'd
17 like to know what his understanding of what the man
18 was doing even before the -- anybody gets involved.
19       MR. POLICK: Well, he's got that all in his
20 report, and you can read it just the same as me.
21 BY MR. POLICK:
22   Q   But my question is: Taking Dr. Hayden's

Page 168

1 opinion that mental health professionals should have
2 been called to the scene, what should be done by the
3 police officers if the mental health professionals
4 get to the scene and attempt to interact with
5 Mr. Lopez, and Mr. Lopez continues to do the same
6 thing that he was doing? Swinging his arms, not
7 cooperating, walking back and forth. What should the
8 officers do then? Do you understand my question,
9 Doctor?
10   A   Yes, I do.
11   Q   Okay. Please answer that question.
12   A   I like your hypothetical, because it kind
13 of lays out the whole problem. If you bring a mental
14 health professional and he is watching the same
15 behavior, Mr. Lopez walking around, he's clenching
16 his fists, he's walking away from people. You can
17 see he's irritated, and he cannot do anything with
18 him, then the police have to decide what's the next
19 action? Do we let him go? We just walk away? Or do
20 we have to take him into custody for his own health
21 or for somebody else's health, whatever it might be.
22 Do we have to do something?