```
1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
2                             EASTERN DIVISION

3
     JOSE LOPEZ, by his wife and next   )   Docket No. 12 C 5751
4    best friend, SANDRA CARDIEL,       )
                                        )
5                    Plaintiff,         )   Chicago, Illinois
                                        )   January 30, 2017
6              v.                       )   12:58 p.m.
                                        )
7    STEVAN VIDLJINOVIC, Star           )
     No. 4051, et al.,                  )
8                                       )
                    Defendants.         )
9

10         TRANSCRIPT OF PROCEEDINGS - Final Pretrial Conference
               BEFORE THE HONORABLE JOHN ROBERT BLAKEY
11

12   APPEARANCES:

13
     For the Plaintiff:    JOHN P. DeROSE and ASSOCIATES, by
14                         MR. JOHN P. DeROSE
                           15 Spinning Wheel Road
15                         Suite 428
                           Hinsdale, IL 60521
16
                           LAW OFFICE of FRANCO N. CARONE, by
17                         MR. FRANCO N. CARONE
                           236 East North Avenue
18                         Northlake, IL 60164

19
     For the Defendants:   THE SOTOS LAW FIRM, PC, by
20                         MR. JOSEPH M. POLICK
                           MS. ELIZABETH A. EKL
21                         MS. LAURA M. RANUM
                           550 East Devon Avenue
22                         Suite 150
                           Itasca, IL 60143
23

24

25
```

1    APPEARANCES (Continued):

2

3                         HONORABLE STEPHEN R. PATTON
                         CITY OF CHICAGO CORPORATION COUNSEL, by
                         MS. KELLY C. BAUER
4                         Assistant Corporation Counsel
                         Department of Law
5                         Federal Civil Rights Litigation Division
                         30 North LaSalle Street
6                         Room 900
                         Chicago, IL 60602
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   Court Reporter:     LISA H. BREITER, CSR, RMR, CRR
                         Official Court Reporter
22                         219 S. Dearborn Street, Room 1728
                         Chicago, IL 60604
23                         (312) 818-6683
                         lisa_breiter@ilnd.uscourts.gov
24

25

1     (In open court.)

2          THE CLERK:  12 C 5751, Lopez v. City of Chicago.

3          THE COURT:  Good afternoon.  Appearances, please.

4          MR. DeROSE:  John DeRose on behalf of Mr. Lopez,

5     Judge.  And my co-counsel, Franco Carone, will be up here

6     momentarily.

7          THE COURT:  All right.  And you indicated you want to

8     start without him, correct?

9          MR. DeROSE:  Yes, please, your Honor.

10          THE COURT:  Okay.

11          MR. POLICK:  Good afternoon, your Honor.  Joseph

12     Polick, P-O-L-I-C-K, on behalf of the defendants.

13          MS. EKL:  Good afternoon, your Honor.  Elizabeth Ekl,

14     E-K-L, also on behalf of defendants.

15          MS. BAUER:  Good afternoon, your Honor.  Kelly Bauer,

16     B-A-U-E-R, on behalf of defendants.

17          MS. RANUM:  Good afternoon, your Honor.  Laura Ranum,

18     R-A-N-U-M, on behalf of the defendants.

19          THE COURT:  Okay.  Everyone can have a seat, if you

20     want.  Just find a microphone so when you talk, my court

21     reporter can hear you.

22          My standard procedure is to go through essentially my

23     to-do list, and at the end, anything the parties want to raise,

24     we can do that as well.

25          Have the parties had an opportunity to look at my

1    protocol for selecting a civil jury?

2         MR. POLICK:  Yes, your Honor.

3         THE COURT:  Is there any questions or confusion about

4    how I pick a jury?

5         MR. DeROSE:  Judge, I didn't -- I don't remember

6    seeing in your pretrial order how you're going to actually do

7    the selection.  Did I miss that?

8         THE COURT:  It's on my website.

9         And, Paul, can you pass out a copy.

10        I'll give you a copy.  You take a look at it, and let

11   me know if you have any questions.

12        MR. DeROSE:  And, Judge, could I raise one other

13   thing?

14        THE COURT:  Sure.

15        MR. DeROSE:  I noticed that your Honor indicated your

16   preference is to take a 12-person jury, and of course the

17   Court's preference gets preference with us.

18        But, Judge, I do want to mention to your Honor that

19   you've given me one-third more burden.  I'm used to in Federal

20   Court here, the judges pick eight and all eight deliberate

21   unless someone gets excused.

22        But now I will be asked -- you've got to convince 12

23   of them, Judge.  Is that the way you're going to want --

24        THE COURT:  I think 12 jurors is preferable.  But what

25   my practice has been is have 12, no alternates, and if we lose

1    anybody, then we take a verdict of less.

2              And if I can't get to 12 with two panels, I ask the

3    parties if they want to have the jury sit with whatever number

4    we get to.  Usually it's around 10-ish, 11.  Sometimes we get

5    the full 12 off the two panels.

6              And in the absence of any objection, then we would

7    take the jury with however many we got after two panels.

8    Normally, though, I'm able to get 12 out of two panels.

9              So the times, I think the last -- I have a jury out

10   right now.  I believe there are 10 on that one, so I was not

11   able to get to a full complement of 12.

12             I think it creates better verdicts when you have 12

13   sets of eyes and ears.  They don't miss things.  And I think

14   that actually inures to the benefit of both sides because you

15   get more accurate verdicts.  So that's my preference, unless

16   you're asking for 10.  Is that what you want?

17             MR. DeROSE:  Judge, I'm asking for whatever your

18   Honor -- I'm always worried when I've got more people to

19   convince, but I'll live with it.

20             THE COURT:  Okay.  So I'll take that as an agreement

21   on 12.  Do you guys have any problem with 12?

22             MR. POLICK:  No, your Honor.

23             THE COURT:  Okay.  And, of course, we lose one -- you

24   know, we could lose all the way down to six and still get a

25   verdict, but that's not likely.

1     MR. POLICK:  Judge, one of the concerns I just had in

2  terms of questioning the jury, I know one of the proposed *voir*

3  *dire* questions was whether you had a positive or negative

4  experience with the police.

5     I'm just wondering, so as not to poison the whole

6  pool, if we get a show of hands by some jurors on that

7  question, whether they may be questioned or *voir dired* at

8  sidebar so as not to poison the whole group with whatever their

9  experience has been.

10     THE COURT:  Do you have any objection to that,

11  Counsel?

12     MR. DeROSE:  No, Judge.

13     THE COURT:  All right.  My standard practice is to let

14  them know during my questioning that if any answer requires a

15  private answer, they just let us know.  If the parties want to

16  engage in that question with a show of hands and then do the

17  follow-up at sidebar, that's okay.  You just need to make sure

18  that they know not to shoot their mouth off.

19     So if you just, say, do it by a show of hands and then

20  at the end, "Judge, at this point I'd like to ask a couple

21  things at sidebar," and then I'll just wave them over, and we

22  can do them one at a time.  You're going to have to take down

23  their names and make whatever record you need to, and then we

24  can do it at sidebar.  That's not a problem.

25     MR. POLICK:  Thank you, Judge.

1          THE COURT:  There's a long list of individuals that

2     are proposed potential witnesses.  After the pretrial

3     conference today, that list might change.

4          So what I want people to do, the parties to meet and

5     confer.  And by noon on February 3rd, I want you to submit to

6     my proposed order inbox the revised list.

7          And the list should just -- not have a style on it.

8     It should just be an alphabetical listing, single-spaced all

9     the way, because what I do is I attach that to the questions

10    I'm giving the jury, and I ask them to take a look at it and

11    let us know if they think they know anybody.

12         That way I'm not reading off and slaughtering the

13    pronunciation of 40 different names.  People can actually see

14    it in print and think about it in advance.

15         With respect to defendants, though, can you give me

16    the pronunciation of the first two defendants?

17         MR. POLICK:  Yes, your Honor.

18         THE COURT:  How do you pronounce Stevan -- how does it

19    go?

20         MR. POLICK:  "Vid-LIN-oh-vick."  The J is silent.

21         THE COURT:  So it's "vid-LIN" --

22         MR. POLICK:  "Oh-vick."

23         THE COURT:  -- "oh-vick."  Okay.

24         And then is it "GIT-ler"?

25         MR. POLICK:  "GET-ler," yes.

1           THE COURT:  "GET-ler"?

2           MR. POLICK:  "GET-ler."

3           THE COURT:  And "val-doh" --

4           MR. POLICK:  "Val-doh-VEEN-nos."

5           THE COURT:  "Val-doh-VEEN-nos."

6           And the rest of them are pretty -- is it "CHEAT-um"?

7           MR. POLICK:  Yes, your Honor.

8           THE COURT:  All right.  Before you leave today, make

9    sure my courtroom deputy has your cell phone numbers.  It's not

10   important now, but obviously once we get the trial going, if

11   there's any scheduling things, she needs to be able to get

12   ahold of everybody very quickly.

13          You need to designate in the list you give her what

14   we'll call the lead person.  Let's say we get a jury question

15   at the end of the day.  She's not going to call every single

16   lawyer.  She's going to make two calls: one to the plaintiff,

17   one to the defense.

18          And you just put a little star against that.  And then

19   that person can call the rest of the people on the team or

20   defendants or whoever needs to come for a jury question or

21   whatever.  That's not part of the record or anything, but she

22   does need to have it.  And it becomes inconvenient if we can't

23   get ahold of people, obviously.

24          Selection is one day and do not do openings on that

25   day.  And the reason that is is because I don't know whether or

1    not we're going to have the selection completed or what time

2    selection might be completed.

3            So rather than have jurors sitting around for the

4    potential of an opening statement and witnesses potentially

5    sitting around maybe being called or not, it's better to have

6    certainty.  So what we'll do is we'll pick the jury on that

7    Monday, and then opening statements will be on Tuesday.

8            As we pick jurors during the process, I release them

9    for the day.  So people are -- when we get complete the

10   questioning of an individual, they're either stricken for

11   cause, stricken on a peremptory or chosen and sent home, to

12   come back the next day.  So just for your planning purposes,

13   you're not going to need any witnesses that first day.  That's

14   just selection.

15           Our normal trial schedule is 10:00 or 10:30 start, and

16   by that I mean jury's in the box, and there's a witness on the

17   stand talking.  The attorneys normally have to be here a half

18   hour in advance because there's always something that comes up.

19           And I don't -- the one thing I really don't want to do

20   is have a jury waiting unnecessarily.  That's one of the -- I

21   think it's really important for the parties and the Court to

22   acknowledge the jury's sacrifice in being here.  And one of the

23   ways we do that is we try not to waste their time.

24           So if the parties can appear -- let's say we had a

25   10:30 start.  The normal schedule would be 10:00 o'clock

1    attorneys.  That way, if there's something that comes up -- if

2    nothing comes up, that's great.  You've got time to go over

3    your notes for the proceedings that day.  If not, we have

4    enough time built in to get through the issue and still start

5    on time.

6         I normally continue to have my other cases during the

7    trial.  So my calendar call usually starts at 9:45, and I

8    usually can get through it in about 15 minutes to 30 minutes or

9    so.  So that's part of the schedule as well.

10        When you're on trial, you own this courtroom, though.

11   So the people in the calendar call will not be taking your

12   tables, and if they are, you can boot them.  And I just ask

13   that you be quiet while you're getting ready while I run

14   through my call.

15        I take my criminal cases over the lunch break, too.

16   So just for planning purposes, that might happen as well.  I

17   normally go five days a week unless there's something coming

18   up.  If the parties think that they're going to run out of

19   witnesses on a particular day or you think you have a special

20   issue with a witness, that's the kind of thing you need to tell

21   me in advance because I will require that you go from whenever

22   our start is till 5:00.

23        I will not hold the jury past 5:00.  I won't hold them

24   at 5:01.  So if you're in the middle of a witness, we're

25   stopping, and that witness is going to have to come back, even

1    if there's only 15 or 20 minutes left of questioning.

2         The reason I do that is because the jurors have

3    sometimes two-hour commutes.  That's why I don't start them

4    before 10:00; that's why I don't hold them past 5:00.  Two-hour

5    commutes each way, because they're not drawn from Cook County;

6    they're drawn from the entire Northern District of Illinois.

7         So, again, you know, people getting kids off to

8    school, trying to arrange for child care, trying to maintain

9    work issues.  And some people are on long bus rides and train

10   rides.  So for planning purposes, we don't go past 5:00.

11        I also want to go all the way to 5:00.  So don't stop

12   at 3:00 o'clock and say, "Judge, I ran out of witnesses,"

13   because you should have had an extra witness standing by.  It's

14   better to have a witness here and not called and waste one

15   person's time than 12 people because the jurors are making a

16   bigger sacrifice.

17        So do the best you can.  I realize trial practice is

18   fluid.  You're not going to be perfect.  So I'm not going to

19   expect you to be perfect, but I do expect you to make a good

20   effort on that.

21        Paul, do you have the new case statement?  I think I

22   got it.  Here we go.  Can you pass these out.  Pass these

23   out -- not those, these.  The case statement, I saw the parties

24   couldn't agree on a case statement.  That's usually not a good

25   sign to start out.

1     The case statement is not an opening statement.  Okay?

2     So it's not about getting into the facts.  So both proposals

3     were more in the line of an opening statement.  A case

4     statement for -- in this court is essentially just explaining

5     what the claims are.  So I've got a revised case statement,

6     which basically lists the defendants, names the claim and notes

7     the denial.

8          Everyone take a look at that and let me know if

9     there's any objection to the Court using its own case

10    statement.

11         MR. POLICK:  I would say the only thing I think is

12    missing in terms of the claim would be the alleged illegal

13    seizure by the defendants as well, which is part of my

14    opponent's case here.

15         THE COURT:  All right.  So I would have to add a line

16    before "finally"?  Or would I add something to the first

17    sentence, "utilized excessive force and illegally seized him"?

18         MR. POLICK:  Correct.

19         MR. DeROSE:  The first.

20         THE COURT:  "Utilized excessive force and unlawfully

21    seized him."  All right.  So it would say, "utilized excessive

22    force against him and unlawfully seized him on July 22nd,

23    2011"; is that correct?

24         MR. DeROSE:  Yes, Judge.

25         MR. POLICK:  Yes, your Honor.

1      THE COURT:  Okay.  I'll make that change.  Thank you,

2  Counsel.

3      Anything else that needs to be changed on the --

4      MR. DeROSE:  Nothing on behalf of the plaintiff, your

5  Honor.

6      THE COURT:  Nothing on behalf of the plaintiff?

7      MR. DeROSE:  No, your Honor.

8      THE COURT:  All right.  My jury -- Counsel, I hate to

9  do this, but I just got a verdict.

10     So, Gloria, could you call the attorneys on that case.

11     THE CLERK:  I did, Judge.

12     THE COURT:  As soon as they're here, we're going to

13  take a quick break.  I'm going to take that verdict.  But let's

14  get as much done as we can before we get to that.

15     Okay.  All right.  In terms of stipulations,

16  obviously, there are three kinds of stipulations.  One is a

17  factual stipulation, one is a testimonial stipulation and the

18  other we'll call an agreement among the parties regarding some

19  objection or not.

20     Obviously, an agreement among the parties to either

21  waive or give up certain objections is not something that's

22  published to the jury.  But if you have some agreement among

23  the parties that you want me to hold the other party to, I'm

24  happy to do that.

25     If you have a testimonial or a factual stipulation, my

1    practice is the same as everybody else in the building.  When

2    you get to that point in your case, you say, "Judge, at this

3    point the plaintiff" or "the defendant would like to proceed by

4    way of stipulation."  I'll give them the standard instruction,

5    explain what a stipulation is.  And then the party reads

6    verbatim the agreed language.  And then I'll ask, "So

7    stipulated?"  And then everyone will say that on the record.

8           The stipulation does not go back to the jury, but the

9    stipulation is admitted into evidence just like testimony would

10   be.  I saw the proposed stipulations, and those were fine.  If

11   you want me to hold or bind the parties to any of those

12   stipulations now in order to relieve the necessity to call a

13   witness or prepare a witness, I'm happy to do that.

14          But based on the stipulations I saw, I don't envision

15   that the parties need to do that.  It would simply be a

16   question of entering into the stipulations mid trial whenever

17   you think those particular stipulations should be entered.

18          Is that your understanding?

19          MR. DeROSE:  Yes, your Honor.

20          THE COURT:  Is that your understanding?

21          MR. POLICK:  Yes.

22          THE COURT:  Okay, great.  I also see that given the

23   objections that there's not going to be any certifications

24   regarding records custodians.  The parties are going to hold

25   each other to their burden of establishing a foundation; is

1  that correct?

2       MR. DeROSE:  I'm asking the Court that things like

3  birth certificates and wedding certificates, I think your Honor

4  can take judicial notice of them.  They're official documents.

5       I thought we can get it for police reports also that

6  are -- or police special orders and general orders.  But the

7  defense has not agreed to anything yet.  We might still be able

8  to work some of this out.

9       THE COURT:  Well, my question in particular has to do

10  with a certification process to avoid a records custodian.  My

11  understanding is that the parties are not engaging that because

12  there are objections, and people need to have records

13  custodians available; is that correct?

14       MR. POLICK:  No, your Honor.  I mean, I think the

15  biggest chunk of material that would fall under a record keeper

16  would be the hospital records, and I don't think anyone is

17  disputing that the hospital records are what they purport to

18  be.

19       I think we reserved our objections because while all

20  parties agree the records are what they are, we don't exactly

21  know what each side is intending to use them for.  There may be

22  other objections such as hearsay or whatnot, but I don't think

23  anybody's objecting to the authenticity of the hospital

24  records.

25       THE COURT:  Well, authenticity objection is not the

1    same thing as a hearsay.  And if someone needs to lay the

2    foundation to overcome a hearsay objection, they'd better have

3    the witness in the absence of a stipulation that I'm going to

4    do now.

5         So agreeing to authenticity is not agreeing to

6    admissibility.  And it doesn't address hearsay within hearsay.

7    It doesn't address 403 concerns.  It doesn't address relevance.

8    Obviously, that's a bad example for that one.

9         But if you want to engage in anything right now in

10   terms of an agreement among the parties to alleviate the need

11   to call a records custodian, now is the time to do it because

12   if you don't do it, you have to have the records custodian

13   there, and you have to lay a foundation in the absence of an

14   agreement.  That's just the rules.

15        So is there any records custodians the parties can

16   look at a particular exhibit, name it, put it on the record and

17   say that you're not making a foundation objection, that you're

18   agreeing to authenticity and non-hearsay or that it's a

19   business record, or what agreements do you want?  Because

20   that's the whole purpose of the meet-and-confer.

21        MR. DeROSE:  The plaintiff will agree to the

22   authenticity of every record that is in our pretrial order or

23   mentioned by the parties or the lawyers -- excuse me -- or the

24   doctors who treated the party without reservation, Judge.

25        THE COURT:  All right.  Well, authenticity is only one

1    thing.  So are you agreeing that -- well, the parties tell me.

2    What exhibits by number are you agreeing or not agreeing to the

3    equivalent testimony of a records custodian?  Because you know

4    what the parties really -- if there's no cross to be had on a

5    records custodian, why are you wasting that person's time in

6    court all day?  It's not fair to people.

7         So the parties have a burden to -- under Rule 1 to try

8    to streamline the litigation consistent with being a vigorous

9    advocate for their client.  So is there -- are you going to

10   agree that certain -- certain exhibits are business records or

11   public records or what?  I mean, what's your thought?  You

12   don't have to, but, you know, it's up to you guys.

13        MR. POLICK:  I would think the majority of the

14   hospital records would be -- the authenticity would be agreed

15   to.  We're all working off the same hospital records, so those

16   from Mount Sinai --

17        THE COURT:  Are you going to agree they're medical

18   records and therefore not hearsay?  And are you going to seek

19   redactions of them if there's hearsay within hearsay?

20        MR. POLICK:  Well, if there's hearsay within hearsay,

21   again, that may be problematic.  I don't know how my opponent

22   intends to use it.  But I think we're all agreeing that these

23   are the medical records and they are business records.

24        We don't need to bring in a custodian to say that

25   these are the records that were generated by Mr. Lopez'

1    treatment at such and such a hospital.

2              THE COURT:  Do you want to -- do you agree to that?

3              MR. DeROSE:  Yes, Judge.

4              THE COURT:  Put on the record right now because we're

5    not going to have a dispute about this in the trial.  What's

6    the number of the exhibits you're referring to?

7              MR. DeROSE:  Judge, every exhibit I've offered --

8              THE COURT:  Counsel, no, I'm not going to do it with a

9    generic definition because then there's a dispute later about

10   whether or not something falls within it.  I want a list of

11   what numbers they are because it's either in or out.  It's much

12   simpler later when there's a misunderstanding about things.  I

13   understand what you're saying, but the shortcut actually will

14   cause problems for us later.

15             Counsel, go ahead and take your time and read whatever

16   you've got in terms of the medical records.  And what we'll do

17   is we'll have a stipulation.  The parties are stipulating as to

18   authenticity and the fact that they are business records, but

19   you're not waiving any 403, relevance or hearsay within hearsay

20   objections.  Is that agreeable?

21             MR. POLICK:  Yes, your Honor.

22             THE COURT:  Is that agreeable?

23             MR. DeROSE:  Yes, your Honor.

24             THE COURT:  All right.  So now if those records get

25   in, then if someone's going to interpret them, that's something

1  else.  But the records themselves would get in.

2  I want the parties also to meet and confer regarding

3  this exhibit and do whatever redactions the parties are able to

4  agree to.  So if there is something that's not -- that might be

5  prejudicial to one side and the other side doesn't care about

6  it and you want to redact it, that's fine.  If there's hearsay

7  within hearsay that the other side doesn't really care about,

8  whatever the case may be, you can make some redactions.

9  In the absence of the redactions, though, the parties

10  need to let me know whether or not there's hearsay within

11  hearsay objections.  Otherwise, I'll expect that document to go

12  into evidence very quickly.

13  All right.  So I need to know by February 3rd at noon

14  exactly the list of which exhibits you're agreeing to and if

15  there are any redactions that need to be made or objections

16  that need to be preserved because my expectation is that you're

17  going to be waiving authenticity and hearsay objections in the

18  absence of you clarifying something.

19  Is there any other exhibit that you think the parties

20  can come to agreement on to avoid a records custodian?

21  MR. DeROSE:  Judge, I believe all of the dispatch

22  times, I think we can agree that that -- we've been working

23  from that from the beginning.  And the two police reports that

24  were drafted in the case, I would expect we can agree to that.

25  THE COURT:  Do you agree to admission of the two

1    police reports as public records or business records, Counsel?

2         MR. POLICK:  I don't know that the police reports

3    themselves would go back.  We're not disputing that they're

4    authentic records.

5         THE COURT:  If it's in evidence, it goes back unless

6    there's a reason not to.

7         MR. POLICK:  I don't think we have any issue with the

8    police reports.

9         THE COURT:  All right.  So you're not going to make --

10   you're going to waive any objection to it being admitted as an

11   agreed exhibit?

12        MR. POLICK:  Depending -- I don't want to say I'll

13   waive any objection.  I mean, it depends again how my --

14        THE COURT:  Well, now is the time to tell me what your

15   objection is.  Do you object to it or not?  I mean, what he

16   argues from it is a separate thing.  Whether or not it goes

17   into evidence is the issue right now.

18        Do you object to it or not?  I'll make him call a

19   custodian if you want, but --

20        MR. POLICK:  No, we don't need to call a custodian to

21   authenticate or lay the foundation for the police reports.

22   Absolutely not.

23        THE COURT:  All right.  Do you have any 403, hearsay,

24   authenticity, any type of evidentiary objection to the

25   admission of the exhibit?

1    MR. POLICK:  As I sit here now, I can't -- without it

2  being in the context of the trial, no, I can't.  I can't think

3  of any other --

4    THE COURT:  Counsel, all right.  There's not an

5  agreement.  You're going to have to bring a witness in and lay

6  the foundation.  It's not an agreed exhibit.  You either agree

7  or you don't.  So it's okay if you don't.  If you want to try

8  the case that way, that's fine.

9    MR. POLICK:  As I understand your Honor's definition

10  of an agreed exhibit, you're waiving any and all objection to

11  it.

12    THE COURT:  To it being admitted into evidence, yes.

13    MR. POLICK:  Yes, so --

14    THE COURT:  Otherwise, you can say, "You know what?

15  I'm not agreeing to it.  He has to lay the foundation."  And

16  then he can try, and then you can say objection or not when he

17  moves -- tries to move it in.  It's up to you.

18    MR. POLICK:  What I'm saying is that I'm not going to

19  force Mr. DeRose or the plaintiff to make -- to bring in a

20  record keeper from the police department to say this is the

21  police report.  We're all working off the same report.  So

22  it's --

23    THE COURT:  Well, what --

24    MR. POLICK:  -- not an exhibit -- they are not

25  exhibits that require a record keeper to come in and lay the

1   foundation.  We agree that these are the police reports.

2          How he uses those at trial may engender some other

3   type of exhibit, but we're not objecting to the foundation that

4   they are what they purport to be.

5          THE COURT:  Authenticity is only part of an

6   evidentiary foundation.  Are you making any 403, hearsay

7   objections to it?

8          MR. POLICK:  Without knowing what the question is, I

9   can't answer that question at this time.  I don't think I have

10  any 403 --

11         THE COURT:  It's not agreed.  So the only -- right now

12  the only agreed one we have is the medical records, and we'll

13  see what that looks like by noon on February 3rd.

14         Any other exhibits you think you guys can reach an

15  agreement on?

16         MR. DeROSE:  Judge, there are two handwritten

17  statements taken from the two paramedics by the Independent

18  Police Review Authority investigator.  I'm asking because we've

19  had a witness already tell us under oath how they came into

20  being, what they are.  And we have a stipulation that they are

21  what they are and they were taken in the way we've all learned

22  they were taken.

23         THE COURT:  Why would that be admissible?

24         MR. DeROSE:  Pardon?

25         THE COURT:  Why would that be admissible?  Do you have

1    the witness to testify?

2            MR. DeROSE:  They'll be admissible to show that the

3    paramedics are impeached by some of their own verbal statements

4    to the IPRA investigator who wrote the report and they signed

5    it.

6            THE COURT:  Well, normally what would happen is the

7    witness will be on the stand -- and are you talking about a

8    defendant or somebody else?

9            MR. DeROSE:  They are defendants.

10           THE COURT:  All right.  So to the degree it's a

11   defendant, it would be admission by a party opponent.  You

12   objecting to any of those going in?

13           MR. POLICK:  We don't believe they're admissible into

14   evidence.  What we believe they're properly used for is

15   impeachment and to refresh the witness' recollection.  But

16   typically the statements of whoever they may be do not go into

17   evidence.

18           THE COURT:  Well, that's true generally because a

19   prior inconsistent statement, you would first have to ask the

20   question.  And then if you need to perfect it, it depends on

21   whether or not it's collateral.

22           But admission by a party opponent's different.  It's

23   not just being used for impeachment or prior inconsistent

24   statement.  Ostensibly, admission by a party opponent, if they

25   lay the foundation for it, it would go right in.  So what's

1    your objection to the admission of those documents?

2              MR. POLICK:  It's coming from an IPRA investigation

3    which we've moved *in limine* to keep out of this case.  We don't

4    believe there should be any mention of the underlying

5    investigation that went on here.

6              THE COURT:  What about the statement itself, though?

7              MR. POLICK:  The statement itself, again, if he wants

8    to use it for impeachment or to refresh a witness'

9    recollection, I have no issue with that.

10             THE COURT:  All right.  He's objecting, so you're

11   going to have to lay the foundation for an admission by a party

12   opponent, et cetera, et cetera.  He's not agreeing to it.

13             MR. POLICK:  Well, Judge, I mean, again, I'm not -- I

14   don't want to prolong the trial.  And, again, I'm not disputing

15   the fact -- or the defense is not disputing the fact that these

16   things are what they are.  We have a concern --

17             THE COURT:  Counsel, I understand that.  But agreeing

18   to authenticity is not agreeing to admissibility.

19             MR. POLICK:  Right.  And that's why --

20             THE COURT:  So that's different, and you're

21   entitled --

22             MR. POLICK:  Right.

23             THE COURT:  -- to hold him to his burden.  I'm not

24   telling you -- I'm just trying to figure out if there's

25   anything that you guys are agreeing on.  And if you're not,

1      that's okay.

2              MR. POLICK:  So with regard to those statements, there

3      are relevance and 403 objections to them.

4              THE COURT:  Okay.  So you're going to have those as

5      well.  Okay.  We'll address the IPRA investigation in the

6      motions *in limine*.  I'll do that at the end.  But at least at

7      this point we're just talking about exhibits.

8              Is there anything else you think you -- parties can

9      have an agreement on?  Right now we're potentially some medical

10     records.  That's it right now.

11             MR. POLICK:  He's got some birth certificates and

12     death certificates or marriage certificates.  Obviously, those

13     are public records.  We don't have any objections as to their

14     authenticity.  We have some certified convictions.

15             THE COURT:  Do you have any objection to their

16     admissibility?  Not their authenticity, their admissibility.

17     Do you have any objection to those?

18             MR. POLICK:  Yes, I think some of them are basically

19     irrelevant to the issues in this case.

20             THE COURT:  All right.  So you don't have an agreement

21     on those.  But if you want to -- do you want to waive public

22     record and authenticity objections to those records and it just

23     becomes a relevance issue?

24             MR. POLICK:  Yes.  We're not disputing that they're

25     public records.

1        THE COURT:  Okay.  For the submission on February 3rd,

2   go ahead, list by number any of those documents, those public

3   record documents.  And if you can agree that they're authentic

4   public records and non-hearsay and then reserve relevance

5   objections, then that's fine.  Go ahead and do that.

6        I think circumstantial, he'll be able to tie up the

7   relevance.  And at least then you won't have to call a keeper

8   of birth records or whatever it is.

9        Okay.  Anything else like that, Counsel?

10       MR. POLICK:  Yes.  We have a -- what's typically

11  called a Secretary of State driver's license abstract that

12  shows Mr. Lopez' driving record.  That's a public document or a

13  state-issued document.

14       We also have several certified convictions from both

15  Illinois and Texas.  I'm assuming that those are -- we're not

16  disputing that they are authentic.  I know they have other

17  objections to them, but --

18       THE COURT:  All right.  If you agree to authenticity

19  and non-hearsay, but reserving relevance and 403 objections,

20  add that to the list for February 3rd.  Okay?

21       Anything else in terms of exhibits?

22       MR. DeROSE:  Nothing I can think of.

23       THE COURT:  Okay, great.  That's awesome.

24    (Court and clerk conferring.)

25       THE COURT:  All right.  Based on that, the Court's not

1    going to preadmit any of the evidence.  I'm going to see what

2    you guys do in terms of your agreement about what objections

3    you're giving up.  And hopefully that helps streamline things

4    so we don't have records custodians sitting around for nothing.

5         Does anyone intend on presenting any deposition

6    testimony in lieu of live testimony?

7         MR. DeROSE:  Not at this point, Judge.  I did catch up

8    with Dr. Sturgill.  He called me back, but I've never had phone

9    contact with him yet.  If he doesn't show up -- and there has

10   been some inability to reach him -- I might have to ask for

11   leave to put his videotape dep in.

12        I hope I don't.  I want him live, and I don't expect

13   that that's going to be a problem.

14        THE COURT:  I'm not going to permit it unless you give

15   the other side notice.  So figure out what portions that you

16   would have to in the case that it -- that that becomes.  And

17   meet and confer with the other side because sometimes people

18   need to edit out objections, et cetera, on the video.  And

19   that's something you can't do on the fly during trial.

20        So have one ready to go, and if there's any objections

21   about the designations, you know, what part's being redacted or

22   what have you, let me know.

23        Is there any deposition that's not in video form that

24   someone intends to present in lieu of live testimony?

25        MR. DeROSE:  No, Judge.

1       MR. POLICK:  At this point, no, Judge.  I would say,

2   though, with regard to my opponent's witness, Dr. Sturgill, we

3   have -- the parties have gone through and made the respective

4   designations.  I think we've worked that out.

5       I want to say there's maybe three objections that need

6   to be ruled on by the Court.  But other than that, they're

7   basically foundational objections.  Other than that, I don't

8   think there's much.

9       THE COURT:  Okay.

10      MR. POLICK:  But we have gone through that transcript.

11      THE COURT:  All right.  Give me the -- is that the

12  video?

13      MR. DeROSE:  It's a video, but we have a transcript

14  also.

15      THE COURT:  Well, what do you intend on playing, the

16  video or --

17      MR. DeROSE:  I'll do the video, yes.

18      MR. POLICK:  I think he needs the rulings in order to

19  know what to edit out of the video should your Honor sustain my

20  objections.

21      THE COURT:  Do you have those designations right now?

22      MR. POLICK:  I'm not sure if they were made part of

23  the pretrial order.  I know we --

24      THE COURT:  Well, just pass them up, and I'll put it

25  in the written order from today.  That way you'll know the

1   balls and strikes on that, and you can edit accordingly.

2           Obviously, if any witness on the stand was deposed

3   earlier and they say something and you want to impeach, you can

4   go ahead and do that in the normal fashion.

5           I'm just trying to figure out if there's any

6   designations in lieu of live testimony and any rulings I need

7   to do so we can streamline that process.

8           MR. POLICK:  We may have an issue with one of our

9   expert witnesses just in terms of his availability to appear.

10  So I guess that's going to depend a lot, though, on the

11  scheduling of the trial and how fast we're moving.  We may --

12  we may have an issue where we need to take his deposition, but

13  at this point --

14          THE COURT:  What do you mean, take his deposition?

15          MR. POLICK:  To preserve his testimony.

16          THE COURT:  Well, when would you propose doing that?

17  The trial is pretty soon.

18          MR. POLICK:  Yes, we could do it -- we could do it

19  over the weekend.  I know he's available on I think that

20  weekend.  The first week of trial, he's available that weekend,

21  should we need that.  If it looks like things are moving

22  faster, quicker than we propose, then he is available to do so.

23          THE COURT:  Well, you're going to need to talk with

24  the other side because ...

25          MR. DeROSE:  We have witnesses coming in from out of

1    state, Judge, that we're going to be working with on that

2    weekend.

3           THE COURT:  Yeah.  So you have no deposition right now

4    on that individual?

5           MR. POLICK:  We have -- yes, we have the deposition

6    that was taken by Mr. DeRose during discovery in the case.  We

7    do have that deposition.

8           THE COURT:  All right.  So if --

9           MR. POLICK:  We may be able to use that.

10          THE COURT:  Yeah, and I've seen that published very

11   easily, too.  You have a, you know, paralegal or somebody hit

12   the stand.  They read one part; the lawyer reads the other.  We

13   just did that on the trial I got right now, so it happens all

14   the time.

15          A video deposition, the problem with that is

16   discovery's closed.  So in the absence of an agreement -- he's

17   got to get ready for trial, too.  And we'd have to edit it, and

18   then you'd have to have designations and I'd have to look at

19   them.

20          If the parties are able to work something out, that's

21   great.  But if not, then you might have to use the written

22   deposition.  Hopefully the trial will be predictable enough,

23   you can make sure he's live because obviously live testimony is

24   better for everybody.

25          MR. POLICK:  Sure.

 1          THE COURT:  Just let me know on February 3rd what the

 2   plan is whatever you guys are going to do because if there's

 3   more designations I need to look at and help you edit, it's

 4   better to do that so we don't have the jury waiting.

 5          Do we have everybody on the case pending right now?

 6      (The Court attends to other matters.)

 7          MR. DeROSE:  They're all here, Judge.

 8          THE COURT:  I beg your indulgence.  I've got to take a

 9   verdict.  Do you mind just sitting tight for 10 minutes.

10      (The Court attends to other matters.)

11          THE COURT:  Recalling this case, Lopez v. City of

12   Chicago, 12 CV 5751.  Thank you, Counsel.  I apologize for

13   that.  It's just getting double-booked, that's how that goes.

14          Does anyone anticipate any electronic evidence other

15   than the video -- potential video of deposition that we

16   mentioned?  Anything else?

17          MR. DeROSE:  Judge, we'll need your Honor's equipment

18   because all the exhibits will be put on overhead projection.

19   So if we do have one that's in evidence, the jurors can follow

20   right along with the witness.

21          THE COURT:  Okay.  If you want -- obviously I have a

22   setup right now for trial.  This is what it normally looks

23   like, our court's equipment.  I've got the ELMO there.  You

24   also have a plug-in for a laptop if you use a Sanction program

25   or some other evidentiary program.

1        There's a screen over there and one over there.  And

2    then obviously I have one, the witness has one, and the parties

3    have some.  You have to make arrangements with the court in

4    advance, and I would say do it this week.  Otherwise, this

5    stuff will not be here.

6        And also if you haven't used it before, I would -- you

7    can come in -- if you make arrangements with Gloria, you can

8    come in and practice with it to make sure everything -- you're

9    not going to have any technical issues with it.

10        The one thing I want the parties to be very careful of

11   is not to publish an exhibit unless it's in evidence.  Pretty

12   much every trial, somebody screws that up at least once.  And

13   the first time's okay, but the second time's not okay.  So try

14   to make sure that you're not clicking the "publish" button

15   until it's actually in evidence or it's been moved into

16   evidence.

17        An exhibit binder for me with exhibits the first day

18   of evidence.  Obviously, that's a moving target.  People keep

19   having exhibits in and out of their battle plan for whatever

20   their trial is.  But the first day of evidence, I'm going to

21   actually need my binder so I can follow along and have hard

22   copies of whatever the parties are going to present.

23        Do the parties anticipate using any exhibits in

24   opening statement?  And by that I mean demonstratives or

25   otherwise including a PowerPoint.

1          MR. DeROSE:  I'm thinking of one, Judge, but I haven't

2    made up my mind, and I'll share it with counsel beforehand.

3    And we've already delivered you two copies -- or three sets of

4    binders of our exhibits.  You have our exhibits.

5          THE COURT:  If you've already given the binders and

6    they're up-to-date, you don't have to give me another one.  But

7    you have to make sure that the first day of evidence that my

8    binder's complete and not be handing me stuff up:  "Oh, by the

9    way, that's not in there, that's not in there, that's not in

10   there."

11         So just make sure that my binder's up-to-date.  You

12   don't have to give me a new copy if the one that I have is

13   okay.  And obviously just because it's in the binder doesn't

14   mean you have to move it into evidence.  But if you do move it

15   into evidence, it better be in the binder so I can find it.

16         If you do want to use any exhibits or PowerPoints or

17   any demonstratives in opening statement, you have to exchange

18   them the day of selection -- all right? -- so the other side

19   can see them so if there's any objection, I can handle it.

20         Normally there's not any objection.  Sometimes there's

21   an objection to a demonstrative.  But normally since what the

22   lawyers say is not evidence and it's just your idea of what the

23   case will be, most of those objections are not founded, but

24   I'll listen to whatever objections you might have.

25         And if you think there's an issue about whether or not

1    something will get into evidence -- obviously, we'll talk about

2    the motions *in limine* in a moment, and you'll have some

3    guidance there.  But if both parties think that a particular

4    piece of evidence is going to get in, I'll even allow you to --

5    with permission.  If you get permission from me in advance,

6    I'll allow you to use that and show it in opening statement if

7    that's what you want to do.

8           It's up to you guys.  Some people don't do that; some

9    people do.  It's up to you.  But we do need to sort that out

10   the day of selection so that there's no surprises.  And I don't

11   want people's opening statements interrupted unnecessarily if

12   we can sort those issues out in advance.

13          The jury instructions, the Court has the copies from

14   the parties.  I will -- based on what you've submitted and my

15   review of the law and what happens in the case, I will put

16   together a proposed Court's instructions, a packet.  And then

17   at the point during the trial when we're ready to do a charge

18   conference, we'll go through those.

19          I do that in a very regimented way, and the reason I

20   do that is to make sure there's a very good record.  I used to

21   do appeals, and trials, obviously.  But -- before I went on the

22   bench.  But one thing that drove me nut when I -- nuts when I

23   was doing appeals was the inability to figure out what was

24   happening in the charge conference because people would say,

25   "Oh, No. 7."  "Oh, this No. 7."  "Yes, there."  "No."  And you

1    couldn't -- there's two No. 7s, and it was a big mess.

2         So what I do instead of having eight different

3    versions, we just have -- we go off my version.  I got what

4    your submissions are.  I'll incorporate to the degree I think I

5    need anything that you've asked for.  And then we'll just go

6    through mine, and I'll ask, "Court's Instruction 1.  Any

7    objection?"  You either say "object" or "no object," and we go

8    through all of them.

9         And if there's any that object, we'll loop back to

10   those.  But first we go all the way through them and figure out

11   which ones are objected to.  Then we go back to the ones --

12   let's say you objected to No. 2.  I'll say, "All right.  What's

13   your objection to No. 2?"

14        And at that moment you put on the record whatever your

15   objection is, whatever proposed alternative language you would

16   have.  You can't incorporate by reference something you filed

17   previously or anything else.  The whole thing for the Appellate

18   Court's right there.

19        "This is wrong because of this case.  This is what it

20   should say," and you quote it.  You don't paraphrase it; you

21   quote it.  And then that way, if I need -- if I grant your

22   objection, I'm going to pull that right off the transcript, and

23   it's going to help me.  And I'll revise the transcript based on

24   whatever rulings I have -- I mean, revise the draft

25   instructions based on whatever we have.

1    Once we go through that in its entirety, including the

2    verdict form, what I'll do then is ask you:  "Is there any

3    instructions that I did not include in my packet that you would

4    want?"  And then you get to make your record on that.  It's

5    pretty straightforward, but it requires you to have all your

6    notes together on each particular thing.

7    I do not permit memorandums of law during trial.  All

8    right?  So if you have any trial briefs, any issues that you

9    want to put some law in my face -- and I will read it -- you

10   have to do it by 10:00 o'clock on the day of jury selection.

11   That way I have that whole day to read it before the

12   evidentiary phase which would start on the next day.  That's

13   another reason I don't have evidence on the same day of

14   selection.

15   You can after that give me an instruction, if it's

16   something that you hadn't anticipated.  But I'm not going to

17   have a 50-page motion for directed verdict.  I'm not going to

18   have a 50-page this is the instruction that's brand new.

19   Both sides need to be preparing their trials and their

20   witnesses.  If you find that there's something that came up

21   totally unexpected and you need to file a memorandum, you have

22   to seek leave first.  And if there's a reason, I'll give it to

23   you.  But then both sides have an opportunity to respond to it.

24   I get a chance to read it.

25   For example, if you think you know what the evidence

1    looks like, you can actually draft a version of what you think

2    the directed verdict motion would look like and just file it by

3    10:00 o'clock that day.

4         And then if you need to alter it based on the

5    evidence, you can orally say, "Well, Judge, you know, I'm

6    withdrawing, you know, the motion on Count 1, but I want to add

7    the following things."  And you can have an oral argument on

8    whatever else.  But you can't file memorandums of law during

9    trial absent leave.  Okay?

10        Anything else the parties want to address before I do

11   the motions *in limine*?  Because that's the only thing left on

12   my list.

13        MR. DeROSE:  Judge, anything I'm going to say is

14   probably already going to be covered by your Honor.  There was

15   one thing I was ...

16        THE COURT:  I have the motions *in limine* and the

17   bifurcation issue.  Those are the two things left on my list.

18        MR. DeROSE:  And, Judge, you asked us earlier were we

19   going to need the equipment for anything else.  We might need

20   it for, depending on how your Honor rules, for the speech of

21   the mayor and for some other thing -- and I can't remember what

22   it is right now -- that we would have to publish.

23        THE COURT:  All right.  I'm assuming that there's

24   potential -- it sounds like people are going to be using the

25   overhead at a minimum.  And if you want equipment to play any

1    other type of -- whether it's a day-in-the-life video, if that

2    gets in, or whatever else, any electronic evidence, I'm telling

3    you now you can't try to get that in at the last second and

4    expect the tech to work because it won't.

5         So worry about that this week, and then obviously the

6    parties know what the exhibits are.  So anything else?

7         MR. POLICK:  Yes.  Just a point of clarification on

8    the directed verdict motion.  So we can present it in a fashion

9    what we expect the evidence will show, and you just want that

10   legal memorandum ahead of time the day that we're --

11        THE COURT:  Yeah, because if you do that, I can not

12   only read it, but I can research it and really chew up whatever

13   you guys got.  If you give it to me mid trial, I can read it,

14   but it's more limited for what I can do in response to it.

15        Obviously, if it's based on what you expect things to

16   be and they're a little different, then we're still going to

17   have argument.  I'll send the jury back; we'll talk about it at

18   length.

19        And if you still -- if you need -- something totally

20   unexpected came up and you need to file a legal memorandum,

21   then we can adjust it.  But if you know what the case is going

22   to look like, you know what your legal argument's going to be,

23   then front that for me because it helps me -- it also helps me

24   with working through the order of proof on both sides, too,

25   because then I know what to look for.

1    MR. POLICK:  Thank you for that clarification.  We are

2 making certain witnesses, other city employees, available for

3 the plaintiff here so he doesn't have to serve them with

4 subpoenas.  Our issue is that some of these employees can only

5 testify on certain days.

6    If that become -- we also have a couple of medical

7 people under subpoena.  Obviously, their schedules may affect

8 us.  Is that something you want to know ahead of time who can

9 testify when, or is that something you want us to work out

10 between us?

11    THE COURT:  If the parties agree to call somebody out

12 of order, I'll acquiesce to that as long as it doesn't come in

13 the middle of another person's testimony.  So I'm not going to

14 stop somebody on cross to put somebody on.

15    But once that person's done with cross and redirect

16 and that person's done, that one's off, I'm happy to, if the

17 parties agree, to call one of your witnesses in their case if

18 they agree to it.  But I'm not going to force people to call

19 people out of turn.

20    MR. DeROSE:  Your Honor --

21    THE COURT:  If there's scheduling -- and this might go

22 both ways.  If there's scheduling issues where a particular

23 witness can only be a certain day, then the parties need to try

24 to plan for that.  But they also need to realize that you can't

25 necessarily control that.

1    For example, let's say one witness goes a lot longer

2  than you thought or one of our jurors is late one day.  I mean,

3  so the -- to the degree your witnesses have to show up, it's up

4  to you guys to make sure they're here even if it's inconvenient

5  and even if a doctor has to cancel appointments and be here on

6  a different day.

7    But to the degree you guys can work it out and say,

8  you know, "We're going to call this guy this day," as long as

9  you're not interrupting a witness who's currently testifying,

10 I'm fine with that.

11    So have you talked about it with each other?

12    MR. POLICK:  We will.

13    MR. DeROSE:  We are talking.

14    MR. POLICK:  We are talking.

15    MR. DeROSE:  Not very well, but we're talking.

16    Judge, could I also mention there is a circumstance

17 from time to time a witness didn't finish on a particular

18 night, goes home and is coming back tomorrow, but we got

19 another witness that has to be in at 9:30.  Can we interrupt

20 the witness that we --

21    THE COURT:  No.

22    MR. DeROSE:  No.

23    THE COURT:  You can't interrupt a witness.  The jury

24 needs to be able to make sense of the testimony.  So you can

25 call people out of order, but you can't call somebody in the

1    middle of somebody else's testimony.

2         MR. DeROSE:  Very well.  Thank you.

3         THE COURT:  Just so you know.  And that's usually not

4    a problem because if you order the witnesses and you have a

5    short witness, you can -- you can normally work it out, getting

6    a good idea of how long the witnesses are to make sure that you

7    can get a witness on and off on a particular day.  It just

8    takes a little planning.

9         Anything else?

10        MR. POLICK:  Yes.  Also the parties have agreed to an

11   exclusion of witnesses under Federal Rule of Evidence 615.  I

12   think the issue we have with that is that if we perceive or

13   either side perceives that they may have to call that witness

14   again that we would still like to have them excluded from the

15   courtroom, even though their testimony is completed for one

16   side.

17        I think that's something we'll have to see how the

18   evidence goes, but we generally agreed to that exclusion.

19        THE COURT:  I would go along with that as well.  Two

20   things.  That doesn't apply to parties, obviously.

21        MR. POLICK:  Right.

22        THE COURT:  And the parties need to enforce that.  So

23   if there's a violation of it, I don't know the witnesses by

24   face.  So you need to have an eye in the back of your head to

25   see who's in the back.  And go, "Hey, by the way, can we come

1    to sidebar?  There's a witness who's in the courtroom."

2         I'm also reasonable in enforcing that.  Sometimes a

3    witness comes in here and they're just trying to find the

4    courtroom and they walk in, and the other lawyer hasn't told

5    them to go to the attorney/witness room.  So I'm not going to

6    be hypertechnical.

7         But on the other hand, people shouldn't be sitting

8    back there listening to testimony when there's a motion to

9    exclude.  So I'll rely on the parties to enforce that.  If you

10   think someone's going to be called multiple times, then they

11   should be excluded until all of their testimony's complete.

12        MR. DeROSE:  Judge, we also agreed we will never make

13   a beyond the scope argument.  So many of the police officers

14   will be put on by plaintiff, and when we are done, counsel is

15   free to go through whatever he wants with that witness.  So

16   when we say we're done, we mean it.

17        THE COURT:  Okay.  That's okay, too, but it does

18   affect one thing.  It would -- might potentially affect what

19   evidence is in the plaintiff's case-in-chief for the purposes

20   of a directed verdict.

21        So some defendants decide not to do that, and they

22   simply recall their witness because sometimes your defense can

23   actually as to other issues help the plaintiff make factual

24   showings that they need to for the directed verdict.

25        So I'm happy to do it, but if you are essentially

1    calling your witness in their case, then that's part of the

2    evidence of their case for my directed verdict analysis.  So

3    just be aware of that.

4              MR. POLICK:  We anticipate, Judge, that he's going to

5    call I believe all of our defendants, the individual

6    defendants, as adverse witnesses in his case.  Each judge here

7    in the building takes that procedure a different way.

8              But it sounds like you're okay if we have stipulated

9    that once he's -- once plaintiff is through with their adverse

10   examination, we can go into our direct examination and

11   therefore eliminate the need and also jury time of calling the

12   witness a second time.

13             THE COURT:  I'm totally okay with that.  My only

14   caveat is is that that affects what evidence I look at for the

15   purposes of a directed verdict.  So if you wait and only

16   call -- and call him for -- or her for your line of questioning

17   in your case, then that would change.

18             MR. POLICK:  Right.

19             THE COURT:  But that's up to you.  A lot of times it

20   doesn't matter because, you know, the case is in, it's in.  So

21   it's up to you guys.

22             MR. POLICK:  I suppose if we wait till all the

23   evidence is in to make the directed verdict motion, then that

24   would -- that would ...

25             THE COURT:  Well, normally people do it twice, once

1    when he rests and then once at the close of all the evidence.

2    So ...

3              MR. POLICK:  I understand what your Honor's alluding

4    to, yes.

5              THE COURT:  Okay, excellent.  Anything else before we

6    go to the motions *in limine*?

7              MR. DeROSE:  No, your Honor.

8              THE COURT:  All right.  Do you want to talk about

9    bifurcation first?  I didn't see your response to the motion to

10   bifurcate.  I'm assuming you object, but I didn't see a written

11   response.  What is the plaintiff's response?

12             MR. DeROSE:  I did respond in writing.  In the final

13   pretrial order, I said that I was opposed to it for the simple

14   reason that this is not -- the City is out of the case.  This

15   is not a *Monell* case.

16             This is all against the individual moving defendants

17   on the activities of the day, and I want the right, or I hope

18   to get the right from this Court, to put in and go at length

19   into not only what they did, but the damages that they -- that

20   they wreaked on my client.

21             And I believe that bifurcation, a jury would never

22   appreciate the severity of what all of this has led to in this

23   man's life.

24             THE COURT:  All right.  I did see that.  What I was

25   referring to is I didn't see a separate response filed.  I did

1  see what was in the pretrial order.

2  Do you want to be heard on the motion to bifurcate?

3  MR. POLICK:  Yes, your Honor.  Our motion basically

4  takes the position that, you know, if we do not bifurcate it,

5  the defendants are going to be prejudiced given the extent of

6  the plaintiff's damages in this case.

7  I think our Fourth Amendment jurisprudence says that,

8  you know, when they are -- when the jury's evaluating an

9  excessive force claim, they can't do so with hindsight.  And

10 what we believe, if the damages evidence comes in, that's

11 exactly what the jury will do.

12 They'll look at the extent of the damages here, and

13 they will conclude, well, the force must have been excessive

14 just by virtue of the nature of the damages here.

15 In terms of the evidence itself, no one here disputes

16 that Mr. Lopez was tased.  The parties agree that he was tased.

17 It was only for one time.  Our Seventh Circuit has indicated

18 that the use of a Taser is more than a de minimis injury.  So

19 we all agree on that.

20 What becomes prejudicial is the cause, nature and

21 extent of the injury itself.  And with that evidence coming in,

22 we believe that our case would be prejudiced, and the jury's

23 focus on liability would be overshadowed by the extent of the

24 damages.

25 THE COURT:  What's the plaintiff's potential unfair

1    prejudice to bifurcate, but bifurcate in front of the same

2    jury?  For example, we do the liability phase, return a verdict

3    of liability, yes or no, and then if there's yes, then we go

4    into the evidentiary phase regarding damages in front of the

5    same jury.  Because that way we don't have a Seventh Amendment

6    issue.

7                MR. DeROSE:  Are you asking me, Judge, or --

8                THE COURT:  I'm asking you.  What is -- articulate for

9    me what unfair prejudice would the plaintiff have by proceeding

10   in that fashion with the bifurcated jury in front of the -- a

11   bifurcated case in front of the same jury.

12               MR. DeROSE:  Judge, the simple facts scream out at us

13   that a man says, if I'm right, "I don't want any help.  Leave

14   me alone.  For my own reasons, I don't want to go to your

15   hospital."

16               Then they give him help, which we contend is

17   unauthorized.  Indeed, part of that help they tase him, which

18   we all agree has been told if you're not wanted for a crime is

19   unconstitutional.  But more importantly, Judge, for the jury to

20   think, oh, well, it was -- you know, they were only trying to

21   help him, and they must have helped him; you know, they took

22   him.

23               If I don't get those damages in, half of my case is

24   left wanting and limping.  What this case is all about is what

25   they wreaked on this man's life.

1      THE COURT:  And you'll be able -- you'll be able to

2    argue all that during the evidentiary phase.  But what is the

3    relevance of the damages to liability?

4      MR. DeROSE:  Relative --

5      THE COURT:  You want to argue that you should find

6    them liable because the damages were really bad?

7      MR. DeROSE:  No --

8      THE COURT:  Because I wouldn't -- I would --

9      MR. DeROSE:  -- they are liable because they did

10   everything wrong, Judge.

11     THE COURT:  But you would get to do that in the

12   bifurcation.  You would get to have all the evidence and

13   testimony you want regarding liability, and then we'd have the

14   court -- the jury would give us a verdict on that.

15     And then if they found liability, then you'd have all

16   the evidence and argument you want.  In fact, you'd have two

17   closing arguments.  You'd have one on liability and one on

18   damages.

19     MR. DeROSE:  Judge, if someone is -- only got a little

20   inconvenience, people forgive them.  I want this jury to

21   realize how these officers cannot be simply excused because

22   "Oh, we were just trying to get him in an ambulance."

23     They ruined his life, and the jury should have a right

24   to say that ruining of his life is liability-strewn.  It's

25   heavy with liability.

1          THE COURT:  All right.  It appears that you're going

2     to argue damages impermissibly on the issue of liability, which

3     is the very issue that predicated the motion to bifurcate.

4          The damage that he suffered, that evidence is relevant

5     to the damages calculation -- it is not relevant to

6     liability -- because they either did something wrong or they

7     didn't.  The damages that he suffered as a part of it is a

8     separate issue.

9          And there's a danger of sympathy in light of the

10    damages he suffered to render a verdict against the evidence

11    regarding liability.  That's the very thing that counsel's --

12    predicated counsel's motion to bifurcate.

13         And your response, when I ask you for unfair

14    prejudice, is saying, "I want to argue essentially the extent

15    of damages to make sure that they find liability."  And that

16    wouldn't be proper --

17         MR. DeROSE:  Judge, either --

18         THE COURT:  -- right?

19         MR. DeROSE:  You know, Judge, I agree, but you're

20    maybe missing what -- liability, these officers are trained.

21    They're trained you don't know how anyone's going to fall, how

22    people get hurt.  There is legions of reports out there of

23    people dying from being tased.

24         And what we're talking about is the recklessness that

25    you tase a man who you believe is on PCP.  You tase the man,

1    and he falls and has brain injury.

2            That notice of the brain injury, Judge, should be

3    known -- that's part of the action that they cause, what caused

4    the action, not how much it's going to cost to take care of him

5    for the rest of his life.  I'm not worried about that.  I'm

6    talking about his life, what happened to his life as they take

7    their action recklessly without concern for his well-being.

8            THE COURT:  If I bifurcate the issues of liability and

9    damages, you would be able to get into what they did or didn't

10   do at the scene.  So I don't see where there's any unfair

11   prejudice.

12           The motion for bifurcation is going to be granted.

13   I'm going to permit issues of damages to be presented after the

14   return of a verdict on liability.  So the parties should be

15   prepared to have their witnesses prepared regarding questioning

16   and cross-examination and availability to have a bifurcated

17   trial in front of the same jury.

18           So if there's a finding of liability after close, then

19   we'll go right into damages evidence, testimony and evidence.

20   There will be another set of instructions and another close,

21   and then we'll be able to address both those issues in front of

22   the same jury.

23           I think that's the best way to adhere to the

24   principles for under Seventh Circuit case law and Federal Rule

25   of Civil Procedure 42(b).

1    MR. DeROSE:  So I don't -- so I don't make a mistake

2  on that ruling, will you tell me where the time frame should be

3  cut off as far as my evidence goes?  Can we talk about he's

4  taken to the hospital?

5    THE COURT:  I'm not going to give you a time frame.

6  What I'm telling you is that the difference between liability

7  and damages, that's what's being bifurcated.  So you have to

8  sort that out, and if there's an objection, we'll do it

9  question by question.

10    It's pretty straightforward what the difference is

11  between liability and damages.  I'm not going to arbitrarily

12  put in a time limitation when I haven't heard the evidence.

13  You have a categorical limitation regarding damages versus

14  liability, and you guys can figure out what that is.  And if

15  there's an objection, I'll handle that during trial.

16    That means for the purpose of the opening statement,

17  however, you would not be able to argue damages in the opening

18  statement.  So when you talk about what you think the evidence

19  is going to be, your opening statement is going to be about

20  liability, not damages, because you're going to have a separate

21  opening, if you want, for the damages phase.  And it will be,

22  again, in front of the same jury.

23    Okay.  Let's go to motions *in limine*, if you could get

24  your notes out for that.  I know some motions *in limine* are

25  agreed, but they're also in -- but rather than just talk about

1　the agreed ones, I'm just going to handle them numerically.  So

2　that -- and then if we miss any, say, "Hey, Judge.  You didn't

3　rule on this one," and I'll find it.  Hopefully I'll get

4　everything that way.

5　　　　So if you could look, go to Plaintiff's Motion *in*

6　*Limine* No. 1, to bar evidence related to the plaintiff's prior

7　felony conviction.  What's the -- do the parties want to be

8　heard on that?

9　　　　MR. DeROSE:  Judge, we ask that you bar all those

10　convictions.  They're all more than 10 years old.  My client

11　has been an otherwise exemplary citizen as far as the criminal

12　law goes and the traffic law goes for the past 10 years.

13　　　　THE COURT:  What's the response of defendants?

14　　　　MR. POLICK:  Your Honor, we would not be offering

15　those prior felony convictions to impeach Mr. Lopez.  It

16　wouldn't be part of the liability case.

17　　　　We see those convictions as being a rebuttal on the

18　damages end of the case, specifically to plaintiff's expert

19　economist, who based his opinion on interviews with both

20　Mr. Lopez' wife and girlfriend to come to his conclusions.

21　　　　Obviously, they painted one picture of his life, and I

22　think that we are entitled to show on the issue of his earning

23　ability that certainly someone with prior felony convictions or

24　a suspended driver's license is going to have a tougher job,

25　especially when the economist is saying, "Well, he could have

1    made X amount of money over the course of several years as a

2    tow truck driver."

3        If, you know, his license is suspended, he may not

4    have the job as a tow truck driver for very long.  And if he

5    has to look for another job, I think most employers would

6    require him to disclose those felony convictions, and I think

7    it makes it harder for him to obtain employment.

8        So we're not using them to impeach.  We were using

9    them to rebut the opinions of plaintiff's expert economist on

10   the damages phase of the case.

11       THE COURT:  All right.  I believe the parties are in

12   agreement that his credibility is not at issue.  He's not going

13   to be hitting the stand.  And so I'm going to grant it absent

14   leave of Court outside the presence of the jury.

15       If you think you need it in rebuttal during the

16   damages phase or otherwise, go ahead and let's talk about it at

17   sidebar before you elicit the testimony.  For example, the fact

18   that he doesn't have a driver's license is probably going to

19   get into evidence in the damages phase.

20       But just to make sure it's really clear, the parties

21   have guidance, don't ask a question or make an argument

22   regarding any of his prior convictions unless you go sidebar

23   first, say, "Judge, I need it for rebuttal because of what just

24   happened," or "because of this."  So that motion's going to be

25   granted absent -- absent leave of Court.

1          And that's actually true for every ruling on the

2    motions *in limine*.  If you think the landscape has changed

3    based on what happened at trial, you're free -- and I will

4    entertain any motion to reconsider, but I do require that you

5    do it outside the presence of the jury.

6          Normally try to do it at a time when the jury's not

7    sitting.  So we have that little time in the morning.  Say,

8    "Oh, by the way, Judge, yesterday, you remember -- you recall

9    this testimony.  I believe now our Motion *in Limine* No. 1 is at

10   issue, and I'd like to revisit that."  That's how.  I'm happy

11   to do it that way.

12         So if any of the motions *in limine* didn't go your way

13   today, go ahead and revisit those.  Don't revisit them if the

14   record's the same, though, because my ruling will be the same.

15   But it's up to you guys to revisit those as we go forward.

16         Plaintiff Motion *in Limine* No. 2, evidence related to

17   PCP in his system.  Do you want to be heard on that?

18         MR. DeROSE:  Yes, Judge.  As we know under the *Graham*

19   case from the Supreme Court, the officers are taken to know

20   what they know at the time.  They had no idea that there was

21   PCP in his system.

22         That does not become disclosed until he's brought to

23   Mount Sinai Hospital and the doctors so indicate.  So they

24   should not have the benefit of that hindsight.  Very explosive,

25   prejudicial testimony before this jury.

1          THE COURT:  And what about the cocaine?  Does your

2    motion also encompass cocaine as well?

3          MR. DeROSE:  Yes, Judge.

4          THE COURT:  Because he tested positive for both,

5    right?

6          MR. DeROSE:  Yes.  Please, Judge, I'd answer for both.

7    I didn't notice cocaine.  My co-counsel told me that coming in

8    today.

9          THE COURT:  Okay.  What's the defendants' response?

10         MR. POLICK:  Judge, we have two responses.  First,

11   with regard to mentioning it in general, both P -- or the PCP,

12   I think all the officers and even the paramedics, the defendant

13   paramedics testified that these were their observations of

14   Mr. Lopez when they arrived on the scene.

15         With respect to plaintiff's illegal seizure claim,

16   that is the basis for the probable cause to take Mr. Lopez into

17   protective custody.  So we believe that that testimony would be

18   relevant to the determination of that claim.

19         With regard to the Mount Sinai records where the -- we

20   have the results of the toxicology showing both PCP and

21   cocaine, I believe the plaintiff is referring to the rule in

22   *Sherrod v. Berry* where the officers can only be judged on what

23   they knew at the time.

24         However, even *Sherrod* itself made clear that that's

25   not an absolute rule and that evidence of that can be used for

1    other purposes.  And that's what we intend to use it here.  We

2    intend -- we have two diametrically opposed versions of events.

3          We have the version that is offered by the plaintiff's

4    witness, Ms. Guzman, who's saying Mr. Lopez is not under the

5    influence of any drugs and is able to talk clearly and

6    coherently and tell the defendants he doesn't want their

7    medical need.

8          On the other hand, the defendants' version of events

9    is that he is under the influence of PCP and that he is in no

10   position to make those determinations because he's not in his

11   right mind.  So the case we are relying upon is *Common v. City*

12   *of Chicago* where the Seventh Circuit has said that that type of

13   evidence can be used when you have two diametrically opposed

14   versions of events to show that the -- that one version of

15   events is more likely than not.

16         And here, we believe that the test results showing the

17   positive for PCP and cocaine corroborates the officers and the

18   paramedics' version of events.  And the *Common* case shows that

19   as an exception to the general rule that -- announced in

20   *Sherrod v. Berry* that the officers can only be judged on what

21   they know.

22         It would show that their -- what they said happened is

23   more likely than not, and it's corroborative evidence of that

24   fact.

25         THE COURT:  Anything further?

1          MR. DeROSE:  Yes, Judge.  Actually what the evidence

2     shows is that Ms. Guzman called the hospital because the man

3     was having trouble breathing and chest pains.  The paramedics,

4     the firefighters and the police should know that you don't use

5     a Taser on someone who has a heart problem, who is on drugs.

6     All the case law says that.  And they say their --

7          THE COURT:  Well, then you would want the fact that he

8     was on drugs in evidence then, right?

9          MR. DeROSE:  No, Judge, I don't want that in because I

10    don't want this jury to think this is a bad man trying to

11    recover money from honorable police officers.  That's --

12         THE COURT:  Well, I wouldn't permit that argument, and

13    if they made that argument, I would sustain and issue a

14    directive to disregard that.  So no one's going to be arguing

15    that.

16         MR. DeROSE:  All right, Judge.  But what they are

17    going to be arguing is the impression what are these poor

18    officers to do when they get called for to bring a Taser out,

19    and within one minute, they tase the man.

20         He hasn't hurt anybody.  He hasn't touched anybody.

21    He's not wanted by the police.  All the case law says you don't

22    use a Taser on someone like that.

23         THE COURT:  All right.  In this instance, the proffer

24    of what the evidence will be is that the police officers were

25    called, at least in part, because of what the paramedics

1    believe was an individual who was on drugs at the time.  So the

2    403 and relevance objections are overruled, and the Court will

3    deny Motion *in Limine* No. 2.

4           I'm not going to permit improper argument regarding

5    that, however.  So, Counsel, I'm sure you're not going to argue

6    the fact that somehow the officers knew what type of drug it

7    was unless there's some factual basis for that.  This is simply

8    to corroborate their observations, albeit lay observations.  Or

9    even in the paramedics' case, probably more than a lay opinion,

10   but simply to corroborate their version of events.

11          And obviously the relevant inquiry -- and the Court

12   will instruct the jury on the relevant inquiry -- has to do

13   with what the officers knew at the time and not with the

14   benefit of 20/20 hindsight.  So I think with proper

15   instruction, the Court can focus the issues for the jury, and I

16   don't believe the danger of unfair prejudice will outweigh the

17   probative value.

18          I believe, in fact, this evidence is highly probative

19   to the reasonableness of how the defendants proceeded and

20   corroborates their version of events.

21          MR. DeROSE:  So is the Court keeping out the actual

22   findings by the hospital?  That won't come in?

23          THE COURT:  Your motion's denied.  So they can get it

24   in if they have a foundation for it.  How you get the record in

25   is up to you guys.  I don't know.  But I'm not excluding it.

1     Your motion was to bar the evidence.  I'm not barring

2    the evidence.  They have to lay a foundation for it.  And I

3    won't permit impermissible argument regarding it if, in fact,

4    it gets into evidence.

5          MR. POLICK:  Just as a point of clarification, Judge,

6    with regard to the officers' observations and their experience,

7    are they going to be allowed to say that based on their

8    observations and experience, they believed Mr. Lopez to be

9    under the influence of PCP?

10          THE COURT:  If you lay the foundation and questioning

11   for a 701 opinion, then I'll take an objection if I get one.

12   But normally a 701 opinion's pretty straightforward.

13          MR. DeROSE:  So then, Judge, they're being allowed to

14   use the reports from the hospital --

15          THE COURT:  I have not -- I have not issued any ruling

16   regarding the admissibility of an exhibit.  You can object if

17   you have a reason for it.  What I'm doing is denying your

18   pretrial request to bar it.  Do you follow?

19          MR. DeROSE:  This has -- I thought I was barred from

20   even going into anything because of damages.  I was supposed to

21   stop when the officers had taken him into custody.

22          THE COURT:  I said this before, and, Counsel, let me

23   repeat it so it's crystal clear for you.  I have not imposed

24   any temporal limitation on the evidence, period, end of

25   sentence.

1      There is no point in time that is on or off limits.

2  What is on and off limits for the first phase of the trial is

3  evidence and argument related to damages.  So if you have an

4  admissible purpose during the liability phase, I don't care

5  when it happened.  It could happen yesterday.

6      If it's relevant and admissible to the liability

7  phase, then it can happen.  There is no temporal limitation

8  being imposed, simply a categorical one regarding the nature of

9  the evidence and the purpose for which it's being admitted

10 because we're bifurcating damages and liability.

11     Okay.  Plaintiff's Motion *in Limine* No. 3.  Based on

12 the submission, I guess I can grant that as agreed.  Is that

13 fair to say?

14     MR. POLICK:  That would be fair to say, your Honor.

15     THE COURT:  All right.  That's going to be granted as

16 agreed.  And, of course, that relates to barring defendants

17 from using I-CLEAR or LEADS to investigate the jurors.

18     Plaintiff's Motion *in Limine* No. 4, to bar any

19 argument that appeals to the jury's pecuniary interests as

20 taxpayers.  Can that also be granted as agreed, Counsel?

21     MS. EKL:  Yes, Judge, except to the extent that that

22 would include our ability to argue inability to pay on behalf

23 of the defendants in relation to the punitive damages.

24     So to the extent that it may appeal to the jurors'

25 pecuniary interest when we're having our clients testify about

1    how it will personally affect them, that will be the only

2    caveat to our agreement.

3              THE COURT:  But then you still wouldn't be talking

4    about the jurors' interest as taxpayers, right?

5              MS. EKL:  Correct, correct.

6              THE COURT:  So I don't understand why we need the

7    caveat because I don't understand how that's affected by the

8    motion.

9              MS. EKL:  I guess just the way the motion was written.

10   Basically they said any argument that may appeal to the jurors'

11   pecuniary interests.  So we're not going to specifically be

12   arguing, "As taxpayers, this may affect you."  But if they

13   personally relate to the defendant officers, that would be our

14   only objection.  It wouldn't bar us in any way from being able

15   to elicit that information from the officers.

16             THE COURT:  Well, the only thing I'm barring is an

17   argument that is appealing to their interest as taxpayers.  I

18   don't see how that argument falls within that, so --

19             MS. EKL:  Okay.  We agree then, Judge.

20             THE COURT:  Okay.  Granted as agreed.  That's

21   Plaintiff 4.

22             Plaintiff's 5, bar evidence related to plaintiff's

23   raising two families and/or using two aliases.  The parties

24   want to be heard on that?

25             MR. DeROSE:  Judge, I don't want them to cast

1    aspersions on my client in any way because he has -- he

2    obviously had two families.  He has two young children and two

3    young adult children and one wife.

4           So I do not want any references to that or the claim

5    that he used aliases.  He had two different names.  He was

6    Navarez with the one family and Jose Lopez with the other

7    family.

8           THE COURT:  What's your response?

9           MR. POLICK:  Our response, your Honor, is this is

10   relevant evidence to bias.  Obviously --

11          THE COURT:  Whose bias?

12          MR. POLICK:  The bias of the witness.

13          THE COURT:  Which witness?

14          MR. POLICK:  The bias of the wife and the bias of the

15   girlfriend, their relationship to Mr. Lopez and what the nature

16   of that relationship is.  They both have children with this

17   man.  That certainly affects their credibility as a witness,

18   and I think we're allowed to bring out what their biases is --

19   or biases are.

20          The majority of our intent to use this, though, I

21   think also relates to again rebutting the damages claims to

22   be -- that were opined by plaintiff's expert economist and

23   using that evidence to rebut the version of Mr. Lopez'

24   financial net worth that was provided by his wife and his

25   girlfriend.

1      We're not suggesting that he has a propensity to

2  commit crimes, but I think knowing the relationship between

3  Mr. Lopez and his wife and the relationship between Mr. Lopez

4  and his girlfriend certainly is relevant to their bias as

5  witnesses in this case.

6      THE COURT:  What's the relevance as to bias of the

7  aliases?  How is that relevant to bias?

8      MR. DeROSE:  Judge, he has two different names.

9      THE COURT:  I understand that, Counsel.  I'm asking

10  him what the relevance in his bias cross-examination would be

11  of the two aliases.

12      MR. POLICK:  I believe that's how they each know him

13  as.  I mean, I believe the wife knows him as Navarez and knows

14  he uses the name Lopez.  And I believe the girlfriend solely

15  knows him as Jose Lopez.  So it explains who he is as they know

16  him.

17      THE COURT:  The Court's going to take that under

18  advisement.  I'll issue a ruling with the minute order from

19  today's pretrial conference, and I'll issue a ruling during the

20  pretrial conference order.  So that one for right now is taken

21  under advisement.

22      No. 6, do the parties want to be heard?  Plaintiff's

23  No. 6.  Is that something I can grant as agreed as well?

24      MR. DeROSE:  I think it's the status of the law,

25  Judge, but ...

1     MS. EKL:  Your Honor, we -- defendants would propose

2  that there be an instruction that it not -- not be granted in

3  whole in the manner that plaintiff requests, but that if the

4  individual defendants argue inability to pay that there be an

5  instruction that the jury only consider their -- and that they

6  then raise that defense -- that the jury be instructed that

7  they can only consider an inability to pay as it applies to

8  punitive damages, but that it not go any further than that.

9     THE COURT:  All right.  At this point the Court's

10  going to grant the motion.  If inability to pay is raised and

11  it affects the jury instructions, then we can address that in

12  the jury instruction conference.  Is that fair to say, Counsel?

13     MS. EKL:  That's fair, Judge.

14     THE COURT:  All right.  So it will be granted as

15  agreed as I just -- granted as agreed as explained in open

16  court.  It's not precluding an inability to pay defense if they

17  choose to do so.  And then the Court will instruct the jury

18  properly, and we'll figure that out in the instruction

19  conference.

20     Plaintiff's Motion *in Limine* No. 7, to bar defendant

21  from arguing that Jose Lopez was not a good role model for his

22  children.  Do you want to be heard on that, Counsel?

23     MR. DeROSE:  Yes, Judge.  They have indicated that

24  they want to put in his convictions to show that he couldn't

25  properly -- as damages because he couldn't properly take care

1       of the children with his prior convictions.

2              The traffic convictions themselves, you could have

3       a -- you can always get your license reinstated.  People do it

4       every day.  And as far as the convictions go, they are so long

5       ago, Judge.

6              He was raising his children.  I tell you in there that

7       his son is in the Marine Corps.  His daughter is in college in

8       the ministry at Lewis University in Romeoville, and she also is

9       studying criminal justice.  He couldn't have two better

10      children who followed his role.

11             And the two younger kids, Judge, since he has gotten

12      taken away from them, they are -- they're emotional wrecks.

13             THE COURT:  What's the relevance of their damages?

14      There's no claim for their damages pending.

15             MR. DeROSE:  I understand that, but they have told me

16      that they are going to try to introduce his convictions to show

17      that he was not -- he was not going to be a proper take-carer

18      of their -- of his children.  He wouldn't be a proper role

19      model for them.

20             THE COURT:  Well, actually what they indicated is that

21      they do not intend to affirmatively argue that he was not a

22      good role model and would only do so if you start introducing

23      evidence that he was in relation to damages suffered by the

24      family members that are not at issue.

25             MR. DeROSE:  Judge, I am going to put on children who

1    are going to say the impact he has had on --

2            THE COURT:  No, you're not.  No, you're not.  What is

3    that relevant to?  You do not have a claim for their damages.

4            MR. DeROSE:  Judge, he has a claim to the extent he is

5    not able to support his children anymore.  They have changed

6    his life.  He was a good father.  His children, they were cared

7    for by him.  They were loved by him.  They --

8            THE COURT:  Those all might be true, Counsel, but you

9    do not have a pending claim for their damages.  So what is the

10   relevance of that?

11           MR. DeROSE:  The relevance is his claim, Judge.

12           THE COURT:  How is that relevant to his claim?  The

13   loss that they suffered, how is that relevant to the estate's

14   claim?

15           MR. DeROSE:  Not their -- not their loss, Judge, his

16   loss.  His loss of his ability to be the caring and nurturing

17   father of children.  We all took that responsibility very

18   seriously.

19           THE COURT:  You're not going to backdoor damages

20   suffered by the family.  That will not happen under 403.  That

21   will not happen.

22           It has to be relevant to the damages that are pending.

23   I don't know why you don't have a claim for their damages, but

24   that's water under the bridge.

25           MR. DeROSE:  Judge, I'm going to ask because they've

1    known about these claims we have been making for four years

2    now.

3              THE COURT:  You don't have a claim in your complaint

4    for those damages, Counsel.

5              MR. DeROSE:  Judge --

6              THE COURT:  Counsel, please.  You don't have a claim

7    for that, and it's too late to amend at the pretrial

8    conference.  So the motion -- to the degree you're seeking to

9    amend, that's denied.  That's not fair to the other side.

10   Discovery's closed.

11             MR. DeROSE:  I haven't asked for it, Judge, but I am

12   asking for the right to amend my complaint to put in claims

13   that they've known have been around all this time and don't

14   even bring it up until the final pretrial.

15             THE COURT:  They don't have to bring up something

16   that's not in your complaint.  The motion to amend the

17   complaint's denied.  Leave is freely given earlier in the case.

18   This is the pretrial conference less than two weeks before the

19   trial, and discovery's long since closed and there's been a

20   dispositive motion schedule.

21             It is too late to add claims of damages suffered by

22   the family.  So that motion's denied, and I'm trying to

23   struggle with the 403 analysis about what you basically are

24   telling me you're going to try to put in, which is a bunch of

25   evidence that relates to their suffering and not the damages

1    suffered by the estate.

2           MR. DeROSE:  Judge, I've got to analyze everything

3    your Honor's saying.

4           THE COURT:  Okay.

5           MR. DeROSE:  The day-in-the-life-of film, it also

6    talked about the suffering.  But they're going to report on his

7    suffering.  I can't bring him in to testify.  That's

8    grandstanding, Judge.  This man is suffering, and I do believe

9    that --

10          THE COURT:  You can bring in people to testify about

11   his suffering.  There's nothing wrong with that.  In the

12   damages phase, hell, yeah.  You can definitely do that.

13          MR. DeROSE:  Can they also say how close he was to

14   them, how close he was?

15          THE COURT:  All right.  The Motion No. 7 is to bar

16   evidence that he was not a good role model.  His role model

17   status is not at issue, so I'm going to grant that as

18   essentially agreed because you don't want them introducing

19   evidence that he was not a good role model.

20          So since they're saying that they're not going to

21   elicit that testimony, it's going to be granted as agreed.  But

22   let me clarify right now.  I'm not going to allow evidence

23   under 403 regarding the suffering of the family.

24          If it's evidence related to his suffering, the

25   objection will be overruled.  If it's evidence related to their

1    suffering, it's going to be objection sustained.  And you're

2    going to have to be able to police that appropriately.

3         You do not in opening statement talk about the loss to

4    those children or that family because I'll cut you off on your

5    opening statement.  So if it's real clear now, you are not to

6    present argument or evidence regarding claims that are not at

7    issue in the case.

8         If the role model issue gets into evidence -- and I

9    can't imagine why it would -- then you realize that that would

10   open a door to why he was not a good role model.  So I think

11   it's better that that door never be opened because the issue of

12   their loss is not at issue.

13        So we'll have to take it as we find it.  Okay?  Just

14   so you know where I'm thinking, I'm not going to permit

15   evidence under 403 regarding damages that are not at issue,

16   which is a loss to the family.

17        So to the degree this Motion No. 7 needs to be

18   clarified, it's granted as agreed, but I'm clarifying for the

19   parties that I'm not going to permit testimony or evidence or

20   argument regarding the damages suffered by the family because

21   there is no claim for that type of suffering.

22        And I'm also advising the parties that if you think

23   the door is opened, defense counsel, to his character, whether

24   it be criminal history or whatever to -- whatever you suggest

25   the evidence might be that he's not a good role model -- I

1    don't know what that evidence is -- you'd better go sidebar

2    first because I do not anticipate that that door is going to be

3    opened because you're going to be objecting to and the Court's

4    going to *sua sponte* be objecting to evidence regarding the

5    family's loss because that's not at issue.

6           That would also not be at issue during the liability

7    phase.  That would only come up during damages anyway.  So --

8           MR. POLICK:  Understood, your Honor.

9           THE COURT:  -- that's where we are with No. 7.

10          Now, that's all of the plaintiff's motions *in limine*

11   unless I missed anything, right?  I know there's some more

12   agreed ones, but we'll talk about that in a minute.

13          All right.  Defendants' Motion *in Limine* No. 1, to bar

14   generalized evidence of police code of silence, including the

15   statements regarding code of silence made by the mayor.  Do the

16   parties want to be heard on that?

17          MS. EKL:  Yes, your Honor.  This motion I guess kind

18   of encompasses a number of issues in the case.  One, plaintiff

19   has -- or has expressed an intention to introduce newspaper

20   articles and other things discussing a code of silence in the

21   media.  He has also expressed a desire to call the mayor to

22   talk about his statements regarding a code of silence.

23          He does not have a *Monell* claim in this case, as your

24   Honor knows, and your Honor ruled on that during summary

25   judgment.  And at that time, he was not able to even, in the

1  context of a *Monell* claim, articulate that there was a code of

2  silence issue here.

3         He has not tried to revive that claim.  Right now the

4  issues before this jury will relate to how -- what the

5  individual defendant officers did in relation to his client.

6  Whether or not there was a generalized code of silence in the

7  Chicago Police Department and whether or not that's talked

8  about by the media or even to the extent that there may have

9  been some admissions by -- made by some -- by the mayor or any

10 other people, that doesn't equate to or he doesn't have any

11 evidence to point to the fact that these particular officers

12 engaged in any code of silence in this case.  And that's really

13 what's at issue here.

14        There will be great prejudice if we inject into this

15 trial the issues about code of silence and police officers in

16 general.  As you know, it's all over the media about different

17 incidents related to police officers, and we're really trying

18 to make sure that this jury hears the evidence here about what

19 happened in this particular incident in relation to these

20 particular defendants.

21        I would also just note -- I don't know if your Honor

22 wants me to address it all any further in relation to the mayor

23 in particular or we can hold off on that motion, but it all

24 kind of relates to the same issue.

25        THE COURT:  Okay.  What's your response, Counsel?

1    MR. DeROSE:  Judge, as I said in my response to them,

2   paragraphs 68 through 70 of my complaint had been on the books

3   for a long time.  I have said that the Chicago police officers

4   and the Chicago paramedics and fire department personnel have

5   long had a code of silence where they don't report wrongdoing

6   by each other.

7    And there has been long a practice where there is no

8   discipline taken against them because they all keep their

9   mouths shut.  And I suggest to your Honor that the mayor has

10  very eloquently advised that that has been a problem with the

11  Chicago Police Department for over 50 years.

12   And I gave you the quote from his speech starting on

13  page 2 of my response.  And I suggest that I could cut that

14  speech down to perhaps 13 -- 15 to 16 minutes and take out all

15  the references to Laquan McDaniel [*sic*].

16   But it's an acknowledgment before the police -- excuse

17  me -- before the city council, to which he got applause, where

18  he said this behavior of keeping our mouths shut and not

19  admitting when things are being done wrong is very important.

20  And, Judge, I think it's part of my case in front of the jury.

21   The jury ought to know that even the mayor and the

22  city council acknowledged that this has occurred.  In my case,

23  Judge, we got 11 police officers.  Two of them say, "I was not

24  even there."  And that's not truthful.

25   The records show they all were there, and two of them

1    say, "I looked away just when it was happening."  It's called

2    the ostrich defense:  Put your head down.  Ignore all this.

3              THE COURT:  All right.  The Court's going to grant in

4    part and deny in part the motion.  I'm going to permit evidence

5    and argument regarding these defendants.  So if you want to --

6    if you have a good-faith basis for the argument that these

7    defendants engaged in a code of silence, I'll permit that.

8              This is not a -- there is no *Monell* claim.  This is

9    not a case indicting the entire police department, civilly or

10   criminally.  So 403 -- I'm going to grant any generalized

11   argument or evidence regarding the police or fire generally,

12   and I'm going to exclude under 403 and potentially hearsay

13   grounds news articles and the mayor's speech, as I indicated in

14   the motion -- the ruling on the motion -- or excuse me -- the

15   ruling on the summary judgment.

16             The mayor does not talk about these defendants.  So

17   his statements about the police in general is not material to

18   what's happening here.  You can present evidence and argument

19   regarding these defendants engaging in a code of silence.  You

20   can go ahead and say that, and you can use that phrase.

21             What you can't talk about is the police generally

22   because it's not a *Monell* claim.  And the mayor's out.  He's

23   out as a witness, and he's out as testimony in evidence,

24   whether it's in a video or otherwise.  And news articles

25   regarding the same are also out.  So make sure you don't

1    mention either of those things in opening statement.

2           All right.  As to Motion *in Limine* -- Defendant Motion

3    *in Limine* No. 2, it's sort of a similar argument.  But do the

4    parties want to be heard on that?  That's the motion to bar any

5    reference to publicized incident of alleged police misconduct

6    not involving these defendants.

7           MS. EKL:  Your Honor, it's my understanding that

8    plaintiff's counsel was not objecting to No. 2, but I may be

9    incorrect.

10          MR. DeROSE:  No, that's correct, Judge.  We're not

11   going to bring up anybody else's case but my client's.

12          THE COURT:  Okay.  Defense Motion *in Limine* No. 2 will

13   be granted as agreed.

14          MS. EKL:  And, your Honor, just one point of

15   clarification.  I think counsel did point out we had said --

16   plaintiff -- we've asked to bar any publicized incidents of

17   police misconduct, including to the extent there was any

18   police -- or any -- any media coverage of this particular case.

19          So I think he has agreed as it relates to other cases,

20   but we do not -- we'd be seeking to bar him from mentioning to

21   the jury that there may have been a newspaper article or two

22   referencing this particular case.

23          THE COURT:  Are you intending to reference --

24          MR. DeROSE:  I will --

25          THE COURT:  Hang on a second, Counsel.  I'll get it

1    out as quick as I can, but she can only take one person at a

2    time.

3            Do you intend to introduce any testimony or evidence

4    or argument regarding news coverage of this case?

5            MR. DeROSE:  No, Judge.

6            THE COURT:  Okay.  There you go.  Granted as agreed,

7    clarified in open court.

8            Defendants' Motion *in Limine* No. 3, to bar evidence or

9    arguments regarding violations of CPD general orders, rules,

10   regulations.  Do the parties want to be heard on that?

11           MR. POLICK:  Yes, your Honor.  It's our understanding

12   based on the plaintiff's exhibit list that he intends to

13   question both the officers and the paramedics about certain

14   orders that they follow.  Basically the Seventh Circuit has

15   ruled that that is prejudicial because it presents a confusion

16   of the issues to the jury.

17           The issue is here not whether the officers

18   appropriately followed department rules and regulations, but

19   whether Mr. Lopez' constitutional rights were violated.  This

20   is not a case about whether they should be disciplined for

21   failure to follow the rules if they did not follow them.

22           So the prejudice that ensues with this type of

23   evidence is the jury becomes confused as to what they are to

24   decide, and it detracts from the issues in this case whether

25   Mr. Lopez was illegally seized and whether Mr. -- whether the

1    defendants used excessive force upon him.

2              THE COURT:  What's your response, Counsel?

3              MR. DeROSE:  Your Honor, there's about four special

4    orders of this department and of the municipal code in the City

5    of Chicago that are critical in this case.

6              They come right out and say in the police department

7    special orders if you come across a man on the street who is

8    intoxicated or under the influence of alcohol and he refuses

9    any attention at all, he does not agree to be transported

10   somewhere, all police activity is to cease.

11             Now, Judge, they're taught that.  The officers have

12   told us under oath they're taught that.  When this man, if they

13   believed he was under oath -- excuse me -- under drugs or under

14   alcohol and he didn't want their help, they had to leave him

15   alone.  And we've got the investigators from the police academy

16   who say, "We teach these guys that."

17             And if this man walked up to him with a Taser in his

18   hand knowing that he wasn't going to be under arrest and he

19   wasn't going to -- then he said it was excessive force that he

20   tased him.  Now, that's why these two or three, maybe four

21   special orders are so very, very important.

22             THE COURT:  Counsel, do you -- counsel for defense,

23   you're not intending to discuss use-of-force training with

24   your -- in your defense of the excessive force?

25             Are you intending to get into any of that training or

1    general orders or how to explain what your clients did or did

2    not do at certain points in the incident?

3              MR. POLICK:  We intend to elicit that from the

4    officers as to when they can appropriately use the Taser, under

5    what circumstances.

6              THE COURT:  So you're going to be referencing their

7    general orders and their training?

8              MR. POLICK:  No, just what they know based on their

9    training, not the specific general --

10             THE COURT:  Well, isn't the general order part of

11   their training?

12             MR. POLICK:  The general order, yes, is part of their

13   training.  But we don't -- I mean, the general orders say a lot

14   of things, many things that are irrelevant to this particular

15   case.

16             THE COURT:  Well, if you got into on direct with let's

17   say one of your clients, "Well, you know, your custom and

18   practice is to follow your training regarding X, Y and Z," and

19   then he wants to get into the fact that, well, their very

20   training included the general orders and here's one that he

21   violated, I mean, why wouldn't that be proper rebuttal?

22             Obviously, it would come with a limiting instruction

23   not to conflate the constitutional analysis with the general

24   order violation.  But if you're getting into their training and

25   their custom and practice in terms of the use of force and part

1    of that is general orders regarding use of force, then wouldn't

2    it -- some of the general orders become admissible even with

3    the limiting instruction?

4              MR. POLICK:  I don't know that they become admissible,

5    your Honor, because, again, I think even if it may be relevant,

6    the prejudice is that the jury may be confused as to what

7    standard they appropriately applied in the --

8              THE COURT:  But you would be -- but you would be

9    bringing that out yourself as part of your defense.  And the

10   question -- the question would be he's got to be able to rebut

11   it, right?

12             MR. POLICK:  I think he's allowed to rebut what we put

13   in.  I don't think it would be in terms of showing what custom

14   and practice is.  But it's our -- it would be more along the

15   lines of when are you allowed to use this particular force

16   option, and they would say these are -- these are the -- these

17   are the circumstances under which we can use that.

18             THE COURT:  And if that's memorialized in a general

19   order, why wouldn't he be allowed to get into it and explain

20   that they didn't follow it with a limiting instruction?

21             MR. POLICK:  Because, again, even though it may be

22   relevant, it would be prejudicial because it would confuse the

23   jury as to what the proper standard is.

24             THE COURT:  All right.  I'm going to grant the motion

25   No. 3.  However, that door can come swinging wide open based on

1     your testimony and argument.

2            So don't mention general orders in opening statement,

3     but listen to what they say in their opening statement and what

4     they present in evidence and then just come sidebar and go,

5     "Hey, Judge, guess what. I think the general order is relevant

6     now because they got into what their training were and what,

7     you know, the proper use of force."

8            If that's the case, then depending on the testimony

9     and the evidence and the argument, I might have to revisit the

10    Court's granting this. I'm going to grant it initially because

11    there isn't -- and the Seventh Circuit is really clear in

12    *Thompson v. City of Chicago*, which is 472 F.3d 444, that even

13    though there's theoretical possibilities for particular rules

14    or general orders being relevant and probative and admissible,

15    there's a danger that the failure to follow general orders or

16    other rules is conflated or mixed up with the constitutional

17    analysis that the jury has to make.

18           So I do not anticipate any of this getting in. But if

19    the defendants open the door to it, then I anticipate that some

20    of it's going to get in with a limiting instruction. So at

21    this point, I'm granting it as clarified in open court and

22    subject to revisiting at sidebar with a request by the

23    plaintiff's counsel.

24           MR. DeROSE: And, Judge, would it also apply when I'm

25    taking these witnesses as a hostile witness or adverse

1    witnesses when I'm questioning them?

2              THE COURT:  You can't open the door unilaterally.

3    Okay?

4              MR. DeROSE:  I can?

5              THE COURT:  You cannot.  You cannot get into it

6    because I'm excluding it.  But if they get into it on what

7    essentially is a friendly cross, then your redirect is going

8    to -- which is going to be a 611, we'll get into whatever you

9    need to.

10             And because we're not going to have beyond the scope

11   objections, you might have to have a long redirect based on

12   what they say.  And obviously during the direct testimony, if

13   the witness unilaterally opens the door, then all you've got to

14   do is go sidebar and say, "Judge, based on that, I think the

15   general" --

16             MR. DeROSE:  Can I ask him, Judge, "Are you taught

17   that a witness has a right to refuse your attention and you

18   have to walk away?"

19             THE COURT:  You cannot get into general orders or

20   department rules or regulations.  You can talk to him about his

21   training, but don't get into what the rules say unless someone

22   opens the door to it.

23             MR. DeROSE:  Okay.

24             THE COURT:  I don't know if -- is that clear enough?

25             MR. DeROSE:  It is clear, Judge.

1    THE COURT:  Everybody clear?  All right.  If it needs

2  to be clearer, let me know because it's hard to do in the

3  abstract without an actual question pending.  So ...

4    MR. POLICK:  Understood, your Honor.

5    THE COURT:  Okay.  All right.  So the minute order --

6  or the order's going to say general question regarding training

7  is going to be okay, but we're not going to get into specifics

8  of any general orders or rules unless the door gets opened to

9  it and there's permission at sidebar.

10    Okay.  Number -- Defendant 4, to bar any evidence or

11  reference to IPRA's investigation or the FBI investigation.

12  Parties want to be heard on that?

13    MR. POLICK:  Yes, your Honor.  Basically this type of

14  evidence is simply irrelevant to the claims that are being put

15  before the jury, which are was Mr. Lopez illegally seized and

16  was excessive force used.

17    I mean, liability here is based upon personal

18  involvement, and the focus of the jury should be on whether the

19  defendants themselves violated Mr. Lopez' constitutional

20  rights, not whether there was an investigation into it.

21    Evidence that an investigation was conducted either by

22  IPRA or the FBI is also irrelevant because I think that would

23  go to plaintiff's *Monell* claim, which this Court has dismissed

24  on summary judgment.  So it has no relevance to the issues that

25  remain in the case.

1       The prejudice argument would be, you know, the jury

2  starts hearing evidence that somebody else investigated it

3  here.  They may put undue weight on that, and it robs the jury

4  of their role in this particular case.  They're here to decide

5  whether these defendants violated Mr. Lopez' constitutional

6  rights, not whether somebody else determined that they did.

7       THE COURT:  What's your response, Counsel?

8       MR. DeROSE:  Judge, it's I suppose quite similar to

9  before.  Paragraphs 68 to 70 talked about the police code of

10  silence, covering up for each other, the paramedics covering up

11  for them, no investigation whatsoever by anyone.

12       The police officers have never to this day been

13  questioned by this -- by anybody in authority in the department

14  while my client lays where he lays.  Nobody has been taken to

15  task for this.

16       This is important to show the whole cover-up by these

17  people, knowing "We're never going to be disciplined in any way

18  for this."  This is the kind of stuff that we're talking about

19  that is going on throughout our country today, Judge.

20       THE COURT:  All right.  But we're not going to try

21  what's going on in our country today.  We've got to try the

22  case that's pending here.

23       What evidence of the FBI or IPRA are you seeking to

24  admit, the absence of an investigation or actually --

25       MR. DeROSE:  The absence of an investigation, yes,

1    Judge.

2            THE COURT:  Okay.

3            MR. DeROSE:  I've got the FBI agent I mentioned, your

4    Honor, months ago, and you were nice enough to allow me to go

5    and question the IPRA investigator.  She never did anything.  I

6    gave her all -- she said, "We don't have any sworn statements

7    about what happened."

8            I gave her the sworn statement from my client and

9    every one of the defendants.  She still did nothing.  The FBI

10   got involved, I mentioned to your Honor.  They said, "We'll get

11   you an answer."  She still wouldn't answer.

12           Then finally, as soon as the FBI put some pressure on

13   her, she threw out the whole investigation without ever

14   investigating anyone.

15           THE COURT:  Well, she's not a defendant, though.  So

16   what has that got to do with these guys and what they did or

17   didn't do?

18           MR. DeROSE:  Judge, it's all part of the cover-up --

19           THE COURT:  The cover-up -- there's no *Monell* claim.

20   How did they conspire with the defendants here?  How is the FBI

21   or the IPRA conspire --

22           MR. DeROSE:  He's --

23           THE COURT:  Please, Counsel, wait till I finish my

24   remark before you interrupt.  It makes the transcript

25   incomprehensible.

1          How is what the IPRA or FBI did or didn't do, how is

2     that relevant to these defendants?  What's the connection?

3          MR. DeROSE:  Because, Judge, they can act with

4     impunity, and that's what they're doing.  I'm trying to give a

5     motive for their behavior throughout this.

6          You'll hear some very laughing firefighters making

7     some very offhanded remarks about this entire investigation.

8     Nobody expects, and this is what I would like the Court to

9     allow me to talk to the jury about.  These people are acting

10    the way they are because they don't expect.  No one ever holds

11    them to task on this.

12         THE COURT:  Well, you could ask questions of the

13    defendant certainly in a damages phase when punitives may or

14    may not be relevant about what the defendants might expect.

15         But, again, what is it -- how are you going to get

16    into evidence that there's no FBI investigation?  How do you

17    know that?  Normally they don't tell people who they're

18    investigating, and certainly to the degree there's any grand

19    jury activity, they're prohibited from law from telling anybody

20    what may or may not have occurred.

21         And the fact that the U.S. Attorney's Office does or

22    does not decline, the fact that the State's Attorney's Office

23    does or does not decline, those are different analyses with

24    different standards, different proceedings.  And we're not

25    privy to the analysis that occurred there.

1           And the same thing with IPRA.  IPRA's not looking for

2 constitutional violations; they're looking for rules violations

3 and potential referrals for criminal prosecution.  They're not

4 making an investigation to support or not support a 1983 claim.

5           It seems incredibly confusing for the jury, and I

6 don't even know how you would get it into evidence.  How are

7 you going to get into evidence there's no FBI investigation?

8           MR. DeROSE:  Judge, I don't know that there was no

9 FBI.  I never mentioned that.  I want to talk about no IPRA

10 investigation.  FBI tried to help me get the results of

11 whatever IPRA was doing.

12           THE COURT:  All right.  The Motion No. 4 is going to

13 be granted in part.  I'm not going to permit evidence or

14 argument regarding IPRA or the FBI investigation.  You can't

15 make references to those because those are not relevant to the

16 claims here.

17           However, because I'm granting in part, I'm also

18 denying in part.  If there's a piece of evidence that was also

19 looked at in an investigation or a statement made during an

20 investigation, that may or may not have independence --

21 independent admissibility.

22           So, for example, let's say one of these guys made a

23 prior inconsistent statement in an IPRA investigation.  You

24 wouldn't be able to talk about the IPRA investigation, but

25 you'd be able to talk about the statement that was made under

1     oath: "Well, you've talked about this incident before, didn't

2     you, sir?" "Yeah." "And you were interviewed on such and such

3     a date, and you said such and such a thing."

4     So I'm not excluding evidence from -- that IPRA or FBI

5     might have looked at, but the fact that FBI or IPRA had an

6     investigation or didn't have an investigation, that's excluded

7     because I don't want to confuse the jury. And this is an

8     exclusion under 403.

9     I don't want to confuse the question that's presented

10     to this jury, which is a different question with a different

11     standard and a different set of facts than what IPRA or FBI may

12     or may not have looked at. So that's granted in part and

13     denied in part as articulated in open court.

14     As to No. 5, Defendants' Motion *in Limine* No. 5, to

15     bar any evidence or reference to the recent DOJ investigation

16     and report. Do the parties want to be heard on that?

17     MR. POLICK: Yes, your Honor. I think this goes

18     hand-in-hand with No. 4. Again, it's another investigation

19     that came down maybe two weeks ago. It might have had some

20     relevance if plaintiff's *Monell* claim was still viable, but

21     that claim is no longer viable.

22     What is at issue here is whether the defendants

23     violated Mr. Lopez' right, and they shouldn't be prejudiced

24     with a report that's going to be designed to inflame the jury

25     against police officers in general and take their attention

1    away from the focus, which should be whether any of the

2    11 individual defendants in this case are personally liable to

3    Mr. Lopez.

4              THE COURT:  What's your response, Counsel?

5              MR. DeROSE:  Judge, if you'd just look at page 10 of

6    my response, the very last paragraph, I'd like to read you just

7    two sentences.  It says:  "As discussed throughout this report,

8    this pattern is largely attributable to systematic deficiencies

9    within CPD and the City.  CPD has not provided officers with

10   adequate guidance to understand the how and when they may use

11   force or how to safely and effectively control and resolve

12   encounters."

13             Judge, that's this whole case.

14             THE COURT:  How is it the whole case in the absence of

15   a *Monell* claim?  There's no reference -- there's no specific

16   reference in the DOJ report to these individual defendants,

17   right?

18             MR. DeROSE:  No, Judge, but they have -- they have

19   hundreds of examples in there which sound just like our case,

20   officers saying they were flailing their arms -- they use code

21   words, flailing their arms -- and so the officer had to tase an

22   unarmed person, in one case a 14-year-old girl.  She was

23   flailing her arms, so the officers decided --

24             THE COURT:  So you want to put into evidence and try

25   every instance that was in the DOJ report.  We're going to have

1    a mini trial about what DOJ did or did not look at in that

2    report.

3          MR. DeROSE:  No, Judge, I don't, but I do want to --I

4    do want to --

5          THE COURT:  All right.  Then articulate how it's tied

6    to these defendants.  There's no *Monell* claim pending.

7          MR. DeROSE:  Judge, what I want to show is that they

8    use code words to describe their rather cavalier activity.  And

9    I would like to pick three or four examples out of that report

10   and say this is the kind of stuff that gets report -- gets

11   reported to IPRA, and they never find any of these officers

12   liable for anything.

13         THE COURT:  What's your response, Counsel?  He wants

14   to use references in there regarding code words.

15         MR. POLICK:  Again, my clients are to be judged on

16   what they did here, not what somebody thinks some other group

17   of police officers or police officers in general may or may not

18   have done.

19         We have no idea what that report is based on.  We

20   don't know what specific incidents they looked at.  We don't

21   know who they interviewed.  We don't know what evidence that

22   they looked at.  And all it's being used for is to inflame the

23   jury against the police.

24         My clients have no control over that investigation.

25   And none of them have given statements or been interviewed by

1    the DOJ.  So it's completely irrelevant to the issues that the

2    jury has to decide here, whether the 11 defendants in this case

3    are personally liable to and were personally involved in the

4    deprivation of Mr. Lopez' constitutional rights.

5            THE COURT:  Do you have any evidence that you can

6    proffer that these defendants have used code words in the

7    report writing?

8            MR. DeROSE:  Judge, the code word is "flailing of

9    arms."

10           THE COURT:  No, Counsel, listen carefully.  Listen

11   carefully.  Do you have evidence that these defendants have

12   used code words in previous reports that they've issued?  The

13   DOJ report's out.  There's no *Monell* claim.  So that Motion *in*

14   *Limine* No. 5 is granted.

15           But to the degree you're proffering "I want to cross

16   them on the fact that they're basically putting in a -- making

17   a false report, and one of the ways they do it is code words,"

18   then I'm happy to hear what your proffer of evidence is because

19   that may or may not be relevant.  But that's something totally

20   independent of the DOJ's report.

21           Do you have evidence that these defendants have

22   engaged in a practice where they would use code words to

23   basically manufacture false reports?

24           MR. DeROSE:  Judge, we only have two reports in this

25   case.  We have the words in their depositions.  Their words are

1    exactly as described by all these -- by many of these other

2    officers when they use Tasers on unarmed people.

3          You ask them in their deposition, "Tell me how he was

4    flailing his arms," and they have no explanation.  They come up

5    with some really -- I want to talk about what they're going to

6    say in the courtroom.  And when they use words like "flailing

7    of arms," this is the code words that they've been using for

8    years when they tase people.

9          THE COURT:  You can cross them on what words they use

10   and whether or not there's any factual basis for it.  So if you

11   want to ask them questions about what flailing arms mean and

12   then cross them with their deposition, you go at it.  All

13   right.  That's not encompassed by Motion *in Limine* No. 5.

14         Motion *in Limine* No. 5 relates to the DOJ report, and

15   I'm excluding it under 403 analysis and granting Motion *in*

16   *Limine* No. 5.  But to clarify, Counsel, you can cross them on

17   what they did or did not put in their reports and whether or

18   not you can test their veracity under a 611 inquiry.

19         All right.  Defendants' Motion *in Limine* No. 6, to bar

20   undisclosed witnesses in evidence.  I'm not really sure what

21   that means.  Can someone tell me?  If it's undisclosed, how do

22   you -- what am I supposed to bar?

23         MS. EKL:  Certainly, Judge.  For instance, plaintiff

24   identified three witnesses in their trial witness list, one

25   including the mayor, but then also an FBI agent, Eugene

1   Jackson, and Dr. Melnick, who purportedly, according to the

2   pretrial order, is going to opine or testify regarding some DNA

3   results.

4           Neither of these witnesses were identified during

5   discovery.  Defendants have not been provided anything about

6   these witnesses until the pretrial order.  And so based on

7   Federal Rule of Evidence 37(c)(1), which mandates that if a

8   party fails to disclose a witness or information pursuant to

9   Federal Rule of Evidence 26(a) or (e), we would be seeking to

10  bar that evidence or those witnesses from being introduced at

11  the trial.

12          There were also some of the exhibits that were

13  identified in the pretrial order that even as of the filing of

14  the exhibits, we weren't quite sure what they were because they

15  were not identified by Bates stamp number.  Counsel provided us

16  with exhibit books that we were told mirrored what was given to

17  the Court, but there were no exhibits contained within the

18  book.

19          So to the extent there's something new that we've

20  never been provided before preparing for the pretrial order or

21  even haven't been provided as of today, we would be seeking to

22  have that barred.

23          THE COURT:  What's your response, Counsel?  Let's take

24  it issue by issue.  Special Agent Eugene Jackson, was that

25  person disclosed in the discovery process?

1       MR. DeROSE:  I disclosed him, Judge.  He was also in

2   the moving papers when you gave me permission to take the dep

3   of the IPRA investigator.  He's the FBI agent who got them to

4   give us an answer, which was "We'll close the file."

5       That's all he's there for, Judge.  If he -- if he's

6   going to be needed during the course of the trial, I want them

7   to know everybody that I potentially could use.

8       THE COURT:  Well, in light of the Court's ruling on

9   Defendants' Motion *in Limine* No. 4, do you anticipate calling

10  Special Agent Eugene Jackson?

11      MR. DeROSE:  I don't think so, not -- no, no.

12      THE COURT:  Okay.  Just so you know, he can't testify

13  unless you've complied with the CFRs.  Are you aware of that?

14      MR. DeROSE:  I didn't know that, Judge.

15      THE COURT:  Okay.  An FBI agent cannot be subpoenaed

16  in a civil case unless you comply with the Federal -- the

17  Federal Code of -- Code of Federal Regulations.  And there's a

18  process that is involved.

19      MR. DeROSE:  I'll remember that.

20      THE COURT:  So even if you wanted to testify to him, I

21  doubt you could get him on the stand.  But I don't think it's

22  going to be --

23      MR. DeROSE:  I don't think --

24      THE COURT:  -- at issue at this point.

25      All right.  What about Dr. Melnick?

1    MR. DeROSE:  Judge, from word one, Ms. Gomez had those

2    two little kids at my house who I had to stay home with while

3    he was taken to the -- those are Jose Lopez' kids.  The very

4    first thing I did was get a paternity test done because I knew

5    that his wife has her own interests.

6         They don't like each other, Judge.  You're going to

7    find that out in this courtroom.  But that -- those babies are

8    his children also.  And that's just if the issue comes up about

9    whether or not Nahum and Tais, T-A-I-S, are his children.

10         THE COURT:  Is there any dispute on --

11         MS. EKL:  No, Judge.

12         THE COURT:  -- paternity?

13         MS. EKL:  There is not.

14         THE COURT:  Do the parties want to stipulate right now

15    to the paternity?

16         MS. EKL:  That's fine, Judge, yes.

17         THE COURT:  All right.

18         MR. DeROSE:  I'll be glad -- that saves us one.

19         THE COURT:  All right.  I'll tell you what.  That

20    witness is off your list because right now a stipulation has

21    been entered into, and you can publish it, if needed, during

22    trial at any time.

23         So Counsel's indicated that they're not going to

24    suggest otherwise.  If they do, then the stipulation would go

25    right into evidence.  So it's not at issue.

1    Okay.  So that's the two big issues on Motion *in*

2  *Limine* No. 6.  I'm going to deny Motion *in Limine* No. 6 as

3  moot.  Deny as moot.

4    But I do want the parties to meet and confer regarding

5  any of the exhibits because I know some of the exhibits were

6  kind of spilling in piecemeal.  But hopefully that's sort of

7  settled its way out.  I want the parties to meet and confer

8  regarding each other's exhibits.

9    And if there's any other challenges to something being

10  not disclosed and you want to categorically preclude it as

11  opposed to simply making an objection at trial, they go,

12  "Judge, this is not even a question of admissibility; this is a

13  question of a discovery sanction," or whatever, let me know in

14  the submission of February 3rd, saying, "The parties have met

15  and conferred, and the following two exhibits, defendant is

16  saying that they were not properly disclosed and would ask that

17  they be precluded at trial."

18    That's different than simply making an objection under

19  the Federal Rules of Evidence.  So meet and confer on that.

20  Hopefully there are no issues, but if there are, make sure I've

21  got that, and we can sort that out on selection day, which is

22  another reason not to have the openings on the day of selection

23  because once we have the jury selected, we can sort through any

24  of the issues that remain outstanding between the parties.

25    Okay.  Defendant Motion *in Limine* No. 7.

1      How are you doing on time, Lisa?  Are you okay?  Do

2  you need a break?

3      (Court and court reporter conferring.)

4      THE COURT:  Let's take a quick 10-minute break, and

5  then we'll come back and finish up.  Thank you.

6      (Recess at 3:20 p.m., until 3:28 p.m.)

7      THE COURT:  We're back on the record.

8      Defendant Motion *in Limine* No. 7.  Based on the

9  submissions, can I grant that as agreed?

10     MR. POLICK:  Based on plaintiff's response, Judge, I

11  believe that's the case, that he is going to agree to that.  I

12  understand he wants to reserve it in terms of a punitive

13  damages argument, but the motion was directed that he could not

14  tell the jury to send a message to the City.  So based on

15  plaintiff's response, I think that can be agreed.

16     THE COURT:  All right.  If someone thinks they want to

17  revisit this, as with any of the Court's rulings, you have to

18  do it at sidebar.  But at this point, Motion *in Limine* No. 7

19  will be granted as agreed.

20     Defendant Motion *in Limine* No. 8, what's the position

21  of the parties?  That has to do with the plaintiff from

22  advancing new arguments or asking the jury to consider a

23  specific damage award or range for the first time during

24  rebuttal closing argument.  What's the position of the parties?

25     MS. EKL:  Your Honor, I wasn't clear from plaintiff's

1    response whether he was agreeing or not.  He said that he fully

2    understands what is appropriate rebuttal under existing case

3    law and will be careful not to violate the law.

4            What defendants are specifically seeking to bar is

5    plaintiff getting up in closing argument and making arguments

6    in general, but not asking the jury for a specific dollar

7    amount and waiting until rebuttal to do that.

8            So we would ask that if he's going to ask the jury for

9    a specific dollar amount that he be required to do that in his

10   opening close because it wouldn't be proper rebuttal to do it

11   in rebuttal unless we were to give out a number and then he

12   wanted to counter that.

13           THE COURT:  What's your response to that?  Do you want

14   to give a number?

15           MR. DeROSE:  I don't know what my -- I'll make the

16   final close.  My co-counsel will make the original close.  In

17   this case I wouldn't be surprised that he does come up with a

18   very big number.  But if he doesn't, if he mentions punitive

19   damages and then they respond, well, he's not entitled to any,

20   then I'm going to go -- I'm going to go all out and give them

21   all the damages I think are appropriate.

22           And, Judge, I don't think we should be limited in any

23   way and say I know I can't do rebuttal for damages if they

24   don't raise them in their close.  So if they keep their -- they

25   don't mention damages, I guess I don't because I'm only going

1    to reply to what they actually -- rebut what they actually say.

2    That's what I meant by the law.

3              THE COURT:  Do you have anything other than the West

4    Virginia case?  I mean, I don't understand your theory that

5    it's not rebuttal to put a number on it.  Whatever you're going

6    to say, you're going to say there's no liability.

7              So from a conceptual, theoretical standpoint, a number

8    is rebuttal.  So what's my basis in law for forcing him to put

9    a number in his opening close rather than his rebuttal close?

10             MS. EKL:  Well, it's our position that if we do not

11   give a number to the jury, then it wouldn't be proper rebuttal

12   for him to give a number.

13             THE COURT:  Do you have a case that says that other

14   than the one you cited?

15             MS. EKL:  Not one that we've cited, no, Judge, not

16   either way.

17             THE COURT:  That one's going to be denied.  He can

18   argue the way he wants.  And if it's not proper rebuttal, I'll

19   do that.  But I think he's fully within his power to raise a

20   number for the first time if it's consist -- because he's going

21   to argue the facts that underlie the number in his opening

22   close, and then he's going to respond to what you say, which is

23   the number should be zero because the liability should be zero

24   or whatever.

25             I guess if we have a bifurcated close, liability would

1    have already been decided at that point.  But at that point you

2    would be saying it should be a low number or it should not be

3    punitives; you have zero punitives and just the compensatory

4    or whatever.  So I think a number in response to that would

5    also be rebuttal.

6         So just so you know, he may or may not give a number

7    in his rebuttal close.  So if you want to give a number during

8    yours, that's a choice you've got to make one way or the other.

9         I'm not going to preclude him from doing so because in

10   the absence of some authority from the Seventh Circuit, it says

11   I should.

12        Defendant Motion *in Limine* No. 9.

13        MR. POLICK:  Judge, I would hope that this is probably

14   one that we should be able to work out a stipulation to.  What

15   we're referring to there, there are printouts commonly referred

16   to as event queries that are generated by the Office of

17   Emergency Management and Communication, OEMC.

18        And what we're trying to prevent in the questioning is

19   counsel giving his interpretation of what these acronyms that

20   are used in this printout mean or don't mean.  If he's willing

21   to give us a list about what particular entries that he is

22   interested in and what he believes these acronyms or entries

23   mean, we're certainly open to working out a stipulation to

24   avoid having to call somebody in here to explain it.

25        MR. DeROSE:  Your Honor, we deposed all these people.

1  We know what the acronyms mean.  But since we know it's a

2  finite amount, they're on the event queries.  If they just give

3  me the meaning of those, I'll be careful to always watch that I

4  don't misstate what they are.

5          THE COURT:  Well, you can't testify, period, end of

6  sentence.  You have to either have a witness or a stipulation.

7  So it sounds like the parties should work out a stipulation.

8  And if you could submit that on February 3rd at noon as well,

9  I'm happy to have a stipulation for you.

10          And that's probably the easy way to do it, just have a

11  stipulation this code means this because it's not really in

12  dispute, and that would save an unnecessary witness, obviously.

13          And then once that's in evidence, you can argue the

14  evidence, but you can't testify, obviously.  So I'm going to

15  grant Motion *in Limine* No. 9 because attorneys can't testify.

16  That's just a black-letter statement of the law.

17          And if you want to get in what these code references

18  mean, you need either a stipulation or some comparable

19  evidence -- competent evidence.

20          All right.  Motion *in Limine* -- Defense Motion *in*

21  *Limine* No. 10, to bar reference or argument that City employees

22  are paid to testify or be professional witnesses.  Can I grant

23  that as agreed based on the --

24          MR. DeROSE:  Yes, Judge.

25          THE COURT:  Okay.  Grant as agreed.

1          Motion *in Limine* -- Defendant Motion *in Limine* No. 11,

2     to bar counsel from bringing Jose Lopez into the courtroom,

3     display him to the jury.

4          What's the position of the parties on that?

5          MS. EKL:  Your Honor, I believe from looking at

6     plaintiff's response that he's agreeing, but I wasn't quite

7     sure if he still intends to actually bring Mr. Lopez into the

8     courtroom.

9          My understanding is that Mr. Lopez is not able to

10    communicate.  We've never been given any indication that he's

11    actually going to testify.  And the sole reason they would be

12    bringing him in, if they still intend to do so, would be

13    basically to display him to the jury and have the jury look at

14    him in the condition that he's in to try to evoke sympathy.

15         It would be overwhelmingly prejudicial.  He's not

16    going to be understanding what's going on if he were brought

17    into the courtroom.  So to the extent plaintiff still intends

18    to bring him in, we would be objecting.

19         THE COURT:  What's your position on that, Counsel?  Is

20    he able to observe events and know what's happening?

21         MR. DeROSE:  Yes, Judge.  When -- some of her

22    statements are terribly wrong.  He knows everything that's

23    going on.  He cannot speak.  He can blink his eyes "yes" or

24    "no," and he can understand what you're saying to him.

25         I guess what I need to know -- and, Judge, this is the

1   hard part -- when and if I would ever be allowed to use the

2   day-in-the-life-of film because if he's not -- if I can't use

3   that on the case-in-chief, I think he should have a right to be

4   in here to -- at least on the very important first phase of the

5   case -- so he can by his answering a question, if they want, or

6   just appearing before the jury say, "This is what they did to

7   me."

8           THE COURT:  Hang on a second.  The -- if he can

9   understand what's happening, he is allowed to be here.  He is a

10  party to the case.  I'm not going to preclude him being

11  present.

12          His presence in the courtroom, though, is not

13  evidence.  So absent him taking the stand, his appearance is

14  not something that can be argued.  And if you need a limiting

15  instruction regarding his appearance, then I'll fashion

16  whatever you want.

17          But it's a pretty high standard for you to establish

18  that a party who's the plaintiff in the case can't see what's

19  happening in a courtroom.  Courtrooms are open.  And he has a

20  right to be here because it's his case, and he has a right to

21  see that his case was given a fair adjudication according to

22  the rule of law.

23          His appearance might evoke sympathy, and I'm going to

24  instruct the jury that they are to disregard sympathy.  If he's

25  medically able to be here, he's able to be conscious enough to

1      know what's happening, then he has a right here.

2              If he was comatose and had no brain activity and would

3      not be able to observe things, we'd be in a different boat.

4      But simply because he can't talk or walk doesn't mean he's not

5      a person who is able to observe the proceedings.

6              I don't see how this is connected to the day-in-life

7      at all, though.  So his presence in here or not has nothing to

8      do with the admissibility of that.  So he can be here because

9      he's a party, but that's it.  And if you need to fashion a

10     limiting instruction or whatever you want, go ahead and submit

11     that by February 3rd and I'll take a look at it.  But meet and

12     confer with the other side if you think that's what you want to

13     do.

14             MS. EKL:  Your Honor, I was not in any way trying to

15     mislead the Court.  It was our understanding that he didn't

16     understand and would not be able to comprehend what was going

17     on.  So that was --

18             THE COURT:  Well, he just told me that he can do that,

19     so --

20             MS. EKL:  Okay.

21             THE COURT:  -- that's enough to get him in the door.

22     All right.  So Motion *in Limine* No. 11 is denied.

23             Motion *in Limine* No. 12, Defendant Motion *in Limine*

24     No. 12, any evidence, testimony, argument or reference to

25     impact, effect or loss of relation to any third party as a

1    result of the injuries.

2            Based on the Court's prior rulings, unless there's

3    something else you want to address, I would be granting that

4    because damages to the family are not -- that is not a pending

5    claim.

6            Is there something I'm missing on that, Counsel?

7            MR. DeROSE:  No, Judge.

8            THE COURT:  Okay.

9            MR. DeROSE:  Probably a bad lawyering job on my part,

10   but you didn't call that out.  So maybe you didn't notice it,

11   so I won't mention it.

12           THE COURT:  I'm not sure what you're referring to

13   there.  What are you referring to?

14           MR. DeROSE:  I probably should have put that clause in

15   the complaint.

16           THE COURT:  Oh, okay.  All right.

17           MR. DeROSE:  I messed up.

18           THE COURT:  Okay.  Motion No. -- Defendant Motion *in*

19   *Limine* No. 12 is granted.

20           Motion -- Defendant Motion *in Limine* No. 13, do the

21   parties want to be heard on that?  Can I grant that as agreed?

22           MR. DeROSE:  I never call the City a deep pocket.  I

23   know they're broke as can be, Judge.

24       (Laughter.)

25           THE COURT:  All right.  That will be granted as

1    agreed, with a sigh of depression on behalf of everyone who

2    lives in the City.  Okay.  Granted as agreed.

3         Motion *in Limine* No. 14, can I grant that as agreed as

4    well?

5         MR. DeROSE:  Judge, I don't understand what they're

6    asking.

7         THE COURT:  I don't either.

8         MR. DeROSE:  I never invite anybody to press coverage

9    since Judge Bua took me to task.

10        THE COURT:  You know what?  Actually, you know what?

11   I'm going to deny that as moot because I'm not barring anyone

12   from exercising First Amendment rights.  I'm going to deny that

13   as moot.  But it doesn't sound like counsel intends to engender

14   any publicity.

15        And to the degree anyone thinks there is going to be

16   publicity, which I do not anticipate, we can sort that out

17   during jury selection and make sure people who are on the jury

18   are not exposed to any publicity.  And they'll get numerous

19   instructions not to expose themselves over the course of the

20   case as well.  So I'm going to deny 14 as moot.

21        Defendant Motion *in Limine* No. 15, to bar plaintiff's

22   expert Philip Hayden.  Do the parties want to be heard on that?

23        MR. POLICK:  Yes, your Honor.  The defendants are

24   moving to bar Mr. Hayden from testifying as an expert in this

25   case because we don't believe his opinions or the bases

1  therefor meet the standards under Federal Rule of Evidence 702

2  and *Daubert v. Merrell Dow Pharmaceuticals*.

3          Basically what Mr. Hayden is being brought in here to

4  opine upon is that the officers' acts here were unreasonable

5  and they used excessive force in dealing with Mr. Lopez.  That

6  is basically what the jury is here to decide.  And basically

7  just getting a bottom line or just telling the jury how to

8  decide the case is not helpful to the jury, and it should be

9  barred on that ground.

10         There's simply legal conclusions that have no place in

11  an expert's opinion.  Your Honor's going to instruct the jury

12  as to what the standard is here.  The expert shouldn't get up

13  there and put his opinion on the case and have that imprimatur

14  of the expert to sway the jury that it should be decided the

15  way he sees it.

16         He also indicates in his opinion as a corollary to the

17  fact that the officers used excessive force is that they should

18  have instead contacted mental health professionals to deal with

19  Mr. Lopez.  When asked at deposition who these mental health

20  professionals were or whether they were even available at the

21  time, Mr. Hayden had no knowledge of that.

22         He's not a medical doctor.  He's not a mental health

23  professional.  He's not a psychiatrist.  He's not a

24  psychologist.  So basically his opinion here is -- is nothing

25  more than sheer speculation.  He doesn't hold himself out as

1    having any expertise in the mental health profession, and

2    therefore, because he has no basis for that, that opinion is

3    really not helpful to the jury.

4         And also it's basically telling the jury to look at

5    this in hindsight, and that they're not allowed to do under the

6    law that your Honor will instruct them on.

7         There's other bases for which we believe Mr. Hayden

8    should be barred.  Just the bases for his opinions that the use

9    of force here was excessive, he's using or relying upon

10   International Association of Chiefs of Police training keys or

11   policies.  He's looking at Ninth Circuit cases, and he's also

12   looking at the Supreme Court's decision in *Graham v. Connor*.

13        First of all, we believe he interprets these cases

14   incorrectly.  Reliance on Ninth Circuit cases I also think is

15   misplaced.  The Seventh Circuit had had occasion to address

16   cases in which the police were accused of using excessive force

17   because they used a Taser under certain circumstances.  So

18   those are controlling here, not Ninth Circuit cases.

19        Also, I think the use of the International Association

20   of Chiefs of Police policies, that gets back to the whole

21   training or general orders motion that we argued a bit earlier

22   this afternoon.

23        Again, he's injecting policies and procedures into

24   this case that these defendants are not controlled by, and he's

25   using a different standard that may differ from the standard

1    that your Honor is going to instruct the jury on.  So he's

2    using bases here that are contrary to the law that the jury

3    must decide this case on, and he should be barred for that

4    reason as well.

5           Also, any opinions that he has as to the credibility

6    of the parties should be barred.  I think it's pretty clear

7    that experts are not here to give opinions on the believability

8    or truthfulness of any witness' testimony or their version of

9    the events.  In his opinion, he tried to suggest that, you

10   know, maybe certain officers, particularly Vidljinovic and

11   Guettler, their testimony doesn't match up with or conflicts

12   with other officers' testimony.  That's not for him to opine

13   on.

14          Credibility is the province of the jury, and

15   Mr. Hayden should not be allowed to comment on the credibility

16   or the believability of one officer's version of events over

17   another.

18          He also has opinions on witnesses' and parties' state

19   of mind.  He assumes or opines that Mr. Lopez may have been

20   frightened.  Well, he has no basis for that.  He doesn't know.

21   He's not competent to testify to what Mr. Lopez, his mental

22   state was.

23          And he says with regard to Officers Vidljinovic and

24   Guettler that they were overwhelmed by their own heightened

25   anxiety and this is what caused them to use the force that they

1    did.  Again, he has no basis for that.  And moreover, the

2    officers' subjective intent here is irrelevant.

3          The case is to be decided on objective reasonableness,

4    not the officers' subjective intent.  That's the holding of

5    *Graham v. Connor*, the Supreme Court case dealing with an

6    officer's use of force.

7          He also has some opinions regarding what the officers

8    did prior to actually seizing Mr. Lopez.  I think it undisputed

9    in this case that Mr. Lopez was not seized until the officers

10   used the Taser upon him.  So anything prior to that, any

11   pre-seizure activity, is not governed by the Fourth Amendment

12   and -- because it's not a seizure.  And his opinions regarding

13   whether the officers should have done something different

14   before they seized Mr. Lopez is really irrelevant and should be

15   barred.

16         So for all of those reasons -- and I know there's

17   several of them -- we believe that Mr. Hayden, plaintiff's

18   police procedures expert, should be barred from testifying in

19   this case.

20         THE COURT:  Before I get a response, how was your

21   force expert -- how do you -- Mr. Darrell Ross, I believe.  How

22   do you anticipate his testimony going?

23         MR. POLICK:  I anticipate his testimony being that

24   he's not going to tell the jury whether this is reasonable or

25   not.  That's for them to decide.

1       What Mr. -- or Dr. Ross' testimony would be, specific

2   to the Taser use in this case and why that option was more

3   appropriate than the other options that plaintiff has suggested

4   and injected into this case: namely, going hands-on with

5   Mr. Lopez, using physical force to overpower him, given the

6   sheer number of police personnel on the scene, using pepper

7   spray, using batons, anything but using the Taser.

8       I know Dr. Ross had several opinions when we started

9   this, many of them related to the *Monell* claim which is now

10  dismissed.  We winnowed down his testimony to fit where the

11  case is.  So that would be the synopsis of the proposed

12  testimony.

13      THE COURT:  What's your response, Counsel?

14      MR. DeROSE:  Yes, your Honor.  Your Honor, many of the

15  things counsel raises now are matter of -- can be handled by

16  objections and also are -- what did you say?

17      (Counsel conferring.)

18      MR. DeROSE:  They go to weight rather than the actual

19  admissibility.  But, Judge, Dr. Layton -- Hayden, he's in

20  New -- he's in New Hampshire.  And he has been the use-of-force

21  instructor, director of the FBI training academy for 11 years.

22      He is highly regarded.  He testifies around the world,

23  in our country as a use-of-force expert.  I will not ask him

24  any questions -- those were their questions of him, not mine.

25      My questions will be what is appropriate use of force

1   and when is it not appropriate.  That's all I'm going to stand.

2   I will ask my questions hopefully where they don't incur a lot

3   of objections from the defense.

4           But they never even tried to have a hearing before,

5   your Honor, to see if Dr. Hayden was, in fact, credentialed and

6   qualified to speak about which he testifies.  And his

7   background says he's eminently qualified in this area about the

8   use of force and what is excessive force.

9           THE COURT:  I don't think they're challenging his

10  use-of-force expertise; they're challenging its admissibility

11  under *Daubert*, which is appropriate for the pretrial because

12  that's when I do *Daubert*.

13          The Court's going to rule, grant in part and deny in

14  part Motion *in Limine* No. 15.  But I want -- even though there

15  was no motion from the plaintiff regarding Darrell Ross, I

16  still have a gatekeeper function that I have to perform.  So

17  this ruling applies to both your use-of-force experts on both

18  sides of the aisle.  It's the same marching orders on both

19  sides, so listen up.

20          I am not going to permit the use-of-force experts to

21  testify as to legal opinions, whether or not the force applied

22  by the defendants was excessive, the import or meaning of any

23  specific police procedures or standards or the relative

24  culpability, state of mind or subjective impression of any

25  witness or party in the case.

1          I will, however, allow the experts to testify on the

2     relevant factors to officers when deciding how much and what

3     type of force to apply -- in particular, the factors relevant

4     to the hypothetical uses of force -- without applying them to

5     this case.  That is consistent with controlling Seventh Circuit

6     case law, and that's what our marching orders are going to be.

7          With respect to Defendant Motion *in Limine* No. 16,

8     this has to do with the economics expert.  Do the parties want

9     to be heard on that?

10          MR. POLICK:  Yes, your Honor.  There were two items or

11     areas of damages that we were seeking to bar plaintiff's

12     economist from testifying to.  The one I think your Honor has

13     ruled upon with regard to the damages that relate to the losses

14     of, for lack of a better word, the next of kin: the wife, the

15     girlfriend, the children.

16          Your Honor's made very clear that that is not going to

17     be allowed here, and therefore I believe that that item of

18     damages is now irrelevant to Mr. Smith's testimony and should

19     be barred.

20          The other item that we are looking at is an item of

21     damages called loss of enjoyment in life.  It also goes by the

22     name hedonic damages, and we're seeking to bar that item of

23     damages under Rule 702 and *Daubert* because it is based on an

24     unreliable methodology that will not assist the jury.

25          The majority of Courts that have looked at Dr. Smith's

1  testimony on this issue have concluded that his methodology is

2  not sound, and it doesn't pass muster under Rule 702.  And

3  we're going back now to the Seventh Circuit's opinion in

4  *Mercado v. Ahmed* back in 1992 affirming the district court's

5  decision to exclude Smith's testimony and also Judge Shadur's

6  very thorough opinion in *Ayers v. Robinson* where he analyzes

7  the methodology used and concludes that it doesn't pass muster

8  under *Daubert*.

9          We admit that some Courts have gone the other way, but

10  we believe that the majority of the Courts that have looked at

11  Dr. Smith's methodology regarding the loss of enjoyment of life

12  have found it unreliable and therefore, if it's unreliable, not

13  helpful to the jury and it should be excluded.

14          THE COURT:  What's your response, Counsel?

15          MR. DeROSE:  Your Honor, Judge Cudahy in the Seventh

16  Circuit years earlier not only affirmed Judge Leighton when he

17  allowed Dr. Smith's testimony, but Judge Cudahy said he found

18  the testimony to be enlightening to the jurors.

19          But in any event, Judge, this is something --

20          THE COURT:  That was a pre-*Daubert* case, right?

21          MR. DeROSE:  I believe it might have been.  1988, yes,

22  I believe, Judge.

23          THE COURT:  Yeah, okay.

24          MR. DeROSE:  But Judge Cudahy, he was saying that the

25  jurors could find that useful.  And if the defense wanted, the

1    City wanted to have their own expert, they should have had

2    their own expert to say something different.

3            Now, I don't know where your Honor will come down on

4    this one, but several of your brothers and sisters on the bench

5    have said, "We'll let Dr. Smith testify about this, but we

6    won't let him put a dollar amount on it."  You know, if your

7    Honor wants to put that limitation, I can understand that.  But

8    I want to help this jury, as far as we are able, to arrive at a

9    fair and proper conclusion in the case.

10           And he is not only approved by judges across the

11   country -- I've got a list here that I've just given to your

12   Honor's clerk in Exhibit 115C of over 200 cases where he has

13   testified across the country, federal and state cases where he

14   has been helpful to juries in this situation.

15           THE COURT:  Anything further on behalf of either

16   party?

17           MR. DeROSE:  Not from me, Judge.

18           THE COURT:  On behalf of the defendants, anything

19   else?

20           MR. POLICK:  Again, just going back to the losses for

21   household and family services, again, I think those really

22   pertain to the wife, children and girlfriend.  And your Honor

23   has ruled on that, so I believe those are now irrelevant

24   damages.  Those are not damage that are personal to Mr. Lopez;

25   those are losses suffered by his family and should be excluded.

1      I think the majority of the Courts that have reviewed

2  the methodology to be used with regard to hedonic damages, they

3  found the methodology to be unreliable.  I don't know what

4  Mr. -- or Dr. Smith has testified in some of these other cases.

5  But the methodology itself is unreliable, and it's not helpful

6  to the jury and should be excluded.

7      THE COURT:  All right.  Motion *in Limine* -- Defense

8  Motion *in Limine* No. 16 will be granted.  In light of the

9  issues that are pending, sort of the portion -- significant

10  portion of his proffered testimony is irrelevant -- the damages

11  resulting in loss of household, family services to his spouse

12  and children, for example -- which leaves essentially, in light

13  of the Court's other ruling, leaves the hedonic damages, which

14  based on the proffer and my review of the case law, certainly

15  there's some difference of an opinion.

16      But I think under the facts of this case, I think the

17  plaintiff is going to have an evidentiary basis to get his

18  evidence in and argue it to the jury.  And I don't know that

19  based on what I've seen of the proffer that it would withstand

20  a *Daubert* analysis in terms of the hedonic damages and the

21  methodology and analysis of the proffered expert would be

22  helpful to the jury.

23      They're fully capable of understanding the loss of

24  enjoyment of life.  That's the very kind of thing that juries

25  decide all the time.  So I don't believe it's helpful for the

1    jury, and with the plaintiff having the burden of proof, he can

2    get the evidence in.

3           And most of this testimony here can simply be the

4    subject of the underlying evidence being admitted and then the

5    counsel making effective closing argument, and the jury can

6    figure the rest out.  I don't think the -- I'm going to

7    exercise my discretion and the appropriate -- apply the

8    appropriate standard under *Daubert* and exclude the witness.

9    Motion *in Limine* No. 16 is granted.

10          All right.  Could we go to Motion *in Limine* No. 17.

11   Do you want to be heard on that, Counsel?

12          MR. POLICK:  Yes, your Honor.  Judge, what we're

13   seeking to do here is bar plaintiff from bringing up what are

14   really discovery issues in this case.  There are three areas

15   that we reference here: dash cam video, the audio portion of

16   the 911 call, and the third would be any video from the Taser.

17          I'll start with the Taser first because it's the

18   easiest of the two to explain.  During the course of discovery,

19   Mr. DeRose wanted us to produce any video from the Taser

20   itself.  We did an inspection of the Taser that was used in

21   this case.  There was no video or camera option on that

22   particular Taser.  That option was never used by the Chicago

23   Police Department.  And we, you know, made it clear to him that

24   no such video existed.

25          Similarly with the dash cam, great pains were taken to

1    look at all the cars that were being used by the officers in

2    this case and determine whether or not there was any dash cam

3    video of our incident, and those results came back negative.

4         With regard to the audio from the 911 center, neither

5    side made a request at or near the time of the incident to

6    preserve this once the lawsuit was filed and requests were

7    begin -- began to be made.  It was determined that that

8    particular tape had already been recycled and that no further

9    audio of the actual 911 was available.

10        So these were all matters that were brought up in the

11   discovery phase of the case.  None of this audio or video

12   exists.  And what we're trying to prevent the plaintiff from

13   doing is making these discovery issues focal points in this

14   trial.  The prejudice I think he's going to suggest is that

15   these officers somehow manipulated these things and caused them

16   not to be captured on video or audio, and that's just not the

17   case here.

18        The fact of the matter is we did make a search for all

19   these items, and these -- this audio and video does not exist.

20   If plaintiff had an issue with that, the time to bring it -- to

21   have brought it up would have been during the course of

22   discovery on a motion to compel and ask your Honor at that

23   point.

24        He did not do that.  We assumed he was satisfied with

25   the responses that we gave him.  And they should not become an

1    argument or a focal point of evidence in this particular case.

2            THE COURT:  What's your response, Counsel?

3            MR. DeROSE:  Judge, counsel is a gentleman.  I never

4    once doubted him when he said, "We can't find any."  That's not

5    the issue that we're talking about.  When we talk about the

6    video, there was 24 cars in the 10th District -- there were

7    24 cars in the 10th District that night that all had video

8    cameras on.  One of them was at the scene of my incident.

9            I'm going to question those items -- if your Honor

10   will allow me.  I'm going to question those officers why they

11   didn't preserve any video.  They can tell me, "Oh, we couldn't

12   find any."

13           "Where was your car?  Where was it facing?"

14           You know, this -- this video evidence now is so

15   important in life.  They had a car out there; they didn't

16   record it.  Or if they did record it, they didn't preserve it,

17   and that's even worse.

18           And by the way, Judge, as you may already know, when

19   you turn on your Mars lights to go to a scene, your video

20   camera automatically goes on, and it has to be manually turned

21   off so it doesn't record anything.  We've learned all of that.

22   We wanted to discuss that with them.

23           As far as the --

24           THE COURT:  Well, have you already asked them that in

25   a deposition?

1           MR. DeROSE:  Oh, yes.

2           THE COURT:  What was the answer?

3           MR. DeROSE:  The answer was "Yes, if we turn on our

4      Mars lights, yes, the camera comes on.  And then if we shut it

5      off, we have to tell them why we shut it off.  We have to make

6      a report on that to command."

7           THE COURT:  What was their response to that question?

8           MR. DeROSE:  They have no such record, no such record

9      of him ever reporting that he shut off the video cam.

10          THE COURT:  Well, a duty to preserve or even negligent

11     destruction is not by itself enough to get an adverse inference

12     instruction.  So I'm trying to figure out what the relevance of

13     it would be in the absence of some bad faith.  Did you get a

14     question and answer in deposition establishing that they shut

15     it off in bad faith?

16          MR. DeROSE:  Judge, I'm not asking for an adverse

17     inference.

18          THE COURT:  Well, you're arguing --

19          MR. DeROSE:  I am only --

20          THE COURT:  Hang on a second.  Hang on a second.  Hang

21     on.  And I'm sorry -- sorry to interrupt, but sometimes I have

22     to.

23          But you're going to argue that.  You're going to argue

24     where's the recording.  And you have the burden of proof; they

25     don't.  So you're basically arguing an adverse inference

1    instruction:  "Guess what, ladies and gentlemen.  You know, the

2    reason that there's no video, because it would have shown X, Y

3    and Z for me."  That's the only --

4           MR. DeROSE:  I'm not going to argue about that.

5           THE COURT:  Well, then what's the relevance if you're

6    not going to argue that?

7           MR. DeROSE:  I'm going to -- I'm going to ask him,

8    "Did you turn on your Mars lights?"  We know they all did

9    because they all came running when the officer said, "I need a

10    Taser here on the scene."

11           So the other -- the next group that comes, they come

12    with their Mars equipment on.  They preserve nothing.  And I am

13    going to argue, if your Honor will allow me, that this is more

14    of the cover-up by these individual officers on the scene.

15           THE COURT:  That's an adverse inference that you're

16    trying to draw.  You're trying to say the reason there's no

17    video is because they did a cover-up.  That's an adverse

18    inference.

19           MR. DeROSE:  But I can argue it, can't I, Judge?

20           THE COURT:  You can if you have the appropriate basis,

21    but you need bad faith.  You can't just do duty to record and

22    even negligent destruction.  You have to have more of a basis,

23    which is why I'm asking what the questions and answers were in

24    the deposition, to see whether or not you can establish the

25    bad-faith predicate to make that argument.

1        Because if you can, all of those questions and answers

2   are relevant and admissible.  But if you can't show bad faith,

3   negligent destruction is not enough for the inference.  You can

4   ask them what happened, but you can't get into the ins and outs

5   of the video in the absence of some bad-faith predicate.

6        So did they tell you that they affirmatively shut it

7   off?  What was the answer to the question?  Because it sounds

8   like you were on it and you asked them.  What did they say?

9        MR. DeROSE:  Judge, I don't remember his exact -- they

10  don't remember if they had their video on or not is what I

11  remember them saying.  What I do remember them saying is "We

12  don't even know which way our car was pointing.  So we don't

13  know if we were limited to that 45 percent in front of our

14  squad or not.  I don't know which street I was on with my car.

15  I don't know if my car was pointing where the man got tased or

16  not."  Those kind of answers I got.

17       And, Judge, what I'm trying to say is I want to be

18  able to argue the inference that this is the ostrich defense:

19  "Look the other way.  We know nothing.  Don't preserve anything

20  you don't have to."

21       I gave --

22       THE COURT:  Oh, I understand the inference you want to

23  draw.  I'm just trying to figure out if you have enough

24  inconsistent with the -- the showing that's required for it.

25       I'm going to grant Defendant Motion *in Limine* No. 17

1   without prejudice.  If you can establish a good-faith basis

2   that there was bad faith in the destruction or the failure to

3   take the video, then I'm going to allow questions and answers

4   regarding it.

5           But until I see some showing of bad faith -- and if

6   you can point me to something in discovery and submit it by

7   February 3rd, I'll take a look at it, and I will reverse my

8   ruling.

9           But you need to have a showing.  Simply having a duty

10  to record it and even negligent destruction of it is not enough

11  for the adverse inference, which is what you're asking for.

12  You're asking to argue it that way whether you get an

13  instruction or not on it.

14          So you need to have a basis for that argument.  And if

15  you've got it, I'm happy to let you make it, but I need to see

16  something.  So go ahead and take a look at the discovery, but

17  at this point Defendants' Motion *in Limine* No. 17 is granted

18  without prejudice.

19          Do the parties want to be heard on the Defendant

20  Motion *in Limine* No. 18 regarding the day-in-the-life video?

21          MS. EKL:  Yes, your Honor.

22          THE COURT:  Okay.

23          MS. EKL:  Your Honor, we seek to bar what plaintiff

24  has called the video in the life of Jose Lopez.  He describes

25  it in his response as simply focusing on a typical day when

1    members of his family visit with him at GlenCrest Healthcare

2    and Rehabilitation Center.

3              We disagree with that characterization and seek to --

4    move to bar this particular video both on its relevance as well

5    as its extreme prejudice.  First off, the video itself is

6    18 and a half minutes long.  It contains music, which evokes

7    sympathy -- and I'm sure that that was the -- in the intended

8    purpose -- but to the extreme prejudice of the defendants in

9    this case.

10             There are a number of things within the video that are

11   not relevant to this case.  It focuses in on some of the

12   machines related to plaintiff as he's laying in the bed.  The

13   first three and 15 seconds -- three minutes and 15 seconds of

14   this video is basically a montage of Mr. Lopez with various

15   family members.  I believe it's the family members and the

16   children that he has with his wife.

17             A number of the photos are repetitive.  But it goes on

18   for three -- over three minutes.  A lot of the photos appear to

19   be from when the children were a very young age and so

20   therefore do not seem to be very relevant to this recent time

21   period or the time period leading up to the incident.

22             After those photos are displayed for over three

23   minutes, there's one full minute of approximately five photos

24   that are just shown over and over of a particular point in time

25   when Mr. Lopez is shown in his bed in between two surgeries

1    when a portion of his head -- his skull was depressed.  These

2    are extremely inflammatory and prejudicial.

3           All of the photographs have also been identified

4    separately by plaintiff as exhibits, but he intends to play

5    them for a full minute with this music playing and the photos

6    flipping before the jury.

7           There are portions of the video that contain

8    statements by his wife in Spanish, and I'm not even quite sure

9    what those statements are or if some of the jurors will

10   understand them.  There are statements by his daughter, such

11   as, "I know it hurts, but you have to keep going."  There's no

12   foundation for whether or not she knows that what they're doing

13   to him hurts.  I think those are gratuitous statements made

14   specifically so that the jury would believe that he was in

15   pain.

16          They also show Mr. Lopez on a ventilator.  It's my

17   understanding that his condition has improved and that he's no

18   longer on a ventilator.  In fact, today they were talking about

19   him being able to come here and understand what's going on.  So

20   it doesn't show what Mr. Lopez' life is like today if that's

21   the case.

22          So for those reasons, it wouldn't be relevant.  For

23   the obvious reasons -- the music, the displaying of Mr. Lopez

24   for 18 and a half minutes -- it would be extremely prejudicial

25   to defendants.

1      They're going to hear testimony from during the --

2  during the second phase of the case in relation -- from doctors

3  about his condition.  He has identified his girlfriend and his

4  wife, as well as all of his children, as potential witnesses

5  who I anticipate will come and testify about his condition.  So

6  it will be cumulative in that respect.

7      For all those reasons, Judge, we'd ask that you bar

8  this video.

9      THE COURT:  What's your response, Counsel?

10     MR. DeROSE:  Judge, I'm sorry he's in the condition he

11 is in.  I'm very sorry of it.  But that's what we all have to

12 deal with.  And any prejudicial effect of that is not of our

13 doing.

14     And, secondly, Judge, Mr. Lopez goes in and out of the

15 need for a ventilator.  Last I heard, he didn't need a

16 ventilator.  He could breathe on his own.  But I don't know.  I

17 might not be able to bring him in to his own trial because of

18 his condition at the time.

19     That video shows him as we pictured him on that day.

20 If your Honor wants me to cut out things that you think are

21 prejudicial, I'll cut them out.  I've got my videographer

22 standing by to cut out anything you say shouldn't be in there.

23 But the jury's got to see him somewhere, somehow.  This is his

24 case.

25     THE COURT:  I have not had an opportunity to review it

1    because I was on trial, so I'm going to take Motion *in Limine*

2    No. 18 under advisement.  Regardless of the ruling on it,

3    though, you should have pictures ready as well in addition to

4    whatever else is happening.  So --

5              MR. DeROSE:  Judge, I didn't hear you.  I should have?

6              THE COURT:  The photographs.  Make sure you have those

7    lined up.  And before any of those are published, we should

8    take a look at those in terms of a 403 analysis to make sure

9    that if there's any disagreement about which ones those

10   might -- may or may not be admissible, I want to make sure that

11   we talk about that before anything's shown.

12             But in terms of the video itself, I actually have to

13   view the video.  And I believe it's on You Tube now, right?

14             MR. DeROSE:  Judge, I gave it to your clerk.  I didn't

15   know it was, but it is.

16             THE COURT:  Well, my understanding is it's on You Tube

17   for some reason; is that correct?

18             MR. DeROSE:  That's how it was sent to me by the

19   videographer.

20             THE COURT:  Is that a private You Tube site?

21             MR. CARONE:  It's private.

22             THE COURT:  Okay.  Okay.  All right.  Well, I'm

23   relieved that it's private.  I'll be able to look at it.  I

24   just didn't have enough time because I was on trial.

25             MR. DeROSE:  And, Judge, you have all the photographs

1    I propose to use of evidence in your book of exhibits.

2              THE COURT:  And there's some objections to some of

3    those, so --

4              MS. EKL:  There is.

5              THE COURT:  Yes, so don't publish those until we

6    figure out which ones are in or out or whatever 403 arguments

7    people want to make.

8              All right.  But until I review the day-in-the-life

9    video, Motion *in Limine* No. 18 is taken under advisement.  I'll

10   rule in minute -- in a written order from today because I'll

11   have an opportunity because my jury came back today, so I'll be

12   able to watch that tonight and get it out in the order

13   tomorrow.

14             Are there any other motions *in limine* that I have not

15   referred -- or the only other, I think there's a motion to

16   compel testimony from the mayor, which based on the Court's

17   motions *in limine*, that will be denied, which is Docket

18   Entry 159.  In the absence of a proffer of relevant admissible

19   testimony, I'm not going to grant a motion to compel.

20             Any other motions *in limine* I did not address?  I

21   think I got -- my notes say I did everything.

22             MS. EKL:  I think you did, Judge.

23             THE COURT:  Okay.

24             MR. POLICK:  Yes.

25             THE COURT:  Anything --

1          MR. POLICK:  The contested ones, your Honor.  There

2     were -- the parties did agree to some, and we've made that part

3     of the final pretrial order.  There was a section there that

4     set forth as a result of our meet-and-confer certain things

5     that we agreed that --

6          THE COURT:  Do you want me to go through those?  I've

7     got the agreed list.  Do you want me to do that?

8          The parties should take a look at the website

9     regarding the questions I ask in jury selection.  As you can

10    tell from my protocol, I do the initial questioning, and then

11    the parties each have 15 minutes to each panel.

12         The questions the parties proposed, let me talk about

13    those as well.

14         The agreed motions *in limine*, the first one is to bar

15    any reference or mention to the jury any argument.  That one I

16    already addressed.

17         No. 2 I addressed.

18         No. 3 I addressed.

19         I don't know if I addressed No. 4.

20         MR. DeROSE:  I forget whether you --

21         THE COURT:  No. 4 is -- and this is on page 91 of

22    Docket Entry 616, which is the proposed pretrial order -- not

23    to mention or reference any parties' trial preparation with

24    their attorneys.  I know it's agreed, but I'm going to deny

25    that.

1    You're allowed to say that people met with people in

2  advance, and there's an instruction saying that's totally

3  proper.  But if someone wants to ask, "Did you meet with the

4  attorneys?" feel free to do so.  But there's not -- I'm not

5  going to draw any sinister inference from it because that's

6  just good lawyering.  And the jury's going to get an

7  instruction on that either way.  So I'm not going to -- I'm not

8  going to enter that motion.

9    1, 2 and 3 I've already ruled on.  So No. 4 is denied.

10    5 is plaintiff will not argue that defendants were not

11  diligent or failed to meet their discovery obligations.  That

12  one -- I don't know if I have addressed that one, but that

13  one's going to be granted.  Discovery obligations are not for

14  the jury.  That's something if there is a problem, you go to

15  sidebar and take it up in the due course.

16    No. 6, to bar evidence or argument of other lawsuits

17  or other citizens' complaints against defendant or any

18  non-party witness.  I have not addressed that, so I'm going to

19  grant that one, No. 6.

20    Agreed No. 7, to bar any evidence, argument or

21  reference to the *Monell* claims that have been dismissed.  That

22  will be granted as agreed.

23    All of these are -- to the degree -- to the degree any

24  of these are being granted, they're being granted as agreed

25  because they're agreed motions.

1    No. 8, to bar -- Agreed Motion No. 8, to bar any

2  evidence, argument or reference to plaintiff's claim against --

3  that was resolved on summary judgment.  That one's granted.

4    No. 9 is going to be granted as agreed, which is

5  barring reference to defense counsel as City attorneys.  Just

6  call them defense counsel.  That's fine.

7    No. 10, to bar any -- Agreed 10, to bar any evidence,

8  argument or reference to any party or witnesses, religious

9  beliefs or opinions to attack their party -- that party's

10  credibility.  That will be granted as agreed.

11    And No. 11, to bar any reference to the Taser as a gun

12  or a Taser gun.  If that's what the parties want, I'll grant

13  that one as agreed as well.

14    That is the -- so I think that covers all the motions

15  *in limine* now, right?

16    MR. POLICK:  Yes, your Honor.

17    THE COURT:  Okay, great.

18    With respect to the questions, the phrase -- and

19  several of these questions I don't think you're going to be

20  getting into based on the motions *in limine*, so I don't think I

21  have to address the -- the propriety of the proposed questions.

22  Parties can object to the questioning by the attorneys if they

23  want.  I allow the attorneys to ask questions, and if they're

24  in the proper format, I'll allow them.  If they're not in the

25  proper format, I will *sua sponte* object to them myself.

1          Normally the main issue comes up with the form of the

2     question, and as long as you tie it to their qualifications as

3     a juror or to explore an area that goes to the qualifications

4     of a juror, then you're going to be fine.

5          If you're trying to introduce facts and indoctrinate

6     the jury, that's obviously going to be a no-no.  So if you

7     frame your question "Would that prevent you from being a fair

8     and impartial juror?" then usually you're not going to get an

9     objection from me if that's what you're directing yourself to.

10         So look at the phrasing of your questions and make

11    sure you're directing them to the relevant inquiry, which is

12    their ability to be a fair and impartial juror.  Beyond that, I

13    don't think I need to get into the specifics.

14         MR. DeROSE:  Can we ask your Honor -- can we ask your

15    Honor to follow up on your questions?  If we get an answer, can

16    we go to sidebar and say, "Judge, will you follow up on that

17    because they said this"?

18         THE COURT:  Well, you need to take a look at my

19    protocol because I let the lawyers ask questions, unlike

20    everybody else.

21         So what happens is -- I'll give you the Cliff Note

22    version, but then you've got to read on -- you've got the

23    written version.  I'll put the whole venire in the room, two

24    panels of 14, so 28 people are in the room.  I'll do the

25    general questions about "Do you know any of the witnesses?"

1    Everyone gets to introduce themselves, all that.

2          Then the second panel goes downstairs so they can have

3    coffee and not listen to what the questioning.  The panel of

4    14, the entire jury box, I asked from the very generic

5    questions that everybody asks anyway.  I go through all of

6    those.

7          And then you get 15 minutes for that panel of 14, and

8    then you get 15 minutes for that panel of 14.  I actually time

9    it, so it's a hard 15.  Most lawyers never use all of it, which

10   is amazing because in state court, people go on forever about

11   it.  But they're just not used to doing it in this building,

12   and then they freeze up, I guess.  I'm kidding.

13         But they -- but if there's a lot of objections, I'll

14   do kind of what's the soccer rule:  I'll give you extra time if

15   they're, you know, running your clock long.  That's never come

16   up either.

17         Then once both you have questioned and I've

18   questioned, then we go sidebar, and I go, "All right.  Based on

19   all the questions, does anyone have anything else they want to

20   ask?"

21         And then you go, "Well, Judge, could you follow up on

22   that one thing?"

23         Then I'll ask questions until we get to the point

24   where everyone's exhausted in terms of questioning.

25         Then I excuse them to my jury room.  We do the

peremptories and the challenges for cause as to that whole box.
There's no backstriking.  Once we deal with that 14, we're done
with them.  Then I bring them back in.  And whether it was for
cause or peremptory, they never know.  I'll excuse those
people.  And the people left in the box, I say, "Come back
tomorrow.  You're my jury."  And then I won't swear them until
tomorrow.

          And then we bring up the second 14, do the same thing.

          And then if we get 12, which normally I can with a
panel of 14 because you're both getting three peremptory
strikes -- you get three; you get three -- then we usually can
get 12.  If we can't get 12, as I indicated at the beginning of
the pretrial conference, then we can -- I'll ask:  "Well, we've
got 10.  We've got 11.  Do you guys want to go with that?"  And
absent an objection, that's what we'll do.

          But if you guys object and you want another panel,
that will push the trial back a day.  And I'll bring -- because
I will only order up two panels of 14.  Okay?

          MR. DeROSE:  All right, Judge.

          THE COURT:  So you get to ask questions.  You'll have
more time than you need.

          But just direct the questions to their qualifications
as a juror.  Don't try to indoctrinate or anything like that.

          MR. DeROSE:  Very rusty on that, Judge.  It's been a
few years.

1        THE COURT:  I have every confidence in you, Counsel.

2        Okay.  Anything I've forgotten to address?

3        MR. POLICK:  Just a couple of logistical questions,

4   your Honor.

5        THE COURT:  Yeah.

6        MR. POLICK:  We obviously have a lot of defendants.

7   Would we be permitted to use the extra table here to --

8        THE COURT:  Absolutely.

9        MR. POLICK:  -- sit our people?  I don't think we're

10  all going to fit at one table.

11       THE COURT:  No, absolutely.  I assumed you'd be doing

12  that.  And if you need another table, let me know.

13       MR. POLICK:  Okay.  I think --

14       THE COURT:  I'll give you another table.  The people,

15  I won't force them to the -- to those other things.  I can get

16  another table and chairs in if you need.

17       MR. DeROSE:  Judge, can we bring our boxes of evidence

18  in on Friday so Monday I can look pretty when I arrive?

19       THE COURT:  Yes, you can.  You have to make

20  arrangements with Gloria.  Don't put anything valuable in it

21  like a laptop because I can't -- we're not creating a bailment

22  here.  So if -- but no one's going to mess with your boxes.

23  You can put them on the front bench if that's convenient.

24       The only thing is you want to make sure that you're

25  not creating a sightline problem or creating a problem for when

1    the jurors walk because I put -- during jury selection, the

2    gallery to that side is going to have jurors in it.  So if

3    you're going to have boxes, you want to put them on that side

4    for jury selection.

5              MR. DeROSE:  Can we put them in the cloakroom, Judge?

6              THE COURT:  No, no.

7              MR. DeROSE:  Can we just -- could we put three -- I

8    think we've got three or four boxes.  I'm not going to bring

9    all of them.

10             THE COURT:  All right.  Then just put them all the way

11   to the side of the wall so we have room for the jurors to sit

12   during selection because the jurors sit in those -- that part

13   of the gallery.  It's kind of the -- that side, my right.

14             MR. POLICK:  We're just trying to envision our

15   headcount here and whether we're going to need another table.

16             THE COURT:  Well, decide and let my courtroom deputy

17   know with enough notice because we would have to find it.  And,

18   you know, unfortunately, I can't just ask my clerks to move

19   furniture because that's apparently a union job.  So I've asked

20   them to move that in the past, and they got in trouble.  So --

21   and I had to fall on my sword, saying that I ordered them to

22   get me a table, and then it was a big issue.

23             He's smiling.  So but let me know with enough advance

24   that I can have somebody bring another table in if you want.

25             MR. POLICK:  Okay.

1          Just in terms of your courtroom ground rules, are we

2    confined to the podium, or are we allowed to --

3          THE COURT:  No.  You can wander all you want, but you

4    have to be heard.  So that means you either wear a body mic, or

5    you keep your voice up.  If you don't do either, then I'll tie

6    you to the -- to your -- to the podium.

7          MR. POLICK:  Okay.  Is it all right, if one attorney

8    is up there, if another attorney approaches the podium to hand

9    a note or --

10          THE COURT:  That's totally fine.

11          MR. POLICK:  Okay.

12          THE COURT:  Totally fine.

13          MR. POLICK:  And I assume --

14          THE COURT:  And sometimes one person has one person

15    working the laptop and then the other person is there.  That's

16    up to you guys, too.

17          MR. POLICK:  Okay.  I'm just going down this list

18    because some of your colleagues here have very strict rules

19    about some of this stuff.  I'm assuming get the Court's

20    permission before we approach a witness.

21          THE COURT:  Yeah, sure.  I always say yes.

22          MR. POLICK:  Okay.

23          THE COURT:  I don't think I've ever said no on that.

24          MR. POLICK:  Okay.  I think that about covers it for

25    that.

1    THE COURT:  And then you -- obviously, it doesn't

2    apply to you, sir.  But generally if you're talking, you need

3    to stand up because the court reporter needs to know who's

4    talking.  She'll get more familiar with your voices as we go,

5    but if someone's just sitting and talking, she's not going to

6    be able to catch who it is.  So just get in the habit of

7    standing when you -- when you're speaking, you're standing.

8    Okay.  All right.  Well, have a great weekend.  I look

9    forward to whatever you're going to send me on the 3rd at noon,

10   and I will see you for -- how much -- it's not next week; it's

11   the week after, right?

12   MR. POLICK:  Right, the 6th.

13   THE COURT:  Yeah, the 6th.

14   All right.  Great.  Thank you, Counsel.

15   MR. POLICK:  Thank you, your Honor.

16   MS. EKL:  Thank you, your Honor.

17   MR. DeROSE:  Thank you, your Honor.

18   (Concluded at 4:25 p.m.)

19                    C E R T I F I C A T E

20   I certify that the foregoing is a correct transcript of the

21   record of proceedings in the above-entitled matter.

22

23   */s/ LISA H. BREITER*                        *February 3, 2017*
     LISA H. BREITER, CSR, RMR, CRR

24   Official Court Reporter

25